Andrew Friedman (*pro hac vice*)
Geoffrey Graber (SBN 211547)
Eric Kafka (*pro hac vice*)
Julia Horwitz (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 2000
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com
jhorwitz@cohenmilstein.com

*Counsel for Plaintiffs and Proposed
Class*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Danielle A. Singer, Project Therapy, LLC (d/b/a Therapy Threads), Holly Dean, EE Digital LLC, and DZ Reserve, individually and on behalf of others similarly situated,<br><br>             Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>             Defendant. | Case No.: 3:18-cv-04978<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs Danielle A. Singer, Project Therapy, LLC (d/b/a Therapy Threads), Holly Dean, EE Digital LLC, and DZ Reserve, individually and on behalf all others similarly situated, hereby file suit against Facebook, Inc., and allege the following:

**INTRODUCTION**

1.      Facebook, Inc. ("Facebook") is a social media company that "generate[s] substantially all of [its] revenue from advertising."[1] In 2017, Facebook earned approximately $40 billion from advertising revenue.[2]

2.      The core of Facebook's business is its large purported user base, which ostensibly enables advertisements placed on Facebook.com to reach a large number of people. Facebook claims to have 2.13 billion monthly active users globally, with over 240 million monthly active users in the U.S. alone.[3]

3.      Before advertisers make a purchase, Facebook represents that their advertisements can potentially reach a specified number of people ("Potential Reach"). Facebook defines "potential reach" as "an estimation of how many people are in an ad set's target audience."[4] Depending on the demographic targeting selected by the advertiser, the Potential Reach is often millions of people. Facebook also represents that the advertisement will reach an estimated number of people per day ("Estimated Daily Reach").  The Estimated Daily Reach is based, in part, on the audience size or Potential Reach. According to Facebook, Estimated Daily Reach "gives you an idea of how many of the people in your target audience [or Potential Reach] you may be able to reach on a given day."[5]

4.      These foundational representations are false. Based on publicly available research and Plaintiffs' own analysis, Facebook overstates the Potential Reach of its advertisements. For example,

---

[1] Facebook, Inc., Annual Report (Form 10-K) for 2017 Fiscal Year, at 41 (Feb. 1, 2018).

[2] *Id.*, at 43 (Feb. 1, 2018).

[3] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018)

[4] *See "About potential Reach"*, available at https://www.facebook.com/adsmanager/creation

[5] *See What are "Potential Reach" and "Estimated Daily Reach?"*, available at https://www.facebook.com/business/help/717368264947302/?ref=u2u (last accessed August 1, 2018)

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

based on publicly available data, Facebook's purported Potential Reach among the key 18-34 year-old demographic in every state exceeds the actual population of 18-34 year-olds.  Based on a combination of publicly available research and Plaintiffs' own analysis, among 18-34-year-olds in Chicago, for example, Facebook asserted its Potential Reach was approximately 4 times (400%) higher than the number of real 18-34 year-olds with Facebook accounts in Chicago.  Based on a combination of publicly available research and Plaintiffs' own analysis, Facebook's asserted Potential Reach in Kansas City was approximately 200% higher than the number of actual 18-54 year-olds with Facebook accounts in Kansas City.  This inflation is apparent in other age categories as well.

5.     Facebook's own former employees have confirmed the problem. For example, a former Facebook employee who worked in the infrastructure/mapping team, (Confidential Witness 1), stated that those who were responsible for ensuring the accuracy of the Potential Reach at Facebook were indifferent to the actual numbers and in fact "did not give a sh--."  This former employee further stated that the" Potential Reach" statistic is "like a made-up PR number."  Another former Facebook employee (Confidential Witness 2), stated that Facebook does not care about the accuracy of information related to the number of users so long as advertising revenue is not negatively affected. And a third former Facebook employee (Confidential Witness 3), stated that Facebook was not concerned with stopping duplicate or fake accounts in calculating Potential Reach.

6.     Because Facebook has inflated its Potential Reach, Plaintiffs and putative class members purchased more advertisements from Facebook and paid a higher price for advertisements than they otherwise would have. Plaintiffs and putative class members accordingly seek compensation and injunctive relief for violations of California's Unfair Competition Law, breach of contract, and for restitution.

## **JURISDICTION**

7.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class of Plaintiffs is a citizen of a state different from a Defendant.

8.      This Court has personal jurisdiction over Defendant Facebook, Inc., because Facebook, Inc., is headquartered in California, and conducts business in the state of California.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from this District. Venue is also proper because Facebook's terms of service require that claims be resolved "exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County…."[6]

## PARTIES

10.     Plaintiff Danielle Singer is a citizen and resident of the state of Kansas. Plaintiff owns and operates a business, Project Therapy, LLC, under the trade name Therapy Threads in the state of Kansas. The primary business activity of Therapy Threads is the selling of aromatherapy fashionwear, sold online through the United States.

11.     Plaintiff Project Therapy, LLC is a limited liability company registered to do business in the state of Kansas.

12.     Plaintiff Holly Dean is a citizen and resident of the state of Florida.

13.     Plaintiff EE Digital LLC is a company incorporated and headquartered in the state of California.

14.     Plaintiff DZ Reserve is a company incorporated and headquartered in the state of Colorado.

15.     Defendant Facebook, Inc., is incorporated in Delaware, and its principal place of business is 1 Hacker Way, Menlo Park, CA 94025.

