# LAW OFFICES OF KELLY A. AVILES

April 20, 2020

VIA ECF

The Honorable James Donato
United States District Court
450 Golden Gate Avenue
San Francisco, CA 94102

   Re: **Singer, et al. v. Facebook, Inc.**
      Case no. 3:18-cv-04978 JD
      Docket nos. 163/165 re: Request to Seal Portions of Third Amended Complaint

Your Honor:

My client, Digital Content Next (DCN)[1], has recently become aware of a request to seal portions of the Third Amended Complaint in this matter. DCN opposes the sealing of any portion of the Third Amended Complaint and, should the court be inclined to grant the request, asks that it be permitted to seek leave to intervene for the limited purpose of moving to unseal the Third Amended Complaint.

## Digital Content Next's Interest in This Matter

Founded in 2001, Digital Content Next is the only trade organization dedicated to serving the unique and diverse needs of high-quality digital content companies which enjoy trusted, direct relationships with consumers and advertisers. DCN's members are many of the most trusted and well-respected media brands that, together, have an unduplicated audience of 223,098 million unique visitors or 100 percent reach of the U.S. online population. Approximately 80% of the revenue generated by our members' digital businesses comes from advertising. DCN's member companies advertise extensively with Facebook to promote their original content, engage with existing subscribers or audiences, and find new audiences.

---

[1] Digital Content Next is a private organization with no parent corporation and no stock, made of up of various media entities.

## Courts Have Repeatedly Recognized the Media's Interest in Preventing the Sealing of Information and Asserting the Public's Right of Access to Court Records and Proceedings

It is well established that the media has standing to assert the right of access to court records and proceedings. *See, e.g., Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 609 n.25 (1982) ("representatives of the press and general public must be given an opportunity to be heard on the question of their exclusion" from court proceedings) (quotation omitted). To that end, the Ninth Circuit has held that nonparties should be permitted to challenge limitations on the right of access. *See Beckman Industries, Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir. 1992) (allowing non-party to challenge protective order); *see also In re Associated Press*, 162 F.3d 503, 508 (7th Cir. 1998) ("Press ought to have been able to … present arguments against limitations on the … right of access").

As recognized by the Supreme Court and the Ninth Circuit, there exists a "general right to inspect and copy public records and documents, including judicial records and documents." *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (citing *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, at 597 & n. 7 (1978)). This right is derived from the interest of citizens in keeping "a watchful eye on the workings of public agencies." *Nixon*, 435 U.S. at 598. Public vigilance is supported by the efforts of newspapers to "publish information concerning the operation of government." *Id*. As the D.C. Circuit explained, "[t]he courts are public institutions that best serve the public when they do their business openly and in full view." *EEOC v. National Children's Center*, 98 F.3d 1406, 1408 (D.C. Cir. 1996).

The right of public access encompasses pretrial documents filed in civil cases and extends to discovery materials exchanged between the parties. Federal Rule of Civil Procedure 26(c); *San Jose Mercury News, Inc. v. United States District Court*, 187 F.3d 1096, 1103 (9th Cir. 1999) ("[i]t is well-established that the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public"); *Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1133-34 (9th Cir. 2003) (Rule 26(c) standard applies to unfiled discovery documents and stipulated protective order providing for sealing insufficient to show "good cause").

## Facebook Has Not Met The High Burden Required For Sealing

"A party asserting good cause bears the burden, for each particular document it seeks to protect, of showing that specific prejudice or harm will result if no protective order is granted." *Foltz*, 331 F.3d at 1131. This showing must be made through "specific demonstrations of fact, supported where possible by affidavits and concrete examples, rather than broad, conclusory allegations of potential harm." *Id*.

A stipulated protective order is insufficient to carry this burden. As the court held in *San Jose Mercury News*, 187 F.3d at 1102, 1103, stipulated protective orders are "subject to challenge and modification, as the party resisting disclosure generally has not made a particularized showing of good cause with respect to any individual document…." *See also Foltz*, 331 F.3d at 1131; *Phillips*, 307 F.3d at 1211 & n.1; *Kamakana*, 447 F.3d at 1182-1183.

