Andrew N. Friedman (*pro hac vice*)
Geoffrey Graber (SBN 211547)
Julia Horwitz (*pro hac vice*)
Karina G. Puttieva (SBN 317702)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
jhorwitz@cohenmilstein.com
kputtieva@cohenmilstein.com

Charles Reichmann (SBN 206699)
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708-1015
Telephone: (415) 373-8849
Charles.reichmann@gmail.com

Eric Kafka (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
ekafka@cohenmilstein.com

*Counsel for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| DZ Reserve and Cain Maxwell (d/b/a Max Martialis), individually and on behalf of others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>     Defendant. | Case No.: 3:18-cv-04978-JD<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date: July 30, 2020<br>Time: 10:00 am<br>Court: Courtroom 11, 19th Floor<br>Hon. James Donato |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................1

II.     FACTUAL BACKGROUND .........................................................................................2

      A.      Facebook Knows Potential Reach Is Important to Advertisers .........................2

      B.      Facebook Knew for Years Its Potential Reach is Misleading and Concealed It
                ██████████████ ...........................................................................3

      C.      Named Plaintiffs Purchased Advertisements from Facebook ...........................4

      D.      The Court Denied Facebook's Motion to Dismiss Plaintiffs' UCL Claim....................4

III.    STANDARD ...................................................................................................................5

IV.     ARGUMENT ..................................................................................................................5

      A.      Plaintiffs Plead Breach of the Implied Covenant of Good Faith and Fair
              Dealing ..............................................................................................................5

              1.      Facebook Frustrated Plaintiffs' Ability to Target Their Advertisements
                    by Providing Inflated and Misleading Potential Reach ......................6

              2.      Facebook's "Disclaimers" Relate to the Delivery and Performance of
                    Advertisements — Not Potential Reach ..............................................7

      B.      Plaintiffs State a Claim for Quasi-Contract ......................................................8

              1.      Quasi-Contract Claim is Not Barred by Parties' Express Contract ...................8

              2.      Plaintiffs Allege Facebook Unjustly Retained a Benefit ...................9

      C.      Plaintiffs State a Claim for Fraudulent Misrepresentation ..............................9

      D.      Plaintiffs Properly State a Claim for Fraudulent Concealment ...................12

      E.      Plaintiffs May Proceed with All Claims ..........................................................15

V.      CONCLUSION..............................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ahern v. Apple Inc.*,
411 F. Supp. 3d 541 (N.D. Cal. 2019) ........................................................................ 13

*In re Apple Inc. Device Performance Litig.*,
386 F. Supp. 3d 1155 (N.D. Cal. 2019) ...................................................................... 13

*Ball v. Johanns*,
2008 WL 269069 (E.D. Cal. Jan. 29, 2008) ............................................................. 8, 9

*Beyer v. Symantec Corp.*,
333 F. Supp. 3d 966 (N.D. Cal. 2018) ........................................................................ 13

*Buckley v. Cty. of San Mateo*,
2017 WL 3394747 (N.D. Cal. Aug. 8, 2017) ............................................................... 5

*County of Santa Clara v. Atlantic Richfield Co.*,
137 Cal. App. 4th 292 (2006) ...................................................................................... 14

*Daly v. United Healthcare Ins. Co.*,
2010 WL 4510911 (N.D. Cal. 2010) ............................................................................ 7

*Daniel v. Ford Motor Co.*,
806 F.3d 1217 (9th Cir. 2015) ..................................................................................... 15

*Engalla v. Permanente Med. Grp., Inc.*,
15 Cal. 4th 951 (1997) ................................................................................................. 11

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........................................................................................ 6

*In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.*,
2019 WL 3000646 (C.D. Cal. May 22, 2019) ............................................................ 14

*Giles v. Gen. Motors Acceptance Corp.*,
494 F.3d 865 (9th Cir. 2007) ...................................................................................... 14

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013) ..................................................................................... 11

*Hodsdon v. Mars, Inc.*,
891 F.3d 857 (9th Cir. 2018) ................................................................................. 12, 13

*Jones v. Progressive Cas. Ins Co.*,
2018 WL 4521919 (N.D. Cal. Sept. 19, 2018) ..................................................... 13, 14

ii

*Kendall v. Ernest Pestana, Inc.*,
    40 Cal. 3d 488 (1985) ................................................................................................. 8

*Knowles v. Arris Int'l PLC*,
    2019 WL 3934781 (N.D. Cal. Aug. 20, 2019) ............................................................ 13

*Lambotte v. IAC/Interactive Corp.*,
    2008 WL 4829882 (C.D. Cal. Nov. 4, 2008) ............................................................... 8

*Lever Your Bus. Inc. v. Sacred Hoops & Hardwood, Inc.*,
    2020 WL 2465658 (C.D. Cal. May 11, 2020) .............................................................. 8

*Mahmoud v. Select Portfolio, Inc.*,
    2018 WL 278621 (N.D. Cal. Jan. 3, 2018) .................................................................. 5

