

Geoffrey Graber
(202) 408-4600
ggraber@cohenmilstein.com

September 24, 2020

**Via ECF**

The Honorable James Donato
United States District Court for the Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

    Re:    *Singer, et al. v. Facebook, Inc.*, Case No. 3:18-cv-04978

Dear Judge Donato:

    In light of newly produced documents and following the depositions of lower-level executives, Plaintiffs seek to depose Facebook COO Sheryl Sandberg about her unique, first-hand knowledge of facts central to Plaintiffs' claims. While Plaintiffs have previously sought Sandberg's custodial documents (ECF Nos. 133, 95), new evidence shows Sandberg was directly involved in Facebook's response to public reports of Potential Reach inflation in the fall of 2017. According to documents and Facebook's own witness, Sandberg met regularly with leaderships of the ads and sales teams in the wake of these reports. Yet, ***none*** of the lower-level executives Plaintiffs have deposed to date have ***any*** recollection of what Sandberg said about Potential Reach.[1] The Parties have met and conferred, and Facebook has refused to make Sandberg available for a deposition.

    When evaluating objections to apex depositions, courts consider whether the deponent has unique or special knowledge of relevant facts, and whether "other less burdensome avenues for obtaining the information sought have been exhausted." *In re Chase Bank USA, N.A. "Check Loan" Contract Litig.*, 2011 WL 5248158, at *1 (N.D. Cal. Nov. 3, 2011) (citations omitted). Facebook carries a "heavy burden" to prevent Sandberg's deposition. *See Google, Inc. v. Am. Blind & Wallpaper Factory Inc.*, 2006 WL 2578277, at *3 n.3 (N.D. Cal. Sept. 6, 2006). Plaintiffs need only make a "plausible prima facie showing" that Sandberg "may have relevant first-hand knowledge of relevant matters." *Hunt v. Cont'l Cas. Co.*, 2015 WL 1518067, at *3 (N.D. Cal. Apr. 3, 2015). Given the newly produced documents, and Rob Goldman's and Alex Schultz's inability to testify about Sandberg's decision-making process, despite clear evidence of her involvement, Plaintiffs meet this threshold.

    **1.   Ms. Sandberg Has Unique, First-Hand Knowledge of Facts Central to This Litigation.**

    By February, Plaintiffs knew Sandberg had historical knowledge of a long-standing problem with Potential Reach. FB-SINGER-00173288 at '89 (Sandberg: "We spoke about this a long time ago many times. I thought we knew about this but we also recognized that when the self-

---

[1] Sandberg was included on and referenced in hundreds of produced documents concerning Facebook's messaging to advertisers.

**COHEN**MILSTEIN

Geoffrey Graber
(202) 408-4600
ggraber@cohenmilstein.com

reporting data was so different than the census we knew we had to address it. I believe we still do.")[2]; *see also* ECF No. 133 at 2. What Plaintiffs did not know is that Sandberg evaluated multiple options for fixing (or deciding not to fix) problems with the Potential Reach metric in fall 2017. FB-SINGER-00255387, at '88-89. According to VP of Ads & Business Platform Mark Rabkin, "The main issue" for Sandberg was "that the numbers, the size of the discrepancies, just don't smell right to her—and thus won't smell right to either reporters or our clients." *Id.* Sandberg wanted "proposals soon on various options to really fix this issue, with timelines and also decisions we may have to make in order to move to modeled ages if that's what the solution is." *Id.* If the solution called for it, Sandberg wanted the ads team "to re-visit" a prior approach "because we should be holding ourselves to a higher accuracy bar these days." *Id.* Sandberg worked on formulating a possible solution. FB-SINGER-00093233. For instance, Head of Product Management Mary Ku noted to VP of Ads Rob Goldman: "[b]ased on the separate thread regarding your conversation with Sheryl, it sounds like we want to ensure that we have considered more aggressive solutions around what we do specifically with audience estimation (e.g. capping, etc.)." *Id.*

Sandberg also oversaw what Facebook would disclose to advertisers about Potential Reach in light of public reports exposing Facebook's Potential Reach inflation. FB-SINGER-00081777. For instance, Corporate Communications Director Elisabeth Diana wrote that after the public statement on reach estimates are reviewed by "legal, IR [investor relations], and [the] growth [team]" she still has to get approval from Sandberg. *Id.* ("From there we can then get Sheryl's and [CFO David] Wehner's reactions."). Likewise, Product Marketing Manager Amy Dunn wrote that while the ads team was "[l]eaning to more transparency" with respect to messaging and had "two options i.e. bulleted list of light suma and age[3] -and 2nd option of bullets that doesn't say much," both options "need[ed] to be presented to Sheryl." FB-SINGER-00145935 at '36. Initially, Facebook had one plan for responding to media inquiries about Potential Reach inflation—but Sandberg changed course. FB-SINGER-00284873. In response to proposed talking points from Corporate Communication Manager Adam Isserlis, Sandberg flatly responded: "I am calling [VP of Growth] Alex [Schultz] about this. I think we are going to need to handle this differently." *Id.*

