Andrew N. Friedman (*pro hac vice*)
Geoffrey Graber (SBN 211547)
Julia Horwitz (*pro hac vice*)
Karina G. Puttieva (SBN 317702)
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
jhorwitz@cohenmilstein.com
kputtieva@cohenmilstein.com

Charles Reichmann (SBN 206699)
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708-1015
Telephone: (415) 373-8849
Charles.reichmann@gmail.com

Eric Kafka (*pro hac vice*)
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
88 Pine Street, 14th Floor,
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
ekafka@cohenmilstein.com

*Counsel for Plaintiffs and Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DZ Reserve and Cain Maxwell (d/b/a Max Martialis), individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> FACEBOOK, INC., <br><br> Defendant. | Case No.: 3:18-cv-04978-JD <br><br> **PLAINTIFFS' NOTICE OF MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Date: June 10, 2021 <br> Time: 10:00 am <br> Court: Courtroom 11, 19th Floor <br> Hon. James Donato |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

I.   Potential Reach, Provided to Every Advertiser on Ads Manager, Is the "Single Most Important Number in [Facebook's] Ads Creation Interface" .................................. 3

    A.   Ads Manager Displays Potential Reach to All Advertisers at Point of Purchase ........ 3

    B.   According to Facebook, Potential Reach Is "Arguably the Single Most Important Number on [Its] Ads Creation Interface" ................................................ 4

II.  Facebook Knew for Years Potential Reach Was Inflated and Not Based on People—But Concealed the Truth to Protect Its Revenue .................................. 5

    A.   In Late 2017, Facebook Executives Repeatedly Concealed the Impact of Fake and Duplicate Accounts on Potential Reach ................................................ 5

    B.   Senior Executives Block the Targeting Team's Proposal to Reduce Potential Reach Inflation Because It Would Have Had a "Significant" Revenue Impact .......... 7

    C.   Executives Block Proposals to Correct Potential Reach's Reference to People Because It Would be "████"– But Admit It Is an "████ ████" ................................................................................................. 9

    D.   In Fall 2018, the Potential Reach Product Manager Discovers Another Source of Inflation and Declares that Facebook Is "████████████" ...................... 10

III. In March 2019—After the Filing of This Lawsuit—Facebook Remediates One of the Five Sources of Inflation ........................................................................................... 11

IV.  Today Facebook Continues to Mislead Its Advertising Customers by Displaying an Inflated Potential Reach that Falsely References People ........................................ 11

V.   Plaintiffs' Experiences ........................................................................................... 12

    A.   Plaintiff DZ Reserve .......................................................................................... 12

    B.   Plaintiff Cain Maxwell ........................................................................................ 12

FACEBOOK'S CLASSWIDE FRAUD ............................................................................ 12

I.   Facebook Disseminated Inflated Potential Reach Numbers .................................... 13

    A.   Default United States Potential Reach – Inflated by at Least █% ........................... 13

    B.   Potential Reach After Targeting – Inflated by At Least █% .................................... 13

II.  Facebook Disseminated a False and Misleading Potential Reach Metric That Is Not Based on Unique People ........................................................................................... 14

i

CLASS DEFINITION .................................................................................................... 15

ARGUMENT ................................................................................................................... 15

I.   The Proposed Class Meets the Rule 23(a) Requirement ......................................... 15

    A.   The Proposed Class Is Sufficiently Numerous ............................................ 15

    B.   Facebook's Conduct Raises Common Legal and Factual Questions........................ 16

    C.   Plaintiffs' Claims Are Typical of the Class ................................................ 16

    D.   Plaintiffs and Counsel are Adequate ........................................................ 17

II.  The Court Should Certify a 23(b)(2) Class for Injunctive Relief ........................... 17

III. The Court Should Certify a 23(b)(3) Class for Damages ...................................... 18

    A.   Common Questions Predominate Because Common Evidence Will Be Used
         to Establish Liability and Damages ........................................................ 18

         1.   Facebook's Fraudulent Conduct Is a Common Question ............................. 19

         2.   Causation and Damages Are a Common Question Because Plaintiffs
              Have Demonstrated a Price Premium ............................................... 21

    B.   Common Questions of Law and Fact Predominate for Each Claim......................... 22

         1.   UCL   ........................................................................... 22

         2.   Common Law Fraud ................................................................ 23

         3.   Fraudulent Omission............................................................. 24

    C.   Class Treatment Is Superior to Other Available Methods of Adjudication............... 25

CONCLUSION................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*625 3rd St. Assoc., L.P. v. Alliant Credit Union*,
    633 F. Supp. 2d 1040 (ND Cal. 2009) ........................................................................24

*Abbit v. ING USA Annuity and Life Ins. Co.*,
    999 F. Supp. 2d 1189 (SD Cal. 2014) ........................................................................24

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997) ..................................................................................................25

*Amgen v. Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013) ..................................................................................................19

*Bradach v. Pharmavite, LLC*,
    735 F. App'x 251 (9th Cir. 2018) (unpublished opinion)........................................20, 22

*Brazil v. Dell Inc.*,
    2010 WL 5387831 (N.D. Cal. Dec. 21, 2010) ............................................................22

*Brickman v. Fitbit, Inc.*,
    2017 WL 5569827 (N.D. Cal. Nov. 20, 2017) (Donato, J.) ............................19, 22, 24

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ...................................................................................15

*Broomfield v. Craft Bew All, Inc.*,
    2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ............................................19, 20, 21, 24

*Carnegie v. Household Int'l, Inc.*,
    376 F.3d 656 (7th Cir. 2004) (Posner, J.) ..................................................................25

*Carriuolo v. General Motors Co.*,
    823 F.3d 977 (11th Cir. 2016) ...................................................................................23

*In re Coca-Cola Prod. Mktg. & Sales Practices Litig.*,
    2020 WL 759388 (N.D. Cal Feb. 14, 2020) ...............................................................18

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ...............................................................................................21, 22

*Cortez v. Purolator Air Filtration Prod. Co.*,
    23 Cal. 4th 163 (2000) ..........................................................................................24, 25

*Davidson v. Kimberly-Clark Corp.*,
    889 F.3d 956 (9th Cir.), cert. denied, 139 S. Ct. 640 (2018) .....................................18

i

*Engalla v. Permanente Med. Grp., Inc.*,
 15 Cal. 4th 951 (1997), *as modified* (July 30, 1997) ................................................23, 24

*Ewert v. eBay, Inc.*,
 2010 WL 4269259 (N.D. Cal. Oct. 25, 2010)..................................................................17

*In re First All. Mortg. Co.*,
 471 F.3d 977 (9th Cir. 2006) .....................................................................................19, 20

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
 326 F.R.D. 592 (ND Cal 2018).........................................................................................24

*Hadley v. Kellogg Sales Co.*,
 324 F. Supp.3d 1084 (N.D. Cal. 2018) .......................................................................19, 22

*Hinojos v. Kohl's Corp.*,
 718 F.3d 1098 (9th Cir. 2013) ..........................................................................................23

*Iorio v. Allianz Life Ins. Co. of N. Am.*,
 2008 WL 8929013 (S.D. Cal. July 8, 2008) ....................................................................24

*Just Film, Inc. v. Buono*,
 847 F.3d 1108 (9th Cir. 2017) ....................................................................................16, 21

*Krommenhock v. Post Foods, LLC*,
 334 F.R.D. 552 (N.D. Cal. 2020)......................................................................................23

*Kwikset v. Super. Ct.*,
 51 Cal. 4th 310 (2011) ......................................................................................................22

*Lilly v. Jamba Juice Co.*,
 2015 WL 1248027 (N.D. Cal Mar. 18, 2015)..................................................................18

*Marsu, B.V. v. Walt Disney Co.*,
 185 F.3d 932 (9th Cir.1999) .............................................................................................21

*McArdle v. AT&T Mobility LLC*,
 2018 WL 6803743 (N.D. Cal. 2018) ................................................................................20

*Nguyen v. Nissan N. Am., Inc.*,
 932 F.3d 811 (9th Cir. 2019) .................................................................................23, 24, 25

*Plascencia v. Lending 1st Mortg.*,
 259 F.R.D. 437 (ND Cal. 2009), *clarified at* 2011 WL 5914278 (ND Cal 2011) .........24

*Pulaski & Middleman, LLC v. Google, Inc.*,
 802 F.3d 979 (9th Cir. 2015) .................................................................................21, 22, 23

