# Exhibit 69

## REDACTED VERSION OF

## DOCUMENT SOUGHT TO BE SEALED

Andrew Friedman (*pro hac vice*)
Geoffrey Graber (SBN 211547)
Julia Horwitz (*pro hac vice*)
Karina G. Puttieva (SBN 317702)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 2000
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
jhorwitz@cohenmilstein.com
kputtieva@cohenmilstein.com

Eric Kafka (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
ekafka@cohenmilstein.com

*Counsel for Plaintiffs and*
*Proposed Class*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DZ Reserve and Cain Maxwell (d/b/a Max Martialis) individually and on behalf of others similarly situated,<br><br>                   Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>                   Defendant. | Case No.: 3:18-cv-04978<br><br>**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u><br><br><u>CLASS ACTION</u> |

Plaintiffs DZ Reserve and Cain Maxwell (d/b/a Max Martialis), individually and on behalf all others similarly situated, hereby file suit against Facebook, Inc., and allege the following:

**INTRODUCTION**

1.      Facebook, Inc. ("Facebook") is a social media company that "generate[s] substantially all of [its] revenue from advertising."[1] In 2017, Facebook earned approximately $40 billion from advertising revenue.[2]

2.      The core of Facebook's business is its large purported user base, which ostensibly enables advertisements placed on Facebook.com to reach a large number of people. Facebook claims to have 2.13 billion monthly active users globally, with over 240 million monthly active users in the U.S. alone.[3]

3.      Before advertisers make a purchase, Facebook represents that their advertisements can potentially reach a specified number of people ("Potential Reach"). Facebook defines "potential reach" as "an estimation of how many people are in an ad set's target audience."[4] Depending on the demographic targeting selected by the advertiser, the Potential Reach is often millions of people. Facebook also represents that the advertisement will reach an estimated number of people per day ("Estimated Daily Reach").  The Estimated Daily Reach is based, in part, on the audience size or Potential Reach. According to Facebook, Estimated Daily Reach "gives you an idea of how many of the people in your target audience [or Potential Reach] you may be able to reach on a given day."[5]

4.      These foundational representations are false. Based on publicly available research and Plaintiffs' own analysis, Facebook overstates the Potential Reach of its advertisements. For example, based on publicly available data, Facebook's purported Potential Reach among the key 18-34 year-old demographic in every state exceeds the actual population of 18-34 year-olds.  Based on a combination

---

[1] Facebook, Inc., Annual Report (Form 10-K) for 2017 Fiscal Year, at 41 (Feb. 1, 2018).

[2] *Id.*, at 43 (Feb. 1, 2018).

[3] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018)

[4] *See "About potential Reach"*, available at https://www.facebook.com/adsmanager/creation

[5] *See What are "Potential Reach" and "Estimated Daily Reach?"*, available at https://www.facebook.com/business/help/717368264947302/?ref=u2u (last accessed August 1, 2018)

1

of publicly available research and Plaintiffs' own analysis, among 18-34-year-olds in Chicago, for example, Facebook asserted its Potential Reach was approximately 4 times (400%) higher than the number of real 18-34 year-olds with Facebook accounts in Chicago.  Based on a combination of publicly available research and Plaintiffs' own analysis, Facebook's asserted Potential Reach in Kansas City was approximately 200% higher than the number of actual 18-54 year-olds with Facebook accounts in Kansas City.  This inflation is apparent in other age categories as well.

5.      Documents produced by Facebook in this litigation confirm that senior executives at the company <u>knew</u> for years that its Potential Reach metric was inflated – yet they failed to do anything, and even took steps to cover up the problem.  As explained below, in late 2017 and throughout 2018, Facebook executives repeatedly acknowledged Potential Reach was inflated and misleading due to, among other reasons, the fact that Potential Reach includes duplicate and fake accounts.  Facebook failed to fix the problem, noting that "revenue impact is indeed significant."  Yet, as the product manager for Potential Reach put it: "it's revenue we should have never made given the fact it's based on wrong data."  Facebook's conduct was – and remains – inexcusable.  Because Facebook inflated its Potential Reach, Plaintiffs and putative class members purchased more advertisements from Facebook and paid a higher price for advertisements than they otherwise would have. Plaintiffs and putative class members accordingly seek compensation and injunctive relief for violations of California's UCL, breach of the covenant of good faith and fair dealing, fraudulent misrepresentation, fraudulent concealment, and for restitution and punitive damages.

## JURISDICTION

6.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class of Plaintiffs is a citizen of a state different from a Defendant.

7.      This Court has personal jurisdiction over Defendant Facebook, Inc., because Facebook, Inc., is headquartered in California, and conducts business in the state of California.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, were directed to, and/or emanated from

2

this District. Venue is also proper because Facebook's terms of service require that claims be resolved "exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County…."[6]

## PARTIES

9.     Plaintiff DZ Reserve is a company incorporated and headquartered in the state of Colorado.

10.     Plaintiff Cain Maxwell (d/b/a Max Martialis) is a citizen and resident of the state of Ohio.

11.     Defendant Facebook, Inc., is incorporated in Delaware, and its principal place of business is 1 Hacker Way, Menlo Park, CA 94025.

## FACTUAL ALLEGATIONS

12.     Facebook is one of the largest social media companies in the world. It owns and operates Facebook.com, as well as Instagram and the WhatsApp Messenger service.

13.     In 2017, Facebook saw its revenues from online advertisements reach approximately $40 billion.[7]

14.     In marketing its online advertisement services, Facebook claims that more than 2 billion people use Facebook every month.[8] Additionally, in its Ads Manager, Facebook has claimed that 240 million of those active users are located in the United States.[9]

15.     Until approximately March 12, 2019, Facebook's Potential Reach was based, at least in part, on estimates of the number of people who were active users in the past month.[10]  After March 12,

---

[6] Facebook, *Statement of Rights and Responsibilities*, https://www.facebook.com/terms (last accessed: June 17, 2019).

[7] Facebook, Inc., Annual Report (Form 10-K) for 2017 Fiscal Year, at 41 (Feb. 1, 2018), at 43.

[8] Facebook, Inc., Annual Report (Form 10-K) for 2017 Fiscal Year, at 41 (Feb. 1, 2018), at 34.

[9] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018).

