LATHAM & WATKINS LLP
Elizabeth L. Deeley (CA Bar No. 230798)
  elizabeth.deeley@lw.com
Melanie M. Blunschi (CA Bar No. 234264)
  melanie.blunschi@lw.com
Nicole C. Valco (CA Bar No. 258506)
  nicole.valco@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA  94111-6538
Telephone:  +1.415.391.0600
Facsimile:  +1.415.395.8095

Andrew B. Clubok (*pro hac vice*)
  andrew.clubok@lw.com
Susan E. Engel (*pro hac vice*)
  susan.engel@lw.com
555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Telephone:  +1.202.637.2200
Facsimile:  +1.202.637.2201

Hilary H. Mattis (CA Bar No. 271498)
  hilary.mattis@lw.com
140 Scott Drive
Menlo Park, CA  94025-1008
Telephone: +1.650.328.4600
Facsimile: +1.650.463.2600

*Attorneys for Defendant Facebook, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DZ RESERVE and CAIN MAXWELL (d/b/a MAX MARTIALIS), individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. 3:18-cv-04978 JD<br><br>**FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:   June 10, 2021<br>Time:   10:00 a.m.<br>Court:  Courtroom 11, 19th Floor<br>Hon.    James Donato |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FACEBOOK'S OPP. TO PLAINTIFFS'
MOT. FOR CLASS CERTIFICATION
CASE NO. 3:18-CV-04978 JD

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................ 4

    A.     Potential Reach Estimates Are A Targeting Tool, Not A Budget Tool ........................................................................................................ 4

    B.     During The Class Period, Facebook Updated The Way Potential Reach Was Estimated But Rejected Some Changes Because They Were Flawed ............................................................................................ 6

    C.     Every Ad Campaign Is A Different Product Sold At A Different Price ................................................................................................... 9

    D.     Advertisers Rely On Different Information (Not Potential Reach) In Setting Their Budgets And Measuring Results ................................. 11

    E.     Plaintiffs' Conduct and Contemporaneous Documents Contradict Their Claimed Reliance on Potential Reach ......................................... 13

III.    LEGAL STANDARD ...................................................................................... 14

IV.     PLAINTIFFS HAVE NOT DEMONSTRATED TYPICALITY, ADEQUACY, OR UCL STANDING ............................................................. 15

V.      PLAINTIFFS HAVE NOT DEMONSTRATED PREDOMINANCE BECAUSE THEY HAVE NO COMMON PROOF OF LIABILITY ....................................... 17

    A.     No Uniform Material Misstatement Or Omission Was Made To The Class ............................................................................................ 18

    B.     Plaintiffs' Ad Auction Evidence Cannot Prove That Any Potential Reach Statement Caused Classwide Injury ......................................... 22

VI.     PLAINTIFFS HAVE NOT DEMONSTRATED PREDOMINANCE BECAUSE THEY HAVE NO CLASSWIDE DAMAGES OR RESTITUTION MODEL .......................................................................................................... 24

VII.    A CLASS ACTION IS NOT SUPERIOR ...................................................... 24

VIII.   PLAINTIFFS HAVE NOT MET THEIR BURDEN UNDER RULE 23(B)(2) ......................................................................................................... 25

IX.     CONCLUSION ............................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All. Mortg. Co. v. Rothwell,*
  10 Cal. 4th 1226 (1995) ................................................................................................ 24

*Am. Express Co. v. Italian Colors Rest.,*
  570 U.S. 228 (2013) ...................................................................................................... 14

*Avilez v. Pinkerton Gov't Servs. Inc.,*
  596 F. App'x 579 (9th Cir. 2015) ................................................................................. 17

*Berger v. Home Depot USA, Inc.,*
  741 F.3d 1061 (9th Cir. 2014) ...................................................................................... 18

*Brazil v. Dell Inc.,*
  2010 WL 5387831 (N.D. Cal. Dec. 21, 2010) .............................................................. 16

*Brickman v. Fitbit, Inc.,*
  2017 WL 5569827 (N.D. Cal. Nov. 20, 2017) .............................................................. 19

*Chowning v. Kohl's Dep't Stores, Inc.,*
  733 F. App'x 404 (9th Cir. 2018) ................................................................................. 24

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) ............................................................................................. 16, 21, 24

*Ebner v. Fresh, Inc.,*
  838 F.3d 958 (9th Cir. 2016) ........................................................................................ 22

*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir. 2011) ........................................................................................ 15

*Fox Test Prep v. Facebook, Inc.,*
  588 F. App'x 733 (9th Cir. 2014) ................................................................................. 17

*Harris v. Vector Mktg., Corp.,*
  753 F. Supp. 2d 996 (N.D. Cal. 2010) .......................................................................... 16

*Hinesley v. Oakshade Town Ctr.,*
  135 Cal. App. 4th 289 (2005) ....................................................................................... 22

*Hirsch v. USHealth Advisors, LLC,*
  337 F.R.D. 118 (N.D. Tex. 2020) ................................................................................. 16

*In re Facebook, Inc., PPC Advert. Litig.,*
  282 F.R.D. 446 (N.D. Cal. 2012) ................................................................................. 17

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019) ...................................................................................... 25

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) .......................................................................................... 14, 15

*In re Vioxx Class Cases*,
    180 Cal. App. 4th 116 (2009) ................................................................................... 18

*Jones v. ConAgra Foods, Inc.*,
    2014 WL 2702726 (N.D. Cal. June 13, 2014) .......................................................... 19

*Lanovaz v. Twinings N. Am., Inc.*,
    726 F. App'x 590 (9th Cir. 2018) ............................................................................. 25

*Lucas v. Berg, Inc.*,
    212 F. Supp. 3d 950 (S.D. Cal. 2016) ...................................................................... 18

*Microsoft Corp. v. Baker*,
    137 S. Ct. 1702 (2017) ............................................................................................. 18

*Miller v. RP On-Site, LLC*,
    2020 WL 6940936 (N.D. Cal. Nov. 25, 2020) ......................................................... 16

*Mirkin v. Wasserman*,
    5 Cal. 4th. 1082 (1993) ............................................................................................ 17

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    993 F.3d 774 (9th Cir. 2021) ............................................................................. passim

*Reitman v. Champion Petfoods USA, Inc.*,
    2019 WL 7169792 (C.D. Cal. Oct. 30, 2019) .......................................................... 19

*Reitman v. Champion Petfoods USA, Inc.*,
    830 F. App'x 880 (9th Cir. 2020) ............................................................................. 19

*Roley v. Google LLC*,
    2020 WL 8675968 (N.D. Cal. July 20, 2020) .......................................................... 21

*Rushing v. Williams Sonoma, Inc.*,
    2020 WL 6787135 (N.D. Cal. Oct. 8, 2020) ............................................................ 17

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018) .................................................................................... 15

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ................................................................................................. 22

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ................................................................... 1, 22, 24, 25

*Spacone v. Sanford, L.P.*,
  2018 WL 4139057 (C.D. Cal. Aug. 9, 2018) ........................................................................ 16

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) ........................................................................ 16, 22

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ........................................................................ 25

*Sussex Fin. Enter., Inc. v. Bayerische Hypo-Und Vereinsbank AG*,
  460 F. App'x 709 (9th Cir. 2011) ........................................................................ 17

*Tucker v. Pac. Bell Mobile Servs.*,
  208 Cal. App. 4th 201 (2012) ........................................................................ 18

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ........................................................................ 17, 23

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002) ........................................................................ 15

*Walker v. Life Ins. Co. of the Sw.*,
  953 F.3d 624 (9th Cir. 2020) ........................................................................ 14, 15, 17, 22

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................ 14

*Williams v. Gerber Prods. Co.*,
  552 F.3d 934 (9th Cir. 2008) ........................................................................ 17

*Zakaria v. Gerber Prod. Co.*,
  755 F. App'x 623 (9th Cir. 2018) ........................................................................ 23

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) ........................................................................ 3, 25

**RULES**

Fed. R. Civ. P. 23 ........................................................................ 2, 14, 15, 22

Fed. R. Civ. P. 23(b)(2) ........................................................................ 3, 25

Fed. R. Civ. P. 23(b)(3) ........................................................................ 24

## I.       INTRODUCTION

Two advertisers—a firearm accessory reseller and a drop-shipping business—ask this Court to represent more than three million advertisers—including large corporations, medium-sized businesses, and individual proprietors that have varying objectives and purchasing experiences—based on their false assertions that Facebook intentionally and uniformly inflated Potential Reach estimates, supposedly causing advertisers across the board to pay more for Facebook ads than they otherwise would have.  At the threshold, Plaintiffs ignore Facebook's motion for judgment on the pleadings, which seeks dismissal of their UCL claim under *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), Dkt. 270.  Beyond *Sonner*, their theory of liability and harm for both the UCL and fraud claims hinges on the proposition that every advertiser received a deceptively high Potential Reach estimate and that millions of advertisers relied on those estimates to increase their ad budgets, which supposedly drove up all ad prices.  None of this is true.  Plaintiffs' narrative misconstrues the record and cannot disguise the fact that this case—with or without the UCL claim—is unsuitable for class treatment.

