REDACTED VERSION REFILED PURSUANT TO DKT NO.
350 ORIGINALLY FILED AT  DKT. 288-1,
Exhibit 1

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

DZ Reserve, and Cain Maxwell (d/b/a Max Martialis) individually and on behalf of others similarly situated,

Plaintiffs,

v.

FACEBOOK, INC.,

Defendant.

Case No. 3:18-cv-04978

**REBUTTAL EXPERT REPORT OF CATHERINE TUCKER, PH.D.**

March 3, 2021

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## TABLE OF CONTENTS

I.   **Introduction**................................................................................................................1

    A.    Qualifications.........................................................................................................1

    B.    Assignment ...........................................................................................................2

    C.    Summary of Opinions ...........................................................................................3

II.   **Background** ................................................................................................................7

    A.    Facebook Advertising ...........................................................................................7

    B.    Overview of Allegations .....................................................................................10

    C.    Overview of Plaintiffs' Damages Analyses .........................................................12

          1.    Levy Report ..............................................................................................13

          2.    McFarlane Report .....................................................................................15

          3.    Other Reports ...........................................................................................17

III.   **Plaintiffs' Experts Fail to Recognize That Most Facebook Advertisers Would Be Unaffected By Any Alleged Inaccuracies in Potential Reach Estimates**....................22

    A.    Plaintiffs' Experts Fail to Consider Many Reasons Why Potential Reach Estimates Are Unimportant for Most Advertisers' Budgeting Decisions ............22

          1.    The Increased Measurability Enabled by the Digital Age Allows Advertisers to Measure Ad Performance in Detail and in Real-Time, Which Renders Potential Reach Estimates Irrelevant to Many Facebook Advertisers ................................................................................22

          2.    Many Facebook Advertisers Are Interested in Performance Advertising, Which Suggests Potential Reach Would be Unimportant to Their Budget Decisions .................................................................................................28

          3.    Facebook Advertisers Are Exposed to Potential Reach Estimates in a Context That Encourages Them to Hone Their Targeting Criteria ...........31

          4.    Facebook Advertisers Are Also Presented With Estimated Daily Reach, Which Is More Relevant Than Potential Reach for Budgeting Purposes ..35

          5.    Most Facebook Advertisers Have Access to Actual Performance Data for Past Ad Campaigns, Which Is More Relevant than Potential Reach for Budgeting Decisions ................................................................................36

          6.    Many Facebook Advertisers Are Aided by Knowledgeable Experts ........37

          7.    Many Facebook Ad Campaigns Have Limited Budgets Relative to Potential Reach ........................................................................................40

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

        8.     Many Facebook Advertisers Identify Their Own Audience For Their Ad Campaigns And For Some of The Class Period Were Not Exposed to Any Potential Reach Estimates ..................................................................42

   B.   The Named Plaintiffs' Advertising Behavior Shows that Potential Reach Was Unimportant to Their Advertising Strategy .........................................42

        1.     DZ Reserve ...........................................................................43

        2.     Cain Maxwell (d/b/a Max Martialis) ........................................49

IV.  **Plaintiffs' Experts Fail to Demonstrate a Relationship Between the Alleged Inflation in Potential Reach and Advertiser Budgets** ...................................................................**54**

   A.   The Allenby Conjoint Study Fails to Reflect How Advertisers Make Decisions, Generating Unreliable Results ...........................................................55

   B.   The McFarlane Report Is Based On A Single Document That Is Misinterpreted and Mischaracterized ...................................................................59

        1.     Budget Impact ..........................................................................59

        2.     Share of Advertisers Affected ...................................................64

V.   **The Levy and McFarlane Reports Cannot Be Used To Reliably Calculate Damages** .**66**

   A.   The Levy and McFarlane Reports Are Based on a Flawed Premise And Cannot Be Used to Calculate Damages ...................................................................67

   B.   Plaintiffs' Experts Ignore The Value Advertisers Received ................................68

        1.     Advertisers Received Value From Facebook .............................69

        2.     The Named Plaintiffs Illustrate the Benefits that Advertisers Receive from Facebook ..................................................................71

   C.   The McFarlane Report Is Based On An Inappropriate But-For World in Which Facebook Does Not Provide Potential Reach Estimates.......................................76

   D.   The Levy Report Incorrectly Concludes That Facebook Faces No Close Competition...................................................................77

        1.     The Levy Report Fails to Account for Marketplace Dynamics that Shape Outcomes ..................................................................78

        2.     The Levy Report's "Price Analysis" of Digital Advertising Venues is Flawed and Does Not Support Its Conclusions About Lack of Competition..................................................................81

VI.  **The Levy and McFarlane Reports Cannot Be Used to Calculate Individual Damages, Which Would Require Individualized Inquiry** ...........................................................**83**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

A.      There Are Many Different Types of Advertisers on Facebook Who Vary in Terms of Whether, How, and to What Extent They May Be Influenced by Potential Reach.....................................................................................................83

B.      Plaintiffs' Experts Ignore Essential Differences Among Facebook Advertisers and Their Ad Placements ...........................................................................85

    1.      The Allenby Conjoint Survey Unrealistically Forces Respondents to Make Budget Allocation Decisions in The Same Way.......................................86

    2.      The Roughgarden Auction Simulations Are Overly Simplified and Ignore Heterogeneity ...........................................................................87

C.      The Levy and McFarlane Reports Cannot be Used to Calculate Individual Damages...................................................................................89

VII.  Conclusion .....................................................................................91

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.   Introduction

### A.   Qualifications

1.   I am the Sloan Distinguished Professor of Marketing at MIT Sloan at the Massachusetts Institute of Technology ("MIT") in Cambridge, Massachusetts. I received an undergraduate degree in Politics, Philosophy, and Economics from Oxford University in the United Kingdom. I received a Ph.D. in Economics from Stanford University in 2005. I have been at MIT since completing my Ph.D. A copy of my curriculum vitae is attached to this report as Appendix A. My academic specialty lies in digital economics, and especially questions of how the increasing use of digital technologies have transformed advertising. I received a National Science Foundation CAREER Award, which is the National Science Foundation's most prestigious award in support of junior faculty. I have twice received the O'Dell award for my marketing research which has demonstrated the most "significant long-term contribution to marketing theory, methodology, and/or practice." I have also received a long-term impact prize from ISMS for my work in marketing.

2.   I am the Director of the Economics of Digitization at the National Bureau of Economics Research as well as co-leading the Economics of Artificial Intelligence initiative. I am an Associate Editor at *Management Science*, *Marketing Science*, and the *Journal of Marketing Research*, and Co-Editor of the *Journal of Quantitative Marketing and Economics*. I was a Co-Editor of the recent National Bureau of Economics Research volume on the Economics of Digitization.

3.   I have testified twice before Congress on policy issues relating to digital advertising and have presented my research to the Federal Trade Commission, the International Monetary Fund, the Federal Communications Commission, and the Organisation for Economic Co-operation and Development. I have published multiple academic papers in leading scientific, economics, marketing, management, and information systems journals, including *Science*, *Marketing Science*, *Journal of Marketing Research*, *Journal of Political Economy*, *RAND Journal of*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Economics*, *Management Science*, and *Information Systems Research*. I am being compensated for my services in this matter at my customary hourly rate of $1,250. Certain employees of Analysis Group have assisted me in working on this report. Analysis Group is being compensated for their time in this matter at an hourly rate ranging between $225 and $865 an hour. In addition, I receive compensation based on a proportion of the total billing of Analysis Group. I reserve the right to amend my testimony with any new information as additional evidence becomes available, and to modify my analysis and resulting conclusions.

4. A list of the materials I have relied upon to date in developing my opinions contained in this report is attached as Appendix B. In addition, I have had conversations with Josh Geller, Software Engineer at Facebook; Yiyang Shi, Data Scientist at Facebook; Janice Jung, User Experience Research Manager at Facebook; and Pawel Chrzan, former Product Analyst at Facebook.

### B.   Assignment

5. I have been retained by counsel for Facebook in this case. I have been asked to review and evaluate certain opinions presented in expert reports submitted by Plaintiffs, including:

- Expert Report of Larry Chiagouris, Ph.D., December 22, 2020 ("Chiagouris Report");

- Expert Report of Armando Levy, Ph.D., in Support of Plaintiffs' Motion For Class Certification, December 22, 2020 ("Levy Report");

- Expert Report of Bruce McFarlane, December 22, 2020 ("McFarlane Report");

- Expert Report of Timothy Roughgarden, Ph.D., December 22, 2020 ("Roughgarden Report");

- Expert Report of Greg Allenby, Ph.D., December 21, 2020 ("Allenby Report"); and

- Expert Report of Charles D. Cowan, Ph.D., December 22, 2020 ("Cowan Report").

6. I have been asked to address Plaintiffs' theories of harm and the damages analyses and conclusions presented in the Levy Report and the McFarlane Report. I have also been asked to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

evaluate and respond to the opinions in Plaintiffs' other expert reports, including the Chiagouris Report, the Roughgarden Report, and the Allenby Report, as they relate to the damages analyses and conclusions presented in the Levy and McFarlane Reports.

## C.   Summary of Opinions

7.    Plaintiffs' damages analyses as set forth in the Levy and McFarlane Reports cannot be used to calculate either aggregate harm or individual damages to the members of the proposed class. In my opinion, Plaintiffs' experts have not shown that there was harm to the class as a whole or to any individual advertisers, including the Named Plaintiffs. Plaintiffs' experts also have shown no evidence that any Potential Reach inflation would have affected the budgets or bids of a meaningful number of advertisers, and have provided no evidence that, even if some advertisers had changed some of their bids or budgets as a result of any Potential Reach inflation, it would have led to any harm. Plaintiffs' experts also have not identified any individual advertisers who increased their budgets, paid elevated prices, or were otherwise harmed—including because the Named Plaintiffs and other advertisers received significant value for their advertising dollars. Even if a limited number of advertisers hypothetically were harmed, Plaintiffs' experts have not provided a way of identifying who those advertisers are or by how much they were harmed.

8.    The damages analyses in the Levy and McFarlane Reports are both based on the faulty premise that most advertisers increased their budgets for Facebook ads, and ultimately overpaid for those ads, because they were exposed to allegedly inflated Potential Reach estimates. However, there is little reason to think that Potential Reach estimates would have affected the budgeting behavior of a meaningful number of advertisers, given the role of Potential Reach estimates in a digital advertising environment. Specifically, as discussed in Section III:

   a.   In a digital context, such as Facebook, advertisers have access to far superior direct measures of advertising performance and are able to directly measure conversions

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

(often defined as purchases) driven by their ads, which renders estimates of audience size irrelevant for many advertisers' budgeting decisions.

b. Most Facebook advertisers are interested in performance advertising, namely, advertising that is designed to trigger a direct response from users such as clicking on the advertiser's website or purchasing the advertiser's product or service. For those advertisers, the key objective is clicks or purchases, rather than the number of users that receive (but might not act on) their ads. This suggests that those advertisers would tend to rely on other metrics unrelated to reach, let alone Potential Reach estimates, for purposes of setting budgets and evaluating ad performance.

c. Facebook advertisers see Potential Reach in a context which encourages them to hone their target audience rather than adjust their budget.

d. Advertisers see personalized estimates of the Estimated Daily Reach and other Estimated Daily Results for their ads based on their budget and projected ad performance, which are more tailored to the advertisers' specific campaign settings (including the advertising objective, targeting criteria, and budget) and more relevant to budgeting decisions than Potential Reach.

e. Advertisers have access to real-time performance data (including actual reach numbers) for ongoing campaigns and historical data for past campaigns, which are more useful than Potential Reach for assessing ad performance and making budget decisions. Approximately ▮▮▮▮▮ of ad revenues from U.S. advertisers between August 15, 2014 and May 16, 2019 are associated with repeat advertisers who have some experience with previous campaigns.

f. Many advertisers set small budgets that limit the reach of their ads to a fraction of the target audience, rendering Potential Reach irrelevant for budgeting. Approximately 70 percent of ad sets placed by U.S. advertisers between August 15, 2014 and May

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

16, 2019 reached less than 2.8 percent of the estimated audience size associated with the ad set.

    g.  The Named Plaintiffs' advertising behavior shows that Potential Reach was unimportant to their advertising strategy for many of these reasons.

9.    Plaintiffs' experts fail to demonstrate any relationship between the alleged inflation and advertiser budgets, which undermines Plaintiffs' theory of harm and renders the resulting damages conclusions unreliable. The assumption in the Levy Report that most advertisers increased their budgets for Facebook ads due to allegedly inflated Potential Reach estimates is based upon the flawed results of a conjoint study described in the Allenby Report. The assumption in the McFarlane Report that most advertisers increased their budgets for Facebook ads due to allegedly inflated Potential Reach estimates relies on a misunderstood and mischaracterized sentence from one Facebook communication as a "crucial input in the calculation of the price premium." Neither shows that alleged inflation caused advertisers to increase their budgets. I discuss these flaws in Section IV.

10.   In addition to incorrectly assuming that Potential Reach drives budgeting decisions for most Facebook advertisers, the Levy and McFarlane Reports cannot be used to reliably calculate damages for a number of reasons. Specifically, as discussed in Section V:

    a.  Plaintiffs' experts ignore the value that advertisers (including the Named Plaintiffs) receive from Facebook. Not only do the damages calculations in the Levy and McFarlane Reports fail to consider the value of the ads that advertisers received, but the conjoint survey (from the Allenby Report) and auction simulation (from the Roughgarden Report) that feed into their damages calculations explicitly ignore the value of the ads and actual results that advertisers receive. But Facebook advertising offers significant benefits to advertisers—indeed, the advertisers in the putative class received trillions of impressions and billions of clicks for the prices they paid, and those advertisers continued to buy ads again and again. Even the Named Plaintiffs

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

recognized that they received value from their Facebook ads: both were repeat purchasers, who continued to buy ads from Facebook long after they began receiving the detailed data regarding their actual reach results. The principal of Plaintiff DZ Reserve appears to have continued to purchase ads under others' accounts after he joined this litigation, indicating that he considered Facebook ads worth the price he was paying even if he believed Potential Reach to be inflated.

b. While the McFarlane Report purports to measure "the economic damages due Plaintiffs as a result of Facebook providing its advertising customers a Potential Reach estimate that is not calculated based on unique people," the damages calculations it presents is instead premised on a but-for world in which Facebook does not provide any Potential Reach estimates. This premise is inappropriate and unrealistic, and leads to inflated estimates of damages associated with the alleged misrepresentations.

c. The Levy Report ignores intense competition faced by Facebook, which causes the damages analysis in the Levy Report to overstate the equilibrium price effects associated with Facebook's alleged misrepresentations.

11. The Levy and McFarlane Reports also cannot be used to calculate individual damages. Determining whether and how any individual advertiser made budgeting decisions based on Potential Reach inflation would require an individualized inquiry. The damages models presented in the Levy and McFarlane Reports largely ignore essential differences among Facebook advertisers and mask the varying effect, if any, that any alleged inflation in Potential Reach estimates would have across different ad campaigns and advertisers. The damages models in the Levy and McFarlane Reports rely on auction simulations described in the Roughgarden Report that ignore essential differences across advertisers by simulating a world in which all advertisers compete against each other in largely undifferentiated auctions. Furthermore, the damages model presented in the Levy Report adopts inputs from the conjoint

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

study described in the Allenby Report that, contrary to reality, forces all respondents to make decisions in the same way. I discuss these points in more detail in Section VI.

## II.  Background

12.  This section provides a short background of Facebook advertising, a summary of Plaintiffs' allegations, and an overview of Plaintiffs' damages analysis to provide context for various aspects of my review and critiques of Plaintiffs' experts' analyses.

### A.  Facebook Advertising

13.  Facebook owns and operates Facebook and Instagram, as well as messaging applications, including Messenger and WhatsApp. Facebook generates revenues from selling ads, which are shown beside content on Facebook's digital properties.[1]

14.  Facebook ads are structured in three parts: campaigns, ad sets, and ads. A Facebook ad campaign is comprised of one or more ad sets, each of which can have one or more ads.[2] Advertisers specify their advertising objective at the campaign level, which reflects "what you want people to do when they see your ads." Facebook offers several different objectives for advertising, organized in three broad categories: awareness, consideration, and conversions.[3] At the ad set level, advertisers choose how to optimize the delivery of their ads ("optimization for ad delivery"), which tells Facebook's algorithms to get "as many/much of that result as

---

[1]   Facebook, Inc. SEC Form 10-K for the fiscal year ended December 31, 2019, at 7.
[2]   "About the structure of Facebook Ads," *Facebook for Business*, available at: https://www.facebook.com/business/help/706063442820839?id=802745156580214 (accessed on February 25, 2021).
[3]   "Choose the Right Objective," *Facebook for Business*, December 30, 2020, available at: https://www.facebook.com/business/help/1438417719786914 (accessed on February 13, 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

efficiently as possible."[4] Based on the advertiser's selected objective and optimization criteria, Facebook will optimize the delivery of the ads to reach the people most likely to generate the desired results. Advertisers also set details about how an ad should be run at the ad set level, including the target audience, placements, budget, bidding parameters, and schedule. Details about the ad creative (such as the image and text) are determined at the ad level.[5]

15.   Advertisers can choose where their ads are displayed on Facebook properties, including whether the ads appear on Facebook, Instagram, Messenger, or the Facebook Audience Network.[6] Advertisers can also choose different physical placements for their ads within these venues. These placements vary in cost, from less expensive right-hand side ads on Facebook Desktop to more expensive placements in the middle of an Instagram story.[7]

16.   Most Facebook ads are placed through Facebook's Ads Manager self-service interface.[8] When setting up a campaign in Ads Manager, advertisers are provided with estimates of Potential Reach, which Facebook defines as "an estimate of the size of the audience that's eligible to see your ad…based on your targeting criteria, ad placements, and how many people were shown ads on Facebook apps and services in the past 30 days" and is "not an estimate of how many

---

[4]   "About Optimizing for Ad Delivery," *Facebook for Business*, November 10, 2020, available at: https://www.facebook.com/business/help/355670007911605?id=561906377587030 (accessed on February 13, 2021); "Optimizing Your Facebook Ad: Delivery and Placements," *AdEspresso*, 2018, available at: https://adespresso.com/guides/facebook-ads-optimization/delivery-placements/ (accessed on February 13, 2021).

[5]   "About the structure of Facebook Ads," *Facebook for Business*, available at: https://www.facebook.com/business/help/706063442820839?id=802745156580214 (accessed on October 24, 2020).

[6]   "About Placements in Ads Manager," *Facebook for Business*, November 11, 2020, available at: https://www.facebook.com/business/help/407108559393196?id=369787570424415 (accessed on November 28, 2020). Facebook's Audience Network allows advertisers to extend their campaigns across thousands of third-party mobile apps using Facebook's targeting capabilities, ad formats, and management tools. *See* "Facebook Audience Network," *Facebook for Business*, available at: https://www.facebook.com/business/marketing/audience-network# (accessed on November 28, 2020).

[7]   "Optimizing Your Facebook Ad: Delivery and Placements," *AdEspresso*, 2018, available at: https://adespresso.com/guides/facebook-ads-optimization/delivery-placements/ (accessed on February 13, 2021).

[8]   Exhibit 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

people will actually see your ad."[9] Ads Manager also provides estimates of Estimated Daily Reach, which Facebook defines as "the number of people we estimate you'll reach in your audience each day" based on "factors like your bid and budget."[10] Depending on their selected campaign objective, some advertisers also receive estimates of Estimated Daily Results, which Facebook defines as "how many results you can get per day if you spend your full budget."[11]

17.   Most Facebook ads are priced through ad auctions in which advertisers compete to have their ad shown in a particular slot. The winning ad for each slot is determined based on three factors: bid, estimated action rate, and underlying ad quality.[12] Facebook also offers certain qualified advertisers interested in controlling the reach of their campaigns the option of placing ads through "Reach and Frequency buying," which lets advertisers "book campaigns in advance with predictable, optimized reach and controlled frequency" at fixed prices.[13] Reach and Frequency buying is intended for a specific subset of advertisers who want to reach an audience of more than 200,000 people, target a broad area, have predictable reach for their ads, control how many times people see their ads, and plan and book campaigns in advance.[14] When setting up a Reach and Frequency campaign, advertisers are shown an estimate of the target audience

---

[9]   Ads Manager Interface Screenshot Showing Potential Reach Definition, *Facebook*, March 2019, FB-SINGER-00001134.

[10]   Ads Manager Interface Screenshot Showing Estimated Daily Reach Definition, *Facebook*, March 2019, FB-SINGER-00001130.

[11]   "About Estimated Daily Results," *Facebook for Business*, October 27, 2020, available at: https://www.facebook.com/business/help/1438142206453359?id=561906377587030 (accessed on February 13, 2021).

[12]   "About Ad Auctions," *Facebook for Business*, September 8, 2020, available at: https://www.facebook.com/business/help/430291176997542?id=561906377587030 (accessed on February 13, 2021).

[13]   "About Reach and Frequency Buying," *Facebook for Business*, December 2, 2019, available at: https://www.facebook.com/business/help/251123081984768?id=842420845959022 (accessed on February 25, 2021); "Choose the Right Buying Type for Your Brand Campaign," *Facebook for Business*, February 11, 2021, available at: https://www.facebook.com/business/help/654484604719506?id=842420845959022 (accessed on February 13, 2021).

[14]   "When to Use Reach and Frequency Buying," *Facebook for Business*, December 2, 2019, available at: https://www.facebook.com/business/help/525949344256092?id=842420845959022 (accessed on February 13, 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

size and what percentage of that audience the advertiser can reach given their budget and desired ad frequency.[15]

## B.    Overview of Allegations

18.    Plaintiffs DZ Reserve and Cain Maxwell (d/b/a Max Martialis), individually and on behalf of all others similarly situated, allege that Facebook overstates the "Potential Reach" of its advertisements. According to Plaintiffs, before advertisers make a purchase, Facebook provides advertisers with "Potential Reach" estimates for their selected targeting criteria, which is defined as "an estimation of how many people are in an ad set's target audience."[16] Plaintiffs allege that Potential Reach inflation "deceived Class members into believing that their advertisements could potentially reach more people than their advertisement could actually reach."[17] Plaintiffs claim that this inflation "can skew an advertiser's decision making, which is frequently based on the anticipated reach of the advertising campaign, or 'Potential Reach.'"[18]

19.    Plaintiffs further allege that, as a result of the alleged inflation of the Potential Reach estimate, they and other class members allegedly "purchased more advertisements from Facebook and paid a higher price for advertisements than they otherwise would have."[19] Plaintiffs allege that they "would not have bought as much advertising services if Facebook had not disseminated

---

[15]    *See, e.g.*, "Choose the Right Frequency Cap for Your Reach and Frequency Campaign," *Facebook for Business*, April 28, 2020, available at: https://www.facebook.com/business/help/1461336133922536?id=84242084595902 (accessed on February 13, 2021).

[16]    Third Amended Complaint, April 8, 2020, at 1.

[17]    Third Amended Complaint, April 8, 2020, at 25.

[18]    Third Amended Complaint, April 8, 2020, at 4.

[19]    Third Amended Complaint, April 8, 2020, at 2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

an inflated Potential Reach statistic, and Plaintiffs would have paid a lower price for the advertising services they did purchase."[20]

20. Plaintiffs assert that the class includes: "All persons or entities who, from January 1, 2013, to the present…, had an account with Facebook, Inc., and who paid for placement of advertisements on Facebook's platforms, including the Facebook and Instagram platforms."[21] I understand that the Court limited the claims to August 15, 2014 to the present based on the statutes of limitations for Plaintiffs' Unfair Competition Law claims, and to August 15, 2015 to the present for Plaintiffs' fraud claims. I understand that Facebook has produced certain data relating to ads placed by U.S. advertisers from August 15, 2014 to May 16, 2019.[22] I refer to the period from August 15, 2014 to May 16, 2019 as the "Data Discovery Period" throughout my report.

21. There are two named plaintiffs remaining in this case (together, "Named Plaintiffs"). Cain Maxwell is a resident of the state of Ohio who ran Facebook ads for his business, Max Martialis, from September 2018 to May 2019, spending a total of less than $400.[23] DZ Reserve is an e-commerce business owned and operated by Daniel Ziernicki that ran Facebook ads from at least December 2017 to December 2018, and spent approximately $1.0 million over this

---

[20]   Third Amended Complaint, April 8, 2020, at 25. Plaintiffs allege that Plaintiffs and members of the proposed class did not receive the "full benefit of their bargain," and instead received "advertising services that were less valuable than what they paid for," and were "damaged by an amount at least equal to this overpayment." Third Amended Complaint, April 8, 2020, at 27.

[21]   Third Amended Complaint, April 8, 2020, at 22.

[22]   *See* All Ads Details data, *Facebook*, August 2014 to May 2019, FB-SINGER-00314652-704 and FB-SINGER-00426663, which reflects data from a data table Facebook produced containing ads purchased by U.S. advertisers between August 15, 2014 and May 16, 2019.

[23]   Exhibit 25.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

period.[24] Both Named Plaintiffs placed their ads through Ads Manager, which priced their ads via the auction. Neither of the Named Plaintiffs used Reach and Frequency buying.[25]

## C.   Overview of Plaintiffs' Damages Analyses

22. Plaintiffs' experts Dr. Levy and Mr. McFarlane propose two alternative theories of damages. As explained in more detail below, the Levy Report purports to calculate class-wide damages based on a price premium associated with advertisers receiving inflated Potential Reach estimates, while the McFarlane Report purports to calculate class-wide damages based on a price premium associated with Facebook providing Potential Reach estimates that were not based on unique people. In this section, I provide an overview of the Levy and McFarlane Reports and the major inputs feeding into their analyses, including the Roughgarden and Allenby Reports. Specifically, both the Levy and McFarlane Reports rely on the Roughgarden Report, which describes auction simulations that purport to predict the impact of changes to advertiser budgets on the prices of Facebook ads in the auction (the "Roughgarden Auction Simulations"). The Levy Report also relies on the conjoint analysis described in the Allenby Report (the "Allenby Conjoint Study") that purports to estimate the impact of changes in Potential Reach on advertiser budgets. Therefore, the usefulness of the damages analyses in the Levy and McFarlane Reports depend in part on the accuracy, reliability, and usefulness of the Roughgarden Auction Simulations and, in the case of the Levy Report, the Allenby Conjoint Study.

---

[24]   Plaintiff DZ Reserve's Fourth Amended Answers and Objections to Defendant's Third Set of Interrogatories, November 23, 2020, at p. 8. *See also*, Exhibit 14.

[25]   *See, e.g.*, Deposition of Cain Maxwell, July 8, 2020 ("Maxwell Deposition"), at 160 ("Q. And to your knowledge, you've never done a particular type of advertisement on Facebook referred to as reach and frequency? A. I don't remember that term, no."). *See also*, DZ Reserve Ads Manager Reports, *DZ Reserve*, DZ_Reserve_00000001-006, DZ_Reserve_00000021-022, DZ_Reserve_00000025-028, DZ_Reserve_00000037-041, DZ_Reserve_00000052-053, DZ_Reserve_00000058-062, DZ_Reserve_00000091-101, and DZ_Reserve_00000106 (showing "Buying Type" = "AUCTION" for all DZ Reserve ad sets).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 1.   Levy Report

23.   Dr. Levy was retained to "determine whether class-wide damages may be reliably estimated on a common class-wide basis, and if so to provide a calculation of those damages."[26] The damages calculations in the Levy Report are based on the alleged price premium associated with higher Potential Reach measures due to Facebook's alleged misrepresentations—that is, the difference between Facebook ad prices with allegedly inflated Potential Reach estimates and Facebook ad prices in the but-for world with non-inflated Potential Reach estimates. This price premium depends on inputs from the Allenby and Roughgarden Reports.[27]

24.   In analyzing the price response due to Facebook's alleged misrepresentations, the Levy Report purports to "pay particular attention to supply-side factors that would affect how advertising rates were determined in the market equilibrium."[28] The Levy Report concludes that "Facebook has no close substitutes for its digital advertising platform."[29]

25.   As an input to its damages estimates, the Levy Report relies on the results of the Allenby Conjoint Study, which purports to estimate the impact of audience size information on advertisers' budgets.[30] The Levy Report relies on the results of the Allenby Conjoint Study regarding "the change in Facebook's share of an advertiser's digital advertising budget that would result from changes in two measurements of potential reach": (1) a change in the "United States Audience Size" from 240,000,000 to 180,000,000, which is meant to represent the alleged inflation in the default Potential Reach estimate shown to U.S. advertisers before they make targeting and placement selections; and (2) a 10 percent reduction in the "Estimated Audience Size After Targeting," which is meant to represent the alleged inflation in Potential Reach estimates advertisers received after making targeting and placement selections.[31]

---

[26]   Levy Report, at 2.
[27]   Levy Report, at 23-27.
[28]   Levy Report, at 2.
[29]   Levy Report, at 13.
[30]   Levy Report, at 23.
[31]   Levy Report, at 23.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Specifically, the Levy Report uses the results of the regression analysis in the Allenby Report that relies on only a subset of the survey data regarding budget allocations to Facebook/Instagram, rather than the results of the Allenby Report's choice-based analysis of the full survey data, as described in more detail in Section II.C.3.b. These regression results imply, for each individual respondent, an estimated change in Facebook's share of the respondent's total ad budget due to the two changes in the audience size proxies for Potential Reach, which the Levy Report then translates to an estimated change in the respondent's Facebook ad budget.[32] This results in a distribution of changes in Facebook ad budgets across individual respondents, with an average budget reduction of 3.2 percent and a median budget reduction of 3.3 percent for the two changes in Potential Reach proxies combined.[33]

26. The Levy Report relies on the Roughgarden Report to translate these budget changes to changes in Facebook ad prices in order to estimate damages. Specifically, the Roughgarden Report uses two inputs from the Levy Report for the auction simulations: (1) the distribution of changes in Facebook ad campaign budgets described in the previous paragraph, and (2) the actual distribution of daily budgets for Facebook ad campaigns running during the first two weeks of May 2019 based on data produced by Facebook.[34] Using these two inputs, the Roughgarden Report "simulated the Facebook auction algorithm to estimate the change in the average CPM for each advertiser that would occur if advertisers adjusted their budgets as estimated by Professor Allenby," which results in an average change in CPM (which is defined

---

[32] Levy Report, at 23-24. Dr. Levy explains, "Professor Allenby performed a regression of Facebook's share of an advertiser's digital ad budget on characteristics of the Facebook campaign, including the potential reach of the campaign. The average part worth for the change from U.S audience size from 240 million to 180 million is -0.75 percentage points. The change in the budget following a 10 percent reduction in targeted audience from the benchmark is 0.75 percentage points. See, Allenby Report, Table 3. The change in ad budget is given by $(\beta_{1i}+\beta_{2i})/(\text{actual FB budget share\_i})$ where $\beta_{1i}$ is the effect of the initial reach metric for individual $i$ and $\beta_{2i}$ is the effect of the final reach metric for individual $i$."

[33] Levy Report, at 24.

[34] Levy Report, at 24-25 and Appendix C.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

as the cost per thousand ad impressions) of 3.4 percent.[35] I describe the Roughgarden Report in more detail in Section II.C.3.c.

27.     Based on these results, the Levy Report concludes that the combined price premium associated with both (1) the alleged inflation of the default Potential Reach estimate for the U.S. as a whole and (2) the alleged inflation of the Potential Reach estimate shown after the advertiser selects their targeting criteria is 3.4 percent. According to the Levy Report, the price premium associated with only one of these changes would be approximately half of this amount.[36]

28.     The Levy Report calculates damages for the class as a whole by applying the average 3.4 percent price premium to the amount spent by Facebook advertisers during the proposed class period. Based on data produced by Facebook showing that U.S. advertisers in the proposed class generated ad revenues of ███ billion during the Data Discovery Period, the Levy Report determines that "the amount of class-wide damages from August 15, 2014 to May 16, 2019 is in excess of ███ billion."[37] The Levy Report uses data reported in Facebook's public financial filings to estimate revenues generated by the class through December 22, 2020, concluding that "the amount of class-wide damages from August 15, 2014 to December 22, 2020 is $3.8 billion."[38]

29.     The Levy Report also claims that damages for any individual advertiser can be calculated by "apply[ing] the price premium of 3.4 percent to the money paid by any advertiser."[39]

### 2.     McFarlane Report

30.     Mr. McFarlane was retained to "evaluate the economic damages due Plaintiffs as a result of Facebook providing its customers a Potential Reach estimate that is not calculated based upon

---

[35]     Levy Report, at 24-25.
[36]     Levy Report, at 27-28.
[37]     Levy Report, at 27.
[38]     Levy Report, at 27.
[39]     Levy Report, at 27.

unique people."[40] The McFarlane Report purportedly provides a damages calculation based on "the difference between (1) the price Plaintiffs paid for advertisements and (2) the price a reasonable consumer would have paid at the time of purchase if Facebook had not provided a Potential Reach metric."[41]

31.   To quantify the impact of removing Potential Reach estimates on advertisers' budgets in the but-for world, the McFarlane Report relies on a statement made in an internal Facebook "Task" email from November 28, 2016 in which Pawel Chrzan, a Product Analyst at Facebook at the time, wrote that "[f]rom our past studies we have seen that not having reach estimation costs us ~8-9% of Revenue."[42] The document does not provide additional context about these "past studies," but discusses applying the 8 to 9 percent figure to a situation where users on Lightweight Interfaces were experiencing issues with reach estimation.[43] The document also does not specify what is meant by "not having reach estimation."[44]

32.   The McFarlane Report then relies on the Roughgarden Auction Simulations to estimate the change in prices of Facebook ads in the but-for world due to an 8.5 percent change in budgets overall.[45] Based on another internal Facebook document describing the results of a survey of fewer than ten advertisers regarding the extent to which they use Potential Reach and find it "important," the Roughgarden Report assumes that 78 percent of advertisers decrease their budgets by 10.9 percent, for an aggregate budget decrease of 8.5 percent.[46] The Roughgarden Report then translates these budget reductions to an 8.9 percent reduction in average CPMs

---

[40]   McFarlane Report, at 1. Mr. McFarlane was instructed by counsel to assume that Facebook's Potential Reach estimate is not a measurement of unique people. McFarlane Report, at 4.
[41]   McFarlane Report, at 4.
[42]   McFarlane Report, at 5.
[43]   Email from Pawel Chrzan to Josh Geller RE: Outcome prediction (reach/engagement) failing, *Facebook*, November 28, 2016, FB-SINGER-00019177-178, at 177 ("We see on average 2 failures of outcome prediction per week for everyone in LWI").
[44]   *See* Email from Pawel Chrzan to Josh Geller RE: Outcome prediction (reach/engagement) failing, *Facebook*, November 28, 2016, FB-SINGER-00019177-178, at 177.
[45]   McFarlane Report, at 8.
[46]   Roughgarden Report, at 21.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

across all advertisers in the simulation.[47] I describe the Roughgarden Auction Simulations in more detail in Section II.C.3.c.

33. The McFarlane Report calculates total damages for the putative class by applying this 8.9 percent price premium to U.S. advertisers' total expenditures for Facebook advertising during the Data Discovery Period of ▮▮▮ billion, resulting in total class-wide damages of approximately ▮▮▮ billion for the period from August 15, 2014 to May 16, 2019.[48] The McFarlane Report claims that "[t]he percentage price premium can also be applied to any advertiser," and calculates damages of $33.72 for Plaintiff Cain Maxwell and $93,741.74 for Plaintiff DZ Reserve.[49]

### 3.   Other Reports

#### a.   Chiagouris Report

34. Dr. Chiagouris was retained to "provide an opinion explaining basic terms used in the advertising industry, including the terms 'reach' and 'potential reach' and other terms related to the term 'reach'" and to "explain how these terms and related terms are widely understood in the advertising industry, and how these terms are used by advertisers."[50]

35. The Chiagouris Report states that "[t]he 'potential reach' and 'reach' metrics are used by advertisers to make ad purchasing decisions, to set and sometimes adjust budgets, and determine the success of ad campaigns," by assessing return on investment before, during, and after a campaign.[51] The Chiagouris Report states that "[t]he use of Potential Reach to plan and budget an advertising campaign is integral to how advertisers use a Target Audience to plan

---

[47]   Roughgarden Report, at 23.
[48]   McFarlane Report, at 8. Calculated as 8.9 percent × $74.5 billion.
[49]   McFarlane Report, at 9. Calculated as 8.9 percent × $378.83 for Mr. Maxwell and 8.9 percent × $1.05 million for DZ Reserve.
[50]   Chiagouris Report, at 1.
[51]   Chiagouris Report, at 16-19, 22.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and budget advertising campaigns across traditional marketing channels such as print media and television."[52]

### b.  Allenby Report

36.  Dr. Allenby "designed and conducted a conjoint analysis study that was fielded in September 2020 to determine the effect of (a) a 10% minimum artificial increase in the value of the estimated Potential Reach after targeting and (b) representing that that estimated United States Potential Reach is 240,000,000 people rather than 180,000,000 people…on the demand for Facebook advertisements."[53] The 10 percent threshold appears to be drawn from the Cowan Report, which opines that all Potential Reach values at issue in this litigation are inflated by at least 10 percent with "near statistical certainty."[54]

37.  The Allenby Conjoint Study was administered to a sample of 1,007 respondents whose job responsibilities included digital ad spending and who had placed ads on Facebook and/or Instagram.[55] Respondents completed a series of allocation tasks in which they were told to assume they were "placing an ad for a campaign similar to the one [they] described in the last few questions" and asked to allocate their campaign budget across three ad venues— Facebook/Instagram, Google/YouTube, and "Elsewhere."[56] For each allocation task, these ad venues were described on seven attributes. Two attributes were proxies for Potential Reach estimates:

- (1) "United States Audience Size," defined as "the number of people or accounts in the United States on the platform before targeting" and with levels for 180 million, 210 million, or 240 million (specified in terms of either people or accounts); and

---

[52]   Chiagouris Report, at 22.
[53]   Allenby Report, at 4.
[54]   Cowan Report, at 8.
[55]   Allenby Report, at 4, 14.
[56]   Allenby Report, at 14, 16.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- (2) "Estimated Audience Size After Targeting," defined as "the number of people or accounts on the platform that match your targeting criteria" and with levels for the same as the respondent's last ad buy, 10% higher, or 10% lower (specified in terms of either accounts or people).[57]

38. The remaining five attributes were: brand (Facebook/Instagram, Google/YouTube, Elsewhere), automatic targeting ("you choose" or "AI based on industry"), creative guidance "yes" or "no"), expected cost per click ("CPC") ($0.50, $2.50, $4.50, or $6.50), and expected cost per thousand impressions ("CPM") ($4.00, $8.00, $12.00, or $16.00).[58]

39. The Allenby Report performs a choice-based analysis using a logit choice model on the survey results, which finds that the coefficients for United States Audience Size and Estimated Audience Size After Targeting are not statistically different than zero. The Allenby Report rejects that finding on the basis that "a choice-based model is not appropriate for the data" and opines that "[t]he poor model fit indicates that Facebook and Google are not close substitutes and their demand is relatively independent of each other."[59]

40. The Allenby Report then performs a hierarchical Bayes regression using a portion of the data from his conjoint—the share of budget allocated to Facebook and the attribute levels describing Facebook/Instagram for each allocation task—and finds that decreasing the estimated United States audience size from 240 million to 180 million decreases Facebook budget allocations by 0.75 percent, and decreasing the estimated audience size after targeting by 10 percent decreases Facebook budget allocations by another 0.75 percent, for a total decrease in budget allocation of 1.50 percent.[60]

---

[57]   Allenby Report, at 14-15 and "Exhibit 3 - 01 Digital Ad Buying Questionnaire 2020.pdf," at 11.
[58]   Allenby Report, at 14-15 and "Exhibit 3 - 01 Digital Ad Buying Questionnaire 2020.pdf," at 11.
[59]   Allenby Report, at 20-21.
[60]   Allenby Report, at 12, 17, 19-20.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### c.    Roughgarden Report

41.  Dr. Roughgarden was asked to estimate the change in prices for Facebook ads under two scenarios: (1) based on the shift in budget allocations associated with inflated measures of Potential Reach implied by the results of the Allenby Conjoint Study; and (2) based on an assumption that "removing the Potential Reach metric would cause an 8.5% decrease in aggregate advertiser budgets for Facebook Advertisements."[61]

42.  The Roughgarden Report estimates the effect of these changes in advertiser budgets on the prices paid by Facebook advertisers using auction simulations that, at a high level, consist of the following parts and assumptions:

- The Roughgarden Auction Simulations consist of 20 trials, each with a different random seed. Each trial consists of 50 advertisers with different budgets, and assumes 50,000 auctions per day, with three slots per auction, for 30 days.[62]

- In each simulation trial, the Roughgarden Auction Simulations sample budgets for 50 advertisers from the distribution of advertiser-level daily budgets based on actual data produced by Facebook for certain ads running in May 2019, which is obtained from the Levy Report.[63] After assigning each advertiser a budget in the "as-is" world, the Roughgarden Auction Simulations calculate each advertiser's "but-for" budget by either (1) sampling from the distribution of budget changes implied by the results of the Allenby Conjoint Study (and calculated in the Levy Report), or (2) based on an assumption that 78 percent of advertisers decrease their budget by 10.9 percent, for an aggregate budget decrease of 8.5 percent.[64]

---

[61]   Roughgarden Report, at 4-5.
[62]   Roughgarden Report, at 18, Appendix B, and backup files "Conjoint Model, Base Case.log" and "Non-Conjoint Model, Base Case.log" (showing "numAds" = 50, "numDays" = 30, "numAuctions" = 50,000").
[63]   Roughgarden Report, at 17 and Appendix B; Levy Report, at Appendix C. The Roughgarden Auction Simulations set a budget limit of $100. Roughgarden Report, at Appendix B.
[64]   Roughgarden Report, at 18-19, 21; Levy Report, at 23-24.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- The Roughgarden Auction Simulations implement a "pacing function" to translate an advertiser's budget into the bid submitted for each auction.[65]

- For each individual auction, the Roughgarden Auction Simulations take advertisers' bids as inputs and determines the winning ads for each slot as well as the price of each impression using a Vickrey-Clarke-Groves ("VCG") auction design.[66] The Roughgarden Auction Simulations also implement positional discounts to determine the decrease in payment for different slots in the same auction. In addition, the Roughgarden Auction Simulations claim to simulate competition between organic stories and advertisements in each auction.[67]

43. The Roughgarden Report uses the results of the simulation to calculate, for each advertiser, the ratio of their overall CPM in the but-for world to their CPM in the as-is world.[68] The Roughgarden Report concludes that "using Dr. Allenby's conjoint survey to measure the change in budgets…Facebook Advertisement purchasers would have paid prices that were [on average] 3.4% lower in the but-for world…than in the as-is world."[69] The Roughgarden Report also concludes that "an 8.5% decrease in advertiser budgets for Facebook Advertisements decreases prices for Facebook Advertisements by 8.9%." In both scenarios, the Roughgarden Report finds that "while there is some variance in the amount of the price premium, the cost-per-impression decreases for all advertisers in the but-for world."[70]

---

[65] Roughgarden Report, at 16-17.
[66] Roughgarden Report, at 15.
[67] Roughgarden Report, at 16.
[68] Roughgarden Report, at 19.
[69] Roughgarden Report, at 20.
[70] Roughgarden Report, at 23.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## III. Plaintiffs' Experts Fail to Recognize That Most Facebook Advertisers Would Be Unaffected By Any Alleged Inaccuracies in Potential Reach Estimates

44.  The Levy and McFarlane Reports are premised on an assumption that the vast majority of Facebook advertisers would change their budgets in response to changes in Facebook's Potential Reach estimates. The Levy Report assumes that, based on the results of the Allenby Conjoint Study, approximately 91 percent of Facebook advertisers would reduce their budgets in response to decreases in Potential Reach estimates.[71] The McFarlane Report assumes that around 78 percent of Facebook advertisers would reduce their budgets in response to the removal of Potential Reach estimates entirely.[72] In addition, the Chiagouris Report asserts that most or all advertisers would rely on Potential Reach to inform their budget decisions.[73] This section explains how the premise that Potential Reach estimates affect most advertisers' budgeting decisions is implausible in the context of the digital advertising environment in general and Facebook advertising in particular.

### A. Plaintiffs' Experts Fail to Consider Many Reasons Why Potential Reach Estimates Are Unimportant for Most Advertisers' Budgeting Decisions

#### 1. The Increased Measurability Enabled by the Digital Age Allows Advertisers to Measure Ad Performance in Detail and in Real-Time, Which Renders Potential Reach Estimates Irrelevant to Many Facebook Advertisers

45.  Plaintiffs' experts' analyses reflect an assumption that the role of Potential Reach on Facebook is akin to the role of projected reach or audience size in the pre-digital age. For example, the

---

[71]  Levy Report, at 24.

[72]  McFarlane Report, at 8  (relying on the Roughgarden Report's "conclusion that an 8.5 percent decrease in advertisers' budgets would have resulted in a corresponding 8.9 percent decrease in the price advertisers would have paid for Facebook advertisements"); Roughgarden Report, at 21, 23 (showing that the Roughgarden Report assumes that 78 percent of advertisers would reduce their budgets by 10.9 percent to arrive at its conclusion that "an 8.5% decrease in advertiser budgets for Facebook Advertisements decreases prices for Facebook Advertisements by 8.9%.").

[73]  Chiagouris Report, at 16-18.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Chiagouris Report compares the role of Potential Reach estimates to circulation and viewership figures in traditional advertising campaigns and asserts that "[t]here are several ways in which advertisers can utilize Potential Reach in the context of media planning."[74] Consistent with this, the Levy and McFarlane Reports are premised on an assumption that the vast majority of Facebook advertisers use Potential Reach to set budgets. However, these opinions reflect an outdated use of projected reach or audience size by advertisers in traditional broadcast media in the pre-digital age. In contrast, the enhanced measurability enabled by the digital age renders estimates of projected reach or audience size irrelevant to budget decisions for many advertisers.

46. Before the advent of the digital era, advertisers were unable to precisely measure the performance of their ads. Advertisers did not know which individuals saw an ad, and advertisers also could not reliably observe whether an individual who saw an ad took action as a result. For this reason, when talking about advertising, people often quote the adage, "half of my advertising is wasted, the trouble is I don't know which half."[75]

47. In this pre-digital world, advertisers had to rely on various unsatisfactory intermediate proxies for ad performance. One of these unsatisfactory intermediate measures was the projected "reach" of an ad. Projected reach was a rough estimate, often based on historical data, of the number of opportunities an ad might have to be seen by a consumer, but did not measure how many people would actually see the ad.

48. For example, in the traditional publishing industry, a newspaper might claim a certain advertising reach based on its circulation,[76] but such estimates were imperfect measures of

---

[74] Chiagouris Report, at 16-18.

[75] This quote is often ascribed to John Wanamaker, an early pioneer in department stores. However, the historical accuracy of it is not clear and the quote has also been ascribed to many others. *See* Gray, Terry, "Variations On The 'But We Don't Know Which Half' Line," available at: https://staff.washington.edu/gray/misc/which-half.html (accessed on February 19, 2021).

[76] Organizations exist that audit these circulation numbers. *See, e.g.*, "Measuring Audiences to Printed Publications," *Audience Dialogue*, available at: http://www.audiencedialogue.net/meas-print.html (accessed on February 19, 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

exposure to any given advertisement contained in the newspapers. For example, a newspaper subscriber might not read the paper that day. Another reader might fold the paper in a certain way where she does not see the ad, or might choose not to read the section of the paper with the ad in it at all. Similarly, TV stations relying on analog technology, rather than digital technology, have not historically provided advertisers with accurate advertising reach estimates. In general, television reach estimates are based on backwards-looking measures of viewership that rely on survey respondents to have accurate recall of which TV programs they viewed. They do not measure whether someone was in the room or actually watching the TV at the point when the ad was aired.

49.  In addition to not being particularly accurate or reliable estimates of reach, audience size estimates in the pre-digital era did not attempt to measure whether consumers who were exposed to an ad actually took any desired action after seeing the ad, such as visiting the advertiser's store or making a purchase. However, because better measures of ad performance generally were not available, prices charged to advertisers on traditional media such as newspaper or television generally reflected the expected size of the audience,[77] and advertisers may have considered this expected audience size information in allocating their advertising budgets.

---

[77]  *See* Main, Kelly, "Everything You Need to Know About TV Advertising Costs," *Fit Small Business*, January 21, 2021, available at: https://fitsmallbusiness.com/tv-advertising/#:~:text=Additionally%2C%20viewer%20demographics%2C%20timing%2C,most%20advertisers%20will%20target%20them (accessed on February 19, 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

50. In contrast to the pre-digital age, digital ad venues such as Facebook enable advertisers to track and measure which users see their ads and what actions they take after seeing those ads,[78] and advertisers are charged on the basis of actual results, as opposed to estimates of Potential Reach.[79] Facebook allows advertisers to monitor the performance of their campaigns in detail and in real time, including the number of times the ad was shown (referred to as "impressions"') and the number of times the ad was clicked on. Ads Manager also gives advertisers insight into how their ad performed among different user groups, such as users of a certain age, gender, or geography. Ads Manager also reports a variety of cost metrics, such as "cost per result."[80]

51. Advertisers can also use Facebook's tracking technology, the Facebook Pixel, to access further information about the performance of their ads. The Facebook Pixel is an easy-to-use piece of software code that advertisers can add to their own webpages to help monitor what actions users take on other websites after viewing ads on Facebook.[81] This provides advertisers with information, such as cost per conversion or cost per purchase, which assists them in allocating their ad budgets to the most efficient use.

---

[78] *See* "View Results On Your Facebook Ad in Ads Manager," *Facebook for Business*, November 11, 2020, available at: https://www.facebook.com/business/help/318580098318734?id=369013183583436&locale=en_US&draft=31 8580098318734 (accessed on February 28, 2021); *See also*, Goldberg, Sam, "Attribution: What It Is And Why It's Important," *Search Engine Land*, December 28, 2009, available at: https://searchengineland.com/attribution-what-it-is-and-why-its-important-32062 (accessed on February 28, 2021). *See also* Miller, Stephanie, "Digital Marketing Attribution," *DM News*, February 6, 2013, available at: https://www.dmnews.com/data/article/13037548/digital-marketing-attribution (accessed on February 28, 2021).

[79] "How Ad Billing Works on Facebook," *Facebook for Business*, January 6, 2021, available at: https://www.facebook.com/business/help/716180208457684?id=1792465934137726 (accessed on February 28, 2021).

[80] *See* "View Results On Your Facebook Ad in Ads Manager," *Facebook for Business*, November 11, 2020, available at: https://www.facebook.com/business/help/318580098318734?id=369013183583436&locale=en_US&draft=31 8580098318734 (accessed on February 28, 2021); "About Breakdowns, Metrics and Filtering in Ads Reporting," *Facebook for Business*, December 17, 2020, available at: https://www.facebook.com/business/help/264160060861852 (accessed on February 28, 2021).

[81] *See, e.g.*, Newberry, Christina, "The Facebook Pixel: What It Is and How to Use It," *Hootsuite*, January 14, 2019, available at: blog.hootsuite.com/facebook-pixel/ (accessed on February 19, 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

52. Any rational advertiser would monitor performance of their ad while it is running and, indeed, such behavior is encouraged by Facebook and third-party industry consultants.[82] Advertisers can rely on these data to maximize the returns on their ad spend by funneling more money towards ad campaigns that appear to be delivering more profitable results or canceling campaigns that are underperforming.[83] Advertisers can also use these real-time data to correct any potential false expectations about ad performance. This suggests that, even if an advertiser makes poor choices in setting their initial campaign parameters and budget, they can course-correct if their ad is not delivering the results they expected.

53. These detailed data enable advertisers to precisely measure the performance of their ad in achieving their desired results, rendering Potential Reach unimportant for many advertisers. Instead of "utiliz[ing] Potential Reach in the context of media planning," as claimed in the Chiagouris Report,[84] advertisers in the digital age can now rely on actual data to assess their ad's performance. Similarly, instead of using Potential Reach "when setting up an advertising campaign," "when evaluating the performance of an advertising campaign," and "to assess

---

[82]  *See*, *e.g.*, "Facebook Measurement," *Facebook for Business*, available at: https://www.facebook.com/business/measurement/ (accessed on February 24, 2021) (emphasizing that "measurement unlocks the potential to optimize your ads, understand your audience and grow your business," and advising advertisers to experiment with their ads by "[c]ompar[ing] two ad strategies to optimize your future campaigns with a A/B test."); "Get Results From Your Campaigns, Ad Sets and Ads ," *Facebook for Business*, available at: https://www.facebook.com/business/learn/lessons/basics-of-editing-campaign-ad-sets-and-more?course_id=2097363980380415&curriculum_id=726377631115881 (accessed on February 24, 2021) (noting "[b]efore you adjust your budget or delivery, we recommend using Ads Manager to review reporting metrics for the campaigns, ad sets or ads you want to change.").; Newberry, Christina, "How to Advertise on Facebook in 2020: The Definitive Facebook Ads Guide," *Hootsuite*, October 2, 2019, available at: https://blog.hootsuite.com/how-to-advertise-on-facebook/ (accessed on February 8, 2021) (stressing the need to "[t]est everything" because "[i]t's important not to make assumptions about what will work and what won't in your Facebook ads.").

[83]  Advertiser interviews conducted by Facebook in 2018 suggest that such behavior is common. *See*, *e.g.*, Transcript, *Facebook*, 2018, FB-SINGER-00130147-164, at 152 ("We're gonna be pushing the budget where we're seeing performance."); Transcript, *Facebook*, 2018, FB-SINGER-00130129-146, at 132 ("just throw out there a bunch of different campaigns and ad sets for different combinations of demographics and just let it run and…see what performs because I really don't know what's going to perform best."); Transcript, *Facebook*, 2018, FB-SINGER-00130218-235, at 222 ("If an ad set's not performing, I'm gonna try to iterate and find a version that's performing.").

[84]  Chiagouris Report, at 17.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

return on investment (ROI)…both in advance of, during and after an advertising campaign" as claimed in the Chiagouris Report,[85] advertisers have access to a dashboard within Facebook that estimates the actual reach of the ad campaign, as well as other far more useful metrics of campaign success and return on investment. Potential Reach is not reported in this exportable dashboard of actual campaign results, further reinforcing its limited relevance in assessing the performance of an ongoing or past campaign.

54. The evidence cited in the Chiagouris Report reinforces the relevance of metrics other than reach to assess ad performance. For example, rather than suggesting that advertisers should base ad budgets on Potential Reach, a Sprout Social article cited in the Chiagouris Report encourages advertisers to be "monitoring reach alongside other metrics like engagement, to determine what percentage of your potential audience respond to and interact with your content."[86]

55. Further, the Chiagouris Report appears to misunderstand what Facebook's Potential Reach estimates represent. The Chiagouris Report incorrectly states that Potential Reach estimates can "represent[] the percent of a target audience that could potentially be reached in a specific market."[87] This conflates Potential Reach with "coverage," a separate concept from the pre-digital era that estimates the percent of penetration a particular venue has in an independently defined target audience, such as the percentage of households a local radio station reaches. Coverage is an outdated measurement that was used in the pre-digital age primarily due to an inability to precisely measure the actual reach of a particular ad.

---

[85]   Chiagouris Report, at 17-18.
[86]   Arens, Elizabeth, "What is Potential Reach?," *Sprout Social*, January 16, 2019, available at: https://sproutsocial.com/insights/potential-reach/ (accessed on February 19, 2021).
[87]   Chiagouris Report, at 12.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2.  **Many Facebook Advertisers Are Interested in Performance Advertising, Which Suggests Potential Reach Would be Unimportant to Their Budget Decisions**

56.  Advertisers on Facebook have a wide range of different advertising objectives, which influences how they set up their ads and assess ad performance. Some advertisers are interested in generating awareness of their product or service. Such advertisers may choose "brand awareness" or "reach" as their Facebook objective as opposed to driving a consumer to take a specific action. A brand awareness objective involves targeting Facebook users who, according to Facebook's algorithm, are more likely to recall the ad two days later.[88] A reach objective indicates that the advertiser wants Facebook to show the ad the largest number of times to the largest number of people in a given audience.[89] Some advertisers can also place ads through Reach and Frequency buying. Such ads are optimized for reach and frequency first and a selected campaign objective second.[90] Reach and Frequency ad campaigns account for approximately ▮▮▮▮▮ of Facebook ad revenues from U.S. advertisers during the Data Discovery Period.[91]

57.  In contrast, and consistent with the enhanced measurability of the digital age, many Facebook advertisers are interested in "performance advertising," or driving specific actions with their ads, such as clicks and conversions, rather than reach. These advertisers are typically focused on trying to identify or have their ads delivered to specific users likely to take a desired action, rather than simply having their ads delivered to as many people as possible. A large audience size is tangential to their desired objective and may even be undesirable. Accordingly, these advertisers' budgeting decisions would be driven by predicted performance of the ad in terms

---

[88]  "About the Brand Awareness Objective," *Facebook for Business*, July 15, 2020, available at: https://www.facebook.com/business/help/1629235777115312?id=429023050853196 (accessed on February 13, 2021).

[89]  "About the Reach Objective," *Facebook for Business*, January 9, 2019, available at: https://www.facebook.com/business/help/218841515201583 (accessed on February 13, 2021).

[90]  "Objectives, Ad Formats and Placements Available with Reach and Frequency Buying," *Facebook for Business*, February 11, 2021, available at: https://www.facebook.com/business/help/681925088666087?id=842420845959022 (accessed on February 13, 2021).

[91]  Exhibit 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

of generating the desired results and, after the ad has been launched, the actual results generated. Potential Reach would be unimportant to their budget decisions.

58. Performance advertisers use ads to prompt users to take a particular action that may lead to a purchase. These advertisers can choose from a variety of Facebook objectives, including "traffic" if they want users to click to the advertiser's website, "engagement" if they want users to interact with content posted by the advertiser, "app installs" if they want users to download an app, or "lead generation" if they want to identify leads for new business.[92] Many advertisers are focused on prompting users directly to make a purchase. These advertisers can choose Facebook objectives such as "conversions" if they want to encourage people to take a specific action on the advertiser's site such as adding items to cart or making a purchase, "catalog sales" if they want to use ads to show products from their digital store to generate sales, or "store traffic" if they want to drive actual offline visits to a physical store.[93]

59. The objective and optimization criteria selected by the advertiser are strong evidence of what the advertiser is trying to achieve and what they consider important for a successful ad campaign, which is critical to understanding advertiser behavior on Facebook. Advertisers with different goals will naturally structure and target their ads in different ways, will have different approaches to budgeting and measuring ad spend, and will focus on different types of information in deciding whether to buy an ad and analyzing whether their ad performed well. Yet all of Plaintiffs' experts ignore advertiser objectives: the Allenby Conjoint Study does not reflect this information, the Roughgarden Report does not model them in the Roughgarden Auction Simulations, and the Levy and McFarlane Reports do not consider them in their class-wide damages calculations.

---

[92] "Choose the Right Objective," *Facebook for Business*, December 30, 2020, available at: https://www.facebook.com/business/help/1438417719786914 (accessed on February 13, 2021).
[93] "Choose the Right Objective," *Facebook for Business*, December 30, 2020, available at: https://www.facebook.com/business/help/1438417719786914 (accessed on February 13, 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

60. For example, if an advertiser chooses website conversions as their objective and optimizes the delivery of their ad to generate as many conversions as possible, that is a strong indication of what they consider important for their ad performance—namely, driving sales conversions in the form of customers purchasing their product. Given this objective, such an advertiser would be focused on having its ads delivered to the users that are most likely to actually purchase its products, not simply as many users as possible even if those users are not likely to convert. For example, if an advertiser was interested in using Facebook ads to drive sales of wedding favors, they would not be interested in reaching the largest audience but instead in identifying people planning their wedding who are likely to purchase such favors online, and would tend to evaluate performance based on metrics such as cost per conversion. Similarly, a firm that is trying to encourage people to install an app would choose an objective of app installs, would target an audience they believe is likely to download the app, and would evaluate performance using metrics such as the cost per app install generated by their ad. Similar to optimizing for clicks and conversions, advertisers optimizing for engagement, app installs, or video views are focused on driving inherently measurable actions that can be tracked via Ads Manager. These advertisers' decisions would tend to be driven by a desire to reach specific users likely to interact with the ads in the way desired.

61. This focus on performance advertising is demonstrated by advertisers' selection of performance objectives and optimization criteria. As summarized in Exhibit 2, approximately ▮▮▮▮▮▮ of ad revenues from U.S. advertisers during the Data Discovery Period were associated with objectives relating to clicks or conversions. Similarly, as summarized in Exhibit 3, approximately ▮▮▮▮▮▮ of ad revenues from U.S. advertisers during the Data Discovery Period were associated with ad delivery optimization criteria relating to clicks or conversions. By comparison, only ▮▮▮▮▮▮ of ad revenues from U.S. advertisers during the Data Discovery Period were associated with a reach objective and only ▮▮▮▮▮▮ of ad

30

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

revenues from U.S. advertisers during the same period were associated with ad delivery optimization criteria relating to reach.

62.   The fact that many advertisers use Facebook for objectives other than reach and therefore would tend to rely on metrics unrelated to reach, let alone Potential Reach estimates, for purposes of setting budgets and evaluating ad performance is inconsistent with Plaintiffs' experts' assumptions that the vast majority of advertisers use Potential Reach to set budgets.

### 3.   Facebook Advertisers Are Exposed to Potential Reach Estimates in a Context That Encourages Them to Hone Their Targeting Criteria

63.   Reflecting the transformations brought about by the digital age and their impact on advertising behavior, Facebook presents Potential Reach estimates in a specific context that encourages advertisers to consider Potential Reach for purposes of refining their targeting criteria rather than adjusting their budgets, and encourages advertisers to hone their audience rather than maximize reach. The opinions in the Levy, McFarlane, and Chiagouris Reports that most advertisers consider Potential Reach for budget-setting purposes are inconsistent with this presentation of Potential Reach as a tool for honing targeting.

64.   Figure 1 shows how Potential Reach estimates are presented in Ads Manager.[94] Potential Reach is presented alongside a dial labeled "Audience Size," which encourages advertisers to consider Potential Reach in the context of refining their target audience. The audience size dial does not encourage advertisers to make their audience as broad as possible, but instead provides a visual indication of whether an advertiser's target audience is too broad if they have applied little or no targeting, or too narrow if they have selected many targeting criteria. A Facebook Help page from 2018 advises that advertisers should "[m]onitor the 'Audience Definition' panel to the right of your audience creation options" and that "[f]or most people, an audience that puts the needle in the green section will work best."[95]

---

[94]   As Ads Manager was the largest source of ad revenues from U.S. advertisers during the Data Discovery Period, this section describes the context in which Potential Reach is presented on Ads Manager. *See* Exhibit 1.
[95]   "About ad targeting," *Facebook*, March 23, 2018, FB-SINGER-00000417-422, at 418.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**Figure 1: Ads Manager Interface, Audience Size (2020)[96]**

65.  Since at least September 20, 2017, Facebook has provided disclosures emphasizing that Potential Reach is not designed to match population or other census estimates.[97] These disclosures also emphasize that Potential Reach is not an estimate of how many people will actually see the ad, and direct advertisers to "check [their] estimated daily results" for a prediction of actual reach and, in certain cases, results of the ad.[98]

66.  The connection between Potential Reach estimates and targeting is made clear in Ads Manager. Third parties also suggest that advertisers should use Potential Reach estimates to hone their

---

[96]  This screenshot was taken using my own Ads Manager account in mid-2020. I have used this account to launch some of the Facebook campaigns that I have studied in my own research - these campaigns are usually conducted in conjunction with non-profits. *See*, *e.g.*, Tucker, Catherine E., "Social Networks, Personalized Advertising, and Privacy Controls," *Journal of Marketing Research*, Vol. 51, No. 5 (2014): pp. 546-562.

[97]  "About Potential Reach," *Facebook*, September 2017, FB-SINGER-00000330-332, at 330; "Ads Manager," *Facebook*, March 2019, FB-SINGER-00001134; "About Potential Reach," *Facebook for Business*, November 12, 2020, available at: https://www.facebook.com/business/help/1665333080167380?id=176276233019487 (accessed on February 13, 2021).

[98]  "About Potential Reach," *Facebook*, September 2017, FB-SINGER-00000330-332, at 330.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

targeting selections. For example, a 2013 AdStage article about Facebook advertising using Ads Manager noted that "Potential Reach also gives you an idea of how narrow your targeting is. If the number is too large, you may be wasting ad impressions on people that are less than ideal and you could narrow down your targeting and be more selective. If the number is too small, your ads are targeted too narrowly and your targeting should be relaxed."[99] Figure 2 displays another page from AdStage, which makes it clear that advertisers should not aim to maximize Potential Reach but instead should consider the tradeoffs between having too narrow or too broad an audience.[100]



**Figure 2: AdStage Discussion of Potential Reach (2016)**

67.   The articles cited in the Chiagouris Report also emphasize that Potential Reach should be used to hone targeting selections to achieve a sufficiently well-defined target audience. For example,

---

[99]   "Top 5 Reasons Your Facebook Ad Has Limited Reach," *AdStage*, October 8, 2013, available at: https://blog.adstage.io/2013/10/08/top-5-reasons-your-facebook-ad-has-limited-reach (accessed on February 14, 2021).

[100]   "How to Target Facebook Ads to Your Audience," *AdStage*, December 15, 2016, available at: https://blog.adstage.io/2013/08/23/how-to-target-facebook-ads-to-your-audience (accessed on February 17, 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

one article cited in the Chiagouris Report as support for how advertisers understand Potential Reach suggests that advertisers should use Potential Reach as a tool to ensure that the target audience is sufficiently narrow to reduce unnecessary ad spending, and cautions that advertisers should not expect Potential Reach to reflect how many people will actually see the ad.[101]

68. Facebook's presentation of Potential Reach estimates and third-party discussion of those estimates signals to advertisers that they should consider Potential Reach for purposes of refining their target audience, rather than as an input in their budget-setting process. Indeed, in a research study conducted by Facebook in 2018, several advertisers reported using Potential Reach to refine their target audience and avoid targeting too broadly or too narrowly.[102] The Levy and McFarlane Reports, as well as the Chiagouris Report, ignore this context in which Facebook presents Potential Reach estimates, which contributes to their flawed conclusions that Potential Reach inflation leads to higher budgets. For the Levy Report, this conclusion stems from the Allenby Conjoint Study, which entirely ignores this context by forcing respondents to focus on certain audience size proxies for Potential Reach for budget allocation decisions rather than targeting decisions, as discussed in Section IV.A.

---

[101]   Chiagouris Report, at 13; Facebook Ads: How to Estimate Your Investment Budget on Facebook?," *My Little Big Web*, November 25, 2020, available at: https://mylittlebigweb.com/en/facebook-ads-how-to-estimate-your-investment-budget-on-facebook/ (accessed on February 19, 2021) (noting that "We recommend not to start running your ads with too broad an audience. Indeed, in choosing too broad an audience you may not target people likely to be interested in your products and so you would use up your budget unnecessarily," and cautioning that "Even if you are targeting 40,000 people, it is not certain that your Facebook Ads will reach 40,000 new people. It was noticed by a British agency that only a quarter of one's target audience is touched during the diffusion of ads.")

[102]   *See*, *e.g.*, "Reach Estimation – Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251, at 230; Transcript, *Facebook*, 2018, FB-SINGER-00130129-146, at 130 ("the main way I used potential reach in the past was just to make sure that the audience that I had picked wasn't too big or way too small. So I was just looking to make sure that some criteria I put in there didn't take the audience basically down to nothing. That's the main way I used it in the past."); Transcript, *Facebook*, 2018, FB-SINGER-00130199-217, at 200 ("The main reason I would look at that potential reach is just to make sure that audience is big enough…We also make sure it's not too big.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**4. Facebook Advertisers Are Also Presented With Estimated Daily Reach, Which Is More Relevant Than Potential Reach for Budgeting Purposes**

69. Facebook typically presents Potential Reach estimates alongside estimates of Estimated Daily Results and Estimated Daily Reach, which are more relevant for budgeting purposes because those estimates specifically take the advertiser's budget into account. As shown in Figure 1, Facebook presents a panel with "Estimated Daily Results" directly underneath Potential Reach, which includes estimates for Estimated Daily Reach and, depending on the campaign objective selected, Estimated Daily Results (shown in Figure 1 as Link Clicks).[103]

70. Unlike Potential Reach, Estimated Daily Reach incorporates information about the advertiser's budget, as well as past campaign performance data and market data,[104] and provides a reasonable prediction of the actual reach they can expect for their ad. Estimated Daily Reach is not calculated based on Potential Reach.[105] According to data produced by Facebook regarding certain ads placed by U.S. advertisers between January and May 2019, actual daily reach was within or above the Estimated Daily Reach range provided to advertisers in Ads Manager for ███████████████ of ads.[106] Estimated Daily Reach is more relevant to advertisers than Potential Reach for planning and budgeting decisions, since Estimated Daily Reach actually reflects the advertiser's expected advertising performance given their budget.

71. Indeed, Facebook highlights the relevance of Estimated Daily Reach and Estimated Daily Results (if available) for purchasing and budgeting decisions. For example, Facebook

---

[103] "About Estimated Daily Results," *Facebook for Business*, October 27, 2020, available at: https://www.facebook.com/business/help/1438142206453359?id=561906377587030 (accessed on February 13, 2021).

[104] "About Estimated Daily Results," *Facebook for Business*, October 27, 2020, available at: https://www.facebook.com/business/help/1438142206453359?id=561906377587030 (accessed on February 13, 2021).

[105] Estimated Daily Reach is estimated by ████████████████ ███████████████████████ and who meet the advertiser's targeting and placement criteria. Potential Reach is not an input into the Estimated Daily Reach calculation. *See* Facebook, Inc.'s Third Amended and Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories, October 12, 2020, at 8-12.

[106] Exhibit 13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

emphasizes that Estimated Daily Reach can be useful to help advertisers decide whether or not to purchase the ad: "[g]iven the characteristics of your ad (including its budget, bid, and targeting), we estimate the number of people you can reach and results you can get before you actually order your ad. This can help you decide if you want to order the ad or not."[107] Another Facebook Help page highlights that Estimated Daily Reach and Estimated Daily Results "can give you context on how much to increase your budget to get the number of conversions you want."[108] Mr. Josh Geller of Facebook confirmed that some advertisers consider Estimated Daily Reach as part of their ad planning process.[109]

72.    Despite the importance of Estimated Daily Reach compared to Potential Reach in budgeting, the Allenby Conjoint Study presents its survey respondents with proxies for Potential Reach but not for Estimated Daily Reach, as discussed in Section IV.A. Similarly, the Chiagouris Report does not examine the role of Estimated Daily Reach and how it would be more informative to an advertiser's return on investment than Potential Reach, which does not consider budget.

### 5.    Most Facebook Advertisers Have Access to Actual Performance Data for Past Ad Campaigns, Which Is More Relevant than Potential Reach for Budgeting Decisions

73.    Plaintiffs' experts' analyses, including the Allenby Conjoint Study relied upon by the Levy Report, ignore that repeat advertisers can use historical data from past ad campaigns to make and adjust budgeting decisions. These actual performance data would be more relevant to assessing performance and setting ad budgets than total audience size estimates such as Potential Reach. For example, to the extent a first-time advertiser was somehow influenced by

---

[107]    "How Much It Costs to Advertise on Facebook," *Facebook for Business*, November 24, 2020, available at: https://www.facebook.com/business/help/201828586525529?id=629338044106215 (accessed on February 13, 2021).

[108]    "About Estimated Daily Results," *Facebook for Business*, October 27, 2020, available at: https://www.facebook.com/business/help/1438142206453359?id=561906377587030 (accessed on February 13, 2021).

[109]    Conversation with Mr. Josh Geller, February 25, 2021.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Potential Reach because they believed that they could reach an entire target audience of 240 million users with a lifetime budget of $20 (contrary to Facebook's disclosures that Potential Reach estimates do not reflect how many people their ad would reach), they would learn from observing the results of that campaign what they can realistically achieve with their budget and other campaign parameters. Based on this experience, a reasonable advertiser would not expect that the ad would reach the full Potential Reach with the next $20 campaign, and would adjust their decision-making accordingly.

74. Data on past campaign performance facilitates analysis of return on investment and can inform the advertiser's performance expectations for new campaigns, which would influence how much money they allocate to the campaign. Approximately ███████ of ad revenues from U.S. advertisers during the Data Discovery Period were associated with repeat advertisers who would have had access to this type of information, which would be more relevant to decision-making than Potential Reach.[110]

75. Given the wealth of data on actual campaign performance available in Ads Manager, Potential Reach is not likely to be used by advertisers to assess return on investment, as claimed in the Chiagouris Report.[111] Similarly, few advertisers would plan ad budgets by focusing on Potential Reach, to the exclusion of their own current and past experience, as is assumed in the Allenby Conjoint Study.

### 6. Many Facebook Advertisers Are Aided by Knowledgeable Experts

76. Many advertisers work with digital ad agencies or directly with Facebook's sales team to set up and manage their campaigns, which provides advertisers with additional information and knowledgeable expert support for their campaign decisions. As a result, these advertisers would be exposed to a different mix of information—beyond that displayed on Ads Manager— that would influence their budget decisions.

---

[110]   Exhibit 6.
[111]   Chiagouris Report, at 18.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

77. Plaintiffs' experts appear to largely ignore the role of digital ad agencies and consultants that work on behalf of or with advertisers to facilitate the purchase and placement of successful ad campaigns on Facebook. Roughly ████████ of ad revenues from U.S. advertisers during the Data Discovery Period were associated with digital ad agencies.[112]

78. Digital ad agencies provide Facebook advertisers with tailored third-party solutions to help advertisers get the most from their campaigns, offering services such as campaign management, measurement, creative platforms, ad technology, and small business solutions.[113] There are many different digital ad agencies providing different services. Some agencies offer clients high-touch expert support through, for example, a "dedicated team of experts— strategists, analysts, creatives, and technical specialists."[114] These agencies also offer a variety of tools and interfaces for their clients, which provide differing information and analyses that may guide advertisers' decision-making. Some of these tools and interfaces allow for the purchase of Facebook ads through the digital agency's interface—indeed, approximately ██ ████ of total ad revenue from U.S. advertisers during the Data Discovery Period is associated with purchases through non-Facebook interfaces through Facebook's API.[115] Others

---

[112] Exhibit 6. Facebook produced a list of ads purchased by U.S. advertisers during the Data Discovery Period that were associated with digital ad agencies in FB-SINGER-00426481, which I matched with the lifetime ad revenue data produced in FB-SINGER-00314652-704 and FB-SINGER-00426663 to determine the total ad revenues from U.S. advertisers associated with digital ad agencies over the Data Discovery Period.

[113] "Welcome to the Facebook Marketing Partners Program," *Facebook for Business*, February 17, 2015, available at: https://www.facebook.com/business/marketing-partners/partner-news/welcome-to-thefacebook-marketing-partner-program (accessed on February 19, 2021); "Facebook Partner Directory," *Facebook for Business*, available at: https://www.facebook.com/business/partner-directory/ (accessed on February 19, 2021).

[114] "Strategy," *Nanigans*, available at: https://www.nanigans.com/solutions/strategy/ (accessed on February 15, 2021); *see also*, "Kenshoo Expert Services," *Kenshoo*, available at: https://kenshoo.com/expertservices/ (accessed on February 15, 2021); "Eliminate Your UA Gaps With Bespoke Services From Bidalgo," Bidalgo, available at: https://www.bidalgo.com/services/#fully-managed-service (accessed on February 15, 2021).

[115] Exhibit 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

provide additional tools and dashboards to help advertisers optimize ad performance and spending across ad campaigns.[116]

79.   Advertisers who work with digital ad agencies often have access to more robust data relevant to their budgeting decisions and sometimes receive individualized expert support to help ensure they are spending their advertising dollars optimally to maximize returns. For example, large advertisers who work with media planners enjoy the benefit that "Media Planners will frequently check in on their campaigns and tests to make sure they are delivering properly."[117] This reflects the fact that agencies are focused on optimizing their clients' ad budgets across multiple media sources. This additional information and support about likely ad performance renders Potential Reach estimates even more redundant as an influence for ad budgeting.

80.   Further, evidence suggests that some digital ad agencies do not rely on Facebook's Potential Reach estimates and recommend that their clients do not use Facebook's Potential Reach estimates for planning purposes. For example, a September 2017 internal communication among Publicis Media employees noted that "no one in the agencies use Facebooks potential reach as a metric as we all have better data when both planning and buying."[118] A Publicis Media communication to clients emphasized that they "do not recommend using Facebook Ad Manager reach estimates."[119]

---

[116]   *See, e.g.*, "Facebook Ads Automation and Reporting," *AdStage*, 2020, available at: https://www.adstage.io/products/integrations/facebook-ads/ (accessed on November 29, 2020); Guerrero, Louis, "Kenshoo Social's New Insights Panel Helps You Start Your Day Off Right," *Kenshoo*, March 13, 2020, available at: https://kenshoo.com/blog/kenshoo-insights-panel/ (accessed on November 29, 2020).

[117]   "Head Advertisers Cheat Sheet," *Facebook*, FB-SINGER-00426499-512, at 504; "Torso Advertisers Cheat Sheet," *Facebook*, FB-SINGER-00426529-542, at 533.

[118]   Email from Kate Sirkin to Rose Ahn RE: Facebook inflates ad reach, *Publicis*, September 7, 2017, PUB0002018-023, at 018.

[119]   "Facebook Reach Discrepancy," *Publicis Media*, PUB0001856-857, at 856-857 ("While Publicis Media agencies will, at times, employ partner data and tools for quick directional purposes, our proprietary agency tools take partner data, and calibrates and validates them internally. […] Publicis Media uses several tools to estimate reach potential across different platforms.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

81. In addition, some advertisers have a direct relationship with Facebook's sales team (often referred to as "managed accounts"). Approximately ▮▮▮▮ of ad revenues from U.S. advertisers during the Data Discovery Period are associated with accounts that were managed by Facebook's sales team.[120] As with digital ad agencies, advertisers who are closely advised by the Facebook sales team tend to employ more sophisticated advertising strategies that would rely on more relevant data, such as actual or predicted return on investment, and expertise to guide spending, rather than relying on Potential Reach estimates.

82. Some advertisers also place ads directly through Facebook's sales team via insertion orders. For example, advertisers who want to share video ads can use insertion orders to place them through Facebook Reserve.[121] Advertisers that want to plan and buy video campaigns that match Nielsen-verified Target Rating Points can do so via insertion order.[122] In both of these instances, such advertisers receive different information relevant to their goals, which is distinct from the information provided by Facebook Ads Manager. Approximately ▮▮▮▮ of ad revenues from U.S. advertisers during the Data Discovery Period are associated with insertion orders.[123]

### 7. Many Facebook Ad Campaigns Have Limited Budgets Relative to Potential Reach

83. Many Facebook advertisers set budgets that limit the delivery of their ads far below their Potential Reach estimates. Advertisers whose budgeting and targeting selections suggest that their ad can only be shown to a small fraction of the target audience—whether they are optimizing for clicks, conversions, reach, or any other result—are unlikely to be affected by

---

[120]   Exhibit 6.
[121]   "Reach today's hard-to-reach audiences," *Facebook for Business*, available at: https://www.facebook.com/business/m/reservefb (accessed on February 27, 2021).
[122]   "How does TRP buying on Facebook work?," *Facebook for Business*, March 17, 2017, available at: https://www.facebook.com/business/help/518993728299293?id=842420845959022 (accessed on February 27, 2021).
[123]   Exhibit 6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

any alleged inflation in Potential Reach. Changes in the number of people their ad could not reach given its budget would not affect the advertiser's decision-making.

84.    Advertisers control their spending on Facebook advertising by setting daily and/or lifetime budgets, which reflects the amount of money they want to spend on a particular ad set or campaign.[124] Many advertisers set budgets that are small relative to the size of their target audience, which means that their ad will only be shown to a small percentage of the target audience before exhausting the budget. For example, an ad campaign with a lifetime budget of $50 will only reach a small number of people in a target audience of 10 million users. As shown in Exhibit 7, approximately 70 percent of ad sets placed by U.S. advertisers during the Data Discovery Period reached less than 2.8 percent of the target audience size[125] and 85 percent of ad sets reached less than 16 percent of the target audience size, suggesting that the budget was small relative to the size of the target audience. The Levy Report's analysis of produced data showing the budgets of Facebook ad campaigns running in the first two weeks of May 2019 suggests that most advertisers set small budgets for their campaigns, with ▮▮▮▮▮▮ of advertisers setting a total daily budget of ▮▮▮▮▮▮▮▮▮▮ across their ad campaigns.[126]

85.    In this situation, a reasonable advertiser would place little, if any, weight on the Potential Reach estimate provided by Facebook, and would not be affected by any alleged inflation in the estimate. At a minimum, the advertiser would understand that their ads would not reach any substantial fraction of the number of people reflected in the Potential Reach estimate.[127] This would also be clear to the advertiser through the Estimated Daily Reach estimates, which

---

[124]   "About Budgets," *Facebook for Business*, November 12, 2020, available at: https://www.facebook.com/business/ help/214319341922580?id=629338044106215 (accessed on December 15, 2020).

[125]   This reflects information from an audience size field in a data table produced by Facebook, which is similar to the Potential Reach estimate shown to advertisers, but differs slightly because among other things it is logged by Facebook at a later time in the day from when the advertiser created their ad set and is not rounded. Deposition of Gerardo Zaragoza, October 20, 2020, at 87, 290, 308-309.

[126]   Levy Report, at Appendix C.

[127]   Dr. Chiagouris acknowledges that "if an advertiser has a very large target audience size then the advertiser will generally need to utilize a large budget to reach that audience." Chiagouris Report, at 17.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

account for the advertiser's budget and would be substantially smaller than Potential Reach estimates in situations where the Potential Reach is large and the advertiser's budget is relatively small.

### 8.  Many Facebook Advertisers Identify Their Own Audience For Their Ad Campaigns And For Some of The Class Period Were Not Exposed to Any Potential Reach Estimates

86.  Custom Audiences targeting allows advertisers to deploy their own data to identify target audiences on Facebook by, for example, uploading a list of previous customers or website visitors.[128] Advertisers who are using Custom Audience targeting to retarget customers who previously visit their websites renders Potential Reach audiences redundant, as that list of customers naturally limits the size of audience the advertiser might hope to reach. In addition, due to privacy concerns, Facebook did not show Potential Reach estimates to advertisers using Custom Audiences for a portion of the proposed class period.[129] Over the Data Discovery Period, approximately ▮▮▮▮▮ of ad revenues from U.S. advertisers used Custom Audience targeting,[130] and were unlikely to have been affected by Potential Reach.

### B.  The Named Plaintiffs' Advertising Behavior Shows that Potential Reach Was Unimportant to Their Advertising Strategy

87.  Evidence on the Named Plaintiffs' advertising shows that, contrary to their testimony, Potential Reach was unimportant to their advertising decisions. This further contradicts the assumptions

---

[128]  "Custom Audiences Is Now Available to Every Advertiser," *Facebook for Business*, October 23, 2013, available at: https://www.facebook.com/business/news/CustomAudiences-Is-Now-Available-to-Every-Advertiser (accessed on February 19, 2021); "About Custom Audiences," *Facebook for Business*, May 8, 2020, available at: https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (accessed on November 29, 2020).

[129]  "Facebook Bug Bounty," *Facebook*, March 23, 2018, available at: https://www.facebook.com/BugBounty/posts/2001267099887506 (accessed on February 24, 2021).

[130]  Exhibit 6. Excludes ads that used Custom Audience targeting and Lookalike Audience targeting.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

in the Levy and McFarlane Reports that the vast majority of Facebook advertisers would change their budgets in response to changes in Potential Reach estimates.

### 1.   DZ Reserve

88.   DZ Reserve was an e-commerce business founded and operated by Daniel Ziernicki that sold a wide range of products worldwide through online storefronts on Shopify.[131] DZ Reserve advertised on Facebook over the period from December 2017 to December 2018. DZ Reserve spent approximately $1.0 million on more than 740 ad campaigns, comprising approximately 23,000 ad sets and 26,000 ads, over this period.[132] Overall, DZ Reserve's Facebook ads generated approximately 328.8 million impressions and 6.9 million clicks.[133] Illustrative examples of DZ Reserve's Facebook ads are provided in Appendix C.

89.   Mr. Ziernicki stated that he used Potential Reach to inform DZ Reserve's advertising strategy in several ways. In particular, he testified that he "always wanted to…get the largest potential reach within my target audience."[134] Mr. Ziernicki said that he considered Potential Reach when setting up ad campaigns "to determine whether the audience – or the potential reach for

---

[131]   30(b)(6) Deposition of Dan Jon Ziernicki, July 13, 2020 ("Ziernicki 30(b)(6) Deposition"), at 15 ("Q. DZ Reserve was a business that sold products through e-commerce; is that correct? A. Yes. Q. And DZ Reserve sold products using shops set up on Shopify? A. Yes. Q. Okay. Did DZ Reserve have online stores through any entity other than Shopify? A. No."), and 47 ("Q. BY MS. DEELEY: And was DZ Reserve's -- DZ Reserve was selling products outside of the United States as well; correct? A. Yes, it was.").

[132]   Exhibit 14. *See also*, Plaintiff DZ Reserve's Fourth Amended Answers and Objections to Defendant's Third Set of Interrogatories, November 23, 2020, at 8.

[133]   Exhibit 14.

[134]   Ziernicki 30(b)(6) Deposition, at 51-52 ("Q. Okay. Can you describe your process for placing ads for DZ Reserve on Ads Manager? […] THE WITNESS: Sure. Yeah. I -- I kind of considered the Ads Manager on Facebook to be kind of like a puzzle. As I mentioned earlier, the right side of the page that contained the potential reach and the daily estimated reach, that part moved down on the right side, and to me, I always envisioned, like, these various inputs or factors that you could put on the form, meaning the targeting, your demographics, et cetera, that showed you your potential reach. And what I always wanted to do was get the largest potential reach within my target audience. That was my goal, so that's what I used Ads Manager for, and that's why I always looked at potential reach.").

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

my target audience was something that I wanted to go into."[135] Mr. Ziernicki also stated that he used Potential Reach and the actual performance of previous ads to inform his decision-making for subsequent campaigns: "[a]fter the fact, and when I purchased the ads, I would be looking at the data on the ads and…I would look at how much of the potential reach has been exhausted, is the -- is there any more audience to advertise to in this – for this particular ad."[136]

90. Contrary to this testimony, the evidence suggests that Potential Reach was unimportant to DZ Reserve's advertising strategy. As shown in Exhibit 16, over 95 percent of DZ Reserve's ads had an objective of website conversions and were optimized to be delivered to Facebook users mostly likely to generate conversions, suggesting DZ Reserve was focused on performance advertising rather than maximizing reach.[137] Consistent with this, Mr. Ziernicki testified that the primary goal of his Facebook campaigns for DZ Reserve was to drive purchases.[138]

91. This is also consistent with documents produced by DZ Reserve. In online conversations with other digital advertisers in a private Facebook group of self-described ecommerce "masterminds," Mr. Ziernicki characterized his advertising strategy as focused on generating

---

[135]   Ziernicki 30(b)(6) Deposition, at 56-57 ("THE WITNESS: …What I would do is first I would look at the Ads Manager process in creating my ad, and I would use that part to determine whether the audience -- or the potential reach for my target audience was something that I wanted to go into. If it was a small used audience, I knew I either had to add more relevant targets to that -- you know, to that -- that interest or I would have to, you know, add additional interests or change it. So I used the planning process within Ads Manager, and I would really try to get the biggest potential reach within my target audience.").

[136]   Ziernicki 30(b)(6) Deposition, at 57.

[137]   Exhibit 16. In deposition, Mr. Ziernicki agreed that he was looking for people within a broad audience that had specific interests, and that using the right targeting criteria is important for generating sales. Ziernicki 30(b)(6) Deposition, at 57-58 ("Q. BY MS. DEELEY: And is this because for your strategy for DZ Reserve, you were looking for people within a broad audience that had specific interests? A. Correct. Q. And it was those specific interests -- if you got the specific interests right, you might see lots of sales generated. If you picked the wrong interest, the sales might not have been so good; right? A. Yeah. Your targeting can have an influence on whether your ads are successful or not.").

[138]   Ziernicki 30(b)(6) Deposition, at 44 ("Q. BY MS. DEELEY: Well, it's really the same question I just asked you about Google, and you explained that you used shopping campaigns, so now I'm asking you the same question about Facebook. What kind of advertising did DZ Reserve purchase through Facebook? […] THE WITNESS: Purchase campaigns. Q. BY MS. DEELEY: What are purchase campaigns? […] THE WITNESS: The objection -- objection [*sic*] of the campaign is to get purchases. Q. BY MS. DEELEY: The objective of the campaign is to get purchases? A. Correct.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

purchases in a cost-effective manner, noting "all I care about is CPP" (cost per purchase).[139]

Mr. Ziernicki consistently described an ad set's performance as a "winner" or a "loser" by

referring to the ad set's cost per purchase and return on ad spend.[140] Mr. Ziernicki also created

custom reports on Facebook that analyzed cost per purchase and return on ad spend for each

ad set.[141] Cost per purchase and return on ad spend are ad performance metrics that are typically

evaluated by advertisers engaging in performance advertising.

92.   Second, DZ Reserve used Custom Audience targeting for approximately 13 percent of its

Facebook ad spending.[142] For these ads, DZ Reserve specified and controlled the audience

based on custom data it imported, rendering Potential Reach estimates irrelevant. In his

deposition, Mr. Ziernicki agreed that Potential Reach was unimportant for ads where he used

Custom Audience targeting:

> There are some specific ads that you launch that the potential reach
> is not really as important, because you're re-marketing a limited
> audience that is already established through your Facebook ads. So,
> for example, abandoned carts. The potential reach can't be any more

---

[139]   Chat between Dan Ziernicki and Rickie Truong, *DZ Reserve*, May 18, 2018, DZ_Reserve_00022413-440, at 435. Cost per purchase, or "CPP," refers to the total advertising spend per purchase (or conversion) generated by the ads. *See* Deposition of Dan Jon Ziernicki, July 13, 2020 ("Ziernicki Deposition"), at 172 ("Q. Okay. And then your next message says, 'All I care about is CPP'; right? A. That's what I wrote. Q. And CPP is cost per purchase? A. Correct.").

[140]   Dan Ziernicki Post in "eCom Accelerators Mastermind," *DZ Reserve*, April 29, 2018, DZ_Reserve_00000172 (discussing "winning" ad set with $2 cpp); Chat between Dan Ziernicki and Florian Tep, *DZ Reserve*, May 21, 2018, DZ_Reserve_00021985-2001, at 1987 ("but its never 3x roas+…or like 6xroas like some guys see"); Chat between Dan Ziernicki and Florian Tep, *DZ Reserve*, June 2, 2018, DZ_Reserve_00022021-027, at 025 ("I launch a few $100 with 5 ads and successfully find that 1-2 work, then a couple days the cpp goes higher."); Chat between Dan Ziernicki and Rickie Truong, *DZ Reserve*, June 28, 2018, DZ_Reserve_00022668-673, at 670 ("should i let this campaign run? Or what, because the original is still killing it 6x roas+"); Chat between Dan Ziernicki and Robert Walden, *DZ Reserve*, August 6, 2018, DZ_Reserve_00022799-800, at 799 ("This 'winner' across my ad accounts, by cpp and roas: $90 and .63 $50 and 1.02 $71 and .87"). *See also*, DZ_Reserve_00022069-070, at 069; DZ_Reserve_00022193; DZ_Reserve_00022378-401, at 382; DZ_Reserve_00022779-782, at 779.

[141]   *See*, *e.g.*, Exhibit 24, which summarizes information from DZ Reserve's Facebook Pixel reports for the top 25 ad sets in terms of amount spent. *See also*, Chat between Dan Ziernicki and Rickie Truong, *DZ Reserve*, June 28, 2018, DZ_Reserve_00022668-673, at 668 (showing a screenshot of a report showing "Cost per Website Purchase" and "Website Purchase ROAS").

[142]   Exhibit 17.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

> or less than the total abandoned carts. So in those circumstances, I
> didn't look.[143]

93. Third, DZ Reserve set relatively small budgets for its ad sets relative to the size of the target audience, suggesting it was not interested in achieving broad reach within that audience. For example, among DZ Reserve's top 10 ad sets in terms of ad spending, DZ Reserve targeted audiences ranging from approximately 8 million to 640 million users. Given the size of the budget the relative to the target audience, these ad sets never generated enough impressions to reach more than 11 percent of the projected audience size (and, in most cases, reached less than 5 percent of the projected audience size).[144]

94. These data contradict Mr. Ziernicki's testimony that he used Potential Reach to determine whether to continue advertising to a particular target audience, or whether that audience had been "exhausted."[145] For example, as shown in Exhibit 18, DZ Reserve's top ad set in terms of spending had an audience size of over 270 million and generated approximately 9 million impressions over roughly four months, with total spending of $4,285.[146] Assuming the ad set performance continued at this rate, it would have taken approximately 10 years and over $128,500 to show ads to 270 million users (roughly 30 times the actual duration and cost of the ad set).[147] Similarly, DZ Reserve's second largest ad set in terms of spending had an audience size of 21 million and generated approximately 450,000 impressions over three months with $3,801 in spending, suggesting that at this rate it would have taken roughly 12 years and $177,000 to "exhaust" the full audience (roughly 47 times the actual duration and cost of the ad set).[148] There is no evidence that any alleged inflation in Potential Reach estimates

---

[143] Ziernicki 30(b)(6) Deposition, at 71.
[144] Exhibit 18.
[145] Ziernicki 30(b)(6) Deposition, at 57 ("After the fact, and when I purchased the ads, I would be looking at the data on the ads and…I would look at how much of the potential reach has been exhausted, is the -- is there any more audience to advertise to in this -- for this particular ad…").
[146] Exhibit 18. This reflects the total impressions for all ads in a given ad set. The unique reach of the ad set would be lower if multiple impressions were delivered to the same person.
[147] Calculated as 270 million ÷ 9 million × 4 months = 120 months, and 270 million ÷ 9 million × $4,285 = $128,550.
[148] Exhibit 18. Calculated as 21 million ÷ 0.45 million × 3 months = 140 months, and 21 million ÷ 0.45 million × $3,801 = $177,380.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

would materially change the inference that DZ Reserve's largest ad sets were not going to actually "exhaust" the total audience.

95.   Moreover, Mr. Ziernicki's claimed method of considering actual reach across multiple ad campaigns targeting the same audience to determine "how much of the potential reach has been exhausted" is inconsistent with his advertising decisions. Running multiple ad campaigns directed to the same audience could mean reaching the same users multiple times, and will not necessarily exhaust the audience. If Mr. Ziernicki wanted to come closer to exhausting the target audience or reach a specific fraction of users in the target audience, this could be more accurately achieved through a Reach and Frequency campaign, which he did not use.[149]

96.   Fourth, Mr. Ziernicki monitored the actual performance of the DZ Reserve ads and made adjustments to improve results. As described in contemporaneous communications, DZ Reserve's strategy was to "test" ad sets with smaller budgets and "scale" those that were successful (meaning, increase the budget and spend). Indeed, during his deposition, Mr. Ziernicki testified that he often experimented with different ad specifications with a lower budget to test whether the strategy would be successful, and only increased spending after seeing initial actual results on the ad's performance.[150] Similarly, Mr. Ziernicki used the Facebook Pixel to track conversions generated by his Facebook advertising, allowing him to

---

[149]   *See* DZ Reserve Ads Manager Reports, *DZ Reserve*, DZ_Reserve_00000001-006, DZ_Reserve_00000021-022, DZ_Reserve_00000025-028, DZ_Reserve_00000037-041, DZ_Reserve_00000052-053, DZ_Reserve_00000058-062, DZ_Reserve_00000091-101, and DZ_Reserve_00000106 (showing "Buying Type" = "AUCTION" for all ad sets).

[150]   Ziernicki 30(b)(6) Deposition, at 59 ("Q. BY MS. DEELEY: Okay. Was it your -- did -- when you were purchasing advertising on Facebook for DZ Reserve, did you have a practice of testing ad sets with a budget of $3 or $5 to see how they do and then scale up? […] THE WITNESS: I think generally speaking, what you just referenced is -- is more -- more often than not every advertiser's strategy. They start with the lower budget, and once they identify what's been working and what's not, they start pouring more money into things that are working and eliminate the losers.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

monitor performance and assess return on ad spend in real time.[151] According to Mr. Ziernicki, conversions and the cost per purchase were among the most important metrics for assessing the performance of his Facebook ads.[152] This suggests that DZ Reserve was focused on actual results, and that DZ Reserve's budget decisions, including whether to invest more money to scale a particular ad, was driven by actual performance of the ad after it was launched rather than estimates of Potential Reach prior to launch.

97. Fifth, consistent with this evidence, data produced by Facebook on DZ Reserve's Facebook ads does not show a positive relationship between Potential Reach and ad set budgets. As shown in Exhibits 19 to 21, DZ Reserve's daily ad set budgets appear to be slightly negatively correlated with audience size, suggesting that DZ Reserve spent more on ad sets with smaller audience sizes.

98. Last, Mr. Ziernicki's ongoing advertising behavior confirms the limited importance of Potential Reach to his advertising strategy. After entering into this lawsuit, Mr. Ziernicki continued advertising on Facebook, spending over $40,000 on Facebook ads for his other companies between March 2019 and September 2020 despite his claims that Facebook's Potential Reach estimates are allegedly inflated.[153] Indeed, in April 2019, after he joined this

---

[151]   Ziernicki 30(b)(6) Deposition, at 68 ("Q. Okay. And what -- what type -- once you started an ad, was there any information you looked at on Ads Manager to track how that ad set was doing? […] THE WITNESS: Yeah. There are a variety of metrics that I would analyze. Q. BY MS. DEELEY: What were those metrics? A. I would look at the cost per purchase and ROAS. I would look at the total reach as it's compared to the potential reach and how much of the audience has been exhausted. I would look at the click-through rate, the cost per click, how many add to carts that have occurred without purchases."). *See also*, Exhibit 24.

[152]   Ziernicki Deposition, at 157-158 ("Q. BY MS. DEELEY: And Did you believe cost per purchase was an important metric in analyzing the advertising -- excuse me. Did you believe that cost per purchase was an important metric in analyzing the performance of DZ Reserve's advertisements? […] THE WITNESS: Yes. It was an important metric I considered."), and 166 ("Q. And was conversion a metric that was -- that you viewed as important in assessing the ad performance of DZ Reserve's ads on Facebook? […] THE WITNESS: Yeah. For most advertisements it was one of the more -- one of the important metrics I considered.").

[153]   Exhibit 15. Mr. Ziernicki's other companies are similar to DZ Reserve. Ziernicki Deposition, at 63 ("Q. Is there any distinction between the types of business that DZ Reserve, DK Reserve, BlueLight Enterprises and OrangeLight Enterprises did? […] THE WITNESS: No, not necessarily.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

case, Mr. Ziernicki wrote on public Facebook message boards that Potential Reach estimates, even if inflated, "should also not deter anyone from doing FB ads for ecom either."[154]

### 2.    Cain Maxwell (d/b/a Max Martialis)

99.    Cain Maxwell owned and operated Max Martialis, a "physical products business" that sold a magnetic gun mount exclusively through Amazon in the U.S. from as early as 2017 to sometime in 2019.[155] Mr. Maxwell advertised for Max Martialis on Facebook from September 2018 through at least May 2019, spending approximately $379 on a total of 11 Facebook ad campaigns, comprising 26 ad sets and 28 ads. Mr. Maxwell's Facebook ads generated approximately 2,400 clicks and almost 44,000 impressions.[156] Illustrative examples of Mr. Maxwell's Facebook ads are provided in Appendix C.

100.    Mr. Maxwell claims to have relied on Potential Reach to inform his advertising strategy in three ways: "One, for determining if there was a large enough pool for me to want to advertise on Facebook in the first place. Two, to determine how much I wanted to budget. Three, to help me target my audience."[157] Mr. Maxwell testified that he was harmed by the alleged inflation in Potential Reach because "I decided to purchase ads with Facebook that I might not have

---

[154]    Ziernicki Facebook Posts, *DZ Reserve*, April 5, 2019,  DZ_Reserve_00023648-650, at 650.

[155]    Maxwell Deposition, at 34-35 ("Q. BY MS. DEELEY: …Can you describe what kind of business Max Martialis is? A. Max Martialis was a physical products business. It sold a physical product. Q. What was the physical product it sold? A. It was a magnet. […] A. It was a 25-pound magnet, meaning it had 25 pounds of pull weight."), 38 ("Q. You don't know when -- when was your first sale of any product through Max Martialis? A. I don't remember. Q. No idea? A. 2017 or 2018."), 43 ("Q. Okay. Let's go back to what we were talking about, which is the information on your sales. You stopped selling the Max Martialis magnet in the spring of 2019? A. That's an estimate. I don't remember. Q. Okay. But your best memory is spring of 2019; is that fair? A. More or less, yes."), 45 ("Q. BY MS. DEELEY: Okay. And other than selling through Amazon, did you sell the magnetic product through any other source? Did you sell it at any trade shows, for example? A. No, not that I remember."), 48 ("Q. BY MS. DEELEY: What was the magnet that you described primarily used for? […] A. It was used to organize and secure firearms. Q. How? A. The metal part of the firearm is magnetized to the magnet.").

[156]    Exhibit 25.

[157]    Maxwell Deposition, at 199-200.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

otherwise purchased at all -- that I would not have purchased at all if I had known that the data was misleading or deceitful. And I was harmed inasmuch as I budgeted for false numbers[.]"[158]

101. The evidence suggests that Potential Reach was unimportant to Mr. Maxwell's advertising strategy. First, Mr. Maxwell testified that he based his business strategy, including his Facebook advertising strategy, on a "template" offered in a course called "AmazingSellingMachine" offered by Amazing.com, a company that offers "a complete step-by step program [for] every part of starting, growing, running, and scaling a business…" on Amazon.[159] Mr. Maxwell closely followed recommendations from videos that he purchased from Amazing.com to use Facebook ads to promote his magnetic gun mount,[160] and appears to have stringently followed Amazing.com's video recommendations on how to place ads on Facebook Ads Manager, including on how to set up advertising objectives, target audiences, and ad budgets.[161] For example, following Amazing.com's recommendations, Mr. Maxwell began his Facebook advertising using an ad campaign comprised of one-day ad sets each with

---

[158] Maxwell Deposition, at 227-228.

[159] Maxwell Deposition, at 67-68 ("Q. BY MS. DEELEY: … You referenced Amazing.com. Do you know what Amazing.com is? A. Yes…. It is a course for entrepreneurs who want to sell physical products online…. Q. What information did Amazing.com provide you on how to start a business? A. It provided assembly for how to determine a viable product, how to acquire said viable product, how to get the product to distribution centers at Amazon, how to create marketing and how to be competitive and rank."); "What is Amazing Selling Machine?," *Amazing.com*, available at: https://www.amazingsellingmachine.com/about?_ga=2.119066240.824253951.1607864974-306871124.1607864974 (accessed on February 19, 2021).

[160] Maxwell Deposition, at 124-125 ("Q. BY MS. DEELEY: All right. Now I want to turn to Facebook advertising, which you mentioned previously. Why did you advertise on Facebook?... THE WITNESS: It was prescribed by Amazing.com…. Amazing.com has a template for setting up a business online. That template involved setting up ads with Facebook"), at 129-130 ("Q. Okay. And it was in these videos where Amazing.com prescribed advertising with Facebook? A. Yes. Q. Did you view that as a recommendation by Amazing.com that you should advertise with Facebook?... THE WITNESS: Yes. …Q. BY MS. DEELEY: And so you advertised with Facebook on Amazing.com's recommendation? THE WITNESS: Yes.").

[161] Deposition of Cain Maxwell, at 130 ("Q. BY MS. DEELEY: … what else did Amazing.com tell you about advertising with Facebook? A. They have a walk-through on the video how to set up advertisement on Facebook. … Q. Okay. Did it … walk through how to place an ad through Facebook Ads Manager? A. Yes. Q. Did it walk through how to set up an advertising objective? A. Yes. Q. Did it walk through how to set up a target audience? A. Yes. Q. Did it walk through how to set your advertising budget? A. Yes."). *See also*, Maxwell Deposition, at 131-133, 153, 167-168, 203, 258-259. According to Mr. Maxwell, other than following recommendations from the Amazing.com, he did not have any other assistance in setting up advertisements on Facebook.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

a lifetime (and daily) budget of $20.[162] In addition, as prescribed by Amazing.com, Mr. Maxwell used "Facebook offer ads" that offered coupons to buyers of Mr. Maxwell's products sold on Amazon.com.[163] Mr. Maxwell's ads also looked very similar to those demonstrated in the Amazing.com materials,[164] and Mr. Maxwell even named his ad campaign and ad sets in a manner consistent with Amazing.com's demonstration.[165] There is no evidence that Amazing.com advised advertisers to rely on Potential Reach to make Facebook advertising decisions.[166]

102. Second, all of Mr. Maxwell's Facebook ads had an advertising objective of "Link Clicks" and were optimized for website clicks.[167] This suggests that Mr. Maxwell was interested in achieving a direct response—link clicks—with his ads, rather than achieving broad reach. Mr. Maxwell testified in deposition that his goal for his Facebook advertising was to generate clicks to his product listing on Amazon in order to generate sales and improve his product page

---

[162] Maxwell Deposition, at 167-168 ("Q. BY MS. DEELEY: Okay. So when you were saying they gave you a template with a suggested budget, was Amazing.com suggesting to you that you try out a one-day campaign and set a $20 budget for starting Facebook ads? […] A. Yes. That sounds right."), 203 ("Q. Okay. And the budget - - when we went back and looked, the budgets you actually entered, they were $20, was your -- was the budgets you put in for your Facebook ads set; right? A. That's right. Q. And that $20, as we discussed when you started setting your budget, that was the number that was recommended to you by Amazing.com in the educational videos; correct? […] THE WITNESS: That's correct."), 258 ("Q. BY MS. DEELEY: Okay. Why didn't you set a longer campaign if you thought and wanted to hit tens of millions of people? A. You know, Amazing.com recommended setting up one-campaign-per-day campaigns. I'm not exactly sure why.").

[163] "Amazing Selling Machine Modules," *Amazing Selling Machine*, 2018, AMAZING.COM_000015-135, at 018-019; "LBR Day 10 ad," *Max Martialis*, MAXWELL_00001143-145, at 145. *See also*, "Launch, Blitz & Rank Pre-Launch Part 2: Creating Your Facebook Ads" Video, *Amazing Selling Machine*, AMAZING.COM_0000140, at 2:08-2:42.

[164] Compare "Amazing Selling Machine Modules," *Amazing Selling Machine*, 2018, AMAZING.COM_000015-135, at 019 to "LBR Day 10 ad," *Max Martialis*, MAXWELL_00001143-145, at 145.

[165] "Launch, Blitz & Rank Pre-Launch Part 2: Creating Your Facebook Ads" Video, *Amazing Selling Machine*, AMAZING.COM_000140, at 15:00-15:41; Exhibit 28.

[166] While the Amazing.com materials discuss targeting and show Potential Reach on the Ad Manager screen as part of showing a demonstration of setting up an ad campaign, the materials do not reference Potential Reach or instruct students to narrow or adjust their interests, budget, or schedule based on Potential Reach. *See, e.g.*, "Launch, Blitz & Rank Pre-Launch Part 2: Creating Your Facebook Ads" Video, *Amazing Selling Machine*, AMAZING.COM_000140, at 15:15-16:00; 21:46-27:21. *See also*, "Amazing Selling Machine Modules," *Amazing Selling Machine*, 2018, AMAZING.COM_000015-135, at 031 ("Don't worry about narrowing down your audience too much, right now. You will know then better over time, and will be able to adjust your targeting as you develop your business and marketing.").

[167] Exhibit 26.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ranking on Amazon.[168] Consistent with this, Mr. Maxwell used cost-per-action ("CPA") bidding for approximately 43 percent of ads and 60 percent of ads by revenues, which indicates that he only wanted to be charged when someone clicked on his ad and further confirms that achieving link clicks was his primary goal.[169]

103. Third, Mr. Maxwell testified that he experimented with different targeting criteria[170] and "made adjustments after looking at the results," including who clicked through and how much traffic the ads generated.[171] Mr. Maxwell also testified that he tried to track sales generated by his Facebook ads using discount codes.[172] This suggests that Mr. Maxwell was using actual performance data and his own experience to inform his advertising decision-making, as opposed to relying on audience size estimates such as Potential Reach.

104. Fourth, Mr. Maxwell set relatively small budgets for ads relative to the size of the target audience, implying that the ads could only reach a small fraction of the users in that audience.

---

[168]   Maxwell Deposition, at 134-135 ("Q. BY MS. DEELEY: Okay. So let's talk first about what your marketing objectives were for your advertising on Facebook. What were -- what were your marketing objections -- objectives for your Facebook advertisements? […] THE WITNESS: Well, I had multiple objectives. Obviously, the individual clicking on each ad of mine is an objective, but also people clicking through -- people clicking through to my -- my posting or my -- my product listing, again, is rewarded with higher rankings, which in the end ostensibly raises my chances of selling more, even if it's not to those individuals who click on the ads.").

[169]   Exhibit 27.

[170]   Maxwell Deposition, at 171-172 ("Q. Okay. And then for some you have the minimum age of 35; right? A. Yes. Q. Why did you pick 35 for some and 25 -- or 21 for others? A. Well, I manipulated the minimum age up and down to see if a -- see if you had different results. I know that there are more -- more mature adults who are gun owners than young adults.").

[171]   Maxwell Deposition, at 152-153 ("Q. …how did you determine what your budget would be when you were placing ads through Facebook.com? […] THE WITNESS: I don't remember exactly. I believe there was a recommended amount to work with from the Amazing.com course, and I think I made adjustments after looking at the results. Q. BY MS. DEELEY: Looking at what results? A. Looking at who clicked through, how many -- how many -- how much traffic it got.").

[172]   Maxwell Deposition, at 109-110 ("Q. Okay. What do you mean you would track it with the discount made available? Did you offer certain levels of discount with Google that you were able to track, or was there a discount code or something? A. For some of my advertisement -- for some of my advertisement, I had discount codes made available, and those discounts were for different amounts."), 236 ("Q. BY MS. DEELEY: Okay. In your supplemental response to Interrogatory 13, it says that, 'Plaintiff also states that MAXWELL 0000824 and MAXWELL 000' -- excuse me -- '000825 show sales that were connected to customers who chose to use a discount code that Cain Maxwell included in his Facebook ads…' Is that an accurate statement? A. As far as I know, yes. I don't know a way to track the sales other than connecting them to the -- to the discount code.").

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Mr. Maxwell appears to have targeted relatively large groups, noting in deposition that he recalled seeing Potential Reach estimates on the order of 10 million or above.[173] According to data produced by Facebook, Mr. Maxwell's ad sets had audience sizes ranging from 1.3 million to 49.8 million users, with most ad sets targeting an audience of roughly 20 million users or more. At the same time, Mr. Maxwell set daily budgets of $5 to $20 for each ad set, and scheduled most ad sets to run for a single day.[174] Given these relatively small budgets and short campaign durations, Mr. Maxwell would not have hoped to reach even a small fraction of the target audience. In fact, no ad set generated more than 13,503 impressions.[175] Overall, Mr. Maxwell spent a total of $379 and generated 43,815 impressions across all ad sets.[176]

105. Mr. Maxwell testified that, while he understood that an ad with a lifetime budget of $20 could not reach tens of millions of users in the target audience, he believed that he may have reached the entire audience across multiple ad campaigns.[177] However, the data suggest that this testimony is implausible. For example, Mr. Maxwell's top ad set in terms of spending had a Potential Reach of 38 million and generated 13,503 impressions over 13 days, with total spending of approximately $84. Assuming this continued at the same rate, it would have taken over 100 years and over $236,000 to reach the entire audience of 38 million users.[178] In contrast, Mr. Maxwell testified that he had a total ad budget of less than $20,000 in 2018.[179] There is no

---

[173]   Maxwell Deposition, at 259 ("Q. BY MS. DEELEY: When you said you got a potential reach for tens of millions of people, did you ever get the potential reach number and narrow your targeting criteria? […] THE WITNESS: The tens of millions was after I had narrowed my targeted criteria.").

[174]   Exhibit 28.

[175]   Exhibit 28.

[176]   Exhibit 25.

[177]   Maxwell Deposition, at 213 ("Q. And you understand that based on your budget of $20, you could only reach a certain number of people; correct? […] A. Yes."), 214 ("Q. BY MS. DEELEY: With $20, you think you could -- with a $20 lifetime campaign budget, you thought you could reach 10 million people? […] THE WITNESS: That's a deceptive question. That $20 lifetime campaign is for one day. If I kept running campaigns day after day after day after day, there are many millions of people -- people on accounts that potentially, yes, I could reach 10 million people. But I cannot reach 10 million people if there are not 10 million people in potential reach.").

[178]   Calculated as $38,000,000 \div 13,503 \times 13$ days $\div 365$ days/year $= 100.2$ years, and $38,000,000 \div 13,503 \times \$84.13 = \$236,758$.

[179]   Maxwell Deposition, at 202-203 ("Q. BY MS. DEELEY: You had $5,000 in 2018 to spend on Facebook ads? A. I could have spent as much money as I wanted to in my business. Yes, I had $5,000 spending money. Q. Okay. Did you have $100,000 to spend on Facebook ads? A. No. Q. Okay. Did you have $20,000 to spend on Facebook ads? A. No.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

evidence that any alleged inflation in Potential Reach estimates would materially change the inference that Mr. Maxwell's largest ad sets were not going to exhaust the potential audience.

106. Consistent with this evidence, data produced by Facebook on Mr. Maxwell's Facebook ads do not show a positive relationship between Potential Reach and ad set budgets. As shown in Exhibits 29 to 31, there does not appear to be any statistically significant relationship between Potential Reach or audience size and daily ad set budgets.

## IV. Plaintiffs' Experts Fail to Demonstrate a Relationship Between the Alleged Inflation in Potential Reach and Advertiser Budgets

107. The Levy and McFarlane Reports' specific assumptions on the extent to which Potential Reach matters for most advertisers stems from two flawed analyses: (1) the results of the Allenby Conjoint Study, which flow from an artificial survey design that forces respondents to make advertising decisions by considering two audience size measures when there is no evidence that most advertisers make decisions in that way, and (2) a flawed interpretation of a single Facebook internal communication from which the McFarlane Report improperly infers that advertiser budgets would decline by 8 to 9 percent if Facebook removed Potential Reach estimates altogether. This section describes several errors in these analyses that undermine their conclusions that there is any relationship between the alleged inflation in Potential Reach and advertiser budgets.

108. Plaintiffs' experts did not investigate whether the assumed relationship between alleged inflation in Potential Reach and advertiser budgets was consistent with data on actual advertiser behavior. In Exhibit 9, I present correlations between ad set audience size and estimated daily budget within an individual advertiser for advertisers who placed 10 or more ad sets during the Data Discovery Period. As shown in the exhibit, the degree and direction of the correlation varies across advertisers and, for the vast majority of advertisers, there is no statistically significant relationship between audience size and budget. Exhibit 11 performs the same

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

analysis using the subset of budget data relied on by the Levy Report, and shows similar results. Similarly, Exhibit 10 also shows that, for the vast majority of advertisers with 10 or more ad sets, there is no statistically significant relationship between audience size and lifetime spending on the ad. These results call into question the main premise of both the Levy and McFarlane Reports that most advertisers use Potential Reach to set their ad budgets, and that most advertisers would have reduced their budgets but for Facebook's alleged misrepresentations.

A.   **The Allenby Conjoint Study Fails to Reflect How Advertisers Make Decisions, Generating Unreliable Results**

109. When I teach conjoint to MBA students at MIT, I emphasize that, while conjoint analysis can be a useful tool, it needs to accurately reflect the buying environment and present questions in a way that is easy for survey respondents to understand in order to be effective. The Allenby Conjoint Study fails on both counts.

110. The Allenby Conjoint Study is a conjoint survey that does not, and cannot, capture the dynamic decision-making process enabled by the digital environment, whereby advertisers can measure ad performance in real-time and make adjustments to improve ad performance or reallocate spending to more successful ads. Instead, the Allenby Conjoint Study forces respondents to make budgeting allocation decisions once prior to purchasing their hypothetical ads, and does not permit the respondents to make adjustments to their decisions after an ad starts running or to use their prior results as a factor in allocating their budget.

111. A conjoint study is therefore the wrong tool to measure the effect of various attributes on advertiser decision-making in a world where advertisers can and do monitor results closely over the course of the campaigns and use these data to adjust their decisions. This dynamic process renders an advertiser's initial campaign decisions less important as those choices can be revised mid-flight if the campaign is not performing as the advertiser expected. By failing to capture this dynamic decision-making process, the Allenby Conjoint Study provides little

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

insight into the role of Potential Reach on advertiser decisions in the real world. Indeed, evidence from the pretest interviews for the Allenby Conjoint Study illustrates how advertisers rely on actual performance data to adjust initial decisions over the course of a campaign.[180]

112. Furthermore, even if the Allenby Conjoint Study were capable of capturing this dynamic decision-making process, Potential Reach is a poor candidate for inclusion in a conjoint study attempting to understand how advertisers make budget allocation decisions because, as described in Section III, Potential Reach would be of limited or no importance to many Facebook advertisers for purposes of setting budgets. To the extent that Facebook advertisers consider Potential Reach in the process of setting up their campaigns, it is typically for purposes of adjusting targeting criteria. The Allenby Conjoint Study, however, did not provide respondents with an option to make targeting adjustments based on the presented audience size information. By ignoring the targeting process entirely and forcing all respondents to consider two proxies for Potential Reach in the budget allocation exercises, the Allenby Conjoint Study creates an artificial choice for respondents that does not mimic the actual purchase environment, which inflates the estimated effect of Potential Reach on advertiser budgets and taints the Levy Report insofar as it purports to calculate damages for the proposed class.

113. Moreover, the Allenby Conjoint Study also forces respondents to consider information that many would not likely have considered in the real world. Specifically, by including two audience size estimates as proxies for Potential Reach—(1) "Estimated Audience Size After Targeting," and (2) "United States Audience Size"—the Allenby Conjoint Study artificially forces all respondents regardless of their targeting criteria, to consider the U.S. nationwide

---

[180] *See, e.g.*, Allenby Report, at backup files: "Ad Buying Interview 04 mp4," at 15:23 ("I will monitor and see how, there's really no return on investment at that point so I just kind of measure the cost and see how much the CPM and all that stuff is; and once the promotion starts, if it's not successful in a day or two, then I will stop it and then, or make adjustments"); "Ad Buying Interview 05.mp4," at 15:26 ("we typically do a lot of adjustments mid-stream"); "Ad Buying Interview 10 mp4," at 18:55 ("we're running it for a 3-month period and we're a month in and what we've learned in terms of where our cost per conversion is and um the performance across the various channels that we're using, we're making shifts dramatically.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

audience size in deciding where to allocate their budget. But data by Facebook regarding the Potential Reach estimates for Facebook ads placed during the Data Discovery Period suggest that few advertisers target all Facebook users in the U.S., which, according to Plaintiffs, was associated with a Potential Reach of around 240 million over the class period.[181] As shown in Exhibit 8, according to Facebook data on the actual Potential Reach numbers shown to advertisers in Ads Manager for ads placed by U.S. advertisers between January and April 2019, approximately 1.2 percent of ad sets placed were associated with a Potential Reach between 200 million and 250 million. Similarly, according to Facebook data covering the full Data Discovery Period, approximately 1.2 percent of ads and ad revenues from U.S. advertisers were associated with an estimated audience size between 200 million and 250 million.[182] These percentages likely overstate the true share of ads and ad revenues targeting all U.S. users as there are other targeting selections that could result in a Potential Reach of around 200 million to 250 million. Consistent with the low prevalence of these targeting selections in the full population, less than 0.5 percent of DZ Reserve's ads targeted all U.S. users, and none of Mr. Maxwell's ads did so.[183]

114. In addition, the Allenby Conjoint Study omits features that would be more relevant to many advertisers' budgeting decisions, including Estimated Daily Reach, which is typically presented alongside Potential Reach and provides information a rational advertiser would consider far more relevant for predicting the outcome of a particular ad than Potential Reach. The conjoint study also omits expected and actual return on investment of the ad campaign,

---

[181]   *See* Allenby Report, at 3; Cowan Report, at 8-9.
[182]   Exhibit 8.
[183]   Exhibit 17; MAXWELL_00001319 (showing that all ad sets used a minimum age of 21 or older, and used interest targeting).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

which several pretest respondents indicated was important to their decision-making,[184] and the more relevant price metric of cost per conversion. Cost per conversion and return on investment are important to many advertisers' budget allocation decisions, and are particularly important to performance advertisers. By omitting these features, the Allenby Conjoint Study fails to accurately reflect the purchase environment and the information used to make purchase decisions in reality, rendering the results a poor guide to behavior in the real world.

115. The results of the Allenby Conjoint Study itself suggest that Potential Reach had no discernible effect on advertisers' budget allocations for Facebook. As shown in Table 4 of the Allenby Report, a choice-based analysis of the survey data (which is how the survey was structured, as a comparison between Facebook/Instagram, Google/YouTube, and Elsewhere) results in estimates of the effect of United States Audience Size and Estimated Audience Size After Targeting on budget allocations that are substantially smaller than the results of the alternative regression analysis presented in Table 3 of the Allenby Report and ultimately used in the Levy Report.[185] In fact, the results of the choice-based analysis presented in Table 4 suggest that the effects of these Potential Reach proxies on budget allocations are not statistically different from zero. While the Allenby Report dismisses these results because "[t]he poor model fit indicates that Facebook and Google are not close substitutes and their demand is relatively independent of each other,"[186] this conclusion ignores intense competition between the companies, described in Section V.D.

---

[184]  *See, e.g.*, Allenby Report, at backup files: "Ad Buying Interview 01.mp4," at 15:21 ("Q: Hi Steve, yeah are there any other features that are missing that would help you make a better decision? A: It's the ROI. […] I'm just not getting it because I don't understand the ROI. I understand the cost associated with it as well as a target audience, but I'm not getting ROI."); "Ad Buying Interview 05.mp4," at 14:28 ("You know, so I would say that virtually, probably 80% of the campaigns we run, we are monitoring ROI and if we see that a bucket is not performing well and we have a fixed budget… we do typically do a lot of adjustments mid-stream"); "Ad Buying Interview 07 mp4," at 16:20 (viewing question on screen: "Approximately what percentage of your campaigns does ROI play a significant role in ad placement decisions?" Respondent: "Umm, I mean 100%."); "Ad Buying Interview 10 mp4," at 19:14 ("the return on investment absolutely plays a huge role in the entire focus").

[185]  Allenby Report, at 19, 21.

[186]  Allenby Report, at 21.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

116. In fact, Facebook's internal analyses suggest that changes in Potential Reach estimates associated with a March 2019 change in the Potential Reach estimation methodology had no effect on ad revenues. In December 2018, prior to the methodology change, Facebook posited that implementing the change could ██████████████████████████████ ████████████ ██████████████████████████████████ ████████████████████████████████████████████████ ████████████████ [188] However, when the methodology change was rolled out beginning in March 2019, Facebook ran an A/B test to measure the effect of the change in Potential Reach estimates and found no discernible effect on revenues.[189]

117. Together, these flaws render the Allenby Conjoint Study an inappropriate survey to analyze the impact, if any, of the alleged inflation in Potential Reach on budgeting decisions. As the results of the Allenby Conjoint Study form the basis for the damages calculations in the Levy Report, these flaws also render the analysis in the Levy Report unusable for purposes of estimating damages to the putative class.

### B. The McFarlane Report Is Based On A Single Document That Is Misinterpreted and Mischaracterized

#### 1. Budget Impact

118. The McFarlane Report relies on one internal Facebook communication from November 28, 2016 from Pawel Chrzan, a Product Analyst at Facebook at the time, to Josh Geller, a Facebook engineer (the "Chrzan Email"). In the email, Mr. Chrzan wrote that "[f]rom our past studies

---

[187] "Potential Reach Change - Central External Metrics Review," *Facebook*, December 17, 2018, FB-SINGER-00183561-596, at 565.

[188] "Potential Reach Change - Central External Metrics Review," *Facebook*, December 17, 2018, FB-SINGER-00183561-596, at 565; Conversation with Ms. Yiyang Shi, February 25, 2021.

[189] Conversation with Ms. Yiyang Shi, February 25, 2021.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

we have seen that not having reach estimation costs us ~8-9% of Revenue."[190] The McFarlane Report uses this single sentence from a single Facebook communication as a "crucial input in the calculation of the price premium: the change in advertisers' budgets that would have resulted had Facebook not provided its Potential Reach metric,"[191] which ultimately forms the basis of the damages opinions in the McFarlane Report. As described in Section IV.B.2, the Roughgarden Report assumes an overall budget reduction of 8.5 percent across advertisers, which appears to be based on the midpoint of the 8 to 9 percent figure in the Chrzan Email, and translates this into a distribution of budget reductions for individual advertisers.[192]

119. The McFarlane Report is based on several unsupported and incorrect inferences about the Chrzan Email that ultimately render the resulting damages conclusions unreliable. The McFarlane Report does nothing to test or verify these assumptions, and neither do any of Plaintiffs' other experts. I also understand that Plaintiffs' counsel has not obtained any testimony about the Chrzan Email or the assumptions made by Plaintiffs' experts. Without additional evidence, the McFarlane Report cannot determine whether this calculation is reliable, or whether it provides relevant, applicable insight into the damages theories articulated in the McFarlane Report. In particular, the McFarlane Report and the Chrzan Email provide no context on what group of advertisers or ads were considered in the study that generated the 8 to 9 percent of revenues estimate. The McFarlane Report assumes that the 8 to 9 percent figure is relevant to all ads and advertisers by assuming that advertisers' budgets would decrease by 8.5 percent in aggregate, but the McFarlane Report does not provide evidence supporting this interpretation.

---

[190]  Email from Pawel Chrzan to Josh Geller RE: Outcome prediction (reach/engagement) failing, *Facebook*, November 28, 2016, FB-SINGER-00019177-178, at 177.

[191]  McFarlane Report, at 7.

[192]  *See* Roughgarden Report, at 21.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

120. Indeed, Mr. Chrzan's reference in the Chrzan Email to "past studies" refers to an ad-hoc observation Mr. Chrzan made after reviewing data to analyze a bug that caused Facebook's Lightweight Interfaces to display very low Potential Reach estimates for a short period of time in 2016.[193] Mr. Chrzan confirmed that the analysis was not a rigorous study and that he is not aware of any formal controlled studies, such as A/B tests, that analyzed the effect of providing no Potential Reach estimates on advertiser behavior or Facebook ad revenue.[194]

121. Mr. Chrzan confirmed that the Lightweight Interface bug described in the Chrzan Email did not involve Facebook showing advertisers on Lightweight Interfaces no Potential Reach estimate at all. Instead, Facebook was showing advertisers on Lightweight Interfaces Potential Reach estimates that were very low, such as less than "100." This is consistent with the Chrzan Email, which describes a situation in which users of Lightweight Interfaces were "getting reach estimation of 0,"[195] and is different from and not comparable to the but-for world contemplated in the McFarlane Report, where Facebook does not provide any Potential Reach estimates.[196] Having a low Potential Reach estimate, as opposed to no Potential Reach estimate, sends a very different signal to an advertiser and would be expected to have different effects on behavior. For example, a missing or omitted Potential Reach estimate suggests that the information is not available or is not being reported, but not necessarily that the Potential Reach is zero. A very low Potential Reach estimate indicates to the advertiser that there are few Facebook users in a selected target audience, which may cause them to believe they need to use a different ad venue to reach the desired target audience or choose a different audience on Facebook.

---

[193]   Conversation with Mr. Pawel Chrzan, March 3, 2021.
[194]   Conversation with Mr. Pawel Chrzan, March 3, 2021.
[195]   Email from Pawel Chrzan to Josh Geller RE: Outcome prediction (reach/engagement) failing, *Facebook*, November 28, 2016, FB-SINGER-00019177-178, at 177 ("What I care about is those huge spikes in a chart where for like 30m-1h everyone seems to be getting reach estimation of 0.").
[196]   Email from Pawel Chrzan to Josh Geller RE: Outcome prediction (reach/engagement) failing, *Facebook*, November 28, 2016, FB-SINGER-00019177-178, at 177.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

122. Moreover, Mr. Chrzan also confirmed that the bug described in the Chrzan Email was limited to Facebook's Lightweight Interfaces, as the Chrzan Email itself discusses.[197] Lightweight Interfaces are streamlined interfaces for purchasing Facebook ads, such as creating boosted posts,[198] and account for ████████ of Facebook ad revenues from U.S. advertisers during the Data Discovery Period.[199] The McFarlane Report fails to establish whether it would be appropriate to extrapolate beyond this specific segment and apply the results more broadly. Lightweight Interfaces are disproportionately used by smaller and potentially less experienced advertisers who are more likely to rely on Facebook-provided estimates for advertising decisions. This is not representative of the broader population of Facebook advertisers, who would tend to rely to a lesser extent on Facebook-provided estimates.[200] Further, it is not clear whether the 8 to 9 percent reflects a diversion of revenues from Lightweight Interfaces to other Facebook interfaces with Potential Reach estimates, which would overstate the impact of removing Potential Reach estimates from all Facebook interfaces, since this would entail advertisers switching away from Facebook entirely. Indeed, even assuming that Lightweight Interfaces experienced an 8 to 9 percent drop in revenue as Mr. McFarlane assumes, it is possible that such revenue simply moved to a different Facebook interface where reach estimates were presented.

---

[197] Conversation with Mr. Pawel Chrzan, March 3, 2021; Email from Pawel Chrzan to Josh Geller RE: Outcome prediction (reach/engagement) failing, *Facebook*, November 28, 2016, FB-SINGER-00019177-178, at 177 ("We see on average 2 failures of outcome prediction per week for everyone in LWI").

[198] *See* Facebook Inc.'s Amended and Supplemental Response and Objections to Plaintiffs' Interrogatory No. 8, September 25, 2020, at 8-9; "Create Boosted Posts," *Facebook for Business*, November 12, 2020, available at: https://www.facebook.com/business/help/347839548598012?id=352109282177656&ref=fbb_boost_posts (accessed on January 27, 2021).

[199] Exhibit 1.

[200] *See* "Head Advertisers Cheat Sheet," *Facebook*, FB-SINGER-00426499-512, at 499 (showing that, as of June 2017, "Beginner" and "Part-Time" marketers used Lightweight Interfaces for ████████ of their Facebook ads and tended to use objectives related to link clicks and page engagements, whereas larger, more experienced advertisers used Lightweight Interfaces for only ████████ of their Facebook ads and tended to use objectives related to conversions and link clicks). *See also*, Conversation with Mr. Josh Geller, February 25, 2021; Conversation with Mr. Pawel Chrzan, March 3, 2021.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

123. In addition, based on my discussion with Mr. Josh Geller of Facebook, I understand the study associated with the 8 to 9 percent figure was conducted prior to mid-2015, likely in 2013 or early 2014.[201] Even if the study were valid for the proposition that it is cited in the McFarlane Report, this timing suggests that its results are unlikely to be applicable for the period at issue (August 2014 to present). Since 2014, Facebook's total ad revenues have increased by a factor of approximately 6.9,[202] driven in part by Facebook's many product improvements to its measurement tools such as to the Facebook Pixel.[203] As a result, even assuming the study were valid, it appears to refer to a period when Facebook advertisers had less information about the performance of their ads than they do for the majority of the class period.

124. In sum, the McFarlane Report errs in drawing strong conclusions from an isolated reference for which he appears to have no context. I understand that Facebook data scientists and product analysts frequently run ad hoc analyses for exploratory purposes that are not necessarily robust or reliable or generalizable beyond a very narrow context. It is unreasonable for the McFarlane Report to rely on a single offhand statement made in one email for the critical input in his damages analysis, when there is no indication that Mr. Chrzan's statement is supported by rigorous analysis of the precise issues relevant to this matter, Plaintiffs' experts have not done

---

[201]   Conversation with Mr. Josh Geller, February 25, 2021.

[202]   In 2014, Facebook generated total revenues of $12.466 billion. In 2020, Facebook generated total revenues of $85.965 billion. Calculated as $85.965 ÷ $12.466 = 6.896. Facebook, Inc. Annual Report (SEC Form 10-K) for the fiscal year ended December 31, 2014, at 30; Facebook, Inc. Annual Report (SEC Form 10-K) for the fiscal year ended December 31, 2020, at 50.

[203]   Facebook updated its pixel in 2015, 2016, and 2018. *See* Ho, Cecile, "Announcing Facebook Pixel," *Facebook for Developers*, October 14, 2015, available at: https://developers facebook.com/ads/blog/post/2015/10/14/announcing-facebook-pixel/ (accessed on February 18, 2021); O'Brien, Brad, "9 new and semi-secret Facebook targeting options," *Marketing Land*, July 21, 2016, available at: https://marketingland.com/9-new-semi-secret-facebook-targeting-options-184810 (accessed on February 18, 2021); Lu, Christine, "Advanced Matching in Pixel," *Facebook for Developers*, July 20, 2018, available at: https://developers facebook.com/ads/blog/post/2018/07/20/advanced-matching-pixel/ (accessed on February 18, 2021); Marvin, Ginny, "Facebook to release first-party cookie option for ads, pull web analytics from Safari," *MarketingLand*, October 5, 2018, available at: https://marketingland.com/facebook-to-release-first-party-pixel-for-ads-web-analytics-from-browsers-like-safari-249478 (accessed on February 18, 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

any independent analyses to verify or test that assumption, and Plaintiffs have not validated the study referred to in this email.

### 2. Share of Advertisers Affected

125. The damages calculation in the McFarlane Report also relies on another internal Facebook document discussing the use of Potential Reach estimates (the "Reach Survey Document") to determine the share of advertisers whose budgets would be affected if Facebook removed Potential Reach estimates.[204] Based on the results of a survey discussed in the Reach Survey Document, the Roughgarden Report assumes that 78 percent of advertisers would reduce their budgets—all by exactly the same amount—if Potential Reach figures were removed.[205] This assumption, which is a critical input to the Roughgarden Auction Simulations that ultimately form the basis for the damages analysis in the McFarlane Report,[206] is inconsistent with other evidence in the Reach Survey Document itself.

126. The Roughgarden Report derives the share of advertisers whose budgets would be affected if Potential Reach estimates were removed based on two results reported in the document: (1) 91 percent of respondents "refer to the Potential Reach number at all while they are creating ad sets," and (2) approximately 85 percent of the respondents who refer to Potential Reach at all find it "very important" or "extremely important" that "the potential reach number appears in every ad set that they create or plan."[207]

127. It is not clear, however, whether the 415 advertisers surveyed are representative of Facebook advertisers in the proposed class. The survey results do not report information on the survey respondents' country location, industry, spend, or other characteristics that could allow for an

---

[204] "Reach Estimation - Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251. *See*, McFarlane Report, at 7-8.

[205] Roughgarden Report, at 21.

[206] Roughgarden Report, at 21; McFarlane Report, at 8.

[207] "Reach Estimation - Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251, at 233-234; Roughgarden Report, at 21.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

assessment of the representativeness of the results for the proposed class.[208] Moreover, it is not clear what specific questions were asked in the survey, or how those questions were presented. Ms. Jung indicated that advertiser surveys of this nature often overstate the usefulness of any tool or metric as advertisers tend to prefer to have as many tools or metrics as possible available to them, and respond that the surveyed tools are important even if they don't use those tools particularly.[209] Furthermore, according to Ms. Jung, the survey was not formally recorded in Facebook's internal survey deployment tool, which raises further questions of reliability.[210]

128. Further, none of the survey findings relate to setting or changing budgets, yet the Roughgarden Report, and ultimately the McFarlane Report, assumes that 78 percent (calculated as 85 percent of 91 percent) of advertisers would decrease their budgets without Potential Reach estimates simply because they stated in a survey that they use Potential Reach and it is important to them. However, the survey does not imply that a decrease in budget would be the natural implication of a statement that Potential Reach is important.

129. The Reach Survey Document summarizes notes from qualitative conversations with eight advertisers, which suggest that many of the surveyed advertisers use Potential Reach for purposes of refining their targeting criteria rather than setting budgets.[211] For example, one of the primary use cases described is ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[208]  *See* "Reach Estimation - Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251.
[209]  Conversation with Ms. Janice Jung, March 2, 2021.
[210]  Conversation with Ms. Janice Jung, March 2, 2021.
[211]  "Reach Estimation - Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251, at 228-233.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



## V. The Levy and McFarlane Reports Cannot Be Used To Reliably Calculate Damages

130. This section describes how the Levy and McFarlane Reports' flawed premise that Potential Reach drives budgeting decisions for most advertisers renders their damages calculations unreliable. The section also discusses several other flaws in the Levy and McFarlane Reports

---

212 "Reach Estimation - Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251, at 230.

213 *See* discussion in Section III.A.2.

214 "Reach Estimation - Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251, at 231.

215 "Reach Estimation - Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251, at 232.

216 "Reach Estimation - Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251, at 229-231.

217 "Reach Estimation - Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251, at 229.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

that further undermine their damages conclusions. As a result, Plaintiffs' experts fail to show any evidence of harm to the proposed class as a whole or to any individual advertisers, nor have I seen any evidence of harm.

### A. The Levy and McFarlane Reports Are Based on a Flawed Premise And Cannot Be Used to Calculate Damages

131. The damages analyses in the Levy and McFarlane Reports are based on a flawed premise that Potential Reach drives budgeting decisions for most Facebook advertisers. Contrary to this premise, the evidence discussed in Section III suggests that Potential Reach, and any alleged inflation in Potential Reach, would be of little or no importance to budgeting decisions for most Facebook advertisers. Plaintiffs' experts have failed to demonstrate a relationship between Potential Reach and advertiser budgets.

132. Even if a limited number of advertisers did increase their budgets in response to the alleged inflation in Potential Reach estimates as claimed by Plaintiffs, Plaintiffs' experts have failed to establish that this leads to broader increases in Facebook ad prices. Any effect on prices would depend on the results of auctions involving other advertisers who may not have received inflated Potential Reach estimates or increased their budgets in response to such estimates. In addition, Plaintiffs' experts have not shown that any advertisers were harmed by these increases in ad budgets. That is because, as will be discussed in Section V.B, Plaintiffs' experts ignore the value of Facebook ads to advertisers.

133. Further, even if a limited number of advertisers increased their budgets based on the alleged inflation, the Levy and McFarlane Reports do not provide a way of identifying who those advertisers are, whether they were harmed, or by how much. The Levy and McFarlane Reports both claim that individual damages can be calculated for any advertiser in the class by applying the average price premium implied by the results of the Roughgarden Auction Simulations to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the amount spent by that specific advertiser.[218] The average price premium across a population of advertisers—each of whom experienced, according to the Roughgarden Auction Simulations, a different change in prices—cannot be used to estimate individual damages for any given advertiser, even assuming that advertiser or other advertisers in their auction(s) actually relied on Potential Reach for budgeting decisions. Because the Levy and McFarlane Reports do not provide a way to calculate the specific price premium, if any, applicable to a given individual based on that advertiser's ads and Potential Reach estimates, their analyses are incapable of calculating individual damages for members of the class.

134. As a result, Plaintiffs' experts fail to show any evidence of harm to the proposed class as a whole or to any individual advertisers, nor have I seen any evidence of harm. Plaintiffs' experts also have not identified any individual advertisers who were harmed by the alleged inflation in Potential Reach estimates, including the Named Plaintiffs. The Named Plaintiffs' advertising strategies do not appear to have been shaped by Potential Reach, and I have seen no evidence that they were otherwise harmed by alleged inflation in Potential Reach.

### B.   Plaintiffs' Experts Ignore The Value Advertisers Received

135. The damages analyses in the Levy and McFarlane Reports focus on the effect of changes in advertiser budgets on Facebook ad prices, and ignore the implications of those changes on benefits delivered by Facebook ads. The class-wide damages calculations offered in the Levy and McFarlane Reports do not account for the value that advertisers received from their ads—instead, the Levy and McFarlane Reports simply apply a price premium to the amount that advertisers paid Facebook for advertising during the period at issue and claim that as damages.

136. Plaintiffs' other experts also ignore the value that advertisers received from their Facebook ads. The Allenby Conjoint Study ignores the actual impressions, clicks, and/or conversions that respondents received, and does not include a measure of return on investment in the

---

[218]   Levy Report, at 27; McFarlane Report, at 8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

survey. Similarly, the Roughgarden Auction Simulations fail to consider the amount or value of the impressions and clicks that advertisers receive. Together, these omissions cause the Levy and McFarlane Reports to overstate any harm associated with changes in budgets allegedly attributable to changes in Potential Reach.

### 1. Advertisers Received Value From Facebook

137. Advertisers receive a variety of benefits from Facebook advertising. Facebook highlights a range of "success stories" on its website showing how advertisers can gain from Facebook advertising. For example, one case study highlights how Parachute, a home essentials retailer, ran a multi-phase Facebook campaign from April to June 2019 that generated a 19 point lift in intent to purchase, a 23 percent lift in purchases, and a 5-times incremental increase in return on ad spend.[219] Another case study describes how AirBnB, a hospitality travel site, used Facebook ads in 2017 to triple its previous return on ad spend and reduce its cost per acquisition by 47 percent.[220] Academic studies of Facebook advertising emphasize both the potentially large returns that advertisers can receive and how that value differs across advertisers. For example, a study that conducted 15 U.S. advertising field experiments found that Facebook ad campaigns increased registrations by as much as 900 percent and increased checkouts by as much as 450 percent or more, and demonstrated a wide range of returns across ad campaigns.[221]

138. Indeed, Facebook ads placed by advertisers in the proposed class generated many results. According to data produced by Facebook, ads placed by U.S. advertisers during the Data Discovery Period generated approximately ███████████████████████[222]

---

[219] "Parachute," *Facebook for Business*, available at: https://www.facebook.com/business/success/parachute (accessed on January 30, 2021).

[220] "AirBnB," *Facebook for Business*, available at: https://www.facebook.com/business/success/2-airbnb (accessed on February 25, 2021)

[221] Gordon, Brett E., Florian Zettelmeyer, Neha Bhargava, and Dan Chapsky, "A Comparison of Approaches to Advertising Measurement: Evidence from Big Field Experiments at Facebook," September 23, 2018, available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3033144 (accessed on March 1, 2021), at 32, 37.

[222] All Ads Details data, *Facebook*, August 2014 to May 2019, FB-SINGER-00314652-704 and FB-SINGER-00426663, at fields lifetime_legal_impressions and lifetime_legal_clicks. Excludes observations with zero, missing, or negative lifetime_legal_revenue.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

While conversions are defined by each individual advertiser, which restricts my ability to assess this value in aggregate, the number of impressions and clicks generated by Facebook ads placed by advertisers in the class is notable, and highlights the extent of the results and potential benefits delivered by Facebook ads. Moreover, advertisers are charged for Facebook ads on the basis of actual results they do receive, such as impressions or clicks. Even if Potential Reach were inflated as Plaintiffs claim, that does not mean—and I understand that Plaintiffs do not allege—that Facebook advertisers paid for impressions or clicks that were not delivered. It is therefore undisputed that advertisers received advertising results in exchange for what they paid for Facebook ads, yet Plaintiffs' experts ignore those results and have failed to consider the value of Facebook ads to advertisers in their damages analyses.

139. Further, the fact that many advertisers in the proposed class kept returning and purchasing ads from Facebook over time is instructive as to their perceptions of the value of those ads. Approximately ■ percent of Facebook ad revenues from U.S. advertisers during the Data Discovery Period are attributable to repeat advertisers who purchased more than one ad set.[223] As I discussed in Section III, advertisers have access to detailed and timely performance data on their digital ads which enables them to understand which ads on which venues are driving the desired results and which are not, and to adjust their spend accordingly. This suggests that advertisers who repeatedly purchase Facebook ads have evaluated their performance and made the conscious decision that the benefits they receive from their Facebook marketing exceeds the cost paid.

---

[223]   Exhibit 6.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

2.   **The Named Plaintiffs Illustrate the Benefits that Advertisers Receive from Facebook**

a.   **DZ Reserve**

140.   Data from both the Facebook Pixel and from DZ Reserve's Shopify account suggest that DZ Reserve generated a substantial amount of sales from Facebook advertising. Over the course of its operations from February 2017 to February 2019, DZ Reserve generated a total of $2.4 million in sales.[224] As shown in Exhibit 23, DZ Reserve's produced Facebook Pixel data, which is available for most of DZ Reserve's ads, indicates that $1.6 million in sales is linked to DZ Reserve's Facebook advertising activity, or roughly 68 percent of DZ Reserve's total sales.[225] As shown in Exhibit 22, produced data related to DZ Reserve's Shopify account indicates that $1.9 million in sales, or roughly 80 percent of DZ Reserve's total sales, is directly attributable to customers who clicked a link on Facebook, Instagram, or Messenger to reach DZ Reserve's online store.[226] Together, these data suggest that Facebook advertising was a key driver of sales for DZ Reserve. This is not unsurprising, as the e-commerce business model followed by DZ Reserve is traditionally heavily dependent on digital advertising to promote products, as e-commerce firms usually do not have brick-and-mortar stores.

141.   DZ Reserve spent approximately $1.0 million on Facebook ads over the period from December 2017 to December 2018.[227] For Facebook ads for which DZ Reserve used the Facebook Pixel to track ad performance, the data suggest that DZ Reserve generated a return on ad spend from

---

[224]   Exhibit 22.

[225]   DZ Reserve's produced Facebook Pixel data covers the period from December 2017 to December 2018, which is the period during which DZ Reserve advertised on Facebook.

[226]   *See* "Sales Reports," *Shopify Help Center*, available at: https://help.shopify.com/en/manual/reports-and-analytics/shopify-reports/report-types/sales-report#sales-by-traffic-referrer (accessed on January 30, 2021) ("The Sales by traffic referrer report shows your sales based on the specific site that your customers are coming from.").

[227]   Plaintiff DZ Reserve's Fourth Amended Answers and Objections to Defendant's Third Set of Interrogatories, November 23, 2020, at 8; Exhibit 14.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Facebook advertising of approximately 1.55.[228] Sales data from DZ Reserve's Shopify account suggest that DZ Reserve generated a return on ad spend of approximately 1.82.[229] While DZ Reserve did not produce information on other costs that would allow me to calculate the return on investment associated with DZ Reserve's Facebook advertising, DZ Reserve's detailed Pixel data would have allowed Mr. Ziernicki to track return on investment for each individual ad set using information available to him on the cost of the product being advertised.[230] This information should enable a knowledgeable advertiser to optimize spending across ads to maximize overall returns on Facebook advertising. Mr. Ziernicki testified in deposition that he believed that many of his Facebook ads "generated a positive return on investment"[231] and that there was value to the Facebook ads he purchased,[232] despite admitting to having a "bad quality" product and a "bad ad" and having the lowest possible satisfaction score.[233] None of

---

[228]  Exhibit 23. This calculation compares the sales revenues generated and the amount spent for DZ Reserve ads that used the Facebook Pixel. There are some ad sets for which DZ Reserve does not appear to have used the Facebook Pixel. *See* Exhibit 23 (showing that DZ Reserve spent $1,052,935 on ads tracked using the Facebook Pixel) and Plaintiff DZ Reserve's Fourth Amended Answers and Objections to Defendant's Third Set of Interrogatories, November 23, 2020, at 8 (showing that DZ Reserve spent a total of $1,053,278 on Facebook ads).

[229]  Exhibit 23. This calculation compares the sales revenues associated with consumers navigating to DZ Reserve's storefront from Facebook properties and the total amount spent DZ Reserve spent on Facebook advertising.

[230]  *See* Exhibit 24, which summarizes various performance metrics from DZ Reserve's produced Pixel data for the top 25 ad sets in terms of spending.

[231]  Ziernicki 30(b)(6) Deposition, at 87-88 ("Q. BY MS. DEELEY: Yeah. You said the highest month -- you said this -- he asked what are your monthly sales. You answered 350K. And now you said on the record that that was your largest month -- 350,000 was the largest month you did in 2018; right? A. Yes. […] THE WITNESS: What that meant was that was the month that I would have probably spent the most money on Facebook ads. Q. BY MS. DEELEY: Okay. A. I know -- I know, because I -- those ads were running well. I know specifically what products those were primarily attributed to. Q. Okay. So you got value out of those ads? MR. GRABER: Objection. Objection to form, outside the scope. THE WITNESS: I -- I believe those ads generated a positive return on investment.").

[232]  Ziernicki 30(b)(6) Deposition, at 106 ("Q. BY MS. DEELEY: There was value to the Facebook ads that DZ Reserve purchased? […] THE WITNESS: Yes, there is some value.").

[233]  Chat between Dan Ziernicki and Florian Tep, *DZ Reserve*, June 1, 2018, DZ_Reserve_00022002-018, at 015 ("yeah my satisfaction score is at 1"), 018 (Florian Tep: "how did your customer feedback went to 1? You scaled some bad quality products?" […] Dan Ziernicki: "yeah bad quality, bad ad."). *See also*, Chat between Dan Ziernicki and Rickie Truong, *DZ Reserve*, May 18, 2018, DZ_Reserve_00022413-440, at 22419); Chat between Dan Ziernicki and Rickie Truong, *DZ Reserve*, June 29, 2018, DZ_Reserve_00022675-678 ("roas down today so far…probably because the campaigns have a ton of disapprovals"); Appendix C (showing examples of DZ Reserve's ads).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Plaintiffs' experts have shown any evidence that the cost of DZ Reserve's Facebook ads exceeded the value DZ Reserve received.

### b.   Cain Maxwell (d/b/a Max Martialis)

142. Mr. Maxwell appears to have generated a substantial portion of his sales through Facebook ads. In total, according to data produced by Mr. Maxwell on sales from his Amazon listing, Mr. Maxwell sold 340 magnetic gun mount units and generated $4,964 in net sales and $3,869 in net sales after promotional discounts from August 2018 to April 2019.[234] According to Mr. Maxwell, substantially all of those sales are linked to Facebook or Google ads. Mr. Maxwell produced data that purportedly show "sales that were connected to customers who chose to use a discount code that Cain Maxwell included in his Facebook ads" and "in his Google ads."[235] According to these data, Mr. Maxwell sold 362 magnetic gun mount units and generated $5,431 in revenues between August 2018 and May 2019 linked to Facebook or Google advertisements.[236] These data suggest that Facebook advertising was a key driver of sales for Mr. Maxwell. Consistent with this, Mr. Maxwell testified that at least some of his Facebook ads were successful in generating sales.[237]

---

[234]   Exhibit 32. The Amazon sales data produced by Mr. Maxwell do not include information on sales in May 2019 or later.

[235]   Plaintiff Cain Maxwell's Fourth Amended Answers and Objections to Facebook's Fifth Set of Interrogatories, October 20, 2020, at 2-3. *See also*, Maxwell Deposition, at 236 ("Q. BY MS. DEELEY: Okay. In your supplemental response to Interrogatory 13, it says that, 'Plaintiff also states that MAXWELL 000824 and MAXWELL 000' -- excuse me -- '000825 show sales that were connected to customers who chose to use a discount code that Cain Maxwell included in his Facebook ads. These documents do not reflect sales from customers who saw Cain Maxwell's Facebook ads and purchased products from Cain Maxwell without putting the discount code.' Is that an accurate statement? A. As far as I know, yes. I don't know a way to track the sales other than connecting them to the -- to the discount code.").

[236]   Exhibit 33. While Mr. Maxwell's Amazon sales data only covers sales through April 2019, MAXWELL_00000824 covers sales through May 2019 and beyond. Because the produced data on Mr. Maxwell's Facebook ads ends in May 2019, Exhibit 33 summarizes data from MAXWELL_00000824 through May 2019.

[237]   Maxwell Deposition, at 241-242 ("Q. BY MS. DEELEY: And you're not saying that your Facebook ads had no value, are you? MR. GRABER: Objection. THE WITNESS: No. At least some of them worked. Q. BY MS. DEELEY: Okay. They were generating clicks, and clicks were leading to sales; right? MR. GRABER: Objection. Objection to form. THE WITNESS: They were generating some clicks, and some clicks would lead to sales, yes.").

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

143. Mr. Maxwell testified that he purchased the magnets from the supplier for approximately $3 per magnet.[238] I have not seen any information on Mr. Maxwell's other costs. As shown in Exhibit 33, the data produced by Mr. Maxwell suggest that sales linked with Facebook and Google advertisements generated an average of $15.00 in revenue per unit, and approximately $12.00 in gross profit per unit after deducting unit costs. Mr. Maxwell spent approximately $379 on Facebook ads over the period from September 2018 to May 2019 and $147 on Google ads, for a total of $526.[239] While Mr. Maxwell did not produce sufficient data to calculate his returns solely attributable to Facebook advertising, the available data suggest the returns were high. Specifically, as shown in Exhibit 33, the combined return on ad spend for Mr. Maxwell's Facebook and Google ads was approximately 10.33, and the combined return on investment (calculated using Mr. Maxwell's gross profits) was approximately 726 percent.

144. While the data produced by Mr. Maxwell indicate that substantially all of his sales were linked to Facebook and Google advertising and Mr. Maxwell testified to the validity of this data, I have also conservatively considered other available information on Mr. Maxwell's overall sales and sales that appear to be linked to advertising activity on Amazon. Data on Mr. Maxwell's Amazon advertising performance suggest that approximately $1,364 in net sales are linked to his Amazon advertising activity.[240] Conservatively deducting these sales from total net sales of $3,869 implied by Mr. Maxwell's Amazon sales data suggests that Facebook and Google advertisements accounted for approximately $2,506 in net sales, or roughly 65 percent of Mr. Maxwell's overall sales.[241] As shown in Exhibit 33, this suggests that the combined return on ad spend for Mr. Maxwell's Facebook and Google ads was approximately 4.77, and the combined return on investment was approximately 251 percent.

---

[238]   Maxwell Deposition, at 64-65 ("Q. What was the supplier price of the magnet to you -- to Max Martialis? […] THE WITNESS: I don't remember exactly. It was somewhere between 2 and $4.").
[239]   Exhibit 33.
[240]   Exhibit 34.
[241]   Exhibits 32 and 34. Calculated as $2,506 ÷ $3,869 = 64.8 percent.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

145. The fact that Mr. Maxwell spent more than 2.5 times more on Facebook ads than he did on Google ads suggests that he believed that Facebook ads generated higher returns and were more valuable than Google ads.[242] Further, Mr. Maxwell's Facebook ads had a lower cost per click and a higher click-through rate than his Google and Amazon ads.[243]

146. Based on Mr. Maxwell's spending on Facebook advertising and overall returns on Facebook and Google ads combined, Mr. Maxwell's return on investment on Facebook advertising was almost certainly positive. Specifically, Mr. Maxwell's return on investment on Facebook advertising was positive as long as at least 32 of the 362 units attributable to Facebook and/or Google advertising based on data identified specifically by Mr. Maxwell, or 45 of the 220 units attributable to Facebook and/or Google advertising after excluding sales associated with Amazon advertising, were actually associated with Facebook advertising. In other words, as long as Mr. Maxwell's Facebook ads, which accounted for 72 percent of the total amount spent on Facebook and Google ads, generated just 9 to 21 percent of the total sales attributable to Facebook and/or Google ads, Mr. Maxwell generated more in gross profits from his Facebook ads than he spent to run them.[244] None of Plaintiffs' experts have shown any evidence that the cost of Mr. Maxwell's Facebook ads exceeded the value Mr. Maxwell received.

147. Mr. Maxwell's approach to tracking sales generated by his Facebook ads and return on investment is also somewhat unusual given the availability of more robust tracking technologies, such as the Facebook Pixel, which allow for more accurate assessment of return on ad spend and return on investment. According to an internal Facebook document, as of June 2017 approximately ███████ of all Facebook advertisers used the Facebook Pixel.[245] By contrast, Mr. Maxwell's unusual approach of using a discount code in his Facebook and

---

[242]   Exhibit 33. Calculated as $379 ÷ $147 = 2.58.
[243]   Exhibit 35.
[244]   Exhibit 33.
[245]   "Torso Advertisers Cheat Sheet," *Facebook*, FB-SINGER-00426529-542, at 529.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Google ads to track conversions appears to stem from his reliance on an online training course from Amazing.com that claims to help entrepreneurs profitably exploit niches in the Amazon marketplace.[246]

### C.   The McFarlane Report Is Based On An Inappropriate But-For World in Which Facebook Does Not Provide Potential Reach Estimates

148.  While the McFarlane Report purports to measure damages due Plaintiffs to Facebook "a Potential Reach metric that is not calculated based on unique people,"[247] the damages analysis in the McFarlane Report is instead premised on a but-for world in which Facebook does not provide any Potential Reach estimates. This premise is inappropriate and unrealistic, and leads to inflated estimates of damages associated with the alleged misrepresentations. It also does not measure what the McFarlane Report suggests it measures—that is, the economic damages due Plaintiffs as a result of Facebook providing its advertising customers a Potential Reach estimate that is not calculated based on unique people.

149.  As an initial matter, the premise that Facebook would have removed Potential Reach estimates in the but-for world does not align with Plaintiffs' theory of harm, which is that advertisers were damaged by inflated or otherwise misrepresented Potential Reach estimates. The analysis in the McFarlane Report fails to consider a but-for world where Potential Reach estimates are presented without the alleged misrepresentations, and therefore fails to provide insight into Plaintiffs' theory of harm.

150.  The premise that Facebook would remove Potential Reach estimates in the but-for world causes the McFarlane Report to overstate damages associated with the alleged inflation. Even according to Plaintiffs' own experts, removing the alleged inflation in Potential Reach estimates would have a substantially smaller impact on advertisers' budgets and Facebook ad

---

[246]   "Amazing Selling Machine," *Amazing.com*, available at: https://www.amazingsellingmachine.com/ (accessed on February 5, 2021); "Amazing Selling Machine Modules," *Amazing Selling Machine*, 2018, AMAZING.COM_000015-135, at 018-019.

[247]   McFarlane Report, at 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

prices than removing Potential Reach estimates altogether. For example, despite numerous flaws that also lead to overstated measures of damages, the Levy Report finds a price premium of 3.4 percent associated with the alleged inflation in Potential Reach estimates, which is less than 40 percent of the 8.9 percent price premium claimed in the McFarlane Report.[248]

151. Moreover, the McFarlane Report is incorrect in claiming that considering a but-for world without Potential Reach estimates provides a "proper measure of damages given the Plaintiffs' assertion that the Potential Reach metric itself (regardless of the specific number) is a misrepresentation…because it refers to people."[249] It is not the case that the effect of removing Potential Reach estimates is the same or similar to the effect of describing Potential Reach as based on "accounts" as opposed to "people." In fact, the results of the Allenby Conjoint Study suggest that advertisers are largely indifferent to a Potential Reach number described in terms of people or accounts. The Allenby Conjoint Study measures the effect of "Audience Units," or whether the Potential Reach estimate is described in terms of people or accounts, on budget allocations. As shown in Table 3 of the Allenby Report, the estimated effect of describing Audience Units in terms of people relative to accounts is negative but not statistically significant.[250] In other words, the results of the Allenby Conjoint Study contradict the McFarlane Report's assumption that a Potential Reach estimate based on accounts is worth significantly less to advertisers.

### D. The Levy Report Incorrectly Concludes That Facebook Faces No Close Competition

152. In addition to the fundamental flaws in Plaintiffs' overarching theory of harm, Plaintiffs' experts also err in concluding that Facebook faces no close competition. This opinion is

---

[248]   Levy Report, at 27.
[249]   McFarlane Report, at 4.
[250]   Allenby Report, at 19.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

relevant to the Allenby Report's rejection of the choice-based analysis of the conjoint survey results, which showed no discernible effect of changes in the audience size proxies for Potential Reach on respondents' budgets.[251]

### 1. The Levy Report Fails to Account for Marketplace Dynamics that Shape Outcomes

153. According to the Levy Report, an analysis of the price response to a change in a firm's product must consider the effect on demand for the product as well as the supply response, or "how the firm reacts to the change in demand accounting for the competitive responses by its rivals."[252] The Levy Report concludes that "none of Facebook's closest rivals controls a platform that provides a close substitute for the Facebook platform,"[253] and that there are no "clear, strong competitor[s]" for Facebook advertising.[254] This conclusion ignores the underlying economics of digital advertising and how digitization has led to increasingly intense competition among different ad venues for the same advertising dollars. By failing to account for the intense competition faced by Facebook, the Levy Report does not account for "supply-side factors that would affect how advertising rates were determined in the market equilibrium" and overstates the equilibrium price effects associated with Facebook's alleged misrepresentations.[255]

154. The Levy Report claims that "different digital properties cater to different advertising objectives" at different points in the marketing funnel, and therefore it is "necessary to look at platforms that provide high-to-mid funnel opportunities" when evaluating Facebook's most direct competitors.[256] This assertion reflects an outdated pre-digital era understanding of the

---

[251] Allenby Report, at 20-21 ("…I find that average choice probability in the data is very small, indicating that a choice-based model is not appropriate for the data. […] The poor model fit indicates that Facebook and Google are not close substitutes and their demand is relatively independent of each other.").

[252] Levy Report, at 10.

[253] Levy Report, at 10-11.

[254] Levy Report, at 19.

[255] Levy Report, at 2.

[256] Levy Report, at 15, 19.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

marketing funnel and how it relates to advertising budgets. The marketing funnel represents the different stages of the consumer's path to purchase, and can be broadly broken up into three stages: awareness, consideration, and purchase.[257] In this pre-digital past, the marketing funnel was used primarily as a conceptual tool for advertiser to organize budgets. The difficulty of measuring ad effectiveness limited the ability of advertisers to fluidly shift money between ad venues because they did not know enough about the contribution of each type of ad venue to overall return on investment and/or return on ad spend.[258]

155. However, in the digital era, rather than using the funnel for organizing advertising budgets, advertisers can now accurately measure the effectiveness of ads placed at each stage of the funnel and measure the performance of ads along the entire funnel, or the "full funnel."[259] What matters to advertisers in the digital era is the return on investment and/or return on ad spend that they receive for that ad placement—that is, the amount of profits or revenues the ad led to, given how much the ad cost. The digital environment makes it easier for advertisers to identify which ad campaign delivers the best return on their ad spending in terms of delivering profitable conversions, and allocate their ad dollars accordingly across the entire funnel.[260]

---

[257] Early writing by marketing practitioners suggested that the way that advertisers might engage with consumers at each of these stages spanned ads designed to gain the consumer's Attention/Awareness (A), Interest (I), Desire (D), and Action (A). As a framework, AIDA is often ascribed to St Elmo Lewis in the late 19th century. Minnium, Peter, "Advertising Engagement: Past, Present and Future," *Marketing Land*, October 1, 2014, available at: https://marketingland.com/advertising-engagement-past-present-future-101087 (accessed on February 18, 2021).

[258] Goldfarb, Avi, and Catherine Tucker, "Online Advertising," *Advances in Computers*, Vol. 81, Elsevier (2011): pp. 289-315.

[259] Tucker, Catherine E., "The Implications of Improved Attribution and Measurability for Antitrust and Privacy in Online Advertising Markets," *George Mason Law Review*, Vol. 20, No. 4 (2013): pp. 1025-1054.

[260] Gesenhues, Amy, "Direct-To-Consumer Advertisers Are Shifting Ad Dollars Away From Facebook," *Marketing Land*, June 11, 2018, available at: https://marketingland.com/direct-to-consumer-advertisers-are-shifting-ad-dollars-away-from-facebook-241986 (accessed on February 18, 2021). As highlighted in my research in 2013, this is fundamental to understanding the constantly evolving nature and convergence of digital media channels. Tucker, Catherine E., "The Implications of Improved Attribution and Measurability for Antitrust and Privacy in Online Advertising Markets," *George Mason Law Review*, Vol. 20, No. 4 (2013): pp. 1025-1054.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

156. The analysis in the Levy Report analysis fails to understand how this increased measurability in the digital era has broadened the scope of competition and enabled a larger variety of venues to compete along the entire marketing funnel. The Levy Report claims that "[s]earch engines like Google…are often the best way for an advertiser to target those in the bottom of the funnel" whereas "[s]ocial media advertising…are much further from a consumer with a purchase decision in mind," and concludes that "search advertising and social media advertising are not substitutable for a particular campaign" with a given objective.[261] Historically, in the 2000s, performance-based advertising was mostly associated with paid search ads or price comparison shopping website ads that tracked clicks, because it was expected that it was more likely that a click from a paid search ad would lead to a purchase.[262] This relationship has changed as advertisers no longer need to rely exclusively on clicks as a proxy for whether someone will convert. Instead, they can now measure conversions directly. This ability has expanded the types of ad venues in which advertisers can engage in performance-based advertising, beyond ad venues where a customer's intent in browsing a website, or in entering a search term, is clear and where that customer is evidently ready for conversion.

157. Contrary to the Levy Report's claims that Facebook advertising is commonly used for "top-of-the-funnel" advertising,[263] many advertisers use Facebook for performance advertising. By May 2019, approximately ███████ of Facebook ad revenues from U.S. advertisers were optimized for conversions.[264] The use of Facebook for performance advertising is also demonstrated by the Named Plaintiffs' advertising behavior, which further belies the Levy

---

[261] Levy Report, at 15-16. Similarly, the Allenby Report concludes that, based on the poor fit of his standard choice model, "Facebook and Google are not close substitutes and their demand is relatively independent of each other." Allenby Report, at 21.

[262] Dalessandro, Brian, Rod Hook, Claudia Perlich, and Foster Provost, "Evaluating and Optimizing Online Advertising: Forget the Click, but There Are Good Proxies," *Big Data*, Vol. 3, No. 2 (2015): pp. 90-102.

[263] Levy Report, at 16.

[264] Exhibit 4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Report's classification of Facebook as a top-of-the-funnel digital ad venue. As described in Section III.B, over 95 percent of DZ Reserve's ads had an objective of conversions and all of Mr. Maxwell's ads had an objective of link clicks.[265] Indeed, echoing Named Plaintiff Cain Maxwell's use of Amazon ads, Facebook faces increasing competition from Amazon for performance advertising, as illustrated by the growth of Amazon's advertising business shown in Figure 2 of the Levy Report.[266]

### 2. The Levy Report's "Price Analysis" of Digital Advertising Venues is Flawed and Does Not Support Its Conclusions About Lack of Competition

158. In an effort to "ascertain the degree of potential price competition between various digital ad platforms," the Levy Report compares quarterly CPM figures for Facebook and Google, YouTube, Bing, LinkedIn, and Twitter using data from AdStage's Paid Media Benchmark Reports from 2017 to 2019.[267] According to the Levy Report, "[i]f different digital platforms were close substitutes for each other, I would expect the CPM figures to move together because if the price differential between two substitutable platforms increased, the platform that was relatively less expensive would take business away from the more expensive platform, all else equal."[268] The Levy Report concludes that the weak correlation between quarterly CPMs for these venues is "consistent with a view that Facebook's News Feed and Instagram News Feed and Stories are not direct substitutes for digital ads on other platforms."[269]

159. This analysis suffers from a number of flaws. First, the analysis focuses on CPM and ignores other metrics such as cost per conversion and return on investment that are more relevant to advertiser decision-making. While CPM was frequently used as a way to price advertising for traditional media in the pre-digital era, this was largely because data were not available to tie ads to individual purchases. In the digital age, however, the industry has evolved to render this

---

[265]   Exhibits 16 and 26.
[266]   Levy Report, at 8.
[267]   Levy Report, at 19.
[268]   Levy Report, at 19-20.
[269]   Levy Report, at 22.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

form of pricing essentially obsolete in capturing the effective price of an ad, as the advertiser can measure the actual effective price of obtaining a desired action. Ultimately, more relevant ad price metrics such as cost per conversion can move in opposite directions as CPM, rendering the pricing analysis in the Levy Report uninformative.[270]

160. Second, the Levy Report considers aggregate quarterly measures of CPM and fails to control for heterogeneity in advertising CPM within a given venue. For example, on Facebook, there is substantial variation in CPM related to several factors, including the audience targeted, the relevance or quality of the ad, the ad objective used, the ad format and the ad placement. Given these sources of variation, shifts in aggregate average prices over time may reflect changes in the relative use of different types of ads and targeting behavior on a given venue rather than changes in ad prices themselves. These potential composition effects render the pricing analysis presented in the Levy Report an unreliable measure of the correlation between ad prices across different ad venues.

161. Third, the nature of the AdStage data underlying the correlation analysis further renders the results unreliable. AdStage notes that the data used in its benchmarks "represent aggregated data from the accounts linked to our reporting platform." This self-selection of advertisers into the AdStage platform makes the data difficult to interpret, particularly if advertisers who tend to use AdStage are systematically different from other advertisers. Indeed, AdStage itself warns that its "numbers don't necessarily illustrate the larger industry trends."[271]

---

[270] To illustrate this point, suppose that for a toy seller, the notional CPM increased from $10 to $14 over 5 years, but the number of parents who bought toys after seeing an ad increased from 20 to 40 per 1,000 impressions. This would imply that the cost per conversion has decreased from $0.50 ($10 ÷ 20 conversions) to $0.35 ($14 ÷ 40 conversions), even as CPM increased.

[271] "AdStage Paid Media Q4 2018 Benchmark Report," *AdStage*, available at: https://www.adstage.io/resources/q4-2018-ppc-benchmark-report/ (accessed on February 18, 2021), at 59.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## VI. The Levy and McFarlane Reports Cannot Be Used to Calculate Individual Damages, Which Would Require Individualized Inquiry

162. This section describes some sources of heterogeneity among Facebook advertisers that would influence whether, how, and to what extent advertisers might consider Potential Reach, if at all. The Allenby Conjoint Study and the Roughgarden Auction Simulations largely ignore these essential differences across advertisers, undermining the validity of their results and, ultimately, the results of the Levy and McFarlane Reports. Even with simplifying assumptions that dismiss these differences, the results of the Allenby Conjoint Study and Roughgarden Auction Simulations suggest a range of outcomes across individuals, indicating that the same price premium cannot be applied to every individual as contemplated by the Levy and McFarlane Reports. Failure to adequately account for essential differences across advertisers exacerbates Plaintiffs' experts' inability to calculate damages on an individual basis.

### A. There Are Many Different Types of Advertisers on Facebook Who Vary in Terms of Whether, How, and to What Extent They May Be Influenced by Potential Reach

163. There are many different advertisers on Facebook who differ in terms of the size and sophistication of their marketing operations, the industry they operate in, their business model, and the goal of their Facebook advertising. These differences affect whether, how, and to what extent advertisers' decisions may be influenced by Potential Reach. Even if any advertisers considered Potential Reach in their budget-setting process, there are a range of individualized factors that affect the impact of the alleged inflation on their budgeting and bidding behavior.

164. Advertisers of different sizes tend to use Facebook advertising for different reasons, which influences whether and to what extent they may consider Potential Reach. For example, as shown in Exhibit 5, small and medium businesses are more likely to choose campaign objectives related to performance adverting than larger advertisers. As of May 2019, approximately ▮▮▮▮▮ of ads placed by U.S. small and medium businesses were optimized for conversions, compared to approximately ▮▮▮▮▮ of ads placed by larger U.S.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

advertisers. While only a small share of ad revenues associated with U.S. advertisers of any size were optimized for reach, only ▮▮▮▮▮ of ad revenues associated with small and medium U.S. businesses were optimized for reach, compared to roughly ▮▮▮▮▮ of ad revenues associated with larger U.S. advertisers.[272]

165. Even if any advertisers considered Potential Reach in their budget-setting process, the effect of the alleged inflation on their budgeting and bidding behavior and/or on the prices paid for Facebook ads would vary depending on a range of individualized factors such as:

- how Potential Reach would be used in the budget-setting process and what other information, such as Estimated Daily Reach, would be used along with it;

- the advertiser's selected objective and optimization criteria for their Facebook ads;

- whether and how the advertiser monitored actual campaign performance, and the extent to which that information was used to make mid-flight adjustments;

- whether the advertiser was a repeat purchaser, and to what extent the advertiser relied on past experience with similar campaigns, which would tend to reduce the weight given to Facebook estimates such as Potential Reach in the decision-making process (and would further reduce the weight given to such estimates over time as the advertiser gained more experience);

- the context in which the ads were placed and what other information was available to the advertiser, including, for example, whether the advertiser used Facebook's Ads Manager self-service interface or received support from a digital ad agency or Facebook's sales team;

- whether the advertiser received any inflated Potential Reach estimates, and the amount by which such estimates were inflated;

---

[272]   Exhibit 5. *See also*, Exhibits 3-4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- whether the magnitude of any alleged inflation was substantial enough to cause the advertiser to make changes to their budgets or bids in light of the advertiser's broader strategy;

- whether the advertiser had budget and bid constraints that capped the amount to which they could or would increase their Facebook ad budgets;

- whether other advertisers in the auctions that the advertiser participated in also received inflated Potential Reach estimates, and whether those advertisers' budgets and bids were affected.

166. Any change in budgets also would vary across advertisers because advertisers receive different benefits from Facebook advertising. An advertiser's return on Facebook advertising varies based on many factors specific to that advertiser, including their business model, the product or service they are advertising, the quality of their ad creatives for the target audience, and their targeting strategy, among other things. If an advertiser (and/or competing advertisers) changes their budgeting or bidding behavior in response to changes in Potential Reach, this could also affect which auctions the advertiser wins, which could also change the number of impressions, clicks, and conversions generated and, ultimately, the benefits from Facebook advertising. Assessing how an advertiser would be affected by the alleged inflation in Potential Reach requires consideration of both changes in budgeting or spending behavior as well as changes in the benefits received, which requires individualized inquiry.

### B.    Plaintiffs' Experts Ignore Essential Differences Among Facebook Advertisers and Their Ad Placements

167. None of Plaintiffs' experts have conducted the degree of individualized inquiry necessary to understand whether and to what extent advertisers' budgets were influenced by Potential Reach. Instead, the Levy and McFarlane Reports rely on overly simplified analyses presented in the Roughgarden Report and the Allenby Report that largely dismiss sources of heterogeneity among Facebook advertisers. The Allenby Conjoint Study assumes that all

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

advertisers make advertising decisions—and consider Potential Reach in those decisions—in the same way, and the Roughgarden Auction Simulations assume that all advertisers compete against each other for the same impressions in largely undifferentiated auctions. As a result, the results of these analyses mask the differential effect, if there is any effect at all, that any alleged inflation in Potential Reach estimates would have across different advertisers and ad campaigns.

### 1.   The Allenby Conjoint Survey Unrealistically Forces Respondents to Make Budget Allocation Decisions in The Same Way

168.   The Allenby Conjoint Study, which is relied upon by the Levy Report, ignores heterogeneity by forcing all respondents to make decisions in the same, unrealistic way (despite their differences) based on the same set of information shown on the choice screen. Respondents to the Allenby Conjoint Study were forced to rely on the few characteristics described on the choice screens, whereas in reality many advertisers would focus on important individualized information not provided in the survey, such as past experience with similar campaigns, real-time results from monitoring actual performance of a campaign, and A/B testing of different ad creatives, among other things. All of these individualized issues would affect if, and how, advertisers respond to changes in Potential Reach. For example, advertisers optimizing for conversions or clicks likely would pay less attention, if any, to reach-related metrics as compared to advertisers optimizing for reach. Similarly, advertisers with small budgets or short campaigns who would not aim to reach a large fraction of their target audience would focus on, if anything, Estimated Daily Reach instead of Potential Reach in setting budgets. As well, the Allenby Conjoint Study ignores the proprietary information that may be used by large, experienced advertisers and by advertisers who are aided by knowledgeable experts in managing their campaigns.

169.   By forcing all respondents to consider Potential Reach in the context of budgeting decisions, the Allenby Conjoint Study design also is inconsistent with documents relied upon in the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

McFarlane and Roughgarden reports that show that there are a variety of use cases for Potential Reach, including to refine targeting criteria rather than to set budgets.[273]

### 2. The Roughgarden Auction Simulations Are Overly Simplified and Ignore Heterogeneity

170. The Roughgarden Auction Simulations ignore heterogeneity by simulating a world in which all advertisers compete against each other in largely undifferentiated auctions. The Roughgarden Auction Simulations assume that all advertisers are identical except for their daily budgets. For example, the Roughgarden Auction Simulations assume that advertisers are equally likely to participate in any simulated auction and randomly select an average of 15 advertisers to participate in every simulated auction regardless of their targeting criteria.

171. These simplifying assumptions ignore the wide range of advertisers on Facebook, who vary in terms of what they are advertising, how engaging or relevant their advertising is, what actions they are hoping to drive with their advertising, what goal they are trying to achieve, which users they are targeting and the level of competition to show ads to those users, and whether they set bid constraints in addition to budgets. The Roughgarden Auction Simulations also do not account for other features of Facebook's auction, such as quality scores and estimated action rates, thereby ignoring differences in ad quality across advertisers.

172. The implication of these simplified design choices is that each advertiser in the Roughgarden Auction Simulations ends up competing against all other advertisers who are assumed to have identical ad quality, leading (unsurprisingly, given its structure) to a tight range of average CPMs across advertisers that is inconsistent with real-world data. Exhibit 12 shows a wide range of average CPMs across U.S. advertisers in 2014 and 2019 during the Data Discovery Period. For example, in 2019, average CPMs across advertisers varied from ████████████

---

[273] *See* "Reach Estimation - Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251, at 230.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

█████████████████████████████████████████ In comparison, the Roughgarden Auction Simulations generate average CPMs by advertiser ranging from less than $3.85 to more than $9.29 overall, with an interquartile range of $4.83 to $6.36.[274] In other words, the range of CPMs was over ████ as wide and the interquartile range was more than ████ as wide based on actual data for 2019 as compared to the Roughgarden Auction Simulations.[275]

173. The design of the Roughgarden Auction Simulations ignores how heterogeneity would lead to substantially greater variation in outcomes. For example, assuming first time, naïve, advertisers are most likely to base advertising budgets on Potential Reach estimates and are disproportionately choosing cheaper, right-hand column placements on Facebook, then their bidding strategies would not tend to have an effect on advertisers targeting video placements. By ignoring heterogeneity, the Roughgarden Auction Simulations fail to capture the fundamental role of the Facebook ad auction process as a complex allocation exercise to match different advertisers with the right Facebook users who will find their ads useful and appealing, which can lead to a wide range of outcomes for different advertisers.

174. The damages calculations in the McFarlane Report flow directly from an assumption in the Roughgarden Auction Simulations that everyone who is affected by Potential Reach is affected in exactly the same way. That is, the Roughgarden Auction Simulations assume that 78 percent of advertisers would all reduce their budget by 10.9 percent in the absence of Potential Reach estimates.[276] There is no evidence from the documents relied upon by the McFarlane and Roughgarden reports, or otherwise that support a conclusion that advertisers would be commonly affected by the removal of Potential Reach estimates. Nor do any of Plaintiffs' experts test this assumption. The document relied upon by the McFarlane and Roughgarden

---

[274]   Exhibit 12.
[275]   Calculated as ($46.07 − $0.39) ÷ ($9.29 − $3.85) = 8.40, and ($11.47 − $4.71) ÷ ($6.36 − $4.83) = 4.42.
[276]   Roughgarden Report, at 21.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

reports to derive the 78 percent figure shows that advertisers use Potential Reach in a variety of ways including to refine targeting criteria.[277]

175. As a result of these flawed and overly simplified assumptions, the Roughgarden Auction Simulations imply CPM effects that, in addition to being overstated, are more homogeneous across advertisers than would be the case in reality. The CPM effects implied by the Roughgarden Auction Simulations flow into the damages analyses in the Levy and McFarlane Reports, undermining their conclusions.

### C.   The Levy and McFarlane Reports Cannot be Used to Calculate Individual Damages

176. Even if a limited number of advertisers increased their budgets based on the alleged inflation, the Levy and McFarlane Reports do not provide a way of identifying who those advertisers are or by how much they were harmed, if at all. Plaintiffs' experts' failure to account for essential differences further compounds their inability to calculate damages on an individual basis.

177. The Levy and McFarlane Reports both claim that individual damages can be calculated for any advertiser in the class by applying the same price premium (3.4 percent in the Levy Report and 8.9 percent in the McFarlane Report) to the amount spent by that advertiser.[278] In both analyses, this price premium relies on the results of the Roughgarden Auction Simulations and represents the average CPM reduction across advertisers in a but-for world without the alleged misrepresentations. The average price premium across a population of individuals cannot be used to estimate individual damages for any given advertiser, even assuming that advertiser actually relied on Potential Reach for budgeting decisions. Because the Levy and McFarlane Reports do not provide a way to calculate the specific price premium, if any, applicable to a given individual based on that advertiser's ads and Potential Reach estimates, their analyses are incapable of calculating individual damages for members of the class.

---

[277]   "Reach Estimation - Summary of Research Insights," *Facebook*, April 24, 2018, FB-SINGER-00150228-251.
[278]   Levy Report, at 27; McFarlane Report, at 8.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

178. The Allenby Conjoint Study underlying the Levy Report suggests a distribution of budget changes in response to changes in Potential Reach that, when fed into the Roughgarden Auction Simulations, results in a distribution of changes in CPMs across advertisers. The Levy Report provides no way of identifying where any individual in the class would fall in these distributions (let alone whether that individual received an inflated Potential Reach estimate or increased their budget based on such estimate), which, according to the Levy Report, should determine their individual damages. Furthermore, the Roughgarden Auction Simulations suggest a distribution of changes in impressions across advertisers in the but-for world. The Levy Report cannot identify how a particular individual's impressions would change or the value of those impressions to that individual, and therefore cannot account for the changes in benefits received in the but-for world.

179. Similarly, the analyses underlying the McFarlane Report assumes a distribution in budget changes across advertisers, which the Roughgarden Auction Simulations translate to a distribution of changes in CPMs and changes in impressions. The McFarlane Report cannot identify whether any individual received an inflated Potential Reach estimate or increased their budget based on such estimate, or where any given individual would fall in these budget distributions, and therefore cannot calculate damages specific to that individual. Similar to the Levy Report, the McFarlane Report cannot identify how a particular individual's impressions would change or the value of those impressions to that individual, and therefore cannot account for the changes in benefits received in the but-for world.

180. Further, the Allenby Conjoint Study and Roughgarden Auction Simulations largely ignore heterogeneity of Facebook advertisers, which, if accounted for, would lead to a wider range of outcomes across advertisers and would only compound the difficulty of calculating individual damages. For example, neither the Allenby Conjoint Study nor the Roughgarden Auction Simulations (nor any other of Plaintiffs' experts) address the range of individualized issues that would influence whether and to what extent any given advertiser was affected by the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

alleged inflation in Potential Reach estimates, including the advertiser's particular budgeting strategy, the extent of the advertiser's past advertising performance, the magnitude of the alleged inflation, and the benefits received from Facebook advertising, among other things.

181. Indeed, the results of the Roughgarden Auction Simulations show that many advertisers would receive fewer impressions in the but-for world than in the as-is world as a result of reducing their budgets relatively more than other advertisers in the simulation.[279] This reduction in impressions (and clicks and conversions) would change the returns for those advertisers because the advertiser would also be getting fewer benefits from their Facebook advertising. Some advertisers may even be worse off in the but-for world if the value of the lost impressions outweighs the price effect predicted by the Roughgarden Auction Simulations, or if they would prefer to receive the additional ad delivery and benefits regardless of the price effect. Furthermore, if a subset of advertisers lowers budgets in response to changes in Potential Reach, other advertisers who do not consider Potential Reach in their budgeting decisions would experience an increase in performance of their ad campaigns. These advertisers may increase their budgets, mitigating any effect of the premised shift in price. By failing to account for this effect, the price premiums used in the Levy and McFarlane Reports overstate the difference between equilibrium prices in the actual and but-for worlds and overstate damages to the class.

## VII. Conclusion

182. This report summarizes the opinions I have formed to date, and the analyses and conclusions presented herein are based on the evidence available at this time. I may modify my opinions,

---

[279]  *See* Roughgarden Report, at backup files "Conjoint Model, Base Case.log" and "Non-Conjoint Model, Base Case.log." In each file, the budget, impressions, and spend are reported for each of the 50 simulated advertisers in the "as-is" world followed by the budget, impressions, and spend for each advertiser in the "but-for" world for each of the 20 trials of the simulation. Comparing as-is and but-for impressions for a given advertiser within a given trial suggests that some advertisers received fewer impressions in the but-for world than in the as-is world. For example, in "Conjoint Model, Base Case.log," advertiser ID 20 in Trial 1 received approximately 9,008 impressions in the as-is world and 7,938 impressions in the but-for world.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

if necessary, based on further review and analysis of information provided to me subsequent to the filing of this report.

183. In connection with my anticipated testimony at trial in this matter, I may use various demonstrative exhibits to support my testimony. To date, no such exhibits have been created.

Catherine Tucker, Ph.D.
March 3, 2021

92

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 1**

**SUMMARY OF FACEBOOK INTERFACES**
**ADS PLACED BY U.S. ADVERTISERS**
**ALL ADS DETAILS DATA**
**AUGUST 15, 2014 – MAY 16, 2019**



|  | Interface | Ad Revenue | |
|---|---|---|---|
|  |  | # | % |
| [1] | Ads Manager | | |
| [2] | API | | |
| [3] | Lightweight Interfaces | | |
| [4] | Other | | |
|  | Total | | |

Notes & Sources:

Summary of ad revenue (derived from lifetime_legal_revenue) by Facebook
  Interfaces. From FB-SINGER-00314652-704 and FB-SINGER-00426663.
  Excludes ads with missing, zero, or negative lifetime_legal_revenue.
  Sorted by highest Ad Revenue.

Interfaces derived from source_app_str and Facebook, Inc.'s Amended and
  Supplemental Response and Objections to Plaintiffs' Interrogatory Number 8,
  September 25, 2020, at pp. 7-9.

[4] Includes observations with source_app_str = ADS_CREATIVE_STUDIO,
  ADS_EVENTS_MANAGER, ADS_INTERFACE_TEST_APP,
  AD_BRANDLIFT_V2, AD_INTERNAL_SCRIPT, AD_SCRIPTS,
  AD_TEMPLATES, BUSINESS_ACCOUNTS, CUSTOM_CTA,
  DEVELOPER_INSIGHTS, FACEBOOK_FOR_ANDROID2,
  FACEBOOK_FOR_EVERY_PHONE, FACEBOOK_FOR_IPHONE,
  FACEBOOK_FOR_TV, GRAPH_SERVICES_SDK, INSTAGRAM,
  INTERN_ANDROID_CATALYST, INTERN_IOS_CATALYST,
  LIFT_STUDY_CREATION, MOBILE_ADS_MANAGER_FOR_IOS,
  Mobile Ads Manager for Android, PAGE_ADMIN_APP_FOR_IOS,
  PAGE_CONTENT_TAB, PRODUCTS, PUBX_PLATFORM, WWW,
  brand_lift, developer_mobile, uni, uni_mobile, and missing source_app_str.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 2**

**SUMMARY OF CAMPAIGN OBJECTIVES**
**ADS PLACED BY U.S. ADVERTISERS**
**ALL ADS DETAILS DATA**
**AUGUST 15, 2014 – MAY 16, 2019**

| | Ad Revenue | |
|---|---|---|
| Objective | # | % |
| [1] WEBSITE_CONVERSIONS | | |
| [2] LINK_CLICKS | | |
| [3] POST_ENGAGEMENT | | |
| [4] VIDEO_VIEWS | | |
| [5] MOBILE_APP_INSTALLS | | |
| [6] REACH | | |
| [7] APP_INSTALLS | | |
| [8] PRODUCT_CATALOG_SALES | | |
| [9] BRAND_AWARENESS | | |
| [10] LEAD_GENERATION | | |
| [11] PAGE_LIKES | | |
| [12] NONE | | |
| [13] STORE_VISITS | | |
| [14] EVENT_RESPONSES | | |
| [15] Other | | |
| Total | | |

Notes & Sources:

Summary of ad revenue (derived from lifetime_legal_revenue) by objective_str.
From FB-SINGER-00314652-704 and FB-SINGER-00426663. Excludes ads
with missing, zero, or negative lifetime_legal_revenue. Sorted by highest
Ad Revenue.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 3**

**SUMMARY OF AD OPTIMIZATION CRITERIA**
**ADS PLACED BY U.S. ADVERTISERS**
**ALL ADS DETAILS DATA**
**AUGUST 15, 2014 – MAY 16, 2019**

| Ad Optimization Criteria | Ad Revenue | |
|---|---|---|
| | # | % |
| [1] Website Conversion | | |
| [2] Website Click | | |
| [3] Post Engagement | | |
| [4] Video Views | | |
| [5] Mobile App Install | | |
| [6] Reach | | |
| [7] Impressions | | |
| [8] App Event Optimization | | |
| [9] LeadGen | | |
| [10] Landing Page View | | |
| [11] Ad Recall Lift | | |
| [12] Undefined | | |
| [13] Attention | | |
| [14] RSVP | | |
| [15] Onsite Conversion | | |
| [16] Canvas App Install | | |
| [17] Offline Conversion | | |
| [18] Canvas App Engagement | | |
| [19] Page Likes | | |
| [20] Research Poll Response | | |
| [21] Page Follow | | |
| [22] Store Visit | | |
| [23] ROAS | | |
| Total | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## EXHIBIT 3

## SUMMARY OF AD OPTIMIZATION CRITERIA
## ADS PLACED BY U.S. ADVERTISERS
## ALL ADS DETAILS DATA
## AUGUST 15, 2014 – MAY 16, 2019

Notes & Sources:

Summary of ad revenue (derived from lifetime_legal_revenue) by delivery_class. From FB-SINGER-00314652-704 and FB-SINGER-00426663. Excludes ads with missing, zero, or negative lifetime_legal_revenue. Sorted by highest Ad Revenue.

[1] Includes "Website Conversion" and "Website Conversion - DPA."

[4] Includes "Video View - 15s," "Video View - 3s," and "Video Views."

[7] Includes "Impressions" and "Impressions - Brand Awareness."

[8] Includes "AEO - Existing" and "AEO - New."

[15] Includes "Onsite Conversion - Jobs," "Onsite Conversion - Other," "Onsite Conversion - Purchase," and "Onsite Conversion - Replies."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 4**

**AD REVENUES BY AD OPTIMIZATION CRITERIA**
**ADS PLACED BY U.S. ADVERTISERS**
**ALL ADS DETAILS DATA**
**AUGUST 15, 2014 – MAY 16, 2019**



Notes & Sources:
From FB-SINGER-00314652-704; FB-SINGER-00426663. Ad revenue derived from lifetime_legal_revenue. Excludes ads with missing, zero, or negative
  lifetime_legal_revenue. Date derived from ad_create_date.
Includes seven ad optimization criteria with the highest Ad Revenue. From Exhibit 3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 5**

**AD REVENUES BY AD OPTIMIZATION CRITERIA AND ADVERTISER TYPE**
**ADS PLACED BY U.S. ADVERTISERS**
**ALL ADS DETAILS DATA**
**AUGUST 15, 2014 – MAY 16, 2019**



Notes & Sources:
From FB-SINGER-00314652-704; FB-SINGER-00426663. Date derived from ad_create_date. Ad revenue derived from lifetime_legal_revenue. Excludes ads
    with missing, zero, or negative lifetime_legal_revenue.
"Small and Medium Business" denotes advertisers whose accounts are not managed by a Facebook sales representative (*i.e.* is_managed_account is
    "NO"), and who does not have an insertion order number (*i.e.* io_number is missing). "Other" includes all other advertisers who do not meet these criteria.
Includes seven ad optimization criteria with the highest Ad Revenue. From Exhibit 3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 6**

**SUMMARY OF AD REVENUE BY SELECT CRITERIA**
**ADS PLACED BY U.S. ADVERTISERS**
**ALL ADS DETAILS DATA**
**AUGUST 15, 2014 – MAY 16, 2019**

| | Ad Revenue | |
|---|---|---|
| Criteria | # | % |
| [1] Ads Purchased via Reach and Frequency Buying | | |
| [2] Ads Associated with Digital Ad Agencies | | |
| [3] Ads Associated with Insertion Orders | | |
| [4] Ads Associated with Custom Audiences | | |
| [5] Ads Associated with Repeat Advertisers | | |
| [6] Ads Associated with Accounts Managed by Facebook Sales Team | | |
| | | |
| [7] All Ads Placed During Discovery Period | | |

Notes & Sources:

From FB-SINGER-00314652-704; FB-SINGER-00426663. Excludes ads with missing, zero, or negative lifetime_legal_revenue.

[1] Includes ads where rf_campaign_ind = 1.

[2] Ads purchased through Facebook Marketing Partners identified from FB-SINGER-00426481.

[3] Ads associated with insertion orders identified from FB-SINGER-00331438.

[4] Ads associated with custom audiences identified from FB-SINGER-00426661-662. Excludes ads where has_lookalike_inclusion = 1 or has_lookalike_exclusion = 1.

[5] Includes ads associated with advertisers who placed more than one ad set (campaign_id) with positive revenues.

[6] Includes ads with is_managed_account = "YES."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 7**

**RATIO OF TOTAL AD SET IMPRESSIONS TO AUDIENCE SIZE**
**ADS PLACED BY U.S. ADVERTISERS**
**ALL ADS DETAILS DATA**
**AUGUST 15, 2014 – MAY 16, 2019**

| Quantiles | Ratio of Impressions to Audience Size |
|---|---|
| 5th Percentile | 0.001% |
| 10th Percentile | 0.002% |
| 15th Percentile | 0.007% |
| 20th Percentile | 0.015% |
| 25th Percentile | 0.030% |
| 30th Percentile | 0.055% |
| 40th Percentile | 0.161% |
| 50th Percentile | 0.428% |
| 60th Percentile | 1.1% |
| 70th Percentile | 2.8% |
| 75th Percentile | 4.6% |
| 80th Percentile | 8.1% |
| 85th Percentile | 15.6% |
| 90th Percentile | 36.0% |
| 95th Percentile | 119.4% |

| Number of Ad Sets | ████████ |
|---|---|

Notes & Sources:
From FB-SINGER-00314652-704; FB-SINGER-00426663. Excludes observations with missing campaign_ids
  or missing, zero, or negative lifetime_legal_impressions, lifetime_legal_revenue, or audience_size.
For each ad set (campaign_id), the ratio is calculated as the sum of impressions (lifetime_legal_impressions)
  for ad_ids in the ad set divided by the median audience size (audience_size) across ad_ids in the ad set.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**EXHIBIT 8**

**DISTRIBUTION OF POTENTIAL REACH AND AUDIENCE SIZE ESTIMATES**
**ADS INTERFACES PREDICTED OUTCOMES AND ALL ADS DETAILS DATA**

| | Potential Reach Estimates in Ads Manager Ads Interfaces Predicted Outcomes (Jan. 18 – Apr. 5, 2019) | | Estimated Audience Size All Ads Details Data (U.S. Advertisers) (Aug. 15, 2014 – May 16, 2019) | | | |
| Range of Potential Reach / | Number of Ad Sets | | Number of Ad Sets | | Ad Revenue | |
| Audience Size | # | % | # | % | # | % |
| [A] | [B] | [C] | [D] | [E] | [F] | [G] |
| Less than or equal to 1,000 | | 5.3% | | 3.7% | | |
| 1,001 – 100,000 | | 9.5% | | 24.1% | | |
| 100,001 – 500,000 | | 13.0% | | 18.5% | | |
| 500,001 – 1,000,000 | | 8.5% | | 8.1% | | |
| 1,000,001 – 5,000,000 | | 24.1% | | 20.5% | | |
| 5,000,001 – 10,000,000 | | 11.0% | | 5.4% | | |
| 10,000,001 – 50,000,000 | | 18.1% | | 9.8% | | |
| 50,000,001 – 100,000,000 | | 3.9% | | 3.9% | | |
| 100,000,001 – 150,000,000 | | 2.9% | | 1.9% | | |
| 150,000,001 – 200,000,000 | | 1.1% | | 2.0% | | |
| 200,000,001 – 225,000,000 | | 0.5% | | 0.9% | | |
| 225,000,001 – 250,000,000 | | 0.7% | | 0.3% | | |
| 250,000,001 – 300,000,000 | | 0.3% | | 0.2% | | |
| 300,000,001 – 1,000,000,000 | | 0.8% | | 0.5% | | |
| Greater than 1,000,000,000 | | 0.3% | | 0.1% | | |
| Total | | 100.0% | | 100.0% | | |

Notes & Sources:

[B]-[C] From FB-SINGER-00256368-372. Excludes observations with missing campaign_ids or missing, zero, or negative monthly_active_users.
For ad sets with multiple values of Potential Reach (derived from monthly_active_users), a median is taken from the values available for each ad set.

[D]-[G] From FB-SINGER-00314652-704; FB-SINGER-00426663. Excludes observations with missing campaign_ids or missing, zero, or negative lifetime_legal_revenue or audience_size. For ad sets with multiple values of Audience Size (derived from audience_size), a median is taken from the values available for each ad set.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 9**

**DAILY BUDGET AND ESTIMATED AUDIENCE SIZE CORRELATION COEFFICIENTS BY ADVERTISER
U.S. ADVERTISERS WITH 10+ AD SETS
ALL ADS DETAILS DATA AND BUDGET DATA**



Notes & Sources:
Significant observations identified as correlation coefficients with p-values < 0.05 and appear as dark blue on the graph. 241,729 advertisers (11.0%) of the 2,204,619 advertisers included in this analysis have a positive and significant correlation coefficient.

There are a total of 2,209,572 advertisers with 10 or more ad sets in merged dataset (see below). Chart excludes 4,953 observations with a missing correlation coefficient.

From FB-SINGER-00314652-704 and FB-SINGER-00426663 ("AAD Data") and FB-SINGER-00426664-855 ("Budget Data").
  Budget Data was cleaned to exclude ad sets (campaign_ids) with multiple campaign_limit_reset_period values, with paceable_limit_level = "CAMPAIGN_GROUP," or with missing or zero advertiser_input_campaign_limit_. For campaign_ids with multiple observations, I selected the observation with the latest date (ds). AAD Data was cleaned to exclude observations with missing, zero, or negative audience_size or

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 9

## DAILY BUDGET AND ESTIMATED AUDIENCE SIZE CORRELATION COEFFICIENTS BY ADVERTISER
## U.S. ADVERTISERS WITH 10+ AD SETS
## ALL ADS DETAILS DATA AND BUDGET DATA

Notes & Sources (continued):

lifetime_legal_revenue. AAD Data was aggregated by campaign_id by taking the median audience_size across all ad_ids associated with a campaign_id. Cleaned Budget Data and AAD Data were merged at the ad set level, matching by campaign_id, campaign_group_id, and anon_account_id. After merging, I calculated the Daily Budget for each campaign_id. For campaign_ids with campaign_limit_reset_period = 24 or 168, I used advertiser_input_campaign_limit_ as Daily Budget. For campaign_ids with campaign_limit_reset_period = 0, I divided advertiser_input_campaign_limit_ by duration (duration was calculated for each campaign_id as campaign_end_date - campaign_start_date). I dropped observations with campaign_limit_reset_period = 0 (or missing) and a negative duration (due to nonsensical campaign_end_date). Once I obtained Daily Budget for each campaign_id, I identified advertisers using anon_account_id and restricted the data to advertisers with 10 or more ad sets with positive revenue. I then calculated correlation coefficients between ad set level audience_size and Daily Budget.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 10**

**TOTAL REVENUE AND ESTIMATED AUDIENCE SIZE CORRELATION COEFFICIENTS BY ADVERTISER
U.S. ADVERTISERS WITH 10+ AD SETS
ALL ADS DETAILS DATA**



Notes & Sources:

Significant observations identified as correlation coefficients with p-values < 0.05 and appear as dark blue on the graph. 357,655 advertisers (13.2%) of the 2,705,876 advertisers used in this analysis have a positive and significant correlation coefficient.

There are a total of 2,713,145 advertisers with 10 or more ad sets. Chart excludes 7,269 observations with missing correlation coefficients.

From FB-SINGER-00314652-704 and FB-SINGER-00426663. Excludes ad sets with missing, zero, or negative audience_size or lifetime_legal_revenue. Data was aggregated by campaign_id by taking the median audience_size and summing lifetime_legal_revenue across all ad_ids associated with a campaign_id. I then calculated advertiser level correlation coefficients between ad set level audience_size and lifetime_legal_revenue. Advertisers identified using anon_account_id.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**EXHIBIT 11**

**DAILY BUDGET AND ESTIMATED AUDIENCE SIZE CORRELATION COEFFICIENTS BY ADVERTISER**
**U.S. ADVERTISERS WITH 10+ AD SETS**
**ALL ADS DETAILS DATA AND LEVY BUDGET DATA**



Notes & Sources:
Significant observations identified as correlation coefficients with p-values < 0.05 and appear as dark blue on the graph. 13,683 advertisers
 (11.6%) of the 117,991 advertisers used in this analysis have a positive and significant correlation coefficient.
There is a total of 118,722 advertisers with 10 or more ad sets in the merged dataset (see below). Chart excludes 731 observations with a missing
 correlation coefficient.
From FB-SINGER-00314652-704 and FB-SINGER-00426663 ("AAD Data") and FB-SINGER-00314707 ("Levy Budget Data").
 Levy Budget Data was cleaned to exclude ad sets (campaign_ids) with multiple paceable_limit_reset_period values, with
 paceable_limit_level = "CAMPAIGN_GROUP," or with missing or zero advertiser_input_budget. AAD Data was cleaned to exclude
 observations with missing, zero, or negative audience_size or lifetime_legal_revenue. AAD Data was aggregated by campaign_id by taking

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## EXHIBIT 11

## DAILY BUDGET AND ESTIMATED AUDIENCE SIZE CORRELATION COEFFICIENTS BY ADVERTISER
## U.S. ADVERTISERS WITH 10+ AD SETS
## ALL ADS DETAILS DATA AND LEVY BUDGET DATA

Notes & Sources (continued):

the median audience_size across all ad_ids associated with a campaign_id. Cleaned Levy Budget Data and AAD Data were merged at the ad set level, matching by campaign_id, campaign_group_id, and anon_account_id. After merging, I calculated the Daily Budget for each campaign_id. For campaign_ids with paceable_limit_reset_period = 24 or 168, I used advertiser_input_budget as Daily Budget. For campaign_ids with paceable_limit_reset_period = 0, I divided advertiser_input_budget by duration (duration was calculated for each campaign_id as campaign_end_date - campaign_start_date). I dropped observations with paceable_limit_reset_period = 0 (or missing) and a negative duration (due to nonsensical campaign_end_date). Once I obtained Daily Budget for each campaign_id, I identified advertisers using anon_account_id and restricted the data to advertisers with 10 or more ad sets with positive revenue. I then calculated advertiser level correlation coefficients between ad set level audience_size and Daily Budget.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## EXHIBIT 12

### COMPARISON OF DISTRIBUTION OF ADVERTISER LEVEL CPMS
### ROUGHGARDEN AUCTION SIMULATIONS AND ALL ADS DETAILS DATA

| | Roughgarden Auction Simulations | All Ads Details Data (U.S. Advertisers) | |
| | | Aug. 15 – Dec. 31, 2014 | Jan. 1 – May 16, 2019 |
|---|---|---|---|
| **Quantiles** | [A] | | |
| 1st Percentile | $3.85 | | |
| 5th Percentile | $4.09 | | |
| 25th Percentile | $4.83 | | |
| 50th Percentile | $5.74 | | |
| 75th Percentile | $6.36 | | |
| 95th Percentile | $8.68 | | |
| 99th Percentile | $9.29 | | |
| # of Advertisers[1] | 50 | | |



Notes & Sources:

[A] From Roughgarden Report, at backup file "Conjoint Model, Base Case.log." In the file, the budget, impressions, and spend are reported for each of the 50 simulated advertisers in the actual world followed by the budget, impressions, and spend for each advertiser in the but-for world for each of the 20 trials of the simulation. Dr. Roughgarden's log files alternate between printed As-Is and But-For world results for each respective trial. CPM distribution from As-Is values.

CPM calculated as Spend/(Impressions/1000).

[B]-[C] From FB-SINGER-00314652-704; FB-SINGER-00426663. Excludes observations with missing campaign_ids or missing, zero, or negative lifetime_legal_impressions or lifetime_legal_revenue. Lifetime_legal_impressions and lifetime_legal_revenue summed up for each advertiser for each year (derived from ad_create_date).

CPM calculated as (Revenue)/(Impressions/1000) for each advertiser for each year.

[1] Number of advertisers with at least one ad with nonzero nonmissing Impressions and Revenue.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 13**

**COMPARISON OF ACTUAL REACH AND ESTIMATED DAILY REACH**
**BISON LOG DATA**
**JANUARY 11 – MAY 16, 2019**

Ad Sets

[1] Ad Sets Where Actual Daily Reach is Within or Above Range of Estimated Daily Reach 
[2] Total Ad Sets



[3] Ad Sets Where Actual Daily Reach is Within or Above Range of Estimated Daily Reach as % of Total Ad Sets

<u>Notes & Sources</u>:
From FB-SINGER-00426323. Actual Daily Reach derived from daily_stats, at reach; Range of Estimated Daily Reach
  derived from interfaces_daily_reach_range, at min and max. Excludes observations with a missing  or "null" min value
  in interfaces_daily_reach_range.
[1] Includes ad sets whose Actual Daily Reach is within or above Range of Estimated Daily Reach on all active days.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 14**

**DZ RESERVE**
**FACEBOOK ADS**
**DZ RESERVE ALL ADS DETAILS DATA**

| | | |
|---|---|---|
| [1] | Dates Ads Created | 12/31/2017 - 12/2/2018 |
| | | |
| [2] | Ads | 26,277 |
| [3] | Ad Sets | 22,903 |
| [4] | Campaigns | 742 |
| | | |
| [5] | Total Facebook Ad Revenue | $1,039,751 |
| [6] | Total Impressions | 328,784,961 |
| [7] | Total Clicks | 6,913,187 |
| | | |
| [8] | Cost Per Click | $0.15 |
| [9] | Click-Through Rate | 2.1% |

Notes & Sources:

Excludes ads with blank or zero total legal revenues.

Includes data from FB-SINGER-00180465, which reflects Facebook all_ads_details data for DZ Reserve, and FB-SINGER-00314652-704 and FB-SINGER-00426663, which reflects Facebook all_ads_details data for the broader class. FB-SINGER-00180465 includes 15,502 unique campaign_ids with positive total legal revenues (based on legal_revenue_1_day). I identified an additional 9,635 campaign_ids placed by DZ Reserve that were not included in FB-SINGER-00180465 using DZ Reserve Ads Manager files produced at DZ_Reserve_00000001-006, DZ_Reserve_00000021-022, DZ_Reserve_00000025-028, DZ_Reserve_00000037-041, DZ_Reserve_00000052-053, DZ_Reserve_00000058-062, DZ_Reserve_00000091-101, and DZ_Reserve_00000106. Data for 6,800 of these missing campaign_ids with positive total legal revenues were available in the produced all_ads_details data for the class (FB-SINGER-00314652-704; FB-SINGER-00426663), and were added to the data from FB-SINGER-00180465 for my analysis.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 14**

**DZ RESERVE**
**FACEBOOK ADS**
**DZ RESERVE ALL ADS DETAILS DATA**

<u>Notes & Sources (cont.)</u>:

For ads from FB-SINGER-00180465, lifetime revenues, impressions, and clicks are based on the sum of legal_revenue_1_day, legal_impressions_1_day, and legal_clicks_1_day. For ads from FB-SINGER-00314652-704 and FB-SINGER-0042666, lifetime revenues, impressions, and clicks are based on lifetime_legal_revenue, lifetime_legal_impressions, and lifetime_legal_clicks.

[1] At variable, ad_create_date.

[2] At variable, ad_id.

[3] At variable, campaign_id.

[4] At variable, campaign_group_id.

[5] At variables, legal_revenue_1_day and lifetime_legal_revenue.

[6] At variables, legal_impressions_1_day and lifetime_legal_impressions.

[7] At variables, legal_clicks_1_day and lifetime_legal_clicks.

[8] = [5] / [7].

[9] = [7] / [6].

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 15**

**OTHER ZIERNICKI COMPANIES**
**FACEBOOK ADS PLACED AFTER DZ RESERVE ENTERED LAWSUIT**
**OTHER ZIERNICKI ALL ADS DETAILS DATA**

| | | |
|---|---|---:|
| [1] | Date DZ Reserve Entered Lawsuit | 12/21/2018 |
| [2] | Dates Ads Created | 3/1/2019 - 9/18/2020 |
| | | |
| [3] | Ads | 3,617 |
| [4] | Ad Sets | 2,349 |
| [5] | Campaigns | 177 |
| | | |
| [6] | Total Facebook Ad Revenue | $43,481 |
| [7] | Total Impressions | 20,234,905 |
| [8] | Total Clicks | 320,286 |
| | | |
| [9] | Cost Per Click | $0.14 |
| [10] | Click-Through Rate | 1.6% |

Notes & Sources:
From FB-SINGER-00426465 and FB-SINGER-00424703. Excludes ads
with blank or zero total legal revenues.
[1] Dan Ziernicki entered the lawsuit on 12/21/2018.
*See* Consolidated Amended Class Action Complaint, December 21, 2018,
at p. 27.
[2] At variable, ad_create_date.
[3] At variable, ad_id.
[4] At variable, campaign_id.
[5] At variable, campaign_group_id.
[6] At variable, lifetime_legal_revenue.
[7] At variable, lifetime_legal_impressions.
[8] At variable, lifetime_legal_clicks.
[9] = [6] / [8].
[10] = [8] / [7].

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 16**

**DZ RESERVE**
**FACEBOOK ADVERTISING OBJECTIVES BY AD OPTIMIZATION CRITERIA**

| | Advertising Objective | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Post Engagement | | Product Catalog Sales | | Website Conversions | | All Objectives | |
| Ad Optimization Criteria | # of Ads | % of Ads | # of Ads | % of Ads | # of Ads | % of Ads | # of Ads | % of Ads |
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] |
| [1] Website Conversion | - | - | 675 | 2.6% | 24,790 | 94.3% | 25,465 | 96.9% |
| [2] Post Engagement | 73 | 0.3% | - | - | - | - | 73 | 0.3% |
| [3] Website Click | - | - | - | - | 8 | 0.0% | 8 | 0.0% |
| [4] Impressions | - | - | 81 | 0.3% | 9 | 0.0% | 90 | 0.3% |
| [5] Reach | - | - | - | - | 3 | 0.0% | 3 | 0.0% |
| [6] Undefined | - | - | - | - | 638 | 2.4% | 638 | 2.4% |
| [7] All Delivery Classes | 73 | 0.3% | 756 | 2.9% | 25,448 | 96.8% | 26,277 | 100.0% |

| | Advertising Objective | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Post Engagement | | Product Catalog Sales | | Website Conversions | | All Objectives | |
| Ad Optimization Criteria | FB Revenue | % of Revenue | FB Revenue | % of Revenue | FB Revenue | % of Revenue | FB Revenue | % of Revenue |
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] |
| [8] Website Conversion | - | - | $23,505 | 2.3% | $996,328 | 95.8% | $1,019,834 | 98.1% |
| [9] Post Engagement | $1,109 | 0.1% | - | - | - | - | $1,109 | 0.1% |
| [10] Website Click | - | - | - | - | $356 | 0.0% | $356 | 0.0% |
| [11] Impressions | - | - | $1,315 | 0.1% | $125 | 0.0% | $1,441 | 0.1% |
| [12] Reach | - | - | - | - | $66 | 0.0% | $66 | 0.0% |
| [13] Undefined | - | - | - | - | $16,947 | 1.6% | $16,947 | 1.6% |
| [14] All Delivery Classes | $1,109 | 0.1% | $24,820 | 2.4% | $1,013,822 | 97.5% | $1,039,751 | 100.0% |

Notes & Sources:

From FB-SINGER-00180465, at objective_str, delivery_class, legal_revenue_1_day, and ad_id; FB-SINGER-00314652-704 and FB-SINGER-00426663, at objective_str, delivery_class, lifetime_legal_revenue, and ad_id. See, Exhibit 14 for more explanation on how the data were combined across these sources. Excludes ads with blank or zero total legal revenues.

Delivery class and advertising objective for each ad_id are based on the earliest date recorded.

[1],[8] Includes "Website Conversion," "Website Conversion - DPA," "oCPM Conversion (DPA Event)," and "oCPM Conversion (Website Conversion)."

[2],[9] Includes "Post Engagement" and "oCPM Conversion (Post Engagement)."

[3],[10] Includes "Website Click" and "oCPM Conversion (Website Click)."

[4],[11] Includes "Impressions" and "oCPM Impressions."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## EXHIBIT 17

## DZ RESERVE
## FACEBOOK AD SETS
## USE OF CUSTOM AUDIENCE TARGETING AND PLAINTIFFS' DEFAULT TARGETING CRITERIA

| | Targeting Type | Ad Sets | | Facebook Ad Revenue | |
|---|---|---|---|---|---|
| | | # | % | $ | % |
| | [A] | [B] | [C] | [D] | [E] |
| [1] | Custom Audience Targeting | 1,555 | 6.8% | $134,265 | 12.9% |
| [2] | Plaintiffs' Default Targeting Criteria (US 18-65) | 14 | 0.1% | $410 | 0.0% |
| [3] | Total | 22,903 | 100.0% | $1,039,751 | 100.0% |

Notes & Sources:

Ads placed by DZ Reserve from FB-SINGER-00180465, FB-SINGER-00314652-704 and FB-SINGER-00426663. See, Exhibit 14 for more explanation on how the data were combined across these sources.

[1] Custom Audience Targeting for the 26,277 DZ Reserve ad ids (ad_id) in these data were identified from FB-SINGER-00426661-662, by ad_id. Identified as ad ids with custom audience targeting, excluding ads with lookalike targeting  (has_lookalike_inclusion = 1 or has_lookalike_exclusion=1).

[2] Targeting specs for the 22,903 DZ Reserve ad sets (campaign_ids) in these data were identified from DZ_Reserve_00000001-006, DZ_Reserve_00000021-022, DZ_Reserve_00000025-028, DZ_Reserve_00000037-041, DZ_Reserve_00000052-053, DZ_Reserve_00000058-062, DZ_Reserve_00000091-101, and DZ_Reserve_00000106, by matching campaign_id to adsetid. Identified as ad sets targeting US nationwide (country = US), ages 18-65 (agemin = 18 and agemax = 65), with no other targeting limitations.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 18**

**DZ RESERVE**
**FACEBOOK AD SET SUMMARY**
**TOP 25 AD SETS BY FACEBOOK AD REVENUE**

| | Ad Set Id | Campaign Name | Ad Set Name | Start Date | End Date | Daily Budget | FB Ad Revenue | Impressions | Clicks | Estimated Audience Size Median | Impressions as % of Median Audience |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] |
| [1] | 23842893043060461 | FlexPro IGS | WW - Physical exercise | 7/2/18 | 10/27/18 | $37 | $4,285 | 9,010,624 | 95,700 | 270,105,347 | 3.34% |
| [2] | 23842850141860147 | MuscleMax V3 Scaling | WW - Buttocks | 8/2/18 | 11/16/18 | $37 | $3,801 | 454,340 | 12,401 | 20,960,449 | 2.17% |
| [3] | 23842735348980337 | Desk Retargetting | Worldwide - 21+ - Travel - $300 | 1/14/18 | - | $300 | $3,473 | 1,987,004 | 60,971 | 640,000,000 | 0.31% |
| [4] | 23842764431970337 | Showerhead | BSD Post/Ad Engaged LLA 1% $100 | 2/18/18 | - | $100 | $3,307 | 480,942 | 12,401 | 13,000,000 | 3.70% |
| [5] | 23842798855290337 | CleanRobot | Worldwide - 21+ - Online shopping - $100 | 3/24/18 | - | $100 | $3,068 | 882,526 | 29,440 | 611,414,252 | 0.14% |
| [6] | 23843006704970452 | Polishing Drill | WW - Wood carving | 10/6/18 | 11/21/18 | $70 | $3,058 | 815,213 | 30,948 | 7,668,101 | 10.63% |
| [7] | 23842867181350461 | Sunglasses IGS | WW - 21+ - Sunglasses | 6/10/18 | 9/2/18 | $37 | $3,057 | 4,048,243 | 56,259 | 90,392,578 | 4.48% |
| [8] | 23842791967510337 | CleanRobot | Worldwide - 21+ - DIY - $100 | 3/21/18 | - | $100 | $2,888 | 942,822 | 37,938 | 89,010,036 | 1.06% |
| [9] | 23842938611490101 | High Tech | WW - Freckle | 8/31/18 | 11/21/18 | $37 | $2,872 | 624,477 | 11,052 | 45,429,149 | 1.37% |
| [10] | 23842764430530337 | Showerhead | Showerhead 10 Second Video LLA 1% - $100 #2 | 2/18/18 | - | $100 | $2,677 | 452,583 | 11,290 | 13,000,000 | 3.48% |
| [11] | 23842960893180225 | Smart Ring IGS | WW - Smartphones | 6/28/18 | - | $44 | $2,629 | 5,082,140 | 93,195 | 203,270,216 | 2.50% |
| [12] | 23842798856440337 | CleanRobot | Worldwide - 21+ - Physical exercise - $100 | 3/24/18 | - | $100 | $2,597 | 786,640 | 26,545 | 205,181,103 | 0.38% |
| [13] | 23842798863950337 | CleanRobot | Worldwide - 21+ - Dogs - $100 | 3/24/18 | - | $100 | $2,596 | 831,642 | 28,075 | 170,874,664 | 0.49% |
| [14] | 23842791972840337 | CleanRobot | Worldwide - 21+ - Housekeeping - $100 | 3/21/18 | - | $100 | $2,567 | 566,488 | 26,215 | 5,980,895 | 9.47% |
| [15] | 23842763300620337 | Showerhead | BSD Saved Page/Post LLA 1% $20 | 2/16/18 | - | $20 | $2,505 | 464,845 | 12,042 | 13,000,000 | 3.58% |
| [16] | 23842944327000101 | High Tech | WW - Freckle - Copy | 9/6/18 | 11/16/18 | $37 | $2,458 | 666,106 | 10,413 | 45,318,641 | 1.47% |
| [17] | 23842733303560337 | Desk Retargetting | Worldwide - 21+ - Travel - $100 | 1/11/18 | - | $100 | $2,445 | 1,043,500 | 31,863 | 700,000,000 | 0.15% |
| [18] | 23842733301380337 | Desk Retargetting | Worldwide - 21+ - Couch - $100 | 1/11/18 | - | $100 | $2,444 | 949,322 | 25,274 | 44,000,000 | 2.16% |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 18**

**DZ RESERVE**
**FACEBOOK AD SET SUMMARY**
**TOP 25 AD SETS BY FACEBOOK AD REVENUE**

| | Ad Set Id | Campaign Name | Ad Set Name | Start Date | End Date | Daily Budget | FB Ad Revenue | Impres-sions | Clicks | Estimated Audience Size Median | Impressions as % of Median Audience |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] |
| [19] | 23842894868610313 | MuscleMax IGS OK 01-04 | WW - Personal Trainer | 7/26/18 | - | $37 | $2,308 | 647,238 | 12,315 | 46,387,705 | 1.40% |
| [20] | 23842925441580461 | FlexPro IGS | WW - 35-44 - Physical exercise | 7/25/18 | 9/26/18 | $37 | $2,307 | 1,722,447 | 23,903 | 41,386,482 | 4.16% |
| [21] | 23842949283910101 | High Tech | WW - Body art | 9/10/18 | 10/14/18 | $70 | $2,243 | 787,238 | 9,983 | 58,296,124 | 1.35% |
| [22] | 23842899313270313 | MuscleMax IGS OK 05-08 | WW - Crossfit | 7/31/18 | - | $37 | $2,106 | 455,620 | 10,085 | 52,303,624 | 0.87% |
| [23] | 23842735347860337 | Desk Retargetting | Worldwide - 21+ - Gadget - $100 | 1/14/18 | - | $100 | $2,078 | 499,735 | 18,582 | 59,000,000 | 0.85% |
| [24] | 23842907635830673 | MuscleMax Page LLA Testing | WW - Beauty Deals IG LLA 1% | 8/10/18 | 9/7/18 | $70 | $1,905 | 207,283 | 4,182 | 21,606,190 | 0.96% |
| [25] | 23842763305080337 | Showerhead | Worldwide - 21+ - Shower - $50 | 2/16/18 | - | $50 | $1,884 | 456,136 | 11,508 | 1,100,000,000 | 0.04% |

Notes & Sources:

From FB-SINGER-00180465, FB-SINGER-00314652-704 and FB-SINGER-00426663. See, Exhibit 14 for more explanation on how the data were combined across these sources.

The audience_size field is similar to the Potential Reach estimate shown to advertisers, but differs slightly because among other things it is logged by Facebook at a later time in the day from when the advertiser created their ad set and is not rounded. Deposition of Gerardo Zaragoza, October 20, 2020, at 87, 290, 308-309.

[A] From FB-SINGER-00180465, FB-SINGER-00314652-704 and FB-SINGER-00426663, at campaign_id.

[B]-[C] From DZ_Reserve_00000001-006, DZ_Reserve_00000021-022, DZ_Reserve_00000025-028, DZ_Reserve_00000037-041, DZ_Reserve_00000052-053, DZ_Reserve_00000058-062, DZ_Reserve_00000091-101, and DZ_Reserve_00000106, at campaignname, adsetname.

[D] From FB-SINGER-00180465, FB-SINGER-00314652-704 and FB-SINGER-00426663, at campaign_start_date.

[E] From FB-SINGER-00180465, at ds. In the data, end dates (campaign_end_date) for these ad sets were all listed as 12/31/1969, so the latest datestamp for each ad set with non-zero legal revenue was used as a proxy. For ad sets with end dates listed as 12/31/1969 and no datestamp variable, the end date is shown as "-".

[F] From DZ_Reserve_00000001-006, DZ_Reserve_00000021-022, DZ_Reserve_00000025-028, DZ_Reserve_00000037-041, DZ_Reserve_00000052-053, DZ_Reserve_00000058-062, DZ_Reserve_00000091-101, and DZ_Reserve_00000106, at adsetdailybudget. I report the maximum value of adsetdailybudget for each campaign_id.

[G] From FB-SINGER-00180465, at legal_revenue_1_day; FB-SINGER-00314652-704 and FB-SINGER-00426663, at lifetime_legal_revenue.

[H] From FB-SINGER-00180465, at legal_impressions_1_day; FB-SINGER-00314652-704 and FB-SINGER-00426663, at lifetime_legal_impressions.

[I] From FB-SINGER-00180465, at legal_clicks_1_day; FB-SINGER-00314652-704 and FB-SINGER-00426663, at lifetime_legal_clicks.

[J] From FB-SINGER-00180465, FB-SINGER-00314652-704 and FB-SINGER-00426663, at audience_size. I report the median values of audience_size for each campaign_id after removing observations with zero or missing audience_size.

[K] Calculated as [H] / [J].

## EXHIBIT 19

### DZ RESERVE
### FACEBOOK AD SET ESTIMATED AUDIENCE SIZE AND DAILY BUDGET



Notes & Sources:

Includes 18,605 observations with non-zero values for daily budget and audience size.

Audience Size from FB-SINGER-00180465, FB-SINGER-00314652-704 and FB-SINGER-00426663, at audience_size. See, Exhibit 14 for more explanation on how the data were combined across these sources. Median values of audience_size used for each campaign_id.

The audience_size field is similar to the Potential Reach estimate shown to advertisers, but differs slightly because among other things it is logged by Facebook at a later time in the day from when the advertiser created their ad set and is not rounded. Deposition of Gerardo Zaragoza, October 20, 2020, at 87, 290, 308-309.

Daily Budget from DZ_Reserve_00000001-006, DZ_Reserve_00000021-022, DZ_Reserve_00000025-028, DZ_Reserve_00000037-041, DZ_Reserve_00000052-053, DZ_Reserve_00000058-062, DZ_Reserve_00000091-101, and DZ_Reserve_00000106, at adsetdailybudget.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 20**

**DZ RESERVE**
**FACEBOOK AD SETS**
**CORRELATION MATRIX**

|  | Estimated Audience Size | Daily Budget | FB Ad Revenue | Impressions | Clicks |
|---|---|---|---|---|---|
|  | [A] | [B] | [C] | [D] | [E] |
| [1] Estimated Audience Size | 1 |  |  |  |  |
| [2] Daily Budget | -0.0123 | 1 |  |  |  |
| [3] FB Ad Revenue | -0.0118 | 0.310* | 1 |  |  |
| [4] Impressions | 0.0357* | 0.118* | 0.547* | 1 |  |
| [5] Clicks | 0.0318* | 0.189* | 0.697* | 0.898* | 1 |

Notes & Sources:

* $p < 0.05$

Audience Size, Facebook Ad Revenue, Impressions, and Clicks from FB-SINGER-00180465, at audience_size, legal_revenue_1_day, legal_impressions_1_day, and legal_clicks_1_day, and FB-SINGER-00314652-704 and FB-SINGER-0042666, at audience_size, lifetime_legal_revenue, lifetime_legal_impressions, and lifetime_legal_clicks. See, Exhibit 14 for more explanation on how the data were combined across these sources. Reflects median audience_size, maximum adsetdailybudget, and total lifetime revenue, impressions, and clicks for each campaign_id.

The audience_size field is similar to the Potential Reach estimate shown to advertisers, but differs slightly because among other things it is logged by Facebook at a later time in the day from when the advertiser created their ad set and is not rounded. Deposition of Gerardo Zaragoza, October 20, 2020, at 87, 290, 308-309.

[1],[3][A] 18,704 observations.

[2][A] 18,632 observations.

[B] 22,831 observations.

[C]-[E] 22,903 observations.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 21**

**DZ RESERVE**
**FACEBOOK AD SETS**
**CORRELATION COEFFICIENTS BETWEEN SELECTED VARIABLES**



Notes & Sources:

From Exhibit 20.

The audience_size field is similar to the Potential Reach estimate shown to advertisers, but differs slightly because among
other things it is logged by Facebook at a later time in the day from when the advertiser created their ad set and is not
rounded. Deposition of Gerardo Zaragoza, October 20, 2020, at 87, 290, 308-309.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 22**

**DZ RESERVE**
**SALES BY REFERRER**
**SHOPIFY SALES DATA**
**FEBRUARY 12, 2017 - FEBRUARY 24, 2019**

| | Referrer Source and Name | Orders | | Total Sales | |
|---|---|---|---|---|---|
| | | # | % | $ | % |
| | [A] | [B] | [C] | [D] | [E] |
| | **Facebook, Inc.** | | | | |
| [1] | Facebook | 27,582 | 56.0% | $1,317,584 | 54.8% |
| [2] | Instagram | 10,000 | 20.3% | $599,486 | 24.9% |
| [3] | Messenger | 4 | 0.0% | $184 | 0.0% |
| [4] | **Facebook, Inc. Total** | 37,586 | 76.3% | $1,917,254 | 79.7% |
| | **Other Referrer Sources** | | | | |
| [5] | Google | 1,772 | 3.6% | $73,127 | 3.0% |
| [6] | Outlook.com | 44 | 0.1% | $2,097 | 0.1% |
| [7] | Yahoo! | 10 | 0.0% | $399 | 0.0% |
| [8] | Bing | 9 | 0.0% | $381 | 0.0% |
| [9] | YouTube | 11 | 0.0% | $290 | 0.0% |
| [10] | Gmail | 7 | 0.0% | $240 | 0.0% |
| [11] | Yandex | 4 | 0.0% | $238 | 0.0% |
| [12] | DuckDuckGo | 2 | 0.0% | $67 | 0.0% |
| [13] | Baidu | 1 | 0.0% | $50 | 0.0% |
| [14] | Arianna | 1 | 0.0% | $48 | 0.0% |
| [15] | MySearch | 1 | 0.0% | $47 | 0.0% |
| [16] | Yahoo! Mail | 2 | 0.0% | $37 | 0.0% |
| [17] | Reddit | 1 | 0.0% | $34 | 0.0% |
| [18] | Ask | 1 | 0.0% | $25 | 0.0% |
| [19] | Vkontakte | 2 | 0.0% | - | - |
| [20] | **Other Referrer Sources Total** | 1,868 | 3.8% | $77,081 | 3.2% |
| [21] | **Unknown Referral Source** | 334 | 0.7% | $16,653 | 0.7% |
| [22] | **Direct Sales** | 9,480 | 19.2% | $394,232 | 16.4% |
| [23] | **Total** | 49,268 | 100.0% | $2,405,220 | 100.0% |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 22**

**DZ RESERVE**
**SALES BY REFERRER**
**SHOPIFY SALES DATA**
**FEBRUARY 12, 2017 - FEBRUARY 24, 2019**

Notes & Sources:

From DZ_Reserve_00023874. *See also* DZ_Reserve_00023882.

[4] Sum of [1] through [3].

[20] Sum of [5] through [19].

[21] Includes 39 referrers with referral source listed as "Unknown." Included in this category are Shopify, Paypal, and Kickstarter, among others.

[23] = [1] + [2] + [20] + [21] + [22].

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 23

## DZ RESERVE
## ESTIMATED ROAS FOR FACEBOOK ADS

**Based on Facebook Pixel Data**

| | | |
|---|---|---|
| [1] | Total Website Conversion Value | $1,633,255 |
| [2] | Total Amount Spent | $1,052,935 |
| [3] | ROAS | 1.55 |

**Based on Referrer Source from Shopify Data**

| | | |
|---|---|---|
| [4] | Total Sales with Facebook/Instagram as Referring Source (Feb 2017 - Feb 2019) | $1,917,070 |
| [5] | Total Amount Spent (Dec 2017 - Dec 2018) | $1,053,278 |
| [6] | ROAS | 1.82 |

Notes & Sources:

DZ Reserve did not produce data on costs to allow for calculation of ROI for Facebook ads.

[1]-[2] From DZ_Reserve_00023655-3690, which report lifetime data by Ad Set, at Website Purchases Conversion Value and Amount Spent (USD). Observations with Website Purchases Conversion Value greater than or equal to $10,000,000 are excluded.

[3] = [1] / [2].

[4] Includes all sales associated with Facebook or Instagram. From Exhibit 22.

[5] From Plaintiff DZ Reserve's Fourth Amended Answers and Objections to Defendant's Third Set of Interrogatories, November 23, 2020, at p. 8.

[6] = [4] / [5].

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 24**

**DZ RESERVE**

**FACEBOOK PIXEL DATA BY AD SET**

**TOP 25 AD SETS BY AMOUNT SPENT**

| Ad Set Name | Reporting Starts | Reporting Ends | Daily Ad Set Budget | Amount Spent | Reach | Clicks | Impressions | Website Purchases | Website Purchases Conversion Value | Cost Per Click | CPM | Click Through Rate | Cost Per 1000 People Reached | Cost Per Purchase | Website Purchase ROAS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] | [N] | [O] | [P] |
| [1] WW - Physical exercise | 2018-06-07 | 2020-08-24 | $37 | $4,287 | 5,680,032 | 91,847 | 9,011,692 | 180 | $8,134 | $0.05 | $0.48 | 1.0% | $0.75 | $23.81 | 1.90 |
| [2] WW - Buttocks | 2018-06-13 | 2020-08-21 | $37 | $3,840 | 266,848 | 8,107 | 454,856 | 117 | $6,725 | $0.47 | $8.44 | 1.8% | $14.39 | $32.82 | 1.75 |
| [3] Worldwide - 21+ - Travel - $300 | 2017-12-31 | 2020-08-24 | $300 | $3,473 | 1,589,721 | 12,712 | 1,987,004 | 76 | $5,990 | $0.27 | $1.75 | 0.6% | $2.18 | $45.70 | 1.72 |
| [4] BSD Post/Ad Engaged LLA 1% $100 | 2017-12-31 | 2020-08-24 | $100 | $3,307 | 400,000 | 8,089 | 480,942 | 144 | $4,321 | $0.41 | $6.88 | 1.7% | $8.27 | $22.96 | 1.31 |
| [5] WW - Wood carving | 2018-05-20 | 2020-08-24 | $70 | $3,116 | 554,993 | 18,200 | 816,216 | 74 | $7,325 | $0.17 | $3.82 | 2.2% | $5.61 | $42.11 | 2.35 |
| [6] Worldwide - 21+ - Online shopping - $100 | 2017-12-31 | 2020-08-24 | $100 | $3,068 | 751,149 | 5,149 | 882,526 | 97 | $6,081 | $0.60 | $3.48 | 0.7% | $4.08 | $31.63 | 1.98 |
| [7] WW - 21+ - Sunglasses | 2018-06-07 | 2020-08-24 | $37 | $3,057 | 2,129,920 | 54,987 | 4,048,981 | 160 | $5,820 | $0.06 | $0.76 | 1.4% | $1.44 | $19.11 | 1.90 |
| [8] WW - Freckle | 2018-06-13 | 2020-08-24 | $37 | $2,968 | 429,748 | 5,369 | 625,518 | 60 | $7,113 | $0.55 | $4.75 | 0.9% | $6.91 | $49.47 | 2.40 |
| [9] Worldwide - 21+ - DIY - $100 | 2017-12-31 | 2020-08-24 | $100 | $2,888 | 651,838 | 5,520 | 942,822 | 93 | $5,144 | $0.52 | $3.06 | 0.6% | $4.43 | $31.06 | 1.78 |
| [10] Showerhead 10 Second Video LLA 1% - $100 #2 | 2017-12-31 | 2020-08-24 | $100 | $2,677 | 392,430 | 7,676 | 452,583 | 111 | $3,390 | $0.35 | $5.91 | 1.7% | $6.82 | $24.11 | 1.27 |
| [11] WW - Smartphones | 2018-05-19 | 2020-08-24 | $44 | $2,629 | 2,992,640 | 89,882 | 5,082,140 | 116 | $5,515 | $0.03 | $0.52 | 1.8% | $0.88 | $22.66 | 2.10 |
| [12] Worldwide - 21+ - Physical exercise - $100 | 2017-12-31 | 2020-08-24 | $100 | $2,597 | 626,443 | 4,032 | 786,640 | 86 | $4,661 | $0.64 | $3.30 | 0.5% | $4.15 | $30.20 | 1.79 |
| [13] Worldwide - 21+ - Dogs - $100 | 2017-12-31 | 2020-08-24 | $100 | $2,596 | 644,580 | 4,407 | 831,642 | 83 | $4,436 | $0.59 | $3.12 | 0.5% | $4.03 | $31.28 | 1.71 |
| [14] Worldwide - 21+ - Housekeeping - $100 | 2017-12-31 | 2020-08-24 | $100 | $2,567 | 751,344 | 4,890 | 566,488 | 63 | $3,593 | $0.52 | $4.53 | 0.9% | $9.31 | $40.75 | 1.40 |
| [15] WW - Freckle - Copy | 2018-06-13 | 2020-08-21 | $37 | $2,546 | 490,600 | 5,165 | 667,409 | 47 | $5,844 | $0.49 | $3.81 | 0.8% | $5.19 | $54.16 | 2.30 |
| [16] BSD Saved Page/Post LLA 1% $20 | 2017-12-31 | 2020-08-24 | $20 | $2,505 | 301,672 | 6,080 | 464,845 | 129 | $4,625 | $0.41 | $5.39 | 1.3% | $8.30 | $19.42 | 1.85 |
| [17] Worldwide - 21+ - Travel - $100 | 2017-12-31 | 2020-08-24 | $100 | $2,445 | 926,200 | 7,133 | 1,043,500 | 62 | $4,690 | $0.34 | $2.34 | 0.7% | $2.64 | $39.44 | 1.92 |
| [18] Worldwide - 21+ - Couch - $100 | 2017-12-31 | 2020-08-24 | $100 | $2,444 | 564,334 | 8,827 | 949,322 | 49 | $3,969 | $0.28 | $2.57 | 0.9% | $4.33 | $49.88 | 1.62 |
| [19] WW - 35-44 - Physical exercise | 2018-06-07 | 2020-08-24 | $37 | $2,313 | 993,993 | 22,987 | 1,722,767 | 82 | $3,690 | $0.10 | $1.34 | 1.3% | $2.33 | $28.21 | 1.60 |
| [20] WW - Personal Trainer | 2018-04-03 | 2020-08-21 | $37 | $2,308 | 528,574 | 11,785 | 647,238 | 60 | $3,839 | $0.20 | $3.57 | 1.8% | $4.37 | $38.46 | 1.66 |
| [21] WW - Body art | 2018-06-13 | 2020-08-24 | $70 | $2,267 | 605,883 | 6,099 | 787,635 | 37 | $4,734 | $0.37 | $2.88 | 0.8% | $3.74 | $61.28 | 2.09 |
| [22] WW - Crossfit | 2018-04-03 | 2020-08-21 | $37 | $2,106 | 384,388 | 9,630 | 455,620 | 59 | $3,489 | $0.22 | $4.62 | 2.1% | $5.48 | $35.69 | 1.66 |
| [23] Worldwide - 21+ - Gadget - $100 | 2017-12-31 | 2020-08-24 | $100 | $2,078 | 412,677 | 5,141 | 499,735 | 51 | $3,949 | $0.40 | $4.16 | 1.0% | $5.04 | $40.75 | 1.90 |
| [24] WW - Beauty Deals IG LLA 1% | 2018-06-13 | 2020-08-21 | $70 | $1,922 | 153,921 | 2,658 | 207,588 | 57 | $3,753 | $0.72 | $9.26 | 1.3% | $12.49 | $33.72 | 1.95 |
| [25] ATC - 1 Day | 2018-05-19 | 2020-08-21 | $35 | $1,885 | 11,035 | 2,723 | 45,882 | 116 | $11,716 | $0.69 | $41.08 | 5.9% | $170.81 | $16.25 | 6.22 |

Notes & Sources:

From DZ_Reserve_00023655-3690. Excludes observations with Website Purchases Conversion Value greater than or equal to $10,000,000.

[G] = [E] / [K].

[H] = [G] / [M].

[L] = [E] / ([H]/1000). CPM refers to cost per 1,000 impressions.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 25

## MAXWELL
## FACEBOOK ADS
## MAXWELL ALL ADS DETAILS DATA

| | | |
|---|---|---|
| [1] | Dates Ads Created | 9/14/2018 - 5/18/2019 |
| [2] | Ads | 28 |
| [3] | Ad Sets | 26 |
| [4] | Campaigns | 11 |
| [5] | Total Facebook Ad Revenue | $379 |
| [6] | Total Impressions | 43,815 |
| [7] | Total Clicks | 2,395 |
| [8] | Cost Per Click | $0.16 |
| [9] | Click-Through Rate | 5.5% |

Notes & Sources:

From FB-SINGER-00426482. Excludes ads with blank or zero total legal revenues.

[1] At variable, ad_create_date.
[2] At variable, ad_id.
[3] At variable, campaign_id.
[4] At variable, campaign_group_id.
[5] At variable, legal_revenue_1_day.
[6] At variable, legal_impressions_1_day.
[7] At variable, legal_clicks_1_day.
[8] = [5] / [7].
[9] = [7] / [6].

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 26**

**MAXWELL**
**FACEBOOK ADVERTISING OBJECTIVE BY AD OPTIMIZATION CRITERIA**

| Ad Optimization Criteria | Advertising Objective | | | |
|---|---|---|---|---|
| | Link Clicks | | | |
| | # of Ads | % of Ads | FB Ad Revenue | % of Revenue |
| [A] | [B] | [C] | [D] | [E] |
| [1] CPA Website Click | 3 | 10.7% | $51 | 13.4% |
| [2] Website Click | 25 | 89.3% | $328 | 86.6% |
| [3] Total | 28 | 100.0% | $379 | 100.0% |

Notes & Sources:
From FB-SINGER-00426482, at objective_str, delivery_class, legal_revenue_1_day, and ad_id.
Excludes ads with blank or zero total legal revenues.
[2] Includes "Website Click" and "oCPM Conversion (Website Click)."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 27**

**MAXWELL**
**FACEBOOK BID TYPES**

| | Bid Type | # of Ads | % of Ads | FB Ad Revenue | % of Revenue |
|---|---|---|---|---|---|
| | [A] | [B] | [C] | [D] | [E] |
| [1] | CPA | 12 | 42.9% | $228 | 60.1% |
| [2] | Absolute MOO (oCPM) | 16 | 57.1% | $151 | 39.9% |
| [3] | Total | 28 | 100.0% | $379 | 100.0% |

Notes & Sources:
From FB-SINGER-00426482, at bid_type_str, legal_revenue_1_day, and ad_id.
Excludes ads with blank or zero total legal revenues.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 28

## MAXWELL
## FACEBOOK AD SET SUMMARY

| | Ad Set Id | Campaign Name | Ad Set Name | Start Date | End Date | Budget Daily | Budget Lifetime | FB Ad Revenue | Impressions | Clicks | Estimated Audience Size Median | Potential Reach | Impressions as % of Median Audience |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] |
| [1] | 23843483046850252 | Magnetic Mount February Buy2Get1 | Magnetic Mount February Buy2Get1 Ad Set | 2/1/19 | 2/14/19 | $5.00 | - | $84.13 | 13,503 | 591 | 39,744,008 | 38,500,000 | 0.034% |
| [2] | 23843390942840252 | December Boost Magnet Gun+EDC - Copy | 2/3December2018 Boost Magnet Gun+EDC - Copy | 12/9/18 | 12/31/18 | - | - | $24.13 | 2,802 | 62 | 43,329,032 | - | 0.006% |
| [3] | 23843388452940252 | December Boost Magnet Gun+EDC | 08December2018 Boost Magnet Gun+EDC | 12/8/18 | 12/8/18 | - | $20.00 | $20.00 | 1,887 | 60 | 44,703,431 | - | 0.004% |
| [4] | 23843692971520252 | Gun Magnet 20May2019 Traffic wk1 day3 | May2019 wk1day3/5 | 5/20/19 | 5/20/19 | - | - | $19.92 | 1,469 | 122 | 19,282,569 | - | 0.008% |
| [5] | 23843388444640252 | December Boost Magnet Knife+Sword | 08December2018 Boost Magnet Knife+Sword Ad Set | 12/8/18 | 12/8/18 | - | $20.00 | $19.86 | 1,577 | 39 | 49,773,433 | - | 0.003% |
| [6] | 23843581731360252 | Magnetic Mount Spring Sale 2019 | Magnetic Mount Spring 25Mar2019 | 3/25/19 | 3/25/19 | - | $20.00 | $19.49 | 1,134 | 91 | - | 28,000,000 | 0.004% |
| [7] | 23843424356510252 | Magnet End-of-Season 2018 | Magnet End-of-Season 2018 Ad Set - Copy | 12/29/18 | 12/31/18 | $10.00 | - | $18.36 | 2,107 | 134 | 41,781,311 | - | 0.005% |
| [8] | 23843244679880252 | Gun Magnet LBR | LBR 20Sept | 9/20/18 | 9/20/18 | - | $20.00 | $18.31 | 1,736 | 83 | 1,341,659 | - | 0.129% |
| [9] | 23843244634480252 | Gun Magnet LBR | LBR 16Sept | 9/16/18 | 9/16/18 | - | $20.00 | $15.94 | 1,468 | 81 | 2,304,961 | - | 0.064% |
| [10] | 23843581732920252 | Magnetic Mount Spring Sale 2019 | Magnetic Mount Spring 28Mar2019 | 3/28/19 | 3/28/19 | - | $20.00 | $14.67 | 1,740 | 121 | - | 28,000,000 | 0.006% |
| [11] | 23843692954590252 | Gun Magnet 18May2019 Traffic wk1 day1 | May2019 wk1day1/5 | 5/18/19 | 5/18/19 | - | - | $14.14 | 788 | 88 | - | - | - |
| [12] | 23843244662500252 | Gun Magnet LBR | LBR 18Sept | 9/18/18 | 9/18/18 | - | $20.00 | $13.68 | 1,494 | 74 | 2,299,945 | - | 0.065% |
| [13] | 23843692956380252 | Gun Magnet 19May2019 Traffic wk1 day2 | May2019 wk1day2/5 | 5/19/19 | 5/19/19 | - | - | $12.85 | 2,178 | 160 | 19,038,854 | - | 0.011% |
| [14] | 23843244686300252 | Gun Magnet LBR | LBR 21Sept | 9/21/18 | 9/21/18 | - | $20.00 | $12.37 | 1,364 | 48 | 3,025,198 | - | 0.045% |
| [15] | 23843244558020252 | Gun Magnet LBR | LBR 15Sept | 9/15/18 | 9/15/18 | - | $20.00 | $11.68 | 1,120 | 75 | 2,762,459 | - | 0.041% |
| [16] | 23843588988740252 | Magnetic Mount Spring Sale 2019 | Magnetic Mount Spring 29Mar2019 DIRECT CANONICAL | 3/29/19 | 3/29/19 | - | $20.00 | $10.52 | 1,986 | 217 | - | 28,000,000 | 0.007% |
| [17] | 23843244666580252 | Gun Magnet LBR | LBR 19Sept | 9/19/18 | 9/19/18 | - | $20.00 | $8.10 | 843 | 37 | 2,564,772 | - | 0.033% |
| [18] | 23843244655510252 | Gun Magnet LBR | LBR 17Sept | 9/17/18 | 9/17/18 | - | $20.00 | $7.25 | 651 | 38 | 2,306,597 | - | 0.028% |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 28**

**MAXWELL**
**FACEBOOK AD SET SUMMARY**

| | Ad Set Id | Campaign Name | Ad Set Name | Start Date | End Date | Budget Daily | Budget Lifetime | FB Ad Revenue | Impressions | Clicks | Estimated Audience Size Median | Potential Reach | Impressions as % of Median Audience |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] |
| [19] | 23843423357090252 | | Magnet End-of-Season 2018 Ad Set | 12/28/18 | 12/31/18 | - | - | $6.62 | 351 | 13 | - | - | - |
| [20] | 23843581732910252 | Magnetic Mount Spring Sale 2019 | Magnetic Mount Spring 27Mar2019 | 3/27/19 | 3/27/19 | - | $20.00 | $6.60 | 822 | 99 | - | 28,000,000 | 0.003% |
| [21] | 23843581732990252 | Magnetic Mount Spring Sale 2019 | Magnetic Mount Spring 26Mar2019 | 3/26/19 | 3/26/19 | - | $20.00 | $5.35 | 1,196 | 90 | - | 28,000,000 | 0.004% |
| [22] | 23843244689330252 | Gun Magnet LBR | LBR 22Sept | 9/22/18 | 9/22/18 | - | $5.00 | $5.00 | 528 | 26 | - | - | - |
| [23] | 23843684129430252 | Magnet Spring Traffic 1/3 GROUP CODE (2 days) | Magnet Spring Traffic 1/3 GROUP day 1 | 5/14/19 | 5/14/19 | - | - | $4.55 | 546 | 17 | 19,437,693 | - | 0.003% |
| [24] | 23843244705800252 | Gun Magnet LBR | LBR 24Sept | 9/24/18 | 9/24/18 | - | $5.00 | $2.84 | 305 | 15 | 3,009,130 | - | 0.010% |
| [25] | 23843244701740252 | Gun Magnet LBR | LBR 23Sept | 9/23/18 | 9/23/18 | - | $5.00 | $2.19 | 178 | 12 | - | - | - |
| [26] | 23843586249790252 | Magnetic Mount Spring Sale 2019 | Magnetic Mount Spring 27Mar2019 - Copy | 3/27/19 | 3/27/19 | - | $20.00 | $0.21 | 42 | 2 | - | 28,000,000 | 0.000% |

Notes & Sources:

The audience_size field is similar to the Potential Reach estimate shown to advertisers, but differs slightly because among other things it is logged by Facebook at a later time in the day from when the advertiser created their ad set and is not rounded. Deposition of Gerardo Zaragoza, October 20, 2020, at 87, 290, 308-309.

[A] From FB-SINGER-00426482, at campaign_id.

[B] From MAXWELL_00001319, at campaignname.

[C] From MAXWELL_00001319 and FB-SINGER-00426482, at adsetname.

[D] From FB-SINGER-00426482, at campaign_start_date.

[E] From FB-SINGER-00426482, at campaign_end_date.

[1][E] From FB-SINGER-00426482, at ds. Campaign_end_date was reported as 12/31/1969, so the latest datestamp with non-zero revenue is used as a proxy for end date.

[F] From MAXWELL_00001319, at adsetdailybudget. I report the maximum value of adsetdailybudget for each campaign_id.

[G] From MAXWELL_00001319, at adsetlifetimebudget. I report the maximum value of adsetlifetimebudget for each campaign_id.

[F]-[G] Ad sets in rows [2], [4], [11], [13], [19], and [23] were not included in MAXWELL_00001319 and therefore do not report daily and/or lifetime budgets.

[H] From FB-SINGER-00426482, at legal_revenue_1_day.

[I] From FB-SINGER-00426482, at legal_impressions_1_day.

[J] From FB-SINGER-00426482, at legal_clicks_1_day.

[K] From FB-SINGER-00426482, at audience_size. I report the median values of audience_size for each campaign_id after removing observations with zero or missing audience_size.

[L] From FB-SINGER-00426543, at monthly_active_users. I report the median value of monthly_active_users for each campaign_id.

[M] Calculated as [I] / [K]. When audience_size was unavailable, potential reach was used.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 29**

**MAXWELL**
**FACEBOOK AD SET ESTIMATED AUDIENCE SIZE AND DAILY BUDGET**



Notes & Sources:
Includes 18 observations with non-zero values for budget and audience size.
From Exhibit 28.
Audience size from FB-SINGER-00426543, at variable monthly_active_users, which corresponds to potential reach. When monthly_active_users is missing or zero, audience_size from FB-SINGER-00426482 is used.
The audience_size field is similar to the Potential Reach estimate shown to advertisers, but differs slightly because among other things it is logged by Facebook at a later time in the day from when the advertiser created their ad set and is not rounded. Deposition of Gerardo Zaragoza, October 20, 2020, at 87, 290, 308-309.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## EXHIBIT 30

## MAXWELL
## FACEBOOK AD SETS
## CORRELATION MATRIX

| | Estimated Audience Size | Daily Budget | FB Ad Revenue | Impressions | Clicks |
|---|---|---|---|---|---|
| | [A] | [B] | [C] | [D] | [E] |
| [1] Estimated Audience Size | 1 | | | | |
| [2] Daily Budget | -0.152 | 1 | | | |
| [3] FB Ad Revenue | 0.361 | -0.266 | 1 | | |
| [4] Impressions | 0.328 | -0.337 | 0.968* | 1 | |
| [5] Clicks | 0.296 | -0.279 | 0.894* | 0.943* | 1 |

<u>Notes & Sources</u>:

* $p < 0.05$

From Exhibit 28.

Audience size from FB-SINGER-00426543, at variable monthly_active_users, which corresponds to potential reach. When monthly_active_users is missing or zero, audience_size from FB-SINGER-00426482 is used.

The audience_size field is similar to the Potential Reach estimate shown to advertisers, but differs slightly because among other things it is logged by Facebook at a later time in the day from when the advertiser created their ad set and is not rounded. Deposition of Gerardo Zaragoza, October 20, 2020, at 87, 290, 308-309.

[1],[3][A]  22 observations.

[2][A]  18 observations.

[B]  20 observations.

[C]-[E]  26 observations.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## EXHIBIT 31

### MAXWELL
### FACEBOOK AD SETS
### CORRELATION COEFFICIENTS BETWEEN SELECTED VARIABLES



Notes & Sources:

From Exhibit 30.

The audience_size field is similar to the Potential Reach estimate shown to advertisers, but differs slightly because among other things it is logged by Facebook at a later time in the day from when the advertiser created their ad set and is not rounded. Deposition of Gerardo Zaragoza, October 20, 2020, at 87, 290, 308-309.

**EXHIBIT 32**

**MAXWELL
PRODUCT SALES
AMAZON SALES DATA
AUGUST 2018 –APRIL 2019**

| | 2018 | | | | | | 2019 | | | | | Aug. '18 - Apr. '19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Aug. | Sep. | Oct. | Nov. | Dec. | Total | Jan. | Feb. | Mar. | Apr. | Total | Total |
| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] |
| [1] Total Units (All Orders) | 12 | 124 | 6 | 21 | 81 | 244 | 73 | 19 | 5 | 9 | 106 | 350 |
| [2]   Returned Units | - | - | - | - | 1 | 1 | 3 | - | - | - | 3 | 4 |
| [3]   Unshipped Units | 1 | - | - | - | 1 | 2 | 1 | 3 | - | - | 4 | 6 |
| [4] Net Units | 11 | 124 | 6 | 21 | 79 | 241 | 69 | 16 | 5 | 9 | 99 | 340 |
| | | | | | | | | | | | | |
| [5] Total Sales Amount (All Orders) | $156 | $1,611 | $102 | $340 | $1,054 | $3,262 | $1,223 | $300 | $105 | $189 | $1,817 | $5,079 |
| [6]   Returned Sales Amount | - | - | - | - | $17 | $17 | $51 | - | - | - | $51 | $68 |
| [7]   Unshipped Sales Amount | $13 | - | - | - | $17 | $30 | $17 | - | - | - | $17 | $47 |
| [8] Net Sales Amount | $143 | $1,611 | $102 | $340 | $1,020 | $3,215 | $1,155 | $300 | $105 | $189 | $1,749 | $4,964 |
| [9]   Total Item Promotion Discounts | - | $1,072 | - | $13 | $10 | $1,095 | - | - | - | - | - | $1,095 |
| [10] Net Sales Amount After Promotion Discounts | $143 | $539 | $102 | $327 | $1,009 | $2,120 | $1,155 | $300 | $105 | $189 | $1,749 | $3,869 |
| | | | | | | | | | | | | |
| [11] Average Sales Price (Before Promotion Discounts) | $13 | $13 | $17 | $16 | $13 | $13 | $17 | $19 | $21 | $21 | $18 | $15 |
| [12] Average Sales Price (After Promotion Discounts) | $13 | $4 | $17 | $16 | $13 | $9 | $17 | $19 | $21 | $21 | $18 | $11 |

Notes & Sources:

From MAXWELL_00001377, MAXWELL_00001379, MAXWELL_00001389, MAXWELL_00001390, MAXWELL_00001392, MAXWELL_00001399, MAXWELL_
00001407, MAXWELL_00001409, and MAXWELL_00001410 txt files, at quantity, itemprice, and itempromotiondiscount. Duplicate observations removed for this analysis.

[2] Returned orders identified using MAXWELL_00001421 and MAXWELL_00001422.

[3] At variable, quantity. Unshipped orders identified as orders with itemstatus equal to "Unshipped."

[4] = [1] - [2] - [3].

[8] = [5] - [6] - [7].

[10] = [8] - [9].

[11] = [8] / [4].

[12] = [10] / [4].

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**EXHIBIT 33**

**MAXWELL**
**ESTIMATED ROAS AND ROI FOR FACEBOOK/GOOGLE ADS**

|  |  | Based on Data Identified by Maxwell | Based on Amazon Sales Data, Excluding Sales Generated by Amazon Ads |
|---|---|---|---|
| | **Sales Attributable to Facebook and Google** | [A] | [B] |
| [1] | Units | 362 | 220 |
| [2] | Sales Revenues | $5,431 | $2,506 |
| [3] | Estimated COGS | $1,086 | $660 |
| [4] | Gross Profits | $4,345 | $1,845 |
| | | | |
| [5] | ASP | $15.00 | $11.38 |
| [6] | Cost/Unit | $3.00 | $3.00 |
| [7] | Gross Profit/Unit | $12.00 | $8.38 |
| | | | |
| | **Amount Spent on Facebook and Google Ads** | | |
| [8] | Total Spend on Facebook Ads | $379 | $379 |
| [9] | Total Spend on Google Ads | $147 | $147 |
| [10] | Total Spend | $526 | $526 |
| | | | |
| | **Facebook and Google Combined Advertising Performance** | | |
| [11] | ROAS | 10.33 | 4.77 |
| [12] | ROI | 726% | 251% |
| | | | |
| | **Facebook Breakeven Analysis** | | |
| [13] | # of Units to Breakeven on Facebook Advertising | 32 | 45 |
| [14] | Breakeven Sales Revenues | $473 | $514 |
| [15] | Breakeven ROAS | 1.25 | 1.36 |
| | | | |
| [16] | Breakeven % of Unit Sales Attributable to Facebook/Google | 9% | 21% |
| [17] | Facebook % of Total Spend | 72% | 72% |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 33

## MAXWELL
## ESTIMATED ROAS AND ROI FOR FACEBOOK/GOOGLE ADS

Notes & Sources:

[1]-[2][A] From MAXWELL_00000824, at Units Ordered and Ordered Product Sales. In his interrogatory responses, Maxwell described MAXWELL_00000824 as showing "sales that were connected to customers who chose to use a discount code that Cain Maxwell included in his Facebook ads" and "sales that were connected to customers who chose to use a discount code that Cain Maxwell included in his Google ads." Plaintiff Cain Maxwell's Fourth Amended Answers and Objections to Facebook's Fifth Set of Interrogatories, October 20, 2020, at 2-3. Data from August 10, 2018 through May 20, 2019.

[1][B] = [2] / [5].

[2][B] From Exhibit 34 and Exhibit 32. Calculated as Total Net Sales Amount After Promotion Discounts - Total Sales Attributable to Amazon ads. Sales data from August 2018 through April 2019.

[3] = [1] * [6].

[4] = [1] * [7].

[5][A] = [2] / [1].

[5][B] From Exhibit 32, at Average Sales Price (After Promotion Discounts).

[6] From Maxwell Deposition, at 64-65.

[7] = [5] - [6].

[8] From Exhibit 25.

[9] From Exhibit 34.

[10] = [9] / [8].

[11] = [2] / [10].

[12] = ( [4] - [10] ) / [10]. ROI calculated based on estimated gross profits.

[13] = [8] / [7].

[14] = [13] * [5].

[15] = [14] / [8].

[16] = [13] / [1].

[17] = [10] / [8].

# EXHIBIT 34

## MAXWELL
## GOOGLE AND AMAZON AD CAMPAIGNS

| Google Campaign | Start Date | Estimated Duration | End Date | Daily Budget | Spending | Impressions | Clicks | Cost Per Click | CTR |
|---|---|---|---|---|---|---|---|---|---|
| [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] |
| [1] Campaign #1 | 9/13/2018 | 21 | 9/23/2018 | $2.50 | $51.86 | 6,141 | 45 | $1.15 | 0.7% |
| [2] Concealed Carry Alternative | 3/20/2019 | 13 | 4/2/2019 | $5.00 | $65.08 | 14,839 | 180 | $0.36 | 1.2% |
| [3] May2019 Traffic 1 (Affiliate URL) | 5/11/2019 | 6 | 5/31/2019 | $5.00 | $30.04 | 1,873 | 76 | $0.40 | 4.1% |
| [4] Total | | | | | $146.98 | 22,853 | 301 | $0.49 | 1.3% |

| Amazon Campaign | Start Date | Estimated Duration | End Date | Daily Budget | Spending | Impressions | Clicks | Cost Per Click | CTR | Orders | Sales | ROAS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [K] | [L] | [M] | [N] | [O] | [P] | [Q] | [R] | [S] | [T] | [U] | [V] | [W] |
| [5] Automatic Gun Magnet Launch | 8/29/2018 | 3 | 8/31/2018 | $5.00 | $14.20 | 25,611 | 46 | $0.31 | 0.2% | 2 | $29.98 | 2.11 |
| [6] Manual Gun Magnet Campaign | 8/29/2018 | 28 | 9/26/2018 | $5.00 | $140.82 | 22,709 | 159 | $0.89 | 0.7% | 12 | $220.87 | 1.57 |
| [7] Manual Gun Magnet Product targeting Campaign | 11/24/2018 | 2 | 11/26/2018 | $5.00 | $12.18 | 19,117 | 40 | $0.30 | 0.2% | 1 | $16.99 | 1.39 |
| [8] O9-8K5J-S6FI - Magnetic Gun Mount - Automatic | 12/16/2018 | 2 | 12/18/2018 | $30.00 | $67.20 | 85,784 | 148 | $0.45 | 0.2% | 13 | $246.37 | 3.67 |
| [9] O9-8K5J-S6FI -Magnetic Gun Mount - Manual | 12/16/2018 | 17 | 1/1/2019 | $30.00 | $499.20 | 74,361 | 474 | $1.05 | 0.6% | 50 | $849.56 | 1.70 |
| [10] Total | | | | | $733.60 | 227,582 | 867 | $0.85 | 0.4% | 78 | $1,363.77 | 1.86 |

Notes & Sources:

   [A] From MAXWELL_00000921.

   [B] From MAXWELL_00000830.

   [C] = [F] / [E]. Duration in days.

   [D] From MAXWELL_00000899. Assumes change in status from 'Active' to 'Paused' indicates campaign end date.

[E]-[J] From MAXWELL_00000921.

   [I] = [F] / [H].

   [J] = [H] / [G].

[K]-[L] From MAXWELL_00001351.

   [M] = [P] / [O]. Duration in days.

   [N] = [L] + [M].

[O]-[V] From MAXWELL_00001351.

   [W] = [V] / [P].

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 35**

**MAXWELL**
**COMPARISON OF FACEBOOK, GOOGLE, AND AMAZON ADVERTISING PERFORMANCE**





Notes & Sources:
From Exhibit 25 and Exhibit 34.

APPENDIX A

# Catherine Tucker

MIT Sloan School of Management                    Tel: (617) 252-1499
100 Main St, E62-536                                  cetucker@mit.edu
Cambridge MA 02142                 http://mitmgmtfaculty.mit.edu/cetucker/

---

## Education

Stanford University, Ph.D. in Economics (Advisor: Tim Bresnahan), 2005

Oxford University, BA in Politics, Philosophy and Economics, 1999

---

## Appointments

MIT Sloan, Sloan Distinguished Professor of Management Science, September 2015 –

MIT Sloan, Chair MIT Sloan PhD Program, July 2015 –

MIT Sloan, Professor of Management Science, July 2015 –

MIT, Co-Founder of the MIT CryptoEconomics Lab, 2018 -

National Bureau of Economic Research (NBER), Research Associate, September 2012 –

MIT Sloan, Mark Hyman Jr. Career Development Professor (with tenure), July 2012 – September 2015

MIT Sloan, Associate Professor of Management Science, July 2011 – July 2015

National Bureau of Economic Research (NBER), Faculty Research Fellow, May 2011 – September 2012

MIT Sloan, Douglas Drane Career Development Chair in IT and Management, July 2006 –

MIT Sloan, Assistant Professor of Marketing, July 2005 – June 2011

---

# APPENDIX A

Honors and Awards

| | |
|---|---|
| 2020 | CITI Fellowship (Columbia University Institute of TeleInformation) |
| 2020 | O'Dell Award |
| 2020 | TechSIG-Lazaridis Prize for Best Paper in Innovation, Technology and Interactivity for 2019 |
| 2018 | ISMS Long Term Impact Award |
| 2018 | O'Dell Award |
| 2018 | MSI Scholar |
| 2017 | Congressional Testimony on 'Algorithms: How Companies' Decisions About Data and Content Impact Consumers'- |
| 2017 | Nominated for Teacher of the Year award (Also in 2012, 2010 and 2009) |
| 2015 | Erin Anderson Award |
| 2014 | Paul E. Green Award |
| 2013 | Teacher of the Year Award, MIT Sloan |
| 2013 | Jamieson Prize for Excellence in Teaching |
| 2012 | Garfield Economic Impact Award for Best Paper in Health Economics |
| 2011 | WHITE Award for best paper in the Economics of Healthcare IT |
| 2011 | Public Utility Research Prize for the best paper in regulatory economics |
| 2011 | NSF CAREER Award |
| 2011 | MSI Young Scholar |
| 2010 | Management Science Distinguished Service Award |
| 2004 | Koret Foundation Scholar, Stanford Institute for Economic Policy Research Fellowship |
| 2004 | Fourth Annual Claire and Ralph Landau Student Working Paper prize |

Published/Accepted Papers

1. 'Identifying Formal and Informal Influence in Technology Adoption with Network Externalities', *Management Science*, Vol. 55 No. 12, December 2008, pp. 2024-2039

2. 'Privacy Protection and Technology Diffusion: The Case of Electronic Medical Records' with Amalia Miller, *Management Science (Lead Article)*, Vol. 55 No. 7, July 2009, pp. 1077-1093

# APPENDIX A

- Republished as part of INFORMS 'Healthcare in the Age of Analytics' series

3. 'How Sales Taxes Affect Customer and Firm Behavior: The Role of Search on the Internet' with Eric Anderson, Nathan Fong and Duncan Simester, *Journal of Marketing Research*, Vol. 47 No. 2, April 2010, pp. 229-239

4. 'Growing Two-sided Networks by Advertising the User Base: A Field Experiment', with Juanjuan Zhang, *Marketing Science*, Vol. 29 No. 5, September-October 2010, pp. 805-814

5. 'Privacy Regulation and Online Advertising' with Avi Goldfarb, *Management Science*, Vol. 57 No. 1, January 2011, pp. 57-71

- Nominated for Long Term Impact Award 2020

6. 'Search Engine Advertising: Channel Substitution when Pricing Ads to Context', with Avi Goldfarb, *Management Science*, Vol. 57 No 3, March 2011, pp. 458-470

7. 'Stuck in the Adoption Funnel: The Effect of Interruptions in the Adoption Process on Usage' with Anja Lambrecht and Katja Seim, *Marketing Science*, Vol. 30 No. 2, March-April 2011, pp. 355-36

8. 'Advertising Bans and the Substitutability of Online and Offline Advertising', with Avi Goldfarb, *Journal of Marketing Research (Lead Article)*, Vol. 48 No. 2, April 2011, pp. 207-227

9. 'Can Healthcare Information Technology Save Babies?' with Amalia Miller, *Journal of Political Economy*, Vol. 119 No. 2, April 2011, pp. 289-324

10. 'How Does Popularity Information Affect Choices? A Field Experiment' with Juanjuan Zhang, *Management Science*, Vol. 57 No. 5, May 2011, pp. 828-842

11. 'Online Display Advertising: Targeting and Obtrusiveness' with Avi Goldfarb, *Marketing Science (Lead Article and Discussion Paper)*, Vol. 30 No. 3, May-June 2011, pp. 389-404

- 'Rejoinder - Implications of "Online Display Advertising: Targeting and Obtrusiveness' with Avi Goldfarb, *Marketing Science*, Vol. 30 No. 3, May-June 2011, pp. 413-415
- Nominated for John D. C. Little Award
- Nominated for Long Term Impact Award 2017
- Long Term Impact Award 2018

12. 'Encryption and Data Security' with Amalia Miller, *Journal of Policy Analysis and Management*, Vol. 30 No. 3, Summer 2011, pp. 534-556

13. 'Paying With Money or With Effort: Pricing When Customers Anticipate Hassle' with Anja Lambrecht, *Journal of Marketing Research*, Vol. 49 No. 1, February 2012, pp. 66-82.

# APPENDIX A

14. 'Heterogeneity and the Dynamics of Technology Adoption' with Stephen Ryan, *Quantitative Marketing and Economics*, Vol 10 No. 1, March 2012, pp 63-109

15. 'Shifts in Privacy Concerns', *American Economic Review: Papers and Proceedings* with Avi Goldfarb, Vol. 102 No. 3, May 2012, pp. 349-53

16. 'How does the Use of Trademarks by Intermediaries Affect Online Search?' with Lesley Chiou. *Marketing Science*, Vol 31 No. 5, September 2012, pp 819-837

17. 'Active Social Media Management: The Case of Health Care' with Amalia Miller. *Information Systems Research*, Vol. 24 No. 1, March 2013, pp. 52-70

    - Republished as part of Informs 'Healthcare in the Age of Analytics' series

18. 'Paywalls and the Demand for News' with Lesley Chiou. *Information Economics and Policy*, Vol. 25 No. 2, June 2013, pp. 61-69

19. 'Days on Market and Home Sales' with Juanjuan Zhang and Ting Zhu. *RAND Journal of Economics*, Vol. 44 No. 2, Summer 2013, pp. 337-360,

20. 'When Does Retargeting Work? Timing Information Specificity' with Anja Lambrecht. *Journal of Marketing Research (Lead Article)* Vol. 50 No. 5, October 2013, pp. 561-576

    - Paul E. Green Award for the 'Best article in the Journal of Marketing Research that demonstrates the greatest potential to contribute significantly to the practice of marketing research.'

    - William O'Dell Award. This award award honors the JMR article published in 2013 that has made the most significant, long-term contribution to marketing theory, methodology, andor practice

21. 'Health Information Exchange, System Size and Information Silos' with Amalia Miller. *Journal of Health Economics*, Vol. 33 No. 2, January 2014: pp. 28-42

22. 'Electronic Discovery and the Adoption of Information Technology' with Amalia Miller. *Journal of Law, Economics, & Organization (Lead Article)*, Vol. 30. No. 2, May 2014, pp. 217-243

23. 'Social Networks, Personalized Advertising, and Privacy Controls.', *Journal of Marketing Research*, Vol. 51 No. 5, October 2014, pp. 546-562.

    - Citation of Excellence Award Emerald Publishing

    - Nominated for William O'Dell Award (2019)

24. 'Trademarks, Triggers, and Online Search' with Stefan Bechtold. *Journal of Empirical Legal Studies*, Vol. 11 No. 4, December 2014

25. 'The Reach and Persuasiveness of Viral Video Ads' *Marketing Science*, Vol. 34 No. 2, 2015, pp. 281-296

# APPENDIX A

26. 'Privacy Regulation and Market Structure' with James Campbell and Avi Gold-farb. *Journal of Economics & Management Strategy*, Vol 24, No. 1, Spring 2015, pp. 47-73

27. 'Standardization and the Effectiveness of Online Advertising' with Avi Goldfarb. *Management Science*, Vol. 61 No. 11, 2015, pp. 2707-2719

28. 'Harbingers of Failure' with Eric Anderson, Song Lin and Duncan Simester. *Journal of Marketing Research (Lead Article)*, Vol. 52 No. 5, Oct 2015, pp. 580-592

    - William O'Dell Award. This award award honors the JMR article published in 2015 that has made the most significant, long-term contribution to marketing theory, methodology, and/or practice

29. 'The Effect of Patent Litigation and Patent Assertion Entities on Entrepreneurial Activity' with Stephen Kiebzaka. and Greg Rafert. *Research Policy*, Vol. 45 No. 1, February 2016, pp. 218-231

30. 'When early adopters don't adopt' with Christian Catalini. *Science*, Vol. 357, Issue 6347, 2017 pp. 135-136

31. 'Network Stability, Network Externalities, and Technology Adoption' in *Advances in Strategic Management*, Vol. 37, 2017, pp.151 - 175

32. 'Digital Content Aggregation Platforms: The Case of the News Media.' with Lesley Chiou. *Journal of Economics & Management Strategy*, Vol. 26 No. 4, 2017, pp. 782-805

33. 'Should You Target Early Trend Propagators? Evidence from Twitter' with Anja Lambrecht and Caroline Wiertz (Lead Article). *Marketing Science*, Vol. 37 No. 2, 2018, pp. 177-199

34. 'Privacy Protection, Personalized Medicine and Genetic Testing' with Amalia Miller. *Management Science*, Vol. 64 No. 10, 2018, pp. 4648-4668.

35. 'Digital Economics' with Avi Goldfarb, *Journal of Economic Literature*, Vol. 57 No. 1, 2019, pp. 3-43

36. Collusion by Algorithm: Does Better Demand Prediction Facilitate Coordination Between Sellers? with Jeanine Miklós-Thal *Management Science*, Vol. 65 No. 4, 2019, pp. 1552-1561

37. 'Algorithmic Bias? An Empirical Study into Apparent Gender-Based Discrimination in the Display of STEM Career Ads ' with Anja Lambrecht. *Management Science* 2019, Vol 65, No 7, pp. 2966-2981

    - TechSIG-Lazaridis Prize for Best Paper in Innovation, Technology and Interactivity for 2019

## APPENDIX A

38. 'How Effective Is Black-Box Digital Consumer Profiling And Audience Delivery?: Evidence from Field Studies' with Nico Neumann and Tim Whitfield. *Marketing Science*, Dec, 2019, Vol 38, No 6, pp. 918-926 (Lead Article)

39. The Surprising Breadth of 'Harbingers of Failure' with Duncan Simester and Clair Yang. *Journal of Marketing Research* 2019, Vol 56, No. 6, pp 1034-1049

40. 'Consumer privacy and the future of data-based innovation and marketing.' with Alexander Bleier and Avi Goldfarb. Forthcoming at *International Journal of Research in Marketing*

41. 'Information Shocks and Internet Silos: Evidence from Creationist Friendly Curriculum' with Ananya Sen. Forthcoming at *Journal of Marketing Research*

42. 'Informational Challenges in Omnichannel Marketing: Remedies and Future Research' with Tony Cui, Anindya Ghose, Hanna Halaburda, Raghuram Iyengar, Koen Powels, S. Siriam, and Sriraman Vankatarman. Forthcoming at *Journal of Marketing*

43. 'How Do Restrictions on Advertising Affect Consumer Search?' with Lesley Chiou. Forthcoming *Management Science*

---

## CHAPTERS IN EDITED VOLUMES AND SUMMARY PIECES

44. 'Modeling Social Interactions: Identification, Empirical Methods and Policy Implications' with Wes Hartmann, Puneet Manchanda, Harikesh Nair, Matt Bothner, Peter Dodds, David Godes and Karthik Hosanagar, *Marketing Letters*, Vol. 19 No. 3, December 2008, pp. 287-304

45. 'Search Engine Advertising - Examining a profitable side of the long tail of advertising that is not possible under the traditional broadcast advertising model' with Avi Goldfarb, *Communications of the ACM*, Vol. 51 No. 11, November 2008, pp. 22-24

46. 'Online Advertising', with Avi Goldfarb, *Advances in Computers*, Vol. 81, March 2011, Marvin Zelkowitz (Ed), Elsevier

47. 'Substitution between Online and Offline Advertising Markets', with Avi Goldfarb, *Journal of Competition Law and Economics*, Vol. 7 No. 1, March 2011, pp. 37-44

48. 'Online Advertising, Behavioral Targeting, and Privacy', with Avi Goldfarb, *Communications of the ACM*, Vol. 54 No. 5, May 2011, 25-27

49. 'Privacy and Innovation', *Innovation Policy and the Economy*, Vol. 11, 2012, Josh Lerner and Scott Stern (Eds), NBER

**APPENDIX A**

50. 'The Economics of Advertising and Privacy', *International Journal of Industrial Organization*, Vol. 30 No. 3, May 2012, pp. 326-329

51. 'Empirical Research on the Economic Effects of Privacy Regulation'. *Journal on Telecommunications and High Technology Law*, Vol. 10 No. 2, Summer 2012, pp. 265-272

52. 'Social Networks, Advertising and Antitrust', with Alex Marthews, *George Mason Law Review*, 2012, Vol 19 No 5., pp. 1211-1227.

53. 'Why Managing Customer Privacy Can Be an Opportunity' with Avi Goldfarb, *Spring 2013, Sloan Management Review*

54. 'The Implications of Improved Attribution and Measurability for Antitrust and Privacy in Online Advertising Markets', *George Mason Law Review*, Vol. 2 No. 2, pp. 1025-1054 (2013).

55. 'Patent Trolls and Technology Diffusion' Chapter in NBER book 'Standards, Patents and Innovations' (2014), Timothy Simcoe, Ajay K. Agrawal, and Stuart Graham

56. 'Privacy and the Internet' Chapter 11, *Handbook of Media Economics*, 2016, Edited by Simon Anderson and Joel Waldfogel

57. Frontiers of Health Policy: Digital Data and Personalized Medicine, *Innovation Policy and the Economy*, Vol. 15, 2016, Josh Lerner and Scott Stern (Eds), NBER

58. 'Impacts of Surveillance on Behavior' with Alex Marthews, in Gray, David C. and Henderson, Stephen (Editors), *The Cambridge Handbook of Surveillance Law* (2017).

59. 'On Storks and Babies: Correlation. Causality and Field Experiments, ' with Anja Lambrecht, *GfK Marketing Intelligence Review*, Vol 8. No 2. 2016

60. 'Field Experiments in Marketing,' with Anja Lambrecht, *Handbook of Marketing Analytics*, Edited by Natalie Mizik and Dominique Hanssens, Edward Elgar Publishing, (2018)

61. 'Can Big Data Protect a Firm from Competition?', *CPI Chronicle*, January, 2017 with Anja Lambrecht

62. Network Effects and Market Power: What Have We Learned in the Last Decade? *Antitrust* Vol. 32 No 2., Spring 2018

63. 'Inequality, Privacy and Digital Market Design', with Avi Goldfarb, Chapter in *Fair by Design* edited by Scott Kominers and Alex Teytelboym, 2017, Oxford University Press

# APPENDIX A

64. 'Digital Data, Platforms and the Usual [Antitrust] Suspects: Network Effects, Switching Costs, Essential Facility' *Review of Industrial Organization* Volume 54, pp 683–694 (2019)

65. 'Antitrust and Costless Verification: An optimistic and a pessimistic view of the implications of blockchain technology' with Christian Catalini, *Antitrust Law Journal* - Volume 82 Issue 3, 2019

66. Online Advertising and Antitrust: Network Effects, Switching Costs and Data as an Essential Facility. April 2019, *'Competition Policy International'*

67. Blockchain and Identity Persistence, with Alex Marthews, Chapter in *Cryptoassets: Legal, Regulatory, and Monetary Perspective*, edited by Chris Brummer, Oxford University Press, 2019.

68. 'Digital Marketing,' with Avi Goldfarb, in the *Handbook of the Economics of Marketing*, Volume 1, edited by JP-Dube and Peter Rossi, pp. 259-290, Elsevier

69. 'Privacy Policy and Competition', with Alex Marthews. *Brookings Papers*

70. Digital Infrastructure: Does the 'Coring'of Digital Platforms make them part of Digital Infrastructure?." (2020) in 'Economic Analysis and Infrastructure Investment' edited by Edward L. Glaeser and James M. Poterba, University of Chicago Press

71. Competition in the Digital Advertising Market, The Global Antitrust Report on the Digital Economy

---

## BOOKS EDITED

72. The Evolution of Antitrust in the Digital Era: Essays on Competition Policy, with David Evans and Alan Fels Ao. November 9, 2020

73. Blockchain: The Insights You Need from Harvard Business Review (HBR Insights Series), 2019

74. Economic Analysis of the Digital Economy, University of Chicago Press, 2015, with Avi Goldfarb and Shane Greenstein

75. The Economics of Digitization, Edward Elgar Publishing, 2013., with Avi Goldfarb and Shane Greenstein

---

## POLICY WRITING

76. OECD Roundtable on Privacy, Report on the 'Economic Value of Online Information', December 2010

# APPENDIX A

77.  Written Congressional Testimony on 'Internet Privacy: The Impact and Burden of European Regulation,' U.S. House Energy and Commerce Committee, September 2011

78.  Written Congressional Testimony on 'Algorithms: How Companies' Decisions About Data and Content Impact Consumers,' U.S. House Energy and Commerce Committee, November 2017

---

## PAPERS UNDER REVIEW

79.  'Social Advertising: How Advertising that Explicitly Promotes Social Influence Can Backfire'. Revise and resubmit at *Management Science*

80.  'Patent Trolls and Technology Diffusion: The Case of Medical Imaging' Revise and resubmit at *RAND Journal of Economics*

81.  'Third-Party Certification: The Case of Medical Devices' with Cristina Nistor Revise and resubmit at *Management Science*

82.  'Guns, Privacy and Crime' with Alessandro Acquisti Revise and resubmit at *Information Systems Research*

83.  'Does IT Lead to More Equal or More Unequal Treatment? An Empirical Study of the Effect of Smartphoe Use on Social Inequality in Employee-Customer interactions' with Shuyi Yu. Revise and resubmit at *Journal of Marketing Research*

84.  'The Digital Privacy Paradox: Small Money, Small Costs, Small Talk' with Susan Athey and Christian Catalini, Revise and resubmit at *Journal of Marketing Research*

85.  'Tensile Promotions in Displays Advertising' with Anja Lambrecht Revise and resubmit at *Quantitative Marketing and Economics*

86.  'A New Method of Measuring Online Media Advertising Effectiveness: Prospective Meta-Analysis in Marketing' with Gui Liberali, Glen L. Urban, Benedict G. Dellaert, Yakov C. Bart, and S. Stremersch.

87.  'Apparent Algorithmic Discrimination and Real-Time Algorithmic Learning with Anja Lambrecht

88.  'Personalizing mental fit for online shopping applications - How the success of recommendations depends on mental categorization and mental budgeting' with Oliver Emrich and Thomas Rudolph.

89.  'Government Surveillance and Internet Search Behavior' with Alex Marthews

90.  'TV Advertising and Online Sales: The Role of Inter-Temporal Substitution' with Anja Lambrecht and Xu Zhang

# APPENDIX A

91. 'Social Distancing and School Closures: Documenting Disparity in Internet Access among School Children' with Ananya Sen

92. 'Asymmetric Consequences of Cyber-Vulnerability on Health Services' with Yiting Deng and Anja Lambrecht

93. 'Tradeoffs in Automated Political Advertising Regulation: Evidence from the COVID-19 Pandemic' with Grazia Cecere, Clara Jean, and Vincent Lefrere

94. 'Social Distancing, Internet Access and Inequality' with Leslie Chiou

95. 'Conducting Research with Quasi-Experiments: A Guide for Marketers' with Avi Goldfarb and Yanwen Wang

96. Data Deserts and Black Boxes: The Impact of Socio-Economic Status on Consumer Profiling with Nico Neumann

---

## WORK IN PROGRESS

### *Manuscripts*

97. Health IT and Ambulatory Care Quality with Carole R. Gresenz, Scott Laughery, and Amalia R. Miller

98. 'Testimonial Advertising on Social Networks to Existing Customers and New Customers' with Shuyi Yu *Data Analysis*

99. 'Data Privacy and Children: An Empirical Study of Mobile Applications' with Grazia Cecere, Fabrice Le Guel, Vincent Lefrere, and Pai-Ling Yin

100. 'Big Bad Data: The Case of For-Profit College Advertising' with Avinash Gannamaneni and Avi Goldfarb

101. 'Selection and Inequality in Big Data' with Amalia Miller

102. 'Spillovers from Product Failure' with Amalia Miller

103. 'Rules For a Nascent Domain: Technological Innovation and Regulatory Uncertainty' with Christian Catalini

104. 'The Shifters and Virality of Hate Speech Online' with Uttara Ananthakrishnan

105. 'Privacy, Surveillance and Antitrust' with Alex Marthews

### *Data Collection*

106. 'Mergers and Big Data: Evidence from Healthcare' with Amalia Miller

107. 'Privacy Regulation and Education IT" with Amalia Miller and Avi Goldfarb

# APPENDIX A

108. 'The Lack of Appeal of Cross-Partisan Appeals: Evidence from an Experiment on Facebook' with Christina Tucker

109. 'The Resillience of Franchise Business Models: Evidence from the Pandemic' with Avi Goldfarb, Verina Que and Shuyi Yu

---

INVITED SEMINARS

*Universities*
1. March 2021, BIDT, Bavarian Academy of Sciences and Humanities
2. February 2021, University of Virginia, Law and Economics Seminar
3. January 2021, Marketing Group, Carnegie Mellon University
4. December 2020, Boston University, Boston Digital Leadership Forum
5. December 2020, Toulouse University, France
6. November 2020, Luohan Academy, Platform Economy and Market Dynamics, Virtual Seminar
7. November 2020, John Hopkins University
8. October 2020, Wharton, Marketing Group
9. October 2020, ITAM, Mexico City
10. September 2020, Econ, Stats and ML Team, Etsy
11. June 2020, CMU Seminar
12. April 2020, Virtual Digital Economy Seminar
13. March 2020, IS group, University of Minnesota
14. February 2020, Georgia Institute of Technology, GA
15. December 2019, HBS Field Experiments Seminar, Cambridge, MA
16. November 2019, Bank of Canada, Ottawa
17. May 2019, Joint-Economics Seminar, Autonomous University of Barcelona) and the IAE (Institute for Economic Analysis)
18. March 2019, LMU Center for Advanced Management Studies in Munich
19. February 2019, Berlin Applied Micro Seminar
20. January 2019, Marketing Group, University of Bologna
21. January 2019, Marketing Group, University College, London
22. January 2019, Marketing Group, London Business School
23. November 2018, Marketing Group, HEC Paris, France
24. November 2018, Management Group, Cass Business School, City University of London, UK
25. November 2018, Marketing Group, SOAS University of London
26. November 2018, All Souls College, Oxford
27. November 2018, Economics Group, Paris Telecom
28. October 2018, Marketing Group, University of Amsterdam, Netherlands
29. October 2018, Marketing Group, King's Business School, King's College, London

## APPENDIX A

30. September 2018, Marketing Group, University of Frankfurt, Germany
31. June 2018, Harbin Institute of Technology, China
32. February 2018, IS/OM Group, New York University, NY
33. November 2017, Marketing Group, Rochester University, NY
34. October 2017, Marketing Group, Maryland University, MD
35. May 2017, Marketing Group, Old Dominion University
36. April 2017, Marketing Group, University of Southern California
37. March 2017, Marketing Group, Arison School of Business, IDC, Israel
38. January 2017, Distinguished Speakers Series, McGill University, Canada
39. September 2016, Technology Group, Harvard Business School, MA
40. August 2016, Southern Jiatong University, Sichuan, China
41. May 2016, Chapman University, Marketing Group
42. April 2016, Carnegie Mellon University, Public Policy Group
43. April 2016, Harvard Business School, Entrepreneurial Management Group
44. March 2016, INSEAD, Marketing Group
45. March 2016, University of Paris-Sud, Privacy Research Group
46. March 2016, Vienna University of Economics and Business, Marketing Group
47. September 2015 University of Maryland, IS Group
48. June 2015, Marketing Group, University of Cambridge, UK
49. May 2015, Marketing Group, University of Texas at Dallas, TX
50. March 2015, Health Policy Group, Georgia State University, GA
51. March 2015, Marketing Group, University of Colorado, CO
52. February 2015, Strategy Group, University of North Carolina, NC
53. January 2015, Marketing Group, Emory University, GA
54. December 2014, OPIM, Wharton School of Management, PA
55. October 2014, Economics Department, Yale University, CT
56. September 2014, Marketing Group, Boston University, MA
57. March 2014, Technology Group, University of California at Berkeley, CA
58. January 2014, Marketing Department at Texas A&M
59. November 2013, Marketing Group, University of California at Berkeley, CA
60. October 2013, Marketing Group, Tulane University, LA
61. October 2013, Marketing Group, University of Houston, TX
62. May 2013, Tuck School of Management, Dartmouth University, NH
63. March 2013, Economics Department, University of Toulouse
64. March 2013, Marketing Group, Rotterdam University
65. March 2013, Economics Department, University of Zurich
66. March 2013, Marketing group, Georgia Tech
67. January 2013, Anderson School, UCLA
68. January 2013, Marketing Group, CMU
69. October 2012, Marketing Group, Stanford University
70. October 2012, Marketing Group, Columbia University
71. October 2012, Marketing Group, University of Texas at Austin

# APPENDIX A

72. September 2012, Marketing Group, Harvard Business School
73. June 2012, Strategy Group, London Business School
74. March 2012, Marketing Group, Cornell
75. February 2012, IS Group, Indian School of Business
76. February 2012, Marketing Group, Wharton
77. January 2012, Marketing Group, UCLA
78. November 2011, Marketing Group, University of Rochester
79. October 2011, Marketing Group, University of Zurich
80. October 2011, Department of Law and Economics, Swiss Federal Institute of Technology, Zurich
81. May 2011, Marketing Group, National University of Singapore
82. May 2011, IS Group, National University of Singapore
83. May 2011, Strategy Group, LMU Munich
84. May 2011, Marketing Group, New York University
85. March 2011, Marketing Group, Florida University
86. February 2011, IS Group, New York University
87. November 2010, European School of Management and Technology
88. October 2010, Marketing Group, Yale University
89. October 2010, Networked Business Group, Harvard Business School
90. September 2010, TIES Group, MIT Sloan
91. July 2010, Department of Economics, University of Mannheim
92. March 2010, Marketing Group, Wharton School, University of Pennsylvania
93. January 2010, Marketing Group, University of Michigan
94. November 2009, Marketing Group, University of California at Berkeley
95. October 2009, Digital Business Seminar, MIT Sloan
96. December 2008, Marketing Group, MIT Sloan
97. November 2008, Marketing Group, Rady School of Business, UCSD
98. September 2008, Strategy Group, MIT Sloan
99. May 2008, Digital Strategy Group, Tuck School of Business, Dartmouth University
100. April 2008, Kellogg Management and Strategy Group, Northwestern University
101. March 2008, Marketing Group, Duke University
102. March 2008, Strategy Group, Chicago GSB
103. July 2007, Marketing Group, London Business School, London, UK
104. April 2007, Marketing Group, Chicago GSB
105. March 2007, Marketing Group, Rotman School, University of Toronto
106. November 2005, Economics Department, Harvard University
107. October 2004-February 2005 (Job Market): NYU Stern, University of Michigan, University of Arizona, University of British Columbia, Federal Reserve Board, Federal Reserve Bank of New York, Harvard Business School, Kellogg, MIT Sloan, Federal Reserve Bank of Chicago, Stanford Economics Department

# APPENDIX A

*Other*

108. June 2020, EE Times- Privacy and Security during Covid-19
109. May 2020, The Digital Economy & The Coronavirus, Bertelsmann Foundation Seminar
110. April 2020, Technology Policy Institute
111. October 2018, Digital Competition Expert Panel, HM Treasury, UK
112. October 2018, Competition and Markets Authority, UK
113. January 2018, IMF
114. December 2017, Technology Policy Institute
115. October 2016, Federal Communications Commission
116. April 2015, Federal Communications Commission
117. November 2014, Office of Research at the Consumer Financial Protection Bureau
118. April 2014, Big Data Working Group, The White House.
119. February 2014, Main Street Patent Coalition, Panel hosted at the Senate by Senator Orrin Hatch
120. July 2013, Federal Communications Commission
121. August 2012, DG Competition, European Commission, Brussels
122. August 2012, Technology Policy Institute Conference, Aspen
123. December 2011, Havas Digital, New York
124. June 2011, Eneca
125. September 2010, Federal Trade Commission
126. September 2010, Google European Public Policy Unit, Paris
127. July 2009, Information Technology and Innovation Foundation, Washington DC

---

## PRESENTATIONS OF RESEARCH AT CONFERENCES

1. December 2020, Digital Economics Research Network Conference
2. December 2020, Conference on Artificial Intelligence, Machine Learning, and Business Analytics
3. December 2020, Health Systems Innovation Advisory Board Meeting
4. November 2020, 2nd Luohan Academy Frontier Dialogue - Platform Economy and Market Dynamics
5. October 2020, Policy Toolkit for a Better Europe, European Commission
6. September 2020, ICN Annual conference
7. June 2020, Marketing Science
8. June 2020, International Competition Network, 'Competition law enforcement at the intersection of Competition, Consumer Protection, and Privacy'
9. November 2019, ABA Fall Forum: The Tech Summit, Washington DC.
10. November 2019, Annual Challenges to Antitrust in a Changing Economy, Harvard Law School
11. October 2019, World Bank Platforms Summit, Washington DC.
12. September 2019, Economics of AI Doctoral Consortium, Toronto

### APPENDIX A

13. July 2019, Quantitative Marketing and Structural Econometrics Workshop, Northwestern University
14. June 2019, Marketing Science, Rome
15. June 2019, Keynote Speaker, ZEW Conference on the Economics of Information and Communication Technologies, Mannheim
16. June 2019 Keynote Speaker, Munich Summer Institute, Munich
17. May 2019, Keynote Speaker, 3rd Doctoral Workshop on the Economics of Digitization, Brussels
18. November 2019, FTC Hearings on Big Data, Privacy, and Competition
19. October 2019, FTC Hearings on Platform Economics, George Mason University
20. June 2018, Antitrust and Big Data, Penn Wharton China Center Conference, Beijing
21. June 2018, Marketing Science
22. May 2018, Boston College Digital Innovation Workshop
23. December 2017, Mobile Marketing and Big Data Conference, NYU
24. September 2017, NBER Economics of AI Conference
25. July 2017, BU Platforms Conference
26. July 2017, NBER Digitization Meetings
27. June 2017, Marketing Science
28. June 2017, Regulation of Algorithms, Berlin
29. May 2017, Boston College Digital Innovation Workshop
30. November 2016, ICANN Public Meetings
31. October 2016, Conference on Digital Experimentation, Cambridge, MA
32. September 2016, FTC Consumer Protection Conference, Washington, DC
33. September 2016, George Washington roundtable on Platforms, Washington DC
34. May 2016, Competing with Big Data, Brugel, Brussels, Belgium
35. April 2016, NBER Innovation and Policy, Washington DC
36. April 2016, Financial Services Roundtable, NYC
37. March 2016, Digitization Tutorial, NBER
38. January 2016, PrivacyCon, FTC Conference, Washington, DC
39. July 2015, NBER Law and Economics (co-author presented), Cambridge, MA
40. July 2015, NBER Economics of Digitization, Cambridge, MA
41. June 2015, 'The Future of Research in the Digital Society', French Ministry of Culture and Communication - Toulouse School of Economics, Paris, France
42. June 2015, Marketing Science, Baltimore, MD
43. June 2015, Doctoral Consortium, Baltimore, MD
44. March 2015, IP Leadership Conference, Washington, DC
45. February 2015, Patents in Theory and Practice, Washington, DC
46. June 2014, Marketing Science, Atlanta, GA
47. May 2014, Boston College Social Media Workshop, Boston, MA
48. January 2014, American Economic Association Meetings
49. July 2013, Marketing Science, Istanbul, Turkey
50. June 2013, Searle Center Conference on Internet Search and Innovation, Chicago, IL

# APPENDIX A

51. April 2013, Brown University Mini-Networks Conference
52. February 2013, WSDM 2013 Conference (Keynote Speaker), Rome, Italy
53. January 2013, American Economic Association Meetings, San Diego, CA (Co-author presented)
54. December 2012, New York Computer Science and Economics Day
55. November 2012, Search and Competition Conference, Melbourne Australia
56. October 2012, Economics of Personal Data, (Keynote Speaker), Amsterdam
57. August 2012, Amsterdam Symposium on Behavioral and Experimental Economics
58. July 2012, Fudan University Marketing Research Symposium, China
59. June 2012, Searle Center Conference on Internet Search and Innovation, Chicago, IL
60. June 2012, Innovation, Intellectual Property and Competition Policy Conference, Tilburg, Netherlands
61. June 2012, Marketing Science, Boston, MA
62. June 2012, Social Media and Business Transformation, Baltimore, MD
63. May 2012, The Law and Economics of Search Engines and Online Advertising, George Mason University, Arlington, VA
64. February 2012, NBER Economics of Digitization (co-author presented), Cambridge, MA
65. January 2012, Symposium on Antitrust and High-Tech Industries, George Mason University, VA
66. January 2012, Patents, Standards and Innovation, Tucson, AZ
67. January 2012, Econometric Society Meetings, Chicago, IL
68. January 2012, AEA Meetings (2 papers), Chicago, IL
69. December 2011, Economics of Privacy Workshop, Boulder, CO
70. November 2011, Economics and Computation Day, Cambridge, MA
71. November 2011, HBS Strategy Research Conference, Boston, MA
72. November 2011, The Law and Economics of Internet Search and Online Advertising Roundtable, George Mason University, Arlington, VA
73. November 2011, Patents Statistics for Decision Makers, Alexandria, VA
74. October 2011, Workshop on Health IT and Economics, Washington, DC
75. October 2011, Innovation, Organizations and Society, University of Chicago, IL
76. October 2011, Direct Marketing Research Summit, Boston, MA
77. September 2011, Invited Session 'Economics and Marketing', EARIE, Stockholm, Sweden.
78. July 2011, NBER Economics of Digitization, Cambridge, MA
79. July 2011, SICS, Berkeley, CA
80. June 2011, The Law and Economics of Search Engines and Online Advertising, George Mason University, Arlington, VA
81. June 2011, Workshop on the Economics on Information Security, Washington, DC
82. June 2011, Marketing Science (3 papers), Houston, TX
83. June 2011, Searle Center Conference on Internet Search and Innovation, Chicago, IL
84. May 2011, Boston College Social Media Workshop, Boston, MA
85. May 2011, Technology Pricing Forum, Boston, MA
86. April 2011, NBER Innovation Policy and the Economy, Washington, DC

# APPENDIX A

87. April 2011, International Industrial Organization Conference (3 papers), Boston, MA
88. March 2011, Technology Policy Institute, Washington, DC
89. February 2011, NBER Economics of Digitization (co-author presented), Palo Alto, CA
90. January 2011, Sixth bi-annual Conference on The Economics of Intellectual Property, Software and the Internet (2 papers, plenary speaker), Toulouse, France
91. January 2011, MSI Young Scholars Conference, Park City, UT
92. December 2010, Workshop on Information Systems and Economics, Washington University of St. Louis (co-author presented), St. Louis, MO
93. December 2010, OECD Economics of Privacy Roundtable, Paris, France
94. November 2010, Net Institute Conference, New York, NY
95. October 2010, Workshop on Media Economics and Public Policy (co-author presented), New York, NY
96. October 2010, Workshop on Health IT and Economics, Washington, DC
97. September 2010, ITIF and CAGW Privacy Working Group Meetings, Washington, DC
98. September 2010, Medical Malpractice Conference, Mohegan, CT
99. September 2010, Search and Web Advertising Strategies and Their Impacts on Consumer Workshop, Paris, France
100. July 2010, NBER Meetings (IT), Cambridge, MA
101. July 2010, NBER Meetings (Healthcare and IT), Cambridge, MA
102. July 2010, SICS, Berkeley, CA
103. July 2010, Keynote Speaker, 8th ZEW Conference on the Economics of Information and Communication Technologies, Mannheim, Germany
104. June 2010, American Society of Health Economists Conference, Cornell, NY
105. June 2010, Marketing Science (2 papers), Koeln, Germany
106. June 2010, Workshop on the Economics of Information Security (2 papers), Harvard, MA
107. January 2010, AEA Meetings, Atlanta, GA
108. December 2009, Workshop on Information Systems and Economics, Scottsdale, AZ
109. November 2009, WPP/Google Marketing Awards, Cambridge, MA
110. July 2009, NBER meetings (IT), Cambridge, MA
111. June 2009, IHIF Debate on Privacy, Washington, DC
112. June 2009, Marketing Science, Ann Arbor, MI
113. April 2009, International Industrial Organization Conference, Boston, MA
114. January 2009, Information Security Best Practices Conference, Philadelphia, PA
115. January 2009, Modeling Social Network Data Conference, Philadelphia, PA
116. July 2008, NBER Meetings (Productivity), Cambridge, MA
117. July 2008, SICS, Berkeley, CA
118. July 2008, Fourth Workshop on Ad Auctions, Chicago, MA
119. June 2008, Marketing Science, Vancouver, BC
120. May 2008, International Industrial Organization Conference, Richmond, VA
121. April 2008, Net Institute Conference, New York, NY
122. November 2007, NBER Health Meetings (Co-author presented), Boston, MA
123. July 2007, SICS, Berkeley, CA

# APPENDIX A

124. June 2007, Workshop on the Economics of Information Security, Pittsburgh
125. June 2007, Choice Symposium, Philadelphia, PA
126. May 2007, eCommerce Research Symposium, Stamford, CT
127. April 2007, Net Institute Conference, New York, NY
128. April 2007, International Industrial Organization Conference, Savannah, GA
129. March 2007, Health Economics Conference, Tucson, AZ
130. February 2007, NBER Winter Meetings, Palo Alto, CA
131. January 2007, Economics of the Software and Internet Industries (2 Papers), Toulouse, France
132. October 2006, QME Conference, Stanford University, CA
133. June 2006, Marketing Science, Pittsburgh, PA
134. April 2006, International Industrial Organization Conference, Boston, MA
135. October 2005, NEMC Conference, Boston, MA
136. October 2005, TPRC Conference, Washington, DC
137. June 2005, CRES Industrial Organization Conference, Washington University in St. Louis, MO
138. July 2002, Payment Systems Conference, IDEI, Toulouse, France

---

## PROFESSIONAL SERVICE

- Director of the program on the economics of digitization at The National Bureau of Economic Research.
- Director of the program on the economics of digitization at The National Bureau of Economic Research.
- **Vice President (Education)**, ISMS 2019-2022
- **Associate Editor:** Management Science, Marketing Science, Journal of Marketing Research, International Journal of Research in Marketing
- **Associate Editor:** Information Systems Research, Special Issue on Social Media and Business Transformation
- **Departmental Editor:** Quantitative Marketing and Economics
- **Editor:** The Economics of the Internet, Palgrave Dictionary of Economics
- **Co-Editor:** NBER: The Economics of Digitization - An Agenda
- **Co-Editor:** Information Economics and Policy, Special Issue on Economics of Digital Media Markets
- **Editorial Review Board:** Journal of Marketing, ISR Special Issue on Managing Digital Vulnerabilities, Journal of Economic Literature

- **Conference Program Committees**
  - 2020 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
  - 2020 Organizer, ISMS Doctoral Consortium
  - 2019 Co-organizer, NBER Conference on the Economics of Artificial Intelligence

# APPENDIX A

– 2019 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
– 2019 Program Committee: Workshop on the Economics of Information Security
– 2019 Scientific Committee: IP Statistics for Decision Makers
– 2018 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
– 2017 Scientific Committee: IP Statistics for Decision Makers
– 2017 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
– 2017 Program Committee: Workshop on the Economics of Information Security
– 2016 Program Committee: Workshop on the Economics of Information Security
– 2016 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
– 2015 Scientific Committee: Competition, Standardization and Innovation
– 2015 Scientific Committee: Intellectual Property Statistics for Decision Makers
– 2015 Associate Editor: ICIS 2015, Healthcare track
– 2015 Scientific Committee: European Association for Research in Industrial Economics
– 2015 Program Committee: ACM Conference on Economics and Computation
– 2015 Program Committee: Workshop on the Economics of Information Security
– 2015 Chief-Organizer: Quantitative Marketing and Economics Conference
– 2015 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
– 2014 Scientific Committee: European Association for Research in Industrial Economics
– 2014 Scientific Committee: Conference on the Economics of Information and Communication Technologies
– 2014 Program Committee: International Conference on Big Data and Analytics in Healthcare
– 2013 Program Committee: Quantitative Marketing and Economics
– 2013 Scientific Committee: European Association for Research in Industrial Economics Conference
– 2013 Scientific Committee: Conference on the Economics of Information and Communication Technologies
– 2013 Program Committee: Workshop on the Economics of Information Security
– 2013 Associate Editor of Personal Data Markets Track: ECIS 2013
– 2012 Program Committee: European Association for Research in Industrial Economics Conference
– 2012 Program Committee (Conference Organizer) NBER: The Economics of Digitization Pre-Conference, June 2012
– 2012 Scientific Committee: Conference on the Economics of Information and Communication Technologies
– 2012 Senior Program Committee: 13th ACM Conference on Electronic Commerce
– 2012 Program Committee: Workshop on the Economics of Information Security
– 2011 Scientific Committee: European Association for Research in Industrial Economics

## APPENDIX A

Conference
– 2011 Scientific Committee: Conference on the Economics of Information and Communication Technologies
– 2011 Program Committee: Ad Auctions Workshop
– 2011 Program Committee: Workshop on the Economics of Information Security
– 2010 Program Committee: Workshop on IT and Economic Growth
– 2010 Program Committee: Conference on Health IT and Economics
– 2010 Program Committee: Workshop on the Economics of Information Security
– 2009 Program Committee: Workshop on the Economics of Information Security
– 2008 Program Committee: Workshop on the Economics of Information Security
– 2008 Program Committee: Ad Auctions Workshop

**External Affiliations**
- **Affiliate:** CESifo Research Network
- **Advisory Board:** Future of Privacy Forum

## MIT SERVICE

- 2015- Faculty Chair, PhD program
- 2015- EMBA Committee
- 2015- ASB Committee
- 2014- MIT Sloan Gender Equity Committee
- 2013-2014 Group Head, Marketing Group
- 2013-2014 Chair, Marketing Faculty Search Committee
- 2013-2014 MIT Committee on Undergraduate Admissions and Financial Aid
- 2011 North East Marketing Conference Coordinator
- 2011 MIT Sloan Marketing Conference, Panel Moderator
- 2011 Sloan Women in Management Conference, Panel Moderator
- 2005, 2008, 2012 Marketing Faculty Search Committee

## ADVISING

- 2019: Shuyi Yu, PhD Thesis supervisor
- 2016: Abhishek Nagaraj, PhD Thesis advisor
- 2012: Cristina Nistor, PhD Thesis advisor
- 2010: Katherine Molina, Masters Thesis
- 2008: Dinesh Shenoy, Masters Thesis
- 2007: James Kelm, Masters Thesis

# APPENDIX A

GRANTS AND SUPPORT

*Academic Grants*

| | | |
|---|---|---:|
| 2018 | Sloan Foundation Grant (2018-2021), 'NBER Project on the Economics of Artificial Intelligence' - Grant supporting series of NBER Economics of AI Conferences. (Joint with Ajay Agrawal, Joshua Gans and Avi Goldfarb) | $914,250 |
| 2017 | Net Institute Grant (Joint with Anuj Kapoor) | $3,000 |
| 2016 | Net Institute Grant (Joint with Christian Catalini) | $6,000 |
| 2013 | MSI research Grant 4-1840 (Joint with Anja Lambrecht) | $10,200 |
| 2011 | Tilburg Law and Economics Center (TILEC) IIPC grant | $21,000 |
| 2011 | Google Grant | $50,000 |
| 2011 | Junior Faculty Research Assistance Program | $30,000 |
| 2011 | Net Institute Grant | $6,000 |
| 2011 | NBER Digitization Grant | $20,000 |
| 2011 | NSF CAREER Award | $502,000 |
| 2010 | Time-Warner Research Program on Digital Communications | $20,000 |
| 2010 | Net Institute Grant | $6,000 |
| 2009 | Net Institute Grant | $6,000 |
| 2009 | The James H. Ferry, Jr. Fund for Innovation in Research Education | $50,000 |
| 2009 | Google/WPP Grant (Joint with Avi Goldfarb) | $55,000 |
| 2008 | Net Institute Grant | $15,000 |
| 2007 | Net Institute Grant | $8,000 |
| 2006 | Net Institute Grant (Joint with Stephen Ryan) | $8,000 |

*Industry Research Grants*

| | | |
|---|---|---:|
| 2015 | CCIA Research: Research into Sustainable Competitive Advantage and Big Data (Joint with Anja Lambrecht) | $60,000 |
| 2015 | E-Logic: Research into Vertical Mergers and Patent Litigation | $60,000 |
| 2014 | CCIA Research: Research into Patent Litigation and Entrepreneurship | $100,000 |
| 2012 | Google Australia: Research into Measurement and Attribution | $50,000 |

# APPENDIX A

EXPERT TESTIMONY

- In Re: Glumetza Antitrust Litigation, Case No. 3:19-cv-05822-WHA, United States District Court for the Northern District of California
  – Expert Report and Deposition (2020)
- In re Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate those Performances (Web V), Case No. 19-CRB-0005-WR (2021-2025), United States Copyright Royalty Judges, Washington, D.C.
  – Expert Reports and Deposition Testimony (2018, 2020), Expert Reports (2019, 2020), Deposition testimony (2020) and Hearing testimony (2020)
- Stephen Adkins, et al., v. Facebook, Inc., Case No. 18-CV-05982-WHA, United States District Court, Northern District of California
  – Expert Report and Deposition (2019)
- DealDash OYJ and DealDash Inc, Plaintiffs vs, Contextlogic Inc. d/b/a Wish, Defendant, Case No. 18-cv-02353-MMC, District Court of Northern California
  – Expert Report and Deposition testimony (2019).
- In Re Disposable Contact Lens Antitrust Litigation. No. 3:15-md-2626-J-20JRK United States District Court, Middle District of Florida, Jacksonville Division
  – Expert Report and Deposition Testimony (2018).
  – Expert Report and Deposition Testimony (2020).
- In Re Appraisal of AOL Inc: Consolidated C.A. No. 11204-VCG. Chancery Court of Delaware
  – Expert Report, Deposition and Trial Testimony (2017)

**APPENDIX A**

---

Teaching

- 15.818, Pricing (MBA Elective) 2006-
- 15.732, Marketing Management for Senior Executives 2012-
- 15.726, Pricing (EMBA Elective) 2012-
- 15.838, Doctoral Seminar, Spring 2006, Fall 2007, Fall 2013
- Marketing Management, Asian School of Business, 2016
- Guest Lecturer: HST.936: Health information systems to improve quality of care in resource-poor settings, 2014
- Executive Education: Blockchain Technologies: Business Innovation and Application, 2018-
- Executive Education: Marketing Innovation, 2016-
- Executive Education: Pricing 4dX, 2016-
- Executive Education: Strategic Marketing for the Technical Executive, 2012-2015
- Executive Education: Systematic Innovation of Products, Processes, and Services, 2013-
- Executive Education: Platform Strategy: Building and Thriving in a Vibrant Ecosystem, 2014-
- Executive Education: Global Executive Academy (multi-language), 2013, 2014
- Executive Education: Entrepreneurship Development Program, 2012-
- Faculty Coach, Takeda Leadership Academy, 2016-18

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX B**

**MATERIALS CONSIDERED AND/OR RELIED UPON**

| Bates Documents | | |
|---|---|---|
| AMAZING.COM_000015 | – | AMAZING.COM_000135 |
| AMAZING.COM_000140 | | |
| DZ_Reserve_00000001 | – | DZ_Reserve_00000108 |
| DZ_Reserve_00000140 | | |
| DZ_Reserve_00000162 | – | DZ_Reserve_00000166 |
| DZ_Reserve_00000172 | | |
| DZ_Reserve_00000174 | | |
| DZ_Reserve_00000176 | | |
| DZ_Reserve_00000178 | | |
| DZ_Reserve_00000180 | | |
| DZ_Reserve_00000188 | – | DZ_Reserve_00000189 |
| DZ_Reserve_00000196 | | |
| DZ_Reserve_00000203 | – | DZ_Reserve_00000208 |
| DZ_Reserve_00000210 | | |
| DZ_Reserve_00000212 | | |
| DZ_Reserve_00000214 | | |
| DZ_Reserve_00000216 | – | DZ_Reserve_00000217 |
| DZ_Reserve_00000336 | | |
| DZ_Reserve_00001333 | | |
| DZ_Reserve_00002011 | | |
| DZ_Reserve_00002365 | | |
| DZ_Reserve_00002368 | | |
| DZ_Reserve_00002378 | | |
| DZ_Reserve_00002444 | | |
| DZ_Reserve_00003750 | | |
| DZ_Reserve_00007041 | | |
| DZ_Reserve_00007855 | | |
| DZ_Reserve_00020388 | – | DZ_Reserve_00020389 |
| DZ_Reserve_00020392 | – | DZ_Reserve_00020394 |
| DZ_Reserve_00020448 | – | DZ_Reserve_00020451 |
| DZ_Reserve_00020453 | – | DZ_Reserve_00020457 |
| DZ_Reserve_00020754 | – | DZ_Reserve_00020758 |
| DZ_Reserve_00020818 | | |
| DZ_Reserve_00020914 | | |
| DZ_Reserve_00020917 | | |
| DZ_Reserve_00020922 | – | DZ_Reserve_00020942 |
| DZ_Reserve_00021603 | – | DZ_Reserve_00021605 |
| DZ_Reserve_00021627 | – | DZ_Reserve_00021629 |
| DZ_Reserve_00021688 | – | DZ_Reserve_00021693 |
| DZ_Reserve_00021696 | – | DZ_Reserve_00021699 |
| DZ_Reserve_00021714 | – | DZ_Reserve_00021722 |
| DZ_Reserve_00021736 | | |
| DZ_Reserve_00021854 | – | DZ_Reserve_00021869 |
| DZ_Reserve_00021914 | – | DZ_Reserve_00021922 |
| DZ_Reserve_00021935 | – | DZ_Reserve_00021951 |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX B**

**MATERIALS CONSIDERED AND/OR RELIED UPON**

| Bates Documents | | |
| --- | --- | --- |
| DZ_Reserve_00021957 | – | DZ_Reserve_00021965 |
| DZ_Reserve_00021983 | – | DZ_Reserve_00022018 |
| DZ_Reserve_00022021 | – | DZ_Reserve_00022027 |
| DZ_Reserve_00022047 | – | DZ_Reserve_00022050 |
| DZ_Reserve_00022059 | – | DZ_Reserve_00022064 |
| DZ_Reserve_00022069 | – | DZ_Reserve_00022070 |
| DZ_Reserve_00022114 | – | DZ_Reserve_00022154 |
| DZ_Reserve_00022183 | | |
| DZ_Reserve_00022193 | | |
| DZ_Reserve_00022195 | | |
| DZ_Reserve_00022232 | – | DZ_Reserve_00022236 |
| DZ_Reserve_00022263 | – | DZ_Reserve_00022283 |
| DZ_Reserve_00022378 | – | DZ_Reserve_00022401 |
| DZ_Reserve_00022413 | – | DZ_Reserve_00022440 |
| DZ_Reserve_00022444 | – | DZ_Reserve_00022453 |
| DZ_Reserve_00022463 | – | DZ_Reserve_00022487 |
| DZ_Reserve_00022492 | – | DZ_Reserve_00022537 |
| DZ_Reserve_00022561 | | |
| DZ_Reserve_00022629 | – | DZ_Reserve_00022664 |
| DZ_Reserve_00022668 | – | DZ_Reserve_00022673 |
| DZ_Reserve_00022675 | – | DZ_Reserve_00022678 |
| DZ_Reserve_00022681 | – | DZ_Reserve_00022686 |
| DZ_Reserve_00022691 | – | DZ_Reserve_00022720 |
| DZ_Reserve_00022725 | – | DZ_Reserve_00022733 |
| DZ_Reserve_00022740 | – | DZ_Reserve_00022741 |
| DZ_Reserve_00022755 | – | DZ_Reserve_00022756 |
| DZ_Reserve_00022769 | – | DZ_Reserve_00022770 |
| DZ_Reserve_00022779 | – | DZ_Reserve_00022783 |
| DZ_Reserve_00022791 | – | DZ_Reserve_00022792 |
| DZ_Reserve_00022799 | – | DZ_Reserve_00022800 |
| DZ_Reserve_00022803 | – | DZ_Reserve_00022804 |
| DZ_Reserve_00022812 | | |
| DZ_Reserve_00022825 | – | DZ_Reserve_00022827 |
| DZ_Reserve_00022848 | | |
| DZ_Reserve_00023125 | – | DZ_Reserve_00023126 |
| DZ_Reserve_00023174 | | |
| DZ_Reserve_00023182 | – | DZ_Reserve_00023184 |
| DZ_Reserve_00023283 | | |
| DZ_Reserve_00023337 | – | DZ_Reserve_00023350 |
| DZ_Reserve_00023353 | – | DZ_Reserve_00023363 |
| DZ_Reserve_00023374 | – | DZ_Reserve_00023384 |
| DZ_Reserve_00023456 | – | DZ_Reserve_00023505 |
| DZ_Reserve_00023629 | | |
| DZ_Reserve_00023648 | – | DZ_Reserve_00023650 |
| DZ_Reserve_00023655 | – | DZ_Reserve_00023762 |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX B**

**MATERIALS CONSIDERED AND/OR RELIED UPON**

| Bates Documents | | |
|---|---|---|
| DZ_Reserve_00023835 | – | DZ_Reserve_00023882 |
| FB-SINGER-00000002 | – | FB-SINGER-00000003 |
| FB-SINGER-00000299 | – | FB-SINGER-00000304 |
| FB-SINGER-00000330 | – | FB-SINGER-00000332 |
| FB-SINGER-00000412 | – | FB-SINGER-00000422 |
| FB-SINGER-00000702 | | |
| FB-SINGER-00001037 | – | FB-SINGER-00001042 |
| FB-SINGER-00001082 | – | FB-SINGER-00001083 |
| FB-SINGER-00001105 | – | FB-SINGER-00001115 |
| FB-SINGER-00001125 | – | FB-SINGER-00001139 |
| FB-SINGER-00001141 | | |
| FB-SINGER-00001472 | – | FB-SINGER-00001484 |
| FB-SINGER-00003746 | – | FB-SINGER-00003757 |
| FB-SINGER-00015547 | – | FB-SINGER-00015556 |
| FB-SINGER-00015854 | | |
| FB-SINGER-00017858 | – | FB-SINGER-00017859 |
| FB-SINGER-00019177 | – | FB-SINGER-00019178 |
| FB-SINGER-00022619 | – | FB-SINGER-00022623 |
| FB-SINGER-00054435 | – | FB-SINGER-00054452 |
| FB-SINGER-00061358 | – | FB-SINGER-00061376 |
| FB-SINGER-00066046 | – | FB-SINGER-00066061 |
| FB-SINGER-00075432 | – | FB-SINGER-00075439 |
| FB-SINGER-00077426 | – | FB-SINGER-00077474 |
| FB-SINGER-00080023 | | |
| FB-SINGER-00084221 | – | FB-SINGER-00084223 |
| FB-SINGER-00084486 | – | FB-SINGER-00084506 |
| FB-SINGER-00087711 | | |
| FB-SINGER-00088107 | – | FB-SINGER-00088109 |
| FB-SINGER-00088112 | – | FB-SINGER-00088115 |
| FB-SINGER-00088221 | – | FB-SINGER-00088223 |
| FB-SINGER-00088690 | – | FB-SINGER-00088706 |
| FB-SINGER-00088787 | – | FB-SINGER-00088792 |
| FB-SINGER-00088839 | – | FB-SINGER-00088848 |
| FB-SINGER-00088882 | | |
| FB-SINGER-00088897 | | |
| FB-SINGER-00088902 | | |
| FB-SINGER-00089002 | – | FB-SINGER-00089007 |
| FB-SINGER-00089014 | | |
| FB-SINGER-00089017 | – | FB-SINGER-00089028 |
| FB-SINGER-00089051 | – | FB-SINGER-00089053 |
| FB-SINGER-00089060 | – | FB-SINGER-00089064 |
| FB-SINGER-00089075 | – | FB-SINGER-00089082 |
| FB-SINGER-00089136 | – | FB-SINGER-00089142 |
| FB-SINGER-00089153 | – | FB-SINGER-00089155 |
| FB-SINGER-00089366 | | |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX B**

**MATERIALS CONSIDERED AND/OR RELIED UPON**

| Bates Documents | | |
|---|---|---|
| FB-SINGER-00089417 | – | FB-SINGER-00089419 |
| FB-SINGER-00089423 | – | FB-SINGER-00089424 |
| FB-SINGER-00089463 | – | FB-SINGER-00089465 |
| FB-SINGER-00089483 | – | FB-SINGER-00089484 |
| FB-SINGER-00089621 | – | FB-SINGER-00089622 |
| FB-SINGER-00089642 | – | FB-SINGER-00089647 |
| FB-SINGER-00089670 | – | FB-SINGER-00089711 |
| FB-SINGER-00091533 | – | FB-SINGER-00091534 |
| FB-SINGER-00091538 | – | FB-SINGER-00091539 |
| FB-SINGER-00091543 | – | FB-SINGER-00091545 |
| FB-SINGER-00091553 | – | FB-SINGER-00091554 |
| FB-SINGER-00091556 | | |
| FB-SINGER-00091723 | | |
| FB-SINGER-00092767 | – | FB-SINGER-00092775 |
| FB-SINGER-00093089 | – | FB-SINGER-00093097 |
| FB-SINGER-00093979 | | |
| FB-SINGER-00103337 | – | FB-SINGER-00103376 |
| FB-SINGER-00117090 | – | FB-SINGER-00117094 |
| FB-SINGER-00119235 | – | FB-SINGER-00119236 |
| FB-SINGER-00122904 | – | FB-SINGER-00122922 |
| FB-SINGER-00125075 | – | FB-SINGER-00125078 |
| FB-SINGER-00130077 | – | FB-SINGER-00130235 |
| FB-SINGER-00130240 | – | FB-SINGER-00130248 |
| FB-SINGER-00141499 | – | FB-SINGER-00141507 |
| FB-SINGER-00150119 | – | FB-SINGER-00150133 |
| FB-SINGER-00150228 | – | FB-SINGER-00150251 |
| FB-SINGER-00151813 | – | FB-SINGER-00151814 |
| FB-SINGER-00151818 | – | FB-SINGER-00151819 |
| FB-SINGER-00151823 | – | FB-SINGER-00151831 |
| FB-SINGER-00165823 | – | FB-SINGER-00165833 |
| FB-SINGER-00169905 | – | FB-SINGER-00169908 |
| FB-SINGER-00170105 | | |
| FB-SINGER-00180465 | – | FB-SINGER-00180472 |
| FB-SINGER-00181941 | – | FB-SINGER-00181948 |
| FB-SINGER-00183123 | – | FB-SINGER-00183125 |
| FB-SINGER-00183561 | – | FB-SINGER-00183596 |
| FB-SINGER-00184892 | – | FB-SINGER-00184894 |
| FB-SINGER-00186795 | – | FB-SINGER-00186801 |
| FB-SINGER-00186872 | – | FB-SINGER-00186874 |
| FB-SINGER-00186887 | – | FB-SINGER-00186891 |
| FB-SINGER-00186896 | – | FB-SINGER-00186913 |
| FB-SINGER-00186923 | – | FB-SINGER-00186926 |
| FB-SINGER-00186952 | – | FB-SINGER-00186960 |
| FB-SINGER-00187005 | – | FB-SINGER-00187006 |
| FB-SINGER-00187068 | – | FB-SINGER-00187070 |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX B**

**MATERIALS CONSIDERED AND/OR RELIED UPON**

| Bates Documents | | |
|---|---|---|
| FB-SINGER-00187074 | – | FB-SINGER-00187083 |
| FB-SINGER-00187088 | – | FB-SINGER-00187090 |
| FB-SINGER-00187226 | | |
| FB-SINGER-00187518 | – | FB-SINGER-00187522 |
| FB-SINGER-00187533 | – | FB-SINGER-00187534 |
| FB-SINGER-00187556 | – | FB-SINGER-00187585 |
| FB-SINGER-00187590 | – | FB-SINGER-00187591 |
| FB-SINGER-00187639 | – | FB-SINGER-00187643 |
| FB-SINGER-00187653 | – | FB-SINGER-00187657 |
| FB-SINGER-00227498 | – | FB-SINGER-00228311 |
| FB-SINGER-00228373 | – | FB-SINGER-00228377 |
| FB-SINGER-00242802 | – | FB-SINGER-00248403 |
| FB-SINGER-00249840 | – | FB-SINGER-00249844 |
| FB-SINGER-00255393 | – | FB-SINGER-00255396 |
| FB-SINGER-00255609 | – | FB-SINGER-00255611 |
| FB-SINGER-00256368 | – | FB-SINGER-00256376 |
| FB-SINGER-00258878 | – | FB-SINGER-00258881 |
| FB-SINGER-00264321 | | |
| FB-SINGER-00265677 | – | FB-SINGER-00265946 |
| FB-SINGER-00272318 | – | FB-SINGER-00272328 |
| FB-SINGER-00274929 | | |
| FB-SINGER-00278838 | – | FB-SINGER-00278840 |
| FB-SINGER-00278872 | – | FB-SINGER-00278892 |
| FB-SINGER-00284873 | – | FB-SINGER-00284874 |
| FB-SINGER-00292236 | – | FB-SINGER-00292359 |
| FB-SINGER-00300058 | – | FB-SINGER-00300062 |
| FB-SINGER-00301080 | | |
| FB-SINGER-00304046 | | |
| FB-SINGER-00304054 | | |
| FB-SINGER-00304060 | – | FB-SINGER-00304068 |
| FB-SINGER-00313499 | – | FB-SINGER-00313546 |
| FB-SINGER-00314173 | – | FB-SINGER-00314215 |
| FB-SINGER-00314652 | – | FB-SINGER-00314707 |
| FB-SINGER-00331431 | – | FB-SINGER-00331441 |
| FB-SINGER-00365693 | | |
| FB-SINGER-00424703 | – | FB-SINGER-00424728 |
| FB-SINGER-00426273 | | |
| FB-SINGER-00426295 | | |
| FB-SINGER-00426302 | – | FB-SINGER-00426333 |
| FB-SINGER-00426355 | – | FB-SINGER-00426454 |
| FB-SINGER-00426465 | | |
| FB-SINGER-00426480 | – | FB-SINGER-00426855 |
| FB-SINGER-SC-0000001 | – | FB-SINGER-SC-0000103 |
| MAXWELL_00000748 | – | MAXWELL_00000749 |
| MAXWELL_00000757 | – | MAXWELL_00000759 |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX B**

**MATERIALS CONSIDERED AND/OR RELIED UPON**

| Bates Documents | | |
| --- | --- | --- |
| MAXWELL_00000822 | – | MAXWELL_00000828 |
| MAXWELL_00000830 | | |
| MAXWELL_00000833 | | |
| MAXWELL_00000835 | | |
| MAXWELL_00000837 | | |
| MAXWELL_00000844 | | |
| MAXWELL_00000882 | | |
| MAXWELL_00000885 | | |
| MAXWELL_00000892 | | |
| MAXWELL_00000896 | | |
| MAXWELL_00000899 | | |
| MAXWELL_00000919 | | |
| MAXWELL_00000921 | | |
| MAXWELL_00000926 | | |
| MAXWELL_00000928 | | |
| MAXWELL_00000930 | | |
| MAXWELL_00000934 | | |
| MAXWELL_00000937 | | |
| MAXWELL_00000940 | | |
| MAXWELL_00000943 | | |
| MAXWELL_00000947 | | |
| MAXWELL_00000952 | | |
| MAXWELL_00000977 | | |
| MAXWELL_00000980 | | |
| MAXWELL_00001092 | | |
| MAXWELL_00001095 | | |
| MAXWELL_00001098 | | |
| MAXWELL_00001100 | | |
| MAXWELL_00001104 | – | MAXWELL_00001105 |
| MAXWELL_00001137 | – | MAXWELL_00001145 |
| MAXWELL_00001319 | | |
| MAXWELL_00001321 | – | MAXWELL_00001470 |
| PUB0000002 | – | PUB0000015 |
| PUB0001444 | – | PUB0001446 |
| PUB0001856 | – | PUB0001857 |
| PUB0002018 | – | PUB0002023 |
| PUB0002665 | – | PUB0002671 |
| TP_00000001 | – | TP_00001252 |

Legal Documents:
Class Action Complaint, August 15, 2018.
Consolidated Amended Class Action Complaint, December 21, 2018.
Declaration of Dr. Charles Cowan in Support of Plaintiffs' Motion to Compel Targeting Data and in Response to Facebook's Declaration of Gerardo Zaragoza, July 3, 2020.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

APPENDIX B

MATERIALS CONSIDERED AND/OR RELIED UPON

Legal Documents (cont.):

Declaration of Dr. Timothy Roughgarden in Support of Plaintiffs' Letter Brief Regarding Discovery, February 24, 2020.

Facebook, Inc.'s Amended and Supplemental Response and Objections to Plaintiffs' Interrogatory Number 8, September 25, 2020.

Facebook, Inc.'s Amended and Supplemental Responses and Objections to Plaintiffs' Third Set of Interrogatories, August 20, 2020.

Facebook, Inc.'s First Amended and Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, June 24, 2019.

Facebook, Inc.'s Responses and Objections to Plaintiffs' Third Set of Interrogatories, October 23, 2019.

Facebook, Inc.'s Third Amended and Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories, October 12, 2020.

Letter from Defendant, Re: Singer et al. v. Facebook, Inc., Case No. 3:18-cv-04978 JD, Response to Dkt. 133, March 12, 2020.

Letter from Defendant, Re: Singer, et al. v. Facebook, Inc., Case No. 3:18-cv-04978 JD, Response to Dkt. 134, March 12, 2020.

Letter from Defendant, Re: Singer, et al. v. Facebook, Inc., Case No. 3:18-cv-04978 JD, Supplemental Response to Dkt. 134, March 17, 2020.

Letter from Plaintiffs, Re: Singer, et al. v. Facebook, Inc., Case No. 3:18-cv-04978 (Custodians), February 26, 2020.

Letter from Plaintiffs, Re: Singer, et al. v. Facebook, Inc., Case No. 3:18-cv-04978 (MTC Class Data), February 26, 2020.

Letter from Plaintiffs, Re: Singer, et al. v. Facebook, Inc., Case No. 3:18-cv-04978, July 3, 2020.

Plaintiff Cain Maxwell's Amended Answers and Objections to Defendant's First Set of Requests for Admission, February 17, 2020.

Plaintiff Cain Maxwell's Amended Answers and Objections to Defendant's Second Set of Interrogatories, February 14, 2020.

Plaintiff Cain Maxwell's Amended Answers and Objections to Defendant's Second Set of Interrogatories, November 17, 2020.

Plaintiff Cain Maxwell's Amended Answers and Objections to Defendant's Third Set of Requests for Admission, October 13, 2020.

Plaintiff Cain Maxwell's Answers and Objections to Defendant's Interrogatories Nos. 8 and 9, October 29, 2019.

Plaintiff Cain Maxwell's Answers and Objections to Defendant's Second Set of Requests for Admission, May 11, 2020.

Plaintiff Cain Maxwell's Answers and Objections to Facebook's Fourth Set of Interrogatories, March 16, 2020.

Plaintiff Cain Maxwell's Answers and Objections to Facebook's Sixth Set of Interrogatories, September 8, 2020.

Plaintiff Cain Maxwell's Fourth Amended Answers and Objections to Defendant's Second Set of Interrogatories, November 23, 2020.

Plaintiff Cain Maxwell's Fourth Amended Answers and Objections to Facebook's Fifth Set of Interrogatories, October 20, 2020.

Plaintiff Cain Maxwell's Second Amended Answers and Objections to Defendant's First Set of Interrogatories, March 6, 2020.

Plaintiff Cain Maxwell's Second Amended Answers and Objections to Defendant's Second Set of Requests for Admission, October 2, 2020.

Plaintiff Cain Maxwell's Third Amended Answers and Objections to Facebook's Fifth Set of Interrogatories, October 2, 2020.

Plaintiff Cain Maxwell's Verification of Fourth Amended Responses to Defendant's Second Set of Interrogatories, November 24, 2020.

Plaintiff DZ Reserve's Amended Answers and Objections to Defendant's Third Set of Interrogatories, February 14, 2020.

Plaintiff DZ Reserve's Amended Responses to Defendant's First Requests for Admission, February 17, 2020.

Plaintiff DZ Reserve's Amended Responses to Defendant's Second Set of Interrogatories, November 15, 2019.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

APPENDIX B

MATERIALS CONSIDERED AND/OR RELIED UPON

Legal Documents (cont.):
Plaintiff DZ Reserve's Answers and Objections to Defendant's Second Set of Requests for Admission, May 11, 2020.
Plaintiff DZ Reserve's Answers and Objections to Facebook's Fourth Set of Interrogatories, March 16, 2020.
Plaintiff DZ Reserve's Fourth Amended Answers and Objections to Defendant's Third Set of Interrogatories, November 23, 2020.
Plaintiff DZ Reserve's Fourth Amended Responses to Defendant's First Set of Interrogatories, March 6, 2020.
Plaintiff DZ Reserve's Second Amended Answers and Objections to Defendant's Third Set of Interrogatories, November 17, 2020.
Plaintiff DZ Reserve's Second Amended Answers and Objections to Defendant's Third Set of Requests for Admission, October 13, 2020.
Plaintiff DZ Reserve's Second Amended Answers and Objections to Facebook's Fifth Set of Interrogatories, October 20, 2020.
Plaintiff DZ Reserve's Second Amended Responses to Defendant's Second Set of Interrogatories, October 20, 2020.
Plaintiff DZ Reserve's Seventh Amended Responses to Defendant's First Set of Interrogatories, October 20, 2020.
Plaintiff DZ Reserve's Third Amended Answers and Objections to Defendant's Third Set of Requests for Admission, November 16, 2020.
Plaintiff DZ Reserve's Verification of Fourth Amended Responses to Defendant's Third Set of Interrogatories, November 24, 2020.
Plaintiff Holly Dean's Amended Answers and Objections to Defendant's Third Set of Interrogatories, February 14, 2020.
Plaintiff Holly Dean's Amended Responses to Defendant's Second Set of Interrogatories, November 15, 2019.
Plaintiff Holly Dean's Third Amended Responses to Defendant's First Set of Interrogatories, November 15, 2019.
Plaintiffs Danielle A Singer and Project Therapy LLC's Amended Responses to Defendant's Second Set of Interrogatories, November 15, 2019.
Plaintiffs Danielle A. Singer and Project Therapy, LLC's Third Amended Answers and Objections to Defendant's First Set of Interrogatories, November 15, 2019.
Plaintiffs Danielle Singer and Therapy Threads' Amended Answers and Objections to Defendant's Third Set of Interrogatories, February 14, 2020.
Third Amended Consolidated Class Action Complaint, April 8, 2020.
Third Amended Consolidated Class Action Complaint, March 19, 2020.

Expert Reports and Declarations:
Expert Report of Armando Levy, Ph.D. in Support of Plaintiffs' Motion for Class Certification, December 22, 2020, with Appendices and Backup Materials.
Expert Report of Bruce McFarlane, December 22, 2020, with Exhibits.
Expert Report of Charles D. Cowan, Ph.D., December 22, 2020, with Exhibits, Appendices, and Backup Materials.
Expert Report of Dr. Atif Hashmi, December 22, 2020, with Exhibits.
Expert Report of Dr. Larry Chiagouris, December 22, 2020, with Exhibits.
Expert Report of Dr. Timothy Roughgarden, December 22, 2020, with Exhibits, Appendices, and Backup Materials.
Expert Report of Greg M. Allenby, December 21, 2020, with Exhibits and Backup Materials.

Depositions:
30(b)(6) Deposition of Dan Jon Ziernicki, July 13, 2020, with Exhibits.
Deposition of Cain Maxwell, July 8, 2020, with Exhibits.
Deposition of Dan Jon Ziernicki, July 13, 2020, with Exhibits.
Deposition of Dr. Chinmay Karande, Ph.D., September 18, 2020, with Exhibits.
Deposition of Gerardo Zaragoza, October 20, 2020, with Exhibits.
Deposition of Rahul Bhandari, October 16, 2020, with Exhibits.
Deposition of Yaron Fidler, July 17, 2020, with Exhibits.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX B**

**MATERIALS CONSIDERED AND/OR RELIED UPON**

Books, Academic Articles, and News Articles:

"Media Planning Professional Exam Study Guide," *Facebook*, January 2020.

Adler, Nicole and Stef Proost, "Introduction to Special Issue of Transportation Research Part B Modelling Non-Urban Transport Investment and Pricing," *Transportation Research Part B* (2010): pp. 791-794.

Allenby, Greg M. and James L. Ginter, "Using Extremes to Design Products and Segment Markets," *Journal of Marketing Research*, Vol. 32 (1995): pp. 392-403.

Allenby, Greg M. and Peter E. Rossi, "Hierachical Bayes Models," in *The Handbook of Marketing Research: Uses, Misuses, and Future Advances*, Thousand Oaks, CA: Sage Publications (2006), pp. 418-440.

Allenby, Greg M. and Peter E. Rossi, "Marketing Models of Consumer Heterogeneity," *Journal of Econometrics*, Vol. 89 (1999): pp. 57-78.

Allenby, Greg M. and Peter E. Rossi, "Perspectives Based on 10 Years of HB in Marketing Research," *Sawtooth Software Research Paper Series*, 2003: pp. 1-16.

Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics*, Vol. 57, No. 3 (2014): pp. 629-663.

Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, Vol. 12 (2014): pp. 421-456.

Allenby, Greg M., Neeraj Arora, and James L. Ginter, "Incorporating Prior Knowledge into the Analysis of Conjoint Studies," *Journal of Marketing Research*, Vol. 32 (1995): pp. 152-162.

Allenby, Greg M., Nino Hardt, and Peter R. Rossi, "Economic Foundations of Conjoint Analysis," in *Handbook of the Economics of Marketing*, Volume 1, Elvesier (2019), pp. 151-192.

Dalessandro, Brian, Rod Hook, Claudia Perlich, and Foster Provost, "Evaluating and Optimizing Online Advertising: Forget the Click, but There Are Good Proxies," *Big Data*, Vol. 3, No. 2 (2015): pp. 90-102.

Dotson, Jeffrey P., John R. Howell, Jeff D. Brazell, Thomas Otter, Peter J. Lenk, Steve MacEachern, and Greg M. Allenby, "A Probit Model with Structured Covariance for Similarity Effects and Source of Volume Calculations," *Journal of Marketing Research*, Vol. 55 (2018): pp. 35-47.

Federal Judicial Center, *Manual for Complex Litigation, Fourth* (2004).

Fennell, Geraldine, and Greg M. Allenby, Sha Yang, and Yancy Edwards, "The Effectiveness of Demographic and Psychographic Variables for Explaining Brand and Product Category Use," *Quantitative Marketing and Economics*, Vol. 1 (2003): pp. 223-244.

Goldfarb, Avi, and Catherine E. Tucker, "Online Advertising," *Advances in Computers*, Vol. 81, Elsevier (2011): pp. 289-315.

Gordon, Brett E., Florian Zettelmeyer, Neha Bhargava, and Dan Chapsky, "A Comparison of Approaches to Advertising Measurement: Evidence from Big Field Experiments at Facebook," September 23, 2018, available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3033144 (accessed on March 1, 2021).

Hayya, Jack, Donald Armstrong, and Nicolas Gressis, "A Note on the Ratio of Two Normally Distributed Variables," *Management Science*, Vol. 21, No. 11 (1975): pp. 1338-1341.

Howell, John R., Sanghak Lee, and Greg M. Allenby, "Price Promotions in Choice Models," *Marketing Science*, Vol. 35, No. 2 (2016): pp. 319-334.

Huber, Joel, "Conjoint Analysis: How We Got Here and Where We Are (An Update)," *Sawtooth Software Research Paper Series* (2005): pp. 1-14.

Kalton, Graham and Daniel Kasprzyk, "Inputting for Missing Survey Responses," *Proceedings of the Section on Survey Research Methods, American Statistical Association* (1982): pp. 22-31.

Kalton, Graham and Daniel Kasprzyk, "The Treatment of Missing Survey Data," *Survey Methodology*, Vol. 12, No. 1 (1986): pp. 1-16.

Lenk, Peter J., Wayne S. DeSarbo, Paul E. Green, and Martin R. Young, "Hierarchical Bayes Conjoint Analysis: Recovery of Partworth Heterogeneity from Reduced Experimental Designs," *Marketing Science*, Vol. 15, No. 2 (1996): pp. 173-191.

Marsaglia, George, "Ratios of Normal Variables," *Journal of Statistical Software*, Vol. 16, No. 4 (2006): pp. 1-10.

Orme, Bryan K., *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Second Edition*, Madison, WI: Research Publishers LLC (2010).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX B**

**MATERIALS CONSIDERED AND/OR RELIED UPON**

Books, Academic Articles, and News Articles (cont.):

Orme, Bryan, "A Short History of Conjoint Analysis," in *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Fourth Edition*, Madison, WI: Research Publishers LLC (2019), pp. 29-37.

Orme, Bryan, *Software for Hierarchical Bayes Estimation for CBC Data*, Orem, UT: Sawtooth Software, Inc (2016).

Orme, Bryan, "Which Conjoint Method Should I Use?" *Sawtooth Software Research Paper Series* (2013): pp. 1-6.

Rossi, Peter E. and Greg M. Allenby, "Statistics and Marketing," *Journal of the American Statistical Association*, Vol. 95, No. 450 (2000): pp. 635-638.

Rossi, Peter, "Package 'bayesm' - Bayesian Inference for Marketing/Micro-Econometrics," (2019).

Tucker, Catherine E., "Social Networks, Personalized Advertising, and Privacy Controls," *Journal of Marketing Research*, Vol. 51, No. 5 (2014): pp. 546-562.

Tucker, Catherine E., "The Implications of Improved Attribution and Measurability for Antitrust and Privacy in Online Advertising Markets," *George Mason Law Review*, Vol. 20, No. 4 (2013): pp. 1025-1054.

Vavra, Terry G., Paul E. Green, and Abba M. Krieger, "Evaluating EZPass: Using Conjoint Analysis to Assess Consumer Response to a New Tollway Technology," *Marketing Research*, Vol. 11, No. 2 (1999): pp. 4-16.

Websites:

blog hootsuite.com/facebook-pixel/ (accessed on February 19, 2021).

http://www.arbitron.com/downloads/terms_brochure.pdf (accessed on February 19, 2021).

http://www.audiencedialogue net/meas-print.html (accessed on February 19, 2021).

https://adespresso.com/guides/facebook-ads-optimization/delivery-placements/ (accessed on February 13, 2021).

https://blog.adstage.io/2013/08/23/how-to-target-facebook-ads-to-your-audience (accessed on February 17, 2021).

https://blog.adstage.io/2013/10/08/top-5-reasons-your-facebook-ad-has-limited-reach (accessed on February 14, 2021).

https://blog.hootsuite.com/how-to-advertise-on-facebook/ (accessed on February 8, 2021).

https://covid19risk.biosci.gatech.edu (accessed on December 23, 2020).

https://developers.facebook.com/ads/blog/post/2015/10/14/announcing-facebook-pixel/ (accessed on February 18, 2021).

https://developers.facebook.com/ads/blog/post/2018/07/20/advanced-matching-pixel/ (accessed on February 18, 2021).

https://en.wikipedia.org/wiki/Purchase_funnel (accessed on December 23, 2020).

https://fitsmallbusiness.com/tv-advertising/#:~:text=Additionally%2C%20viewer%20demographics%2C% 20timing%2C,most%20advertisers%20will%20target%20them (accessed on February 19, 2021).

https://help.shopify.com/en/manual/reports-and-analytics/shopify-reports/report-types/sales-report#sales-by-traffic-referrer (accessed on January 30, 2021).

https://kenshoo.com/blog/kenshoo-insights-panel/ (accessed on November 29, 2020).

https://kenshoo.com/expertservices/ (accessed on February 15, 2021).

https://marketing-dictionary.org/a/advertiser/ (accessed on December 23, 2020).

https://marketing-dictionary.org/a/advertising-agency/ (accessed on December 23, 2020).

https://marketing-dictionary.org/a/advertising-impression/ (accessed on December 23, 2020).

https://marketing-dictionary.org/c/click/ (accessed on December 23, 2020).

https://marketing-dictionary.org/f/frequency/ (accessed on December 23, 2020).

https://marketing-dictionary.org/i/impression/ (accessed on December 23, 2020).

https://marketing-dictionary.org/r/reach/ (accessed on December 23, 2020).

https://marketing-dictionary.org/t/target-market/ (accessed on December 23, 2020).

https://marketingland.com/9-new-semi-secret-facebook-targeting-options-184810 (accessed on February 18, 2021).

https://marketingland.com/advertising-engagement-past-present-future-101087 (accessed on February 18, 2021).

https://marketingland.com/direct-to-consumer-advertisers-are-shifting-ad-dollars-away-from-facebook-241986 (accessed on February 18, 2021).

https://marketingland.com/facebook-to-release-first-party-pixel-for-ads-web-analytics-from-browsers-like-safari-249478 (accessed on February 18, 2021).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX B**

**MATERIALS CONSIDERED AND/OR RELIED UPON**

Websites (cont.):

https://mashable.com/2013/08/15/facebook-first-ad/ (accessed on February 15, 2021).

https://mylittlebigweb.com/en/facebook-ads-how-to-estimate-your-investment-budget-on-facebook/ (accessed on February 19, 2021).

https://sawtoothsoftware.com/conjoint-analysis/cbc (accessed on December 23, 2020).

https://sawtoothsoftware.com/resources/technical-papers/categories/choice-based-conjoint (accessed on December 23, 2020).

https://searchengineland.com/attribution-what-it-is-and-why-its-important-32062 (accessed on February 28, 2021).

https://sproutsocial.com/glossary/potential-reach/ (accessed on December 23, 2020).

https://sproutsocial.com/insights/potential-reach/ (accessed on February 19, 2021).

https://staff.washington.edu/gray/misc/which-half.html (accessed on February 19, 2021).

https://statisticsbyjim.com/hypothesis-testing/failing-reject-null-hypothesis (accessed on December 23, 2020).

https://stratechery.com/2020/facebooks-ios-14-announcement-understanding-the-idfa-the-real-showdown/ (accessed on December 23, 2020).

https://support.google.com/google-ads/answer/7450050?hl=en (accessed on December 23, 2020).

https://themasb.org/organization/ (accessed on December 23, 2020).

https://themasb.org/the-masb-story/ (accessed on December 23, 2020).

https://www.adstage.io/products/integrations/facebook-ads/ (accessed on November 29, 2020).

https://www.adstage.io/resources/q4-2018-ppc-benchmark-report/ (accessed on February 18, 2021).

https://www.amazingsellingmachine.com/ (accessed on February 5, 2021).

https://www.amazingsellingmachine.com/about?_ga=2.119066240.824253951.1607864974-306871124.1607864974 (accessed on February 19, 2021).

https://www.bidalgo.com/services/#fully-managed-service (accessed on February 15, 2021).

https://www.bloomberg.com/quote/FB:US (accessed on December 23, 2020).

https://www.campaignmonitor.com/resources/knowledge-base/how-to-get-your-return-on-investment-from-online-advertising/ (accessed on December 23, 2020).

https://www.cdc.gov/disasters/lightning/victimdata.html (accessed on December 23, 2020).

https://www.cnbc.com/2016/08/05/digital-media-is-worried-readers-are-burning-out-on-too-many-ads.html (accessed on September 18, 2020).

https://www.darpa.mil/program/systems-of-neuromorphic-adaptive-plastic-scalable-electronics (accessed on December 23, 2020).

https://www.dmnews.com/data/article/13037548/digital-marketing-attribution (accessed on February 28, 2021).

https://www.dynata.com/research-insights/ (accessed on December 23, 2020).

https://www.facebook.com/BugBounty/posts/2001267099887506 (accessed on February 24, 2021).

https://www.facebook.com/business/ help/214319341922580?id=629338044106215 (accessed on December 15, 2020).

https://www.facebook.com/business/help/1438142206453359?id=561906377587030 (accessed on February 13, 2021).

https://www.facebook.com/business/help/1438417719786914 (accessed on December 23, 2020).

https://www.facebook.com/business/help/1438417719786914 (accessed on February 13, 2021).

https://www.facebook.com/business/help/1461336133922536? id=842420845959022 (accessed on February 13, 2021).

https://www.facebook.com/business/help/1629235777115312?id=429023050853196 (accessed on February 13, 2021).

https://www.facebook.com/business/help/1665333080167380?id=176276233019487 (accessed on December 23, 2020).

https://www.facebook.com/business/help/1665333080167380?id=176276233019487 (accessed on February 13, 2021).

https://www.facebook.com/business/help/201828586525529?id=629338044106215 (accessed on February 13, 2021).

https://www.facebook.com/business/help/201828586525529?id=629338044106215&ref=fbb_budgeting (accessed on September 17, 2020).

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX B**

**MATERIALS CONSIDERED AND/OR RELIED UPON**

Websites (cont.):

https://www.facebook.com/business/help/218841515201583 (accessed on February 13, 2021).

https://www.facebook.com/business/help/251123081984768?id=842420845959022 (accessed on February 25, 2021).

https://www.facebook.com/business/help/264160060861852 (accessed on February 28, 2021).

https://www.facebook.com/business/help/318580098318734?id=369013183583436 (accessed on December 23, 2020).

https://www.facebook.com/business/help/318580098318734?id=369013183583436&locale=en_US&draft=318580098318734 (accessed on February 28, 2021).

https://www.facebook.com/business/help/347839548598012?id=352109282177656&ref=fbb_ boost_posts (accessed on January 27, 2020).

https://www.facebook.com/business/help/355670007911605?id=561906377587030 (accessed on February 13, 2021).

https://www.facebook.com/business/help/407108559393196?id=369787570424415 (accessed on November 28, 2020).

https://www.facebook.com/business/help/430291176997542?id=561906377587030 (accessed on February 13, 2021).

https://www.facebook.com/business/help/518993728299293?id=842420845959022 (accessed on February 27, 2021).

https://www.facebook.com/business/help/525949344256092?id=842420845959022 (accessed on February 13, 2021).

https://www.facebook.com/business/help/560163334110364?helpref=faq_content (accessed on December 23, 2020).

https://www.facebook.com/business/help/624074880953806 (accessed on November 23, 2020).

https://www.facebook.com/business/help/654484604719506?id=842420845959022 (accessed on February 13, 2021).

https://www.facebook.com/business/help/681925088666087?id=842420845959022 (accessed on February 13, 2021).

https://www.facebook.com/business/help/706063442820839?id=802745156580214   (accessed on February 25, 2021).

https://www.facebook.com/business/help/716180208457684?id=1792465934137726 (accessed on February 28, 2021).

https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (accessed on November 29, 2020).

https://www.facebook.com/business/help/753932008002620 (accessed on September 17, 2020).

https://www.facebook.com/business/learn/lessons/basics-of-editing-campaign-ad-sets-and-more?course_id=2097363980380415&curriculum_id=726377631115881 (accessed on February 24, 2021).

https://www.facebook.com/business/m/reservefb (accessed on February 27, 2021).

https://www.facebook.com/business/marketing/audience-network# (accessed on November 28, 2020).

https://www.facebook.com/business/marketing-partners/partner-news/welcome-to-thefacebook-marketing-partner-program (accessed on February 19, 2021).

https://www.facebook.com/business/measurement/ (accessed on February 24, 2021).

https://www.facebook.com/business/news/CustomAudiences-Is-Now-Available-to-Every-Advertiser (accessed on February 19, 2021).

https://www.facebook.com/business/partner-directory/ (accessed on February 19, 2021).

https://www.facebook.com/business/success/2-airbnb (accessed on February 25, 2021).

https://www.facebook.com/business/success/parachute (accessed on January 30, 2021).

https://www.nanigans.com/solutions/strategy/ (accessed on February 15, 2021).

https://www.pewresearch.org/internet/2018/03/01/social-media-use-in-2018/ (accessed on December 23, 2020).

https://www.theguardian.com/technology/2007/jul/25/media.newmedia (accessed on December 23, 2020).

insights.marinsoftware.com/facebook/facebooks-new-metrics-and-changes-to-potential-reach/16/ (accessed on December 23, 2020).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

APPENDIX B

MATERIALS CONSIDERED AND/OR RELIED UPON

Earning Calls, SEC Filings and Annual Reports:
Facebook, Inc. (FB)'s First Quarter 2017 Results Conference Call, May 3, 2017.
Facebook, Inc. (FB)'s First Quarter 2018 Results Conference Call, April 25, 2018.
Facebook, Inc. (FB)'s First Quarter 2019 Results Conference Call, April 24, 2019.
Facebook, Inc. (FB)'s First Quarter 2020 Results Conference Call, April 29, 2020.
Facebook, Inc. (FB)'s Fourth Quarter 2016 Results Conference Call, February 1, 2017.
Facebook, Inc. (FB)'s Fourth Quarter 2017 Results Conference Call, January 31, 2018.
Facebook, Inc. (FB)'s Fourth Quarter 2018 Results Conference Call, January 30, 2019.
Facebook, Inc. (FB)'s Fourth Quarter 2019 Results Conference Call, January 29, 2020.
Facebook, Inc. (FB)'s Second Quarter 2016 Results Conference Call, July 27, 2016.
Facebook, Inc. (FB)'s Second Quarter 2017 Results Conference Call, July 26, 2017.
Facebook, Inc. (FB)'s Second Quarter 2018 Results Conference Call, July 25, 2018.
Facebook, Inc. (FB)'s Second Quarter 2019 Results Conference Call, July 24, 2019.
Facebook, Inc. (FB)'s Second Quarter 2020 Results Conference Call, July 30, 2020.
Facebook, Inc. (FB)'s Third Quarter 2016 Results Conference Call, November 2, 2016.
Facebook, Inc. (FB)'s Third Quarter 2017 Results Conference Call, November 1, 2017.
Facebook, Inc. (FB)'s Third Quarter 2018 Results Conference Call, October 30, 2018.
Facebook, Inc. (FB)'s Third Quarter 2019 Results Conference Call, October 30, 2019.
Facebook, Inc. SEC Form 10-K for the fiscal year ended December 31, 2012.
Facebook, Inc. SEC Form 10-K for the fiscal year ended December 31, 2013.
Facebook, Inc. SEC Form 10-K for the fiscal year ended December 31, 2014.
Facebook, Inc. SEC Form 10-K for the fiscal year ended December 31, 2015.
Facebook, Inc. SEC Form 10-K for the fiscal year ended December 31, 2016.
Facebook, Inc. SEC Form 10-K for the fiscal year ended December 31, 2017.
Facebook, Inc. SEC Form 10-K for the fiscal year ended December 31, 2018.
Facebook, Inc. SEC Form 10-K for the fiscal year ended December 31, 2019.
Facebook, Inc. SEC Form 10-K for the fiscal year ended December 31, 2020.
Facebook, Inc. SEC Form 10-Q for the quarterly period ended September 30, 2020.
IAB Internet Advertising Revenue Report, 2012 Full Year Results, April 2013.
IAB Internet Advertising Revenue Report, 2013 Full Year Results, April 2014.
IAB Internet Advertising Revenue Report, 2014 Full Year Results, April 2015.
IAB Internet Advertising Revenue Report, 2015 Full Year Results, April 2016.
IAB Internet Advertising Revenue Report, 2016 Full Year Results, April 2017.
IAB Internet Advertising Revenue Report, 2017 Full Year Results, May 2018.
IAB Internet Advertising Revenue Report, 2018 Full Year Results, May 2019.
IAB Internet Advertising Revenue Report, 2019 Full Year Results.

Other:
AdStage Paid Media Q3 2018 Benchmark Report.
AdStage Paid Media Q4 2019 Benchmark Report.
Documents listed in excel files produced as FB-SINGER-00331439-441.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

APPENDIX C

EXAMPLES OF ADS PLACED BY DZ RESERVE AND MAXWELL

Ads Placed by DZ Reserve[1]







---

[1] DZ_Reserve_00021603-605, at 605; DZ_Reserve_00021627-629, at 629; DZ_Reserve_00020922-931, at 924-925.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**APPENDIX C**

**EXAMPLES OF ADS PLACED BY DZ RESERVE AND MAXWELL**

**Ads Placed by Maxwell[2]**





---

[2] MAXWELL_00001137-139, at 139; MAXWELL_00001140-142, at 142; MAXWELL_00001143-145, at 145.