Geoffrey Graber (SBN 211547)
Andrew N. Friedman (*pro hac vice*)
Karina G. Puttieva (SBN 317702)
Paul Stephan (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
kputtieva@cohenmilstein.com
pstephan@cohenmilstein.com

Charles Reichmann (SBN 206699)
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708-1015
Telephone: (415) 373-8849
Charles.reichmann@gmail.com

Eric Kafka (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor,
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
ekafka@cohenmilstein.com

*Counsel for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| DZ Reserve and Cain Maxwell (d/b/a Max Martialis), individually and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>Meta Platforms, Inc. (f/k/a Facebook, Inc.),<br><br>        Defendant. | Case No.: 3:18-cv-04978-JD<br><br>**PLAINTIFFS' OPPOSITION TO META PLATFORMS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br><br>Date: June 23, 2022<br>Time: 10:00 am<br>Court: Courtroom 11, 19th Floor<br>Hon. James Donato |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND..................................................................................................2

    I.      The Evidence Shows That Potential Reach Is Material to Advertisers'
          Purchasing Decisions and That Advertisers Rely on Potential Reach...................2

    II.     The Evidence Shows that Potential Reach Is Materially Inflated .........................3

    III.    Record Evidence Shows Facebook Executives Knew Potential Reach Was
          Inflated and Not Based on People – But Concealed the Truth to Protect its
          Revenues ...........................................................................................................4

    IV.    The Evidence Shows that Plaintiffs Relied on Potential Reach ...........................6

          A.     Plaintiff Cain Maxwell ...........................................................................6

          B.     Plaintiff DZ Reserve ..............................................................................7

    V.     The Evidence Shows that Plaintiffs' Potential Reach Numbers Were
          Inflated .............................................................................................................8

    VI.    Facebook Has Not Materially Changed How Potential Reach Is Calculated .........9

    VII.   Procedural History ............................................................................................9

LEGAL STANDARD ...........................................................................................................10

ARGUMENT........................................................................................................................11

I.     THE COURT SHOULD DENY SUMMARY JUDGMENT ON PLAINTIFFS'
      FRAUD CLAIMS ............................................................................................11

    A.     The Evidence Shows Potential Reach Is Material and Plaintiffs Relied on
          It .........................................................................................................11

          1.     Facebook Admits the Materiality of Potential Reach...............................12

          2.     Record Evidence Shows Plaintiffs Actually Relied on Potential
               Reach ........................................................................................12

          3.     The Evidence Shows Plaintiffs Justifiably Relied on Potential
               Reach ........................................................................................16

    B.     The Court Should Reject Facebook's Recycled Arguments Against
          Plaintiffs' Fraudulent Concealment Claim..............................................17

    C.     Plaintiffs Have Evidence of Fraud Damages...........................................20

II.    FACEBOOK IS NOT ENTITLED TO SUMMARY JUDGMENT ON
      PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF UNDER THE UCL...................21

          A.     The Court Already Determined that Plaintiffs' Injury Is Cognizable
               Under Article III......................................................................................21

    B.     Plaintiffs Face an Imminent Threat of Harm...........................................22

CONCLUSION.....................................................................................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*A White and Yellow Cab, Inc. v. Uber Technologies, Inc.*,
2017 WL 1208384 (N.D. Cal. Mar. 31, 2017)....................................................................24

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986) ................................................................................... 10, 15, 17

*In re Apple Inc. Device Performance Litig.*,
386 F. Supp. 3d 1155 (N.D. Cal. 2019)................................................................19

*Ball v. Steadfast-BLK*,
126 Cal. Rptr. 3d 743 (Cal. Ct. App. 2011).........................................................24

*Beyer v. Symantec Corp.*,
333 F. Supp. 3d 966 (N.D. Cal. 2018)..................................................................19

*Boeken v. Philip Morris*,
26 Cal.App.4th 1640 (2005) ................................................................................13

*Brickman v. Fitbit, Inc.*,
2016 WL 3844327 (N.D. Cal. July 15, 2016).......................................................17

*Brickman v. Fitbit, Inc.*,
2017 WL 6209307 (N.D. Cal. Dec. 8, 2017) (Donato, J.)...............................10, 15

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)), *aff'd*, 932 F.3d 861 (9th Cir.
2019) ....................................................................................................................10

*Cent. Delta Water Agency v. United States*,
306 F.3d 938 (9th Cir. 2002) .........................................................................22, 24

*Club Xtreme, Inc. v. City of Wayne*,
2010 WL 1626415 (E.D. Mich. Apr. 21, 2010)....................................................24

*In re: Coca-Cola Prods. Mktg. & Sales Pracs. Litig.*,
2021 WL 3878654 (9th Cir. Aug. 31, 2021) ........................................................22

*County of Santa Clara v. Atlantic Richfield Co.*,
137 Cal. App. 4th 292 (2006) ..............................................................................19

*Crayon v. Hill*,
2016 WL 282176 (E.D. Cal. Jan. 22, 2016) .........................................................16

*Cummings v. Starbucks Corp.*,
2013 WL 12131281 (C.D. Cal. Aug. 30, 2013).....................................................16

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) ................................................................. 22, 23

*Davis v. HSBC Bank Nevada, N.A.*,
  691 F.3d 1152 (9th Cir. 2012) .......................................................................16

*Engalla v. Permanente Med. Grp., Inc.*,
  15 Cal. 4th 951 (1997), *as modified* (July 30, 1997)........................... 11, 14, 16, 17

*Giles v. Gen. Motors Acceptance Corp.*,
  494 F.3d 865, 874-75 (9th Cir. 2007) ............................................................19

*Heeger v. Facebook, Inc.*,
  509 F. Supp. 3d 1182 (N.D. Cal. 2020) (Donato, J.) ..................................... 14, 15

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013) .......................................................................11

*Hodsdon v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) ................................................................... 17, 18

*Iorio v. Allianz Life Ins. Co. of N. Am.*,
  2008 WL 8929013 (S.D. Cal. July 8, 2008) .....................................................15

*Jones v. Progressive Cas. Ins Co.*,
  2018 WL 4521919 (N.D. Cal. Sept. 19, 2018) (Donato, J.)................................19

*Kabbash v. Jewelry Channel, Inc. USA*,
  2015 WL 6690236 (C.D. Cal. Nov. 2, 2015)....................................................17

*Knowles v. ARRIS International PLC*,
  847 F. App'x 512 (9th Cir. 2021) ...................................................................18

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) .........................................................................21

*Milan v. Clif Bar & Co.*,
  489 F. Supp. 3d 1004 (N.D. Cal. 2020) (Donato, J.) .........................................22

*Nelson v. City of Davis*,
  571 F.3d 924 (9th Cir. 2009) ................................................................... 15, 16

*Norcia v. Samsung Telecommunications America, LLC*,
  2018 WL 4772302 (N.D. Cal. Oct. 1, 2018) (Donato, J.) .............................. 17, 18

*NuCal Foods, Inc. v. Quality Egg LLC*,
  918 F. Supp. 2d 1023 (N.D. Cal. Jan. 16, 2013). Application of the .....................19

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) ....................................................................................23

iv

*Patterson v. V&M Auto Body*,
589 N.E.2d 1306 (Ohio 1992) ............................................................................... 24

*Pulaski & Middleman v. Google*,
802 F.3d 979 (9th Cir. 2015) ................................................................................. 21

*R Power Biofuels, LLC v. Chemex LLC*,
2017 WL 1164296 (N.D. Cal. Mar. 29, 2017) ...................................................... 19

*Radobenko v. Automated Equipment Corp.*,
520 F.2d 540 (9th Cir. 1975) ................................................................................. 16

*Rahman v. Mott's LLP*,
2014 WL 5282106 (N.D. Cal. Oct. 15, 2014) ............................................... 14, 15

*Sanders v. Rodriguez*,
2020 WL 5217155 (C.D. Cal. July 2, 2020) .......................................................... 16

*Sloan v. General Motors LLC*,
2020 WL 1955643 (N.D. Cal. Apr. 23, 2021) ....................................................... 19

*Smith v. Keurig Green Mountain, Inc.*,
2020 WL 5630051 (N.D. Cal. Sept. 21, 2020) ...................................................... 23

