LATHAM & WATKINS LLP
Elizabeth L. Deeley (CA Bar No. 230798)
*elizabeth.deeley@lw.com*
Melanie M. Blunschi (CA Bar No. 234264)
*melanie.blunschi@lw.com*
Nicole C. Valco (CA Bar No. 258506)
*nicole.valco@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: +1.415.391.0600

Andrew B. Clubok (*pro hac vice*)
*andrew.clubok@lw.com*
Susan E. Engel (*pro hac vice*)
*susan.engel@lw.com*
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

DZ RESERVE and CAIN MAXWELL (d/b/a MAX MARTIALIS), individually and on behalf of all others similarly situated,

Plaintiffs,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 3:18-CV-04978 JD

**META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE IN PART META'S EXPERT CATHERINE TUCKER, PH.D.**

Date: June 23, 2022
Time: 10:00 a.m.
Court: Courtroom 11, 19th Floor
Hon. James Donato

## TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

A. Tucker Is A Leading Expert On The Economics Of Digital Advertising ........ 3

B. Tucker Rebuts Plaintiffs' Experts ........ 3

III. LEGAL STANDARD ........ 5

IV. ARGUMENT ........ 5

A. Tucker's Opinions About DZ Reserve And Maxwell Concern Their Advertising Behavior, Not Their Credibility Or State Of Mind ........ 6

B. Tucker's Analysis Of The Value And Benefits Advertisers Receive From Meta Ad Campaigns Is Relevant To Plaintiffs' Claims ........ 8

C. Tucker Is Qualified To Opine On The Auction Simulation's Flaws ........ 11

D. Tucker Is Qualified To Opine On Whether Allenby's Conjoint Analysis Accurately Reflects Real-World Advertiser Decision-Making ........ 13

V. CONCLUSION ........ 14

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alcantar v. Foulk*,
2016 WL 3001242 (E.D. Cal. May 25, 2016) ....................7, 8

*Apple, Inc. v. Samsung Elecs. Co.*,
2012 WL 2571332 (N.D. Cal. June 30, 2012) ....................8

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) ....................5

*Colgan v. Leatherman Tool Grp., Inc.*,
135 Cal. App. 4th 663 (2006) ....................10

*Day v. Cnty. of Contra Costa*,
2008 WL 4858472 (N.D. Cal. Nov. 10, 2008) ....................13

*Greenwell v. Boatwright*,
184 F.3d 492 (6th Cir. 1999) ....................7

*Hangarter v. Provident Life & Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) ....................5

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011) ....................10

*Munoz v. PHH Mortgage Corp.*,
2022 WL 138670 (E.D. Cal. Jan. 14, 2022) ....................7

*In re Myford Touch Consumer Litig.*,
2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ....................10

*Natural-Immunogenics Corp. v. Newport Trial Grp.*,
2019 WL 3099725 (C.D. Cal. Apr. 15, 2019) ....................7

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ....................7

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
2018 WL 6511146 (N.D. Cal. Dec. 11, 2018) ....................7, 8

*In re Pacific Fertility Center Litig.*,
2021 WL 842739 (N.D. Cal. Mar. 5, 2021) ....................12

*Pooshs v. Phillip Morris USA, Inc.*,
287 F.R.D. 543 (N.D. Cal. Dec. 5, 2012) ....................11

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ....................5, 10

*Pulaski & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015) ....................10

*Ramirez v. ITW Food Equip. Grp., LLC*,
686 F. App'x 435 (9th Cir. 2017) ....................13

*Reed v. Lieurance*,
863 F.3d 1196 (9th Cir. 2017) ....................7

*S.F. Baykeeper v. City of Sunnyvale*,
2022 WL 298564 (N.D. Cal. Feb. 1, 2022) ....................11

*Shahinian v. Kimberly-Clark Corp.*,
2017 WL 11595343 (C.D. Cal. Mar. 7, 2017) ....................11

*Siring v. Oregon State Bd. of Higher Ed. ex rel. E. Oregon Univ.*,
927 F. Supp. 2d 1069 (D. Or. June 11, 2013) ....................8

*Stilwell v. Smith & Nephew, Inc.*,
482 F.3d 1187 (9th Cir. 2007) ....................10

*Tucker v. Cnty. of Riverside, Cal.*,
2018 WL 6017036 (C.D. Cal. May 23, 2018) ....................7

*In re Twitter, Inc. Sec. Litig.*,
2020 WL 9073168 (N.D. Cal. Apr. 20, 2020) ....................8

*U.S. v. Filler*,
210 F.3d 386 (9th Cir. 2000) ....................7

*U.S. v. Finley*,
301 F.3d 1000 (9th Cir. 2002) ....................14

*Wolf v. Hewlett Packard Co.*,
2016 WL 7743692 (C.D. Cal. Sept. 1, 2016) ....................11, 14

**RULES**

Fed. R. Evid. 702 .................... *passim*

## I. INTRODUCTION

Dr. Catherine Tucker is a leading expert on the economics of digital advertising. Meta retained her to evaluate the opinions of Plaintiffs' experts, who have tried to show that "inflated" Potential Reach estimates caused advertisers to set higher budgets and pay higher prices for their ads. Tucker debunked this theory, and now Plaintiffs want to prevent her from explaining to a jury why their evidence is flawed and based on a misunderstanding of the digital advertising industry.