## FACTUAL ALLEGATIONS

16.     Facebook is one of the largest social media companies in the world. It owns and operates Facebook.com, as well as Instagram and the WhatsApp Messenger service.

17.     In 2017, Facebook saw its revenues from online advertisements reach approximately

---

[6] Facebook, *Statement of Rights and Responsibilities*, https://www.facebook.com/terms (last accessed: Jan. 9, 2017).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

$40 billion.[7]

18.    In marketing its online advertisement services, Facebook claims that more than 2 billion people use Facebook every month.[8] Additionally, in its Ads Manager, Facebook has claimed that 240 million of those active users are located in the United States.[9]

19.    Facebook defines a Monthly Active User (MAU) as a "registered Facebook user who logged in and visited Facebook through [Facebook's] website or a mobile device, or used [Facebook's] Messenger application (and is also a registered Facebook user), in the last 30 days as of the date of measurement. MAUs are a measure of the size of our global active user community."[10]

20.    Audience size is an important factor when advertisers determine where to spend marketing dollars.  Indeed, Potential Reach and Estimated Daily Reach are the only information Facebook provides to advertisers regarding the anticipated performance of the ad campaign prior purchasing an advertisement.  Moreover, user inflation can skew an advertiser's decision making, which is frequently based on the anticipated reach of the advertising campaign, or "Potential Reach."[11]

21.    Reach inflation can have "real consequences for an advertiser's overall communications plain."[12] For advertisers, "Facebook Ads Manager functions as a tool for an advertiser to plan, budget, buy and optimize their own campaigns across Facebook platforms."[13]

22.    Facebook's large purported potential reach is widely acknowledged as one of the main reasons that advertisers choose to purchase advertisements from Facebook.

23.    For example, an online advertising commentator recently noted that the large number

---

[7] Facebook, Inc., Annual Report (Form 10-K) for 2017 Fiscal Year, at 41 (Feb. 1, 2018), at 43.

[8] Facebook, Inc., Annual Report (Form 10-K) for 2017 Fiscal Year, at 41 (Feb. 1, 2018), at 34.

[9] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018).

[10] *Id.* at 36

[11] "Facebook Audience Inflation a Global Issue-Ad News Study", AdNews (September 8, 2017) available at http://www.adnews.com.au/news/facebook-audience-inflation-a-global-issue-adnews-study (visited July 16, 2018).

[12] Video Advertising Bureau, "Facebook's Reach (on Reach), Miscalculations in the Age of Precision", p. 19, September 2017, available at https://www.thevab.com/wp-content/uploads/2017/09/Facebooks-Reach.pdf (accessed August 6, 2018).

[13] *Id.*

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

of people that can potentially be reached on Facebook is one of the four "reasons why you can't ignore Facebook advertising."[14]

24.    Similarly, Aleksandar Radonjic, the Founder and Chief Growth Strategist at Evolving Digital (a digital marketing agency) explained in his blog post, "Why Facebook Has To Be Included in Your Marketing Plan" that "big brands understand the value of Facebook and are actively engaged with their customers. Small and medium-sized organizations have to do the same, even if you are a small local business *because the potential reach is unmatched by any other social media platform*." (emphasis added).[15]

25.    Moreover, Facebook itself encourages advertisers to refer to the Potential Reach after they have started an advertising campaign to determine the percentage of their target audience that they have reached.[16]

I.    **Facebook's Representations to Advertisers**

26.    In describing the advantages of advertising on its website, Facebook tells advertisers that "[t]wo billion people use Facebook every month."[17]

27.    Facebook touts the reach of its platform, telling advertisers "Show your ads to more people in more places. Improve your reach by running your ads across Facebook, Instagram, and Audience Network."[18]

28.    Facebook makes these representations when advertisers purchase advertisements from Facebook, which they do through Facebook's "Ads Manager."

29.    The terms on the "Ads Manager" are part of Facebook's contract with advertisers.

30.    The "Ads Manager" provides only two data points related to audience size, "Potential

---

[14] "4 Reasons Why You Can't Ignore Facebook Advertising," InstaPage (September 10, 2018) https://instapage.com/blog/4-reasons-facebook-advertising-cant-be-ignored (last accessed December 19, 2018).

[15] "Why Facebook Has to Be Included in Your Marketing Plan," Aleksandar Radonjic, http://www.evolving-digital.com/resources/Facebook-Marketing (last accessed December 19, 2018).

[16] https://www.facebook.com/business/help/1639908612985580 (last accessed December 19, 2018).

[17] Quoted from https://www.facebook.com/business/products/ads (accessed August 13, 2018).

[18] *Id.*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Reach" and "Estimated Daily Results Reach." The Estimated Daily Results Reach is derived in part from the Potential Reach audience size. Facebook's Estimated Daily Reach "gives you an idea of how many of the people in your target audience [or Potential Reach] you may be able to reach on a given day."[19]

31.     The Potential Reach and the Estimated Daily Results Reach are part of Facebook's contract with advertisers.

32.     On the "Ads Manager," advertisers can target their advertisement to users of different demographics. *See* Figure 1. Using the demographic criteria on "Ads Manager," advertisers can target people in various locations, age ranges, or genders.