This case is no different. The stipulated protective order and Facebook's confidential designation pursuant to that order is the foundation for Facebook's request to seal the Third Amended Complaint. Under the stipulated protective order, Facebook may unilaterally designate as confidential any documents produced in discovery without court approval. This type of blanket protective order, inherently subject to challenge and modification, does not provide the good cause necessary to seal court documents.

The declarations filed by Facebook in support of sealing make broad and vague allegations of the prospect of competitive harm, but fail to identify any concrete, particularized harm as the law requires. *See*, e.g., *Foltz*, 331 F.3d at 1133.

### The Substantial Public Interest in Disclosure Outweighs Any Asserted Interest in Confidentiality

Even if Facebook had identified some non-speculative, particularized harm (which, to date, it has not done), it would be outweighed by the substantial public interest in this case. *Phillips*, 307 F.3d at 1211 ("If a court finds particularized harm will result from disclosure of information to the public, then it balances the public and private interests to decide whether a protective order is necessary"); *see also In re Roman Catholic Archbishop*, 661 F.3d at 425 n.5 (in evaluating whether a party has shown good cause for a protective order, courts consider "whether a party benefitting from the order of confidentiality is a public entity or official" and "whether the case involves issues important to the public").

The strong public interest in this case, which involves serious allegations of fraud related to the largest social media organization in the world, weighs in favor of public disclosure of materials produced in the course of the litigation. *See, e.g., In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 425 n.5 (9th Cir. 2011); *Welsh v. City & County of San Francisco*, 887 F. Supp. 1293, 1299-1302 (N.D. Cal. 1995).

The digital advertising marketplace has rapidly evolved as new technologies emerged to provide advertisers greater opportunities to reach audiences. One key to a healthy marketplace is the ability to accurately and truthfully measure advertising across different platforms. An apples-to-apples comparison allows for true competition and for advertisers to make decisions where to invest their dollars.

**Law Offices of Kelly A. Aviles**

Hon. James Donato
April 20, 2020
Page 4

In the digital landscape, Facebook and Google currently account for approximately 60% of digital advertising dollars.[2] These two market leaders set a bar which is used to evaluate all other digital advertising. These same two companies heavily influence the rules and methods in which digital advertising is sold.

However, Facebook has a history of incorrectly reporting its own metrics. In September 2016, only after being sued by advertisers, Facebook admitted that it had significantly overstated the number of video ads shown to consumers.[3] In November 2016, Facebook admitted that it had overstated the average time consumers spent on Instant Articles and the number of people businesses reached with unpaid posts on their Facebook Pages.[4] In December 2016, Facebook also admitted that it had overestimated the number of consumers that advertisers could reach across its platform.[5] Throughout 2017, Facebook routinely overcharged advertisers for advertisements that did not reach consumers.[6]

While these practices were ultimately remedied, it has been proven on multiple occasions that Facebook's leadership team has gone to great lengths to cover up missteps. In the case of overstating video views, after documents were unsealed, it became clear that Facebook executives knew about the faulty metrics for over a year before they took actions to fix the problem.[7] Infamously, Facebook stonewalled federal investigations into its relationship with Cambridge Analytica.[8] Indeed, it continues to resist subpoenas to appear before the Canadian and British Parliaments.[9] Indeed, the United Kingdom's Digital, Culture, Media and Sport Committee drafted a 108-page

---

[2] https://www.cnbc.com/2017/12/20/google-facebook-digital-ad-marketshare-growth-pivotal.html; https://www.emarketer.com/content/facebook-google-duopoly-won-t-crack-this-year

[3] https://money.cnn.com/2016/11/16/technology/facebook-ad-metrics/index.html

[4] https://money.cnn.com/2016/11/16/technology/facebook-ad-metrics/index.html

[5] https://www.nytimes.com/2016/12/09/technology/facebook-advertising-inaccuracies-social-media.html

[6] https://marketingland.com/heres-itemized-list-facebooks-measurement-errors-date-200663

[7] https://www.niemanlab.org/2018/10/did-facebooks-faulty-data-push-news-publishers-to-make-terrible-decisions-on-video/