*Marsu, B.V. v. Walt Disney Co.*,
    185 F.3d 932 (9th Cir. 1999) ...................................................................................... 5

*Morawski v. Lightstorm Entm't, Inc.*,
    599 F. App'x 779 (9th Cir. 2015) ............................................................................... 8

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Res. Dev. Servs., Inc.*,
    2012 WL 12920615 (N.D. Cal. Apr. 16, 2012) ......................................................... 15

*Norcia v. Samsung Telecommunications Am., LLC*
    2018 WL 4772302 (N.D. Cal. Oct. 1, 2018) ........................................................ 12, 13

*Openshaw v. FedEx Group Package Sys., Inc.*,
    576 F. App'x 685 (9th Cir. 2014) ............................................................................... 5

*Peterson v. Cellco Partnership*,
    164 Cal. App. 4th 1583 (2008) .................................................................................. 8

*R Power Biofuels, LLC v. Chemex LLC*,
    2017 WL 1164296 (N.D. Cal. Mar. 29, 2017) .......................................................... 14

*Sharp v. Nationstar Mortg., LLC*,
    701 F. App'x 596 (9th Cir. 2017) ............................................................................... 6

*Sloan v. Gen. Motors LLC*,
    2020 WL 1955643 (N.D. Cal. Apr. 23, 2020) .......................................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................... 6

*Trombley Enterprises, LLC v. Sauer, Inc.*,
    2019 WL 452044 (N.D. Cal. Feb. 5, 2019) ................................................................ 6

*Vanella v. Ford Motor Co.*,
    2020 WL 887975 (N.D. Cal. Feb. 24, 2020) ............................................................ 14

*Yetter v. Ford Motor Co.*,
   2019 WL 3254249 (N.D. Cal. July 19, 2019) .................................................................. 14

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) ....................................................................................................................... 10

Rest. (Second) of Contracts § 205 cmt. d (1981) ........................................................................... 5

## I.      INTRODUCTION

Over nearly two years of litigation, Facebook has told this Court its Potential Reach metric is "simply a free tool" advertisers can use, whether or not they buy an ad. Facebook has suggested advertisers, including Plaintiffs, should never have relied on Potential Reach, because it does not affect billing or actual delivery of ads. Facebook also suggested to this Court – as it had to the public – that inflation of its Potential Reach metric could never be misleading because it was not designed to match the census, and any inaccuracies were caused by travelers and commuters.

The facts tell a different story. Behind closed doors, Facebook stated: ██████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████

Facebook knew for years its Potential Reach was inflated and misleading. While Facebook brushed aside Plaintiffs' allegations here, ███████████████████████████████ ████████████████████████████████████████████████ Facebook knew the problem was largely due to ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Facebook knew it was wrong. ████████████████████████████████████████████ Another employee stated ███████ ██████████████████████████████████████████████ The only question was, "[h]ow long can we get away with the reach overestimation." After learning these facts, Plaintiffs amended their complaint to add claims for fraud and a request for punitive damages, because Facebook's officers engaged in or ratified conduct despicable under California law.

In its latest Motion to Dismiss ("Mot.," ECF 177) Facebook asserts the same arguments it has raised before – including arguments this Court has rejected. In its Motion, Facebook continues to downplay its potential reach metric as nothing more than a "free tool" — even though its internal documents show ████████████████████████████████████████████████████ Facebook contends Plaintiffs do not state a claim of breach of implied covenant of good faith and fair

1   dealing — even though its own documents demonstrate ████████████████████████████

2   ███████████████████████████████████████████████. And Facebook asserts

3   Plaintiffs fail to state a claim for quasi-contract because Facebook did not unjustly retain a benefit—

4   even though ███████████████████████████████████████████████████████████

5   █████████████████████████████████. The facts speak for themselves. The Court

6   should deny the Motion. Facebook's egregious conduct warrants no different outcome.

## II.    FACTUAL BACKGROUND

### A.    Facebook Knows Potential Reach Is Important to Advertisers

9   Facebook earns "substantially all of [its] revenue" by selling advertising. TAC ¶ 1. Before

10  purchasing advertisements through Facebook's Ads Manager, advertisers input information about their

11  advertisements, including audience targeting criteria and budget. *Id.* ¶¶ 29; 33. On multiple consecutive

12  pages on Ads Manager displayed prior to purchase, Facebook makes a "Potential Reach" representation

13  below a graphic labeled "Audience Size." *Id.* ¶¶ 30-31; 33. The "Potential Reach" representation states

14  "Potential Reach: _____ people." *Id.* ¶ 31, as depicted in Figure 2 of the TAC:



20  *Id.*, Fig. 2. Potential Reach provides the number of "people [are] in an ad set's target audience." *Id.* ¶ 3.

21  Facebook's large purported potential reach is widely acknowledged as one of the main reasons

22  advertisers chose to purchase advertisements from Facebook. *Id.* ¶¶ 19-22. Facebook's internal

23  documents show ███████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████

26  Advertisers use Facebook "because the potential reach is unmatched by any other social media

27  platform." *Id.* ¶ 21. Reach inflation thus has "real consequences for an advertiser's overall

28  communications plan" because advertisers rely on Potential Reach when choosing whether to advertise

on Facebook, *id.* ¶ 18, █████████████████████████████████████████████

██████████████ and how to select and modify demographic targeting settings, *id.* ¶¶ 3, 22, 29, 36.