As Plaintiffs noted before, Sandberg called a meeting with members of the ads and sales teams, including senior leadership, during which she provided the "framing on SUMA / fake accts." FB-SINGER-00083058; FB-SINGER-00165792 ("Subject: MTG Communicating our metrics."; Sandberg: "The key thing is that we find a way to communicate accurately so we set expectations in the market on this. I am not sure exactly how to do this."); FB-SINGER-00272365 (Product Marking Director Lu'chen Foster: "Hi all, Please see the attached deck draft for the conversation with Sheryl tomorrow."); *see also* ECF No. 133 at 2. But Plaintiffs now know that this type of meeting was not a one-off occurrence. All throughout late 2017 and early 2018, senior executives, as well as sales and ads team members, met with Sandberg on a ***biweekly*** basis to discuss public statements to customers. Goldman Dep. Tr. at 31:4-32:20.

---

[2] Plaintiffs will separately seek leave to file the documents referenced herein as Exhibits.
[3] "SUMA" or "Single User Multiple Account" refers to duplicate accounts. Documents show that at the time Facebook understood Potential Reach inflation to be caused in part by the presence of duplicate (SUMA) accounts and inaccurate age reporting by users.

COHENMILSTEIN

Geoffrey Graber
(202) 408-4600
ggraber@cohenmilstein.com

In sum, Facebook's documents show that Sandberg has first-hand knowledge of facts relevant to Plaintiffs' allegations that Facebook knew its Potential Reach was misleading.

2. **Only Sandberg Can Testify to Decisions She Made for Facebook, as Plaintiffs Have Exhausted Other Avenues for Obtaining This Information**.

Though exhaustion is not required, Plaintiffs already deposed two key lower-level executives before noticing Sandberg's deposition. *See Hunt*, 2015 WL 1518067, at *2 ("[E]xhaustion of other discovery methods is an important, but not dispositive, consideration"). Then-VP of Ads Goldman and VP of Growth Schultz denied having *any* recollection of what Sandberg said either in discussions with them individually or in the recurring meetings they attended with Sandberg, though documents and testimony show that both took place. *See* Goldman Dep. Tr. at 90:22-91:16, 105:18-106:7, 111:14-112:7, 141:5-18; Schultz Dep. Tr. at 69:25-70:15, 83:3-84:20, 110:17-22. Thus, only Sandberg can testify about her knowledge of why, under her leadership, Facebook chose not to disclose that Potential Reach measured accounts, not people, and that it was inflated.

3. **The Burden of Preventing Sandberg's Deposition Lies with Facebook, And Plaintiffs Have Made a Prima Facie Showing that Sandberg Should Be Deposed**

Precluding a requested deposition of an apex witness is an "extraordinary remedy." *Hunt*, 2015 WL 1518067, at *3. And Facebook bears the "heavy burden" of proving that it is entitled to that remedy. *See Google*, 2006 WL 2578277, at *3 n.3; *see also Hunt*, 2015 WL 1518067, at *1 n.1. Conversely, Plaintiffs need only make a plausible showing that Sandberg may personally know relevant information. *Hunt*, 2015 WL 1518067, at *3. Indeed, courts in this District have found that "where a corporate officer may have *any* first-hand knowledge of relevant facts, the deposition should be allowed." *Grateful Dead Prods. v. Sagan*, 2007 WL 2155693, at *1 n.5 (N.D. Cal. July 26, 2007) (emphasis original); *see also In re NCAA Student-Athlete Name & Likeness Litig.*, 2012 WL 174834, at *1 (N.D. Cal. Jan. 20, 2012) (allowing apex deposition because the witness "likely has first-hand knowledge of the relevant facts"). Here, it is evident from the documents that because Sandberg was directly involved in choosing what Facebook would disclose to advertisers after reports of Potential Reach inflation came out she has first-hand knowledge of facts that are relevant to the case, including Plaintiffs' UCL and fraud claims. Her knowledge is unique: the executives who worked with Sandberg testified that they have no recollection of *anything* Sandberg said or decided about Potential Reach's inflation or Facebook's response to reports that their metrics were misleading advertisers. Thus, Sandberg is the only person who can answer why Facebook chose to conceal Potential Reach's inflation from advertisers. These facts more than suffice for a "plausible prima facie showing" that Sandberg "may have relevant first-hand knowledge of relevant matters." *Hunt*, 2015 WL 1518067, at *3. Therefore, the Court should order Facebook to make Sandberg available for a deposition.

Respectfully submitted,

*/s/ Geoffrey Graber*
Geoffrey Graber (counsel for Plaintiffs)

cc:    Counsel for All Parties (via ECF)