*Rannis v. Recchia*,
 380 F. App'x 646 (9th Cir. 2010) (unpublished) ..............................................................15

ii

*Small v. Fritz Cos., Inc.*,
    30 Cal. 4th 167 (2003) ............................................................................................24

*Smith v. Keurig Green Mountain, Inc.*,
    2020 WL 5630051 (N.D. Cal. Sept. 21, 2020) .........................................................18

*Soares v. Flowers Foods, Inc.*,
    320 F.R.D. 464 (N.D. Cal. 2017)..............................................................................25

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ...................................................................................17

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (9th Cir. 2011) .................................................................................22

*Tait v. BSH Home Appliances Corp.*,
    289 F.R.D. 466 (C.D. Cal. Dec. 20, 2012).................................................................22

*In re Tobacco II Cases*,
    46 Cal. 4th at 312, 320 .................................................................................19, 22, 23

*Torres v. Mercer Canyons Inc.*,
    835 F. 3d 1125 (9th Cir. 2016) ...........................................................................16, 19

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)..............................................................................................19, 20

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013)......................................................................................20

*Vasquez v. Super. Ct.*,
    4 Cal. 3d 800 (1971)............................................................................................19, 24

*Wal–Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..............................................................................................16, 18

*Walker v. Life Ins. Co. of the Sw.*,
    953 F.3d 624 (9th Cir. 2020) ...................................................................................22

*Yokoyama v. Midland Nat. Life Ins. Co.*,
    594 F.3d 1087 (9th Cir. 2010) .................................................................................21

**STATUTES**

Cal. Bus. & Prof. Code § 17200 ...................................................................................22

Cal. Bus. & Prof. Code § 17203 ...................................................................................23

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(b)(2)......................................................................................................17

Fed. R. Civ. P. 23(b)(3)..............................................................................................18, 25

Fed. R. Civ. Pro. 23 (a)(2) ..........................................................................................16

1

## NOTICE OF MOTION

2

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

3

 **PLEASE TAKE NOTICE THAT** on June 10, 2021, at 10:00am, or as soon thereafter as

4

counsel may be heard, before the Honorable James Donato, Courtroom 11, United States District Court

5

for the Northern District of California, 450 Golden Gate Ave., San Francisco, California, Plaintiffs

6

will and hereby do move this Court for an Order pursuant to Federal Rule of Civil Procedure 23, to

7

certify the following class:

8

9

10

> All United States residents (including natural persons and incorporated entities) who,
> from August 15, 2014, to the present ("Class Period"), paid for the placement of at least
> one advertisement on Facebook's platforms, including the Facebook and Instagram
> platforms, which was purchased through Facebook's Ads Manager or Power Editor.

11

12

13

14

15

> Excluded from the class are: (1) advertisements purchased pursuant to agreements other
> than Facebook's Terms of Service or Statement of Rights and Responsibilities;
> (2) advertisements purchased using only non-lookalike Custom Audiences as the
> targeting criteria; (3) advertisements purchased using Reach and Frequency buying; (4)
> advertisements purchased with the objectives of canvas app engagement, canvas app
> installs, offer claims, event responses, page likes, or external; and (5) advertisements
> for which Facebook provided a Potential Reach lower than 1000.

16

17

18

> Also excluded from the Class are Defendant, any entity in which Defendant has a
> controlling interest, and Defendant's officers, directors, legal representatives,
> successors, subsidiaries, and assigns. Further excluded from the Class is any judge,
> justice, or judicial officer presiding over this matter and the members of their
> immediate families and judicial staff.

19

20

 Plaintiffs also move to appoint DZ Reserve and Cain Maxwell (d/b/a Max Martialis) as class

21

representatives and current interim class counsel Geoffrey Graber of Cohen Milstein Sellers & Toll

22

PLLC as class counsel for the proposed class under Fed. R. Civ. P. 23(g). This motion is based on this

23

Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the

24

pleadings and papers on file in this action, the arguments of counsel, and any other matter that the

25

Court may properly consider.

DATED: April 23, 2021      Respectfully submitted,

26

27

          By: /s/ *Geoffrey Graber*

28

          Geoffrey Graber (SBN 211547)

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Potential Reach is the cornerstone of Facebook's ads platform. The Potential Reach metric tells advertisers how many people are in an ad set's target audience. Facebook displays Potential Reach to every advertiser on Ads Manager, and, according to Facebook, "███████" uses Potential Reach. Facebook knows advertisers use Potential Reach to plan, budget and evaluate the performance of their campaigns. This is why, according to Facebook, Potential Reach is "arguably the single most important number in [its] ads creation interface."

Senior executives at Facebook, however, knew for years their "most important" metric was inflated and misleading. Immediately following public accusations that Potential Reach exceeds the census, Sheryl Sandberg said "we spoke about this a long time ago many times." Alex Schultz, the current VP of Analytics and Chief Marketing Officer, wrote that fake and duplicate accounts were responsible for "███████████" between Potential Reach and the census, and Facebook had made a "███████████" not to remove fake accounts. Executives also repeatedly ████████████ ███████ the impact of fake or duplicate accounts on Potential Reach and ████████ the inflation or changing the metric to make it less misleading.

Facebook executives knew their conduct was wrong. Rob Goldman, VP for Ads at the time, called Facebook's treatment of duplicate accounts "pretty indefensible." Another executive called Facebook's conduct "deeply wrong." Facebook acknowledged its Potential Reach metric is an "█████████████" and the Product Manager for Potential Reach declared that Facebook was "█████████████"

Facebook executives knew these lies were responsible for significant revenues—at the expense of advertisers. When Facebook considered implementing a model to reduce Potential Reach inflation, the successful counterargument was that Facebook would suffer a severe negative "revenue impact," which prompted the Potential Reach Product Manager to observe, "it's revenue we should have never made given the fact it's based on wrong data." And when employees suggested changing Potential Reach to refer to accounts instead of people, the Chief Revenue Officer ████████, because Facebook's "people-based narrative" is key to the company's value proposition. In short, Facebook

1  admits it intentionally lied to make money – the textbook definition of fraud.

2  Facebook admits the classwide impact of its misconduct. Schultz, VP of Analytics,
3  acknowledged "███████████████████████████████████████████████████████████████
4  ███████████████████████████████████████████████████████████████████████████
5  ██████████████████████████████████████████████████████████████████ This is
6  consistent with Plaintiffs' expert analysis showing that Potential Reach is inflated for everyone by at
7  least ███%. Consistent with Plaintiffs' findings, Facebook also acknowledges Potential Reach inflation
8  causes advertisers to spend more money: "██████████████████████████████████████████
9  ████████████████████████████████████████████" And Facebook admits increased
10  advertiser spending results in higher prices for all advertisers, because when advertisers increase their
11  budgets, "████████████████████████████████████████████████" In sum, Facebook
12  explains how Potential Reach inflation causes all class members to pay a price premium.

13  Facebook's own words and actions also explain why injunctive relief is necessary. Facebook
14  has failed to take steps to reduce inflation—even though it developed ways to do so. It continues to
15  insist Potential Reach means people—even though it acknowledges internally "people" is an
16  "██████████████████████" And at least one former senior executive has indicated Facebook *aims* to
17  provide inflated Potential Reach: when Goldman, former VP for Ads, was asked whether "[it] would
18  be a good thing, to reduce the overestimation problem significantly?", he answered: "No."

19  Plaintiffs seek certification on behalf of a class of United States advertisers who bought ads
20  through Facebook's Ads Manager or Power Editor. (*See infra*, at 15). Class certification is warranted
21  because the central questions of the case are susceptible to classwide proof: whether a reasonable
22  advertiser would view Potential Reach as material, whether Potential Reach is inflated and misleading,
23  and whether and by how much Facebook's actions increased the price for its ads. A class action is also
24  superior to any other form of redress. Indeed, it is the *only* practical way to obtain a remedy— the
25  median class member advertiser, on the one hand, has incurred no more than $32 in damages;
26  Facebook, on the other hand, is the most powerful social media company in the world. Absent
27  certification, Facebook's misconduct will continue to go unpunished. In sum, this case is ideally suited
28  for class treatment, and Plaintiffs' Motion for Class Certification should be granted.