[10] *See Updates to Potential Reach*, available at https://www.facebook.com/business/help/567031670465069?helpref=faq_content (last accessed June 14, 2019)

2019, Potential Reach is based, at least in part, on how many people have been shown an ad on a Facebook Product in the past 30 days who match the respective advertiser's desired audience and placement criteria.[11]

16.     Facebook defines a Monthly Active User (MAU) as a "registered Facebook user who logged in and visited Facebook through [Facebook's] website or a mobile device, or used [Facebook's] Messenger application (and is also a registered Facebook user), in the last 30 days as of the date of measurement. MAUs are a measure of the size of our global active user community."[12]

17.     Audience size is an important factor when advertisers determine where to spend marketing dollars.  Indeed, Potential Reach and Estimated Daily Reach are the only information Facebook provides to advertisers regarding the anticipated performance of the ad campaign prior purchasing an advertisement.  Moreover, user inflation can skew an advertiser's decision making, which is frequently based on the anticipated reach of the advertising campaign, or "Potential Reach."[13]

18.     Reach inflation can have "real consequences for an advertiser's overall communications plain."[14] For advertisers, "Facebook Ads Manager functions as a tool for an advertiser to plan, budget, buy and optimize their own campaigns across Facebook platforms."[15]

19.     Facebook's large purported potential reach is widely acknowledged as one of the main reasons that advertisers choose to purchase advertisements from Facebook.

20.     For example, an online advertising commentator recently noted that the large number of people that can potentially be reached on Facebook is one of the four "reasons why you can't ignore Facebook advertising."[16]

---

[11] *Id.*

[12] Facebook, Inc., Annual Report (Form 10-K) for 2017 Fiscal Year, at 41 (Feb. 1, 2018), at 36

[13] "Facebook Audience Inflation a Global Issue-Ad News Study", AdNews (September 8, 2017) available at http://www.adnews.com.au/news/facebook-audience-inflation-a-global-issue-adnews-study (visited July 16, 2018).

[14] Video Advertising Bureau, "Facebook's Reach (on Reach), Miscalculations in the Age of Precision", p. 19, September 2017, available at https://www.thevab.com/wp-content/uploads/2017/09/Facebooks-Reach.pdf (accessed August 6, 2018).

[15] *Id.*

[16] "4 Reasons Why You Can't Ignore Facebook Advertising," InstaPage (September 10, 2018)

21.     Similarly, Aleksandar Radonjic, the Founder and Chief Growth Strategist at Evolving Digital (a digital marketing agency) explained in his blog post, "Why Facebook Has To Be Included in Your Marketing Plan" that "big brands understand the value of Facebook and are actively engaged with their customers. Small and medium-sized organizations have to do the same, even if you are a small local business *because the potential reach is unmatched by any other social media platform.*" (emphasis added).[17]

22.     Moreover, Facebook itself encourages advertisers to refer to the Potential Reach after they have started an advertising campaign to determine the percentage of their target audience that they have reached.[18]

I.      **Facebook's Representations to Advertisers**

23.     In describing the advantages of advertising on its website, Facebook tells advertisers that "[t]wo billion people use Facebook every month."[19]

24.     Facebook touts the reach of its platform, telling advertisers "Show your ads to more people in more places. Improve your reach by running your ads across Facebook, Instagram, and Audience Network."[20]

25.     Facebook makes these representations when advertisers purchase advertisements from Facebook, which they do through Facebook's "Ads Manager."

26.     The terms on the "Ads Manager" are part of Facebook's contract with advertisers.

27.     The "Ads Manager" provides only two data points related to audience size, "Potential Reach" and "Estimated Daily Results Reach." The Estimated Daily Results Reach is derived in part from the Potential Reach audience size.  Facebook's Estimated Daily Reach "gives you an idea of how

---

https://instapage.com/blog/4-reasons-facebook-advertising-cant-be-ignored (last accessed December 19, 2018).

[17] "Why Facebook Has to Be Included in Your Marketing Plan," Aleksandar Radonjic, http://www.evolving-digital.com/resources/Facebook-Marketing (last accessed December 19, 2018).

[18] https://www.facebook.com/business/help/1639908612985580 (last accessed December 19, 2018).

[19] Quoted from https://www.facebook.com/business/products/ads (accessed August 13, 2018).

[20] *Id.*

many of the people in your target audience [or Potential Reach] you may be able to reach on a given day."[21]

28.     The Potential Reach and the Estimated Daily Results Reach are provided to every advertiser who purchases advertisements through Ads Manager, and are part of Facebook's contract with advertisers.

29.     On the "Ads Manager," advertisers can target their advertisement to users of different demographics. *See* Figure 1. Using the demographic criteria on "Ads Manager," advertisers can target people in various locations, age ranges, or genders.

*Figure 1*



30.     Regardless of the demographic criteria used to target the advertisements, the "Ads Manger" shows a graphic with the audience size based on the criteria that advertisers selected. *See* Figure 2.

---

[21] *See What are "Potential Reach" and "Estimated Daily Reach?"*, available at https://www.facebook.com/business/help/717368264947302/?ref=u2u (last accessed August 1, 2018)

*Figure 2*



31.     Below the audience size graphic, the "Ads Manager" states "Potential Reach: _____ people." *See* Figure 2.  The "Ads Manager" displays the "Potential Reach" statistic before the advertiser purchasers the advertisement.

32.     Facebook consistently represents that the Potential Reach is a measurement of actual *people*, not just accounts.

33.    The Ads Manager graphic displaying the Potential Reach and Estimated Daily Results Reach is shown on multiple consecutive pages on Ads Manager where advertisers input information before purchasing an advertisement. *See* Exhibit 1, Facebook's Ads Manager.[22] The Potential Reach and Estimated Daily Reach are included on the same page where advertisers set the budget and schedule for their advertisements:



34.    When an advertiser clicks on the "i" icon next to the Potential Reach, Facebook's website states, "Estimates are based on the placements and targeting criteria you select and include

---

[22] Exhibit 1 to Plaintiffs' Second Amended Consolidated Class Action Complaint is identical to ECF No. 66-3 (Exhibit C to Facebook's Motion to Dismiss Consolidated Class Action Complaint).

factors like Facebook user behaviors, user demographics and location data. They're designed to estimate how many *people* in a given area could see an ad a business might run. They're not designed to match population or census estimates. Numbers may vary due to performance reasons." (emphasis added) *See* Figure 3.