Potential Reach is one of several tools Facebook provides advertisers to help them target their ad campaigns.  Facebook calculates Potential Reach in real time when an advertiser selects targeting and placement criteria (from vast options) to provide a unique estimate of the number of people who received an ad on Facebook in the last 30 days and who match the selected criteria. Potential Reach is not designed to match census data (as Facebook discloses), but reflects real-time demographics, interests, and behaviors based on what people do and share on Facebook. Plaintiffs do not claim (and have no evidence) that Facebook made a computational error in its calculation.  Rather, Plaintiffs believe Facebook should describe or compute Potential Reach differently, yet they fail to tell the Court that Facebook *did* make updates to improve its estimates, but rejected some proposed updates because they would have made Potential Reach less accurate.

Most important for purposes of their motion for class certification ("Motion"), Plaintiffs fail to present evidence showing that advertisers as a class uniformly relied on "inflated" Potential Reach estimates to increase their budgets.  In fact, Plaintiffs' expert (Allenby) conducted a study showing that when presented with ████████████████████████████████

1 ████████████████████████ Reibstein Ex. 3.[1]  Faced with these results, he invented

2 a brand new, results-driven analysis to try to support Plaintiffs' theory, but he still found that

3 advertisers as a class do not rely on the description of Potential Reach as "people," ████████

4 ████████████████████████████████████████

5 Reibstein ¶¶ 125-26 & Table 6.  Those results are consistent with the named Plaintiffs' own

6 conduct—they did not rely on supposedly "inflated" Potential Reach to increase their budgets.

7 Declarations from other advertisers confirm that they too do not rely on Potential Reach in their

8 budget decisions, but instead use it (if at all) as a "directional guide" in selecting targeting criteria.

9 *E.g.*, Ex. B (Flanders) ¶ 8; Ex. D (McDowell) ¶ 10.[2]  That is no surprise; Potential Reach is not an

10 estimate of advertisers' results, which is what advertisers consider in setting budgets.  *E.g.*, Ex. A

11 (Lowe) ¶ 8; Ex. C (Hampton) ¶ 10.   In fact, Facebook provides entirely different (and

12 unchallenged) estimates to predict advertisers' results on the same webpage right below Potential

13 Reach—these Estimated Daily Results estimate how many people the advertiser may actually

14 reach or may click on an ad in a day based on the advertiser's budget.  *See* Ex. 78 at 11-12, 17-19;

15 Ex. 93.  Plaintiffs have not presented a single on-the-record statement from *any* other advertisers

16 stating they relied on Potential Reach to set their budget.   Without evidence that advertisers

17 increased their budgets in reliance on "inflated" Potential Reach, Plaintiffs' theory of classwide

18 injury—which *assumes* based on their experts' results-driven analysis that ████████████

19 ████████████████████████—collapses.

20     To paper over these fundamental problems, Plaintiffs' experts use averages to assume away

21 critical differences between advertisers.   But to satisfy Rule 23, Plaintiffs must show by a

22 preponderance of the evidence that their claims are capable of common proof, *without* using

23 "average assumptions" that "mask individual differences among the class members," and without

24 sweeping into the class more than a *de minimis* number of uninjured class members.  *Olean*

---

[1] Unless noted, all exhibits cited herein are attached to the Declarations of Michael Duffey and Melanie M. Blunschi ("Blunschi") in Support of Facebook's Opposition to Plaintiffs' Motion . Facebook's expert reports are cited herein by last name: Dr. Catherine Tucker (Dkt. 288-1), David Reibstein (Dkt. 289-1), Dr. Steven Tadelis, and Dr. Adam Porter (both filed concurrently).  Cites to Reibstein Ex. 3 are to Reibstein's concurrently-filed Supplemental Declaration.  All internal quotation marks and citations are omitted and all emphases are added unless noted.
[2] Facebook reserves the right to submit additional testimony from other advertisers.

1    *Wholesale Grocery Coop., Inc. v. Bumble Bee Foods* LLC, 993 F.3d 774, 791-92 (9th Cir. 2021).

2    Plaintiffs cannot do so, and class certification should accordingly be denied.

3       **First**, the remaining class representatives, Cain Maxwell and DZ Reserve, are atypical and

4    inadequate, and lack UCL standing, because they did not rely on Potential Reach and lied about it.

5    While telling the Court that DZ Reserve "would not have paid Facebook the money it did" had it

6    known Potential Reach was allegedly inflated (Mot. at 12), DZ Reserve's owner (and sole ad-

7    buyer) continued to buy Facebook ads under false pretenses *after* joining this case. *See infra*

8    Section II.E; Blunschi ¶¶ 69-78.  And any claim that Maxwell relied on Potential Reach rings

9    hollow given his admission that he actually relied on an online tutorial's instructions to set his

10    budgets—and that tutorial did not discuss Potential Reach. *See infra* Section II.E; Blunschi ¶ 90.

11       **Second**, Plaintiffs cannot show predominance because there is no common proof of

12    liability.  Each ad an advertiser purchases is a different product with a different price based on

13    different information and performance objectives.  As set forth in Facebook's *Daubert* motion

14    (Dkt. 285), Plaintiff's own expert (Allenby) finds that advertisers as a class **do not rely** on

15    "inflated" Potential Reach to increase their budgets.  That alone defeats class certification.

16       **Third**, Plaintiffs also cannot show predominance because they have no viable classwide

17    damages model.  As explained in Facebook's *Daubert* motion (Dkt. 286), the McFarlane model is

18    based on a flawed "observation" about a single email and does not fit Plaintiffs' theory of liability,

19    and Plaintiffs offer no other measure of damages for their allegation that Potential Reach was

20    misleadingly described as "people."  And as for Plaintiffs' effort to show damages caused by the

21    "inflated" Potential Reach estimates, that model relies on Allenby's results-driven revised analysis,

22    which is unreliable as set forth in Facebook's second *Daubert* motion (Dkt. 285).

23       **Fourth**, Plaintiffs cannot show superiority because class claims would require millions of

24    mini-trials, and Plaintiffs do not attempt to satisfy their burden of showing "a suitable and realistic

25    plan for trial."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001).

26       **Fifth**, Plaintiffs' Rule 23(b)(2) class fails because they are not entitled to injunctive relief,

27    including for the reasons stated in Facebook's motion for judgment on the pleadings, Dkt. 270.

28

## II.       BACKGROUND

Plaintiffs devote the bulk of their Motion to a fabricated story that Facebook inflated Potential Reach to trick advertisers into spending more on Facebook.[3]  But they ignore key facts that doom class certification: (1) the proposed class of advertisers does not use Potential Reach as a tool for setting budgets; (2) Facebook updated Potential Reach throughout the Class Period but rejected the changes Plaintiffs now champion because they would have made Potential Reach *less* reliable; (3) advertisers bought different types of ads at different prices, and used different information to evaluate and set budgets for those ads; (4) the named Plaintiffs did not rely on Potential Reach; and (5) Plaintiffs' experts assume away these issues through averages.

### A.       Potential Reach Estimates Are A Targeting Tool, Not A Budget Tool

Potential Reach is a planning tool that some advertisers use to help create a target audience for their ad campaigns—not for setting budgets.  In declarations, Exs. A-J, Facebook advertisers explain that they use Facebook because it allows them to "target[] the right audiences with our ads," Ex. H (Grantham) ¶ 3, or "target specific events, for specific groups of people," Ex. B ¶ 3; *see also* Tucker ¶¶ 137-39 (advertisers received value from Facebook and continued to buy ads).

Advertisers explained that Facebook advertising helps them get results:

- "I choose to advertise on Facebook because it works. It is where my target audience is online and I get results. I check Google Analytics every other week and can tell that Facebook is currently responsible for approximately 37 percent of traffic driven to the Cork & Keg Tours website…In fact, I am planning to increase my advertising budget (likely to $500 per year) because of the strong results I have been getting with my Facebook ads and the expanded needs of my business." Ex. I (Ventrice) ¶¶ 3, 13.

- "I do not know where my business would be without Facebook, especially since the start of the COVID-19 pandemic. … I could keep in contact and engage with my community and direct people to my website, and it really helped my sales." Ex. C ¶ 5.

- "What matters to me is actual results—people coming in to my taproom—and Facebook delivers good results." Ex. B ¶¶ 3, 13.

---

[3] Plaintiffs base their UCL and fraudulent misrepresentation and concealment claims on three misstatements (collectively, "***Potential Reach Statements***"): (1) the "targeted" Potential Reach estimate provided for each ad set after the advertiser selected targeting and placement criteria ("***Targeted Statement***"); (2) the description of Potential Reach estimates as "people" instead of "accounts" ("***People Statement***"); and (3) a new statement challenged for the first time in the Motion, namely, the "default" Potential Reach estimate that appeared when a U.S. advertiser opened Ads Manager ("***Default Statement***")*.* Mot. at 3-4, 14.  Contrary to Plaintiffs' suggestion, the "Default Statement" has not been "uniform" during the Class Period—Plaintiffs reference a Default Statement of 240 million (*id.* at 3), but the so-called "default" was at times 220 million (Ex. 84) and 230 million (Dkt. 282-9 ¶ 18; Graber Ex. 4 at Fig. 1).  And Plaintiffs admit that the age of people included in the "default" varied.  Mot. at 3 n.2.