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) ........................................................................................... 22

*Winding Creek Solar LLC v. Peevey*,
293 F. Supp. 3d 980 (N.D. Cal. 2017) (Donato, J.) ............................................... 10

*Yetter v. Ford Motor Co.*,
2019 WL 3254249 (N.D. Cal. July 19, 2019) ....................................................... 19

*Young v. Cree, Inc.*,
2021 WL 4749384 (N.D. Cal. Oct. 12, 2021) ................................................. 12, 13

*Zetwick v. Cnty. of Yolo*,
850 F.3d 436 (9th Cir. 2017) ................................................................................. 10

# INTRODUCTION

Meta Platforms, Inc. ("Facebook") argues it is entitled to summary judgment on all claims but does not dispute that Potential Reach is inflated and does not represent "people," that executives knew of this deception, and that the named Plaintiffs testified that they relied on it. Facebook recognizes, and a company survey confirms, that Potential Reach is "arguably the single most important number in [its] ads creation interface" and is "vital to 100%" of its ad revenue. Executives knew for years that Potential Reach was and still is inflated. After reports that Potential Reach exceeds the census, Facebook executives actively concealed the issue for years to protect the company's bottom line. Facebook contests none of these damning facts.

Facebook asserts it is nevertheless entitled to summary judgment because Plaintiffs supposedly did not actually or justifiably rely on Potential Reach. Yet Facebook ignores the avalanche of evidence of materiality – which gives rise to a presumption of reliance – as well as the clear, unequivocal, and repeated testimony from both Plaintiffs that they did in fact rely on Potential Reach.[1] And, in any event, the Court has now determined that the "named plaintiffs demonstrated reliance." Class Cert. Order at 6:26–7:13 (ECF No. 388).

Facebook's motion disregards this Court's stern admonitions against filing summary judgment motions in the face of genuine factual disputes. MTD Order at 2:26–3:2 (ECF No. 255) (citing *FTC v. D-Link Systems, Inc.*, 2018 WL 6040192 (N.D. Cal. Nov. 5, 2018)); 06/10/21 Transcript at 9:12–10:7 (ECF No. 322). It also ignores the Court's prior rulings by repeating several of its failed arguments. The Court previously rejected Facebook's arguments about the central function test and the economic loss rule when it denied a motion to dismiss, yet Facebook repeats those exact arguments here. Facebook also argues that Plaintiffs lack Article III standing to seek injunctive relief because their theory of harm is insufficient. But, the Court has twice rejected this argument, recognizing most recently that Plaintiffs allege future harm because they "will be unable to trust Meta going forward." Nevertheless, Facebook now quotes that language

---

[1] *See* Standing Order for Civ. Cases Before J. Donato ¶ 23 ("All case citations and factual statements must be completely accurate."); Cal. R. Pro. Conduct 3.3(a)(1) (candor toward the tribunal).

back at the Court to argue that this inability to trust Facebook's representations is insufficient. In other words, Facebook seeks summary judgment by arguing the Court had it wrong.

Facebook's motion is both meritless and highly inappropriate, and it should be denied.

## FACTUAL BACKGROUND

### I.   The Evidence Shows That Potential Reach Is Material to Advertisers' Purchasing Decisions and That Advertisers Rely on Potential Reach

When advertisers create ad sets on Facebook's Ads Manager, the Potential Reach is displayed on consecutive webpages at the point of purchase.[2] Ex. 75. Facebook exposes each advertiser to Potential Reach on the page where they select the targeting criteria for the ad set, and on the page where they set their budget. *Id.* (Potential Reach with targeting criteria); Ex. 76 (Potential Reach with budget). Potential Reach is displayed in the right-side column using the words "Potential Reach: _____ people" (where blank is filled with the Potential Reach number).

The first Potential Reach number displayed to all advertisers when they create an advertisement set on Ads Manager is based on default targeting criteria. *See* Ex. 77, Hashmi Report ¶¶ 55-60; Ex. 78, Hashmi Reply ¶ 10. Advertisers can target their advertisement sets at certain audiences by selecting targeting criteria, such as location, age, and gender. Ex. 75. When an advertiser selects targeting criteria, Ads Manager displays the Potential Reach number corresponding to the selected criteria. *See* Ex. 79, Facebook Business Help Center ("Potential reach is an estimation of how many people are in an ad set's target audience.")[3]

Facebook admits in documents that Potential Reach is material to advertisers' purchasing decisions and that advertisers rely on Potential Reach. For example, Facebook acknowledged internally that advertisers "frequently rely" on Potential Reach:

> When creating advertising campaigns, advertisers frequently rely on the estimated audience size to understand the potential reach of their campaigns and set the bid and budget strategy. Thus, this number is

---

[2] In its brief, Facebook states that, "in September 2021, Meta changed Potential Reach to show a range instead of one number, and renamed it Estimated Audience Size." Facebook's Summ. J. Mot. ("SJ"), at 7:5-6 (ECF No. 385-3). Unless otherwise noted, Plaintiffs' brief discusses Potential Reach prior to September 2021. (The fact discovery cut-off in this matter was October 20, 2020.)

[3] https://www.facebook.com/business/help/624074880953806 (last accessed April 6, 2021)

> arguably *the single most important number* in our ads creation
> interfaces.

Ex. 80 (emphasis added). Facebook employees repeatedly acknowledged the importance of Potential Reach to advertisers. For example, one Facebook employee wrote, "Advertisers don't like spending money if they don't know where it is going. Another way to put this: Reach Estimates are vital to 100% of our Ads Revenue."[4] Ex. 81; *see also*, Ex. 82.

These statements are consistent with Facebook's own customer survey, which found that 91% of advertisers use Potential Reach, and that advertisers believe both that it is important to receive Potential Reach and that Potential Reach should be "close to the true number of people." Ex. 83 at '33-34. These findings are also consistent with the conjoint survey conducted by Plaintiffs' expert Dr. Greg Allenby, which found that Potential Reach inflation has "a statistically significant impact on consumer demand for Facebook advertisements." Ex. 84 at 5; *see also* Ex. 85

## II.     The Evidence Shows that Potential Reach Is Materially Inflated

On September 5, 2017, an analyst from Pivotal Research wrote that Facebook's Potential Reach exceeds the census. Ex. 86 at '90-91. Immediately following this allegation, senior executives acknowledged they had long known Potential Reach was inflated due to fake and duplicate accounts. *Id*. In response to Pivotal Research's findings, the Targeting Team, which was responsible for Potential Reach and led by Product Manager Yaron Fidler, began investigating inflation levels due to duplicate accounts. *See* Exs. 87, 88 (21:18-20). Preliminary results showed duplicate accounts constituted ███ of global Monthly Active People (MAP) and ███ of United States MAP. Ex. 87 at '06. Vice President for Ads, Rob Goldman remarked to others that Facebook's **SUMA [Single User Multiple Accounts] treatment is pretty indefensible**." Ex. 89 at '20-21 (emphasis in original). After another report surfaced from the Video Advertising Bureau, a media and marketing consultancy, leveling accusations that Potential Reach was inflated, a Targeting Team data scientist stated that the report "ha[s] the order of magnitude in inflation correct." Exs. 91, 92 at '40.

---

[4] "Reach Estimates" is a synonym for "Potential Reach." Ex. 81; *see also* Ex. 90 at 111:5-12.

The Targeting Team discovered other sources of inflation. In particular, the team observed that, unlike Monthly Active Users, Potential Reach includes non-activated accounts, and non-activated accounts are "a source of overestimation" for Potential Reach. Ex. 93, at '79-81; *see also* Ex. 78, ¶¶ 7-8; Ex. 94 at '56-57; Ex. 95; Ex. 96 at Appx. A, Tab 4. The team also observed Facebook does not match all people who have a Facebook and Instagram account, resulting in Potential Reach double counting a portion of such users. Ex. 97 at '76; Ex. 98, ¶ 118. And Fidler subsequently learned that Potential Reach was inflated because it counted accounts that were not eligible to see ads: "[w]e are counting people that can't be reached on FB and misleading advertisers." Ex. 99; Ex. 100 at '94.