Plaintiffs do not challenge Tucker's qualifications as an expert in the economics of digital advertising or the majority of her rebuttal opinions, including her opinion that DZ Reserve's and Cain Maxwell's ad data shows no connection between their budgets and the size of their Potential Reach estimates. Instead, Plaintiffs (1) attempt to miscast her data-driven analysis of Plaintiffs' advertising ***behavior*** as some sort of "credibility" or "state of mind" opinion. But the fact that Plaintiffs' own ad data is inconsistent with their self-serving reliance testimony does not transform Tucker's analysis of that data into credibility or state of mind testimony. Plaintiffs then seek to prevent Tucker from critiquing (2) their experts' failure to consider in their damages models the value and benefits Plaintiffs receive in purchasing ads, (3) the flawed assumptions about Meta advertisers in Plaintiffs' expert's auction simulation, and (4) the flaws in Plaintiffs' expert's conjoint survey. Dkt. 370 ("Mot.") at 4-10. Each critique is baseless, and Plaintiffs' motion—which largely focuses on rehabilitating their own experts—should be denied.

***First***, Tucker does not opine on Plaintiffs' credibility or state of mind. Her opinion is that DZ Reserve's and Maxwell's advertising behavior—as evidenced by their campaign data and contemporaneous documents—shows no correlation between their ad budgets and the size of Potential Reach estimates. Plaintiffs may disagree with Tucker's conclusions, but they do not dispute the underlying evidence or fault her analytical methods. Instead, they object to Tucker's statements that her conclusions are "[c]ontrary to Plaintiffs' testimony" and are evidence that Potential Reach was "unimportant to Plaintiffs," claiming such testimony impermissibly opines on Plaintiffs' credibility and state of mind. Mot. at 1. But it does not. If experts could be excluded simply because their opinions were inconsistent with or undermined a party's testimony, nearly every expert would be excluded. Tucker is permitted to explain her analysis and identify where

her opinions diverge from a witness's testimony. That is not "state of mind" or "credibility" testimony.

***Second***, Plaintiffs' challenge to the relevance of Tucker's opinion about the value and benefits that advertisers received from their Meta ads is meritless. Plaintiffs argue that this case is not about "clicks and impressions," *id.* at 7, and so their experts purportedly had no need to consider the value and benefits of clicks and impressions. But that is just not true. Plaintiffs' theory of damages is that inflated Potential Reach estimates caused advertisers to increase their budgets, and in turn increased the prices advertisers paid *for clicks and impressions* through Meta's ad auction. Clicks and impressions are not "post-purchase benefits," as Plaintiffs suggest, but part of the ad purchase—advertisers only pay for the clicks and/or impressions their ads receive. And how much advertisers are willing to pay for ad clicks and impressions is not only relevant to Plaintiffs' theory of damages, but necessarily depends on the value of those clicks and impressions.

***Third***, Plaintiffs argue that Tucker cannot critique Dr. Timothy Roughgarden's auction simulation because she supposedly does not have sufficient expertise in how an auction simulation actually works. Setting aside that Tucker *does* have significant auction experience, including with Meta's auction, Plaintiffs' complaint is entirely misplaced for the simple reason that Tucker does *not* opine about how Meta's auction system works. Her opinion is that Roughgarden's simulation takes as inputs unsupported assumptions about how *digital advertising* works—namely, the number of advertisers that would be affected by changes in Potential Reach and key differences across advertisers—and therefore is unreliable. And Plaintiffs do not dispute the digital advertising expertise that grounds Tucker's actual opinion.

***Finally***, Plaintiffs' challenge to Tucker's qualifications to opine on flaws in Dr. Greg Allenby's conjoint survey fares no better. Tucker has nearly two decades of qualifications in digital advertising (which Plaintiffs do not challenge), and Plaintiffs concede that she teaches conjoint analysis at the Massachusetts Institute of Technology ("MIT"), an amply sufficient basis for her to explain why Allenby's survey fails to accurately reflect how advertisers set their budgets.

Plaintiffs' effort to exclude Tucker's testimony in part should be denied in its entirety.