***Figure 1***



33.     Regardless of the demographic criteria used to target the advertisements, the "Ads Manger" shows a graphic with the audience size based on the criteria that advertisers selected. *See* Figure 2.

---

[19] *See What are "Potential Reach" and "Estimated Daily Reach?"*, available at https://www.facebook.com/business/help/717368264947302/?ref=u2u (last accessed August 1, 2018)

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

*Figure 2*



Audience Size

Your audience selection is fairly broad.

Specific          Broad

Potential Reach: 97,000,000 people

34.     Below the audience size graphic, the "Ads Manager" states "Potential Reach: _____ people." *See* Figure 2.  The "Ads Manager" displays the "Potential Reach" statistic before the advertiser purchasers the advertisement.

35.     Facebook consistently represents that the Potential Reach is a measurement of actual *people*, not just accounts.

36.     When an advertiser clicks on the "i" icon next to the Potential Reach, Facebook's website states, "Estimates are based on the placements and targeting criteria you select and include factors like Facebook user behaviors, user demographics and location data. They're designed to estimate how many *people* in a given area could see an ad a business might run. They're not designed to match population or census estimates. Numbers may vary due to performance reasons." (emphasis added) *See* Figure 3.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1    *Figure 3*



37.    When an advertiser clicks on "Learn More" for potential reach, Facebook's website states, "Potential reach is an estimation of how many *people* are in an ad set's target audience…. It updates in real time as you create or edit your ad set to help you understand how your targeting and placement choices affect the number of *people* you could reach." (emphasis added) *See* Figure 4.

*Figure 4*

> About potential reach
>
> Potential reach is an estimation of how many people are in an ad set's target audience. This estimation is a unique calculation by Facebook (more on our methodology below) and isn't intended to align with third party calculations or population census data. It updates in real time as you create or edit your ad set to help you understand how your targeting and placement choices affect the number of people you could reach.
>
> The number of people you actually end up reaching depends on your budget and performance. For that estimation, check your estimated daily results (and keep in mind those results apply to each day, not the total results for your ad set).

38.    Facebook's Advertiser Help Center states that the "Potential Reach is an estimation of the potential number of people your ads could reach."[20]

---

[20] Quoted from https://www.facebook.com/business/help (accessed August 13, 2018).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## II.    Facebook's Potential Reach is Inflated

39.    According to Census data, the U.S. population numbered over 320 million individuals in 2017, with just over 250 million adults over 18 years old.[21]

40.    Facebook represents to advertisers a Potential Reach of 230 million monthly active users over the age of 18 in the U.S.[22]

41.    According to a 2018 survey from the Pew Research Center, 68% of U.S. adults, aged 18 and over, use Facebook.[23]  Based on this 68% figure, only 170 million U.S. adults have a Facebook account.  Thus, Facebook represents to advertisers that it has approximately 35% more users in the United States than it actually does.

42.    Using the usage rate estimate provided by Pew Research Center, Facebook's Potential Reach is inflated with respect to the 18 years and over demographic in the four largest states, as set forth below:

| State | Estimated Actual Facebook Users[24] | Facebook's Claimed Reached[25] | Inflation Rate |
|---|---|---|---|
| California | 20.7 million | 30 million | 45% |
| Texas | 14.2 million | 21 million | 48% |
| Florida | 11.4 million | 16 million | 40% |
| New York | 10.6 million | 16 million | 50% |

43.    Among the most important – if not the most important – demographic for advertisers is the 18-34 year-old audience.  This is because younger audiences are generally believed to have less

---

[21] *See* United States Census Bureau's *"American Fact Finder"* available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2017_PEPA GESEX&prodType=table (last accessed August 1, 2018).

[22] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018)

[23] Pew Research Center, March 2018, "Social Media Use in 2018".

[24] These figures are based on the U.S. Census Bureau's estimated demographic size and accounting for the national average of Facebook participation as determined by Pew Research's polling data of 68%.

[25] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018)

brand loyalty and more disposable income.[26]

44.    Even more inflated is the key marketing demographic of young adults aged 18-34, where the U.S. population in 2017 numbered just under 76 million.[27] Facebook represents to advertisers that it can reach 100 million people in this age category.[28] Accordingly, Facebook claims that it can reach 24 million more people in this demographic than actually exist. Additionally, according to Pew Research only 80% of this demographic actually use Facebook.[29] Thus, only 61 million 18-34 year-olds are actually using Facebook, resulting in a nationwide inflation rate of 64%.

45.    Nor can this discrepancy be explained by non-resident travelers. Facebook indicates that its Potential Reach among 18-34 year olds in the United States includes less than 2 million non-resident travelers. *See* Figure 5.

---

[26] *See e.g.*, Weinman, Jaime J. (2012). "Television's mid-life crisis." *Maclean's*. 125 (27): 72

[27] *See* United States Census Bureau's *"American Fact Finder"*, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2017_PEPS YASEXN&prodType=table (last accessed August 1, 2018).

[28] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018)

[29] Pew Research Center, March 2018, "Social Media Use in 2018".