[8] https://www.washingtonpost.com/technology/2018/07/02/federal-investigators-broaden-focus-facebooks-role-sharing-data-with-cambridge-analytica-examining-statements-tech-giant/

[9] https://www.politico.com/story/2019/05/28/canada-facebook-mark-zuckerberg-1475782

**Law Offices of Kelly A. Aviles**

Hon. James Donato
April 20, 2020
Page 5

report entitled "Disinformation and 'Fake News,'"[10] which characterized Facebook as a "digital gangster(s)."[11]

At the same time, Facebook has long resisted calls from many in industry to submit to having independent, audited third-party verification companies measure advertising across its services. Bob Liodice, CEO of the Association of National Advertisers noted "It's like having the ability to grade your own homework."[12]  Only in 2017, after significant pressure from its advertising customers, did Facebook initiate the process of being audited.[13]  These audits remain in-progress approximately 3 years later.[14]

Additionally, even as Facebook's executives regularly espouse the importance of transparency to its customers, it often falls short.[15]  Now more than ever it is critically important to understand Facebook's decision-making process all of the way to the top as the complaint and discovery includes communications of key executives, including the Chief Operating Officer and Chief Financial Officer.  Given that Facebook and the issues surrounding its advertising practices are already the subject of intense media scrutiny, it is highly inappropriate for Facebook to now seek to have allegations sealed, which may shine a light on the veracity of its previous claims.

In light of the concerns around Facebook's actions over the last several years and the significant impact its financial dominance is having on the rest of the media ecosystem, it is critically valuable to understand whether their actions and promises to be a better actor for the industry are in good faith. In the absence of Facebook abiding by an industry standard and in light of Facebook's status as a market leader, buyers and sellers in the digital advertising marketplace would benefit from more fully understanding the internal decision-making that takes place at Facebook.

Not only is access important to evaluate these particular claims against Facebook, as explained countless times by circuit courts, there is a strong general public interest in access to the judicial process. *See, e.g.*, *Gambale v. Deutsche Bank AG*, 377 F.3d 133,

---

[10] https://publications.parliament.uk/pa/cm201719/cmselect/cmcumeds/1791/179102.htm

[11] https://publications.parliament.uk/pa/cm201719/cmselect/cmcumeds/1791/179106.htm#_idTextAnchor012, at ¶ 139.

[12] https://mashable.com/2016/11/16/facebook-metrics-advertiser-trust/

[13] https://www.adexchanger.com/platforms/facebook-slowly-embraces-mrc-agrees-independent-audit/

[14] https://www.mediapost.com/publications/article/346667/mrc-completes-audits-for-facebook-instagram-yout.html

[15] https://www.nytimes.com/2018/11/14/technology/facebook-data-russia-election-racism.html

140 (2d Cir. 2004) ("[T]he bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury, and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness" (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)); *United States v. WECHT*, 537 F.3d 222, 257 (3d Cir. 2008) (noting the importance of "exposing the judicial process to public scrutiny"); *United States v. Holy Land Found. for Relief and Dev.*, 624 F.3d 685, 690 (5th Cir. 2010) ("The right to public access 'serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of its fairness'"); *Valley Broad. Co.*, 798 F.2d 1289, 1294 (9th Cir. 1986) ("promoting the public's understanding of the judicial process" justifies the presumption of public access).

Secrecy allows wrongdoing to continue and undermines trust in the justice system. Considering the powerful public interest in both the claims of fraud against Facebook and the interest in observing how the judicial process handles these allegations, the allegations in the Third Amended Complaint should not be sealed.

## Conclusion

For the reasons set forth above, DCN respectfully urges this Court to deny the Motion to Seal, and order that the Third Amended Complaint be publicly filed in its entirety. Alternatively, should the Court seal any portion of the Third Amended Complaint, DCN requests that it be allowed to seek leave to intervene for the limited purpose of moving to unseal the Third Amended Complaint.

Respectfully submitted,

*Kelly Aviles*

Kelly Aviles (CA State Bar No. 257168)[16]
Attorneys for Interested Third Party
Digital Content Next

---

[16] Application for admission to Northern District of California filed and pending as of 4/20/20.