**B.      Facebook Knew for Years Its Potential Reach is Misleading and Concealed It** ███████████████████████

Facebook's Potential Reach is systematically inflated. For example, in August 2018, Facebook represented to its advertisers that it had a Potential Reach of 230 million adults (i.e. 18 years old or over). *Id.* ¶ 39. According to United States Census data, there are 250 million adults in the U.S., only 68% of which—or 170 million—use Facebook, according to Pew. *Id.* ¶¶ 38, 40. For 18 to 34-year-olds, Facebook represents to advertisers a Potential Reach of 100 million people. But there are only 76 million 18 to 34-year-olds in the U.S. *Id.* ¶ 43. And Pew found that only 80% of them—or 61 million— use Facebook. *Id.* After a report was published in the fall of 2017 report ("Report") alleging that Facebook's Potential Reach was inflated and exceeded the Census numbers, ████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

Documents now confirm senior executives knew for years Potential Reach was inflated and misleading – yet they failed to act, and even took steps to conceal the problem. *Id.* ¶¶ 5, 60-92. One Facebook employee wrote, "My question lately is: how long can we get away with the reach overestimation?" *Id.* ¶ 86. In fall 2017, Facebook COO Sheryl Sandberg ████████████████████ ████████████████████████████████████████████████ The Potential Reach Product Manager (Yaron Fidler) ████████████████████████████████████████████ ███████ But Facebook's metrics leadership team rejected his proposal because ███████████████████████████████████████████. Fidler responded, ██████ ████████████████████████████████████████████████████████ Fidler's proposals to fix the flawed metric were repeatedly rejected. *Id.* ¶ 91. Instead, Facebook developed talking points to deflect from the truth. Facebook claimed Potential Reach inflation is caused by travelers, and repeatedly reminded advertisers and the public that "the Potential Reach is not designed to match the census." *Id.* ¶ 71. Facebook used these same talking points in its prior motion to dismiss. ECF 65, Facebook's MTD CAC, at 7-8.



Facebook employees acknowledged

Facebook made

In early 2018, a Facebook analysis found

In the summer of 2018, Fidler proposed

Multiple Facebook employees

### C.     Named Plaintiffs Purchased Advertisements from Facebook

Plaintiff DZ Reserve purchased approximately $1 million in Facebook advertisements (on the Facebook and Instagram platforms) from December 2017 to December 2018, and ran nationwide campaigns, as well as campaigns targeted at specific cities. *Id.* ¶¶ 94-101. Plaintiff Maxwell purchased approximately $ 400 in Facebook advertisements from September 2018 to May 2019. *Id.* ¶¶ 102-108. Both plaintiffs entered into a contract with Facebook that includes the Self-Serve Ad Terms ("SSAT"). Mot. at 4. The SSAT states advertisers can "target [their] desired audience by buying ads to be delivered on Facebook, Instagram or our published network." ECF 178-5, SSAT.

### D.     The Court Denied Facebook's Motion to Dismiss Plaintiffs' UCL Claim

On December 21, 2018, Plaintiffs filed their Consolidated Amended Complaint. ECF 55. On February 7, 2019, Facebook moved to dismiss. ECF 65. The Court denied Facebook's motion to dismiss Plaintiffs' UCL claim. ECF 83. On June 17, 2019, Plaintiffs filed their Second Amended Complaint. After a hearing on October 17, 2019, the Court dismissed Plaintiffs' breach of contract claim, finding the SSAT does not create a contractual obligation for the Potential Reach or Estimated Daily Reach. ECF 130. The Court took Plaintiffs' quasi-contract and breach of covenant of good faith and fair dealing claims under submission. *Id.* Before the Court issued a ruling on those two claims,

Plaintiffs filed a Third Amended Complaint on April 15, 2020, adding claims for fraudulent misrepresentation and fraudulent concealment, and seeking punitive damages. ECF 166.[1]

## III. STANDARD

"In evaluating a [12(b)(6)] motion to dismiss, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in his or her favor." *Buckley v. Cnty. of San Mateo*, 2017 WL 3394747, at *1 (N.D. Cal. Aug. 8, 2017) (Donato, J.). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," and a claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at *1 (internal quotations omitted).