## FACTUAL BACKGROUND

I.    **Potential Reach, Provided to Every Advertiser on Ads Manager, Is the "Single Most Important Number in [Facebook's] Ads Creation Interface"**

A.    **Ads Manager Displays Potential Reach to All Advertisers at Point of Purchase**

When advertisers create ad sets on Facebook's Ads Manager, the Potential Reach is displayed on consecutive webpages at the point of purchase. Declaration of Geoffrey Graber ("Graber Decl."), Ex. 1.[1] Each Advertiser is exposed to Potential Reach on the page where they select the targeting criteria for the ad set, and on the page where they set their budget. Ex. 1 (Potential Reach with targeting criteria); Ex. 2 (Potential Reach with budget). For the entire class period, Facebook's Ads Manger has displayed Potential Reach at the point of purchase. *See e.g.*, Ex. 3 (image of Potential Reach in 2014). The Potential Reach is consistently displayed in the right-side column using the same words "Potential Reach: _____ people" (where the blank is filled in with the Potential Reach number):

**Figure 1: Potential Reach (*See* Ex. 1)**

Potential Reach 240,000,000 people

The first Potential Reach number displayed to all advertisers when they create an advertisement set on Ads Manager is based on default targeting criteria. ███████████████████████████████

████████████████████████████████████████████████████████████

████████ [2] Ex. 4 (Hashmi Rpt.) at ¶¶ 55-60; Ex. 5 (Hashmi Reply) at ¶ 10 Thus, throughout the class period, all United States advertisers creating a new advertisement set on the same day with the same objective were provided the same default Potential Reach number. Throughout the class period, the default Potential Reach number was inflated by at least ███%. *See* Ex. 6 (Cowan Rpt.) at ¶ 15.a; Ex.7 (Cowan Reply) at ¶ 8.a-b.

Advertisers can target their advertisement sets at certain audiences by selecting "targeting criteria," such as location, age, and gender. Ex. 1; Ex. 8 at 54:1-59:25. When an advertiser selects targeting criteria, Ads Manager displays the Potential Reach number corresponding to the selected

---

[1] All exhibit references herein are to the Graber Declaration.

[2] ████████████████████████████████████████████████████████████ . Ex. 5 at ¶ 10.

targeting criteria. *See* Ex. 9 (Facebook Business Help Center, "Potential reach is an estimation of how many people are in an ad set's target audience."). Here, Plaintiffs refer to the Potential Reach of the final targeting criteria for an advertisement as the "Potential Reach After Targeting." Throughout the class period, the Potential Reach After Targeting was inflated by at least ███% percent for all advertisement sets with a Potential Reach greater than 1,000. Ex. 6 at ¶ 155.

After an advertisement is ordered on Ads Manager, it is entered into Facebook's advertisement auction, which determines the price of the ad. Ex. 10 (Facebook's Resp. ROG 5) at pp. 6-7. In the auction, the prices paid by an advertiser are affected by the ████████████████████████. Ex. 11 (Roughgarden Rpt.) at ¶¶ 30-32. As Facebook explains internally: "████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████" Ex. 12 at '90.

**B.  According to Facebook, Potential Reach Is "Arguably the Single Most Important Number on [Its] Ads Creation Interface"**

Facebook knows that Potential Reach is material to advertisers' purchasing decisions. Facebook initially launched Potential Reach "████████████████████████████████ ████████████████████████████████████" Ex. 13. And Facebook acknowledged internally that advertisers "frequently rely" on Potential Reach:

> When creating advertising campaigns, advertisers frequently rely on the estimated audience to understand the potential reach of their campaigns and set the bid and budget strategy. Thus, this number is arguably *the single most important number* in our ads creation interfaces.

Ex. 3 (emphasis added). Facebook employees repeatedly acknowledged the importance of Potential Reach to advertisers. For example, one Facebook employee wrote, "████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████"[3] Ex. 14. When asked who uses Potential Reach, a Facebook product marketing manager responded, "████████████████████████████" Ex. 13. And, ████████ ███████████████████████████████████████, Facebook Vice President Carolyn

---

[3] "████████████████" is a synonym for "████████████" Ex. 14; *see also* Ex. 15 at 111:5-12.

1  Everson explained, "███████████████████████████████████
2  ████████████████████████████████████████████████████
3  ██████████████████████████," Ex. 16 at '61 (emphasis added).
4      These statements are also consistent with ███████████████, which found that
5  ███% of advertisers ████████████ and that advertisers believe both that ███████
6  ████████ and that ████████████████████████████████ Ex. 17 at
7  '33-34. These findings are consistent with the conjoint survey conducted by Plaintiffs' expert Dr. Greg
8  Allenby, which found that Potential Reach inflation has "a statically significant impact on consumer
9  demand for Facebook advertisements." Ex. 18 (Allenby Rpt.) at 5; *see also* Ex. 19 (Allenby Reply).

10  **II.     Facebook Knew for Years Potential Reach Was Inflated and Not Based on People—But
           Concealed the Truth to Protect Its Revenue**

11      Facebook—including Chief Operating Officer Sheryl Sandberg ("Sandberg"), Chief Financial

12  Officer Dave Wehner ("Wehner"), now-Chief Marketing Officer Alex Schultz ("Schultz"), and Vice

13  President for Ads Rob Goldman ("Goldman")—knew for years that Potential Reach was inflated, and

14  not based on people. And for years Facebook repeatedly confronted a choice between telling customers

15  the truth or preserving its revenue: at every turn, Facebook chose its revenue.

16      **A.     In Late 2017, Facebook Executives Repeatedly Concealed the Impact of Fake
17              and Duplicate Accounts on Potential Reach**

18      On September 5, 2017, an analyst from Pivotal Research wrote that Facebook's Potential

19  Reach exceeds the census. Ex. 20 at '90-91. Immediately following this allegation, senior executives

20  acknowledged they had long known Potential Reach was inflated due to fake and duplicate accounts.

21  Schultz told fellow executives, including Sandberg and Wehner, that fake and SUMA ("Single User

22  Multiple Accounts" or duplicate accounts) were responsible "████████████████" between

23  Potential Reach and the census, and that Facebook had made a "████████████" not to remove

24  fake accounts. *Id.* at '88 (emphasis added). Schultz said Facebook "could retire" Potential Reach, a

25  solution that "has been suggested and rejected down the years," and told Sandberg and Wehner "[l]et

26  me know … if you think [Potential Reach] should be explicitly added to the list of public metrics to

27  deprecate." *Id.* at '89. Sandberg showed no interest in eliminating Potential Reach. Instead, Sandberg

28  acknowledged she had known about problems with Potential Reach for years, "We spoke about this a

long time ago many times. I thought we knew about this but we also recognized that when the self-reporting data was so different than the census we knew we had to address it. I believe we still do." *Id.* at '88-89.

In response to Pivotal Research's accusations, the Targeting Team, which was responsible for Potential Reach and led by Product Manager Yaron Fidler, began investigating ███████████████ ████████████. *See* Exs. 21, 22 (21:18-20). Their preliminary results showed ███████████████ constitute ██% of global Monthly Active People (MAP) and ██% of United States MAP. Ex. 21 at '06. Goldman remarked to others that Facebook's "██████████████████████████." Ex. 23 at '20-21 (emphasis in original) After another report surfaced from the Video Advertising Bureau leveling accusations that Potential Reach was inflated, a Targeting Team data scientist stated that the report "ha[s] the order of magnitude in inflation correct." Exs. 24, 25 at '40.

The Targeting Team discovered other sources of inflation. In particular, the team observed that, ████████████████████████████████████ for Potential Reach. Ex. 26, at 78-81; *see also* Exs. 5 and 7. In calculating Potential Reach, Facebook fails to use the ████████████ that is used to ████████ ████████████████████████████ Exs. 5, at ¶¶ 7-8; 27 at '56-57. Thus, while Facebook touts on its "Transparency Portal" that it removes billions of accounts annually, such accounts ████████████████████████ – and are a significant source of inflation. Exs. 28; 5 at ¶ 7; 7 at Appx. A, Tab 4. The team also observed Facebook does not ████████████████████████████, resulting in Potential Reach ████████ ████████████████████. Exs. 29 at '76; 6 at ¶ 118.