35.     Yet, Facebook fails to disclose to advertisers that its Potential Reach statistic is inflated.

*Figure 3*



36.     When an advertiser clicks on "Learn More" for potential reach, Facebook's website states, "Potential reach is an estimation of how many *people* are in an ad set's target audience…. It updates in real time as you create or edit your ad set to help you understand how your targeting and placement choices affect the number of *people* you could reach." (emphasis added) *See* Figure 4.

9

*Figure 4*

About potential reach

Potential reach is an estimation of how many people are
in an ad set's target audience. This estimation is a
unique calculation by Facebook (more on our
methodology below) and isn't intended to align with third
party calculations or population census data. It updates
in real time as you create or edit your ad set to help you
understand how your targeting and placement choices
affect the number of people you could reach.

The number of people you actually end up reaching
depends on your budget and performance. For that
estimation, check your estimated daily results (and keep
in mind those results apply to each day, not the total
results for your ad set).

37.     Facebook's Advertiser Help Center states that the "Potential Reach is an estimation of the potential number of people your ads could reach."[23]

## II.     Facebook's Potential Reach is Inflated

38.     According to Census data, the U.S. population numbered over 320 million individuals in 2017, with just over 250 million adults over 18 years old.[24]

39.     Facebook represents to advertisers a Potential Reach of 230 million monthly active users over the age of 18 in the U.S.[25]

40.     According to a 2018 survey from the Pew Research Center, 68% of U.S. adults, aged 18 and over, use Facebook.[26]  Based on this 68% figure, only 170 million U.S. adults have a Facebook account.  Thus, Facebook represents to advertisers that it has approximately 35% more users in the United States than it actually does.

41.     Using the usage rate estimate provided by Pew Research Center, Facebook's Potential Reach is inflated with respect to the 18 years and over demographic in the four largest states, as set

---

[23] Quoted from https://www.facebook.com/business/help (accessed August 13, 2018).

[24] *See* United States Census Bureau's *"American Fact Finder"* available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2017_PEPA GESEX&prodType=table (last accessed August 1, 2018).

[25] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018)

[26] Pew Research Center, March 2018, "Social Media Use in 2018".

10

forth below:

| State | Estimated Actual Facebook Users[27] | Facebook's Claimed Reached[28] | Inflation Rate |
|---|---|---|---|
| California | 20.7 million | 30 million | 45% |
| Texas | 14.2 million | 21 million | 48% |
| Florida | 11.4 million | 16 million | 40% |
| New York | 10.6 million | 16 million | 50% |

42.     Among the most important – if not the most important – demographic for advertisers is the 18-34 year-old audience.  This is because younger audiences are generally believed to have less brand loyalty and more disposable income.[29]

43.     Even more inflated is the key marketing demographic of young adults aged 18-34, where the U.S. population in 2017 numbered just under 76 million.[30] Facebook represents to advertisers that it can reach 100 million people in this age category.[31] Accordingly, Facebook claims that it can reach 24 million more people in this demographic than actually exist. Additionally, according to Pew Research only 80% of this demographic actually use Facebook.[32] Thus, only 61 million 18-34 year-olds are actually using Facebook, resulting in a nationwide inflation rate of 64%.

44.     Nor can this discrepancy be explained by non-resident travelers. Facebook indicates that its Potential Reach among 18-34 year olds in the United States includes less than 2 million non-resident travelers. *See* Figure 5.

---

[27] These figures are based on the U.S. Census Bureau's estimated demographic size and accounting for the national average of Facebook participation as determined by Pew Research's polling data of 68%.

[28] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018)

[29] *See e.g.*, Weinman, Jaime J. (2012). "Television's mid-life crisis." *Maclean's*. 125 (27): 72

[30] *See* United States Census Bureau's *"American Fact Finder"*, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2017_PEPSYASEXN&prodType=table (last accessed August 1, 2018).

[31] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018)

[32] Pew Research Center, March 2018, "Social Media Use in 2018".

1

*Figure 5*



2

3

4

5

6

7

8

9

10

11

12

13

14

15

16        45.      Publicly available research has shown that the Potential Reach for 18-34 year-olds is

17  not only overstated at a national level but exceeds the U.S. Census Population Data in every state. *See*

18  Figure 6.[33]

19

20

21

22

23

24

25

26

27

28      _____

[33]  Video Advertising Bureau Report, at 13.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 3:18-cv-04978

*Figure 6*



In *Every* State, Facebook Claims They Can Reach More P18-34 Residents Than What Is Reported By The U.S. Census Bureau

% Overage of Facebook Platforms' Potential Reach Vs. U.S. Census Population Data
P18-34

FACEBOOK'S REACH (ON REACH)

Source: 2016 U.S. Census (American Community Survey, 1-year estimate); Facebook Ad Manager based on data pulled on September 22nd, 2017; P18-34. "FB Potential Reach" includes Facebook + Instagram + Audience Network + Messenger platforms.  Facebook data based on "People who live in this location."

46.     The difference between Facebook's Potential Reach and U.S. Census Bureau statistics can be illustrated at the metropolitan level as well.  For example, the following chart provides examples of the massive inflation of Facebook's claimed Potential Reach in selected cities:

47.     Other examples[34] from September 2017 for the 18-34 year-old demographic include:

| City | 18-34 year-old Census Pop. | Facebook's Claimed Reach | Inflation Rate |
|------|------|------|------|
| Dallas | 379,567 | 1,200,000 | 216% |
| Houston | 645,229 | 1,800,000 | 179% |
| Los Angeles | 1,125,300 | 2,700,000 | 140% |
| New York | 2,305,171 | 4,100,000 | 78% |
| Philadelphia | 459,386 | 1,100,000 | 139% |
| Phoenix | 410,220 | 720,000 | 76% |
| San Antonio | 401,801 | 690,000 | 72% |
| San Diego | 434,646 | 760,000 | 75% |
| San Jose | 256,343 | 490,000 | 91% |

48.     Because not every 18-34 year-old has a Facebook Account, the discrepancy between

---

[34] *See* Video Advertising Bureau Report, at 14.