1     Advertisers can select from hundreds of thousands of targeting and placement criteria to

2   define the audience they want, based on demographics (*e.g.*, location, age, gender), interests (*e.g.*,

3   bagels), and the platform to display their ads (*e.g.*, Facebook, Instagram).  Tadelis ¶¶ 30-32; Tucker

4   ¶ 15; Ex. 78 at 12; Ex. 89; Ex. 90.  As an advertiser selects criteria, the Potential Reach estimate

5   updates in real-time to provide an "estimate of the size of the audience that's eligible to see your

6   ad" based on the selected criteria.  Ex. 85; Ex. 78 at 13; Ex. 80.  Above the numerical Potential

7   Reach estimate, a color-coded dial shows whether the target audience "is fairly broad," "defined,"

8   or "too specific."   Ex. 84; Ex. 93; Tucker ¶¶ 64-68.   As one advertiser explains, "if I add

9   preferences to my targeting criteria and the Potential Reach estimate does not change, then it

10  indicates to me it is not a widely held preference."  Ex. B ¶ 8.  Advertisers "might dial in the

11  audience with additional targeting criteria if it is too broad," Ex. D ¶ 10, and they recognize the

12  value in Potential Reach as a "sanity check or directional guide" in crafting an audience, Ex. B ¶

13  8; *see also* Tucker ¶¶ 63-68; Tadelis ¶¶ 35-38; Porter ¶ 64.  But advertisers also understand that,

14  as Facebook discloses, Potential Reach is not "an estimate of how many people will actually see

15  your ad," which depends on an advertiser's budget (and other factors like the quality of the ad).

16  Ex. 80 at 3; Ex. 87; Ex. H ¶ 6; Ex. C ¶ 9.  For that, Facebook provides estimates of actual results

17  (Estimated Daily Results), including Estimated Daily Reach, which is right below—and is a

18  fraction of—Potential Reach, and takes into account an advertiser's budget.  Ex. 94 ("The number

19  of people you actually end up reaching depends on your budget and performance.  Check your

20  estimated daily results for that estimation."); Ex. 88; Tucker ¶¶ 69-72; Tadelis ¶¶ 46-48.

21     In declarations, actual advertisers and ad agencies explain that they use Potential Reach (if

22  at all) to select their targeting criteria, ***not*** to set their budgets:

23  - "Sometimes I use Potential Reach while planning an ad campaign ***to choose preferences***. … I do not expect to reach anywhere close to [the Potential Reach estimate]."  Ex. B ¶ 8.

24  - "The only way I use Potential Reach estimates is refining and honing in on the target audience."  Ex. I ¶ 9.

25
26  - "I am never trying to reach everyone in the Potential Reach estimate.  Sometimes I tinker with the Potential Reach meter to see how many people may possibly be included in my targeting criteria, but I hardly look at it."  Ex. F (Davis) ¶ 6.

27  - "I may use the Potential Reach estimate as a guide to help determine whether to make my target audience narrower or broader, but Potential Reach has no impact on my budget decisions."  Ex. J (Pettys) ¶ 6.

28

Advertisers explain that they set and adjust their budgets based on a variety of information, including prior campaign results, real-time actual results that Facebook provides once they launch a campaign, and Estimated Daily Results (such as Reach and Link Clicks)—not Potential Reach:

- "I do not rely on Potential Reach when setting the budget for my ads, and I do not increase or decrease my ad budgets based on Potential Reach estimates.  I have a tight marketing budget and use the funds I have available to advertise."  Ex. A ¶ 8.
- "The Estimated Daily Reach ranges that Facebook displays are more useful information for me and are what I sometimes consider instead of Potential Reach."  Ex. C ¶ 10.
- "We activate ads on Facebook and monitor them to see if they are performing, and then make adjustments as warranted by the performance—including while the campaign is running, or when placing the next campaign."  Ex. E (Davis) ¶ 10.
- "We adjust our ad campaigns while they are running based on measured ROI, and we generally have a good idea of what will work or not based on past performance."  Ex. H ¶ 5.

Potential Reach is an estimate with constantly changing inputs.  Ex. 92; Ex. 93; Ex. 115 at 68:11-25; 74:9-75:10.   Advertisers understand that Potential Reach is necessarily an estimate because it is a real-time calculation based on data, including self-reported user data, about users' interests, activities, and locations, among others.  Ex. B ¶ 11 ("I understand that Potential Reach is only an estimate or guideline, and not an exact science.").   There is no "ground truth" for Potential Reach, Ex. E ¶ 10, but that does not matter to advertisers because Potential Reach is not what they use to measure results, Tucker ¶¶ 50-54, 56-62; Ex. 115 at 76:6-78:1.  For example:

- "If Potential Reach estimates were off from the actual number of people in my target audience by 10%, it would not affect my advertising decisions.  I understand that Potential Reach is only an estimate or guideline, and not an exact science."  Ex. B ¶ 11.
- "The Potential Reach estimates that Facebook provides are not important to Carvana's advertising strategy, because we care if we are getting conversions, not reach. … Potential Reach is fluid on an hourly, daily, and weekly basis … ."  Ex. H ¶¶ 5-6.
- "Facebook's interest targeting is based on user reported information as well as user behavior (such as engagement with certain pages).  I will explain to my [agency] clients that, given the way interests are determined, the size of an audience represented by a given interest may be over or under-inclusive of the universe of people who really hold that interest." Ex. E ¶ 8.

**B.     During The Class Period, Facebook Updated The Way Potential Reach Was Estimated But Rejected Some Changes Because They Were Flawed**

Plaintiffs argue—based on misconstrued excerpts from documents—that Facebook knew Potential Reach was "inflated" but chose not to fix it to make more money.  Not true.  Facebook made numerous updates to Potential Reach during the seven-year Class Period, but it *rejected* changes that would have made Potential Reach *less reliable*.  *E.g.*, Dkt. 282-70 at 10, 15; Dk. 282-

59; Tadelis ¶¶ 38-39, 40-45, 49-67; Porter ¶¶ 66-68; Ex. 112 at 39:4-40:15, 43:8-18, 66:12-23, 94:23-95:13; Ex. 113 at 125:2-18, 134:22-135:8.  In fact, Facebook made updates that addressed each of the issues Plaintiffs target.  Mot. at 13, 18 (alleging purported inflation from multiple, fake, inactive, ineligible and duplicate Facebook/Instagram accounts).  For example:

- Potential Reach counts only those people who have actually seen an ad in the last 30 days, rather than those who were active and *could* see an ad.  Dkt. 282-70 at 10, 15; Dk. 282-59.[4]

- Facebook de-duplicates up to ■■■ of Instagram accounts matched to Facebook accounts and counts them as one person in Potential Reach estimates.  Ex. 99 at '23; Tadelis ¶¶ 105, 107.

- Facebook removes billions of fake and abusive accounts every year.  Ex. 101; Ex. 115 at 74:9-75:10, 132:22-133:18; Tadelis ¶¶ 61-63; Ex. 112 at 34:19-35:2; Ex. 102 at 4 (defining fake (false) accounts); *see also* Ex. 100.[5]

Facebook also updated its disclosures during the Class Period to explain improvements and provide even more transparency.  For example, Facebook clarified that:

- Potential Reach estimates are not "intended to align with third party calculations or population census data" and are based on factors like "Facebook user behaviors," "self-reported demographics like age and gender" (which Facebook cannot verify), "location data (*e.g.*, device technology and information)," and "how many temporary visitors are in a particular geographic location at a given time."  Ex. 92; Ex. 87; *see also* Ex. 108.

- Potential Reach estimates "may differ" depending on "how many accounts are used per person," Ex. 94, and "may count[] a user's actions "separately,"" if they have "more than one account and take [] actions (such as liking photos or adding comments) on the separate accounts," Ex. 96; *see also* Ex. 102 at 4 (defining duplicate Facebook accounts).

- "Facebook has a number of systems in place to detect and remove fake accounts," but "[i]n some cases, the presence of fake accounts may have some impact on unique metrics, such as potential reach estimates."  Ex. 97.[6]

Some advertisers *knew* that Potential Reach estimates would count, for example, some fake and multiple accounts, but did not care because they were focused on results: *e.g.*, "whether people are engaging with my posts and coming to my classes or events," rather than "the number of people that my ads could potentially reach or even how many they actually reach."  Ex. A ¶ 7.  Others believed that "as long as [people] use the accounts that are included in the Potential Reach estimate, it does not matter to me that there might be duplicates."  Ex. D ¶ 11.  Some people have multiple accounts expressing different interests, behaviors, and demographics (*e.g.*, an account focused on

---

[4] ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■. L (Shi).

[5] These efforts succeeded: Facebook estimates that only 0.005% of News Feed and right-hand column "ad impressions were consumed by accounts that were later deemed invalid," *e.g.*, from bots or spam accounts.  Ex. 98 at 4; Tadelis ¶¶ 62-63, 78-793.

[6] The factors used for Potential Reach have been disclosed since September 20, 2017 (before either named Plaintiff began advertising), *see* Ex. 92, and the disclosures about multiple and fake accounts were added March 12, 2019, Ex. 94, June 3, 2020, Ex. 96, and March 16, 2021, Ex. 97.