Facebook employees admitted that Potential Reach inflation caused advertisers to increase their budgets for Facebook ads and spend more money on Facebook ads. In discussing allegations of Potential Reach inflation, former Facebook Vice President Carolyn Everson explained, "I think it clearly impacted planning and we are going to get really criticized for that (and justifiably so). If we overstated how many actual real people we have in certain demos, **there is no question that impacted budget allocations**." Ex. 101 at '61 (emphasis added).

In addition, Facebook employees conducted multiple analyses, based on highly conservative assumptions, showing that Facebook would lose hundreds of millions of dollars in annual revenues from advertisers if the Targeting Team's Potential Reach correction were implemented. Ex. 102 at '65, '67; *see also* Ex. 103 at '97. Another Facebook study found that eliminating Potential Reach would "cost[] us ~8-9% of Revenue." Ex. 104.

### III. Record Evidence Shows Facebook Executives Knew Potential Reach Was Inflated and Not Based on People – But Concealed the Truth to Protect its Revenues

Following the Targeting Team's analysis, Facebook decided to change the description of the Potential Reach metric advertisers would see if they clicked on a link on Ads Manager. Rob Goldman, however, rejected any disclosure regarding fake and duplicate accounts. Ex. 105. Alex Schultz, the current VP of Analytics and Chief Marketing Officer, separately directed Facebook's sales staff not to discuss duplicate and fake accounts with advertisers – while admitting internally

████████████████████████████████████████. Ex. 106

at '21; Ex. 107 at '16.

In Spring 2018, the Targeting Team proposed a plan to reduce Potential Reach inflation due to duplicate accounts, which would have lowered Potential Reach by about 10%. But Fidler highlighted that one of the main counter-arguments was that Facebook stood to lose a significant amount of revenue from that plan:

> **Revenue impact is indeed significant.** The question is how do we quantify the loss of advertiser trust? **Also, in a way it's revenue we should have never made given the fact it's based on wrong data[].**

Ex. 108 at '70 (emphasis added); *see also* Ex. 109 at 124:18-125:18; 130:6-132:6.

On April 12, 2018, Fidler met with the "Central Metrics XFN" team to discuss the Targeting Team's proposal to implement a "SUMA model" to reduce the impact of duplicate accounts on Potential Reach. According to Facebook, Central Metrics XFN's mission is to "[p]rotect the trust of our partners in external metrics, **while minimizing the restriction of this on revenue** or innovation." Ex. 110 at PDF pg. 4 (emphasis added). At that meeting, Schultz blocked the Targeting Team's proposed duplicate account fix. Schultz wrote that he "tried to stop it there a few times and Yaron [Fidler] kept pushing." Ex. 111 at '22. Another executive later complained that "I think we hung Yaron a bit out to dry today." *Id.* at '23.

In June 2018, Fidler again proposed Potential Reach solutions, including implementing the SUMA model or removing the reference to "People" in Potential Reach. Again these proposals were blocked because Facebook executives could not determine the monetary value of the "people based narrative." Ex. 112 at '50. In August 2018, senior executives received a PowerPoint presentation that labeled the reference to people in the Potential Reach metric as an "inaccurate representation." Ex. 113 at PDF pp. 5-6. The presentation explained: "Our value proposition in the market emphasizes **people**-based targeting and reach . . . However, this data actually utilizes **accounts**," and emphasized, "How we represent about our targeting/reach does not match the reality of the data behind it." *Id.* at PDF pp. 6-7 (emphasis in original). The presentation concluded:

"We expect this discrepancy between people and accounts will be identified publicly. . . . We fear this could be sooner rather than later." *Id.*

### IV.    The Evidence Shows that Plaintiffs Relied on Potential Reach

Plaintiffs Cain Maxwell and DZ Reserve each testified repeatedly and consistently that they relied on Potential Reach to determine how much to spend on Facebook ads; and, both Plaintiffs testified repeatedly that if they had known that the Potential Reach was inflated, they would not have spent as much money on Facebook ads.[5] Facebook concedes both Plaintiffs testified that they relied on Potential Reach. SJ at 7:14-16.

### A.    Plaintiff Cain Maxwell

Plaintiff Cain Maxwell (d/b/a Max Martialis) had an online store selling a safety magnet used for storing and securing firearms. Ex. 114 at 34:14-35:3, 48:11-19. Maxwell bought advertisements on Facebook between September 14, 2018 and May 18, 2019, spending over $350. Ex. 115 at 3 (response to ROG 2); Ex. 116 at 8 (response to ROG 10). Since joining this lawsuit in June 2019, Maxwell has not purchased any Facebook advertisements. Ex. 114 at 164:14–165:9.

Maxwell read and relied on Potential Reach when purchasing each Facebook advertisement set. Ex. 115 at 3 (response to ROG 2); Ex. 114 at 218:13-19. Maxwell testified that he relied on Facebook's Potential Reach:

> Q. Did you read Facebook's potential reach prior to purchasing advertisements from Facebook?
> A. Yes.
> Q. And did you rely on potential reach in making your decision to purchase advertisements from Facebook?
> A. Yes, absolutely.
> Q. Okay. What did you rely on potential reach for?
> A. One, for determining if there was a large enough pool for me to want to advertise on Facebook in the first place. Two, to determine how much I wanted to budget. Three, to help me target my audience.

*Id.* at 199:5-12. Maxwell testified that had he known that the Potential Reach was inflated, he would not have purchased all of the ads that he purchased or spent the same budget on Facebook

---

[5] Ex. 114 at 199:5-12; 218:13-19; 227:24-228:9; 217:22-218:2; 246:247:5; 257:5-258:6; 188:1-6; Ex. 117 at 158:6-7; Ex. 118 at 51:12-52:2; 74:24-75:3; 98:3-5; 103:15-23; 104:21–106:5.

6

ads. *Id.* at 227:24-228:9; 217:22-218:2; 246:247:5; 257:5-258:6; *see also id.* at 188:1-6. Maxwell testified that he wanted "as large of a potential reach as limited to my target audience as possible." *Id.* at 259:17-23.

### B.    Plaintiff DZ Reserve

Plaintiff DZ Reserve is an e-commerce business, selling a variety of products, including fitness products. Ex. 117 at 35:11-17. Between December 2017 and December 2018, DZ Reserve bought advertisements on Facebook, spending over $ 1 million. Ex. 116 at 8 (response to ROG 10) *see also* Ex. 119 at 114 (ex. 14).

Dan Ziernicki, the owner of DZ Reserve, repeatedly and consistently testified that he relied on Facebook's Potential Reach. *See*, *e.g.*, Ex. 117 at 158:6-7 ("Potential reach was very important."); Ex. 118 at 51:12-52:2; 74:24-75:3; 98:3-5 ("By Ms. Deeley: Okay. You also said you relied on potential reach? A. Yes, I did. Very much.").

Ziernicki testified that, if he had known that Facebook's Potential Reach was inflated, DZ Reserve "wouldn't have spent so much money on Facebook." Ex. 118 at 103:15-23. When specifically asked if he "didn't want to buy ads again for DZ Reserve" due to Potential Reach inflation, Ziernicki responded, "I know I would have spent less. Would I probably spend money? Most likely." *Id.* at 105:11-106:1; *see also id.* at 104:21–105:20; 105:24-106:5. Consistent with his testimony, after learning of Potential Reach inflation and joining this lawsuit, Ziernicki lowered his spending on Facebook by over 90%; Ex. 119 at 116 (ex. 15.)

Ziernicki "looked at" the Potential Reach "every time before purchasing ads." Ex. 118 at 95:8-12; *see also* Ex. 117 at 75:18-76:1. Ziernicki explained why he relied on the Potential Reach and why Potential Reach inflation mattered to him: "[W]hat I always wanted to do was get the largest potential reach within my target audience. That was my goal, so that's what I used Ads Manager for, and that's why I always looked at potential reach." Ex. 118 at 51:12-52:2.

Ziernicki testified that Potential Reach is an important metric for analyzing the performance of his advertisements. Ex. 117 at 153:19-154:7; 154:14-155:18. Ziernicki also explained that when he used Estimated Daily Reach, he analyzed it as a percentage of the Potential

Reach. Ex. 118 at 96:23-97:9. Ziernicki specifically testified that "cost per purchase" was not the only metric he cared about in evaluating ads. Ex. 117 at 175:23-176:1.