## II. BACKGROUND

### A. Tucker Is A Leading Expert On The Economics Of Digital Advertising

Tucker is a leading expert on the economics of digital advertising. She holds a Ph.D. in economics from Stanford University, and she is currently the Sloan Distinguished Professor of Marketing at MIT's Sloan School of Management and the Director of the Economics of Digitization at the National Bureau of Economics Research. Dkt. 370-2 ("Tucker Rpt.") ¶ 1 & App. A. She has published dozens of articles on the digital economy, including how digital technology has transformed the advertising industry, and has presented her research to the U.S. Congress, the Federal Trade Commission, the International Monetary Fund, the Federal Communications Commission, and the Organization for Economic Cooperation and Development. *Id.* Tucker teaches and supervises conjoint analyses as part of her work at MIT, and has published research on digital ad auctions. *See id.*; Dkt. 370-3 ("Tucker Dep.") at 77:7-88:24.[1]

### B. Tucker Rebuts Plaintiffs' Experts

Based on her extensive digital advertising expertise gained over more than fifteen years, Tucker concluded that, contrary to Plaintiffs' experts' assertions, "most Facebook advertisers would be unaffected by any alleged inaccuracies in Potential Reach estimates." Tucker Rpt. ¶ 44. Tucker found that Plaintiffs' experts wrongly assume advertisers' budgets would be affected by alleged inflation in Potential Reach estimates, and cannot be used to reliably calculate damages.

To reach these opinions, Tucker traced the evolution of digital advertising and explained how improvements in ad delivery and tracking reduced the importance of audience size estimates like Potential Reach because advertisers receive better information about actual results in the digital era and make decisions based on actual and estimated results. *Id.* ¶¶ 45-55. Tucker analyzed Meta advertising specifically and found that most advertisers would not set their ad budgets based on Potential Reach estimates, based on Meta's disclosures about Potential Reach,

[1] Plaintiffs filed an administrative motion to consider whether Tucker's deposition transcript and portions of their motion that quote it should be sealed. *See* Dkt. 369. Pursuant to Paragraph 31 of the Court's Standing Order and the Court's January 8, 2021 Order (Dkt. 235), the parties will meet and confer and file a revised, comprehensive motion to seal and joint declaration setting out the parties' positions on sealing for all summary judgment and *Daubert* submissions.

the role of other estimates Meta provides advertisers (particularly Estimated Daily Results), other available tools for tracking results, the characteristics of Meta's advertisers, and advertisers' actual budget-setting practices. *Id.* ¶¶ 63-75, 83-85. Her key opinions that bear on this motion are:

**Plaintiffs' Advertising Behavior Indicates They Set Budgets Based On Performance, Not Potential Reach Estimates.** Tucker found Plaintiffs' advertising behavior and data consistent with an advertising strategy focused on performance, not reach: Plaintiffs set performance objectives (traffic, conversions); modified their campaigns based on results; and set small budgets relative to Potential Reach estimates. *Id.* ¶¶ 87-106. Tucker looked for any relationship between Plaintiffs' Potential Reach estimates and their budgets and found that, on average, Plaintiffs set *smaller* budgets for campaigns with *larger* Potential Reach estimates. *Id.* at Exs. 20-21, 30-31.

**Plaintiffs' Experts Improperly Ignore The Value And Benefits Advertisers Received.** Tucker found that advertisers in the class received many results from their ads, including trillions of impressions and hundreds of billions of clicks, and that the majority of class members were repeat advertisers, which suggested that they believed they were getting value from their ad impressions and clicks. *Id.* ¶¶ 138-39. Tucker found that Plaintiffs' experts ignored these results, which should have been considered in Plaintiffs' damages models. *Id.* ¶¶ 135-39.

**Plaintiffs' Experts Ignore Essential Differences Among Meta Advertisers.** Tucker found that Roughgarden and Allenby failed to take into account differences in Meta advertisers.

Roughgarden: Tucker concluded that Roughgarden's auction simulation was overly simplified and ignored key differences in advertisers—and therefore was unreliable—for two reasons: (1) it was based on unrealistic assumptions about the number of advertisers that would change their budgets if Meta no longer provided Potential Reach, *id.* ¶¶ 125-29; and (2) it was overly simplified and ignored key differences across advertisers, such as ad objectives, optimization goals, targeting selection, bid constraints, ad quality, and ad placements—which she found to have a significant impact on Roughgarden's outcomes. *Id.* ¶¶ 170-75.