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

*Figure 5*



46.    Publicly available research has shown that the Potential Reach for 18-34 year-olds is not only overstated at a national level but exceeds the U.S. Census Population Data in every state. *See* Figure 6.[30]

---

[30]  Video Advertising Bureau Report, at 13.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

*Figure 6*



47.     The difference between Facebook's Potential Reach and U.S. Census Bureau statistics can be illustrated at the metropolitan level as well.  For example, the following chart provides examples of the massive inflation of Facebook's claimed Potential Reach in selected cities:

48.     Other examples[31] from September 2017 for the 18-34 year-old demographic include:

| City | 18-34 year-old Census Pop. | Facebook's Claimed Reach | Inflation Rate |
|------|----------------------------|--------------------------|----------------|
| Dallas | 379,567 | 1,200,000 | 216% |
| Houston | 645,229 | 1,800,000 | 179% |
| Los Angeles | 1,125,300 | 2,700,000 | 140% |
| New York | 2,305,171 | 4,100,000 | 78% |
| Philadelphia | 459,386 | 1,100,000 | 139% |
| Phoenix | 410,220 | 720,000 | 76% |
| San Antonio | 401,801 | 690,000 | 72% |
| San Diego | 434,646 | 760,000 | 75% |
| San Jose | 256,343 | 490,000 | 91% |

49.     Because not every 18-34 year-old has a Facebook Account, the discrepancy between

---

[31] *See* Video Advertising Bureau Report, at 14.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Facebook's Potential Reach for the 18-34 year-old demographic and the Census Population does not capture the full extent to which Facebook's Potential Reach is overstated.

50.     For example, Plaintiffs commissioned their own survey to determine the percentage of 18-34 years old in Chicago who have a Facebook account.  The survey found that 59% of 18-34 year-olds in Chicago have Facebook accounts.  In September 2017 in Chicago, Facebook's Potential Reach was 1,900,000.  However, the Census Population for 18-34 year-olds in Chicago was only 808,785.[32] Thus, based on this comparison alone, Facebook's Potential Reach for 18-34 years old in September 2017 was 2.35 times the Census Population.

51.      The inflation of Facebook's Potential Reach is even more dramatic when compared to the survey.  In 2017, based on the survey described above, approximately 485,000 actual Chicago residents between 18-34 had Facebook accounts. Therefore, when Facebook represented that the "Potential Reach" for this demographic was 1,900,000, it was almost 4 times that true number of people potentially reached.

52.     A similar analysis reveals dramatic inflation of the Potential Reach number in Kansas City.  Among the 18-54-year-olds demographic in the Kansas City metropolitan area, Facebook claims advertisements placed on its marketplace have the potential to reach 1.4 million people.[33]

53.     But the 18-54 demographic in the Kansas City metropolitan area only consists of approximately 1 million people.[34] And even then, based on survey data commissioned by the Plaintiff only 70% of that demographic has Facebook accounts. This puts the inflation rate in Kansas City at 100%.

III.     **Former Facebook Employees Confirm the Problem**

54.     Former Facebook employees have acknowledged that Facebook did not care about the accuracy of its "Potential Reach" statistic.

---

[32] *Id.*

[33] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018)

[34] *See* United States Census Bureau's *"American Fact Finder"*, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=DEC_10_SF1_Q TP2&prodType=table (last accessed August 1, 2018).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

55.     When asked about Facebook's reach numbers, Confidential Witness 1, a data rating and labeling specialist formerly employed at Facebook, stated that the Potential Reach statistic sounds "like a made-up PR number" and that it was "fluff".  When asked if Facebook cared about getting these numbers right, Confidential Witness 1 stated that those who were responsible for ensuring the accuracy "did not give a sh--."

56.     When directly asked about potential inflation of Facebook's user base, Confidential Witness 2, a former Engineering Lead with Facebook, stated that Facebook does not care about the accuracy of information related to number of users so long as advertising revenue is not negatively affected. Confidential Witness 2 believed that number of Facebook purported users – and therefore the Potential Reach – is inflated.

57.     Confidential Witness 3, a former Operations Contractor with Facebook, stated that Facebook was not concerned with stopping duplicate or fake accounts.  Confidential Witness 3 explained that Facebook primarily relied on ad hoc written complaints from Facebook users and ineffective algorithms to assure accuracy.  Generally, Confidential Witness 3 claimed Facebook was only concerned with accounts created for nefarious purposes and Facebook turned a blind eye to other non-unique individual accounts.

## IV.     Facebook's User Base Inflation Is Material

58.     Advertising purchasers, including Plaintiffs Danielle A. Singer, Project Therapy, LLC (d/b/a Therapy Threads), Holly Dean, EE Digital LLC, and DZ Reserve, viewed the "Potential Reach" as an important statistic because it means that more individuals could potentially view their advertisement.

59.     Plaintiffs Danielle A. Singer, Project Therapy, LLC (d/b/a Therapy Threads), Holly Dean, EE Digital LLC, and DZ Reserve read Facebook's "Potential Reach" prior to purchasing advertisements from Facebook, and they relied on Facebook's "Potential Reach" in making their decisions to purchase advertisements from Facebook.

60.     Facebook's misrepresentation of the Potential Reach of its advertisements induced advertising purchasers (including Plaintiffs Danielle A. Singer, Project Therapy, LLC (d/b/a Therapy

Threads), Holly Dean, EE Digital LLC, and DZ Reserve) to purchase advertisements, which they otherwise would not have purchased, because purchasers (including Plaintiffs Danielle A. Singer, Project Therapy, LLC (d/b/a Therapy Threads), Holly Dean, EE Digital LLC, and DZ Reserve) believed that more people could potentially be reached by their advertisements than possibly could have been.