## IV. ARGUMENT

### A. Plaintiffs Plead Breach of the Implied Covenant of Good Faith and Fair Dealing

"The implied covenant of good faith and fair dealing is that neither party will do anything that will injure the right of the other to receive the benefits of the agreement." *Openshaw v. FedEx Group Package Sys., Inc.*, 576 F. App'x 685, 687 (9th Cir. 2014). No violation of an express contract term is required. *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 937 (9th Cir. 1999) (breach of a specific provision of the contract not necessary). Rather, the purpose of the implied covenant is "to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenant) frustrates the other party's rights of the benefits of the contract." *Mahmoud v. Select Portfolio, Inc.*, 2018 WL 278621, at *5 (N.D. Cal. Jan. 3, 2018) (*quoting Marsu, B.V.* 185 F.3d at 937–38). As the Court put it, breach of the implied covenant can occur where a contract is "performed without zest and verve" even though the conduct "doesn't necessarily rise to a technical level of breach." ECF 129, Oct. 17, 2019 Hr'g Trans. at 18:12-17; *see also*, Rest. (Second) of Contracts § 205 cmt. d (1981) ("lack of diligence and slacking off" examples of breach of good faith).

Facebook's inaccurate and misleading Potential Reach interfered with a benefit <u>expressly</u> conferred by the contract to allow advertisers to "target [their] desired audience by buying ads to be delivered on Facebook, Instagram or [Facebook's] published network." ECF 178-5, SSAT. And, here

---

[1] Facebook asserts this is Plaintiffs' "fifth" or "sixth" amendment. In fact, Plaintiffs amended their contract claims *once* since consolidation and the fraud claims have never been amended.

Facebook did not merely 'drag its feet' in providing inaccurate and misleading Potential Reach. Rather, Facebook knew for years its Potential Reach was misleading, and concealed that fact ██████████████████████

### 1. Facebook Frustrated Plaintiffs' Ability to Target Their Advertisements by Providing Inflated and Misleading Potential Reach

Facebook asserts Plaintiffs' implied covenant claim fails because no "specific contractual provision" has been frustrated. Mot. at 6-7. But Facebook unfairly interfered with Plaintiffs' rights to receive the benefits of the contract by hindering Plaintiffs' audience targeting, a benefit expressly conferred by the contract: "You can target your desired audience by buying ads to be delivered on Facebook, Instagram or our published network." ECF 178-5, SSAT at 1.[2] As Plaintiffs point out in the Complaint, advertisers use Potential Reach, in part, to "understand how [their] targeting and placement choices affect the number of people [they] could reach." TAC ¶ 36. Facebook acknowledges Potential Reach is a "tool" provided to advertisers "to evaluate the type of people to target…" ECF 103, MTD SAC at 1. Facebook knows ████████████████████████ Thus, by providing inflated and misleading Potential Reach, Facebook interfered with a benefit (audience targeting) expressly promised to Plaintiffs in the contract. This is a breach of the covenant of good faith and fair dealing. *See e.g., Trombley Enterprises, LLC v. Sauer, Inc.*, 2019 WL 452044, at *5–6 (N.D. Cal. Feb. 5, 2019) (motion to dismiss denied because "misrepresentation … interfered with [plaintiff's] ability to perform the contract in a reasonable, orderly and efficient manner…").

Citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) and *Sharp v. Nationstar Mortg., LLC*, 701 F. App'x 596 (9th Cir. 2017), Facebook contends the implied covenant claim is duplicative and superfluous to Plaintiffs' previously dismissed breach-of-contract claim. Mot. at 6-7. *Internet Tracking Litigation* and *Sharp* are inapposite. In both cases, the plaintiffs' implied covenant claims did not differ from their breach of contract claims. *In re Facebook*, 956 F. 3d, at 610; *Sharp*, 701 F. App'x at 598. Here, Plaintiffs' implied covenant claim is tethered to a *different*

---

[2] Plaintiffs can rely on this term in the SSAT because it is undisputed the SSAT is part of the contract, and Facebook argues Plaintiffs' implied covenant claim depends on the full contents of the SSAT. *See* Mot. at 4; Facebook's Request for Judicial Notice, ECF 179, at 6-7; *see also*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts "must consider … documents incorporated into the complaint by reference and matters of which a court may take judicial notice.")

contractual provision than Plaintiffs' previously dismissed breach-of-contract claim. Plaintiffs' implied covenant claim is based on Facebook's interference with a benefit expressly conferred in the SSAT (audience targeting), while Plaintiffs' previously dismissed breach-of-contract claim was based on a legal theory the Court rejected – that the Potential Reach metric on Ads Manager is an express contractual term. *See* ECF 89, SAC, at ¶¶ 30, 120. Because the two claims can be "distinguished," Plaintiffs' claim is neither duplicative nor superfluous under California law. *See Daly v. United Healthcare Ins. Co.*, 2010 WL 4510911, at *5-6 (N.D. Cal. 2010).