After a week of internal debate, Facebook decided to change only the description of the Potential Reach metric advertisers would see if they clicked on a link on Ads Manager. The new proposed description reiterated Facebook's public talking point that Potential Reach is "██████ ████████████████████████. Ex. 30 at '45-46. In response, a Facebook employee suggested revising the disclosure "██████████████████████████████████████████." *Id.* at '44. The Potential Reach Product Manager, Fidler, responded, "████████████████████



." *Id.* at '43. He further explained: "

" *Id.* Fidler further

noted, "

." *Id.*

Nevertheless, Fidler then offered the following alternative proposal to

:

*Id.* at '42 (emphasis in original). Fidler stated, "

." *Id.* Later that evening, an Ads Team member responded that

*Id.* at '41. Goldman later testified his decision was "          " Ex. 31 at 130:8-18.[4]

Alex Schultz separately directed Facebook's sales staff not to discuss duplicate and fake accounts with advertisers: "Additionally, just a polite reminder that we've been given guidance from growth (Alex Schultz) that we should not include messaging about MAP and duplicate or false accounts outside of earnings . . ." Ex. 32 at '21. Internally, however, Schultz openly admitted that Facebook's Potential Reach numbers

Ex. 33 at '16. (emphasis added).

**B.**   **Senior Executives Block the Targeting Team's Proposal to Reduce Potential Reach Inflation Because It Would Have Had a "Significant" Revenue Impact**

In Spring 2018, Facebook's Targeting Team repeatedly proposed to partially fix or eliminate Potential Reach. Specifically, in March 2018, the Targeting Team proposed a plan to reduce duplicate accounts in Potential Reach through a          . The Targeting Team determined that if their plan

---

[4] Wehner, Facebook's CFO, directed subordinates to conceal the impact of fake and duplicate accounts on Potential Reach on the company's November 2017 earnings call. *See* Ex. 16 at '63.

7

to reduce duplicate accounts were implemented, the number of "People will drop ~ **10%** Globally."

Ex. 34 at 7 (emphasis in original). The "████████" for implementing the plan was straightforward:

"██████████████████████████████████████████████████████████

████████████████████████." Ex. 35 at '68. Fidler highlighted that one of the main counter-

arguments to the proposed solution was that Facebook stood to lose a significant amount of revenue:

> **Revenue impact is indeed significant.** The question is how do we
> quantify the loss of advertiser trust? **Also, in a way it's revenue we
> should have never made given the fact it's based on wrong data[ ].**

*Id.* at '70 (emphasis added); *see also* Ex. 36 at 124:18-125:18; 130:6-132:6.

Indeed, Facebook continually considered the revenue impact of fixing or eliminating its

Potential Reach. Facebook employees expected proposed changes to Potential Reach to be

accompanied by ████████████████████████████. Ex. 37 at

'08. And employees conducted multiple analyses, based on highly conservative assumptions, showing

that ████████████████████████████████████████████████████

████████████████████████. Ex. 38 at '65, '67; *see also* Ex. 48 at '97. Another

Facebook study found that eliminating Potential Reach would "████████████████████." Ex. 39.

On April 12, 2018, Fidler met with the "Central Metrics XFN" team to discuss the Targeting

Team's proposal to implement a "████████████" to reduce the impact of duplicate accounts on

Potential Reach. According to Facebook, Central Metrics XFN's mission is to "[p]rotect the trust of

our partners in external metrics, **while minimizing the restriction of this on revenue** or innovation."

Ex. 40 at PDF pg. 4 (emphasis added). At that meeting, Schultz blocked the Targeting Team's

proposed duplicate account fix. Schultz wrote that he "tried to stop it there a few times and Yaron kept

pushing." Ex. 41 at '22. Following the meeting, another executive complained to Schultz:

> Yaron and team have done a huge amount of data analysis on this, not
> just averages but detailed distributions as well. . . . **The status quo in
> ads Reach estimation and reporting is deeply wrong**, and our data
> analysis suggests [de-duplicating accounts] and Age Affinity [ ] would
> dramatically improve things . . . I think we hung Yaron a bit out to dry
> today.

*Id.* at '23 (emphasis added).[5]

---

[5] Despite blocking implementation of the ████████████, in October 2017, Schultz had told

Despite this resistance, Fidler continued to press ahead in implementing the ███████ to filter duplicate accounts out of Potential Reach. By June 2018, the Targeting Team had conducted the necessary work so Potential Reach numbers based on the ███████ could be provided to advertisers. On June 11, 2018, Fidler wrote that "████████████████████ ███████████████████████████." Ex. 43 at '10. Fidler told the Targeting Team: "████████████████████ ████████████████████" *Id*. Facebook employees had previously agreed, however, that, ████████████████████████. Ex. 44 ("█████████████████████ ████████████████████████ ████████████████████") (███████ in original.) The ███████ was never implemented.[6]

### C.   Executives Block Proposals to Correct Potential Reach's Reference to People Because It Would be "█████"– But Admit It Is an "████████████████"

In June 2018, Fidler again proposed Potential Reach solutions to Goldman and other executives. In addition to suggesting the ███████ again, Fidler proposed that Facebook represent Potential Reach numbers as counting "accounts" instead of "people." Ex. 47 at '48-50. According to Fidler, this was the "███████" and would solve the "numbers accuracy" problem because the "metrics description will be aligned with reality". *Id*. at '50. Fidler, however, acknowledged that this change would come at the "cost of losing the people based narrative". *Id*. Executives directed Fidler to discuss the proposal with Facebook's Chief Revenue Officer, David Fischer, to determine the cost of switching from "people" to "accounts." *See* Exs. 48 at '92-93; 36 at 168:8-13.

---

Goldman he was █████████████████████████████████ *See* Ex. 42.

[6] As of April 6, 2019, Facebook's source code ████████████████████████. Ex. 45 at ¶¶ 4-5. Thus, every time an advertiser submits targeting criteria, Facebook's source code ███████████. *Id*. at ¶ 7. However, in that source code, ███████████████████. *Id*. at ¶ 6. And, to this day, Facebook's Potential Reach o███████████████. Exs. 4 at ¶¶ 46-49; 8 at 25:10-20; *see also* Ex. 46.

Fischer told Fidler the "███████████████████████████████████████████████

██████████████" and it would "be costly to change to accounts…" Ex. 48 at '89, '92. Based on

feedback from Fischer, Goldman, and others, Fidler wrote, "█████████████████████████

████████████████████████████████████████████████████████████████████████████████

█████████████████████████". Ex. 47 at '44.

In July and August 2018, Facebook employees continued to express concern about Potential

Reach. One employee wrote on July 12, 2018: "my question lately is: how long can we get away with

the reach overestimation?" Ex. 49. Fidler also expressed frustration at Facebook's failure to fix its

Potential Reach, stating that ███████████████████████████████████. Ex. 50 at '11.

Senior executives also acknowledged Facebook's dishonesty with its advertising customers.

On August 3, 2018, Goldman and Executive Vice President for Growth Javier Olivan both received a

PowerPoint presentation depicting how █████████████████████████████████████████

█████████. Ex. 51. The presentation labeled the reference to people in the Potential Reach metric as

an "██████████████████." *Id.* at PDF pp. 5-6. The presentation explained: "████████████

█████████████████████████████████████████████████████████████████████████████████

███████," and emphasized, "███████████████████████████████████████████████████

█████████████████████". *Id.* (emphasis in original). The presentation concluded: "███████████

████████████████████████████████████████████████████████████████████████████████

██████████████". *Id.*

**D.     In Fall 2018, the Potential Reach Product Manager Discovers Another Source of Inflation and Declares that Facebook Is "██████████████████████"**

Around August 2018, Facebook employees discovered *another* source of inflation: Potential

Reach included users who ████████████████████████████████ (hereinafter "████████████").

*See* Ex. 52. Upon learning this, Fidler stated: "███████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████" *Id.* at '19. An engineer noted that counting ███████████████ led to

█%–██% inflation in Potential Reach. *Id.* Facebook later conducted an analysis showing that

██████████████████ alone inflated Potential Reach by █████% . Ex. 53. Thereafter, Fidler pressed

10

Facebook executives to fix the problem: ████████████████████████████████
████████████████" Ex. 54 at '94 (emphasis added). Fidler also remarked that the error was "a lawsuit waiting to happen", "████████████████████████████".[7] Ex. 55 at '78.

By late 2018, Fidler, appearing frustrated by the opposition to fixing Potential Reach, told an incoming team member, ████████████████████████████████████████
████████████████████████████████████████████████████" Ex. 60 at '75. Fidler left Facebook in December 2018. Ex. 36 at 19:3-6.