13

Facebook's Potential Reach for the 18-34 year-old demographic and the Census Population does not capture the full extent to which Facebook's Potential Reach is overstated.

49.     For example, Plaintiffs commissioned their own survey to determine the percentage of 18-34 years old in Chicago who have a Facebook account.  The survey found that 59% of 18-34 year-olds in Chicago have Facebook accounts.  In September 2017 in Chicago, Facebook's Potential Reach was 1,900,000.  However, the Census Population for 18-34 year-olds in Chicago was only 808,785.[35] Thus, based on this comparison alone, Facebook's Potential Reach for 18-34 years old in September 2017 was 2.35 times the Census Population.

50.     The inflation of Facebook's Potential Reach is even more dramatic when compared to the survey.  In 2017, based on the survey described above, approximately 485,000 actual Chicago residents between 18-34 had Facebook accounts. Therefore, when Facebook represented that the "Potential Reach" for this demographic was 1,900,000, it was almost 4 times that true number of people potentially reached.

51.     A similar analysis reveals dramatic inflation of the Potential Reach number in Kansas City.  Among the 18-54-year-olds demographic in the Kansas City metropolitan area, Facebook claims advertisements placed on its marketplace have the potential to reach 1.4 million people.[36]

52.     But the 18-54 demographic in the Kansas City metropolitan area only consists of approximately 1 million people.[37] And even then, based on survey data commissioned by the Plaintiff only 70% of that demographic has Facebook accounts. This puts the inflation rate in Kansas City at 100%.

## III.     Facebook's User Base Inflation Is Material

53.     Advertising purchasers, including Plaintiffs DZ Reserve and Cain Maxwell, viewed the "Potential Reach" as an important statistic because it means that more individuals could potentially

---

[35] *Id.*

[36] *See Facebook's Ads Manager*, available at https://www.facebook.com/adsmanager/creation (last accessed August 1, 2018)

[37] *See* United States Census Bureau's *"American Fact Finder"*, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=DEC_10_SF1_QT P2&prodType=table (last accessed August 1, 2018).

view their advertisement.

54.     Facebook fails to disclose to advertisers that its Potential Reach statistic is inflated.

55.     Plaintiffs DZ Reserve and Cain Maxwell read Facebook's "Potential Reach" prior to purchasing advertisements from Facebook, and they relied on Facebook's "Potential Reach" in making their decisions to purchase advertisements from Facebook.

56.     Facebook's misrepresentation of the Potential Reach of its advertisements induced advertising purchasers (including Plaintiffs DZ Reserve and Cain Maxwell) to purchase advertisements, which they otherwise would not have purchased, because purchasers (including Plaintiffs DZ Reserve and Cain Maxwell) believed that more people could potentially be reached by their advertisements than possibly could have been.

57.     Facebook's misrepresentation of the Potential Reach of its advertisements induced advertising purchasers (including DZ Reserve and Cain Maxwell) to pay more for Facebook advertising than they otherwise would have been willing to pay.

58.     Facebook's misrepresentation of the Potential Reach of its advertisements thereby distorted the market price for its advertising by artificially increasing the price of Facebook advertising, causing advertising purchasers (including Plaintiffs DZ Reserve and Cain Maxwell) to pay more than they otherwise would have paid.

59.     Facebook's misrepresentation of the Potential Reach of its advertisements provided Facebook with an unfair competitive advantage over other advertising platforms including other online advertising platforms, such as YouTube, LinkedIn, and Twitter.

## NEW FACTUAL ALLEGATIONS

60.     Facebook's internal documents show that Facebook personnel knew for years that the Potential Reach metric that it provides to Facebook advertisers on its advertisement purchasing interfaces (including on Ads Manager and Power Editor) was inflated and misleading.

61.     Facebook's internal documents show that Facebook personnel knew its Potential Reach metric is a material representation that advertisers rely on. Internally, Facebook acknowledged in its own official documents that advertisers "frequently rely" on Potential Reach:

When creating advertising campaigns, advertisers frequently rely on the

estimated audience to understand the potential reach of their campaigns and set the bid and budget strategy. Thus, this number is arguably ***the single most important number*** in our ads creation interfaces. (emphasis added).

62.     Facebook employees acknowledged in internal documents that complaints about the Potential Reach being misleading have been made since approximately September 2015.

63.     For example, in December 2016, the UK Advertising Standards Authority (UK ASA) complained to Facebook that the Potential Reach was misleading.

64.     In the fall of 2017, the Video Advertising Bureau (VAB) published a report that alleged that Facebook's Potential Reach was inflated and exceeded the Census numbers. This report was referenced in Plaintiffs' Second Amended Complaint, and cited in ¶¶ 45-48 of the Third Amended Complaint as the VAB Report ("Report.")

65.     Senior Facebook officials struggled to respond to the publication of the Report. Facebook employees conducted analysis comparing Facebook's Potential Reach to US census statistics and acknowledged internally that the Report has "the order of magnitude in inflation correct." Among the inflation identified by the Report, the Report found that Facebook's Potential Reach exceeds the number of 18-34 residents in every state. *Cf.* ¶ 46, Figure 6.

66.     In the fall of 2017, Facebook employees, including Facebook Chief Operating Officer Sheryl Sandberg, acknowledged that they had known about the problems with Facebook's Potential Reach for years. Ms. Sandberg wrote:

> We spoke about this a long time ago many times. I thought we knew about this but we also recognized that when the self-reporting data was so different than the census we knew we had to address it. I believe we still do.

67.     In response to Ms. Sandberg's e-mail, a Facebook Vice President wrote to Ms. Sandberg and Dave Wehner (Facebook's Chief Financial Officer) that duplicate and fake accounts were a factor in Facebook overreporting its Potential Reach metric and that Facebook had made a "a deliberate decision" not to remove duplicate or fake accounts from the Potential Reach metric.

68.     Facebook's failure to remove duplicate and fake accounts from its Potential Reach metric makes the metric fundamentally misleading; Facebook represents that Potential Reach is measurement of *people* (see ¶ 32) when Potential Reach is, at best, a measurement of *accounts*.

69.   Facebook executives repeatedly acknowledged that duplicate accounts are "a major factor in our potential reach overestimation problem."