1   work interests and a separate account focused on dogs only); these are not true duplicates, and so

2   depending on an advertiser's targeting criteria, a targeted Potential Reach estimate would only

3   include the interested account.  *See, e.g.*, Ex. N (Lobert) ¶¶ 4-5; Tadelis ¶¶ 59, 95-103; Ex. 107;

4   Ex. 116 at 136:12-143:17; *see also* Ex. 102 at 4; Ex. 109; Ex. I ¶ 10 Ex E ¶ 10.

5        Facebook rejected the additional changes Plaintiffs champion because they were ***flawed***.

6   As senior Facebook personnel, product managers, and data scientists explained, those changes

7   would have ***undermined*** the accuracy of Potential Reach estimates.  First, Facebook ***rejected*** the

8   single-user-with-multiple-account ("SUMA") model that Plaintiffs suggest the Court should order

9   Facebook to implement.  Mot. at 7-9, 18.  As Facebook's VP of Analytics and Chief Marketing

10  Officer Alex Schultz explained, the model would have made Potential Reach "less precise" and

11  "was a bad change to ship."  Ex. 115 at 119:24-120:10; 127:2-128:2; *see also* Ex. 46 (validation

12  study); Ex. 111 at 116:5-118:14; Ex. 113 at 104:12-25; Ex. 114 at 257:8-20; Dkt. 282-45.  Plaintiffs

13  rely on comments from a former Product Manager for Potential Reach, Yaron Fidler, but ignore

14  that Facebook adopted some of his proposed changes and that Fidler testified that his views

15  evolved on whether to incorporate the SUMA model into Potential Reach as analyses proceeded.

16  Describing the issue as ▬▬▬▬," Fidler acknowledged the change was not implemented

17  because the model's accuracy could not be verified for use with Potential Reach.  Ex. 114 at 171:4-

18  173:10; 252:8-19, 256:2-258:17; *see also* Ex. 81 (clarifying chronology of Plaintiffs' exhibits).[7]

19        Second, Facebook ***rejected*** the proposal to describe Potential Reach as "accounts" ***not*** to

20  increase profits, but for the simple reason that Potential Reach ***is*** an estimate of people.  As noted,

21  Facebook de-duplicates up to ▬▬ of Instagram accounts matched to Facebook accounts, Ex. 99

22  at '23, and Mr. Schultz explained that changing the description to "▬▬▬" would have been

23  ▬▬▬▬▬▬," ▬▬▬▬▬▬▬▬▬ and "▬▬▬

24  ▬▬▬▬  Ex. 115 at 74:9-23, 76:6-78:1, 80:15-81:7; 96:17-100:3, 132:22-133:9; *see also* Ex.

25  101; Porter ¶¶ 17, 37, 75-79; Ex. 112 at 34:19-35:2; Ex. 100.  Plaintiffs' claim also makes no

26  sense—people only use Facebook through accounts.

27

28  [7] Fidler left Facebook after Google recruited him ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
    ▬▬▬▬▬▬▬▬▬▬ Ex. 114 (Fidler) at 19:19-20:8.

Plaintiffs' concocted revenue motive rests on snippets of documents that do not say what Plaintiffs claim.  First and foremost, Plaintiffs repeatedly mischaracterize an email discussing whether eliminating "reach estimates" would have an ▮▮▮ revenue impact. Mot. at 8.  That email (the "Chrzan Email," *see* Dkt. 286 at 8-12) is *the* sole basis for their experts' (Roughgarden's and McFarlane's) ***assumptions*** that advertisers increased their budgets and overpaid for ads in reliance on the People Statement.  Yet Plaintiffs opted not to ask any Facebook witnesses about the Chrzan Email, while Facebook's experts explained it in their rebuttal reports based on conversations with the document's authors, one of whom has submitted a declaration here. Tucker ¶¶ 118-24; Tadelis ¶¶ 223-25; Ex. M (Geller).  The Chrzan Email does not even concern Ads Manager, let alone Potential Reach on Ads Manager.  Rather, it discussed a supposed revenue impact on Facebook's Lightweight Interfaces, which are ***different*** interfaces than Ads Manager that Plaintiffs ***excluded*** from the class.  Ex. M ¶¶ 3-11; Tucker ¶¶ 118-24; Tadelis ¶¶ 223-25.  Nor did the Chrzan Email purport to suggest that advertisers were removing their spending from Facebook altogether, rather than shifting it to another interface (*e.g.*, Ads Manager) when there was a bug in "reach estimates" on the Lightweight Interfaces. Ex. M ¶¶ 3-10; *see also* Dkt. 286 at 8-9.  The term "reach estimates" is not even a synonym for Potential Reach, as Plaintiffs repeatedly imply in misconstruing documents, Mot. at 4 & n.3, 15, but includes estimates like Estimated Daily Reach, which is an estimate of ***results*** that some advertisers ***may*** use to set their budgets.  Second, Plaintiffs point to a customer survey stating that "it is important to receive Potential Reach," Mot. at 5, but that survey does not say that Potential Reach is important *to setting budgets*, as opposed to setting targeting criteria or other purposes.  Likewise, Plaintiffs heavily quote a document stating that Potential Reach is "the single most important number in [Facebook's] ads creation interface," Mot. at 1, 3-4, but that statement was written by a software engineer who confirmed that she "did not have any direct sense from advertisers why Potential Reach may be important to them," and simply thought Potential Reach was important as a targeting tool. Ex. K (Chen) ¶¶ 3-7.

**C.    Every Ad Campaign Is A Different Product Sold At A Different Price**

Plaintiffs' Motion assumes that all ad campaigns are the same, as if this were a case about a single product with the same label containing the same representations, sold at a single price.

But it is not.  The over 352 million ads purchased by the proposed class are all different and were each priced differently, and each advertiser had its own purchasing experience.

*First*, ad campaigns and Potential Reach estimates were all different because advertisers selected from among hundreds of thousands of targeting and placement criteria, and the particular criteria selected determined the Potential Reach estimate, and whether it was more or less accurate. Tucker ¶¶ 15, 63-68 & Ex. 8; Tadelis ¶¶ 31-32, 39-41 & Ex. 20; Porter ¶¶ 22-23, 54; Ex N ¶¶ 4-6; Dkt. 282-70 at 9-11.  While Plaintiffs' expert (Cowan) asserts every Potential Reach estimate was inflated by the same "baseline" amount, Facebook's expert (Tadelis) shows that simply is not true. Potential Reach was not systematically misstated across the board, or even at all, and Cowan's model falls apart when you consider individual differences in ad campaigns.  Tadelis ¶¶ 123-31 & Exs. 1-12.  Nor can Plaintiffs rely on the "default" Potential Reach estimate as a uniform estimate—not only did it vary over time, *supra* n.3, but most advertisers (including named Plaintiffs[8]) selected targeting criteria that triggered Potential Reach estimates a fraction the size of the "default" (*e.g.*, 1 thousand to 5 million, rather than 240 million).  Ex. A ¶ 4; Ex. B ¶ 6; Tucker Exs. 8, 17, 28; Ex. 119 at 150:7-18, 208:20-209:3; 213:3-9, 213:15-24 (Maxwell explaining that he selected detailed targeting); Ex. 118 at 97:10-15 (DZ Reserve explaining same).

*Second*, each ad was priced differently through Facebook's competitive ad auction, which Facebook's expert Tadelis explains does not necessarily—let alone uniformly—result in higher prices based on increased demand.  There are billions of ad auctions each day, with different combinations of advertisers competing against each other in each one.  Tadelis ¶¶ 143-44, 146-74. The winners and prices for each auction are based on factors including the unique combination of advertisers competing for a particular ad slot (which depends on the advertiser and targeting criteria), and each advertiser's "total value" (the bid amount entered in the auction for that advertiser based on numerous factors).  *Id.* ¶¶ 167-74; Ex. N ¶¶ 16-18.  And the price a winning advertiser pays is determined by the bids of other advertisers in their auction.  Tadelis ¶¶ 148-50. As a result, ad prices vary significantly.  Tucker ¶¶ 132-33, 160, 165, 181 & Ex. 12; Tadelis ¶¶ 171, 205-208, 231-34 & Exs. 26, 38.

---

[8] DZ Reserve targeted all U.S. users for *half of one percent* of its ad campaigns.  Tucker ¶ 113.

*Third*, ad campaigns had different "objectives," and only one of those objectives had anything to do with reach. Tucker ¶¶ 14, 56-62; Tadelis ¶ 29 & n.21; Ex. 91; Ex. 95; Ex. 78 at 4-8. Most U.S. Facebook advertisers use "conversion" or "consideration" objectives, which mean advertisers want the ads delivered to users most likely to take desired actions, like clicking through to a website. Tucker ¶¶ 57-62 & Exs. 2-5; Tadelis ¶ 29 & Exs. 17-18; Ex. H ¶¶ 4-5; Ex. 134 at Exs. 17-18. Few advertisers (and less than ███ of ads purchased by the proposed class) use the "reach" objective, which maximizes the number of people who see an ad. Ex. 134 at Ex. 17; Tucker ¶ 61 & Exs. 2, 16, 26. One advertiser explained that the only time she used Potential Reach for budgeting was when she bought "Reach and Frequency" ads, Ex. G (Novak) ¶ 12, which Plaintiffs excluded from the proposed class, Mot. at 15.

## D. Advertisers Rely On Different Information (Not Potential Reach) In Setting Their Budgets And Measuring Results

Advertisers care most about the results they see from their ads, but Potential Reach does not estimate or measure results. Rather, advertisers rely on other data to measure results and decide how much to spend on ads. For most advertisers, including DZ Reserve, ad performance—or ████████████████████"—"████████████████████████████████ Ex. 104 at '96; Tucker ¶¶ 8, 52-53, 56-61; Ex. 118 at 68:13-69:1; *see, e.g.*, Ex. C ¶ 10; Ex. H ¶¶ 4-5. Plaintiffs' expert admitted that "████████████████████████████████████████ ████████████████████████████████████," Ex. 120 at 215:18-216:2, and that ████████████████████████████████, *id.* at 368:5-369:1; Dkt. 282-20 at 13. Advertisers are "focused on results," and "whether people have taken the desired action in response to" ads. Ex. A ¶ 6; *see also* Tucker ¶¶ 56-62.