Ziernicki's testimony in this litigation is consistent with the views he has shared in public forums. In 2019, another person told Ziernicki on an online forum that Potential Reach inflation was a "conspiracy" that "isn't proven yet." Ex. 120 at '50. Ziernicki responded that Potential Reach inflation "is a fact." *Id.* Ziernicki mocked the other persons' view that Potential Reach inflation was a conspiracy with laughing emojis. *Id.*

### V.    The Evidence Shows that Plaintiffs' Potential Reach Numbers Were Inflated

In its summary judgment motion, Facebook does not dispute that Plaintiffs have evidence that the Potential Reach provided to the Plaintiffs was inflated. Nor could it. The record contains voluminous internal acknowledgements from Facebook executives that Potential Reach was inflated. *See e.g.*, Ex. 86 at '88 (acknowledging Potential Reach was inflated dues to fake and duplicate account); Ex. 121 (acknowledging Video Advertising Bureau Report "ha[s] the order of magnitude in inflation correct"); Ex. 107 at '16 (Alex Schultz admitting that ███████████████████ ███████████████████████████ Ex. 122 ("my question lately is: how long can we get away with the reach overestimation?").

Plaintiffs' statistics expert Dr. Charles Cowan analyzed five sources of Potential Reach inflation identified in Facebook documents: SUMA (duplicate), fake, ineligible, inactive, and cross-platform (Facebook/Instagram overlap) accounts. Ex. 125, ¶¶ 32-35. Dr. Cowan conducted a statistical analysis of the five inflation sources using Facebook's own data to determine that the default United States Potential Reach is inflated by at least 33% during the entire class period, and that it is a "statistical certainty" that regardless of more granular targeting criteria any Potential Reach of at least 1,000 will be inflated by *at least* 10%. Ex. 96, ¶ 8; Ex. 98, ¶ 155.

Dr. Cowan also calculated Potential Reach inflation for Plaintiffs Maxwell and DZ Reserve, using the Potential Reach and targeting criteria for each of their ad sets. Ex. 98, ¶¶ 162-172. Dr. Cowan found Maxwell's Potential Reach for each respective ad set ranged from approximately 2.4 to 49.8 million, and the Potential Reach inflation for Maxwell ranged from 32%

to 33%. *Id.,* ¶ 169. Dr. Cowan found DZ Reserve's Potential Reach for each respective ad set ranged from 1,000 to approximately 2.1 billion, and that the Potential Reach inflation for DZ Reserve ranged from 28% to 48%. *Id.,* ¶ 170.

## VI.    Facebook Has Not Materially Changed How Potential Reach Is Calculated

Despite superficial changes and disclosures over the years, the core problems with Potential Reach remain unaddressed. Facebook still has not remediated the inflation in its Potential Reach metrics, nor has it disclosed that it is not calculated based on people. In March 2019, after this lawsuit was filed, Facebook remediated one source of inflation: Ineligible Accounts. Ex. 123. Four sources of inflation still remain: (1) duplicate, (2) fake, (3) inactive, and (4) cross-platform duplicate accounts. *See* Class Cert. Mot. at 11:10–12 (ECF No. 282); Ex. 98, ¶¶ 33, 46–64; Ex. 96, ¶¶ 9–22; Ex. 77, ¶¶ 46-49; Ex. 124 at 25:10-20; Exs. 86, 89 and 97. While Facebook changed the name of "Potential Reach" to "Estimated Audience Size" after the close of fact discovery, SJ at 7:5–9, Facebook still falsely tells advertisers that Estimated Audience Size represents "people." ECF No. 375-24. Facebook also has not provided evidence that it remediated any of the four remaining sources of inflation at any time since the close of fact discovery in October 2020.

## VII.    Procedural History

On April 15, 2020, Plaintiffs filed the operative Third Amended Consolidated Complaint ("TAC") in this action. ECF No. 166.[6] The TAC asserted claims for violation of California's Unfair Competition Law (UCL), breach of the implied covenant of good faith and fair dealing, unjust enrichment, fraudulent misrepresentation and fraudulent concealment. *Id.,* ¶¶ 121–60. Facebook moved to dismiss Plaintiffs' TAC. The Court denied the motion to dismiss with respect to the fraudulent misrepresentation and fraudulent concealment claims but dismissed Plaintiffs' contract-related claims. ECF No. 255. On January 20, 2022, the Court granted Facebook's motion for judgment on the pleadings with respect to Plaintiffs' request for restitution under the UCL. ECF No. 366. The Court denied Facebook's motion on the pleadings for injunctive relief under the

---

[6] This case was originally filed on August 15, 2018, and a Consolidated Amended Class Action ("CAC") was filed on December 21, 2018. ECF No. 55.

9

UCL, finding that Plaintiffs sufficiently allege "that they will be unable to trust [Facebook's] representations going forward." *Id*. at 2. Thus, Plaintiffs' remaining claims are for (1) fraudulent misrepresentation, (2) fraudulent concealment, and (3) injunctive relief under UCL. On March 29, 2022, the Court granted Plaintiffs' motion for class certification. (ECF No. 388).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In "determining whether a genuine dispute of material fact exists, the Court will view the evidence in the light most favorable to the non-moving party and draw 'all justifiable inferences' in that party's favor." *Brickman v. Fitbit, Inc.*, 2017 WL 6209307, at *2 (N.D. Cal. Dec. 8, 2017) (Donato, J.) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986)). At summary judgment, the Court is not permitted to evaluate the credibility of the evidence or weigh the evidence. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *see also Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) ("The court must not make any credibility determinations.")

To prevail on summary judgment, the moving party must show "that there is an absence of evidence to support the nonmoving party's case." *Winding Creek Solar LLC v. Peevey*, 293 F. Supp. 3d 980, 989 (N.D. Cal. 2017) (Donato, J.) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)), *aff'd*, 932 F.3d 861 (9th Cir. 2019). "Where evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal citations omitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ARGUMENT**

## I.    **The Court Should Deny Summary Judgment on Plaintiffs' Fraud Claims**

Facebook challenges Plaintiffs' claims for common law fraud and fraudulent concealment on three grounds. *First*, Facebook asserts it is undisputed that Plaintiffs did not rely on Potential Reach – notwithstanding voluminous evidence of materiality and Plaintiffs' own testimony that they did, in fact, rely on Potential Reach. *Second*, Facebook rehashes its arguments regarding fraudulent concealment from its motion to dismiss the TAC – despite the Court's rejecting those arguments previously. *Third*, Facebook asserts Plaintiffs have "no evidence" of damages – despite their submission of multiple expert reports regarding damages, and that the Court has now accepted the admissibility of one of Plaintiffs' damages models.

### A.    **The Evidence Shows Potential Reach Is Material and Plaintiffs Relied on It**

Facebook argues it is entitled to summary judgment on the common law fraud claims because it is purportedly undisputed that Plaintiffs did not rely on Potential Reach.[7] Under California law, "a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Engalla v. Permanente Medical Group, Inc*., 15 Cal.4th 951, 977 (1997) (citing *Vasquez v. Sup. Ct*., 4 Cal. 3d 800, 814 (1971)).

In turn, "materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable [person] would have been influenced by it." *Engalla*, 938 P.2d at 919 (citations omitted); *see also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013). Thus, Plaintiffs "need only make a showing that the misrepresentations were material, and that therefore a reasonable trier of fact could infer reliance from such misrepresentations, in order to survive" summary judgment. *Engalla*, 915 Cal.4th at 977.

---

[7]  The elements of fraud and fraudulent concealment are "(a) misrepresentation (false representation, concealment, or nondisclosure), (b) knowledge of falsity (or 'scienter'), (c) intent to defraud, i.e., to induce reliance, (d) justifiable reliance, and (e) resulting damage." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997), *as modified* (July 30, 1997) (internal quotation marks omitted); Class Cert. Order at 9:10-16.