Allenby: Based on her advertising expertise, Tucker concluded that Allenby's survey was flawed and unreliable for assessing real world behavior because it did not reflect the real world environment in which advertisers set their budgets, including because (a) it only allowed

respondents to set their ad budgets once, whereas in the real world advertisers continuously adjust their budget based on real-time results, *id.* ¶¶ 110-11; (b) it omitted information like expected return on investment that advertisers actually consider when setting their budget, *id.* ¶¶ 112-14; (c) it did not give respondents the option of using Potential Reach to hone their targeting decisions, which is how advertisers typically use it, *id.* ¶ 112; and (d) it forced advertisers to consider information they would not likely consider in the real world, such as the Potential Reach for the entire United States, *id.* ¶ 113. Tucker also found that Allenby's survey wrongly assumed that all advertisers make advertising decisions in the same way, but in the real world "many advertisers would focus on important individualized information not provided in the survey," such as past campaign performance and real-time results. *Id.* ¶ 168.[2]

## III. LEGAL STANDARD

The testimony of a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" is admissible where their "(a) scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The requirement that an expert be qualified is a liberal one, because Rule 702 "contemplates a broad conception of expert qualifications." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). The reliability requirements mean the proffered expert opinions must have "a reliable basis in the knowledge and experience of the relevant discipline." *Id*. "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).

## IV. ARGUMENT

Plaintiffs' motion relies on repeated mischaracterizations of Tucker's opinions and the

---

[2] Tucker also disputed Allenby's justification for rejecting his original analysis (which found that advertisers did ***not*** set budgets based on Potential Reach) on the basis that Meta and Google are not "close substitutes," but Plaintiffs do not appear to challenge that opinion. *Id.* ¶¶ 109-17.

requirements of Rule 702. It should be denied because (1) Tucker's opinions about DZ Reserve and Maxwell concern their advertising behavior, not their credibility or state of mind; (2) Tucker's opinion about the value and benefits advertisers receive from Meta ads is relevant to multiple issues; (3) Tucker is well-qualified to opine on faulty assumptions about Meta's advertisers in Roughgarden's auction simulation; and (4) Tucker is also well-qualified to opine that Allenby's conjoint survey does not reflect how advertisers make budget decisions in the real world.

### A. Tucker's Opinions About DZ Reserve And Maxwell Concern Their Advertising Behavior, Not Their Credibility Or State Of Mind

Plaintiffs argue that Tucker should be excluded from testifying about DZ Reserve's and Maxwell's "credibility" and "state of mind" (Mot. at 4-5), but Tucker does not testify about either; Plaintiffs misstate Tucker's opinions and the law.

Tucker's opinions are about Plaintiffs' advertising behavior: she analyzed how advertisers buy ads and whether they use Potential Reach, and she determined that advertisers are typically (1) focused on achieving results and (2) unlikely to use Potential Reach to set their ad budgets because Potential Reach does not tell advertisers about their expected results (and is not affected by changes in budget in any event). *See supra* Section II.B. Within this framework, Tucker analyzed DZ Reserve's and Maxwell's ad campaign data, contemporaneous statements in documents, and other documentary evidence, and found that their behavior was consistent with advertisers that are focused on achieving results and set budgets accordingly. For example:

- Tucker analyzed the budgets that DZ Reserve and Maxwell set and found that their budgets were not positively correlated with their Potential Reach estimates. (In other words, Plaintiffs did ***not*** set higher budgets for campaigns with higher reach estimates. If anything, they did the opposite.) Tucker Rpt. at Exs. 20-21, 30-31;

- Tucker found that all of Maxwell's campaigns had a "link clicks" objective and over 95% of DZ Reserve's campaigns had a "website conversion" objective, which "is a strong indication of what they consider important for their ad performance"—namely, maximizing clicks and conversions. *Id.* ¶¶ 56, 60, 95, 102, Exs. 16 & 26;

- Tucker examined documentary evidence containing statements describing Plaintiffs' goals and advertising strategies, including chats in which Dan Ziernicki stated "all I care about is CPP" (cost-per-purchase), meaning that when advertising on Meta, he cared about achieving an optimal advertising cost per sale of his products. *Id.* ¶ 91;

- Tucker reviewed the materials for the Amazing.com course Maxwell followed, and found that Maxwell's behavior was consistent with Amazing's instructions, which do

not mention Potential Reach. *Id.* ¶ 101.

The fact that Plaintiffs' advertising data is inconsistent with their own allegations does not transform Tucker's opinions about that data into credibility opinions. There is "no rule barring expert testimony because it might indirectly impeach the credibility of an opposing party's testimony." *Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017); *see also Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2019 WL 3099725, at *7 (C.D. Cal. Apr. 15, 2019) (permitting expert testimony regarding whether a party's conduct conformed to industry standards, which "the jury can use . . . to aid it in making its own [credibility] determinations").[3] An expert ***can*** "testify about whether [a party's] actions were consistent with (or inconsistent with) what is discussed in the documentary evidence," so long as the expert does not "ascribe an intent or motivation" to a particular person. *Munoz v. PHH Mortgage Corp.*, 2022 WL 138670, at *4-5 (E.D. Cal. Jan. 14, 2022) (striking testimony that sought to "ascribe an intent, motivation, agenda" to party's actions, but not testimony "discussing documentary evidence and opining whether [the party] acted consistently"); *see also Alcantar v. Foulk*, 2016 WL 3001242, at *12 n.17 (E.D. Cal. May 25, 2016) ("There is an important difference between an expert's testimony that a specific individual possessed a specific intent, and testimony that gives meaning to [a party's] actions.").