61.     Facebook's misrepresentation of the Potential Reach of its advertisements induced advertising purchasers (including Plaintiffs Danielle A. Singer, Project Therapy, LLC (d/b/a Therapy Threads), Holly Dean, EE Digital LLC, and DZ Reserve) to pay more for Facebook advertising than they otherwise would have been willing to pay.

62.     Facebook's misrepresentation of the Potential Reach of its advertisements thereby distorted the market price for its advertising by artificially increasing the price of Facebook advertising, causing advertising purchasers (including Plaintiffs Danielle A. Singer, Project Therapy, LLC (d/b/a Therapy Threads), Holly Dean, EE Digital LLC, and DZ Reserve) to pay more than they otherwise would have paid.

63.     Facebook's misrepresentation of the Potential Reach of its advertisements provided Facebook with an unfair competitive advantage over other advertising platforms including other online advertising platforms, such as YouTube, LinkedIn, and Twitter.

## PLAINTIFFS' EXPERIENCES

64.     As noted above, Facebook's Potential Reach is vastly inflated at the national, state, and local levels. Thus, the inflation impacted the Potential Reach and Estimated Reach of Plaintiffs' advertising campaigns on Facebook.

### *Danielle Singer and Therapy Threads*

65.     Plaintiff Danielle Singer ("Singer") owns and operates Plaintiff Project Therapy, LLC d/b/a Therapy Threads ("Therapy Threads").

66.     Therapy Threads is an online business that sells aromatherapy fashionwear and accessories, including scarfs, jewelry, and essential oils.

67.     During the period starting in October 2013 and ending in April 2018, Plaintiff Singer

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

ran advertising campaigns on Facebook for Therapy Threads.

68.     Over this time period, Plaintiffs Singer and Therapy Threads paid Facebook over $14,000 for Facebook advertisements.

69.     Plaintiffs Singer and Therapy Threads read Facebook's "Potential Reach" prior to purchasing advertisements from Facebook, and they relied on Facebook's "Potential Reach" in making their decisions to purchase advertisements from Facebook.

70.     Plaintiffs Singer and Therapy Threads read Facebook's "Estimated Daily Results Reach" prior to purchasing advertisements from Facebook, and they relied on Facebook's "Estimated Daily Results Reach" in making their decisions to purchase advertisements from Facebook.

71.     Plaintiffs Singer and Therapy Threads ran nationwide campaigns for various age demographics, as well as campaigns targeted at specific large metropolitan areas, including, but not limited to, Austin, Chicago, Dallas, Denver, Kansas City, Las Vegas, Los Angeles, New York, San Diego, San Francisco, and Phoenix. For example, in October 2017, Plaintiffs Singer and Therapy Threads purchased advertising campaigns on Facebook targeting 18-35 year-olds in the Chicago metropolitan area. Plaintiffs Singer and Therapy Threads also purchased multiple advertising campaigns in the Kansas City metropolitan area, the metropolitan area where Plaintiff Singer resides.

72.     Plaintiffs Singer and Therapy Threads wish and intend to purchase additional advertisements from Facebook in the future. However, if Facebook continues to inflate its Potential Reach and Estimated Daily Results Reach, it will be difficult for Plaintiffs Singer and Therapy Threads to trust Facebook's representations about the Potential Reach and Estimated Daily Results Reach of Plaintiffs' Facebook advertisements or other statistics provided by Facebook about Facebook advertisements.

### *Holly Dean*

73.     Plaintiff Holly Dean ("Dean") is a citizen and resident of the state of Florida.

74.     In January 2016, Plaintiff Dean ran advertising campaigns on Facebook.

75.     Plaintiff Dean paid Facebook approximately $ 40 for Facebook advertisements.

76.     Plaintiff Dean read Facebook's "Potential Reach" prior to purchasing advertisements

from Facebook, and Plaintiff Dean relied on Facebook's "Potential Reach" in making her decision to purchase advertisements from Facebook.

77.     Plaintiff Dean read Facebook's "Estimated Daily Results Reach" prior to purchasing advertisements from Facebook, and Plaintiff Dean relied on Facebook's "Estimated Daily Results Reach" in making her decision to purchase advertisements from Facebook.

### EE Digital LLC

78.     Plaintiff EE Digital LLC is a company incorporated and headquartered in California.

79.     Plaintiff EE Digital LLC is an online business that sells skincare products.

80.     Between 2015 and 2018, Plaintiff EE Digital LLC ran advertising campaigns on Facebook.

81.     Over this time period, Plaintiff EE Digital LLC paid Facebook over $ 1 million dollars for Facebook advertisements.

82.     Plaintiff EE Digital LLC read Facebook's "Potential Reach" prior to purchasing advertisements from Facebook, and Plaintiff EE Digital LLC relied on Facebook's "Potential Reach" in making Plaintiff's decision to purchase advertisements from Facebook.

83.     Plaintiff EE Digital LLC read Facebook's "Estimated Daily Results Reach" prior to purchasing advertisements from Facebook, and Plaintiff EE Digital LLC relied on Facebook's "Estimated Daily Results Reach" in making Plaintiff's decision to purchase advertisements from Facebook.