### 2. Facebook's "Disclaimers" Relate to the Delivery and Performance of Advertisements — Not Potential Reach

Facebook asserts Plaintiffs' implied covenant claim would "create an obligation inconsistent with the express term[s] of the agreement" because the contract "explicitly disclaims an audience reach or target guarantee." Mot. at 8. Plaintiffs' implied covenant claim is not "inconsistent" with either clause. Starting in May 2018, Facebook's SSAT stated, "[w]e do not guarantee the reach or performance that your ads will receive, such as the number of people who will see your ads or the number of clicks your ads will get." ECF 178-6, SSAT. **But the "reach" referenced in the no-guarantee clause is a *different* metric than the Potential Reach.** Reach is the number of people who actually see the ads, which is only reported *after* the ad is purchased. "Potential Reach" is a metric shown to advertisers *before* the ad is purchased, when they are in the process of designing their ad campaigns, and measures the number of people within an ad set's *target audience*. It is a separate calculation and a separate representation on Ads Manager. *See* TAC ¶¶ 29-31. Furthermore, because the reach no-guarantee clause was only added to the SSAT in May 2018, it does not affect Plaintiff DZ Reserve's claim related to advertisements it purchased prior to May 2018. *See Id.* ¶ 96 (DZ Reserve began purchasing Facebook advertisements in December 2017); *compare* ECF 178-6 *with* 178-5 (versions of SSAT from before and after May 2018).

Nor is Plaintiffs' implied covenant claim inconsistent with the SSAT clause which states "[w]hen serving your ad, we use best efforts to deliver the ads to the audience you specify … though we cannot guarantee in every instance that your ad will reach its intended target." ECF 178-6, SSAT. That clause also concerns Facebook's delivery of ads, *not* advertisers' selection of audience targeting

criteria. And, even assuming *arguendo* this clause applied to Plaintiffs' audience targeting, it gives Facebook discretion so long as it uses best efforts. This is not inconsistent with Plaintiffs' implied covenant claim, because "where a contract confers one party with discretionary power . . . a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *Lever Your Bus. Inc. v. Sacred Hoops & Hardwood, Inc.*, 2020 WL 2465658, at *6 (C.D. Cal. May 11, 2020) (internal citations omitted); *see also, Kendall v. Ernest Pestana, Inc.*, 40 Cal. 3d 488, 500 (1985).[3]

### B.     Plaintiffs State a Claim for Quasi-Contract

To state a claim for quasi-contract, the plaintiff must allege (1) a defendant's receipt of a benefit and (2) unjust retention of the benefit at the plaintiff's expense. *Peterson v. Cellco Partnership*, 164 Cal. App. 4th 1583, 1593 (2008). Plaintiffs adequately plead both elements.

### 1.     Quasi-Contract Claim is Not Barred by Parties' Express Contract

The contracts entered into between Plaintiffs and Facebook will not foreclose Plaintiffs' quasi-contract claim unless they cover the metrics at issue in this case: Potential Reach and Estimated Daily Reach. As Facebook concedes, "[I]t is well-established that an action based on a 'quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter.'" Mot. at 9 (citing *Morawski v. Lightstorm Entm't, Inc.,* 599 F. App'x 779, 780 (9th Cir. 2015)). If the factfinder determines Facebook's contracts do not cover Potential Reach and Estimated Daily Reach, then Plaintiffs can recover in quasi-contract, on the theory it would be inequitable for Facebook to retain funds it gained by virtue of those misleading metrics. *See Ball v. Johanns*, 2008 WL 269069, at *3 (E.D. Cal. Jan. 29, 2008). This is precisely what the Court determined here: "the SSAT *does not create a contractual obligation* as to the accuracy of the *Potential Reach or Estimated Daily Reach*." ECF 130, Minutes for Proceedings on Oct. 10, 2019 (emphasis added).

Faced with this ruling, Facebook conflates Potential Reach and actual reach, so that the contract covers the subject of this lawsuit. Mot. at 10. Not so. As Facebook concedes, Mot. at 11, Plaintiffs never claim they were misled about advertisements' ad delivery, i.e., *actual* reach. Facebook itself

---

[3] At best, Facebook's disclaimers are ambiguous, and therefore present a question for the jury. *See Lambotte v. IAC/Interactive Corp.*, 2008 WL 4829882 (C.D. Cal. Nov. 4, 2008) (motion to dismiss denied because "the disclaimer does not unambiguously conflict with plaintiffs' breach of the covenant of good faith and fair dealing claim.").

repeatedly stressed the distinction between the Potential Reach metric at issue and an advertisement's actual reach. *See, e.g.,* ECF 65 at 3 (Potential Reach and Estimated Daily Reach "are only estimates . . . and neither figure represent[s] actual campaign reach"; ECF 103 at 4 (citation omitted) ("reach estimates do not affect the number of people to whom its ad is actually delivered"). Facebook cannot now argue Potential Reach is the same as actual ad delivery and therefore covered by the contract. Because the Court found Potential Reach is not in the contract, Plaintiffs can pursue their quasi-contract claim. *See Ball*, 2008 WL 269069, at *3.

### 2.    Plaintiffs Allege Facebook Unjustly Retained a Benefit

Facebook asserts it did not unjustly retain a benefit as a result of its inflated and misleading Potential Reach. Mot. at 11. But Facebook

In the face of these facts, Facebook argues it did not retain a benefit because "Potential Reach estimates do not affect the pricing, payment or delivery of Facebook advertisements." Mot. at 11. Once again Facebook misconstrues Plaintiffs' allegations. Plaintiffs do not claim they were mis-billed or that there was an error in the delivery of their ads. *See* ECF 68 at 6 (same clarification in response to this identical argument in Facebook's first Motion to Dismiss). Instead, Plaintiffs plead Facebook misrepresented, at the point of purchase, the potential number of people their advertisements could reach. TAC ¶¶ 23-52; *see also,* ECF 68 at 6. Plaintiffs allege Facebook unjustly enriched itself by inflating Potential Reach, and representing it is based on people rather than accounts to make advertising on its platform appear more effective and valuable than it really was, leading Plaintiffs to pay more money than they otherwise would have paid. TAC ¶ 132.