### III.    In March 2019—After the Filing of This Lawsuit—Facebook Remediates One of the Five Sources of Inflation

In March 2019, six months after the filing of this lawsuit, Facebook remediated the ████████ ████████ source of inflation. Ex. 57. Facebook, however, failed to remove from the Potential Reach calculation four other internally identified sources of inflation: (1) duplicate, (2) fake, (3) ████, and (4) ████████████████ accounts. In March 2019, Facebook also added language on its Help Center description of Potential Reach stating that "Estimates aren't designed to match census population or other sources and may differ depending on facts such as: How many accounts are used per person…" Ex. 58. This convoluted language fails to disclose that Potential Reach is based on accounts rather than people, or that the accounts include fake and duplicate accounts. On Ads Manager itself, Facebook still represents that Potential Reach counts "people." Ex. 59.

### IV.    Today Facebook Continues to Mislead Its Advertising Customers by Displaying an Inflated Potential Reach that Falsely References People

To this day, Facebook still has not removed the remaining sources of inflation—fake, duplicate, ████████████████ accounts—from its Potential Reach. Accordingly, Potential Reach remains inflated. *See* Exs. 6, 7. Facebook still represents that Potential Reach counts people— which executives acknowledged is an "████████████████" and has displayed no intention of reducing its Potential Reach inflation or otherwise correcting the metric.

---

[7] In late 2016, Facebook acknowledged that its video watch time metric was inflated. Ex. 56.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.    Plaintiffs' Experiences

### A.    Plaintiff DZ Reserve

Plaintiff DZ Reserve is an e-commerce business, selling a variety of products, including fitness products. Ex. 60 at 35:11-17. DZ Reserve bought advertisements on Facebook, spending over $1 million. Ex.61 at 8 (response to ROG 10.) Prior to purchasing the Facebook ads, DZ Reserve relied on Potential Reach. *See*, *e.g.*, Exs. 60 at 158:6-7 ("Potential reach was very important."); 62 at 51:12-52:2. Had DZ Reserve known Facebook's Potential Reach was a misrepresentation, DZ Reserve would not have paid Facebook the money it did. *See*, *e.g.*, Exs. 60 at 194:3-5; 62 at 103:15-104:20; 105:4-10; *see also* 105:24-106:5.

### B.    Plaintiff Cain Maxwell

Plaintiff Cain Maxwell (d/b/a Max Martialis) had an online store selling a safety magnet used for storing and securing firearms. Ex. 63 at 34:14-35:3, 48:11-19. Mr. Maxwell bought advertisements on Facebook between September 14, 2018 and May 18, 2019, spending over $350. Ex. 64 at 3 (response to ROG 2); Ex. 65 at 8 (response to ROG 10). Mr. Maxwell relied on Potential Reach, "for determining if there was a large enough pool for [him] to want to advertise on Facebook in the first place," "to determine how much [he] wanted to budget," and "to help [him] target [his] audience." Ex. 63 at 199:5-12. Had Mr. Maxwell known Potential Reach was a misrepresentation, he would not have paid Facebook the money he did. *Id*. at 217:22-218:2; 227:24-228:9. Mr. Maxwell explained, "I am suing because of inflated potential reach numbers and because Facebook said that potential reach meant people, not accounts, but, in fact, it means accounts, not people." *Id*. at 188:1-6.

### FACEBOOK'S CLASSWIDE FRAUD

Facebook's Potential Reach is fraudulent on two independent grounds: (1) Facebook disseminated inflated default United States Potential Reach numbers and inflated Potential Reach After Targeting; and (2) the Potential Reach metric itself is false and misleading because Facebook falsely identified "Potential Reach" as unique people. Plaintiffs have amassed common evidence for each ground of liability, including evidence of classwide damages matching the theories of liability.

**I.      Facebook Disseminated Inflated Potential Reach Numbers**

**A.      Default United States Potential Reach – Inflated by at Least ██%**

When United States advertisers use Ads Manager to create new Facebook ad campaigns, Ads Manager displays the default United States Potential Reach – which purportedly reflects all people on Facebook in the United States, age 18 and above. Ex. 4 at ¶¶ 55-60.[8] Because the proposed class is defined to only include United States advertisers who purchased Facebook advertisements through Ads Manager, all putative Class Members were exposed to the default United States Potential Reach.

Plaintiffs' statistics expert Dr. Charles Cowan analyzed five sources of Potential Reach inflation identified in Facebook documents: SUMA (duplicate), fake, ███████████████ ███████████████████████████ accounts. Ex. 6 at ¶¶ 32-35. Dr. Cowan conducted a statistical analysis of the five inflation sources using Facebook's own data to determine that the default United States Potential Reach is inflated by at least ██% during the entire class period, and by as much as ██% in 2019. Ex. 7 at ¶ 8.

**B.      Potential Reach After Targeting – Inflated by At Least ██%**

Dr. Cowan also analyzed the sources of Potential Reach inflation identified in Facebook documents to conduct a statistical analysis of the Potential Reach After Targeting. Ex. 6 at ¶¶ 132-55. Using well-accepted statistical methods, Dr. Cowan computed Plaintiffs' Potential Reach inflation and demonstrated that he can "compute an expected value of inflation for any Potential Reach displayed by Facebook – to Plaintiffs or any other advertiser", and that he can calculate the probability that the Potential Reach for any specific advertisement is inflated by at least 10%. *Id*. at ¶ 143; *see also* ¶¶ 132-72. Dr. Cowan also found that it is a "statistical certainty" that regardless of more granular targeting criteria any Potential Reach of at least 1000 will be inflated by least ██%. *Id*. at ¶ 155.

To measure the price premium damages stemming from Facebook's inflated Potential Reach (as measured by Dr. Cowan), Plaintiffs tested the impact of Potential Reach inflation on Facebook advertisement budgets. Through a conjoint survey, Plaintiffs' expert, Dr. Allenby, determined that

---

[8] ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ Ex. 5 at ¶ 10.

13

inflation of the United States default Potential Reach and a ▇% minimum inflation of Potential Reach After Targeting resulted in larger advertiser budgets. Ex. 18 at 5. Plaintiffs' auction expert, Dr. Timothy Roughgarden, utilized the results of the conjoint to determine a 3.4% price premium by simulating Facebook's auction and "the impact of changes in advertiser budgets for Facebook Advertisements on the prices paid by Facebook advertisers." Ex. 11 at ¶¶ 17,19. Plaintiffs' economist, Dr. Armando Levy, then determined that the 3.4% price premium calculated by Dr. Roughgarden properly considers both supply and demand, and that damages can be calculated on a classwide basis using the 3.4% price premium. Ex. 66 (Levy Rpt.) at ¶¶ 6, 53; *see also* Ex. 67 (Levy Reply).

## II. Facebook Disseminated a False and Misleading Potential Reach Metric That Is Not Based on Unique People

Facebook's Potential Reach metric is also fraudulent because it is not based on unique people. On Ads Manager when providing Potential Reach, Facebook states, "Potential Reach: _____ **people**." *See e.g.*, Ex. 1 (emphasis added). Facebook continues to insist in this litigation that Potential Reach is a measurement of the "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" Ex. 68 (Response to ROG No. 3) at 8; *see also* Ex. 69 (TAC) at ¶¶ 31-32.

Facebook, however, freely admits internally that the term "people" is an "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" Ex. 51 at PDF pg. 6 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇ Indeed, the record is replete with examples of Facebook personnel acknowledging the falsity of this representation. *See e.g.*, Ex. 70 at 4. Plaintiffs' industry expert Dr. Larry Chiagouris explains that, "the term 'potential reach' refers to unique people. Facebook's external and internal facing documents are consistent with this decades-long understanding related to the concept of reach" and "a Potential Reach metric that is not based on unique people (and is instead based on accounts) is not a Potential Reach metric." Ex. 71 (Chiagouris Rpt.) at ¶ 70.

To measure the price premium damages stemming from Facebook's dissemination of a false and misleading Potential Reach metric not based on unique people, Plaintiffs' damages expert Bruce McFarlane measured the "difference between (1) the price [Plaintiffs and Class Members] paid for advertisements and (2) the price a reasonable consumer would have paid at the time of purchase if Facebook had not provided a Potential Reach metric." Ex. 72 (McFarlane Rpt.) at ¶ 14. Mr. McFarlane

1  relies on Facebook's past studies finding that " ████████████████████████

2  ██████." *Id.* at ¶¶ 18-19. Mr. McFarlane also relied on Dr. Roughgarden's auction simulation which

3  showed that an ██████████████████████ would decrease Facebook advertisement prices by 8.9%.