70.   Notwithstanding their own internal acknowledgement that Potential Reach was inflated, Facebook executives did nothing.  Instead, Facebook took steps to obfuscate the issue, and even to cover it up.

71.   First, instead of disclosing the inflation that it internally acknowledged, Facebook developed a set of talking points, by claiming, inter alia, that discrepancies between the census and its Potential Reach metric were due to travelers, and the fact that Potential Reach is not designed to match the census.  Facebook never acknowledged externally what it admitted internally:  that its Potential Reach metric was inflated, and that the inflation was partly due to duplicate and fake accounts.

72.   Second, Facebook executives took steps to cover up the problem.  Just prior to their November 1, 2017 earnings call, Facebook discussed how to disclose that 10% of their MAUs were duplicate accounts and that 2-3% of their MAUs were fake accounts. Because Potential Reach is based on MAUs Facebook considered including another line on its earnings call about how it would update its Potential Reach metric based on its updated calculation of the number of duplicate and fake accounts in its MAU. However, Facebook CFO Dave Wehner declined to make this disclosure:

> There was talk of having another line on the call, around how we'll work these new updated estimates into our ads systems, but Dave review and declined. The context is that investors view Wehner's prepared remarks as a place to listen for risks to the business. Highlighting this as an advertiser issue spotlights this as a business risk for us, when it currently is not.
> However if he is asked about reach and census he will answer: Going forward we are working on how our ad tools can better reflect our updated duplicate accounts estimates (IF PRESSED: such as our advertising reach tools).

73.   Facebook CFO Dave Wehner never disclosed, on the earnings call or elsewhere, the impact of duplicate and fake accounts in Facebook's MAU on its Potential Reach calculation.

74.   Facebook's internal documents show that Facebook employees had widespread knowledge that Potential Reach is based on monthly active users. For example, Facebook employees wrote, "The potential reach comes from the [system used to calculate Potential Reach] – it's the MAU" and that "Potential Reach reflects the number of monthly active users."

17

75.     However, in order to conceal that Potential Reach includes duplicate and fake accounts due to inflation in Facebook's Monthly Active Users, Facebook obfuscated the close relationship between monthly active users and Potential Reach. Thus, Facebook Marketing Manager Amy Dunn told fellow marketing and sales employees, "It's important to also remember that Potential Reach is not MAU but are estimates of people that ads may reach with a campaign. We have recently put out some messaging to help clarify that with advertisers."

76.     Facebook marketing employees were instructed to avoid discussing duplicate and false accounts with advertisers. For example, when a group of Facebook employees discussed how to respond to "advertisers [sic] questions on people numbers and measurement," Marketing Manager Amy Dunn reminded her fellow Facebook employees to exclude any messaging about duplicate or false accounts:

> Additionally, just a polite reminder that we've been given guidance from growth (Alex Schultz) that we should not include messaging about MAP [Monthly Active People[38]] and duplicate or false accounts outside of earnings where these answers are addressed as there are a number of downstream implications.

77.     In early 2018, Facebook employees continued to debate whether to fix the Potential Reach metric and whether to disclose the truth about the inflation of its Potential Reach.

78.     Facebook executives held no fewer than four major meetings in early 2018 to discuss Potential Reach inflation.  For example, on April 19, 2018, several senior employees met to discuss the issue, including that Facebook could substantially reduce overestimation of Potential Reach with "age modeling" and by removing duplicate accounts.

79.     By February 2018, Facebook had already conducted extensive analysis about how to reduce the Potential Reach inflation:

> █████████████████████████████████
> ██████████████████████ There are 2 main sources of overestimation: [1] users misrepresenting their age [and 2] users having multiple accounts.

---

[38] Facebook's Monthly Active People metric is also very similar to its Monthly Active Users metric.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 3:18-cv-04978

80.     Yaron Fidler (the former Product Manager for Potential Reach) modeled the impact on Potential Reach if Facebook removed duplicate accounts from the Potential Reach. An analysis found that "people will drop ~10% Globally."

81.     In March 2018, Fidler proposed a solution under which Facebook would (1) decrease age overestimation in Potential Reach and (2) remove duplicate accounts from Potential Reach. Facebook conducted an analysis and found that the proposed solution would negatively impact revenues.

82.     Fidler highlighted that one the main of objections to the proposed solution was that Facebook stood to lose a significant amount of revenue.  Fidler wrote:

> **Revenue impact is indeed significant.** The question is how do we quantify the loss of advertiser trust? **Also, in a way it's revenue we should have never made given the fact it's based on wrong data.** (emphasis added)

83.     But, before any corrections to the Potential Reach metric could be made – and the truth disclosed – the decision had to be reviewed by the so-called "Central Metrics XFN" team, comprised of "leadership across several product orgs, engineering, sales, legal, audit, finance, comms/pr, policy, analytics, and more." The mission of the Central Metrics XFN team is to "[p]rotect the trust of our partners in external metrics, **while minimizing the restriction of this on revenue** or innovation." (emphasis added).

84.     On April 12, 2018, Fidler met with the "Central Metrics XFN" team to discuss making corrections to the Potential Reach metric – but his proposals were rejected. Central Metrics XFN participant (and Vice President of Growth Marketing & Analytics) Alex Schultz was particularly aggressive in blocking Fidler's proposed duplicate account fix. Schultz wrote that he "tried to stop it there a few times and Yaron kept pushing."

85.     Another Central Metrics XFN team member told Schultz that the team had treated Fidler unfairly:

> Yaron and team have done a huge amount of data analysis on this, not just averages but detailed distributions as well. Far more thorough IMHO than most presentations we see at Central Metrics….**The status quo in ads Reach estimation and reporting is deeply wrong,** and our data analysis suggests [de-duplicating accounts] and Age Affinity would

19

1    dramatically improve things….I think we hung Yaron a bit out to dry
     today.

2    86.    In the summer of 2018, Facebook employees continued to express concern about

3    Potential Reach inflation. As one Facebook employee wrote on July 12, 2018: "My question lately is:

4    how long can we get away with the reach overestimation?"

5    87.    In the summer of 2018, Mr. Fidler proposed to change the name of Facebook's Potential

6    Reach metric so that it would no longer include the words "people" or "reach" and instead make clear

7    that the metric is based on "accounts." Mr. Fidler wrote that this change "solves numbers accuracy –

8    metrics description will be aligned with reality."  However, Mr. Fidler acknowledged that this would

9    come at the "cost of losing the people based narrative."