In deciding whether and how much to spend on ads, advertisers rely on other metrics that render Potential Reach estimates "unimportant for most advertisers' budgeting decisions." Tucker ¶¶ 44-53, 56-62, 69-75. Those metrics include at the outset *estimated results* (like Estimated Daily Reach) and *prior results*. Tucker ¶¶ 8, 69-74; Tadelis ¶¶ 46-48; *see, e.g.*, Ex. A ¶ 8 ("sometimes I used [Estimated Daily Reach], among other information, to help with making budget decisions"); Ex. D ¶ 10; Ex. 118 at 60:21-61:11; 95:13-96:11; Ex. 79. Even the tutorial Maxwell followed

1  ████████████████, but discussed nothing about Potential Reach.  Ex. 131 at 23:48-

2  24:10.  And most class members are repeat buyers, meaning they had actual results from prior ads

3  to use in budget decisions—nearly ████ of spending by the class was by repeat advertisers.  Tucker

4  ¶¶ 8(e), 74 & Ex. 6; Ex. 133 at Ex. 6; Ex. 118 at 59:11-22, 60:21-25; Ex. 119 at 151:22-152:12.

5  After advertisers launch campaigns, Facebook provides *real-time actual results* (such as

6  number of clicks, return on ad spend, or cost per impression)—which advertisers rely on to adjust

7  budgets and targeting criteria, or even abandon campaigns.  Tucker ¶¶ 73-75.  They explained:

8  • "For big events, I use Facebook ads to get the word out sooner and will monitor the
   performance mid-flight.  If the ad for a big event is not performing well, I may adjust the ad
9  content or sometimes I will end a poorly performing campaign early.  If the ad is doing really
   well and getting a lot of event responses, I may add to the budget."  Ex. B ¶ 7.

10 • "We activate ads on Facebook and monitor them to see if they are performing, and then make
   adjustments as warranted by the performance—including while the campaign is running, or
11  when placing the next campaign."  Ex. E ¶ 10.

12 • "After launching a campaign, I closely track performance of the ads on a daily basis.  Nine
   times out of ten, the key metric I look at is return on ad spend (ROAS).  If an ad campaign
13  is hitting the ROAS goal, I frequently will increase budget during the course of the campaign.
   If ROAS is low, I look to other metrics to diagnose the problem."  Ex. G ¶ 7.

14 • "Once I have placed an ad, I continue to monitor to see how it performs.  On a few occasions,
15  I have interrupted an ad while it was running to change the messaging and then re-start it."
   Ex. I ¶ 8; *see also id.* ¶ 11

16 The class varies in sophistication, ranging from small businesses to Fortune 500

17 companies, mom-and-pop shops to ad agencies, nonprofits to governments.  Tucker ¶¶ 76-82, 162-

18 66.  Some of them got information from ad agencies, consultants, and Facebook's sales team.  For

19 example, advertisers making up ████ of ad revenues from the proposed class between August 2014

20 and May 2019, Ex. 133 at Ex. 6, worked with agencies, consultants, and third party Facebook

21 Marketing Partners to inform and manage ad campaigns.  Tucker ¶¶ 76-80 & Ex. 6.  Ad agencies

22 use their own tools and data, which may not show Potential Reach at all.  Tucker ¶¶ 76-80; Ex. E

23 ¶ 8; Ex. 105.[9]  And advertisers making up nearly ████ of ad revenues from the proposed class

24 during the same period, (Ex. 133 at Ex. 6), had a direct relationship with Facebook's sales team to

25 advise on advertising strategies.  Tucker ¶¶ 81-82.  Other advertisers go it alone, crafting and

26 managing campaigns themselves, or like Maxwell, using third-party guides.  Ex. N ¶¶ 8-10; Tucker

27

28 [9] For example, one of the largest ad agencies in the world instructed its clients in 2018 not to rely
   on Potential Reach and to use the agency's own proprietary information instead.  Ex. 106; Ex. 132.

¶ 101; Ex. 119 at 124:23-125:2, 129:20-131:16; Blunschi ¶¶ 79-92.

E.   **Plaintiffs' Conduct and Contemporaneous Documents Contradict Their Claimed Reliance on Potential Reach**

The evidence of the named Plaintiffs' actions establishes—contrary to their self-serving testimony in this case—that they did not rely on Potential Reach to set their ad budgets.

**DZ Reserve** is an ecommerce drop-shipping business owned and operated by Dan Ziernicki that made millions of dollars advertising on Facebook between December 2017 and December 2018.[10] Tucker ¶ 88. DZ Reserve's advertising strategy was to ██████████████ ██████████████████████████████. *Id.* ¶¶ 90-91; Ex 118 at 59:11-22; Ex. 123 at '435. DZ Reserve ████████████████████████ ████████████████████████████████████████████████████████████████████, Tucker ¶¶ 93-97), contrary to Ziernicki's claim that he relied on Potential Reach to determine if there was "████████████████████████████████████████████." Ex. 118 at 56:13-57:14. Ziernicki lied when he testified that DZ Reserve "████████████████████ Facebook ads had he known about the ████████ of Potential Reach, and that he was no longer advertising on Facebook, Ex. 117 at 72:16-20, 193:17-194:5; *see also* Third Am. Compl. ("TAC," Dkt. 282-71) ¶ 56. But Plaintiffs again repeat that assertion in their Motion, Mot. at 12 ("Had DZ Reserve known Facebook's Potential Reach was a misrepresentation, DZ Reserve would not have paid Facebook the money it did."). Potential Reach did not matter to DZ Reserve:

- ███████████████████████████████████████████████████████████████████ ████████████████████████████ Tucker ¶¶ 88, 98, 140; Ex. 117 at 28:9-29:8, 62:11-25, 201:9-202:6, 202:15-203:24, 207:15-209:9, 209:10-211:22, 217:22-219:10; Blunschi ¶¶ 69-78.

- ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Ex. 117 at 209:24-210:13, 210:20-211:22.

- ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Ex. 117 at 101:4-104:12, 108:10-114:21, 212:16-214:14, 214:25-215:7.

- Ziernicki admitted after joining this lawsuit that "██████" Potential Reach numbers "███

---

[10] DZ Reserve purchased more than ████████████████████████████████████████████ ███████████████████████████████████████. Tucker ¶¶ 21, 81, 140-141.

█████████████████████████████████████████████████████████ Ex. 124 at '650.

**Maxwell** is an entrepreneur who sold firearm mounts on Amazon.[11]   His advertising strategy was to ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. Tucker ¶ 102.  Maxwell's allegations and testimony that he relied on Potential Reach to buy ads and set his budgets are not credible.  Ex. 119 at 199:8-12; *see* TAC ¶ 105.  In fact, Potential Reach did not matter to him:

- Maxwell testified that he relied on Potential Reach to "███████████████████████████ ████████████████" to advertise on Facebook, to "███████████████████████████████████ ██████████████████████" Ex. 119 at 199:8-12.

- But he admitted that ████████████████████████████████████████████████████████. *Id.* at 103:3-5, 124:23-125:8.  And his own documents and deposition testimony show that he █████████████████████████████████. *Id.* at 68:7-19, 124:23-125:2, 129:20-131:24, 138:24-139:7, 203:13-23, 258:7-19; Tucker ¶¶ 100-01, 104.  Blunschi ¶¶ 79-92.  ██████████████████████████████████ ██████████Ex. 131 at 21:45-33:25; Blunschi ¶ 90—████████████████████████████████████ █████████████████████████████████████. Tucker ¶¶ 104-106 & Exs. 29-31.

- ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████ Ex. 119 at 203:18-23; Tucker at ¶¶ 104-06.  He admitted █████████████████████████████████████████████████████████████████████████████████

Ex. 119 at 202:7-203:9.

## III.    LEGAL STANDARD

A "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  Rule 23 "imposes stringent requirements for certification that in practice exclude most claims."  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).  And a court must find that a class representative has standing to bring a UCL claim.  *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020) (citing *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009)).  The Ninth Circuit recently confirmed that a plaintiff must demonstrate its compliance with Rule 23 by a "preponderance of the evidence," and that, as part of its rigorous analysis, a district court

---

[11] Maxwell bought ███ Facebook ad campaigns from September 2018 to May 2019, earning ██████ in product sales during the Class Period. Tucker ¶ 99, 142-47 & Exs. 25, 32-34. His data indicates that ████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ *Id.* ¶¶ 142-145.  In his first day of advertising on Facebook, ████████████████████████████████ █████████████████████ Ex. 125.

must ensure that a class not include more than a *de minimis* percentage of uninjured parties, must "closely and carefully scrutinize[]" "the use of representative evidence," and must "resolve" any disputes between the parties' experts regarding the fact of injury. *Olean*, 993 F.3d at 781, 791-92. Facebook intends to file an administrative motion requesting an evidentiary hearing to facilitate that rigorous analysis and resolve key disputes between the parties' experts.