### 1.   Facebook Admits the Materiality of Potential Reach

Plaintiffs have amassed overwhelming evidence of materiality. It is undisputed Facebook exposed Plaintiffs (and the entire class they seek to represent) to Potential Reach *at the point of sale* on Ads Manager. *See e.g.*, Exs. 75, 76, 98 ¶ 18, 77 ¶¶ 55-60. Facebook admits in documents that Potential Reach is material to advertisers. *See e.g.,* Exs. 80; 101 at '61; FB-108 at '70; 102 at '65, '67; 103 at '97; 104; 83 at '33-34. Plaintiffs' experts also find that Potential Reach is material. Ex. 84 at 5; Ex. 85 at 8. And Facebook does not dispute that Plaintiffs testified that they each read and relied on Potential Reach when purchasing Facebook ads. Ex. 115 at 3 (response to ROG 2); Ex. 114 at 218:13-19; Ex. 118 at 95:8-12; *see also* Ex. 117 at 75:18-76:1.

Despite this evidence, Facebook asserts Plaintiffs have no evidence of materiality "because each of their Potential Reach estimates was different for each different ad set, and Plaintiffs' own expert attaches a different amount of supposed inflation to each estimate." SJ at 15:19-21. It is unclear why differing levels of inflation would render Potential Reach immaterial. Regardless, Facebook ignores Plaintiffs' expert evidence that a minimum level of 10% Potential Reach inflation has "a statistically significant impact on consumer demand for Facebook advertisements." Ex. 84 at 5. And Plaintiffs' expert Dr. Cowan found that *all* Facebook ads on Ads Manager had at least 10% Potential Reach inflation. Dr. Cowan also found that the Potential Reach for Maxwell and DZ Reserve's ad sets were all inflated more than 10%. Ex. 98, ¶¶ 169-170 (Maxwell's Potential Reach was inflated by 32% to 33%, and DZ Reserve's Potential Reach was inflated by 28% to 48%). And Facebook refused to implement proposed remediations that would have reduced Potential Reach inflation. Ex. 111. In addition, Facebook's argument ignores the evidence showing the materiality of Potential Reach's reference to "people." Ex. 112 at '48-50.

In sum, Plaintiffs' evidence of materiality establishes a genuine issue of material fact regarding reliance and precludes summary judgment on the common law fraud claims.

### 2.   Record Evidence Shows Plaintiffs Actually Relied on Potential Reach

Notwithstanding overwhelming evidence of materiality, Facebook argues it is undisputed that Plaintiffs never actually relied on Potential Reach. Facebook repeatedly cites *Young v. Cree,*

*Inc.*, 2021 WL 4749384, at *3 (N.D. Cal. Oct. 12, 2021), to argue there is no evidence of reliance because Plaintiffs supposedly did not sufficiently testify regarding "the *specific* misrepresentations that supposedly caused each Plaintiff to spend more on ads." SJ at 13:3-14:6. Facebook's argument is legally and factually wrong.

*Young* bears no resemblance to this case. In *Young*, the plaintiff alleged LED lightbulb packages contained false and misleading statements regarding the longevity of the bulbs in violation of consumer protection statutes and in breach of express and implied warranties. 2021 WL 4749384, at *3. At his deposition, the plaintiff could not identify any of the challenged longevity statements, could not state what motivated his purchasing decision, could not recall any representation on the package other than the lightbulb being "dimmable," which was not in the complaint, and could not confirm if he ever read the warranty. *Id.* Then after his deposition, counsel attempted to submit errata "to change his answer 'to nearly the opposite' of what he originally said." *Id.* at *3–4. Given those facts, the court rightfully found that the plaintiff's testimony failed to show reliance. *Id.* at *6–7.

In contrast, here Facebook concedes both Plaintiffs testified that they relied on Potential Reach. SJ at 7:14-16. Ex. 114 at 199:5-12; 218:13-19; 227:24-228:9; 217:22-218:2; 246:247:5; 257:5-258:6; 188:1-6; Ex. 117 at 158:6-7; Ex. 118 at 51:12-52:2; 74:24-75:3; 98:3-5; 103:15-23; 104:21–106:5. And Plaintiffs testified that they relied on Potential Reach for *every* ad set that they purchased. Ex. 115 (response to ROG 2); Ex. 114 at 218:13-19; Ex. 118 at 95:8-12. To the extent Plaintiffs need evidence of the Potential Reach number and Potential Reach inflation for each of their ad sets (as suggested by Facebook), Plaintiffs' expert Dr. Cowan provides this information in his expert report. Ex. 98, ¶¶ 162-172. There is no lack of evidence regarding what specifically Plaintiffs relied upon.[8]

Facebook asks the Court to disregard Plaintiffs' repeated testimony on reliance because it supposedly conflicts with other portions of their deposition testimony. SJ at 14:7-15:4. But

---

[8] Facebook suggests Plaintiffs are somehow required to recall the exact Potential Reach numbers provided for each of their ads. Facebook cites no authority for that proposition because California law rejects the notion that "proof [of reliance] must include the exact words of the false or misleading representation." *Boeken v. Philip Morris*, 26 Cal.App.4th 1640, 1650 (2005).

Facebook again ignores the facts: there is no conflict in Plaintiffs' testimony. Both Plaintiffs testified consistently that they relied on Potential Reach. *See Supra* at 6.

Facebook contends Maxwell's use of the Amazing.com tutorial[9] and its recommended "$20 or less" daily budget conflicts with his reliance on Potential Reach. SJ at 14:12-16. Under California law, Maxwell can rely on both Potential Reach and the Amazing.com tutorial. To prove actual reliance, "[i]t is not … necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *Engalla,* 15 Cal. 4th at 976–77. And the tutorial did not tell Maxwell how much to spend on his Facebook ads overall: it only provided him a *daily* range of $20 or less. Maxwell decided how many days to run ads, and thus how much money to spend overall, based on Potential Reach. Ex. 114 at 257:15-258:6; 246:21-247:25.

Nor is there any conflict in Ziernicki's testimony regarding DZ Reserve's reliance on Potential Reach. Facebook asserts that, "Ziernicki admitted that all he cared about was performance (cost per purchase) . . . ." SJ at 14:18-19. That is false. Ziernicki testified that he was *not* solely concerned about cost per performance. Ex. 117 at 175:23-176:1. Looking at ad performance also does not conflict with DZ Reserve's reliance because Potential Reach need not be the sole factor DZ Reserve relied upon. *Engalla*, 15 Cal. 4th at 976–77.[10] Ziernicki's continued purchase of *some* ads for other companies after he learned of Potential Reach inflation only corroborates his reliance: Ziernicki lowered his spend on Facebook ads by over 90% and testified that he "wouldn't have spent so much money on Facebook" had he known about Potential Reach inflation. Ex. 118 at 103:15-23; 104:21–106:5. *See Rahman v. Mott's LLP*, 2014 WL 5282106, at *7 (N.D. Cal. Oct. 15, 2014) (summary judgment denied where plaintiff testified that he relied on

[9] Amazing.com offers "a course for entrepreneurs who want to sell physical products online." Ex. 114 at 67:17–18.

[10] Facebook's attempt to manufacture a conflict between looking at ad performance and relying on Potential Reach is particularly unpersuasive because Ziernicki also used Potential Reach to analyze ad performance. Ex. 117 at 153:19-154:7; 154:14-155:18.

misrepresentation to purchase more of the product, even though he had bought some – but less – units of the product without the misrepresentation).[11] And the Court has now squarely rejected this same argument in the context of class certification. Class Cert. Order at 6:26–7:13.

Facebook points to analysis by its expert Catherine Tucker to argue Plaintiffs never personally relied on Potential Reach. SJ at 7:22-8:1; 8:22-9:5; 9:22-10:10; 15:9-12. But Tucker's "analysis" is nothing more than her improper attempt to opine on Plaintiffs' state of mind. Mot. to Exclude Tucker at 4:11–6:5 (ECF Nos. 369-1 (sealed), 370 (redacted)). Tucker's analysis is also flawed because it ignores Plaintiffs' testimony that they wanted the largest possible Potential Reach for a given targeting criteria. *See* Ex. 114 at 259:17-23; Ex. 118 at 51:12:52:2. In the context of Plaintiffs' damages analyses, Plaintiffs' expert Dr. Levy explained that Tucker's raw Potential Reach number/budget correlation analysis is irrelevant for this reason. Ex. 125, ¶ 9. And even if it were admissible and proper, Tucker's analysis only underscores the disputed issues of fact. Tucker's state of mind opinion might be evidence that supports Facebook's defense, but Plaintiffs have opposing evidence on reliance, "and the clash between the two frames a genuine dispute that precludes summary judgment." *Brickman v. Fitbit, Inc.*, 2017 WL 6209307, at *5 (N.D. Cal., Dec. 7, 2017).