Tucker's opinions fit squarely within the scope of permissible expert testimony. Tucker "give[s] meaning to [Plaintiffs'] actions," *Alcantar*, 2016 WL 3001242, at *12, by explaining "the considerations on which [advertisers] generally rely" when setting their budget, *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018), and describing Plaintiffs' advertising behavior and whether it is consistent with certain types of advertisers. *See, e.g.*, Tucker Rpt. ¶ 90 (describing DZ Reserve's ad objectives and optimization and explaining the

---

[3] "Expert testimony is not inadmissible simply because it contradicts [a fact witness's] testimony." *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) (permitting expert testimony that eyewitnesses' testimony was contradictory); *see also Tucker v. Cnty. of Riverside, Cal.*, 2018 WL 6017036, at *12 (C.D. Cal. May 23, 2018) (citing *Greenwell*). The case law Plaintiffs cite is consistent with this rule and holds only that experts cannot expressly comment on the truth or falsity of witness statements—which Tucker has not done here. *See U.S. v. Filler*, 210 F.3d 386, at *2 (9th Cir. 2000) (allowing testimony about whether a party's statements were consistent with an illness, but not that the statements were "false"); *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) (testimony that police officers were "telling the truth as they perceived it" should have been excluded as opining on the officers' credibility).

implications of those selections); ¶ 130 (same for Maxwell's testimony about using discount codes for ads). But she does not "baldly assert" that Plaintiffs did or did not factor Potential Reach into their decision-making. *Alcantar*, 2016 WL 3001242, at *12 n.17. Plaintiffs nitpick Tucker's word choices, arguing that her report "reads . . . more like an attorney's cross-examination or closing argument" because she describes "claims" Plaintiffs made in their depositions, Mot. at 4, but Plaintiffs ignore the context of these statements; Tucker relied on Plaintiffs' *own testimony* and noted where their ad data and contemporaneous documents were consistent with or diverge from their testimony, but she does not opine on their credibility or state of mind.[4] *See* Tucker Rpt. ¶ 90 (stating that Ziernicki's testimony was "[c]onsistent with" certain evidence); ¶ 96 (describing DZ Reserve's "contemporaneous communications" and what they show about its advertising strategy); ¶ 102 (describing Maxwell's testimony about his "goal" for Meta advertising).[5] Plaintiffs do not dispute the evidence supporting her opinions or fault her analytical methods. A jury may well agree with Tucker's analysis rather than Plaintiffs' self-serving assertions, but that is not because Tucker offers a conclusion on credibility. Her testimony should therefore not be excluded, and the jury should be allowed to decide for itself who to believe. *See, e.g.*, *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 2571332, at *8 (N.D. Cal. June 30, 2012) (holding that disagreements over expert's conclusions is not a basis for exclusion).

### B. Tucker's Analysis Of The Value And Benefits Advertisers Receive From Meta Ad Campaigns Is Relevant To Plaintiffs' Claims

Plaintiffs challenge Tucker's opinions that their experts improperly ignored the value and benefits advertisers received from their Meta ads, arguing that the value advertisers obtain from

---

[4] To be clear, Tucker will not offer an opinion on Plaintiffs' credibility or state of mind.

[5] The case law Plaintiffs cite where experts expressly opine on a party's intent or state of mind has no application here, given that Tucker's opinions are about Plaintiffs' advertising behavior. *See In re Twitter, Inc. Sec. Litig.*, 2020 WL 9073168, at *6 (N.D. Cal. Apr. 20, 2020) (testimony regarding "how investors would have understood Twitter's public comments" is permissible, but testimony that metrics were "not a focus of management's attention" was not); *Oracle Am., Inc*, 2018 WL 6511146, at *3 (permitting expert testimony on "the considerations on which persons in the field generally rely," but excluding testimony about why a person "took . . . a particular action or made . . . a particular decision"); *Siring v. Oregon State Bd. of Higher Ed. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1077–78 (D. Or. June 11, 2013) (excluding opinion regarding "unexpressed reasons" for terminating plaintiff or what defendant "may have been thinking.").

clicks and impressions—which Plaintiffs inaccurately call "post-purchase benefits"—is not relevant to this case. Plaintiffs' relevance argument is a thinly disguised attempt to hide the fact that Plaintiffs received excellent value from their Meta ads, which then informed their purchase decisions and budgets, and Plaintiffs' failure to account for that value in their damages models improperly gives them a windfall.[6]