84.     Plaintiff EE Digital LLC ran nationwide campaigns for various age demographics, as well as campaigns targeted at specific states, including, but not limited to, California and New York.

85.     Plaintiff EE Digital LLC wishes and intends to purchase additional advertisements from Facebook in the future. However, if Facebook continues to inflate its Potential Reach and Estimated Daily Results Reach, it will be difficult for Plaintiff EE Digital LLC to trust Facebook's representations about the Potential Reach and Estimated Daily Results Reach of Plaintiff's Facebook advertisements or other statistics provided by Facebook about Facebook advertisements.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

*DZ Reserve*

86.     Plaintiff DZ Reserve is a company incorporated and headquartered in Colorado.

87.     Plaintiff DZ Reserve operates several e-commerce stores.

88.     Between December 2017 and December 2018, Plaintiff DZ Reserve ran advertising campaigns on Facebook.

89.     Over this time period, Plaintiff DZ Reserve paid Facebook approximately $ 1 million dollars for Facebook advertisements.

90.     Plaintiff DZ Reserve read Facebook's "Potential Reach" prior to purchasing advertisements from Facebook, and Plaintiff DZ Reserve relied on Facebook's "Potential Reach" in making Plaintiff's decision to purchase advertisements from Facebook.

91.     Plaintiff DZ Reserve read Facebook's "Estimated Daily Results Reach" prior to purchasing advertisements from Facebook, and Plaintiff DZ Reserve relied on Facebook's "Estimated Daily Results Reach" and in making Plaintiff's decision to purchase advertisements from Facebook.

92.     Plaintiff DZ Reserve ran nationwide campaigns, as well as campaigns targeted at specific cities, including, but not limited to, Los Angeles and New York City.

93.     Plaintiff DZ Reserve wishes and intends to purchase additional advertisements from Facebook in the future. However, if Facebook continues to inflate its Potential Reach and Estimated Daily Results Reach, it will be difficult for Plaintiff DZ Reserve to trust Facebook's representations about the Potential Reach and Estimated Daily Results Reach of Plaintiff's Facebook advertisements or other statistics provided by Facebook about Facebook advertisements.

## CLASS ALLEGATIONS

94.     Plaintiffs re-alleges and incorporates by reference herein all of the allegations contained above.

95.     Pursuant to the Federal Rule of Civil Procedure 23(b)(3), Plaintiff asserts claims on behalf of the following "Class": All persons or entities who, from January 1, 2013, to the present ("Class Period"), had an account with Facebook, Inc., and who paid for placement of advertisements on Facebook.com.  Excluded from the Class are Defendant, any entity in which Defendant has a

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

96.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule 23(b)(3). Plaintiffs seek to represent an ascertainable Class, as determining inclusion in the class can be done through Facebook's own records.

97.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

98.     Although the precise number of Class members is unknown and can only be determined through appropriate discovery, Plaintiffs believe, and on that basis alleges, that the proposed Class is so numerous that joinder of all members would be impracticable as Facebook sells millions of advertisements annually to hundreds of thousands or even millions of advertisers.

99.     Questions of law and fact common to the putative Class predominate over questions affecting only individual members, including inter alia:

a.     Whether Facebook made material misrepresentations about its advertising services, including misrepresenting its Potential Reach; and

b.     Whether Facebook breached its contractual duty to perform competently and with reasonable care by providing its inflated Potential Reach.

100.     Plaintiffs are members of the putative Class. The claims asserted by Plaintiffs in this action are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

101.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class, as their interests are coincident with, and not antagonistic to, the other members of the putative Class.

102.     Plaintiffs have retained counsel competent and experienced in both consumer

protection and class action litigation. Plaintiffs' counsel has experience litigating some of the largest and most complex consumer class actions, including numerous consumer class actions in the Northern District of California.

103.    Certification of the Class is appropriate pursuant to Fed. Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be highly unlikely that the members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

104.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

105.    In the alternative, the Class should be certified pursuant to Federal Rule of Civil Procedure 23(b)(2) because:

    a.  The prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Facebook;

    b.  The prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and

    c.  Facebook has acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# FIRST CAUSE OF ACTION
## CALIFORNIA UNFAIR COMPETITION LAW,
### CAL. BUS. & PROF. CODE § 17200, *et seq.* [35]

106.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

107.    Facebook violated California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §17200 et seq., by engaging in the fraudulent and unfair business acts and practices alleged previously, and as further specified below.

108.    Facebook's misrepresentation of the Potential Reach of advertisements constitutes a fraudulent practice under the UCL, as it deceived Class members into believing that their advertisements could potentially reach more people than their advertisement could actually reach.

109.    Facebook fails to disclose to advertisers the extent to which the Potential Reach statistic is inflated. This omission constitutes a fraudulent practice under the UCL, as it deceived Class members into believing that their advertisements could potentially reach more people than their advertisement could actually reach.

110.    Facebook's failure properly to audit and verify the accuracy of its Potential Reach statistics before disseminating them to Class members is unethical, unscrupulous, and substantially injurious to advertising purchasers, and thus constitutes an unfair practice under the UCL.  The harm these practices caused to Plaintiffs and the Class members outweigh their utility, if any.