Accordingly, Plaintiffs sufficiently allege Facebook unjustly retained a benefit.

### C.    Plaintiffs State a Claim for Fraudulent Misrepresentation

Facebook knew for years its Potential Reach was inflated and misleading. Internal documents reveal Facebook, including its senior-most executives, understood Potential Reach is systematically inflated and Potential Reach falsely represents it is a measurement of people, when in fact it is a

1    measurement of accounts, including fake and duplicate accounts. Yet Facebook failed to fix the

2    problem, and took steps to conceal it. ████████████████ Upon learning this information,

3    Plaintiffs amended their complaint to add a claim for common law fraud.

4         Facebook asserts Plaintiffs do not plead fraud with particularity and do not allege reasonable

5    reliance. In so doing, Facebook rehashes its prior failed motions to dismiss Plaintiffs' fraud claim under

6    the UCL. *See* ECF Nos. 65 at 3-10, 103 at 14-15. The Court already rejected these arguments *twice*,

7    and should reject them again here. ECF Nos. 83 (denying motion to dismiss UCL claim), 130

8    ("Facebook's attempt to revisit the denial of dismissal of the UCL claim is an improper request for

9    reconsideration, and denied.").

10        Specifically, Facebook contends Plaintiffs do not plead the "specific content" that misled them

11    into purchasing ads on Facebook, as required under Rule 9(b). Mot. at 12. This is the *identical* argument

12    Facebook raised in its failed motions to dismiss Plaintiffs' UCL fraud claim. *See* ECF 65 at 4 (arguing

13    Plaintiffs did not "specify which statements [each of them] actually saw and relied upon" as required

14    by Rule 9(b)); *see also* ECF 103 at 14. The Court rejected these arguments. *See* ECF Nos. 83, 130.

15    Facebook also asserts Plaintiffs could not have reasonably relied on Potential Reach because there is

16    no connection to "the price they were charged for their ad campaigns" and no alleged "surprise or

17    dissatisfaction with their actual advertising reach results." Mot. at 12. This, too, is an argument

18    Facebook made before, and the Court twice rejected. *See* ECF Nos. 65 at 4-5 (arguing Plaintiffs did not

19    plead reliance because Potential Reach does not "represent actual campaign reach or campaign

20    reporting," "affect [ad] delivery," or "guarantee results"), 103 (contending Plaintiff Maxwell did not

21    plead reliance); *rejected in* ECF Nos. 83 and 130.

22        Facebook's reasonable reliance argument is particularly curious in light of the documentary

23    evidence amassed to date. ████████████████

24    ████████████████████████████

25    ████████████████████████████

26    ████████████████████████████

27    ████████████████████████████

28    Regardless, under California law, "a presumption, or at least an inference, of reliance arises wherever

there is a showing that a misrepresentation was material," as it is here. *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 976-77 (1997); *see also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (materiality is a question of fact).

Facebook also asserts Plaintiffs do not allege they reasonably relied on the "people statement." Mot. at 12. Facebook misstates the allegations in the Complaint by asserting Plaintiffs' fraud claim "is premised on two statements." That is incorrect. Plaintiffs' fraudulent misrepresentation claim is based on <u>one</u> statement: Facebook's Potential Reach. TAC ¶¶ 142-148. The Potential Reach representation states: "Potential Reach: _____ people." *Id.* ¶ 31, as depicted in Figure 2 of the TAC:



*Id.*, Fig. 2. Here the Potential Reach representation includes the word "people," ███████████ ███████████████████████████████████████ Plaintiffs allege the single Potential Reach representation is false and misleading *for two reasons*. First, Potential Reach is inflated. *Id.* ¶ 143. Second, Potential Reach is misleading because it uses the word "people" when it is (at best) a measurement of accounts. *Id.* ¶¶ 68, 144. And, "Potential Reach is not a measurement of people because it includes fake and duplicate accounts." *Id.* ¶ 144. Facebook's documents also contradict its assertion there are two separate statements. When Facebook's Product Manager for Potential Reach ███████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

Plaintiffs allege they read and relied on Facebook's "Potential Reach" statement, *see* TAC ¶¶ 98, 105, and the Potential Reach statement includes the word "people." *Id.* ¶¶ 30-31. This reliance was reasonable, especially given the factual allegations referenced above. ███████████████████ ██; *Engalla*, 15 Cal. 4th at 976-77; *Hinojos*, 718 F.3d 1107. Plaintiffs also plead they would have purchased fewer Facebook ads and they would have paid a lower price had they known Potential Reach is calculated based on accounts rather than people. TAC ¶ 158. This is sufficient.