4  *Id.* at ¶¶ 26-27; Ex. 11 at ¶ 18. Based on Dr. Roughgarden's analysis, Mr. McFarlane determined that

5  classwide damages can be calculated based on an 8.9% price premium. Ex. 72 at ¶ 27.

## CLASS DEFINITION

7  Plaintiffs seek certification of the following class:

All United States residents (including natural persons and incorporated entities) who, from August 15, 2014, to the present ("Class Period"), paid for the placement of at least one advertisement on Facebook's platforms, including the Facebook and Instagram platforms, which was purchased through Facebook's Ads Manager or Power Editor.

Excluded from the class are: (1) advertisements purchased pursuant to agreements other than Facebook's Terms of Service or Statement of Rights and Responsibilities; (2) advertisements purchased using only non-lookalike Custom Audiences as the targeting criteria; (3) advertisements purchased using Reach and Frequency buying; (4) advertisements purchased with the objectives of canvas app engagement, canvas app installs, offer claims, event responses, page likes, or external; and (5) advertisements for which Facebook provided a Potential Reach lower than 1000.

Also excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Further excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

## ARGUMENT

**I.    The Proposed Class Meets the Rule 23(a) Requirement**

**A.    The Proposed Class Is Sufficiently Numerous**

During each year of the class period, more than ██████████ United States advertisers purchased

Facebook ads. Ex. 66, at Appendix D-8-9. The proposed class is sufficiently numerous. *Rannis v.

Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010) (unpublished). Plaintiffs here will be able to identify

the class members through Facebook's own records. Graber Decl. ¶¶70-77, 80; *see also* Exs. 74, 75.[9]

---

[9] The Ninth Circuit does *not*, however, impose a separate requirement that there is an "administratively feasible" means of identifying absent class members. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017) ("A separate administrative feasibility prerequisite to class certification is not compatible with the language of Rule 23.")

15

1

### B.      Facebook's Conduct Raises Common Legal and Factual Questions

The commonality requirement is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23 (a)(2). A common question is one that "generate[s] common answers apt to drive the resolution of the litigation." *Torres v. Mercer Canyons Inc.*, 835 F. 3d 1125, 1133 (9th Cir. 2016). Only one common question is required. *Id.* at 359 (internal citation omitted). "To satisfy Rule 23(a)(2) commonality, '[e]ven a single [common] question will do.'" *Id.* at 1133 (quoting *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)). In this case, many common questions exist. The common questions that will be proven through common evidence include:

- Did Facebook inflate its United States Potential Reach?
- Did Facebook inflate its Potential Reach After Targeting?
- Is Facebook's Potential Reach calculated based on unique people? If not, is Facebook disseminating a false and misleading Potential Reach metric?
- Is Facebook's Potential Reach metric and Facebook's inflation of the Potential Reach metric material to advertising purchasers?
- Was Facebook's dissemination of a Potential Reach metric that is not based on unique people deceptive or unfair under California law?
- Was Facebook's use of an inflated Potential Reach metric deceptive or unfair under California law?
- Did Facebook know that Potential Reach is inflated and not based on people?
- Did Facebook intend for advertisers to rely on Potential Reach?
- Did Facebook's dissemination of an inflated Potential Reach that is not based on unique people constitute fraud or fraudulent concealment under California law?
- Are Class Members entitled to restitution and/or damages?
- How should Class Member's restitution and damages be calculated?

### C.      Plaintiffs' Claims Are Typical of the Class

"Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interest of the class representative aligns with the interests of the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (internal citations and quotations omitted). "The requirement is permissive, such that representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Id.* (internal citations and quotations omitted).

16

1    Here, putative class representatives DZ Reserve and Maxwell bring the same legal claims as
2 the rest of the putative Class. They also rely on the same grounds for liability as the rest of the class:
3 Facebook disseminated inflated Potential Reach numbers and the Potential Reach metric itself is false
4 and misleading because it is not based on unique people. And like all Class Members, Plaintiffs
5 purchased their Facebook advertisements using Facebook's standard contract. *See Ewert v. eBay,*
6 *Inc.*, 2010 WL 4269259, at *3 (N.D. Cal. Oct. 25, 2010).

7    **D.    Plaintiffs and Counsel are Adequate**

8    Rule 23(a)(4) requires the representative parties to "fairly and adequately protect the interests
9 of the class." Fed. R. Civ. P. 23(a)(4). Adequacy is satisfied when (1) the named plaintiffs and counsel
10 have no conflicts with the class; and (2) the named plaintiffs and counsel will "prosecute the action
11 vigorously." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

12   Plaintiffs are adequate. They have no conflicts with the class. Each Plaintiff has already spent
13 numerous hours to protect the interests of the class: both participated actively in this case by
14 reviewing pleadings, responding to numerous discovery requests, and preparing for and sitting for
15 depositions. Graber Decl. ¶ 78. Both Plaintiffs also conducted time-consuming and thorough searches
16 of their own documents. *Id.*

17   Plaintiffs' counsel, Geoffrey Graber of Cohen Milstein, was appointed interim lead class
18 counsel in December 2018, and has ably prosecuted this action for over two years. Graber Decl. *Id.*
19 at ¶ 79. ECF No. 15. Counsel is conflict-free, has extensive experience with complex litigation,
20 including class actions, and has already demonstrated the ability and willingness to vigorously
21 prosecute this action through extensive motion practice, as well as hard fought fact and expert
22 discovery. *See id.* at ¶80, Ex. 73. Plaintiffs and proposed Class Counsel meet the adequacy
23 requirement.

24 **II.   The Court Should Certify a 23(b)(2) Class for Injunctive Relief**

25   Class certification of a claim for declaratory relief is appropriate when, in addition to the four
26 requirements of Rule 23(a) discussed above, "the party opposing the class has acted or refused to act
27 on grounds that apply generally to the class, so that final injunctive relief … is appropriate respecting
28 the class as a whole." Fed. R. Civ. P. 23(b)(2). There is no need to show predominance or superiority

17

to certify a Rule 23(b)(2) class. *See Wal-Mart Stores, Inc.*, 564 U.S. at 362-63. Here, due to Facebook's misrepresentations, Plaintiffs are "unable to rely on" Facebook's Potential Reach "and so will not purchase" as many—or any—Facebook ads as they did before they were aware of the misrepresentation, "although [they] would like to." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-70 (9th Cir. 2018), cert. denied, 139 S. Ct. 640 (2018); *see* Ex. 63 at 242:18-23 ("I think I would [use Facebook ads again] if I knew I was getting good data…"); Ex. 60 at 194:3-5; Ex. 62 at 105:24-106:5. Ultimately, "unless the manufacturer or seller has been enjoined from making the same representation," the consumer "won't know whether it makes sense to spend [their] money on the product." *Lilly v. Jamba Juice Co.*, 2015 WL 1248027, at *4 (N.D. Cal Mar. 18, 2015).

Plaintiffs' injunctive relief claim meets the (b)(2) standard because Facebook is acting in a manner common to the Class: (1) Facebook represents Potential Reach is a count of people, (2) Facebook's Potential Reach for United States is inflated by at least ▮%, and (3) Potential Reach After Targeting is inflated by at least ▮%. Facebook executives have not corrected these misrepresentations despite repeated proposals and warnings from program managers—including a warning of potential litigation that actually materialized. To redress this ongoing harm, Plaintiffs seek a Court order directing Facebook to either (a) correct the metric by removing known sources of inflation, or (b) remove the metric altogether. *See, e.g., Smith v. Keurig Green Mountain, Inc.*, 2020 WL 5630051, at *11 (N.D. Cal. Sept. 21, 2020); *In re Coca-Cola Prod. Mktg. & Sales Practices Litig.*, 2020 WL 759388, at *6-7 (N.D. Cal Feb. 14, 2020).

## III. The Court Should Certify a 23(b)(3) Class for Damages

Class certification is appropriate under Rule 23(b)(3) when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Because of the common questions at the center of this case, both the predominance and superiority requirements are met.