10   88.    Multiple Facebook employees agreed that "people-based marketing" was core to

11   Facebook's value proposition and that it would thus "be costly to change to accounts…" The proposed

12   name change in the metric's name was not implemented.

13   89.    No later than September 2018, Facebook employees also discovered another reason that

14   the Potential Reach was inflated: Potential Reach included users who were never served

15   advertisements. Facebook did not correct this problem until March 2019.  Facebook's March 2019

16   change caused the Potential Reach for ads targeted at United States users to drop 8 percent on average.

17   90.    Despite making this correction in March 2019, Facebook still failed to remove the

18   duplicate or fake accounts from Potential Reach calculation.

19   91.    As Mr. Fidler's proposals continued to be rejected throughout 2018, he grew

20   increasingly frustrated. He wrote in October 2018 that Facebook's Potential Reach calculation was "a

21   lawsuit waiting to happen." Fidler further observed "this is just like video."[39] Mr. Fidler left Facebook

22   late in 2018.

23   92.    As of March 3, 2020, Facebook still provides a Potential Reach metric to advertisers

24   that states that it measures a number of people. As of March 3, 2020, Facebook still has not removed

25   the fake and duplicate accounts from its Potential Reach calculation.

26

27   ───────────────

28   [39] In late 2016, Facebook acknowledged that two of its video advertising performance metrics
     were inflated.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 3:18-cv-04978

**PLAINTIFFS' EXPERIENCES**

93.      As noted above, Facebook's Potential Reach is vastly inflated at the national, state, and local levels. Thus, the inflation impacted the Potential Reach and Estimated Reach of Plaintiffs' advertising campaigns on Facebook.

**DZ Reserve**

94.      Plaintiff DZ Reserve is a company incorporated and headquartered in Colorado.

95.      Plaintiff DZ Reserve operates several e-commerce stores.

96.      Between December 2017 and December 2018, Plaintiff DZ Reserve ran advertising campaigns on Facebook platforms (including Facebook and Instagram platforms).

97.      Over this time period, Plaintiff DZ Reserve paid Facebook approximately $ 1 million dollars for Facebook advertisements.

98.      Plaintiff DZ Reserve read Facebook's "Potential Reach" prior to purchasing advertisements from Facebook, and Plaintiff DZ Reserve relied on Facebook's "Potential Reach" in making Plaintiff's decision to purchase advertisements from Facebook.

99.      Plaintiff DZ Reserve read Facebook's "Estimated Daily Results Reach" prior to purchasing advertisements from Facebook, and Plaintiff DZ Reserve relied on Facebook's "Estimated Daily Results Reach" and in making Plaintiff's decision to purchase advertisements from Facebook.

100.      Plaintiff DZ Reserve ran nationwide campaigns, as well as campaigns targeted at specific cities, including, but not limited to, Los Angeles and New York City.

101.      Plaintiff DZ Reserve wishes and intends to purchase additional advertisements from Facebook in the future. However, if Facebook continues to inflate its Potential Reach and Estimated Daily Results Reach, it will be difficult for Plaintiff DZ Reserve to trust Facebook's representations about the Potential Reach and Estimated Daily Results Reach of Plaintiff's Facebook advertisements or other statistics provided by Facebook about Facebook advertisements.

**Cain Maxwell**

102.      Plaintiff Cain Maxwell ("Maxwell"), d/b/a Max Martialis, is a citizen and resident of the state of Ohio.

103.      From approximately September 2018 to May 2019, Maxwell ran advertising campaigns

21

on Facebook platforms (including the Facebook platform).

104.   Over this time period, Maxwell paid Facebook approximately $ 400 for Facebook advertisements.

105.   Plaintiff Maxwell read Facebook's "Potential Reach" prior to purchasing advertisements from Facebook, and Plaintiff Maxwell relied on Facebook's "Potential Reach" in making his decision to purchase advertisements from Facebook.

106.   Plaintiff Maxwell read Facebook's "Estimated Daily Results Reach" prior to purchasing advertisements from Facebook, and Plaintiff Maxwell relied on Facebook's "Estimated Daily Results Reach" in making his decision to purchase advertisements from Facebook.

107.   Plaintiff Maxwell ran nationwide campaigns.

108.   Plaintiff Maxwell wishes and intends to purchase additional advertisements from Facebook in the future. However, if Facebook continues to inflate its Potential Reach and Estimated Daily Results Reach, it will be difficult for Plaintiff Maxwell to trust Facebook's representations about the Potential Reach and Estimated Daily Results Reach of Plaintiff's Facebook advertisements or other statistics provided by Facebook about Facebook advertisements.

## CLASS ALLEGATIONS

109.   Plaintiffs re-alleges and incorporates by reference herein all of the allegations contained above.

110.   Pursuant to the Federal Rule of Civil Procedure 23(b)(3), Plaintiff asserts claims on behalf of the following "Class": All persons or entities who, from January 1, 2013, to the present ("Class Period"), had an account with Facebook, Inc., and who paid for placement of advertisements on Facebook's platforms, including the Facebook and Instagram platforms.  Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

111.   This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule

23(b)(3). Plaintiffs seek to represent an ascertainable Class, as determining inclusion in the class can be done through Facebook's own records.

112.    Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

113.    Although the precise number of Class members is unknown and can only be determined through appropriate discovery, Plaintiffs believe, and on that basis alleges, that the proposed Class is so numerous that joinder of all members would be impracticable as Facebook sells millions of advertisements annually to hundreds of thousands or even millions of advertisers.

114.    Questions of law and fact common to the putative Class predominate over questions affecting only individual members, including inter alia:

a.    Whether Facebook made material misrepresentations about its advertising services, including misrepresenting its Potential Reach; and

b.    Whether Facebook breached its contractual duty to perform competently and with reasonable care by providing its inflated Potential Reach.

115.    Plaintiffs are members of the putative Class. The claims asserted by Plaintiffs in this action are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by the Defendant and the relief sought is common.

116.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class, as their interests are coincident with, and not antagonistic to, the other members of the putative Class.