## IV.   PLAINTIFFS HAVE NOT DEMONSTRATED TYPICALITY, ADEQUACY, OR UCL STANDING

A class representative must "have the same or similar injury" as the putative class, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (typicality); must prosecute the action without "conflicts of interest with other class members," *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018) (adequacy); and must satisfy the "actual reliance" UCL standing requirement, *Tobacco II Cases*, 46 Cal. 4th at 326. Plaintiffs fail all three requirements.

***First***, the record shows the named Plaintiffs did not rely on Potential Reach in setting their budgets—and they have not been honest about that critical issue. Plaintiffs claim that had they known about the alleged fraud, they would not have spent as much money on ads. Mot. at 12; TAC ¶ 158. Plaintiffs doubled down on their allegations in their depositions, testifying that inflated Potential Reach ████████ " ████████ Ziernicki "from using Facebook ads," Ex. 117 at 192:14-194:5, and that Maxwell relied on Potential Reach, Ex. 119 at 199:8-12. But this is inconsistent with their conduct: ████████████████████████████

████████████████████████████

████████████████████████████

████████████████████  *See supra* Section II.E; Blunschi ¶¶ 69-92.

Plaintiffs' uncorroborated and self-serving testimony is not "proof of 'actual reliance,'" as required for standing. *Walker*, 953 F.3d at 630; *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (rejecting "uncorroborated and self-serving testimony"). And the Ninth Circuit and this Court have found named plaintiffs atypical and inadequate where their claims "abound[] in crocodility." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019-20 (9th Cir. 2011), *abrogated on other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); *see also*

1   *Miller v. RP On-Site, LLC*, 2020 WL 6940936, at \*9-12 (N.D. Cal. Nov. 25, 2020) (finding

2   plaintiff inadequate where he "repeatedly made false statements").[12]  Neither Plaintiff was able to

3   ██████████████████████████████████████████.  Ex. 119 at 204:12-21; Ex. 118 at

4   76:7-17.  It took a discovery motion to get Plaintiffs to provide any information about their alleged

5   damages, beyond conclusory statements parroting legal principles.  Dkt. 208, 237.  And both

6   conceded that they likely would have purchased ads notwithstanding Potential Reach inflation:

7   Ziernicki said he "████████████████████████████████████████████████████

8   ████████████████        Ex. 118 at 105:11-106:5, and Maxwell admitted he still might have

9   ██████████████████████████████████████████████████████████████████

10  ████████   Ex. 119 at 257:3-9.  If this case went to trial, Plaintiffs would "play as much defense as

11  offense," *Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 133 (N.D. Tex. 2020) (typicality),

12  and their "credibility as to [their] claimed injury jeopardizes the class's ability to prevail," *Spacone*

13  *v. Sanford, L.P.*, 2018 WL 4139057, at \*9-10 (C.D. Cal. Aug. 9, 2018) (adequacy) (citing *Harris*

14  *v. Vector Mktg., Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010)).

15          ***Second***, that Plaintiffs repeat the same debunked assertions in their Motion (at 12), without

16  acknowledging their inconsistent testimony only underscores that Plaintiffs—and the class counsel

17  who chose them out of all other advertisers—are not adequate to represent the class.  The class

18  includes more than 3 million advertisers of varying size and sophistication who purchased different

19  types of ads with widely varying budgets and information—and surely most did not try to buy fake

20  accounts to covertly buy ads, or form new alter ego companies to buy ads while suing Facebook.

21  *See supra* Section II.C-E.  Courts have held that where the proposed class is comprised of a

22  "diverse group" of advertisers from "large sophisticated corporations" to "individuals and small

23  businesses" that "use different channels to manage their ongoing advertising campaigns with

24  Facebook," there is no adequacy because the named plaintiffs' and class members' interests "are

25

26  _____

[12] Plaintiffs' reliance on *Brazil v. Dell Inc.*, 2010 WL 5387831, at \*4 (N.D. Cal. Dec. 21, 2010),

27  Mot. at 22, is misplaced.  Not only were uniform prices "communicated to all class members," *id.* at \*5, but *Brazil* held that "the purchaser of a single laptop for personal use" was not typical of "a purchaser of a large number of computers for a business, or even the purchaser of a single $20,000

28  commercial server," because they were ***unlikely to have a substantially similar purchasing experience***.  *Id.* at \*4 (emphasis added).

different." *In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012), *aff'd sub nom. Fox Test Prep v. Facebook, Inc.*, 588 F. App'x 733 (9th Cir. 2014) (denying class certification based on differences between plaintiff and proposed class of advertisers).

**Finally**, Plaintiffs are atypical and inadequate insofar as they seek to represent advertisers who purchased ads on or after May 28, 2018, the date an arbitration provision in Facebook's Commercial Terms became effective.  Exs. 76-77; *see also Avilez v. Pinkerton Gov't Servs. Inc.*, 596 F. App'x 579, 579 (9th Cir. 2015) (holding plaintiff atypical and inadequate where absent class members had defenses to an arbitration provision different from plaintiff).[13]

## V.   PLAINTIFFS HAVE NOT DEMONSTRATED PREDOMINANCE BECAUSE THEY HAVE NO COMMON PROOF OF LIABILITY

Plaintiffs must show by a preponderance of the evidence that they can prove a classwide fraud, including by demonstrating the class was exposed to the same false or misleading statement or omission (fraud/UCL), the statement or omission was justifiably relied on by the class (fraud) or was likely to deceive the class (UCL), and the statement or omission caused the class harm (fraud/UCL).[14]  Because Plaintiffs fail to show these elements are "susceptible to generalized, class-wide proof," class members would "need to present evidence that varies from member to member," *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016), and the class cannot be certified.

None of the Potential Reach Statements was uniformly made or material to the class, as required for a presumption of reliance.  *See Mirkin v. Wasserman*, 5 Cal. 4th. 1082, 1094 (1993) (requiring "the same material misrepresentations" be made "to each member of a class").  In fact, Plaintiffs' own expert (Cowan) shows that purported inflation rates varied by ad campaign, and therefore whether Potential Reach is false or misleading is an individual issue.  Another of Plaintiffs' experts (Allenby) shows that many advertisers did not rely on the Potential Reach

---

[13] Facebook has not waived its right to enforce the provision against absent class members.  *See Rushing v. Williams Sonoma, Inc.*, 2020 WL 6787135, at *3 (N.D. Cal. Oct. 8, 2020).

[14] Plaintiffs' fraud claims require (a) a misrepresentation (false representation, concealment, or nondisclosure), (b) knowledge of falsity, (c) intent to defraud, (d) justifiable reliance, and (e) damages.  *See Sussex Fin. Enter., Inc. v. Bayerische Hypo-Und Vereinsbank AG*, 460 F. App'x 709, 712 (9th Cir. 2011).  To bring a UCL claim, a plaintiff must show actual reliance on the alleged misstatements or omissions, *Walker*, 953 F.3d at 630, as well as proof of a specific misrepresentation or omission that is false or "likely to deceive a reasonable consumer," *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

Statements to increase their budgets, and therefore reliance is an individual issue and Plaintiffs lack common proof of a likelihood of deception.  Plaintiffs also lack reliable classwide proof that Potential Reach caused a classwide price increase.

**A.**     **No Uniform Material Misstatement Or Omission Was Made To The Class**

**Plaintiffs Are Not Entitled To A Presumption Of Reliance:**  There is nothing uniform about advertisers' Potential Reach or purchases, and there is no common proof of materiality.  The proposed class bought *different ad products* and used *different information* to buy their ads.  *See supra* Section II.C-D.  These differences require "an independent legal analysis" to determine whether an advertiser would have been deceived by, or considered material, Potential Reach when they bought ads.  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017) (affirming denial of class cert on UCL and CLRA claims); *see also Tucker v. Pac. Bell Mobile Servs.*, 208 Cal. App. 4th 201, 227-28 (2012) ("[I]f the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof."); *Lucas v. Berg, Inc.*, 212 F. Supp. 3d 950, 969-970 (S.D. Cal. 2016).

This case does not involve a single product with a single misstatement on an identical label sold at the same price.  Rather, advertisers bought ads with individualized Potential Reach estimates that reflected different targeting criteria; selected different objectives for their campaigns and measured performance based on different information (not including Potential Reach); and bought at different times and at different prices.  *See supra* Section II.B-D.  As a result:

- Plaintiffs offer no evidence that the class saw the same Potential Reach—almost all advertisers chose a particular bundle of targeting criteria that triggered different Potential Reach estimates, alongside tailored Estimated Daily Results.  *See supra* Section II.C; Tucker ¶¶ 15-16, 63-72 & Ex. 8; Tadelis ¶¶ 28-32, 46-48 & Ex. 20.

- Plaintiffs offer no evidence that every advertiser for seven years saw a Potential Reach that was so much higher than a purportedly "accurate" number that every Potential Reach number was false or misleading, even as an estimate—in fact, Facebook repeatedly updated Potential Reach throughout the Class Period, and Plaintiffs' expert's own model shows *de minimis*

1    inflation in some estimates.  *See supra* Section II.B-C; Tadelis ¶¶ 35-45.

2    • Plaintiffs offer no evidence the class considered the same information in buying ads—in fact,

3    all advertisers had unique Estimated Daily Reach estimates and real-time actual results; ███

4    were repeat advertisers; and ████████████ were bought via agencies or by advertisers

5    with access to Facebook's sales team.  *Supra* Section II.D; Tucker ¶¶ 69-82 & Ex. 6.