Moreover, even if there were a conflict in Plaintiffs' deposition testimony, this would not be grounds for summary judgment because the Court is not permitted to evaluate the credibility of Plaintiffs' deposition testimony or weigh the evidence at this stage. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986). Thus, courts deny summary judgment on reliance for fraud when plaintiffs provide conflicting deposition testimony regarding reliance. *See e.g., Iorio v. Allianz Life Ins. Co. of N. Am.*, 2008 WL 8929013, at *12 (S.D. Cal. July 8, 2008); *Rahman*, 2014 WL 5282106, at *7 (denying summary judgment motion on fraud where there was "conflicting evidence" at deposition "on the issue of whether Rahman relied" on the misrepresentation).

---

[11] Facebook citation to *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1194 (N.D. Cal. 2020) (Donato, J.) is misplaced. *Heeger* did not involve the purchase of a product. Rather, there plaintiff Facebook users alleged privacy violations but failed to explain why they continued to use Facebook. 509 F. Supp. 3d at 1194. Here, by contrast, Plaintiffs have an explanation: Ziernicki reducing his ad spending by 90%, which is consistent with DZ Reserve's allegation and testimony that it spent more than it otherwise would have due to Potential Reach inflation.

Facebook incorrectly asserts that Plaintiffs' testimony should be disregarded based on *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 542, 544 (9th Cir. 1975), an early decision regarding the "sham affidavit" rule.; *see Nelson v. City of Davis*, 571 F.3d 924, 927–28 (9th Cir. 2009) (discussing "sham affidavit" rule). But here, there are no Plaintiff affidavits and "courts generally do not apply the sham affidavit rule to conflicting statements within the same deposition."[12]

### 3.   The Evidence Shows Plaintiffs Justifiably Relied on Potential Reach

Facebook asserts that Plaintiffs' reliance on Potential Reach was unreasonable as a matter of law because Estimated Daily Results shows "an estimate of how many people an advertiser could expect to reach." SJ at 16:3–6. Facebook also argues that any reliance was legally unreasonable because Facebook "disclosed that Potential Reach does not match the census, is affected many factors . . . and is not an estimate of the actual number of people an advertiser should expect to reach." *Id.* at 16:15–18. Facebook raised these exact arguments in its prior motion to dismiss, MTD at 5:5–8 (ECF No. 65), and the Court rejected them, Civ. Minutes at 1 (ECF No. 83). The same result is warranted here.

Potential Reach and Estimated Daily Results are separate metrics that provide different, material information. MTD Opp. at 6:17–18 (ECF No. 68). Moreover, nothing in the Estimated Daily Results discloses that Facebook's separate Potential Reach is inflated and fails to count people. *Id.* at 6:18–19.[13] Facebook also suggests that Plaintiffs' claims are foreclosed because they testified that they read and relied on Estimated Daily Results. SJ at 16:21–17:5. But, again, Plaintiffs are not required to prove that Potential Reach was the sole, or even predominant, factor in their decision. *Engalla*, 938 P.2d at 919.

---

[12] *Crayon v. Hill*, 2016 WL 282176, at *8 (E.D. Cal. Jan. 22, 2016) (collecting cases), *report and recommendation adopted*, 2016 WL 10756356 (E.D. Cal. Mar. 4, 2016); *see also Sanders v. Rodriguez*, 2020 WL 5217155, at *4 (C.D. Cal. July 2, 2020), *report and recommendation adopted*, 2020 WL 5211039 (C.D. Cal. Sept. 1, 2020); *Cummings v. Starbucks Corp.*, 2013 WL 12131281, at *3 (C.D. Cal. Aug. 30, 2013).

[13] Facebook's reliance on *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1162-63 (9th Cir. 2012) is misplaced. In *Davis*, the plaintiff alleged defendant had failed to disclose in the contract that there was an annual fee; but the defendant did in fact disclose that in the contract. *Id.* Facebook cited this same case in its failed motion to dismiss. MTD at 16:6–12, 17:2–5.

16

Facebook suggests no reasonable advertiser could have been deceived into believing Potential Reach matches Census data. SJ at 16:15–18. But Plaintiffs nowhere claim Facebook promised to match the Census. Rather Plaintiffs claim that Potential Reach is inflated and is fundamentally misleading because it does not count people – which Facebook has never disclosed. Facebook also suggests Plaintiffs could not be deceived because Potential Reach is referred to as an "estimate." *Id.* The use of the word "estimate," however, is no shield to liability, *Kabbash v. Jewelry Channel, Inc. USA*, 2015 WL 6690236, at *3 (C.D. Cal. Nov. 2, 2015), and statements "can be sued on" when "they make measurable claims." *Brickman v. Fitbit, Inc.,* 2016 WL 3844327, at *3 (N.D. Cal. July 15, 2016) (collecting cases).

Moreover, the facts make clear that Facebook itself knew – for years – that its Potential Reach was deceptive and that it caused advertisers to spend more. *See, e.g.*, Exs. 86–89 Ex. 101 at '61; Ex. 84 at 3; Ex. 126, ¶ 68. For instance, Facebook's Product Manager for Potential Reach investigated the problem and, after discovering just one source of inflation, concluded Facebook was "misleading advertisers." Ex. 100 at '94. This evidence is sufficient to create a genuine issue of material fact regarding Plaintiffs' justifiable reliance. *Anderson*, 477 U.S. at 248–52.

**B.     The Court Should Reject Facebook's Recycled Arguments Against Plaintiffs' Fraudulent Concealment Claim**

Facebook rehashes two legal arguments regarding fraudulent concealment that it previously raised in its motion to dismiss Plaintiffs' TAC. *See* ECF No. 177 at 13:12-14:23 (same arguments made in motion to dismiss TAC that are raised at summary judgment). The Court rejected these arguments in denying Facebook's motion to dismiss Plaintiffs' fraudulent concealment claim. *See* ECF No. 255. No different conclusion is warranted here.

First, Facebook contends that its omissions are not material, and it has no duty to disclose the omissions, unless Plaintiffs present evidence "showing 'physical defects that affect the central function' of the product that render it 'incapable of use.'" SJ at 17:14-18:13. Facebook misapplies the "central functionality" test. A defendant has a duty to disclose defects that "go to the central function" of its products or services, as Facebook's inflated and misleading Potential Reach does here. *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 863–64 (9th Cir. 2018).

This Court's decision in *Norcia v. Samsung Telecommunications America, LLC,* 2018 WL 4772302 (N.D. Cal. Oct. 1, 2018) (Donato, J.) is instructive. There, plaintiffs alleged, "Samsung engaged in omissions relating to the Galaxy S4 smartphone's speed and performance, and more specifically, that Samsung 'intentionally programmed the Galaxy S4 to fool benchmark apps and to create false perceptions regarding the speed and performance of these devices.'" *Id.* at *1. The Court held plaintiffs satisfied *Hodsdon*'s central functionality test, because "[n]o reasonable person could disagree that 'speed and performance' go to the heart of a smartphone's central function." *Id.* at *2 (noting plaintiffs had sufficiently alleged facts demonstrating the importance of the speed and performance feature).

Here too, Plaintiffs provide evidence that Potential Reach goes to the heart of Facebook's ad services, including facts demonstrating the importance of Potential Reach. Ex. 80 ("arguably the single most important number in our ads creation interfaces"); Exs 81, 82. And, like in *Norcia*, the evidence shows that Facebook "intentionally" concealed Potential Reach's inflation and the prevalence of duplicate and fake accounts "to create false perceptions regarding" Potential Reach and Facebook's ad services. *Norcia*, 2018 WL 4772302 at *1; *see* Exs. 110, 111. Facebook also concealed the fact that Potential Reach does not count people. Ex. 112. This evidence is sufficient to create a genuine issue of material fact.