First, Plaintiffs misleadingly argue this case is not about ad clicks and impressions, *see* Mot. at 7, but that fundamentally misstates how ads are purchased. Advertisers *only* pay for the clicks or impressions their ads receive, Dkt. 375-20, so Plaintiffs' damages theory is that advertisers overpaid (or paid a "price premium") for clicks and impressions as a result of inflation in Potential Reach estimates. Plaintiffs cannot divorce the act of purchasing an ad from the clicks or impressions that were purchased; clicks or impressions are the very things advertisers allegedly overpaid for, *not* a subsequent benefit. Plaintiffs want to have their cake and eat it too—their experts would award damages to any advertiser that purchased an ad without considering the value of the clicks or impressions that were purchased, and whether Plaintiffs and other advertisers would have purchased the same number of clicks or impressions or were even damaged at all.

Second, Tucker's analysis of the value received by advertisers in purchasing ad clicks and impressions is relevant to both damages and reliance.[7] Tucker analyzed ad transaction records and found that, in exchange for their payments, advertisers received trillions of impressions and hundreds of billions of clicks, and that most class members were repeat purchasers of Meta ads. Tucker Rpt. ¶¶ 138-39.[8] Nevertheless, Tucker found that "Plaintiffs' experts ignore those results and have failed to consider the value of Facebook ads to advertisers in their damages analyses," and instead "simply apply a price premium" to every dollar advertisers spent on ads and "claim that as damages." *Id.* ¶¶ 135, 138. Tucker also found that Plaintiffs' damages calculations were

---

[6] Plaintiffs do not argue that Tucker is not qualified to offer this opinion or that her opinion does not comply with the requirements of Rule 702(b)-(d).

[7] Plaintiffs argue that Tucker's opinion is "irrelevant to damages," Mot. at 6, but do not challenge its relevance to other issues, such as reliance and materiality.

[8] Plaintiffs' suggestion that Tucker "equivocated" on the value of Potential Reach, Mot. at 1 n.2, misstates her testimony, which was that Potential Reach estimates are "irrelevant for [] budget-making decisions for most advertisers," even though Potential Reach estimates can be used in other ways to help advertisers unlock the value of Meta targeting. Tucker Dep. at 51:15-17.

flawed because they relied on Allenby's conjoint survey, which "ignores the actual impressions, clicks, and/or conversions that respondents received," and Roughgarden's auction simulation, which "fail[s] to consider the amount or value of the impressions and clicks that advertisers receive." *Id.* ¶ 136.

Plaintiffs argue that Tucker's opinion about flaws in their experts' analyses is not relevant because "[t]he calculation [of damages] need not account for benefits received after purchase." Mot. at 7 (citation omitted). But as already noted, the impressions and clicks that ads receive are not "post-purchase benefits" as Plaintiffs claim, Mot. at 6—they are how advertisers pay for ads. Dkt. 375-20. Advertisers do not buy an ad and then subsequently receive clicks and impressions and evaluate whether those post-purchase clicks and impressions make that ad purchase valuable; to the contrary, advertisers *purchase* clicks and impressions, and receive value instantly. The question of what advertisers would have paid for clicks and impressions at the time of purchase is the core damages issue in the case—and one which necessarily must take into account advertisers' valuation of each click and impression. Tucker's analysis of the value and benefits that Plaintiffs and advertisers received from their Meta ads is relevant because "it has a valid connection" to the valuation of each click and impression, and whether advertisers were harmed. *Primiano*, 598 F.3d at 565; *see also Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (in assessing "helpfulness," courts look to "determine whether there is a link between the expert's testimony and the matter to be proved." (citation and internal quotation marks omitted)).

Third, even if clicks and impressions were "post-purchase benefits" as Plaintiffs claim (they are not), Plaintiffs cite no authority barring their consideration to *damages*—all of Plaintiffs' case law concerns *restitution*, which is no longer relevant given the Court's dismissal of Plaintiffs' UCL claim for restitution. Dkt. 366 at 1-2. For example, Plaintiffs rely heavily on the Ninth Circuit's decision in *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015), but *Pulaski* was limited to restitution under the UCL and FAL.[9] Courts have distinguished *Pulaski* on that basis, found its holding to be "confined to situations in which a plaintiff seeks (1) restitution

[9] Plaintiffs' two other cases, *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663 (2006), and *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011), are equally inapposite for the same reason as both involved restitution under the UCL and FAL.

under (2) California's UCL or FAL," and rejected similar arguments about post-purchase events in common law fraud claims. *In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *18 (N.D. Cal. Sept. 14, 2016) ("Plaintiffs misrepresent *Pulaski*'s holding as applying to 'all damages' when in fact it only discusses restitution."); *Shahinian v. Kimberly-Clark Corp.*, 2017 WL 11595343, at *13 (C.D. Cal. Mar. 7, 2017) (explaining that *Pulaski* is "limited" to situations where a plaintiff seeks restitution under the UCL or FAL).