111.    Facebook should have known that its Potential Reach was inaccurate and inflated, and had Facebook properly audited and verified its Potential Reach, it would have known that the Potential Reach is inaccurate and inflated.  The Potential Reach inflation would have been caught by a reasonable auditing and verification process.

112.    Facebook's failure to employ reasonable auditing and verification procedures gives it an unfair competitive advantage, as it allowed Facebook to provide advertising services at a lower

---

[35] Pursuant to Facebook's terms of service, the laws of the State of California govern "any claim" that arises between Facebook and its users, "without regard to conflict of law provisions." Facebook, *Statement of Rights and Responsibilities*, https://www.facebook.com/terms (last accessed: August 13, 2018).

cost and made those advertising services appear to be more effective than they were.

113.    Plaintiffs have standing to bring these claims under the UCL because they were injured and lost money or property, including but not limited to money paid for Facebook advertisements, as a result of Facebook's fraudulent and unfair business practices.  Among other things, Plaintiffs would not have bought as much advertising services if Facebook had not disseminated an inflated Potential Reach statistic, and Plaintiffs would have paid a lower price for the advertising services they did purchase.

114.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek equitable relief to prevent the continued use of Facebook's unfair and fraudulent practices and to restore to the Class all money Facebook may have acquired by means of its fraudulent and unfair business practices.

## SECOND CAUSE OF ACTION
## QUASI-CONTRACT CLAIM FOR RESTITUTION

115.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

116.    Plaintiffs seek restitution in quasi contract.

117.    Facebook's inflated Potential Reach made advertising on its platform appear more effective and valuable than it really was—leading Plaintiffs and the Class to pay more money to Facebook for advertising services than they otherwise would have paid.

118.    Facebook knew about, accepted, and benefited from Plaintiffs' and Class members' purchase of these advertising services.

119.    Under the circumstances, it would be inequitable for Facebook to benefit from its inaccurate and inflated Potential Reach calculation and its persistent failure to correct the error.

120.    To avoid injustice, Plaintiffs and the Class accordingly seeks restitution and/or disgorgement of profits in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT

121.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

122.   Plaintiffs and Class members contracted with Facebook to provide them with advertising services.  No single integrated contract spells out Facebook's obligations to Plaintiffs and the Class. Rather, the contract includes the express terms from various webpages created by Facebook, Facebook's course of performance and course of dealing with the Class, and industry practice.

123.   The webpages created by Facebook that contain the express terms of Facebook's contract with Plaintiffs and the Class include Facebook's Terms of Service (https://www.facebook.com/legal/terms); Facebook's Self-Serve Ad Terms (https://www.facebook.com/legal/self_service_ads_terms); Facebook's Advertising Guidelines (https://www.facebook.com/policies/ads); Facebook's Advertiser Help Center (https://www.facebook.com/business/help); Facebook's Community Payments Terms (https://www.facebook.com/payments_terms); and Facebook's ad-creation, editing, and management interfaces, which may be accessed through Facebook's Ads Manager (https://www.facebook.com/ads/manager/creation/), Facebook's Power Editor (https://www.facebook.com/ads/manage/powereditor), Facebook's Ads Manager App, Facebook Pages, and Facebook Ads API.

124.   Plaintiffs and Class members met all or substantially all of their contractual obligations, including submitting their advertising for Facebook's approval and paying for Facebook's advertising services.

125.   As part of Facebook's contract with Plaintiffs and the Class, Facebook makes promises regarding the Potential Reach and Estimated Daily Results Reach in Facebook's Ads Managers. *See* Exhibit 1, Facebook's Ads Manager.

126.   Regardless of the demographic criteria selected by the advertiser, the Ads Manager contract states "Potential Reach: _____ people." *See* Figure 2; Exhibit 1.

127.   The Ads Manager contract also states, "Estimated Daily Results Reach _____," and states a number. *See* Figure 1; Exhibit 1.

128.   The Potential Reach and Estimated Daily Reach were material terms of Facebook's

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1    contract with Plaintiffs and Class members.

2    129.    Facebook did not satisfy its promises and obligations to Plaintiffs and Class members

3    because their Potential Reach and Estimated Daily Reach were inflated.

4    130.    Facebook, thus, materially breached its contracts with Plaintiffs and Class members

5    by providing advertising services with less Potential Reach and Estimated Daily Reach than stated in

6    the parties' contracts.

7    131.    As a direct and proximate result of Facebook's inflated Potential Reach and

8    Estimated Daily Reach, Plaintiffs and Class members did not receive the full benefit of their bargain,

9    and instead received advertising services that were less valuable that what they paid for. Plaintiffs

10   and Class members were damaged in an amount at least equal to this overpayment.

11   132.    Accordingly, Plaintiffs and Class members have been injured as a result of

12   Facebook's breach of contract and are entitled to damages and/or restitution in an amount to be

13   proven at trial.

14   **FOURTH CAUSE OF ACTION**

15   **BREACH OF IMPLIED DUTY TO PERFORM WITH REASONABLE CARE**

16   133.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained

17   above.

18   134.    Plaintiffs and Class members contracted with Facebook to provide them with

19   advertising services.