11

**D.    Plaintiffs Properly State a Claim for Fraudulent Concealment**

Plaintiffs allege Facebook fraudulently concealed Potential Reach is inflated and misleading. *Id.* ¶ 150; ████████████ Facebook argues it had no duty to disclose its Potential Reach metric is inflated and misleading because "Potential Reach estimates" do not "relate to the central functionality of their ads campaigns," and therefore its failure to disclose the inflation was not fraud. Mot. at 13-14. But Facebook misapplies the "central functionality" test. A defendant has a duty to disclose defects that "go to the central function" of its products or services, as Facebook's inflated and misleading Potential Reach does here. *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 863–64 (9th Cir. 2018) (holding slave labor in the supply chain is not "related to the chocolate's function as chocolate.").

This Court's decision in *Norcia v. Samsung Telecommunications Am., LLC* is instructive. 2018 WL 4772302 (N.D. Cal. Oct. 1, 2018) (Donato, J.). There, plaintiffs alleged "Samsung engaged in omissions relating to the Galaxy S4 smartphone's speed and performance, and more specifically, that Samsung 'intentionally programmed the Galaxy S4 to fool benchmark apps and to create false perceptions regarding the speed and performance of these devices.'" *Id.* at *1. The Court held plaintiffs satisfied *Hodsdon's* central functionality test, because "[n]o reasonable person could disagree that 'speed and performance' go to the heart of a smartphone's central function." *Id.* at *2 (noting plaintiffs had sufficiently alleged facts demonstrating the importance of the speed and performance feature).

Here, Plaintiffs similarly allege Potential Reach goes to the heart of Facebook's ad services, and Potential Reach allows advertisers to effectively target their ads. *See e.g*, TAC ¶¶ 3, 18. Facebook recognizes ████████████████████████████████████ Plaintiffs also used Potential Reach to customize their demographic targets, ███████████████████ Because Potential Reach was inflated, the performance of each of these tools was affected. And, like in *Norcia*, Plaintiffs allege Facebook "intentionally" concealed Potential Reach's inflation and the prevalence of duplicate and fake accounts "to create false perceptions regarding" Potential Reach and the effectiveness of Facebook's ad targeting. *Norcia*, 2018 WL 4772302 at *1. These allegations are sufficient to state a claim.

Contrary to Facebook's assertion, the Ninth Circuit never held that a product must be "unusable" to trigger a duty to disclose. *See Hodsdon*, 891 F.3d at 864 (noting that corrupted hard drives or defective computer screens that render those products "incapable of use by any consumer" demonstrate that central functionality of a product is not based on subjective preferences). Several courts – including this Court – have found a duty to disclose even when the product still works. *Norcia*, 2018 WL 4772302 at *2 (central function related to diminished speed and performance of the phone, no allegation phone was unusable), *Beyer v. Symantec Corp.*, 333 F. Supp. 3d 966, 980 (N.D. Cal. 2018) (vulnerabilities in computer security software relate to central functionality of the software despite lack of allegation that vulnerabilities were exploited; no allegation of unusability); *In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155, 1179 (N.D. Cal. 2019) (diminished battery capacity "goes to the central functionality of the devices"; no allegation of unusability).

Facebook misapplies a pair of district court decisions to assert a defect must render a product "unusable" for the defect to relate to the product's central function. Mot. at 13-14. In *Knowles v. Arris Int'l PLC*, 2019 WL 3934781, at *15 (N.D. Cal. Aug. 20, 2019), *appeal pending* (N.D. Cal. Dec. 6, 2019), plaintiffs alleged defects rendered a modem unusable; but, after fact and expert discovery, the court found "because Plaintiffs have not identified a genuine dispute of material fact as to whether any latency issues impaired the SB6190 Modem's central function, summary judgment is warranted." Here Plaintiffs at the pleading stage do not allege Facebook's ad services are unusable. In *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 567 (N.D. Cal. 2019), plaintiffs alleged Apple had a duty to disclose filter defects resulting in smudges in the corners of the screen; the court held "small, gray haze in the corners of the screen" do not impact the central function of the computer. *Id.* at 568. Here, Plaintiffs sufficiently allege Potential Reach goes to the central function of Facebook's ad services – ███

Facebook also argues fraudulent concealment is barred by the economic loss rule. "Broadly speaking, the economic loss rule is intended to police the boundary between tort and contract damages, and holds that certain damages should be remedied only in contract." *Jones v. Progressive Cas. Ins Co.*, 2018 WL 4521919, at *2 (N.D. Cal. Sept. 19, 2018) (Donato, J.). "[T]he rule is often misinterpreted to bar all tort recovery for 'purely' economic losses[, but a]pplying the rule in that

fashion makes scant sense because torts like fraud and negligent misrepresentation exist precisely to remedy purely economic losses." *Id.* at \*3 (citing *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 874-75 (9th Cir. 2007)). Here Plaintiffs seek to recover economic losses due to Facebook's fraudulent concealment.

Facebook cites a single case, decided on summary judgment, holding the economic loss rule applies to fraudulent concealment. Mot. at 14, *citing Sloan v. Gen. Motors LLC*, 2020 WL 1955643, at \*23 (N.D. Cal. Apr. 23, 2020). But courts have repeatedly held application of the economic loss rule to fraudulent concealment is inappropriate at the motion to dismiss stage, where all inferences are drawn in favor of the plaintiff. *See In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Lit.,* 2019 WL 3000646, at \*6 (C.D. Cal. May 22, 2019) ("The Court finds insufficient support in the California cases Ford cites for its distinction between fraudulent inducement by misrepresentation and fraudulent inducement by omission, and therefore declines to apply the economic loss rule to the omission claims at this [motion to dismiss] stage."); *Vanella v. Ford Motor Co.*, 2020 WL 887975, at \*9 (N.D. Cal. Feb. 24, 2020) (quoting same and declining to apply economic loss rule to the fraudulent omission claims at motion to dismiss stage); *see also*, *County of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292, 329 (2006) (declining to apply to economic loss rule to fraud claims including fraudulent concealment.)

This is especially true where, as here, Plaintiffs omission claim sounds in fraudulent inducement. *Yetter v. Ford Motor Co.*, 2019 WL 3254249 at \*7 (N.D. Cal. July 19, 2019) (declining to apply economic loss rule to fraudulent concealment and other fraud claims, "all of which sound in fraudulent inducement."); *Sloan,* 2020 WL 1955643, at \*23 (citing same); *R Power Biofuels, LLC v. Chemex LLC,* 2017 WL 1164296, at \*5 (N.D. Cal. Mar. 29, 2017) ([F]raudulent inducement is a well-recognized exception to the economic loss rule."). Plaintiffs here allege Facebook's fraudulent concealment induced Plaintiffs to buy more Facebook advertisements than they otherwise would have, and caused Plaintiffs to overpay for the advertisements they did purchase – all of which sound in fraudulent inducement. TAC ¶¶ 158-59; *see also id.* ¶¶ 56-57. Facebook's reliance on *Sloan* is therefore both premature at the motion to dismiss stage and inapposite, as Plaintiffs allege Facebook's fraud induced them to purchase advertising services.

1   Facebook also argues the fraudulent concealment claim does not "allege with particularity the

2   circumstances of the fraud, including how [Plaintiffs] relied on any omission about Potential Reach

3   estimates." ECF 177 at 14. Facebook is wrong. A plaintiff demonstrates reliance on an omission "by

4   simply proving that, had the omitted information been disclosed, one would have been aware of it and

5   behaved differently." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (internal

6   quotations omitted) ("plaintiff must show that the defendant's nondisclosure was an immediate cause

7   of the plaintiff's injury-producing conduct"; but "need not prove that the omission was the only cause

8   or even the predominant cause, only that it was a substantial factor in his decision.").

9   Here, Plaintiffs allege Potential Reach was an important factor in their decision to purchase

10   ads from Facebook, that it would have been important to them to know Potential Reach was inflated,

11   that it was comprised of accounts rather than people, and that it included fake and duplicate accounts.

12   *See e.g.,* TAC ¶¶ 53 55-57, 68, 71. Plaintiffs purchased their ads through Facebook's Ads Manager

13   interface: thus they would have been able to see the omitted information had it been disclosed, because

14   Potential Reach is displayed on Ads Manager. *Id.* ¶¶ 28, 33, 98, 105. Plaintiffs sufficiently allege

15   reliance with respect to their fraudulent concealment claim.

16   **E.    Plaintiffs May Proceed with All Claims**

17   Facebook argues the Court should dismiss Plaintiffs' claims prior to their accrual under

18   applicable statutes of limitations. While Facebook correctly states the statute of limitations for the

19   implied covenant and quasi-contract claims, Facebook is incorrect regarding Plaintiffs' fraud claims,

20   which relate back to the original complaint. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Res. Dev.*

21   *Servs., Inc.*, 2012 WL 12920615, at *2 (N.D. Cal. Apr. 16, 2012). Therefore, the fraud claims accrued

22   as of August 15, 2015 (three years prior to the filing of this suit).

23   **V.    CONCLUSION**

24   For the reasons stated above, Facebook's motion to dismiss should be denied in its entirety.

25   DATED: June 11, 2020                    Respectfully submitted,

26   By: /s/ *Geoffrey Graber*

27   Geoffrey Graber (SBN 211547)
     Andrew N. Friedman (*pro hac vice*)
28   Julia Horwitz (*pro hac vice*)

15

Karina G. Puttieva (SBN 317702)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
ggraber@cohenmilstein.com
afriedman@cohenmilstein.com
jhorwitz@cohenmilstein.com
kputtieva@cohenmilstein.com

Eric Kafka *(pro hac vice)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
ekafka@cohenmilstein.com

Charles Reichmann (SBN 206699)
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708-1015
Telephone: (415) 373-8849
Charles.reichmann@gmail.com

*Counsel for Plaintiffs and Proposed Class*