### A. Common Questions Predominate Because Common Evidence Will Be Used to Establish Liability and Damages

When "central issues in the action are common to the class," certification is appropriate "even

18

though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54 (2016) (internal quotation marks omitted). The "important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Brickman v. Fitbit, Inc.*, 2017 WL 5569827, at *6 (N.D. Cal. Nov. 20, 2017) (Donato, J.) (quoting *Torres*, 835 F.3d at 1134).

### 1.    Facebook's Fraudulent Conduct Is a Common Question

Facebook's fraudulent course of conduct is a common question because it is susceptible to proof through common evidence. "Because deception and materiality are objective questions, they are 'common question[s]' for purposes of Rule 23(b)(3)." *Hadley v. Kellogg Sales Co.*, 324 F. Supp.3d 1084, 1116 (N.D. Cal. 2018) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 467 (2013)); *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009); *Brickman*, 2017 WL 5569827, at *7 (citing *Vasquez v. Super. Ct.*, 4 Cal. 3d 800, 814 (1971). Facebook deceived—and continues to deceive—its advertisers by providing an inflated Potential Reach. In addition, the Potential Reach metric is false and misleading because it is not based on unique people. *See supra*, at 9-10. Facebook's fraud is a quintessential common question.

"[I]in identifying the degree of factual commonality required in the misrepresentations to class members," the Ninth Circuit "follow[s] an approach that favors class treatment of fraud claims stemming from a 'common course of conduct'" such as the "centrally-orchestrated" misrepresentations in this case. *In re First All. Mortg. Co.*, 471 F.3d 977, 990-92 (9th Cir. 2006); *Broomfield v. Craft Bew All, Inc.*, 2018 WL 4952519, at *13 (N.D. Cal. Sept. 25, 2018); *see also* Fed. R. Civ. P. 23, Advisory Committee Notes to 1966 Amendments, Subdivision (b)(3) ("use of similar misrepresentations may be an appealing situation for a class action").

Here, Facebook's misrepresentations exceed the Ninth Circuit's "common course of conduct" standard. In stating Potential Reach measures "people," Facebook exposed all class members to an *identical* misrepresentation—which has always been "██████." At any given time, the default United States Potential Reach is the same for all advertisers with the same objectives – and it has always been inflated by at least ██%. And, Facebook's Potential Reach After Targeting is inflated –

19

1   by at least ██% for all Class Members. *See supra*, at 13-14. These misrepresentations are common to

2   all Class Members. *See In re First All. Mortg. Co.*, 471 F.3d at 990-92; *In re U.S. Foodservice Inc.*

3   *Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (affirming certification where defendant overbilled

4   customers by "inflating the cost component" of its billing notwithstanding "different bills of goods

5   with different mark-ups," because "the material misrepresentation—concealment of the fact of a

6   mark-up inserted by the VASP—was the same in each.")

7         Plaintiffs will offer classwide evidence to prove Facebook's fraudulent conduct. Aside from

8   Facebook's own damning admissions regarding the inflation of its Potential Reach, which establish

9   liability and a common course of conduct, Plaintiffs' statistician, Dr. Cowan, demonstrates that

10  Potential Reach is inflated by a minimum of ██% (for the U.S., before targeting) and ██% (anywhere,

11  after targeting). Dr. Cowan's statistical analysis is the same he would use for "each advertiser

12  individually." *See* Ex. 6 at ¶ 16. And statistics are necessary to calculate Potential Reach inflation for

13  any individual claim and for the class because Potential Reach is ███████████ *See* Ex. 36 at

14  263:20 – 264:5; *see also* at 243:4-9. This is an appropriate use of statistics to establish classwide

15  liability. *Tyson Foods,* 577 U.S. at 455.

16        Plaintiffs will also show, using common evidence, that Potential Reach is false and misleading

17  because it is not based on unique people. *See supra,* at 9-10.; Exs. 71 at ¶ 70; 70 at 4. And because

18  Plaintiffs' claims are governed by an objective standard, absent class members' "[i]ndividual

19  preferences and beliefs are immaterial." *Broomfield*, 2018 WL 4952519, at *12; *see also*, *Bradach v.*

20  *Pharmavite, LLC*, 735 Fed. Appx. 251, 254-55 (9th Cir. May 17, 2018) (unpublished); *McArdle v.*

21  *AT&T Mobility LLC*, 2018 WL 6803743 *12 (N.D. Cal. 2018).

22        Regardless, here, Facebook admits in documents that it ████████████████████.

23  Upon discovering just one source of inflation (███████████), the Product Manager for

24  Potential Reach declared Facebook was "████████████." Ex. 54 at '94. And with regard to

25  its representation that Potential Reach counts people, Facebook stated that it is an "████████

26  ███████████." Ex. 51 at pdf pg. 6. In sum, there is powerful classwide evidence Facebook has, and

27  continues to, defraud advertisers.

28

### 2.   Causation and Damages Are a Common Question Because Plaintiffs Have Demonstrated a Price Premium

"[D]amages calculations alone cannot defeat class certification." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015) (quoting *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010). "In calculating damages, here restitution, California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'" *Pulaski & Middleman, LLC*, 802 F.3d at 989 (quoting *Marsu, B.V. v. Walt Disney Co.,* 185 F.3d 932, 938–39 (9th Cir.1999). "[T]he fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." *Id.*

Here, "Plaintiffs propose measuring damages that are directly attributable to their legal theory of the harm." *Just Film, Inc.*, 847 F.3d at 1121. To measure the price premium damages attributable to Facebook's inflated Potential Reach (as measured by Dr. Cowan), Plaintiffs' conjoint expert, Dr. Allenby, fielded a conjoint survey that tested the impact of the inflation on advertisers' budgets. *See Broomfield*, 2018 WL 4952519, at *14 (conjoint surveys widely accepted to determine price premium). Relying on the shifts in budgets identified in the conjoint survey as an input, Plaintiffs' auction expert, Dr. Roughgarden, found that the inflated Potential Reach numbers result in a 3.4% price premium. Ex. 11 at ¶¶ 19, 62-67, 73-75, pp 18-20; *see also*, *supra* at 13-14. And Plaintiffs' economist, Dr. Levy, determined that the 3.4% price premium calculated by Dr. Roughgarden properly considers both supply and demand, and that damages can be calculated on a classwide basis using the 3.4% price premium. Ex. 66 at ¶¶ 6, 53.

To measure the price premium damages stemming from Facebook disseminating a false Potential Reach metric that is not based on people, Mr. McFarlane and Dr. Roughgarden calculated an 8.9% price premium based on ███████████████ and Dr. Roughgarden's Facebook Auction Simulation. *See supra* at 14-15 (explaining damages model based on ███████████ ██████████████). Consistent with *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), for each of Plaintiffs' grounds for liability, Plaintiffs' experts have calculated the price premium that "stemmed from" those grounds respectively. *Pulaski & Middleman, LLC*, 802 F.3d at 987–88.

21

Moreover, because Plaintiffs' damages models measure a price premium, "[t]he calculation need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase." *Pulaski & Middleman, LLC*, 802 F.3d at 989. Rather, "the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information." *Id.* (citing *Kwikset v. Super. Ct.*, 51 Cal. 4th 310, 329 (2011). Like *Pulaski*, Plaintiffs' damages models both properly focus on the price premium at the time of purchase rather than the "benefits received after purchase." *Id.* at 989. Plaintiffs' damages models are thus common evidence for the jury to evaluate.

### B.   Common Questions of Law and Fact Predominate for Each Claim

As explained below, each of Plaintiffs' causes of action satisfy the predominance standard. *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (predominance inquiry focuses on causes of action) (abrogated on other grounds by *Comcast*, 569 U.S. 27).

#### 1.   UCL

The UCL bans "'unlawful, unfair or fraudulent business act[s] or practice[s] and unfair, deceptive, untrue or misleading advertising.'" *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020) (citing Cal. Bus. & Prof. Code § 17200). To state a claim under the UCL, "it is necessary only to show that members of the public are likely to be deceived," with no need for "individualized proof of deception, reliance and injury." *In re Tobacco II Cases*, 46 Cal. 4th at 312, 320 (internal citations and quotations omitted); *see also Brickman*, 2017 WL 5569827, at *6. "UCL claims are 'ideal for class certification because they will not require the court to investigate class members' individual interaction with the product.'" *Bradach v. Pharmavite, LLC*, 735 F. App'x at 254–55 (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. Dec. 20, 2012)); *accord Hadley*, 324 F. Supp. 3d at 1115–16 (citation omitted).

"To establish a reliance presumption, the operative question has become whether the defendant so pervasively disseminated material misrepresentations that all plaintiffs must have been exposed to them." *Walker*, 953 F.3d at 631. Plaintiffs establish the reliance presumption "because the representations were made at the point of sale as part of a standardized online purchasing process." *Brazil v. Dell Inc.*, 2010 WL 5387831, at *5 (N.D. Cal. Dec. 21, 2010). As explained above, Facebook

22

displays Potential Reach *at the point of sale* to every advertiser who purchased advertisements on Ads Manager. *See e.g.*, Exs. 1, 2, 6 at ¶ 18, 4 at ¶¶ 55-60.

Materiality is based on an objective standard. *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 564 (N.D. Cal. 2020); *see also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013). Here, there is overwhelming evidence Potential Reach is objectively material. Facebook admits it is "arguably the single most important number in [its] ad creation interfaces." Ex. 3. Facebook also

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Ex. 17 at '33. In addition to Plaintiffs who testified that they relied on Potential Reach, Facebook admits in its documents that advertisers "frequently rely" on Potential Reach and that "██████████████████████████" uses Potential Reach. Exs. 3, 13; *see also, e.g.*, Exs. 14, 16 at '61, 60 at 158:6-7, 63 at 199:5-12.

Under the UCL, Plaintiffs seek restitution on behalf of the class. *See In re Tobacco II Cases*, 46 Cal. 4th at 320 (citing Cal. Bus. & Prof. Code § 17203). Plaintiffs' damages models calculate the price premium wrongfully obtained by Facebook, which is "the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information." *Pulaski & Middleman, LLC*, 802 F.3d at 989; *see also Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 821, fn. 7 (9th Cir. 2019) (quoting *Carriuolo v. General Motors Co.*, 823 F.3d 977, 987 (11th Cir. 2016)).

### 2.   Common Law Fraud

The elements of fraud are "(a) misrepresentation (false representation, concealment, or nondisclosure), (b) knowledge of falsity (or 'scienter'), (c) intent to defraud, i.e., to induce reliance, (d) justifiable reliance, and (e) resulting damage." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997), *as modified* (July 30, 1997) (internal quotation marks omitted). All elements present common questions that will be answered with common evidence.

As discussed above, Plaintiffs will prove Facebook's misrepresentations through common evidence. *See supra* at 5-11. Knowledge and intent focus purely on the mental state of the defendant, with no need for any individualized inquiry. *See e.g., Broomfield*, 2018 WL 4952519, at *13. Thus, California common law fraud claims are "good candidates for class treatment in that they focus in

23

significant part on the falsity of the defendant's statements, and the defendant's knowledge of falsity or assertion of a falsehood without reasonable grounds." *Brickman*, 2017 WL 5569827, at *6 (citing *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 173-74 (2003)). Here, numerous documents show that Facebook knew Potential Reach was inflated and did not measure people. *See*, *e.g.*, Exs. 20-21, 23, 24, 26, 29, 33. Documents also show Facebook intended for Class members to rely on Potential Reach because it knew advertisers "frequently rely" on Potential Reach, and Potential Reach is "arguably the most important number in [Facebook's] ad creation interfaces." Ex. 3; *see also e.g.*, Exs. 13, 16 at '61, 17 at '33-34, 35 at '70, 39. Evidence of falsity and scienter come from Facebook itself and there is no need for individualized determinations.

As with the UCL, "reliance may be inferred" for fraud claims under California law when "material misrepresentations were made to the entire class." *Brickman*, 2017 WL 5569827, at *7; *see also Engalla*, 15 Cal. 4th at 977; *Vasquez*, 4 Cal. 3d at 814; *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 613 (N.D. Cal. 2018); *Broomfield*, 2018 WL 4952519, at *12; *Iorio v. Allianz Life Ins. Co. of N. Am.*, 2008 WL 8929013 at *28 (S.D. Cal. July 8, 2008). Finally, the price premium calculation (restitution) is an appropriate measure of damages. *Cortez v. Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 173 (2000); *see also Nguyen*, 932 F.3d at 820 n.6 (citing *Cortez*). And Plaintiffs provide classwide damages models that match their grounds for liability.

### 3.     Fraudulent Omission

"Under California law, a claim for fraudulent concealment requires 'knowing concealment or nondisclosure by a defendant with the intent to defraud, which induces justifiable reliance and causes injury to the plaintiff.'" *Abbit v. ING USA Annuity and Life Ins. Co.*, 999 F. Supp. 2d 1189, 1200 (S.D. Cal. 2014) (quoting *625 3rd St. Assoc., L.P. v. Alliant Credit Union*, 633 F. Supp. 2d 1040, 1050 (N.D. Cal. 2009)). As with common law fraud, fraudulent concealment is appropriate for class treatment because it focuses on Facebook's conduct and knowledge. *See Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437 (N.D. Cal. 2009) (certifying fraudulent concealment), *clarified* at 2011 WL 5914278 (N.D. Cal 2011).

Here there is powerful common evidence not only of omissions, but of active concealment. Facebook never disclosed that Potential Reach is inflated, and its executives repeatedly prevented

1   personnel from taking steps to reduce Potential Reach inflation or to correct the "███████"

2   reference to people. Facebook's highest-level executives repeatedly took active steps to conceal the

3   truth: ████████████████████████████████████████████ and Schultz

4   instructed sales representatives not to mention Potential Reach's inflation to advertisers "as there are

5   a number of downstream implications." Exs. 30, 32 at '21. And, as with Plaintiffs' common law fraud

6   claim, damages can be calculated through a price premium. *Cortez*, 23 Cal. 4th at 173; *Nguyen*, 932

7   F.3d at 820 n 6.

8       **C.   Class Treatment Is Superior to Other Available Methods of Adjudication**

9           Certification of Plaintiffs' claims is "superior to other available methods for fairly and

10  efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Indeed, this is the kind of case for

11  which the class action procedure was created. Any Class member's individual recovery would be

12  dwarfed by the cost of proving the predominating issues in this litigation. *Soares v. Flowers Foods,*

13  *Inc.*, 320 F.R.D. 464, 485 (N.D. Cal. 2017) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 616

14  (1997)). Here, the median class member advertiser has incurred no more than $32 in damages. Ex.

15  66, at Appendix D-8-9. No rational person would challenge the most powerful social media company

16  in the world to recover $32 in damages. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th

17  Cir. 2004) (Posner, J.) ("only a lunatic or a fanatic sues for $30."). As a practical matter, if class

18  treatment is denied, the wrongdoing outlined above "will go unpunished," leaving Facebook free to

19  continue to defraud its customers with impunity. *Id.*[10]

20                              **CONCLUSION**

21          For the foregoing reasons, the Court should grant Plaintiffs' Motion and certify the class.

22

23  DATED: April 23, 2021                     Respectfully submitted,

24                                            By: /s/ *Geoffrey Graber*

25

26          [10] Plaintiffs satisfy the remaining superiority requirements because no separate cases remain
    outside this proceeding indicating low or no interest in pursuing the matter on an individual basis;
27  Facebook's Terms of Service dictate all litigation must be brought in this forum or in California; and,
    the issues presented in this class litigation are manageable given the narrowly defined class
28  (identifiable from Facebook's records). *See* Fed. R. Civ. P. 23(b)(3)(B)-(D).

1

2
Geoffrey Graber (SBN 211547)
Andrew N. Friedman (*pro hac vice*)
3
Julia Horwitz (*pro hac vice*)
Karina G. Puttieva (SBN 317702)
4
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
5
Washington, DC 20005
Telephone: (202) 408-4600
6
Facsimile: (202) 408-4699
7
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
8
jhorwitz@cohenmilstein.com
kputtieva@cohenmilstein.com
9

10
Eric Kafka (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
11
88 Pine Street, 14th Floor,
New York, NY 10005
12
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
13
ekafka@cohenmilstein.com
14

15
Charles Reichmann (SBN 206699)
**LAW OFFICES OF CHARLES REICHMANN**
16
16 Yale Circle
Kensington, CA 94708-1015
17
Telephone: (415) 373-8849
Charles.reichmann@gmail.com
18

19
*Counsel for Plaintiffs and Proposed Class*

20

21

22

23

24

25

26

27

28