117.    Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation. Plaintiffs' counsel has experience litigating some of the largest and most complex consumer class actions, including numerous consumer class actions in the Northern District of California.

118.    Certification of the Class is appropriate pursuant to Fed. Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance

23

makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be highly unlikely that the members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

119.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

120.    In the alternative, the Class should be certified pursuant to Federal Rule of Civil Procedure 23(b)(2) because:

    a.   The prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Facebook;

    b.   The prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and

    c.   Facebook has acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

**FIRST CAUSE OF ACTION**
**CALIFORNIA UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE § 17200,** *et seq.* [40]

121.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

122.    Facebook violated California's Unfair Competition Law (UCL), Cal. Bus. & Prof.

---

[40] Pursuant to Facebook's terms of service, the laws of the State of California govern "any claim" that arises between Facebook and its users, "without regard to conflict of law provisions." Facebook,

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 3:18-cv-04978

Code §17200 et seq., by engaging in the fraudulent and unfair business acts and practices alleged previously, and as further specified below.

123.    Facebook's misrepresentation of the Potential Reach of advertisements constitutes a fraudulent practice under the UCL, as it deceived Class members into believing that their advertisements could potentially reach more people than their advertisement could actually reach.

124.    Facebook fails to disclose to advertisers the extent to which the Potential Reach statistic is inflated. This omission constitutes a fraudulent practice under the UCL, as it deceived Class members into believing that their advertisements could potentially reach more people than their advertisement could actually reach.

125.    Facebook's failure properly to audit and verify the accuracy of its Potential Reach statistics before disseminating them to Class members is unethical, unscrupulous, and substantially injurious to advertising purchasers, and thus constitutes an unfair practice under the UCL.  The harm these practices caused to Plaintiffs and the Class members outweigh their utility, if any.

126.    Facebook should have known that its Potential Reach was inaccurate and inflated, and had Facebook properly audited and verified its Potential Reach, it would have known that the Potential Reach is inaccurate and inflated.  The Potential Reach inflation would have been caught by a reasonable auditing and verification process.

127.    Facebook's failure to employ reasonable auditing and verification procedures gives it an unfair competitive advantage, as it allowed Facebook to provide advertising services at a lower cost and made those advertising services appear to be more effective than they were.

128.    Plaintiffs have standing to bring these claims under the UCL because they were injured and lost money or property, including but not limited to money paid for Facebook advertisements, as a result of Facebook's fraudulent and unfair business practices.  Among other things, Plaintiffs would not have bought as much advertising services if Facebook had not disseminated an inflated Potential Reach statistic, and Plaintiffs would have paid a lower price for the advertising services they did purchase.

_____

*Statement of Rights and Responsibilities*, https://www.facebook.com/terms (last accessed: June 17, 2019).

25

129.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek equitable relief to prevent the continued use of Facebook's unfair and fraudulent practices and to restore to the Class all money Facebook may have acquired by means of its fraudulent and unfair business practices.

## SECOND CAUSE OF ACTION
## QUASI-CONTRACT CLAIM FOR RESTITUTION

130.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

131.     Plaintiffs seek restitution in quasi contract, in the alternative, in the event that the trier of fact ultimately determines that a contract did not exist between Plaintiffs and Facebook.

132.     Facebook's inflated Potential Reach made advertising on its platform appear more effective and valuable than it really was—leading Plaintiffs and the Class to pay more money to Facebook for advertising services than they otherwise would have paid.

133.     Facebook knew about, accepted, and benefited from Plaintiffs' and Class members' purchase of these advertising services.

134.     Under the circumstances, it would be inequitable for Facebook to benefit from its inaccurate and inflated Potential Reach calculation and its persistent failure to correct the error. To avoid injustice, Plaintiffs and the Class accordingly seeks restitution and/or disgorgement of profits in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

135.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

136.     Plaintiffs and Class members contracted with Facebook to provide them with advertising services.

137.     These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties (both explicit and fairly implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts.  These included the covenants that Facebook would act fairly and in good faith in carrying out its contractual obligations to provide Plaintiffs and Class

members with accurate Potential Reach and Estimated Daily Reach of Plaintiffs and Class members' advertising.

138.    Facebook did not act in good faith and fair dealing to provide Plaintiffs and Class members with accurate Potential Reach and Estimated Daily Reach of Plaintiffs and Class members' advertising. For example, instead of implementing a reasonable process to ensure the accuracy of its Potential Reach and Estimated Daily Reach, Facebook primarily relied on ad hoc written complaints from Facebook users and ineffective algorithms to assure accuracy.

139.    Plaintiffs and Class members met all or substantially all of their contractual obligations, including submitting their advertising for Facebook's approval and paying for Facebook's advertising services.

140.    Facebook's failure to act in good faith in providing accurate Potential Reach and Estimated Daily Reach denied Plaintiffs and Class members the full benefit of their bargain. Plaintiffs and Class members received advertising services that were less valuable than what they paid for and less valuable than their reasonable expectations under the contracts.  Plaintiffs and Class members were damaged by an amount at least equal to this overpayment.

141.    Accordingly, Plaintiffs have been injured as a result of Facebook's breach of the covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## FRAUDULENT MISREPRESENTATION

142.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

143.    Facebook falsely represents the Potential Reach of its advertisements. Because of Facebook's method of calculating Potential Reach, Potential Reach exceeds the number of people in an advertisement set's target audience.

144.    Facebook also falsely represents that Potential Reach is a measurement of people when it is a measurement of accounts. Potential Reach is not a measurement of people because it includes fake and duplicate accounts.

145.    Facebook either knew that the representations in paragraphs 148-149 were false or

27

Facebook made these representations recklessly and without regard for their truth. Facebook employees have received complaints about Potential Reach being misleading since September 2015. In the fall of 2017, Facebook senior executives, including Sheryl Sandberg, acknowledged that the Potential Reach needed to be fixed. In 2017 and 2018, Facebook executives repeatedly stated in internal communications that the Potential Reach was inflated, and that Potential Reach measured accounts rather people. Despite multiple meetings in 2017 and 2018 in which Facebook executives discussed fixing Potential Reach so that it would measure people and/or removing Potential Reach metric from its interfaces, Facebook continues to this day to provide an inflated Potential Reach metric that measures accounts rather than people.

146.    Facebook intended that Plaintiffs and Class members rely on its Potential Reach metric. Facebook knew that its advertising customers "frequently rely" on Potential Reach, and that this number is arguably the single most important number in our ads creation interfaces."

147.    Plaintiffs and Class members did reasonably rely on Facebook's Potential Reach representations in paragraphs 148-149 when deciding whether they would purchase advertising from Facebook and how much advertising to purchase from Facebook. As a result of Facebook's misrepresentations, Plaintiffs and Class members were harmed: Plaintiffs and Class members purchased more advertising from Facebook than they otherwise would have and paid a higher price than they would otherwise have.

148.    Plaintiffs seek an award of compensatory and punitive damages. Facebook's conduct as previously described constitutes oppression, fraud, or malice, and was authorized or ratified by Facebook's officers.

### FIFTH CAUSE OF ACTION
### FRAUDULENT CONCEALMENT

149.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained above.

150.    Facebook conceals from Plaintiffs and Class members that Facebook's Potential Reach metric is inflated and misleading, and conceals that it is inflated in part due to duplicate and fake accounts in Facebook's user base and MAUs.  Facebook also conceals that Potential Reach is calculated using accounts, not people.

151.    In November 2017, Facebook CFO David Wehner declined to disclose the relationship between the duplicate and fake accounts in its MAU and the duplicate and fake accounts in Facebook's Potential Reach.

152.    Instead, Facebook created and disseminated a fiction: that MAU and Potential Reach are unrelated. Facebook has used this fiction to conceal that the Potential Reach metric includes duplicate and fake accounts.

153.    Facebook has a duty to disclose to Plaintiffs and Class members that Potential Reach is inflated and misleading; that it includes duplicate and fake accounts; and that it is calculated based on accounts rather than people because Facebook has exclusive knowledge of these material facts.

154.    Facebook has a duty to disclose to Plaintiffs and Class members that Potential Reach is inflated and misleading; that it includes duplicate and fake accounts; and that it is calculated based on accounts rather than people because Facebook actively concealed these material facts from Plaintiffs and Class members.

155.    Facebook has a duty to disclose to Plaintiffs and Class members that Potential Reach is inflated and misleading; that it includes duplicate and fake accounts; and that it calculated based on accounts rather than people because Facebook makes a partial representation by providing the Potential Reach metric to Plaintiffs and Class members while also suppressing these material facts.

156.    Because of Facebook's omissions and concealment, Plaintiffs and Class members did not know when they purchased Facebook advertisements that the Potential Reach was inflated and misleading; that it included duplicate and fake accounts; or that Potential Reach was calculated based on accounts rather than people.

157.    Facebook intentionally concealed that Potential Reach is inflated and misleading; that it includes duplicate and fake accounts; and that it is calculated based on accounts rather than people with the intention of defrauding Plaintiffs and Class members.

158.    Plaintiffs and Class members would have acted differently had they known that Potential Reach is inflated and misleading; that Potential Reach includes duplicate and fake accounts; and that Potential Reach is calculated based on accounts rather than people. They would have purchased fewer (if any) Facebook advertisements and they would have paid a lower price.

29

159.    As a result of Facebook's concealment and omissions described in this complaint, Plaintiffs and Class members were harmed: Plaintiffs and Class members purchased more advertising from Facebook than they otherwise would have and paid a higher price than they would otherwise have.

160.    Plaintiffs seek an award of compensatory and punitive damages. Facebook's conduct as previously described constitutes oppression, fraud, or malice, and was authorized or ratified by Facebook's officers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs DZ Reserve and Cain Maxwell, on behalf of themselves and the Class, seek the following relief:

A.    An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing Geoffrey Graber of Cohen Milstein Sellers & Toll PLLC, as Class Counsel, and finding that Plaintiffs are proper representatives of the Class requested herein.

B.    Plaintiffs request injunctive relief.  Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including: (i) an order prohibiting Facebook from engaging in the wrongful acts described herein; (ii) requiring Facebook to engage third-party auditors to conduct audits and evaluations of Facebook's purported user base and its Potential Reach, and ordering them to promptly correct any problems or issues detected by these auditors, and (iii) requiring Facebook to disclose any further inaccuracies with respect to its user base in a timely and accurate manner.

C.    Plaintiffs also request damages, restitution, punitive damages, attorneys' fees, statutory costs, and such other and further relief as is just and proper. Plaintiffs seek attorneys' fees under California Code of Civil Procedure 1021.5.

1

## JURY TRIAL DEMAND

2
Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by

3
jury in this action of all issues so triable.

4
DATED:          March 6, 2020                    Respectfully submitted,

5
By: /s/          *Geoffrey Graber*

6
Geoffrey Graber

7
ANDREW N. FRIEDMAN (admitted *pro hac vice*)
afriedman@cohenmilstein.com

8
GEOFFREY GRABER (SBN 211547)
ggraber@cohenmilstein.com

9
JULIA HORWITZ (admitted *pro hac vice*)
jhorwitz@cohenmilstein.com

10
KARINA G. PUTTIEVA (SBN 317702)
kputtieva@cohenmilstein.com

11
**COHEN MILSTEIN SELLERS & TOLL PLLC**

12
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

13
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

14
*Counsel for Plaintiffs and Proposed Class*

15

16
ERIC KAFKA (admitted *pro hac vice*)
ekafka@cohenmilstein.com

17
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor

18
New York, NY 10005
Telephone: (212) 838-7797

19
Facsimile: (212) 838-7745
ekafka@cohenmilstein.com

20

21
CHARLES REICHMANN (SBN 206699)
Charles.reichmann@gmail.com

22
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle

23
Kensington, CA 94708-1015
Telephone: (415) 373-8849

24

25
MICHAEL RAPP (*pro hac vice forthcoming*)
mr@kcconsumerlawyer.com

26
**STECKLEIN & RAPP**
748 Ann Ave.

27
Kansas City, KS 66101-3014
Telephone: (913) 703-5354

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 3:18-cv-04978

REUBEN D. NATHAN (SBN 208436)
rnathan@nathanlawpractice.com
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite #200
Newport Beach, CA 92663
Telephone: (949) 270-2798
*Additional Counsel for Plaintiffs*

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: 3:18-cv-04978