6    • There is no evidence the class considered Potential Reach in the same way in buying ads—

7    in fact, some but not all used it to select targeting criteria, and Plaintiff's expert found that

8    advertisers as a class do not rely on the People Statement to increase budgets and ███

9    ███████████████████████████████████████████—the opposite

10   of Plaintiffs' liability theory.  *See infra* Section V.B; Reibstein ¶¶ 125-26 & Table 6.

11   Because of this lack of uniformity and lack of proof of materiality, Plaintiffs are not entitled

12   to a presumption of reliance.  *See Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *14 (N.D.

13   Cal. June 13, 2014) (no presumption under UCL where there were "numerous reasons a customer

14   might buy" products, which varied by size, variety, time, and ingredients).

15   Plaintiffs invoke this Court's decision in *Brickman v. Fitbit, Inc.*, but that case turned on

16   "the same bundle of representations that potential buyers would unquestionably find significant."

17   2017 WL 5569827, at *7 (N.D. Cal. Nov. 20, 2017).  Plaintiffs here have no evidence that the

18   bundle of representations were the "same" or that advertisers as a class "unquestionably find

19   [Potential Reach] significant."  *Id.*  And in *Reitman v. Champion Petfoods USA, Inc.*, the Ninth

20   Circuit affirmed denial of class certification because "*each bag contains different information*"

21   and the *dog food formula in each bag varied.*  830 F. App'x 880, 881 (9th Cir. 2020); *Reitman v.*

22   *Champion Petfoods USA, Inc.*, 2019 WL 7169792, at *9 (C.D. Cal. Oct. 30, 2019) (opinion below,

23   finding that the facts necessitated "individualized inquiry into the specific formula at issue because

24   each formula is unique and has different representations on the packaging that give context").  So

25   too here:  because the proposed class had different information and bought different ad campaigns

26   with different Potential Reach estimates at different times, determining whether the "message is

27   misleading could only be determined by separately examining each" ad campaign.  *Id.*

28

1  **Plaintiffs' Falsity Evidence Impermissibly Masks Individual Differences:**  Plaintiffs

2  cannot solve their uniformity problem by relying on their experts' *average* levels of inflation.

3  First, Cowan's average rates "mask individualized differences" in targeting criteria and

4  alleged inflation at any given time because (1) he ignores changes that affected Potential Reach

5  during the Class Period, *Olean*, 993 F.3d at 791; *see* Tadelis ¶¶ 74-76 & Table 3, 86, 96 & Table

6  4, 105-08; Ex. 116 at 103:20-25, and (2) as Tadelis explains, Cowan's inflation model falls apart

7  when one considers individual differences in ad campaigns—in particular, even under Cowan's

8  model, more targeted ad campaigns had *de minimis* alleged inflation, if any.  Tadelis ¶¶ 99-102 &

9  Figs. 3-4, 110-16 & Tables 5-7, 124-31 & Exs. 1-12; Tadelis Dep. 136:12-143:17; Ex. 107; *see*

10  *supra* Section II.D.  Indeed, Cowan *admits* ███████████████████████████

11  ███████████████ , but he ignores it.  Ex. 121 at 220:7-19.  Yet Plaintiffs' claim of inflation

12  depends on their Potential Reach estimates being so much higher than "reality" for a particular ad

13  campaign that it was misleading for Facebook to call them estimates; under Plaintiffs' own theory,

14  it matters whether an estimate ██████████████████████████,[15] and the experts *agree*

15  Potential Reach estimates were not uniformly inaccurate.  *Id.* at 220:7-19; Tadelis ¶¶ 124-31.

16  Second, Plaintiffs and their expert offer no common evidence of falsity on the People

17  Statement:  Cowan does not show Potential Reach estimates would have been lower across the

18  class if they measured only "people" instead of "accounts," and during the Class Period Facebook

19  changed how it calculated Potential Reach and updated its disclosures.  *Supra* Section II.B.

20  Finally, Cowan does not identify the alleged inflation attributable to each alleged source of

21  inflation at any particular time, even though some advertisers knew about, *e.g.*, multiple or fake

22  accounts, Ex. E ¶ 10, Ex. A ¶ 10, and therefore could not recover on that ground.  *See Roley v.*

23  *Google LLC*, 2020 WL 8675968, at *8 (N.D. Cal. July 20, 2020) (denying class certification on

24  fraud claims where class members received disclosures that negated alleged misrepresentation).

25  Because Cowan offers no way to carve out a particular source of alleged inflation for any class

26  member, Plaintiffs have no common proof of falsity.  *See Comcast*, 569 U.S. at 37-38 (reversing

27  ───────────────────────
[15] ████████████████████████████████████████████████████

28  ████████████████████████████████████████████████ *See*

Tadelis ¶¶ 3-10; Ex. 120 at 416:10-25; Dkt. 282-13 (Roughgarden) ¶ 55 at 20.

1    certification because damages model was not limited to remaining theories).

2          **Plaintiffs' Own Evidence Shows Many Advertisers Were Not Injured By Potential**

3    **Reach**.  Starting with Plaintiffs' ***own*** expert (Allenby), the record shows the class did not rely on

4    Potential Reach in increasing budgets and therefore impermissibly includes more than a *de minimis*

5    number of uninjured class members.  *See Olean*, 993 F.3d at 792 ("reported decisions involving

6    uninjured class members 'suggest that 5% to 6% constitutes the outer limits of a *de minimis*

7    number'").  Specifically, and as set forth in Facebook's *Daubert* Motion (Dkt. 285), Allenby

8    originally found no statistically significant relationship between ***any*** of the Potential Reach

9    Statements and advertisers' ad purchasing decisions.[16]  Even after he threw out those results and

10   performed a results-driven analysis, ████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████████████████████

12   ████████████████████████████████ets.[18]  In fact, Allenby found that ████████████████

13   ████████████████████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████  *See Olean*, 993 F.3d at 791 (if an

16   element "cannot be proved or disproved through common evidence, then 'individual trials are

17   necessary to establish whether a particular [class member] suffered harm from the [alleged

18   misconduct],' and class treatment under Rule 23 is accordingly inappropriate.").  That alone dooms

19   class certification.  *See id.* at 788, 792 ("[i]f 28% of the class" could not satisfy element of

20   "individual injury," "common questions of law or fact would not be shared by substantially all the

21   class members, nor would they prevail in strength or pervasiveness over individual questions.").

22          A presumption of reliance on these facts would be pure fiction.  Even if that presumption

23   _____

24   [16] Allenby found that over ████████████████████████████████████████████████████████

     ████████████████████████████████████████████████████████████  Reibstein Ex. 3.

25       Plaintiffs have no other reliable evidence showing reliance on the People Statement.  One expert

26   points to the Chrzan Email to argue revenue would fall if Facebook did not show reach estimates
     ***at all***.  But the question of reliance is a subjective one, and regardless, the Chrzan Email does not

27   say what Plaintiffs claim.  *See supra* Section II.B Dkt. 286 at 8-9; Ex. M.
     [18] Allenby claimed that some advertisers increased their budget in response to a Default Statement

28   of 240 million, Allenby at 5, 20, but Plaintiffs offer no evidence as to when the Default Statement
     appeared as 240 million or claim *they* relied on the 240 million Default Statement.

1   were triggered in the first instance (it is not, *see supra*), it is well settled that the presumption is

2   rebuttable on a fraud claim. *See Hinesley v. Oakshade Town Ctr.*, 135 Cal. App. 4th 289, 300

3   (2005) (finding the presumption rebutted). Likewise on the UCL claim, the presumption also

4   should be rebuttable and Facebook allowed to assert a defense of non-reliance against absent class

5   members. Even though state law requires only the named plaintiff, not absent class members, to

6   show actual reliance, *Walker*, 953 F.3d at 630, Rule 23 is "like traditional joinder" and under the

7   Rules Enabling Act, does not expand absent class members' rights to bring suit. *See Shady Grove*

8   *Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (discussing Rules Enabling

9   Act).[19]  But even apart from reliance and the Rules Enabling Act, Allenby's 21% figure also shows

10  that Plaintiffs have no common proof of a likelihood of deception, an independent element of the

11  UCL claim. *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (requiring proof that "a

12  significant portion" of reasonable consumers could be misled). Individual issues of reliance and/or

13  a lack of evidence showing likelihood of deception therefore defeat predominance.

14       Moreover, even if Plaintiffs could evade the reliance or deception elements of their claims

15  (they cannot), their theory that Potential Reach Statements caused classwide injury still turns on a

16  showing of classwide reliance: namely, in calculating purported price premiums and damages for

17  the Potential Reach Statements, their experts assume that between 78% and 91% of advertisers

18  relied on Potential Reach to increase their budgets, Roughgarden ¶¶ 56-57; Levy ¶ 47.

19       **B.   Plaintiffs' Ad Auction Evidence Cannot Prove That Any Potential Reach Statement Caused Classwide Injury**

20       Plaintiffs' theory of injury and causation is that *some* advertisers relied on Potential Reach

21  to increase their budgets, driving up aggregate demand for ads and, in turn, increasing average

22  prices.[20]  As discussed *supra* Section V.A, Plaintiffs impermissibly ignore some class

23

---

24  [19] This is consistent with the Ninth Circuit's holding in *Sonner* that state UCL law cannot expand
    a federal court's equitable powers. 971 F.3d at 841. So too, it cannot expand Rule 23. While

25  *Walker* observed that "[w]e have repeatedly relied on *Tobacco II* in recognizing 'what amounts to
    a conclusive presumption' of reliance in UCL cases," 953 F.3d 624, 630-31 (citing *Stearns*, 655

26  F.3d at 1021 n.13), the Court did not consider whether the Rules Enabling Act requires that the
    presumption be rebuttable in federal court because absent class ▮▮▮▮▮ can only be part of a class

27  where they could themselves have brought suit. In *Stearns*, the Ninth Circuit held only that a
    named plaintiff need not establish absent class members' Article III standing. 655 F.3d at 1021.

28  [20] Roughgarden's price premium for the Default and Targeted Statements relies on Allenby's

1  members' **non**-reliance.  In any event, their expert's price premium for the Default and Targeted

2  Statements relies on Allenby's inadmissible opinion, and for the People Statement relies on

3  McFarlane's flawed "observation" of the Chrzan Email.  Because those inputs are inadmissible,

4  Dkts. 285, 286, Roughgarden's conclusions based on them are inadmissible as well.

5  Independently, their expert's price premium is unreliable because it merely "assum[es] away the

6  very differences that make the case inappropriate for classwide resolution," *Tyson Foods*, 577 U.S.

7  at 454, and ignores "marketplace realities that would affect product pricing," *Zakaria v. Gerber*

8  *Prod. Co.*, 755 F. App'x 623, 624 (9th Cir. 2018) (affirming decertification).

9  　　　　The proposed class purchased ⬛⬛⬛ ads.  The price of each one was set through

10  an auction unique to each particular ad,[21] and the resulting prices varied widely across the class.

11  Tadelis ¶¶ 146-74, 204-17 & Exs. 26, 28; Tucker Ex. 12. ⬛⬛⬛

12  ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

13  ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

14  ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

15  ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

16  ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. Tadelis ¶¶

17  213-14. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

18  ⬛⬛⬛⬛⬛⬛⬛⬛⬛ *Id*. ¶¶ 218-219.  Basic economic theory holds

19  that if prices were lower (as Plaintiffs claim they would be in the but-for world), demand would

20  increase and advertisers would purchase more ads; Roughgarden ignores that effect.  Ex. 122 at

21  154:5-157:15; Tadelis ¶¶ 11-19, 186-234.  Finally, ⬛⬛⬛⬛⬛

22  ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

23  ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ *See* Ex. 133 at

24  Ex. 2-3; Ex. 134 at Exs. 17-18; Tadelis ¶¶ 167-74, 232 & Exs. 21, 23; Tucker ¶¶ 163-65.

25

26

27  inadmissible opinion, and his price premium for the People Statement hinges on McFarlane's
flawed "observation" of the Chrzan Email.  Those inputs are inadmissible, Dkts. 285 at 3-4, 286

28  at 10-12, rendering Roughgarden's conclusions based on them inadmissible as well.
[21] Those auctions also included advertisers excluded from the proposed class.

## VI. PLAINTIFFS HAVE NOT DEMONSTRATED PREDOMINANCE BECAUSE THEY HAVE NO CLASSWIDE DAMAGES OR RESTITUTION MODEL

At class certification, Plaintiffs must offer a methodology for reliably calculating classwide damages (fraud) and restitution (UCL) "consistent with [their] liability case." *Comcast*, 569 U.S. at 35; *Olean*, 993 F.3d at 784. Plaintiffs offered two models,[22] but both rest on the faulty analyses of Plaintiffs' other experts: (1) Levy calculates damages/restitution for the Default and Targeted Statements based on invalid inputs from Allenby and Roughgarden, as explained in the Allenby *Daubert* Motion, Dkt. 285 at 8; and (2) McFarlane calculates damages/restitution for the People Statement based on invalid inputs from Roughgarden, Dkt. 286 at 3-4. *See* Tucker ¶¶ 148-51; 170-81. In addition, as explained in the McFarlane *Daubert* Motion, the McFarlane Model is also unreliable and irrelevant, not least because it does not calculate damages/restitution from Plaintiffs' theory that Facebook should have used "accounts" instead of "people." Dkt. 286 at 6-7. Instead, McFarlane calculates damages/restitution based on the *removal* of Potential Reach altogether. *See id.* Because that is not Plaintiffs' theory of liability—indeed, Plaintiffs argue that advertisers *value* Potential Reach—his model fails under *Comcast*. *See also id.* Finally, Levy and McFarlane do not reliably calculate classwide damages/restitution because they (1) rely on Roughgarden's price premium, which is not based on the number of ads each advertiser *actually* purchased, and (2) ignore the value of the ads that advertisers received.[23]

## VII. A CLASS ACTION IS NOT SUPERIOR

Plaintiffs do not show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), because they fail to

---

[22] Neither distinguishes restitution from damages—Plaintiffs are requesting the same amount in damages under their fraud claims as they request in restitution under the UCL claim, which underscores that the UCL claim must be dismissed under *Sonner*, Dkt. 270.

[23] ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████. *See* Ex. 133 at Ex. 12; *supra* Section V.C. Levy and McFarlane ignore that change: they simply multiply Roughgarden's "price premium" by the total amount advertisers actually paid in the real world. This is not "consistent with [their] liability case," *Comcast*, 569 U.S. at 35, because it does not account for the change in advertisers' value from receiving fewer (or more) ads as part of their damages/restitution calculations. Tucker ¶¶ 135-47; Tadelis ¶¶ 231-33. That is wrong as a matter of law. *Chowning v. Kohl's Dep't Stores, Inc.*, 733 F. App'x 404, 405 (9th Cir. 2018) (UCL); *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995) (fraud).

"demonstrat[e] a suitable and realistic plan for trial of the class claims," and do not explain how this case would avoid mini-trials (on falsity, reliance, and injury/causation) for each advertiser to determine whether that advertiser's Potential Reach estimates were inflated, and by how much; whether the advertiser relied on the Potential Reach Statements to increase its budget; and whether the advertiser paid a higher price through Facebook's auction as a result of the Potential Reach Statements. *Zinser*, 253 F.3d at 1189; *see also In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) ("[A] district court must be concerned with manageability at trial.").

## VIII.   PLAINTIFFS HAVE NOT MET THEIR BURDEN UNDER RULE 23(b)(2)

Plaintiffs have not met their evidentiary burden for certification of a Rule 23(b)(2) class.

*First*, as explained in Facebook's *Sonner* motion, Dkt. 270, federal equitable principles bar Plaintiffs' request for injunctive relief under the UCL.  The purely monetary injury Plaintiffs assert—buying too many ads at too high a price—is the antithesis of irreparable harm, and the opportunity to recover money damages in the future constitutes an adequate remedy at law.

*Second*, Plaintiffs do not show that they "face[] an imminent or actual threat of future harm" and that there is "a sufficient likelihood that [they] will again be wronged in a similar way," given updates to Potential Reach.  *Lanovaz v. Twinings N. Am., Inc.*, 726 F. App'x 590 (9th Cir. 2018).  Plaintiffs admit at least one of Cowan's alleged inflation sources was remediated, Mot. at 11, and Facebook's updated disclosure about multiple accounts remediates another.  Tadelis ¶ 38.

*Third*, Plaintiffs' requested injunctive relief is overbroad and unworkable, and renders them inadequate.  *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (court must "tailor the injunction to remedy the specific harm alleged").  Plaintiffs seek an order directing Facebook to "correct" Potential Reach estimates by "removing known sources of inflation," Mot. at 18, but they offer no specifics about what that would entail or why Facebook's updates during the Class Period do not already resolve their concerns.  *See supra* Section II.B.  And Plaintiffs' alternative request to require that Facebook "remove" Potential Reach altogether, Mot. at 18, is entirely inconsistent with their theory that Potential Reach is important to advertisers.

## IX.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

1    DATED:  May 14, 2021                    LATHAM & WATKINS LLP

2

3                                            By:   /s/ Elizabeth L. Deeley
                                                 Elizabeth L. Deeley (CA Bar No. 230798)
                                                 Melanie M. Blunschi (CA Bar No. 234264)
4                                                Nicole C. Valco (CA Bar No. 258506)
                                                 505 Montgomery Street, Suite 2000
5                                                San Francisco, CA  94111-6538
                                                 Telephone:  +1.415.391.0600
6                                                Facsimile:  +1.415.395.8095
                                                 *elizabeth.deeley@lw.com*
7                                                *melanie.blunschi@lw.com*
                                                 *nicole.valco@lw.com*
8
                                                 Andrew B. Clubok (*pro hac vice*)
9                                                Susan E. Engel (*pro hac vice*)
                                                 555 Eleventh Street, N.W., Suite 1000
10                                               Washington, D.C. 20004
                                                 Telephone:  +1.202.637.2200
11                                               Facsimile:  +1.202.637.2201
                                                 *andrew.clubok@lw.com*
12                                               *susan.engel@lw.com*

13                                               Hilary H. Mattis (CA Bar No. 271498)
                                                 140 Scott Drive
14                                               Menlo Park, CA  94025
                                                 Telephone: +1.650.328.4600
15                                               Facsimile: +1.650.463.2600
                                                 *hilary.mattis@lw.com*
16
                                                 *Attorneys for Defendant Facebook, Inc.*
17

18

19

20

21

22

23

24

25

26

27

28