Contrary to Facebook's assertion, the Ninth Circuit does not require a product to be "unusable" to trigger a duty to disclose. *See Hodsdon*, 891 F.3d at 864 (noting that corrupted hard drives or defective computer screens that render those products "incapable of use by any consumer" demonstrate that central functionality of a product is not based on subjective preferences).[14] Several courts – including this Court – have found a duty to disclose even when the product still works. *Norcia*, 2018 WL 4772302 at *2 (central function related to diminished

---

[14] Facebook relies on the unpublished decision in *Knowles v. ARRIS International PLC*, 847 F. App'x 512, 514 n.1 (9th Cir. 2021), to argue that Plaintiffs' ads must be unusable. SJ at 17:23–26. *Knowles* applies *Hodsdon* to find an alleged defect made no difference because the "Plaintiffs' own expert acknowledged that even if a cable modem worked perfectly, a consumer could still experience the same issues experienced by Plaintiffs." *Id.* Thus, the court relied on *Hodsdon* to find that "[t]he identified defects therefore were not material." *Id.* at 514. No analogous situation exists here.

1   speed and performance of the phone, no allegation phone was unusable), *Beyer v. Symantec Corp*.,

2   333 F. Supp. 3d 966, 980 (N.D. Cal. 2018) (vulnerabilities in computer security software relate to

3   central functionality of the software despite lack of allegation that vulnerabilities were exploited;

4   no allegation of unusability); *In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155,

5   1179 (N.D. Cal. 2019) (diminished battery capacity "goes to the central functionality of the

6   devices;" no allegation of unusability).

7        Facebook also argues that fraudulent concealment is barred by the economic loss rule. As

8   this Court has previously observed, "[b]roadly speaking, the economic loss rule is intended to

9   police the boundary between tort and contract damages, and holds that certain damages should be

10   remedied only in contract." *Jones v. Progressive Cas. Ins Co*., 2018 WL 4521919, at *2 (N.D. Cal.

11   Sept. 19, 2018) (Donato, J.). "[T]he rule is often misinterpreted to bar all tort recovery for 'purely'

12   economic losses[, but a]pplying the rule in that fashion makes scant sense because torts like *fraud*

13   and negligent misrepresentation exist precisely to remedy purely economic losses." *Id*. at *3 (citing

14   *Giles v. Gen. Motors Acceptance Corp*., 494 F.3d 865, 874-75 (9th Cir. 2007)) (emphasis added).

15   Here Plaintiffs seek to recover economic losses due to Facebook's fraudulent concealment.

16        Courts have found that the economic loss rule does not apply to fraudulent concealment.

17   *See County of Santa Clara v. Atlantic Richfield Co*., 137 Cal. App. 4th 292, 329 (2006) (declining

18   to apply economic loss rule to fraud claims including fraudulent concealment.); *NuCal Foods, Inc.*

19   *v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1031 (N.D. Cal. Jan. 16, 2013). Application of the

20   economic loss rule is especially inappropriate where, as here, Plaintiffs omission claim sounds in

21   fraudulent inducement. *Yetter v. Ford Motor Co*., 2019 WL 3254249 at *7 (N.D. Cal. July 19,

22   2019) (declining to apply economic loss rule to fraudulent concealment and other fraud claims,

23   "all of which sound in fraudulent inducement."); *Sloan v. General Motors LLC,* 2020 WL

24   1955643, at *23 (N.D. Cal. Apr. 23, 2021) (citing same); *R Power Biofuels, LLC v. Chemex LLC,*

25   2017 WL 1164296, at *5 (N.D. Cal. Mar. 29, 2017) ("[F]raudulent inducement is a well-

26   recognized exception to  the  economic  loss rule."). The evidence here shows that  Facebook's

27   fraudulent concealment induced Plaintiffs to buy more Facebook advertisements than they

28

otherwise would have and caused Plaintiffs to overpay for the advertisements they did purchase – both of which sound in fraudulent inducement. TAC ¶¶ 158-59; *see also id.* ¶¶ 56-57.[15]

### C.    Plaintiffs Have Evidence of Fraud Damages

Facebook asserts Plaintiffs "have no evidence of fraud damages" SJ at 19:1-20:5. But Plaintiffs submit voluminous reports from multiple damages experts, and the Court has already determined that Plaintiffs' conjoint-based damages model is admissible. Class Cert. Order at 12:22–14:5.

Plaintiffs measure damages based on two different theories. First, to calculate damages stemming from Potential Reach inflation, Plaintiffs measured the impact of inflation on advertisers' budgets through a conjoint survey conducted by Dr. Greg Allenby. Ex. 84 at 4–22. As noted, the Court rejected a *Daubert* challenge to Dr. Allenby. Class Cert. Order at 12:22–14:5. Dr. Roughgarden used the survey results to determine a 3.4% price premium through a simulation of Facebook's auction. Ex. 127, ¶¶ 51–55. Plaintiffs' economist, Dr. Levy, then determined the 3.4% price premium properly considers supply and demand and can be used to calculate classwide damages. Ex. 128, ¶¶ 27, 53–55. Second, to calculate damages stemming from Potential Reach's "inaccurate" reference to "people," Plaintiffs rely on Facebook's "past studies" which found that "not having reach estimation costs [Facebook] ~8-9% of Revenue," and Roughgarden's auction simulation which showed that an 8%–9% decrease in budgets would decrease ad prices by 8.9%. Ex. 104; Ex. 127, ¶¶ 56–61.

Facebook argues, "Plaintiffs also have no basis for calculating damages based on Meta's description of Potential Reach as estimating 'people' instead of 'accounts.'" SJ at 19:15-16. This is a repetition of its *Comcast* argument that it made, and that the Court rejected, at the class certification stage. Class Cert. Opp. at 24:9–17; Class Cert. Order at 14:19–21. Plaintiffs' experts measure the price impact of Potential Reach inflation based on Plaintiffs' claim and evidence showing Potential Reach was inflated for all of Plaintiffs' ad sets and across the class. Ex. 84 at

---

[15] Facebook notes that the California Supreme Court recently agreed to address this issue. SJ at 18:18-23. At the very least, therefore, the Court should defer ruling on this issue until the California Supreme Court issues its decision.

4–22; Ex. 130, ¶¶ 51–55. Alternatively, Plaintiffs' experts measure the price impact of removing Potential Reach based on Plaintiffs' claim and evidence showing Potential Reach is fundamentally misleading because it does not count people. Ex. 104; Ex. 127, ¶¶ 56–61; TAC, ¶ 68 ("Facebook's failure to remove duplicate and fake accounts from its Potential Reach metric makes the metric fundamentally misleading; Facebook represents that Potential Reach is [a] measurement of people … when Potential Reach is, at best, a measurement of accounts."); *see also* Ex. 126, ¶ 38 ("Potential Reach refers to people . . . ."); Class Cert. Order at 10:5-17. Plaintiffs' damages models are therefore sufficient under Ninth Circuit law because Plaintiffs "show that their damages stemmed from actions that created the legal liability." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *Pulaski & Middleman v. Google*, 802 F.3d 979, 987 (9th Cir. 2015).

Plaintiffs' damages models are sufficient under Ninth Circuit law and raise genuine issues of material fact that preclude summary judgment.

## II. Facebook Is Not Entitled to Summary Judgment on Plaintiffs' Claim for Injunctive Relief Under the UCL

Facebook argues that it is entitled to summary judgment on Plaintiffs' claim for injunctive relief. First, it argues that there is no evidence demonstrating Plaintiffs' reliance on Potential Reach. SJ at 20:17–24. That argument fails for the reasons explained above. *See supra* Section I.A. Facebook also argues that Plaintiffs lack standing to seek injunctive relief. SJ at 20:26–23:21.[16] Facebook's arguments are meritless.

### A. The Court Already Determined that Plaintiffs' Injury Is Cognizable Under Article III

In its first Motion to Dismiss, Facebook argued Plaintiffs lack standing to seek injunctive relief, Mot. to Dismiss at 14:17–15:4 (ECF No. 65), and the Court rejected its argument, Civ. Minutes at 1 (ECF No. 83). Then, after Facebook challenged Plaintiffs' future injuries under *Sonner*, Mot. for Judgment on the Pleadings (ECF No. 270), the Court reiterated Plaintiffs' Article III injury – "that they will be unable to trust Meta's representations going forward." Order Re Mot.

---

[16] Facebook also argues, "For the same reasons, Plaintiffs cannot show they are likely to suffer irreparable harm in the absence of an injunction." SJ at 23:23–24.

for Judgment on the Pleadings at 2:11–15 (ECF No. 366).[17] Now, Facebook quotes that Order back at the Court to somehow argue, again, that Plaintiffs lack standing. SJ at 21:15–16. Facebook's "renewed request is effectively an improper motion for reconsideration that is entirely unsupported by new facts or law." *Milan v. Clif Bar & Co.*, 489 F. Supp. 3d 1004, 1008 (N.D. Cal. 2020) (Donato, J.).

A plaintiff is injured by the "inability to rely on the validity of the information advertised." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 971 (9th Cir. 2018); *see also id.* at 967; *Milan*, 489 F. Supp. 3d at 1006.[18] Both named Plaintiffs have testified to that injury, *e.g.*, DZ Reserve 30(b)(6) Dep. at 104:21–106:13; Maxwell Dep. at 242:18–23. That testimony satisfies Plaintiffs' burden at this stage. *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002) ("[A]t the summary judgment stage the plaintiffs need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements." (citation omitted)).

The peculiar facts of the non-precedential *Coca-Cola* case do not exist here and do not change the analysis. *In re: Coca-Cola Prods. Mktg. & Sales Pracs. Litig.*, 2021 WL 3878654 (9th Cir. Aug. 31, 2021). There, plaintiffs were not concerned about the actual product. Rather, they cared only about "whether Coca-Cola was telling the truth" about it, so "they would be interested in purchasing Coke again if its labels were accurate, regardless of whether it contained chemical preservatives or artificial flavors." *Id.* at *3. Here, however, Plaintiffs testified that they care about the product itself, not just representations made about the product. *E.g.*, Ex. 117 at 51:12–52:2; Ex. 114 at 199:8–12.

## B. Plaintiffs Face an Imminent Threat of Harm

Facebook argues that Plaintiffs cannot secure an injunction because any harm is not "imminent." SJ at 22:13–23:21. Facebook's first argument, in essence, is that it fixed the problem.

---

[17] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), was published before the Court's Order and does not alter the relevant law.

[18] *Davidson* is the controlling case; Facebook's cited cases discuss standing requirements in general and are not central to the question here. *See* SJ at 20:26–21:5.

*Id.* at 22:21–23:7. Even if that were true, "[v]oluntary cessation does not moot a case or controversy unless 'subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (quotation marks, brackets, and citation omitted).

And Facebook has *not* voluntarily ceased its conduct. Facebook has not fixed inflation caused by fake, duplicate, inactive, and cross-platform accounts.[19] In fact, Facebook's Motion avoids even acknowledging the problem, calling it "alleged" and "supposed inflation," though it admits that it decided not to correct known sources of inflation. SJ at 5:26–6:12. 13:8, 13:15; *see also* Ex. 11 at '22.[20] Additionally, Facebook still falsely represents that Potential Reach (now "Estimated Audience Size") counts "people." Class Cert. Mot. at 11:18–24; Def.'s Exs. 27–28 (ECF No. 375-27, -28).

Facebook then argues that Plaintiffs "stopped advertising." SJ at 23:8–10. Standing requires only a "desire" to purchase the product again. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970–71 (9th Cir. 2018). Record evidence demonstrates Plaintiffs' "desire" to purchase Facebook ads in the future. DZ Reserve testified that if Facebook fixed Potential Reach, it would "most likely" still spend money on Facebook ads but "would have spent less," and it "believe[s] that even today Facebook ads have some value." Ex. 118 at 104:21–106:13. Plaintiff Maxwell testified that though he's "not advertising on Facebook," he would "continue advertising on Facebook in the future" "if [he] knew [he] was getting good data and . . . was getting what [he] paid for." Ex. 114 at 242:3–23. Moreover, Plaintiffs, and virtually anyone looking to advertise online, would be extremely likely to turn to Facebook because it has no close rival in the

---

[19] Class Cert. Mot. at 11:10–12 (ECF No, 282); Ex. 98, ¶¶ 33, 46–64; Ex. 96, ¶¶ 9–22; Ex. 77, ¶¶ 46-49; Ex. 124 at 25:10-20; Exs. 86, 89 and 97, ECF No. 375-24.

[20] Facebook argues that its "disclosures" cure any deception about Potential Reach. SJ at 22:21–23:7; *see also, id.* at 5:13–7:9. When a company "add[s] qualifying language" but Plaintiffs contend "that the qualifying language does not cure" the misrepresentations, then "[t]he qualifying language does not strip Plaintiff of standing to seek injunctive relief." *Smith v. Keurig Green Mountain, Inc.*, 2020 WL 5630051, at *11 (N.D. Cal. Sept. 21, 2020).

1  marketplace for ads. Ex. 128, ¶¶ 14, 21; *see also* Ex. 118 at 105:21–106:5 ("I mean, there's mostly

2  two options in town [describing Facebook and Google].").

3       Facebook also asserts that Plaintiffs "stopped running their businesses altogether," SJ at

4  23:10. But Plaintiff DZ Reserve remains in "Good Standing," *Business Entity Search*, Colorado

5  Secretary of State, https://bit.ly/3utYjz9 (search "DZ Reserve"), and "the corporate entity is still

6  active," Ex. 117 at 37:12–14. Contrary to Facebook's accusations, Plaintiff Maxwell has not done

7  anything to "dissolve[]" his online business, and its Tax ID is still active. Ex. 114 at 268:8–269:2.

8  Even if it were otherwise, Maxwell is the plaintiff here, not his business entity. *Id.* at 52:5–10

9  (testifying that Max Martialis is a "self-proprietorship" registered in Ohio); *Patterson v. V&M*

10  *Auto Body*, 589 N.E.2d 1306, 1308 (Ohio 1992) (finding "[a] sole proprietorship has no legal

11  identity separate from that of the individual who owns it," and cannot be a party in litigation);

12  *accord Ball v. Steadfast-BLK*, 126 Cal. Rptr. 3d 743, 747 (Cal. Ct. App. 2011). And again, both

13  Plaintiffs testified that they would continue advertising on Facebook if Facebook corrected its

14  misrepresentations. Ex. 118 at 104:21–106:13; Ex. 114 at 242:3–23.[21] This is sufficient to create

15  a genuine issue of material dispute on these issues. *See Cent. Delta Water Agency*, 306 F.3d at

16  947.

## **CONCLUSION**

18       For the foregoing reasons, Facebook's motion for summary judgment should be denied.

20  DATED: April 1, 2022         Respectfully submitted,

22                    By: */s/ Geoffrey Graber*

23                    Geoffrey Graber (SBN 211547)

23                    Andrew N. Friedman (*pro hac vice*)

23                    Karina G. Puttieva (SBN 317702)

24                    Paul Stephan (*pro hac vice*)

---

[21] This evidence distinguishes this case from others where a plaintiff stated no intention to reenter business. *A White and Yellow Cab, Inc. v. Uber Technologies, Inc.*, 2017 WL 1208384, at *5 (N.D. Cal. Mar. 31, 2017) ("Plaintiff [does not] explain[] how an injunction would redress any on-going injuries."); *Club Xtreme, Inc. v. City of Wayne*, 2010 WL 1626415, at *5 (E.D. Mich. Apr. 21, 2010) ("[I]t is no longer in business and does not assert that it would reopen if granted relief by this Court.").

**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
ggraber@cohenmilstein.com
kputtieva@cohenmilstein.com
pstephan@cohenmilstein.com

Eric Kafka *(pro hac vice)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor,
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
ekafka@cohenmilstein.com

Charles Reichmann (SBN 206699)
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708-1015
Telephone: (415) 373-8849
Charles.reichmann@gmail.com

*Counsel for Plaintiffs and Proposed Class*