### C. Tucker Is Qualified To Opine On The Auction Simulation's Flaws

Plaintiffs also seek to prevent Tucker from opining on flaws in Roughgarden's auction simulation. Plaintiffs' sole argument is that Tucker is not qualified to opine on Roughgarden's auction simulation because she allegedly has no background in how an auction system actually works.[10] Mot. at 1. But Tucker is *not* opining on how Meta's auction system actually works. Her "critique" of Roughgarden's auction simulation is that it is based on unrealistic assumptions of how *digital advertising* actually works. Plaintiffs nowhere challenge Tucker's qualifications in digital advertising, and their Motion should be denied on this ground as well.

Plaintiffs go to great lengths to avoid stating the opinion they claim Tucker is unqualified to give. But as even Plaintiffs concede, *see* Mot. at 7-8 & n.4, Tucker need only "have expertise in the matters on which [s]he will opine in this case[.]" *Wolf v. Hewlett Packard Co.*, 2016 WL 7743692, at *6 (C.D. Cal. Sept. 1, 2016); *see also Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 553 (N.D. Cal. Dec. 5, 2012) (public health expert qualified to testify on "advertising and marketing in the area of public health" despite not being "expert in the total universe of commercial marketing and advertising"); *S.F. Baykeeper v. City of Sunnyvale*, 2022 WL 298564, at *2 (N.D. Cal. Feb. 1, 2022) (storm water management expert qualified to testify on economic feasibility of water quality standards despite not being an economist).

Tucker's opinion is that Roughgarden's auction simulation is based on unsupported assumptions about Meta advertising—specifically, the number of advertisers that would have been affected by changes in Potential Reach, key differences across advertisers, such as their objectives,

[10] Plaintiffs do not argue that Tucker's testimony about Roughgarden's auction simulation falls short of any other requirements of Rule 702.

bid constraints, and targeting criteria, and differences in simulated ad prices versus real world prices. *See supra* Section **Error! Reference source not found.**. Each opinion is rooted in Tucker's expertise as an advertising expert and economist, qualifications Plaintiffs do not challenge. And for good reason: Tucker is widely recognized as one of the leading experts on the digital advertising industry, *see supra* Section **Error! Reference source not found.**, and is more than qualified to opine on assumptions about advertiser behavior and characteristics.

Unable to grapple with Tucker's advertising qualifications, Plaintiffs raise a strawman: Plaintiffs complain that Tucker does not teach "auction theory," write auction code, or publish research on "auction simulations." Mot. at 8. Not only do Plaintiffs ignore the fact that Meta proffers a separate expert (Dr. Steven Tadelis) to opine on the mechanics of Meta's ad auction, and that their own expert (Roughgarden) never reviewed Meta's auction source code (or even auction bid data), but these "qualifications" are not relevant or necessary to Tucker's opinion that Roughgarden's simulation is based on unrealistic assumptions about advertisers which lead to unreliable results. In any event, Tucker did not design an auction simulation and her opinions about advertisers and ad prices do not require "experience running auction simulations," Mot. at 2, they require knowledge about the advertising industry.

Plaintiffs also invent a dispute about Tucker's "familiarity with Facebook's auction system," Mot. at 8-9, but that only backfires. For starters, on top of her extensive (and unchallenged) digital advertising expertise, Plaintiffs admit that Tucker has specific prior experience related to Meta's ad auction, including published studies in which she analyzed "the inputs and outputs of the auction system." *Id.* at 8. Plaintiffs complain that Tucker did not examine "the inner workings" of Meta's auction (whatever that means) in those publications, *id.* at 9, but her opinions about Roughgarden's faulty assumptions are based on her expertise as an advertising expert and economist—she does not opine on the "inner workings" of Meta's auction, and Tucker does not even cite her prior publication in her report. Moreover, even assuming Plaintiffs' critiques were valid (they are not), they merely go to weight, not admissibility. *See In re Pacific Fertility Center Litig.*, 2021 WL 842739, at *3 (N.D. Cal. Mar. 5, 2021) ("whether an expert is the best qualified or has sufficient specialized knowledge is a matter of weight[.]").

### D. Tucker Is Qualified To Opine On Whether Allenby's Conjoint Analysis Accurately Reflects Real-World Advertiser Decision-Making

Plaintiffs' challenge to Tucker's opinion regarding Allenby's conjoint analysis is remarkable: Plaintiffs argue that Tucker, a digital advertising expert who teaches MIT graduate students how to conduct and use conjoint surveys, is not qualified to opine on whether Allenby's conjoint survey accurately reflects how advertisers set their ad budget in the real world.[11] Not so.

First, Tucker's opinions about flaws in Allenby's conjoint survey are rooted in her uncontested expertise as a digital advertising economist developed over more than fifteen years. Tucker is more than qualified to analyze Allenby's conjoint survey and to identify flaws that render it unreliable for assessing real-world advertiser behavior. And that is exactly what Tucker did: she opined that Allenby's survey failed to accurately reflect the real world environment in which advertisers set their budgets, including because it ignored the fact that advertisers adjust their budgets while their ads run and omitted key factors that advertisers find important in setting their budget (such as return on investment). *See supra* Section **Error! Reference source not found.**. Plaintiffs' failure to challenge Tucker's qualifications as a digital advertising economist is alone reason to deny their Motion.

Second, in addition to her digital advertising expertise, Tucker is also qualified to opine on flaws in Allenby's conjoint survey based on her experience conducting and analyzing conjoint analyses. She has conducted hundreds of conjoint surveys and taught conjoint survey technique and methodology at MIT for years. Tucker Rpt. at ¶ 109; Tucker Dep. at 77:7-88:24. Despite these credentials, Plaintiffs argue that she is not sufficiently qualified because "[n]o one has ever paid her to conduct a conjoint survey," "she has never given any presentations at conferences" on conjoint analyses, and because she does not publish articles on conjoint surveys. Mot. at 9.[12] But Rule 702 does not require that an expert have specific types of expertise (let alone that she be paid, publish, or present at research conferences), and these experiences say nothing about whether

[11] Plaintiffs do not argue that Tucker's testimony about Allenby's conjoint survey fails any of the other requirements of Rule 702.

[12] Plaintiffs' argument is also misleading, as Tucker testified that she has received offers to conduct conjoint surveys for paying clients but turned them down. Tucker Dep. at 78:8-10.

Tucker has sufficient "knowledge, skill, experience, training, or education" to opine on conjoint analyses (she does). Fed. R. Evid. 702; *Ramirez v. ITW Food Equip. Grp., LLC*, 686 F. App'x 435, 441 (9th Cir. 2017) (reversing exclusion of expert because the "lack of particularized expertise goes to the weight accorded [her] testimony, not to the admissibility of her opinion"); *Day v. Cnty. of Contra Costa*, 2008 WL 4858472, at *20 (N.D. Cal. Nov. 10, 2008) (rejecting argument that expert was not qualified due to "lack of published books or other materials"). Plaintiffs argue that Tucker is similar to the expert in *Wolf v. Hewlett Packard*, who had insufficient conjoint qualifications, but *Wolf* is inapposite. 2016 WL 7743692. Unlike in *Wolf*, where the expert sought to opine that a conjoint survey could be used to calculate damages, *id.* at *5, Tucker did not conduct her own conjoint survey—she identifies flaws in Allenby's survey—and she has a background in conjoint surveys, has conducted conjoint surveys, and has an educational and professional background in survey design.

Finally, Plaintiffs try to undermine Tucker's experience in conjoint analysis. Even though Tucker teaches conjoint survey analysis to graduate students at one of the nation's top universities, Plaintiffs claim that the courses she teaches at MIT are not sufficiently robust to qualify her as an expert. This argument, which misstates her testimony and is based on long-outdated lecture notes Plaintiffs dug up from 2010 and 2014,[13] would turn *Daubert* and Rule 702 on its head—the question is whether Tucker, not her students, is qualified to opine on conjoint analysis. In any event, the robustness of her syllabi for classes taught a decade ago "can be properly addressed by [Plaintiffs] on cross-examination." *U.S. v. Finley*, 301 F.3d 1000, 1014 (9th Cir. 2002) ("Any deficits in [an expert's] qualifications beyond her professional training go to the weight of her testimony rather than to its admissibility." (citation omitted)).

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied in its entirety.

---

[13] As she testified, Tucker teaches how to execute and analyze conjoint surveys, and she helps students design surveys. *See* Tucker Dep. at 81:4-86:7 (discussing material taught in each class).

DATED: April 1, 2022

LATHAM & WATKINS LLP

By: /s/ *Elizabeth L. Deeley*

Elizabeth L. Deeley (CA Bar No. 230798)
Melanie M. Blunschi (CA Bar No. 234264)
Nicole C. Valco (CA Bar No. 258506)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
*elizabeth.deeley@lw.com*
*melanie.blunschi@lw.com*
*nicole.valco@lw.com*

Andrew B. Clubok (*pro hac vice*)
Susan E. Engel (*pro hac vice*)
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201
*andrew.clubok@lw.com*
*susan.engel@lw.com*

*Attorneys for Defendant Meta Platforms, Inc.*