20   135.    Plaintiffs and Class members met all or substantially all of their contractual

21   obligations, including submitting their advertising for Facebook's approval and paying for

22   Facebook's advertising services.

23   136.    One of Facebook's obligations was to provide Plaintiffs and Class members with the

24   Potential Reach and Estimated Daily Reach of their advertisements.  This obligation is derived from

25   Facebook's express contract, Facebook's course of performance and course of dealing with the

26   Class, and industry practice.

27   137.    Under California law, Facebook was required to perform its contractual obligations

28   competently and with reasonable care.  Facebook breached that duty by providing inflated Potential

Reach and Estimated Daily Reach numbers to Plaintiffs and Class members.

138.    Had Facebook used reasonable care, it would have calculated the Potential Reach and Estimated Daily Reach correctly, and it would have discovered any causes of inflation for the Potential Reach and Estimated Daily Reach through auditing and verification.

139.    As a result of Facebook's failure to provide its agreed advertising services competently and using reasonable care, Plaintiffs and Class members purchased advertising services they would not otherwise have purchased and failed to receive the benefit of their bargain. They are entitled to damages in an amount to be proven at trial.

<u>**FIFTH CAUSE OF ACTION**</u>
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

140.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

141.    Plaintiffs and Class members contracted with Facebook to provide them with advertising services.

142.    These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties (both explicit and fairly implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts.  These included the covenants that Facebook would act fairly and in good faith in carrying out its contractual obligations to provide Plaintiffs and Class members with accurate Potential Reach and Estimated Daily Reach of Plaintiffs and Class members' advertising.

143.    Facebook did not act in good faith and fair dealing to provide Plaintiffs and Class members with accurate Potential Reach and Estimated Daily Reach of Plaintiffs and Class members' advertising. For example, instead of implementing a reasonable process to ensure the accuracy of its Potential Reach and Estimated Daily Reach, Confidential Witness 3 explained that Facebook primarily relied on ad hoc written complaints from Facebook users and ineffective algorithms to assure accuracy.

144.    Plaintiffs and Class members met all or substantially all of their contractual

obligations, including submitting their advertising for Facebook's approval and paying for Facebook's advertising services.

145.     Facebook's failure to act in good faith in providing accurate Potential Reach and Estimated Daily Reach denied Plaintiffs and Class members the full benefit of their bargain. Plaintiffs and Class members received advertising services that were less valuable than what they paid for and less valuable than their reasonable expectations under the contracts.  Plaintiffs and Class members were damaged by an amount at least equal to this overpayment.

146.     Accordingly, Plaintiffs have been injured as a result of Facebook's breach of the covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Danielle A. Singer, Project Therapy, LLC (d/b/a Therapy Threads), Holly Dean, EE Digital LLC, and DZ Reserve, on behalf of themselves and the Class, seek the following relief:

A.     An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing Geoffrey Graber of Cohen Milstein Sellers & Toll PLLC, as Class Counsel, and finding that Plaintiffs are proper representatives of the Class requested herein.

B.     Plaintiffs request injunctive relief.  Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including: (i) an order prohibiting Facebook from engaging in the wrongful acts described herein; (ii) requiring Facebook to engage third-party auditors to conduct audits and evaluations of Facebook's purported user base and its Potential Reach, and ordering them to promptly correct any problems or issues detected by these auditors, and (iii) requiring Facebook to disclose any further inaccuracies with respect to its user base in a timely and accurate manner.

C.     Plaintiffs also request damages, restitution, attorneys' fees, statutory costs, and such other and further relief as is just and proper. Plaintiffs seek attorneys' fees under California Code of Civil Procedure 1021.5.

1

## JURY TRIAL DEMAND

2

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial

3

by jury in this action of all issues so triable.

4

5

DATED:        December 21, 2018        Respectfully submitted,

6

By: /s/        *Geoffrey Graber*

7

Geoffrey Graber

8

ANDREW N. FRIEDMAN (admitted *pro hac vice*)

9

afriedman@cohenmilstein.com
GEOFFREY GRABER (SBN 211547)

10

ggraber@cohenmilstein.com
ERIC KAFKA (admitted *pro hac vice*)

11

ekafka@cohenmilstein.com
JULIA HORWITZ (admitted *pro hac vice*)

12

jhorwitz@cohenmilstein.com

13

**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor

14

Washington, DC 20005
Telephone: (202) 408-4600

15

Facsimile: (202) 408-4699

16

*Counsel for Plaintiffs and Proposed Class*

17

CHARLES REICHMANN (SBN 206699)

18

Charles.reichmann@gmail.com
**LAW OFFICES OF CHARLES REICHMANN**

19

16 Yale Circle
Kensington, CA 94708-1015

20

Telephone: (415) 373-8849

21

MICHAEL RAPP (*pro hac vice forthcoming*)

22

mr@kcconsumerlawyer.com
**STECKLEIN & RAPP**

23

748 Ann Ave.
Kansas City, KS 66101-3014

24

Telephone: (913) 703-5354

25

REUBEN D. NATHAN (SBN 208436)

26

rnathan@nathanlawpractice.com
**NATHAN & ASSOCIATES, APC**

27

2901 W. Coast Hwy., Suite #200

28

Newport Beach, CA 92663

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Telephone: (949) 270-2798

*Additional Counsel for Plaintiffs*

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK