<u>**UNREDACTED VERSION REFILED PURSUANT TO DKTS. 253, 320, 419-1**</u>
<u>**ORIGINALLY FILED AT DKT. 369-2**</u>

# EXHIBIT 2



Deposition of:

# Catherine Tucker , Ph.D.

*April 8, 2021*

In the Matter of:

# DZ Reserve v Facebook, Inc.

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com  |

```
                                                      Page 1

 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION

 4

 5     DZ RESERVE, and CAIN MAXWELL
       (d/b/a MAX MARTIALIS),
 6     individually and on behalf of
       all others similarly
 7     situated,                        No. 3:18-cv-04978-JD

 8                  Plaintiffs,

 9            vs.

10     FACEBOOK, INC.,

11                  Defendant.
       _____/

12

13
                     -- HIGHLY CONFIDENTIAL --
14

15      VIDEO-RECORDED DEPOSITION OF CATHERINE TUCKER, PH.D.

16                   REMOTE ZOOM PROCEEDING

17                   Belmont, Massachusetts

18                   Thursday, April 8, 2021

19

20

21

22

23     REPORTED BY:

24     LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25     Job No. 4502127
```

Page 2

```
 1        UNITED STATES DISTRICT COURT FOR THE
 2           NORTHERN DISTRICT OF CALIFORNIA
 3
    DZ RESERVE, and CAIN MAXWELL
 4  (d/b/a MAX MARTIALIS),
    individually and on behalf of
 5  all others similarly
    situated,                 No. 3:18-cv-04978-JD
 6
         Plaintiffs,
 7
 8
         vs.
 9
    FACEBOOK, INC.,
10
         Defendant.
11  _____/
12
13        -- HIGHLY CONFIDENTIAL --
14
15     Video-recorded deposition of CATHERINE TUCKER,
16  PH.D., taken on behalf of the Plaintiff, Remote Zoom
17  Proceeding, Belmont, Massachusetts, beginning at 10:59
18  A.M. and ending at 4:48 P.M., on Thursday, April 8, 2021,
19  before Leslie Rockwood Rosas, RPR, CSR No. 3462.
20
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2
 3  FOR THE PLAINTIFF DZ RESERVE:
 4    COHEN MILSTEIN SELLERS & TOLL PLLC
 5    BY: GEOFFREY GRABER, ESQ.
 6      KARINA G. PUTTIEVA, ESQ.
 7    1100 New York Avenue NW, Fifth Floor
 8    Washington, DC 20005
 9    (202) 408-4600
10    ggraber@cohenmilstein.com
11    kputtieva@cohenmilstein.com
12
13  FOR THE DEFENDANT FACEBOOK, INC., AND THE WITNESS:
14    LATHAM & WATKINS LLP
15    BY: FRANCIS ACOTT, ESQ.
16      PATRICK JOHNSON, ESQ.
17      CATHERINE ANNE RIZZONI, ESQ.
18    505 Montgomery Street, Suite 2000
19    San Francisco, California 94111
20    (415) 391-0600
21    francis.acott@lw.com
22    patrick.johnson@lw.com
23    cat.rizzoni@lw.com
24
25
```

Page 4

```
 1  APPEARANCES (Continued):
 2
 3    LATHAM & WATKINS LLP
 4    BY: HILARY H. MATTIS, ESQ.
 5    140 Scott Drive
 6    Menlo Park, California 94025
 7    (650) 328-4600
 8    hilary.mattis@lw.com
 9
10  Also Present:
11    Shireen Hamdan, paralegal, Cohen Milstein Sellers &
12      Toll PLLC
13    Nikki Sokol, Facebook, Inc.
14    Ron Lazo, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              I N D E X
 2
 3
 4  THURSDAY, APRIL 8, 2021
 5
 6  WITNESS                    EXAMINATION
 7  CATHERINE TUCKER, PH.D.
 8
 9    BY MR. GRABER                 8
10    BY MR. ACOTT               151
11
12  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
13         (NONE)
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1          DEPOSITION EXHIBITS

2          CATHERINE TUCKER, PH.D.

3 NUMBER          DESCRIPTION          IDENTIFIED

4 Exhibit 344   Rebuttal Expert Report of          27

5          Catherine Tucker, Ph.D.

6 Exhibit 345   Screenshots, MIT Course          89

7          Number 15.818

8 Exhibit 346   Measuring Customer Reactions          90

9          to Prices, lecture notes

10 Exhibit 347   MIT Sloan School of          99

11          Management 15:818 Pricing

12 Exhibit 348   Digital Platforms Inquiry          121

13          Report, June 2019

14 Exhibit 349   The Technology Policy          128

15          Institute article

16 Exhibit 350   Expert Reply Report of          152

17          Armando Levy, Ph.D.

18

19          PREVIOUSLY MARKED EXHIBITS REFERENCED:

20

21 EXHIBIT NUMBER          PAGE

22 Exhibit 286          156

23

24

25

Page 7

1   Belmont, Massachusetts; Thursday, April 8, 2021

2          10:59 A.M.

3

4          PROCEEDINGS

5          THE VIDEOGRAPHER:  We are now on the record.   10:59:03

6   The time is 10:59 Eastern Daylight Time on April 8th,

7   2021.  This is Media Unit 1 of the video-recorded

8   deposition of Catherine Tucker.

9          I'm sorry, folks.  I'm going to have to stop.

10   I'm having a little technical issue.          10:59:22

11          (Discussion off the record.)

12          THE VIDEOGRAPHER:  We are now on the record.

13   The time is 11 o'clock a.m. Eastern Daylight Time on

14   April 8th, 2021.  This is Media Unit 1 of the

15   video-recorded deposition of Dr. Catherine Tucker, taken   11:00:26

16   by counsel for the Plaintiff, in the matter of DZ Reserve

17   versus Facebook, Incorporated, filed in the United States

18   District Court, Northern District of California, San

19   Francisco.  The case number is 3:18-cv-04978-JD.

20          This deposition is being held via online          11:00:52

21   conference.  All parties are attending remotely.

22          The court reporter is Leslie Rosas from

23   Veritext.  The videographer is Ron Lazo from Veritext.

24          Counsel, please state your appearances and

25   affiliations for the record.          11:01:09

Page 8

1          MR. GRABER:  Good morning.  Geoffrey Graber from

2   Cohen Milstein for the plaintiff.  Also with me today is

3   Karina Puttieva and Shireen Hamdan, also of Cohen

4   Milstein.

5          MR. ACOTT:  Good morning.  Francis Acott of          11:01:25

6   Latham & Watkins on behalf of Facebook and the witness.

7          MS. MATTIS:  Hilary Mattis from Latham & Watkins

8   on behalf of Defendant Facebook and the witness.

9          MS. SOKOL:  Nikki Sokol on behalf of Facebook.

10          THE REPORTER:  Thank you.

11          I'll swear you in, Dr. Tucker, if you'll raise

12   your right hand, please.

13          Thank you.

14          You do solemnly state that the evidence you

15   shall give in this matter shall be the truth, the whole

16   truth and nothing but the truth, so help you God?

17          THE WITNESS:  Yes, I do.

18          THE REPORTER:  Thank you.

19          You may proceed, Counsel.

20                    11:01:59

21          EXAMINATION

22 BY MR. GRABER:

23   Q.  Good morning.  Can you please state your full

24   name and spell your last name for the record?

25   A.  Of course.  Good morning.  Catherine Elizabeth   11:02:07

Page 9

1   Tucker.  My last name is spelled T-U-C-K-E-R.

2   Q.  Thank you.

3          Ms. Tucker, you understand you're under oath

4   today?

5   A.  Yes, I do.          11:02:32

6   Q.  Is there any reason you cannot give your best

7   testimony today?

8   A.  No.

9   Q.  Ms. Tucker, do you have anything with you today

10   in the room you're sitting in taking this deposition?   11:02:41

11   A.  So I have my lighting, my AV set up.  I do have

12   a copy of my report, and I'm happy to remove that from

13   the room if you'd prefer.  It's a clean copy.

14   Q.  No, no, no.  That's perfectly fine, and that's

15   what I was really getting at, so you have a copy of your   11:03:01

16   expert report; is that right?

17   A.  Yes, I do.

18   Q.  Okay.  And I take it that's a clean copy?

19   A.  Yes, it is.

20   Q.  All right.  Do you have copies of any other          11:03:11

21   documents with you today?

22   A.  No, I don't.

23   Q.  Ms. Tucker, you've been deposed before; is that

24   right?

25   A.  Yes, I have.          11:03:25

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

1  Q. So you understand the general ground rules;
2  right?
3  A. Yes, I do.
4  Q. Okay. So we'll go through this quickly since
5  you're experienced at that.                          11:03:35
6     You understand it's a question and answer
7  format; right?
8  A. Yes.
9  Q. And have you taken any depositions on -- via
10 Zoom?                                                 11:03:46
11 A. Yes, I have.
12 Q. Okay. So you understand that there's a little
13 bit of a time delay, so it's important that you, you
14 know, avoid talking over each other -- that we avoid
15 talking over each other. You need to pause before, you  11:04:02
16 know, I finish my question so that we don't talk over
17 each other.
18    Does that make sense?
19 A. Yes, it does.
20 Q. Okay. Great.                                      11:04:12
21    So you were deposed via Zoom; is that right?
22 A. That's correct.
23 Q. Okay. What case was that?
24 A. So I was deposed by Zoom in the Glumetza case.
25 And I also -- I was also -- I've given evidence at    11:04:35

Page 11

1  proceedings via Zoom as well.
2     It might be worth just stating now that I should
3  perhaps mention that I have actually been deposed twice
4  since I submitted my report. And both of those occasions
5  were on Zoom, too. But, you know, those were not      11:05:03
6  currently listed in my CV because obviously I had not
7  been deposed at the time I submitted my report.
8  Q. Okay. Let's walk through those really quickly.
9     So you mentioned the Glumetza case. Can you
10 spell -- or who is the plaintiff and who is the       11:05:21
11 defendant?
12 A. So in that case, the defendant was the firm
13 that -- well, basically ended up having the rights to
14 Glumetza. And plaintiffs were there on behalf of firms
15 in the distribution channel who saw what they said was an  11:05:56
16 overcharge.
17 Q. Do you know the name of the plaintiff?
18 A. I'm very sorry I don't know the name of the
19 plaintiff, but I think it is listed on my report --
20 sorry, it is listed in my CV in my report.           11:06:15
21 Q. And what was the nature of your testimony in
22 that case?
23    MR. ACOTT: Object to the form.
24    THE WITNESS: So in the Glumetza case, it was
25 really exploring the but-for world that was proposed by  11:06:37

Page 12

1  plaintiffs in the case and also the methodology they used
2  to sort of think about a bargaining outcome.
3  Q. BY MR. GRABER: And you were asked to render an
4  expert opinion in that case?
5  A. Yes, that's right.                                11:07:03
6  Q. Okay. And can you just give me a brief overview
7  of your opinion in that case, very high level?
8  A. Very high level. So I was mainly focused on why
9  the use of this bargaining use model was a highly
10 simplified and unrealistic methodology given the setting  11:07:28
11 and the facts of the case, which seemed to ignore a lot
12 of what actually happened around the -- it was about a
13 now generic agreement, which -- and the actual facts
14 surrounding it.
15 Q. You were testifying for the defense; right?     11:07:50
16 A. Yes. There, I was testifying for the defense.
17 Q. And what was the methodology being utilized by
18 the plaintiffs that you were going on?
19    MR. ACOTT: Object to the form.
20    THE WITNESS: So it's a little bit of time ago,    11:08:10
21 but at the highest level, they had a bargaining model to
22 try and understand: Well, what might have been the
23 outcome if there had not been a no generic agreement?
24 Q. BY MR. GRABER: Did they use a specific
25 econometric model?                                    11:08:36

Page 13

1     MR. ACOTT: Object to the form.
2     THE WITNESS: No, they didn't. And that was
3  actually one of the things I was pointing out. Instead,
4  they used a highly stylized theory model. And it was a
5  theory model really designed to, you know, illuminate  11:08:52
6  something very conceptual and hypothetical.
7     And then they used this incredibly, sort of,
8  abstract theory model to try and come up with precise
9  numbers for a bargaining outcome.
10 Q. BY MR. GRABER: Okay. Thank you.                  11:09:14
11    And then you said there were a couple of other
12 cases that you've testified in, besides the Glumetza
13 case, since the submission of your report; is that right?
14 A. That's right. And they're not listed on my CV,
15 because obviously I hadn't been deposed. But there have  11:09:32
16 been two depositions since I submitted my report.
17 Q. Okay. So can you walk me through each of those?
18    MR. ACOTT: Object to the form.
19    THE WITNESS: So the first case was the Blue
20 Cross Blue Shield antitrust case. And this is -- and in  11:09:54
21 it, I submitted a report on behalf of plaintiffs as part
22 of the litigation in the case.
23 Q. BY MR. GRABER: Was the case pending down in
24 Alabama?
25 A. Your memory is wonderful. Yes, it was -- it is  11:10:19

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1 pending in Alabama.

2 Q. Okay. And can you give me at a very high level

3 the nature of your opinion in that case?

4 MR. ACOTT: Object to the form.

5 THE WITNESS: Yes. So I was asked to evaluate   11:10:43

6 whether health insurance, and in particular Blue Cross

7 and Blue Shield, was a two-sided platform in terms of the

8 way that economists think about two-sided platforms.

9 And I described what a two-sided platform was,

10 how we thought about what makes a two-sided platform in   11:11:05

11 the economics literature and why health insurance didn't

12 meet the classifications we usually use.

13 Q. BY MR. GRABER: So you didn't offer an

14 econometric model in this case; is that right?

15 A. So in that case, I referred to some   11:11:28

16 econometrics, which was that I -- one of the opposing

17 experts had an econometric model which he purported to

18 suggest implied network effects. And I explained why it

19 didn't.

20 Q. I see. Okay.   11:11:54

21 But you did not construct an econometric model

22 in that case; is that correct?

23 A. No, I didn't construct one. Instead, I was

24 evaluating and looking at an econometric piece of

25 analysis proposed by another expert.   11:12:11

Page 15

1 Q. What was the econometric model that you were

2 evaluating in that case?

3 MR. ACOTT: Object to the form.

4 THE WITNESS: Can I just double-check with

5 Francis that it's fine to talk about this? I just don't   11:12:29

6 know the rules.

7 MR. ACOTT: Yeah, Catherine, to the extent your

8 answer -- we can go off the record if there's a potential

9 privilege.

10 MR. GRABER: Let me just -- let me clarify my   11:12:41

11 question.

12 Q. I don't want to get into the details of your

13 opinion or the details of the econometric model, if there

14 was any, that you were evaluating on the other side.

15 I just want to know at a very high level what   11:12:57

16 econometric model you were opining on or you were

17 evaluating or criticizing. Just, I mean, if there's a

18 name for that econometric model. But that's all I'm

19 asking.

20 A. Of course.   11:13:13

21 MR. ACOTT: Objection to form. And I would also

22 object on the basis of privilege and instruct

23 Dr. Tucker not to divulge the contents of privileged

24 communications with counsel.

25 THE WITNESS: It was --   11:13:22

Page 16

1 MR. ACOTT: To the extent you can answer with

2 that instruction, you may do so.

3 THE WITNESS: It was what -- at the highest

4 level, it was a regression model.

5 Q. BY MR. GRABER: Was there a type of regression   11:13:40

6 model? Just, again, at the highest level. I know

7 there's different types of regression models. Can you

8 classify it at all?

9 MR. ACOTT: Same objections and instruction.

10 THE WITNESS: My recollection is it was using a   11:13:57

11 general class of models we may think of as being in the

12 GLM class. My memory is too there was a variety of

13 robustness checks. And I can't recall which exactly of

14 those -- which of those specifications the opposing

15 expert focused on.   11:14:27

16 Q. BY MR. GRABER: And then you were deposed, you

17 said, or you gave testimony in another proceeding; is

18 that right?

19 A. That's right.

20 Q. And what's the name of that case?   11:14:44

21 A. That is named Integrity Message Boards versus

22 Facebook.

23 Q. And you testified on behalf of Facebook, I take

24 it?

25 MR. ACOTT: Objection to form.   11:15:13

Page 17

1 THE WITNESS: So in that case, I was asked by

2 Facebook to provide an expert opinion.

3 Q. BY MR. GRABER: And what is the nature of your

4 expert opinion in that case?

5 MR. ACOTT: Object. Object to form.   11:15:33

6 And I will just caution the witness not to

7 reveal communications with counsel.

8 Q. BY MR. GRABER: Go ahead.

9 A. So at the highest level, this is a case about

10 the accuracy of data used in targeting on Facebook. And   11:15:58

11 my -- at the highest level, my opinion was that

12 plaintiffs misstated the role of targeting in modern day

13 digital advertising and that targeting should be viewed

14 as an input, not an output.

15 Q. Were you criticizing other opinions in that   11:16:43

16 case?

17 MR. ACOTT: Object to form.

18 THE WITNESS: So I just expressed my affirmative

19 opinion. I think -- again, I hope I'm allowed to say

20 this, but, yes, I was opposing -- or offering an opinion   11:17:02

21 on another expert who had submitted a damages

22 methodology.

23 Q. BY MR. GRABER: What was the damages methodology

24 being utilized that you were criticizing?

25 MR. ACOTT: Object to form.   11:17:19

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1    And I'll also just caution the witness not to
2    reveal the contents of privileged communications with
3    counsel.
4        THE WITNESS:  So in that case, plaintiff's
5    expert suggested two methodologies which attempted to          11:17:39
6    correlate alleged inaccuracy rates with the value of
7    targeting.  And I criticized those methodologies.
8        Q.  BY MR. GRABER:  What two types of methodologies
9    were you criticizing?
10       MR. ACOTT:  Same objection.                              11:18:03
11   Same instruction.
12       THE WITNESS:  So just as a first matter, both of
13   these methodologies produce very different results.  One
14   methodology was related to revenue sharing between
15   Facebook and its partners.  The other methodology was        11:18:27
16   based on a technique developed for a totally different
17   purpose by a Facebook employee for deciding what
18   targeting categories to make redundant.
19       Q.  BY MR. GRABER:  Let's start with the revenue
20   sharing approach.  Did that utilize an econometric model?    11:19:02
21       MR. ACOTT:  Object to form.
22       And I would give the same instruction
23   regarding -- just to caution not to reveal the contents
24   of communications with counsel in your answer.
25       THE WITNESS:  No.  That methodology just used           11:19:27

Page 19

1    multiplication.
2        Q.  BY MR. GRABER:  And how about the -- you
3    referred to a second approach that was based on something
4    that Facebook had done; is that right?
5        MR. ACOTT:  Object to the form.                         11:19:49
6        THE WITNESS:  I referred to a second approach
7    which was based on a document developed by a Facebook --
8    a single Facebook employee, which he was using amongst
9    other criteria to decide what Facebook categories should
10   be redundant.  Now, that methodology used division and      11:20:11
11   then multiplication.
12       Q.  BY MR. GRABER:  That was not an econometric
13   model either; correct?
14       MR. ACOTT:  Object to form.
15       THE WITNESS:  No.  To my recollection, it               11:20:30
16   didn't.  I'm not sure if there's going to be any
17   refinements, but to my recollection, it involved mainly
18   division and multiplication.
19       Q.  BY MR. GRABER:  And you said you also opined on
20   the role of targeting; is that right?                       11:20:52
21       MR. ACOTT:  Object to the form.
22       Same instruction regarding contents of
23   privileged communications.
24       THE WITNESS:  Yes.  I described how in the
25   digital advertising world targeting is -- can be viewed     11:21:07

Page 20

1    as an input to try and ensure that advertisers get what
2    they're really seeking, which is to optimize their return
3    on investment.
4        Q.  BY MR. GRABER:  Targeting is, in your opinion,
5    important for purposes of getting return on investment?     11:21:33
6        MR. ACOTT:  Object to the form.
7        THE WITNESS:  So my opinion was -- is that
8    evidently it is wonderful in the digital world that we
9    now have data and vast troves of data which allow us to
10   better hone and target narrower and narrower audiences so   11:21:58
11   our advertising dollars are not wasted.  However, that
12   targeting is not an end point.  Instead, it is an input
13   which can then be used to better enhance return on
14   investment.
15       Q.  BY MR. GRABER:  Thank you.  That was helpful.       11:22:17
16       Any other testimony or providing of evidence
17   since the submission of your report in this matter?
18       A.  No.
19       MR. ACOTT:  Object to the form.
20       THE WITNESS:  No.                                       11:22:41
21       I apologize I interjected.
22       Q.  BY MR. GRABER:  Dr. Tucker, you understand your
23   testimony today can be used for trial and before a jury?
24       MR. ACOTT:  Object to form.
25       THE WITNESS:  Yes, I do.                                11:23:21

Page 21

1        Q.  BY MR. GRABER:  And you're prepared to give your
2    best testimony today; right?
3        MR. ACOTT:  Object to the form.
4        THE WITNESS:  Yes.  The best is -- what I mean
5    is I will do my best.                                       11:23:39
6        Q.  BY MR. GRABER:  Okay.  Well, you -- are you
7    having trouble with my question and the use of the term
8    "best"?
9        A.  I think I've just never been asked about my best
10   testimony.  So I don't know what you mean by that.  But I   11:24:02
11   will, of course, endeavor to give my clearest, most
12   accurate, complete testimony that I can.
13       Q.  Dr. Tucker, what did you do to prepare for your
14   deposition today?
15       MR. ACOTT:  Object to the form.                         11:24:24
16       THE WITNESS:  So I read my report quite a few
17   times.  I reviewed some of the data, which has gone into
18   my report.  I read the other expert reports.  And I also
19   met with counsel twice.
20       Q.  BY MR. GRABER:  When did you first meet with        11:25:03
21   counsel to prepare for the deposition today?
22       MR. ACOTT:  Object to the form.
23       I'll also just caution the witness not to reveal
24   the contents of any communications with counsel.
25       THE WITNESS:  My memory is Monday.                      11:25:17

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1  Q. BY MR. GRABER: That was your first meeting to
2  prepare for this deposition; correct?
3      MR. ACOTT: Same objections.
4      Same instruction.
5      THE WITNESS: That is right.                    11:25:30
6  Q. BY MR. GRABER: And did you meet via video
7  conference?
8      MR. ACOTT: Same objections.
9      Same instructions.
10     THE WITNESS: Yes. I haven't had any physical    11:25:46
11 in-person meetings for over a year. So, yes, we met by
12 Zoom.
13 Q. BY MR. GRABER: Yeah. It's a strange world
14 we're living in now.
15     And who -- you met with attorneys from Latham &  11:25:59
16 Watkins; is that right?
17 A. That is --
18     MR. ACOTT: Same objections.
19     Same instructions.
20     THE WITNESS: Yes. To my recollection, yes, I    11:26:09
21 met with attorneys from Latham & Watkins.
22 Q. BY MR. GRABER: And, Dr. Tucker, I want to be
23 clear, I'm not asking about the substance of your
24 communications with counsel. I'm just going to ask you
25 some questions about who, what, where, when, in your    11:26:23

Page 23

1  meetings with counsel to prepare for your deposition
2  today. Does that make sense?
3  A. Yes, it does.
4  Q. So who from Latham & Watkins was at the meeting
5  on Monday to prepare for your deposition?              11:26:39
6      MR. ACOTT: Object to the form.
7      MR. GRABER: Go ahead.
8  A. So Francis was there, Hilary was there, a lady
9  name Kat was there, but I'm afraid I don't know her last
10 name, and I apologize to her for not knowing it. And   11:27:06
11 then a lady named Beth was there.
12 Q. Would that be Beth Deeley?
13 A. Yes.
14 Q. Was there anyone from Facebook there?
15     MR. ACOTT: Object to the form.              11:27:25
16     THE WITNESS: Not that I can recall. I mean,
17 I'm going by who I remember having their videos on, if
18 that makes sense. So not that I can recall, but I can't
19 recall everyone who was at the meeting.
20 Q. BY MR. GRABER: Was there anyone from Analysis    11:27:48
21 Group there?
22     MR. ACOTT: Same objection.
23     THE WITNESS: Yes. My memory is that
24 Kate Schofield was there.
25 Q. BY MR. GRABER: What is Ms. Schofield's role in  11:28:13

Page 24

1  this matter?
2      MR. ACOTT: Object to the form.
3      THE WITNESS: So Ms. Schofield is part of my
4  support team at Analysis Group.
5  Q. BY MR. GRABER: Who else is on your support team  11:28:34
6  at Analysis Group, for purposes of this matter?
7  A. Christopher Borek and John Browning.
8  Q. How do you spell Christopher's last name?
9  Sorry.
10 A. Borek is spelled B-O-R-E-K. At least I hope it   11:29:01
11 is.
12 Q. Fair enough. Thank you.
13     Was anyone else on the line during the meeting
14 on Monday?
15     MR. ACOTT: Object to the form.              11:29:27
16     THE WITNESS: I just can't remember. No, I
17 mean, I've given you the Latham -- as you know, on Zoom,
18 you really just see the people if their video's on. I'm
19 not sure if there was someone else who didn't have their
20 video on. But those are the people I can recall speaking  11:29:51
21 and talking during the meeting.
22 Q. BY MR. GRABER: How long was that meeting?
23     MR. ACOTT: Object to the form.
24     THE WITNESS: I want to say perhaps three hours.
25 Something around that time.                         11:30:08

Page 25

1  Q. BY MR. GRABER: Were you shown any documents
2  during that meeting that refreshed your recollection?
3      MR. ACOTT: Object to the form.
4      THE WITNESS: So I don't recall seeing any
5  documents -- I mean, I -- what I -- what I remember at    11:30:32
6  that meeting in terms of documents was a screen share of
7  my own report. And that's actually what I remember as
8  being the focus.
9  Q. BY MR. GRABER: So you don't recall being shown
10 anything other than your report that refreshed your     11:30:57
11 recollection?
12     MR. ACOTT: Object to the form.
13     Also, I would just caution on privilege. If you
14 were shown any documents that refreshed your
15 recollection, as Mr. Graber said, you can testify about  11:31:08
16 that. But, otherwise, you shouldn't disclose the
17 contents of communications with counsel.
18     THE WITNESS: So, no, my memory is -- the focus
19 was on my report.
20 Q. BY MR. GRABER: You had a second meeting; is      11:31:31
21 that right?
22 A. Yes, that's right.
23 Q. When was the second meeting to prepare for your
24 deposition?
25 A. That was yesterday.                          11:31:39

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1  Q. And that was via video conference?

2  A. That was also via video conference.

3  Q. And who was at that meeting?

4      MR. ACOTT: Object to the form.

5      THE WITNESS: So my answer would be the same in    11:32:00

6  terms of the people who were there were the same people

7  who were there on Monday.

8  Q. BY MR. GRABER: And were you shown any documents

9  at the meeting yesterday that refreshed your

10 recollection?                                         11:32:19

11     MR. ACOTT: Objection to form.

12     I would also give the same instruction to

13 caution Dr. Tucker that you can testify about documents

14 that did refresh your recollection, but beyond that, I

15 would instruct you not to answer on the basis of        11:32:32

16 attorney-client work-product privilege.

17     THE WITNESS: So the -- so I don't know if you

18 count it as refreshing my recollection because I was

19 already well aware of them, but we did look at the --

20 Dr. Levy's rebuttal report and Dr. Allenby's rebuttal    11:32:57

21 report.

22 Q. BY MR. GRABER: How long did that meeting last?

23 A. That meeting lasted approximately -- just over

24 five hours. Actually -- I apologize. It actually was

25 under five hours. I was getting my times confused.      11:33:34

Page 27

1  Q. Just under five hours or was it closer to four

2  hours?

3  A. I'm sorry. It was probably about four and a

4  half.

5  Q. So, Dr. Tucker, let's go ahead and get your      11:33:56

6  report on the record.

7      MR. GRABER: Why don't we introduce that.

8      It will just take a second.

9      My apologies. Here we go.

10     (Exhibit 344, Rebuttal Expert Report of    11:34:40

11     Catherine Tucker, Ph.D., marked for

12     identification electronically by counsel.)

13 Q. BY MR. GRABER: Do you see the exhibit that has

14 populated on the Exhibit Share?

15 A. That is Exhibit 344?                              11:34:51

16 Q. Correct.

17 A. Yes. And I've been able to access it.

18 Q. Great.

19     Does that appear to be a copy of your expert

20 report in this case?                                  11:35:04

21 A. Yes, it does.

22 Q. And I understand that there were exhibits

23 submitted with this report; is that right?

24     MR. ACOTT: Object to the form.

25     THE WITNESS: Yes. So this report has -- I'm    11:35:30

Page 28

1  just checking the PDF -- Exhibits 1 through 35 attached

2  to it.

3      Q. BY MR. GRABER: And this report contains a

4  complete compilation of your opinions in this matter; is

5  that right?                                          11:35:55

6      MR. ACOTT: Object to the form.

7      THE WITNESS: So it is a complete set of my

8  opinions as of the time I submitted my report. And, yes,

9  it's complete. You know, it was complete when I

10 submitted it.                                        11:36:17

11     Q. BY MR. GRABER: Well, is it complete as of

12 today?

13     MR. ACOTT: Object to the form.

14     THE WITNESS: The only reason I'm hesitating to

15 answer that question is, of course, there have been    11:36:40

16 rebuttal reports submitted by plaintiffs' experts.

17     I actually feel my report does a good job

18 already of rebutting their rebuttal, if that makes sense.

19 But it doesn't -- you know, I haven't got, for example,

20 in this report an exact mapping to what paragraph will    11:36:59

21 rebut which portion of their expert rebuttal report, if

22 that makes sense.

23     Q. BY MR. GRABER: Okay. So other than perhaps

24 mapping your existing report that's been marked as

25 Exhibit 344 to the reply reports submit by the       11:37:24

Page 29

1  plaintiffs, is it fair to say that this is a complete

2  summation of your opinions in this matter?

3      MR. ACOTT: Object to the form.

4      THE WITNESS: It is a -- apart with that

5  exception, it is a complete summation of my opinions so    11:37:47

6  far in this case, sitting here today.

7      Q. BY MR. GRABER: And you included all of the

8  materials you considered in preparing your opinions in

9  this matter; right?

10     MR. ACOTT: Object to the form.                  11:38:05

11     THE WITNESS: To the best of my ability, yes.

12 Q. BY MR. GRABER: So let's go to your report.

13     And just to orient you here, Dr. Tucker, I just

14 want to go over some of your opinions at a high level so

15 we can get our bearings. Does that make sense?        11:38:35

16 A. Yes.

17 Q. So let's start on -- let's start on page 22.

18 Are you with me?

19 A. Yes, I am.

20 Q. You're referring to what is the Section III of    11:39:01

21 my report, starting at paragraph 44?

22 A. Correct.

23 Q. So you state at the top here, Section III:

24 "Plaintiffs' experts fail to recognize that most Facebook

25 advertisers would be unaffected by any alleged          11:39:14

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

1  inaccuracies in potential reach estimates."
2      Do you see that?
3  A. Yes.
4  Q. So let's walk through some of these subheadings,
5  and I'll just ask you some high-level questions about        11:39:27
6  that. Does that make sense?
7  A. Of course.
8  Q. So if you go a little further down, do you see
9  it says here in subsection A, "Plaintiffs' experts fail
10  to consider many reasons why potential reach estimates        11:39:41
11  are unimportant for most advertisers' budgeting
12  decisions."
13      Do you see that?
14  A. Yes.
15  Q. And then you state: "The increased        11:39:52
16  measurability enabled by the digital age allows
17  advertisers to measure ad performance in detail and in
18  real-time, which renders potential reach estimates
19  irrelevant to many Facebook advertisers."
20      Do you see that?        11:40:05
21  A. Yes.
22  Q. And that's one of your opinions in this report;
23  is that right?
24  A. So, yes, that describes one of my opinions. And
25  I go into detail about why I have that opinion and the        11:40:21

Page 31

1  power that goes with it.
2  Q. So you explain why that's your opinion in
3  photographs 56 through -- sorry.
4  A. Forty-five through -- to 55.
5  Q. Thank you.        11:40:41
6      So you explain -- you explain the basis for that
7  in paragraphs 45 to 55; is that right?
8      MR. ACOTT: Object to form.
9      THE WITNESS: Yes. Yes, I explain the basis for
10  my opinions and the underlying economic transformation of        11:40:51
11  traditional advertising in paragraphs 45 to 55.
12  Q. BY MR. GRABER: And if you go to page 28, do you
13  see at the top there it says, "Many Facebook advertisers
14  are interested in performance advertising, which suggests
15  potential reach would be unimportant to their budget        11:41:22
16  decisions"?
17      Do you see that?
18  A. Yes.
19  Q. And your basis for that opinion is set forth in
20  paragraphs 56 through 62; right?        11:41:36
21      MR. ACOTT: Object to the form.
22      THE WITNESS: So that is right, but I would also
23  call into -- I think it's going to be Exhibits 2 -- 2 and
24  3 and 4, which also relate to that opinion.
25  Q. BY MR. GRABER: Right. And those exhibits are        11:41:59

Page 32

1  referenced here in those paragraphs; right?
2  A. Yes, that's right.
3  Q. So let's go to -- let's talk about one of these
4  in a little bit more detail here. So let's take a look
5  at paragraph 57.        11:42:18
6      Do you see that?
7  A. Yes, I think I'm there.
8  Q. On page 28.
9  A. That is right.
10  Q. And you state in paragraph 57: "In contrast,        11:42:43
11  and consistent with the enhanced measurability of the
12  digital age, many Facebook advertisers are interested in
13  performance advertising, or driving specific actions with
14  their ads, such as clicks and conversions, rather than
15  reach. These advertisers are typically focused on trying        11:43:05
16  to identify or have their ads delivered to specific users
17  likely to take a desired action, rather than simply
18  having their ads delivered to as many people as possible.
19  A large audience size is tangential to their desired
20  objective and may even be undesirable. Accordingly,        11:43:23
21  these advertisers' budgeting decisions would be driven by
22  predicted performance of the ads in terms of generating
23  the desired results and, after the ad has been launched,
24  the actual results generated."
25      Do you see that?        11:43:42

Page 33

1  A. Yes.
2  Q. And then you state: "Potential reach would be
3  unimportant to their budgeting decisions"; right?
4  A. Yes.
5  Q. And when you say "their budgeting decisions,"        11:43:48
6  you're referring to advertisers who select performance
7  objectives as opposed to reach objectives; right?
8      MR. ACOTT: Object to the form.
9      THE WITNESS: So there I am talking about
10  advertisers that have chosen performance objectives. And        11:44:05
11  I explain why potential reach is tangential to their
12  decisions.
13  Q. BY MR. GRABER: And the basis for that
14  conclusion is set forth in -- in what we just read in
15  paragraph 57; is that right?        11:44:30
16      MR. ACOTT: Objection to form.
17      THE WITNESS: So the basis for that conclusion
18  is my academic expertise and study of the digital
19  transformation and the emergence of performance
20  advertising as a key transformative economic force.        11:44:46
21      So I am expressing my academic expertise there
22  about something I've written about extensively.
23  Q. BY MR. GRABER: Okay. You don't cite any of
24  your writings there, though; right?
25  A. So, no, I don't cite any of my particular        11:45:03

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1 writings there, but certainly -- you know, this report is
2 written to reflect my academic expertise and writings.
3 And if you're interested, I can certainly point you to
4 some articles where I discuss this in detail.
5       But, no, this is on the basis of my academic      11:45:22
6 writings.
7    Q. Okay. Again, just to be clear, none of those
8 academic writings were cited here; right?
9    A. So those academic citings are not cited in
10 paragraph 57. But certainly if you look at my CV, you    11:45:38
11 can see all the articles I've written regarding the
12 digital transformation in performance advertising.
13    Q. And you've not spoken to any Facebook
14 advertisers in connection with this lawsuit; is that
15 right?                                                    11:45:53
16       MR. ACOTT: Objection. Form.
17       THE WITNESS: So in connection with this
18 lawsuit, I have not talked with any Facebook advertisers.
19 But of course I've worked with many Facebook advertisers
20 over the course of studying digital advertising for many  11:46:09
21 years.
22    Q. BY MR. GRABER: You've not conducted any
23 specific studies focusing on whether Facebook advertisers
24 believe potential reach is important or unimportant;
25 right?                                                    11:46:20

Page 35

1       MR. ACOTT: Object to the form.
2       THE WITNESS: So this entire Section III is what
3 I recall my analysis of how potential reach is
4 unimportant for Facebook advertisers. And I've laid,
5 therefore, for the evidence I've considered in forming    11:46:44
6 that opinion.
7    Q. BY MR. GRABER: So in paragraphs -- let's stick
8 with the heading on the top of page 28, "Many Facebook
9 advertisers are interested in performance advertising,
10 which suggests potential reach would be unimportant to    11:47:01
11 their bundling decisions."
12    Do you see that?
13    A. I'm sorry, I missed the page reference just
14 before you spoke.
15    Q. Uh-huh. The top of page 28.                        11:47:13
16    A. Top of page 28. So you're talking about the
17 section header?
18    Q. Correct. Section header 2.
19    So do you see where I am?
20    A. Yes, I see -- I see that you're looking at the    11:47:28
21 section header.
22    Q. And all of the analysis that you used to support
23 subsection 2 is contained in paragraphs 56 through 62;
24 right? That's what you said earlier; right?
25       MR. ACOTT: Objection to form.                      11:47:50

Page 36

1       THE WITNESS: So what I think I said earlier was
2 that certainly all those paragraphs relate to that
3 subheading. As you know, there are other instances in my
4 report which also relate to the subheadings, such as the
5 behavior of one of the named plaintiffs who talked about  11:48:10
6 the extent to which his focus and orientation towards
7 performance advertising meant, that that was what he was
8 interested in.
9       And so, yes, obviously these paragraphs are
10 supportive. But there are other paragraphs in the report  11:48:30
11 which reinforce this point.
12    Q. BY MR. GRABER: So part of your support for this
13 subsection 2 here at the top of page 28 is your analysis
14 of the behavior of the named plaintiffs in this action?
15       MR. ACOTT: Object to the form.                     11:48:51
16       THE WITNESS: I would say that that is an
17 illustration of the underlying economic imperative that I
18 describe in this subsection.
19    Q. BY MR. GRABER: What's the economic imperative
20 that you're talking about?                                11:49:10
21    A. That the amazing transformation of digital
22 advertising, which finally allows advertisers to measure
23 return on investment, means that rather than looking at
24 unsatisfactory or outdated pieces of information, they're
25 able to focus on what advertisers are really interested   11:49:41

Page 37

1 in, which is: Are my advertising -- are my ads
2 delivering return on the money that I'm spending on?
3    Q. Is your opinion that potential reach is an
4 outdated metric?
5       MR. ACOTT: Object to the form.                     11:49:55
6       THE WITNESS: So when I talk about an outdated
7 metric, what I'm really talking about is what I go into
8 in paragraphs 48, for example. And, you know, if you
9 look to 48, 50.
10    In the past, because we weren't -- advertisers      11:50:18
11 weren't able to measure how well ads performed -- for
12 example, an advertiser might look at newspaper
13 circulation or viewership of TV programs. And that's
14 what I'm referring to as an outdated metric.
15    Q. BY MR. GRABER: Okay. Let me ask my question    11:50:42
16 again.
17    Dr. Tucker, is it your opinion that potential
18 reach is an outdated metric?
19       MR. ACOTT: Same objection.
20       THE WITNESS: So monthly active users is number   11:50:52
21 one. You know, you're using the term "metric." I think
22 the right way to think of it is an estimate.
23    And I talk about the utility of potential reach
24 in paragraph 63 to 68 of my report. And I explain that
25 you shouldn't conflate the potential reach estimate with  11:51:25

10 (Pages 34 - 37)

Page 38

1 something like the circulation of a newspaper. Instead,
2 the way that it's presented is actually encouraging
3 advertisers to use it to hone their targeting criteria.
4 Q. BY MR. GRABER: Dr. Tucker, you understand that
5 your testimony here can be used for trial; is that right?   11:51:45
6 MR. ACOTT: Object to the form.
7 THE WITNESS: Yes, I do.
8 Q. BY MR. GRABER: You understand your testimony
9 may be played in front of the jury; right?
10 MR. ACOTT: Same objection.   11:51:56
11 THE WITNESS: Yes, I do.
12 Q. BY MR. GRABER: Okay. So I'm going to ask you
13 the same question again. It seems to be pretty
14 straightforward, so I'd just like you to answer it for
15 me. If it's difficult, that's fine. You know, we can   11:52:08
16 let the jury decide.
17 But let me ask you again: Is it your opinion in
18 this matter, Dr. Tucker, that potential reach is an
19 outdated metric?
20 MR. ACOTT: Same objection.   11:52:25
21 THE WITNESS: My opinion is that potential reach
22 is not a metric, it is an estimate. And my opinion is --
23 is that potential reach is provided to advertisers to
24 help them hone their targeting criteria.
25 If we're talking about something like a   11:52:45

Page 39

1 newspaper circulation, then, yes, in some sense that is
2 an outdated metric in the digital era.
3 Q. BY MR. GRABER: Is Facebook's potential reach
4 outdated?
5 MR. ACOTT: Object to the form.   11:53:02
6 THE WITNESS: So potential reach -- no. I mean,
7 I wouldn't say potential reach is outdated. Potential
8 reach is something which advertisers can use to work out
9 if they've got too broad or too narrow an audience. I
10 won't describe that as outdated.   11:53:29
11 Q. BY MR. GRABER: It remains on -- the potential
12 reach metric remains on Facebook's Ads Manager even
13 today; right?
14 A. So, yes, it does. And it continues to have the
15 utility I described to advertisers to allow them to hone   11:53:49
16 their targeting criteria.
17 Q. Right.
18 And it's a useful metric for advertisers, isn't
19 it?
20 MR. ACOTT: Object to the form.   11:53:59
21 Q. BY MR. GRABER: So, again, you're using the word
22 "metric." And this is an estimate. And it is a useful
23 estimate for advertisers in terms of allowing them to
24 hone their targeting criteria in the way I describe in
25 paragraphs 63 to 68 in my report.   11:54:21

Page 40

1 Q. So, Dr. Tucker, you don't believe that potential
2 reach is a metric. Is that your testimony?
3 MR. ACOTT: Object to the form.
4 THE WITNESS: So I -- you keep on -- so I am
5 reacting, perhaps, to the -- I'm going to pronounce his   11:54:45
6 name poorly -- Chiagouris report, where he persistently
7 described potential reach as an estimate.
8 All I am just pointing out is that, as I
9 described in paragraph 16, Facebook describes this as an
10 estimate.   11:55:16
11 Q. BY MR. GRABER: I'm asking something different.
12 Dr. Tucker, is it your view that potential reach
13 is not a metric?
14 MR. ACOTT: Object to the form.
15 THE WITNESS: So it is my opinion that potential   11:55:34
16 reach is an estimate and is a useful guideline for
17 advertisers who are trying to hone their targeting
18 criteria and work out if they've got too small an
19 audience or too big an audience.
20 Q. BY MR. GRABER: Dr. Tucker, I think I still   11:55:57
21 don't have an answer to my question. Let me -- let's --
22 I don't think this is a hard question. Let's imagine
23 we're in front of the jury. And maybe we'll play this in
24 front of the jury.
25 I've asked you a simple question. Do you think   11:56:14

Page 41

1 that potential reach is a metric or not?
2 MR. ACOTT: Object to the form.
3 I'll also just add that Dr. Tucker has answered
4 the question and provided her opinion several times.
5 MR. GRABER: Counsel, Counsel, there's no   11:56:27
6 speaking objections allowed. You know that.
7 MR. ACOTT: I understand.
8 MR. GRABER: We're going to get an answer to
9 this very simple question.
10 Q. Go ahead, Dr. Tucker.   11:56:35
11 A. I can't answer it any other way. You know, it
12 is an estimate which is useful for advertisers trying to
13 hone their targeting criteria.
14 If by the use of metric you mean something that
15 advertisers use to evaluate return on investment in ad   11:56:54
16 spend, no, it isn't, in my opinion.
17 Q. Do you think it's a metric at all?
18 MR. ACOTT: Object to the form.
19 THE WITNESS: So -- no, as I said before, it's
20 an estimate which provides a guideline to allow   11:57:15
21 advertisers to hone their targeting criteria.
22 Now, we have not -- you know, you're asking me
23 repeatedly to define a metric. I'm just saying I don't
24 believe that it's a metric in the way that the Chiagouris
25 report used the term, where it was suggesting that it was   11:57:42

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1 a metric used by advertisers to optimize advertising
2 budget allocation decisions.
3    Q. BY MR. GRABER:  Would it surprise you to learn
4 that Facebook itself refers to potential reach as a
5 metric?                              11:57:58
6        MS. DEELEY:  Objection to form.
7        THE WITNESS:  So I'm not -- if -- so what can I
8 say?  I mean, Facebook can -- many Facebook data
9 scientists can refer to many things in many different
10 ways.  I think what's important, though, is that it --    11:58:23
11 potential reach is not a metric in the way that the
12 Chiagouris report was using the term, which suggests it's
13 a metric in terms of outcomes or allocating advertising
14 budget decisions.
15    Q. BY MR. GRABER:  I just want to make sure we have    11:58:43
16 clear testimony from you, Dr. Tucker.
17        Set aside the Chiagouris report.  I'm just
18 asking you, Dr. Tucker:  Do you view potential reach as a
19 metric or not?
20        MR. ACOTT:  Object to the form.              11:58:59
21        THE WITNESS:  So, no, I don't view it as a
22 useful metric for thinking about advertising budgeting
23 decisions.  And that is the sense in which metric is
24 being used in this case.  And so, no, I don't think
25 potential reach classifies as a metric in that sense.    11:59:16

Page 43

1    Q. BY MR. GRABER:  Do you think it classifies as a
2 metric in any sense?
3        MR. ACOTT:  Object to the form.
4        THE WITNESS:  So -- you know, so first of all,
5 it's an estimate.  And usually when we think about    11:59:33
6 metrics, they're more of an objective number.  That's my
7 hesitation.
8        And usually when we think about -- when I'm
9 teaching, you know, and we use the term "metric," it's
10 suggesting some kind of objective by which you evaluate    11:59:57
11 an outcome.  And so if we use potential -- if we take the
12 definition of metric as being a number by which you use
13 it to evaluate an outcome -- now, I'm not sure if
14 potential reach would be a metric in that sense.
15 Instead, it's acting as a guideline where you're trying    12:00:22
16 to work out how to be not too narrow and not too broad.
17    Q. BY MR. GRABER:  You said that potential reach is
18 not an objective number; is that right?
19        MR. ACOTT:  Object to the form.
20        THE WITNESS:  No.  And I'm sorry if I said that    12:00:41
21 wrongly or the record didn't pick it up.  Thank you for
22 allowing me to clarify.
23        I say you're looking -- when you think about a
24 metric, you're often looking for an objective target.
25 So, for example, perhaps I'm wanting to ensure that my    12:00:54

Page 44

1 return on ad spending delivers a certain percentage.
2        Then a -- potential reach is not in any case
3 that you're sort of trying to hit a particular potential
4 reach number.  Instead, it is given in the form of a
5 guideline and encourages you to think:  Oh, am I going    12:01:21
6 too broad?  Am I going too narrow?
7    Q. BY MR. GRABER:  So that was helpful, Dr. Tucker.
8        So you recall I asked you just a couple of
9 minutes ago about whether it would surprise you that
10 Facebook itself has referred to potential reach as a    12:01:43
11 metric.  Do you recall that question?
12    A. Yes, I do.
13    Q. So based on your testimony today, it sounds like
14 your view is that when Facebook employees or executives
15 are referring to potential reach as a metric, they really    12:02:06
16 don't have it right; right?
17        MR. ACOTT:  Object to the form.
18        THE WITNESS:  Well, I mean, I think -- you know,
19 it is my observation that -- you know, that people often
20 use casually the word "metric" when they mean number in    12:02:26
21 the same way that people often use the word "utilize"
22 when they mean use.
23        Now, of course, that may -- you know, that may
24 happen.  I'm just saying that as someone, you know,
25 who -- if you think of metric as in some sense -- you    12:02:44

Page 45

1 know, in a more formal sense and being related to
2 something that's -- a firm would be objectively using to
3 evaluate outcomes, then I don't think that common use of
4 metric is a substitute for number.  You know, meets that
5 way in which I think of a metric and the way in which it    12:03:09
6 was being used -- the word "metric" was being used in the
7 Chiagouris report.
8    Q. BY MR. GRABER:  Yeah, but coming back to my
9 question, it's your view that when Facebook employees are
10 referring to potential reach as a metric, they really    12:03:26
11 have it wrong, because it's not a metric.  Am I right?
12        MR. ACOTT:  Objection to form.
13        THE WITNESS:  You know, you're referring to
14 Facebook employees using the term "metric" in a context
15 in a document you haven't shown me.  And so, you know,    12:03:46
16 I'm not able to comment on any specific cases.
17        I am just saying that there's often a casual use
18 of phrases, such as I give an example of utilize for use,
19 and similarly metric for number.
20        But I think the key thing is that one of the    12:04:06
21 things I was asked to do was to rebut the Chiagouris
22 report.  And it is using metric in a certain sense.
23        I'm very happy to look at any documents that you
24 want to put in front of me in terms of what Facebook
25 employees have used in terms of the word "metric."  So,    12:04:22

12 (Pages 42 - 45)

Page 46

1 you know, if you want to do that, I'm very happy to.

2     Q.  BY MR. GRABER:  Well, maybe we'll do that.  But

3 I just want to make sure I understand where you're coming

4 from.

5         According to you, Dr. Tucker, potential reach is    12:04:39

6 not really a metric.  But at the same time, Facebook

7 employees do refer to potential reach as a metric.  So

8 I'm trying to understand the disconnect.

9     A.  So I don't know --

10        MR. ACOTT:  Object to the form, to the extent    12:04:57

11 there's a question.

12        THE WITNESS:  So, you know, I have not

13 testified, and I hope I haven't, that Facebook employees

14 have referred to Facebook -- has referred to potential

15 reach as a metric.  You suggested that they had.  I've    12:05:09

16 said they may have done.  That wouldn't surprise me.

17        But I certainly haven't testified or suggested

18 myself that Facebook employees have used potential --

19 metric from referring to it.  So I just should clarify

20 that.  And I'm sorry if my language has been loose.    12:05:32

21     Q.  BY MR. GRABER:  Well, it is your testimony today

22 that if someone's talking about potential reach and

23 they're being careful, they should not talk about it as a

24 metric; right?

25     A.  So --    12:05:49

Page 47

1         MR. ACOTT:  Object to the form.

2         THE WITNESS:  It is my testimony that if you're

3 using metric in the sense of the Chiagouris report to

4 mean an objective number that a firm uses to evaluate an

5 outcome, then, no, potential reach doesn't fit that    12:06:05

6 definition.

7     Q.  BY MR. GRABER:  But set aside the Chiagouris

8 report.  Let's set that aside.  Does that make sense?

9 Dr. Tucker, do you follow me?

10    A.  Yes, we can set it aside.  Though, in some    12:06:24

11 sense -- at that point we're straying aside from my -- my

12 report.  Because, you know, I was reacting to what -- you

13 know, Mr. Chiagouris' report and what I said about it in

14 my report.

15    Q.  I just want you to understand my question.    12:06:39

16        So, Dr. Tucker, I'm setting aside the Chiagouris

17 report.  I'm just asking for your view, independent of

18 the Chiagouris report.

19        It is your testimony today that if someone is

20 talking about potential reach, and they're being careful,    12:06:55

21 they should not talk about it as a metric; right?

22        MR. ACOTT:  Object to the form.

23        THE WITNESS:  No, I don't presume to tell anyone

24 to make certain language choices.  I, of course, make

25 certain language choices because I'm a professor who    12:07:13

Page 48

1 studies these things.  You know, so, for example, if

2 someone uses the term "extant" when they mean existing, I

3 certainly wouldn't correct them or presume to do that,

4 because I realize that the use of extant has evolved in

5 some sense from its original narrow meaning.    12:07:34

6         So, no, I don't presume to tell anyone what

7 language they should use.  You know, that's not my place.

8 But my place is to say that if we think of a metric as

9 being an objective measure by which advertisers

10 evaluate -- any firm evaluates performance, then    12:07:52

11 potential reach is not a metric.

12    Q.  BY MR. GRABER:  Okay.

13        MR. ACOTT:  Geoff, we've been going for a little

14 over an hour, so I guess whenever you're done with this

15 set of questions might be a good time to take a break.    12:08:08

16        MR. GRABER:  Just a few more questions.

17    Q.  Let me go back to a question that I asked you a

18 while ago and make sure I -- we have a clear answer.

19        Dr. Tucker, you have not conducted any specific

20 studies focusing on whether Facebook advertisers believe    12:08:30

21 potential reach is important or unimportant; right?

22        MR. ACOTT:  Object to the form.

23        THE WITNESS:  So what I would refer you to

24 there is the series of correlations that I present in

25 Exhibits 9 to -- sorry, 9 to 11, which show the lack of    12:08:51

Page 49

1 correlation between estimated audience size and revenue

2 from advertiser and budget from advertiser and so on.

3     Q.  BY MR. GRABER:  Thank you, Dr. Tucker.  That

4 clears my question.  So let me ask it in a little bit of

5 a different way.    12:09:15

6         Outside of this lawsuit, you have not conducted

7 any specific studies focusing on whether Facebook

8 advertisers believe potential reach is important or

9 unimportant; right?

10        MR. ACOTT:  Object to the form.    12:09:25

11        THE WITNESS:  So outside of this lawsuit, I have

12 written extensively all about what advertisers value in

13 the digital age.  And I talk about what they value.  And

14 that doesn't include an estimate such as potential reach.

15        But I have not written something which    12:09:53

16 explicitly says potential -- you know, evaluated

17 potential reach.  Because it's just not -- you know, it's

18 not relevant for digital advertising measurement.

19    Q.  BY MR. GRABER:  Dr. Tucker, you cannot rule out

20 the possibility that a Facebook advertiser who selects a    12:10:12

21 performance adjective still views potential reach as

22 important; right?

23        MR. ACOTT:  Object to the form.

24        THE WITNESS:  So, you know, I think I go into

25 this when I talk about -- you know, it's very hard for    12:10:26

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1 me, as someone who studies this, to imagine the set of
2 unusual circumstances which would have to take place for
3 potential reach to have influenced any kind of budgeting
4 decision.  I certainly haven't seen any evidence in the
5 case that this has happened.                12:10:49
6     You know -- I mean, all I can say is that, you
7 know, if you want to put something in front of me where
8 it definitely happened or where you believe it happened,
9 I'm happy to look at that and evaluate it.
10    But, you know, my general opinion is that    12:11:07
11 it's -- everything about the digital world means that
12 that is highly unlikely to occur.  And if it was to
13 occur, then it would have to occur in a highly
14 individualized context.
15    Q. BY MR. GRABER:  It's your testimony that you've   12:11:26
16 seen no evidence that advertisers use potential reach for
17 budgeting decisions?
18        MR. ACOTT:  Object to the form.
19        THE WITNESS:  So my testimony is that I have
20 certainly seen nothing which is persuasive that   12:11:43
21 advertisers use potential reach in their budgeting
22 decisions.
23        Evidently I realize that plaintiffs have put
24 forth some evidence that they believe shows that in my
25 report.  I explain why I don't think that is persuasive.   12:12:09

Page 51

1        MR. GRABER:  Let's take a break.
2        THE WITNESS:  Thank you.
3        Would it be all right to come back at 25 past
4 the hour?
5        MR. GRABER:  Yeah, let's go off the record.   12:12:27
6        THE VIDEOGRAPHER:  We are going off the record.
7 The time is 12:12 p.m. Eastern Daylight Time.
8        (Recess.)
9        THE VIDEOGRAPHER:  We are now back on the
10 record.  The time is 12:29 p.m. Eastern Daylight Time.   12:29:38
11    Q. BY MR. GRABER:  Welcome back, Dr. Tucker.
12    Dr. Tucker, is it your view that Facebook's
13 potential reach is irrelevant for most advertisers?
14        MR. ACOTT:  Object to the form.
15        THE WITNESS:  It is -- my view is that it's   12:29:55
16 irrelevant for budget -- budget-making decisions for most
17 advertisers.
18    Q. BY MR. GRABER:  So what is potential reach
19 relevant to for advertisers?
20        MR. ACOTT:  Object to the form.        12:30:12
21        THE WITNESS:  So as I describe in my report --
22 and this refers back to paragraph 63 to 68 -- potential
23 reach is a helpful guideline which advertisers can use to
24 work out:  Well, is the target audience I selected too
25 broad or too narrow?                        12:30:36

Page 52

1    Q. BY MR. GRABER:  So potential reach helps
2 advertisers target their ads; is that right?
3        MR. GRABER:  Let's go off the record.
4        THE VIDEOGRAPHER:  We are now going off the
5 record.  The time is 12:31 p.m. Eastern Daylight Time.   12:30:52
6        (Discussion off the record.)
7        THE VIDEOGRAPHER:  We are now back on the
8 record.  The time is 12:36 p.m. Eastern Daylight Time.
9    Q. BY MR. GRABER:  Dr. Tucker, I had a question
10 pending.  Let me just reask that.           12:35:51
11    Do you recall we were talking about the
12 potential reach in the context of targeting?  Do you
13 recall that?
14    A. That is right.
15    Q. Okay.  And I had asked you, so potential reach   12:36:05
16 helps advertisers target their ads; is that right?
17        MR. ACOTT:  Object to the form.
18        THE WITNESS:  It helps them precisely work out
19 if the target audience they've selected may be too narrow
20 or too broad.                           12:36:23
21    Q. BY MR. GRABER:  And can we agree that an
22 advertiser's ability to target their ads is important?
23        MR. ACOTT:  Object to the form.
24        THE WITNESS:  So in the digital environment,
25 certainly targeting is a huge innovation and valuable to   12:36:40

Page 53

1 advertisers.
2    Q. BY MR. GRABER:  So if potential reach helps
3 advertisers target their ads and targeting is valuable to
4 advertisers, wouldn't you agree with me that potential
5 reach is also valuable to advertisers?       12:37:07
6        MR. ACOTT:  Object to the form.
7        THE WITNESS:  No.  Because the value of
8 targeting comes from the use of data to select audience
9 and not halfway is it impressions.
10       Potential reach is a guideline, which makes sure   12:37:28
11 you don't target too much and don't target too little.
12 So targeting is evidently of huge value in the digital
13 era.  Potential reach is a guideline which helps
14 advertisers work out if they target too much or target
15 too little.                             12:37:51
16    Q. BY MR. GRABER:  I want to make sure I understand
17 this.  So according to you, Dr. Tucker, targeting is of
18 huge value to advertisers; right?
19        MR. ACOTT:  Object to the form.
20        THE WITNESS:  Yes.  The ability to use data to   12:38:02
21 select an audience and show ads to that audience is of
22 huge value.
23    Q. BY MR. GRABER:  And potential reach provides
24 some of the data that helps advertisers target; isn't
25 that right?                             12:38:20

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1  A. No.

2      MR. ACOTT: Object to the form.

3  Q. BY MR. GRABER: Potential reach doesn't provide

4  any data that helps advertisers target?

5  A. No. Because the valuable data in targeting    12:38:25

6  data such as: Have I just been searching for credit card

7  offers? Where do I live?

8      That's the valuable data, because that will

9  allow a credit card company to identify people who are

10  likely prospects and not waste money to people who are    12:38:51

11  not looking for a credit card.

12      Potential reach is a guideline as part of the

13  targeting process, but it's not the data that is used for

14  targeting.

15  Q. Potential reach provides data to advertisers;    12:39:10

16  right?

17      MS. DEELEY: Object to the form.

18      THE WITNESS: Potential reach provides an

19  estimate to advertisers that allows them to assess -- or

20  at least some advertisers to assess whether or not    12:39:23

21  they're going to be too broad or too narrow.

22      You know, there's not more I can say. I mean,

23  that's its role.

24  Q. BY MR. GRABER: Well, yeah, I mean, what I'm

25  getting at here is what I think is a pretty    12:39:39

Page 55

1  straightforward, easy question.

2      You have stated clearly that targeting provides

3  huge value and is important to advertisers, and potential

4  reach is used in the targeting process; is that correct?

5  A. Yes. When you say "used in the targeting    12:40:03

6  process," we just have to be distinctive that we're not

7  implying, of course, that this is targeting data. And

8  that's where I was being -- trying to clarify.

9  Q. Okay. Fair enough.

10      So if potential reach is useful in a very    12:40:17

11  important process such as targeting, why isn't potential

12  reach also important?

13  A. Well, I mean, in some sense I go through the

14  reasons why that is true in Section III of my report.

15      Let's be clear. So value from targeting. The    12:40:45

16  fact you could target a 43-year-old female who's just

17  searched for a credit card offer who lives in a suburb of

18  Boston, that is incredibly valuable. It means you're not

19  going to be wasting impressions.

20      Now, for many cases, the advertiser is going to    12:41:07

21  already have that target market in mind. Potential reach

22  is not that useful as an adjustment.

23      There may be some advertisers who had specified

24  an audience such as women over the age of 40 in

25  Massachusetts who are interested in credit card offers,    12:41:30

Page 56

1  and then they look at that and they say, "Gosh, that's

2  actually a bit broader than we were thinking. Let's hone

3  it in a bit."

4      But it's pretty relative to where the value's

5  being created in the targeting process. Potential reach    12:41:49

6  is a tool which may or may not be used by some

7  advertisers when trying to hone their targeting criteria.

8  But it's certainly not a driver or source of value in the

9  targeting process.

10  Q. You're saying that potential reach is useful but    12:42:13

11  not valuable?

12      MR. ACOTT: Object to the form.

13      THE WITNESS: So I am saying that some

14  advertisers -- some advertisers, you know, have got a

15  custom audience who have a set target market, aren't    12:42:28

16  going to be using potential reach to hone their targeting

17  criteria.

18      Another advertiser potentially could start

19  off with thinking, "Well, I'm going to use these

20  targeting criteria," then see the dial go all the way    12:42:48

21  over to broad and say, "No, I'm going to actually try to

22  hone my targeting further and think what I can do to be

23  more precise."

24      Now, that advertiser may end up making a better

25  advertising decision in that case, but the value is being    12:43:08

Page 57

1  unlocked by the fact that the advertiser has further data

2  to further hone their targeting decision rather than the

3  nudge given by the potential reach in the audience style

4  dashboard.

5  Q. BY MR. GRABER: So potential reach helps    12:43:26

6  advertisers make better decisions about their targeting;

7  right?

8  A. So --

9      MR. ACOTT: Objection to form.

10      THE WITNESS: I mean, I -- again, I feel like    12:43:36

11  I've answered this. But let me try again.

12      So for some advertisers, it may help them to

13  think, "I need to do a better job with targeting." That

14  would be the process.

15  Q. BY MR. GRABER: But does it help them -- does it    12:43:52

16  help them target better?

17      MR. ACOTT: Object to the form.

18      THE WITNESS: No, because the potential reach --

19  let's imagine I start off with too broad a campaign. Say

20  I'm just targeting everyone over the age of 18 in    12:44:15

21  Massachusetts. You know, then the advertiser has to make

22  decisions: Well, how am I going to hone further my

23  targeting criteria?

24      If the advertiser makes the right decisions and

25  chooses an audience which is a better match for their    12:44:38

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1  product, then the potential reach will have given them a

2  useful nudge to have done that.

3      But, really, again, it's only a nudge.  And the

4  value which would be created in terms of making the

5  better targeting decision would come from the advertiser      12:44:57

6  choosing further targeting criteria, which better allow

7  them to select an audience which would be relevant for

8  their ad.

9      Q.  BY MR. GRABER:  Okay.  So according to you,

10 Dr. Tucker, potential reach does not help advertisers'      12:45:12

11 target better?

12     MR. ACOTT:  Object to the form.

13     THE WITNESS:  So as I say, it gives them a

14 useful nudge to try and target better in some

15 circumstances.      12:45:28

16     Q.  BY MR. GRABER:  So it's not helpful, but it just

17 gives them a nudge; is that right?

18     MR. ACOTT:  Object to the form.

19     THE WITNESS:  So it -- while an advertiser is

20 creating a Facebook ad, potential reach and the      12:45:52

21 associated dial is there as a nudge to get them to be

22 thoughtful about their targeting criteria.

23     It's the thoughtfulness about the targeting

24 criteria, which is unlocking the value.  A nudge is just

25 a nudge.      12:46:12

Page 59

1      Q.  BY MR. GRABER:  So the potential reach helps the

2  advertiser unlock value.  Is that your testimony?

3      A.  No.

4      MR. ACOTT:  Object to the form.

5      THE WITNESS:  No.  My testimony is that      12:46:20

6  potential reach is a nudge to encourage the advertiser to

7  use appropriate data to unlock the value of targeting.

8      Q.  BY MR. GRABER:  Other than providing advertisers

9  a nudge, does potential reach play any other useful role

10 for advertisers?      12:46:47

11     MR. ACOTT:  Object to the form.

12     THE WITNESS:  So I -- I will point you back to

13 those paragraphs, which I think are 63 to 68 in my

14 report, where I describe how potential reach is presented

15 and the context in which advertisers see it.      12:47:12

16     I think I've described quite clearly how it can

17 potentially be this useful nudge for advertisers in that

18 section.  I also discuss, for example, an AdStage

19 article, which describes how advertisers could use it.

20     I don't know how much more I can say, because I      12:47:36

21 think it's quite well written in those paragraphs, 63 to

22 68.

23     Q.  BY MR. GRABER:  Well, I'm just trying to make

24 sure I understand your testimony, Dr. Tucker.  I mean,

25 I'm trying to get an understanding of how potential reach      12:47:48

Page 60

1  is at all important or relevant to advertisers, according

2  to you.

3      And you've testified that advertisers use it as

4  a nudge to, you know, help them target.  And I'm trying

5  to get an understanding as to whether there's any other      12:48:14

6  value that advertisers can get from the potential reach

7  metric.

8      A.  I'm saying that the -- the value to advertisers

9  is this nudge which encourages them to think more

10 carefully about their targeting decisions.      12:48:34

11     And, you know, as to whether it has any other

12 value -- you know, in my opinion, this is the main value

13 for the vast majority of advertisers that it's providing,

14 this nudge.

15     Now, it's hard to think of the -- you know,      12:48:54

16 given it's a temporary number that comes up on a

17 temporary screen, it's hard to think of any other value

18 it's really providing than the one given by the clear

19 context in which it's presented.  And, also, it's

20 discussed in the literature surrounding it.      12:49:13

21     Q.  What literature discusses potential reach

22 specifically?

23     A.  Oh, I'm sorry.  When I say that, I should be

24 clear.  I'm referring to, for example, that AdStage

25 article.  And I'm talking about the guidelines given to      12:49:27

Page 61

1  advertisers about how you should think about that, that

2  the broad, clearly defined narrow buckets.

3      Q.  So it's your testimony that potential reach does

4  provide some value to advertisers; right?

5      MR. ACOTT:  Object to the form.      12:49:47

6      THE WITNESS:  It is my testimony that potential

7  reach provides advertisers the nudge to unlock the value

8  of targeting for their campaign.

9      Q.  BY MR. GRABER:  And that provides some value to

10 advertisers; right?      12:50:01

11     MR. ACOTT:  Object to the form.

12     THE WITNESS:  So, again, we come to this

13 distinction.  You have a nudge, but the value is really

14 being created by the better use of targeting data.

15     So I think it is a useful image, a useful dial      12:50:18

16 for advertisers to nudge them to think carefully about

17 targeting.  And the value in it lies in that nudge to

18 encourage them to make best use of the targeting function

19 of Facebook.

20     Q.  BY MR. GRABER:  So it does -- so potential reach      12:50:43

21 does provide some value to Facebook advertisers; right?

22     MR. ACOTT:  Object to the form.

23     THE WITNESS:  No.  I mean, again, the value

24 that's provided to Facebook advertisers comes from the

25 combination of targeting and measurement and also,      12:51:00

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1 obviously, the provision of eye balls and all of this --

2 these innovations surrounding that. Now, that's where

3 the value lies.

4 And obviously Facebook provides many tools to

5 try and help advertisers unlock the value of that    12:51:22

6 combination of eye balls, targeting and measurement. But

7 it doesn't change where the volume is. These are just

8 tools to help advertisers unlock that value. And that's

9 the distinction I'm trying to draw.

10 Q. BY MR. GRABER: Let me ask it this way:    12:51:47

11 Dr. Tucker, is it your view that potential reach provides

12 absolutely no value to Facebook advertisers?

13 MR. ACOTT: Object to the form.

14 THE WITNESS: It is my view that if we're

15 thinking about the value unlocked by Facebook in terms of    12:52:08

16 delivering ROI, no, potential reach isn't part of that

17 value.

18 On the other hand, it is my view that potential

19 reach, amongst many other tools, is something which is

20 potentially useful for advertisers to make sure they are    12:52:31

21 unlocking that value.

22 Q. BY MR. GRABER: Look at page 35 of your report.

23 A. Yes.

24 Q. So you state here: "Facebook advertisers are

25 also presented with estimated daily reach, which is more    12:53:42

Page 63

1 relevant than potential reach for budgeting purposes."

2 Do you see that?

3 A. Yes, I do.

4 Q. And your basis for that statement is set forth

5 in paragraphs 69 through 72; is that right?    12:54:05

6 MR. ACOTT: Objection to form.

7 THE WITNESS: So, again -- I should be careful,

8 because I know basis is a legal meaning. But certainly

9 my explanation of that statement is set forth in

10 paragraphs 69 to 72.    12:54:21

11 Q. BY MR. GRABER: And that's a complete

12 explanation; right?

13 MR. ACOTT: Object to the form.

14 THE WITNESS: So, yes, I think it summarizes the

15 major points about why it is that something which is    12:54:42

16 personalized and geared to that particular advertiser

17 will be more useful.

18 Q. BY MR. GRABER: So let me ask you this,

19 Dr. Tucker: Is it your understanding that one of

20 plaintiffs' contentions is that potential reach is    12:55:23

21 important? Right?

22 A. So yes.

23 Q. And you disagree with that; right?

24 A. I should be clear that plaintiffs have stated

25 that they made advertising budgeting decisions on the    12:55:41

Page 64

1 basis of potential reach. And as you know, there was a

2 section in my report which discusses why their actual

3 behavior could be taken to contradict that.

4 Q. Right. But I'm talking to you about plaintiffs'

5 contentions in this lawsuit. Does that make sense?    12:56:04

6 A. Yes.

7 Q. And you understand that one of plaintiffs'

8 contention -- contentions in this lawsuit is that

9 potential reach is important; right?

10 A. So, yes, plaintiffs are claiming that potential    12:56:30

11 reach influenced their budget allocation decisions. Yes.

12 Q. And that potential reach is important in general

13 to advertisers. That's one of plaintiffs' contentions;

14 right?

15 A. So my -- so I'm happy to go and look at the most    12:56:54

16 recent Amended Complaint. Certainly I was focused -- I

17 am focused on statements which describe how this

18 importance lead it to matter for budget decisions.

19 You're asking me for the sort of general

20 proposition about whether plaintiffs say it is important.    12:57:24

21 And, yes, plaintiffs do say it is generally important,

22 and they point to its importance in terms of influencing

23 how they thought about allocating budget and spending

24 money on Facebook.

25 Q. Well, let me ask you the question this way: You    12:57:42

Page 65

1 don't believe that potential reach is important to

2 advertisers; right?

3 MR. ACOTT: Object to the form.

4 THE WITNESS: So I don't believe that potential

5 reach affects how advertisers allocate their budgets.    12:58:01

6 Q. BY MR. GRABER: Okay. But did you believe that

7 potential reach is important to advertisers or not?

8 A. Without wanting to rehash my earlier answers, I

9 think Facebook's -- potential reach is one among many

10 tools that Facebook provides to advertisers and -- but    12:58:29

11 that does not render it important about budgeting

12 decisions of ads.

13 Q. Do you think potential reach is important to

14 advertisers in general?

15 MR. ACOTT: Object to the form.    12:58:50

16 THE WITNESS: So now you're saying -- can I just

17 clarify something? I was pausing. You said "advertisers

18 in general." Are we now going out of the world of

19 Facebook, or are we still focused on potential reach on

20 Facebook for Facebook advertisers?    12:59:23

21 Q. BY MR. GRABER: We're only talking about

22 Facebook here.

23 A. Okay. Just double-checking, because when you

24 say "in general," I think about the broader ecosystem.

25 So I think that for some advertisers, potential    12:59:34

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1 reach gives them a useful nudge to unlock the value of
2 Facebook advertising, as I said before.
3     Now, is it -- you know, you used the word
4 "important," which is, you know, a very broad term. Is
5 it -- you know, do I believe it's a useful nudge? Yes.   13:00:01
6 Do I believe it's important in the sense of driving
7 behavior? No.
8     Q. So you don't think that potential reach drives
9 advertiser behavior at all. Is that your testimony?
10    A. I think it encourages advertisers to make better   13:00:25
11 targeting decisions in some circumstances where the
12 advertiser may have been too broad or too narrow in their
13 initial target market selection. That's what I believe.
14    Q. So sometimes it does drive -- I'll restate it.
15    So it's your testimony, Dr. Tucker, that   13:01:03
16 sometimes potential reach does drive advertiser behavior;
17 is that right?
18    MR. ACOTT: Object to the form.
19    THE WITNESS: It -- like any other educational
20 tool for advertisers, it encourages them to make better   13:01:18
21 decisions and potentially launch more successful
22 advertising campaigns in certain circumstances for
23 certain advertisers.
24    Q. BY MR. GRABER: But potential reach is an
25 educational tool, Dr. Tucker?   13:01:34

Page 67

1     A. So when I say "educational tool," I don't mean
2 in the sense of me or professor or something like that.
3 What I mean is that Facebook has a lot of resources --
4 maybe we should call it a resource for advertisers --
5 that help advertisers try and unlock the value of the   13:01:52
6 Facebook advertising platform. And potential reach is
7 one of those resources or tools.
8     Q. Dr. Tucker, isn't it possible that advertisers
9 use potential reach after running their campaigns to
10 determine the reach percentage out of the total audience?   13:02:19
11    MR. ACOTT: Object to the form.
12    THE WITNESS: Well, it would be highly unusual
13 and difficult to do so. Why? Well, remember potential
14 reach is an estimate that is presented when you're
15 creating your campaign. It's not recorded anywhere. So   13:02:39
16 I'd have to write it down separately. And then -- for
17 some reason, I'd have to write it down separately.
18    And then after my campaign has launched, I'd
19 have to look at that thing I wrote down separately more
20 than the actual performance outcomes of my campaign,   13:02:56
21 which tell me how many people I have reached and how cost
22 effective that is and so on.
23    So, you know, it seems to -- you know, any use
24 of potential reach to evaluate the outcome of an
25 advertising campaign would have to require the advertiser   13:03:27

Page 68

1 to write it down and then later on ignore all the far
2 more relevant measures about campaign performance. So it
3 just seems implausible to me.
4     Q. BY MR. GRABER: So you don't think advertisers
5 do that; right?   13:03:48
6     MR. ACOTT: Object to the form.
7     THE WITNESS: So if -- I mean, you know, I just
8 want to be completely precise here. If we've been
9 talking -- we're talking so far about potential reach as
10 presented in the Ads Manager interface.   13:04:10
11    I'm just saying that the steps that an
12 advertiser would have to go through, which means taking
13 that number, manually copying and pasting it, which is a
14 reasonably, you know, tedious process, putting it in a
15 separate Excel spreadsheet, whatever, and then using   13:04:31
16 that, cross-referencing it with later outcomes for that
17 performance and ignoring all the actual outcomes that are
18 presented for you in a convenient manner by the Facebook
19 dashboard, it just seems implausible.
20    Q. BY MR. GRABER: Would you say it's highly   13:04:48
21 implausible?
22    MR. ACOTT: Objection to the form.
23    THE WITNESS: I would say -- I would say that it
24 just seems an incredibly unusual set of events and
25 behaviors to be suggesting it happens.   13:05:03

Page 69

1     Q. BY MR. GRABER: So it would surprise you of that
2 if you learned that advertisers do that; right?
3     MR. ACOTT: Object to the form.
4     THE WITNESS: So I know, for example, that both
5 named plaintiffs claimed they did something of that   13:05:36
6 order, where they would note down the number, record it
7 separately, and then look back on it when they were
8 evaluating their campaigns.
9     I am just saying that given the amazing wealth
10 of information advertisers actually have access to to   13:05:53
11 evaluate their campaigns, that it is very -- you know,
12 it's an unusual and surprising claim.
13    Q. BY MR. GRABER: You're talking about
14 Dan Ziernicki? The named plaintiff Dan Ziernicki?
15    A. I am talking about -- yes, I mean, I'd go -- I   13:06:17
16 mean, again, I don't want to talk in the abstract, and my
17 report goes into this in detail.
18    But I certainly -- you know, certainly I've read
19 the deposition testimony which relates to what this
20 process would have to involve to actually use it for   13:06:39
21 advertising budgeting decisions.
22    Q. Let's talk about advertisers in general. Okay?
23 Facebook advertisers in general.
24    Would it surprise you that Facebook advertisers
25 used potential reach after running their campaigns to   13:07:07

18 (Pages 66 - 69)

Page 70

1 determine the reach percentage out of the total audience?

2     MR. ACOTT: Object to the form.

3     THE WITNESS: So I'm glad I made that

4 clarification earlier that I was talking about Ads

5 Manager. Your question seems to suggest you're talking   13:07:28

6 about reach and frequency bias. Now --

7   Q. BY MR. GRABER: No. No, I'm not talking about

8 that.

9   A. Okay. So are you talking about reaching

10 frequency bias or are you talking about advertiser using   13:07:39

11 the typical Ads Manager interface?

12   Q. I'm talking about using the Ads Manager's

13 interface.

14   A. Correct. So --

15   Q. So with that clarification, let me ask it again.   13:07:58

16     Would you be surprised that advertisers use

17 potential reach after running their campaigns to

18 determine the reach percentage out of the total audience?

19     MR. ACOTT: Object to the form.

20     THE WITNESS: Well, it would seem -- yes, it   13:08:18

21 would surprise me. And I can tell you why it would

22 surprise me that that would be -- the advertisers would

23 find that a useful thing to do.

24     And the reason it would surprise me is if we go

25 to my Exhibit 7, if an advertiser was to do that, then,   13:08:35

Page 71

1 as you can see, for the 75th -- up to the 75th

2 percentile, what they're going to see is they've hit

3 below 5 percent of that potential reach. And I'm not

4 sure why knowing that you've hit 3 or 4 percent would be

5 a tool informative in thinking about your ad campaign.   13:09:08

6   Q. BY MR. GRABER: You don't think those types of

7 percentages are informative about the performance of an

8 ad campaign?

9     MR. ACOTT: Object to the form.

10     THE WITNESS: So, again, with reference to   13:09:28

11 Exhibit 7, the typical budget for an advertiser means

12 that, as I say, up to the 75th percentile they're going

13 to be hitting below 4.6 percent of that potential reach.

14     Now, in those 75 percent of cases, it -- the

15 budget is in nowhere close to any threshold of hitting   13:09:54

16 potential reach. Knowing that they were at 3.5 or

17 4 percent of the potential reach figure seems completely

18 uninformative relative to something actually relevant,

19 such as: Well, what is my cost for conversion? What is

20 my return on ad spend?   13:10:20

21   Q. BY MR. GRABER: Is that -- and are you saying

22 that, Dr. Tucker, because -- I'm looking at your

23 Exhibit 7. Is that because those percentages are so low

24 that the -- for example, 50th, 40th, 30th percentiles?

25   A. Yes. I'm saying that for 75 -- you know, in   13:10:41

Page 72

1 this graph, for 75 -- in 75 percent of instances, you're

2 below 4.6 percent.

3     And what you're suggesting, as an advertiser is

4 doing, is that they would have a reason to monitor

5 whether or not they were at 3.5 or 4. And somehow that   13:11:06

6 would be meaningful to their advertising decision making.

7 And I'm saying that doesn't -- that doesn't make sense,

8 given that they have very relevant metrics available to

9 them about how many people have actually seen their ad,

10 how many people have responded to it in a positive way   13:11:25

11 and what the cost of those conversions have been.

12   Q. Well, let's stay on Exhibit 7, though.

13     Are you saying that -- let's take the 30th

14 percentile. Okay? And that shows here -- your analysis

15 shows a ratio of impressions to audience size of   13:11:43

16 0.055 percent.

17     Do you see that?

18   A. That's right.

19   Q. And you're saying that number is not very useful

20 because it's so small; right?   13:11:58

21     MR. ACOTT: Objection to form.

22     THE WITNESS: Well, the reason it is not useful

23 is that you are suggesting that advertisers would look at

24 that percentage and then make some advertising allocation

25 decision on its basis.   13:12:15

Page 73

1     And if you're going to make an advertising

2 allocation decision, it suggests you're comparing across

3 campaigns. And in this case, while what we're learning

4 is -- it doesn't really tell you anything.

5     I mean, if I was comparing across campaigns as   13:12:35

6 an advertiser, I would be, like, saying, "Oh, well, which

7 one is delivering the best cost conversion? Let's put

8 more money there."

9     The idea you'd be comparing and evaluating

10 across campaigns like this just doesn't make sense.   13:12:50

11   Q. BY MR. GRABER: Well, but let's stay on

12 Exhibit 7. The ratio of impressions to audience size.

13 Do you see those numbers there?

14   A. Yes.

15   Q. And that provides certain information; right?   13:13:03

16   A. It provides the information that vast -- I mean,

17 just about all advertisers on Facebook are not setting

18 budgets which are anywhere close to them being ever

19 plausibly able to hit a potential reach number in terms

20 of their coverage.   13:13:30

21     You know, I find it an incredibly informative

22 exhibit.

23   Q. So I want to make sure I understand you

24 correctly. I mean, the reason that this is not useful to

25 advertisers is because these numbers are very, very low;   13:13:40

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1 right?

2      MR. ACOTT: Objection. Form.

3      THE WITNESS: So I think you're generalizing a

4 bit. You said to me, is it possible that an advertiser

5 would look at the percentage of people reached relative      13:13:58

6 to potential reach after launching their campaign? I

7 said what they're going to see is what we see in

8 Exhibit 7. And, of course, it's going to vary across

9 advertisers and campaigns.

10      And then if I am trying to evaluate how to      13:14:21

11 allocate advertising dollars going forward, the

12 difference between, say, hitting .5 versus .75 is just

13 unmeaningful relative to a clearly informative metric

14 such as: What is my cost for conversion? What actually

15 am I paying to reach each of these people, you know, in      13:14:45

16 certain circumstances?

17      That is an informative metric. This is not

18 informative.

19      Q. BY MR. GRABER: And it's not informative because

20 these numbers are so small; is that right?      13:15:02

21      MS. DEELEY: Objection to form.

22      THE WITNESS: No. I think you're simplifying.

23      The -- you said our firm -- our firm is going to

24 look at the percentage of reach. Now, the only type of

25 advertiser that could possibly be doing that is one that,      13:15:32

Page 75

1 in some sense, is interested about how close to the

2 threshold they got of being able to cover the market.

3      Now, I'm saying that if you look at the vast

4 majority of advertisers, the advertising budgets are such

5 that that's not going to happen, and it's not going to be      13:15:55

6 relevant for them.

7      So it's not that these numbers -- you know, it's

8 not -- I think the direct relationship you're suggesting,

9 that these numbers are small, therefore, they're

10 irrelevant.      13:16:08

11      Instead, advertisers' budgets are so small that

12 this kind of behavior you're suggesting just doesn't make

13 sense. That's the point I'm making.

14      And I should say advertisers' budgets relative

15 to potential reach.      13:16:23

16      Q. BY MR. GRABER: So these numbers would not be

17 useful to look at unless you had a budget sufficient to

18 cover the entire audience reflected in potential reach?

19      MR. ACOTT: Object to the form.

20      THE WITNESS: So I don't think that these      13:16:48

21 numbers are useful to look at, just as a first matter,

22 because there are so many more relevant ways to do it.

23      You asked me if there was any plausible context

24 in which an advertiser could potentially look at the

25 percentage of actual reach to potential reach.      13:17:05

Page 76

1      I was saying, well, you know, it's a hard

2 hypothetical to think about. But the only way I could

3 think of an advertiser ever having any motivation to do

4 that could be if they had a large advertising budget and

5 they were interested to see: Well, we've reached so many      13:17:29

6 people, how are we doing? Something like that.

7      But that's a, sort of, very unique and

8 specialized type of advertiser. And my point was that,

9 you know, if you look at Exhibit 7, the class is not

10 anywhere close to that.      13:17:48

11      Q. BY MR. GRABER: How do you know that advertisers

12 don't use potential reach after running their campaigns

13 to determine the reach percentage out of the total

14 audience?

15      A. Well, to establish that -- you know, sounds --      13:18:19

16 you know, first of all -- well, first of all, I was just

17 saying as to someone who studies digital advertising,

18 it's just incredibly implausible behavior. The idea that

19 you would be tracking this metric, which is not

20 automatically provided to you somewhere else and knowing      13:18:50

21 all the metrics provided by the dashboard, it's just

22 implausible.

23      Now you're saying to me, how do I know that no

24 one does something implausible? Well, I'm not aware of

25 any survey evidence introduced by plaintiffs to suggest      13:19:09

Page 77

1 that this is widespread behavior.

2      And -- and the evidence we do have from the

3 named plaintiffs I think makes it clear how this type of

4 behavior just doesn't make sense for the majority of

5 advertisers.      13:19:32

6      Q. You mentioned surveys. Let's talk about that.

7      Dr. Tucker, have you ever published an article

8 regarding conjoint surveys?

9      A. No. No, I haven't -- I haven't published a

10 conjoint survey article. But, of course, I teach them.      13:20:19

11      Q. And you're not a specialist in conjoint; right?

12      MR. ACOTT: Objection to form.

13      THE WITNESS: So I am someone who teaches

14 conjoint, thinks hard about its potential flaws, how to

15 use it well. So I would say I am a specialist in terms      13:20:44

16 of thinking about conjoints and how to apply them.

17      Now, you know, I don't want to back away from

18 their expertise because certainly, you know, it's

19 expertise which has been gained over running many

20 conjoint surveys myself and teaching many students over      13:21:05

21 time how to use this tool.

22      Q. BY MR. GRABER: Has anyone ever paid you to

23 conduct a conjoint survey?

24      MR. ACOTT: Object to the form.

25      THE WITNESS: Candidly, many of my students have      13:21:28

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

1 asked me to and I've refused because I don't want that
2 conflict of interest.
3    Q.  BY MR. GRABER:  So other than your students
4 who've asked you, has anyone ever -- set aside what your
5 students have asked you to do.  Has anyone ever paid you    13:21:43
6 to conduct a conjoint survey?
7    MR. ACOTT:  Same objection.
8    THE WITNESS:  So no one has paid me.  I have
9 received offers to do a conjoint survey in an area where
10 it was inappropriate and I said no.    13:21:58
11    Q.  BY MR. GRABER:  Have you ever given any
12 presentations at any conferences specifically regarding
13 conjoint surveys?
14    A.  I'm trying to think.  Not that I recall.  I
15 mean, obviously many of the conferences I attend present    13:22:42
16 conjoint studies.  And I'm trying to recall if I've ever
17 asked to be -- you know, given a discussion or so on.
18    I've certainly sat on panels, but nothing -- I
19 have never presented a conjoint survey myself at a
20 conference.    13:22:58
21    Q.  And you said you teach conjoint; right?
22    A.  That's right.
23    Q.  Okay.  Is that the basis for your -- you contend
24 you're an expert in conjoint; is that right?
25    MR. ACOTT:  Object to the form.    13:23:16

1    THE WITNESS:  So I have a large degree of
2 expertise in conjoint.  I -- you know, and I would hold
3 myself up as someone very well placed to think about it
4 as a methodology.
5    Q.  BY MR. GRABER:  You would be comfortable    13:23:37
6 designing your own survey and offering that as an expert
7 witness if it was a subject matter appropriate for
8 conjoint?
9    A.  Yes.  But I'm glad you added the caveat that it
10 would have to be a subject matter appropriate for    13:23:52
11 conjoint.
12    Q.  Is the basis for your assertion that you have
13 expertise in conjoint the fact that you teach conjoint at
14 MIT?
15    A.  It is both that I teach conjoint at MIT and I    13:24:10
16 have helped implement conjoints as part of my general
17 mentorship activities.
18    Q.  What firms have you -- okay.  What mentorship
19 activities are you talking about?
20    A.  So I teach many senior executives at MIT.  Often    13:24:34
21 conjoint is a tool that they are excited about.  They
22 want to deploy it in their companies, and I help them --
23 you know, because it's so easy to get a conjoint wrong or
24 to make it misleading, I honestly help them set it up so
25 it's less confusing and it's more likely to produce    13:25:05

1 reliable results.
2    Q.  And you're talking about the executives that you
3 teach through the executive program at MIT; right?
4    A.  That is correct.
5    Q.  Right.    13:25:20
6    And that's a two-day program; right?
7    A.  Oh, no.  No.  Sorry.  I misunderstood you.
8    So we have an executive MBA, and those are the
9 executives I'm thinking about.  Because as part of their
10 class project, often they attempt conjoints.    13:25:38
11    And then, you know, some of them have used
12 conjoints to make hundreds of thousands of dollars for
13 their companies.  So, I mean, there's been some really
14 good results.
15    But, no, it's that.  It's not the two-day    13:25:50
16 program.  I wouldn't try and teach the conjoint there.  I
17 just mean I wouldn't teach it because it's, you know,
18 such an in-depth subject, and I have to cover a lot of
19 material at a high level for executives in that two-day
20 program.    13:26:10
21    Q.  You teach conjoint in your pricing class; is
22 that right?
23    A.  Yes, I do.
24    Q.  That's where you teach it; right?
25    A.  No, that's not so.  To be clear, I teach it in    13:26:24

1 my pricing class, 15818; my executive pricing class,
2 15726; and then my general management class, which is
3 15732.
4    Q.  Let me see if I got it right.
5    So you teach it in your pricing class, 15818?    13:26:54
6    A.  That's right.
7    Q.  And then you teach it in your executive pricing
8 class, 15726; correct?
9    A.  That's correct.
10    Q.  And your general management class at 15732?    13:27:11
11    A.  That's correct.
12    Q.  Okay.  And in each of these classes, you cover
13 conjoint in a substantive fashion; right?
14    A.  Yes.
15    Q.  Okay.    13:27:27
16    A.  I mean, there's no point in teaching conjoint if
17 you don't get into the substance about how to practically
18 execute and do analytics.
19    Q.  Okay.  Do you teach it kind of the same way in
20 each of these classes?    13:27:43
21    MR. ACOTT:  Object to the form.
22    THE WITNESS:  No.
23    Q.  BY MR. GRABER:  Okay.  How is it different?
24    A.  Well, in pricing, we think about how to use
25 conjoint to both price a particular feature of a new    13:28:01

21 (Pages 78 - 81)

Page 82

1  product and also to potentially identify a useful
2  segmentation feature for purposes of price segmentation.
3      Q.  Okay.  That's in your pricing class.  How about
4  in the -- there's the general management class; right?
5  And then -- well, I'm getting the numbers mixed up.  I          13:28:30
6  apologize, Dr. Tucker.
7      A.  So that is the 15732 class.
8      Q.  Yes.
9      A.  And there I am teaching about how to use
10  conjoint to evaluate the fit of a product and set of          13:28:42
11  features with different segments of the population.
12      Q.  And then in 15726 -- which class is that?
13      A.  That is the price -- executive pricing class.
14  And because it's more compressed, it's the same material
15  but I speak faster.                                             13:29:13
16      Q.  Okay.
17      A.  It's the same material as the full-time MBA
18  class, that is.
19      Q.  Do you cover conjoint more quickly in one of
20  these classes -- strike that.                                   13:29:32
21          Do you cover conjoint at, sort of, just the
22  higher, more superficial level in one of these classes
23  versus the others, or do you go into, like, equal amounts
24  of depth in all of these classes?
25      MR. ACOTT:  Object to the form.                            13:29:52

Page 83

1      THE WITNESS:  So I think in all cases I talk
2  about:  Well, why would you use a conjoint?  I then --
3  then typically what I've done is I've worked with a young
4  firm in start-up who once helped to set up a conjoint for
5  them.                                                           13:30:14
6          I have the students beforehand take the
7  conjoint.  I then demonstrate how I set up that conjoint.
8  And sometimes I just do an ad hoc one in class to show
9  how you would use a tool like Sawtooth to set one up.
10          And then I get the students -- I take the              13:30:33
11  students through a:  What do these numbers mean?  How do
12  you think about them?  How are they produced?
13          And then I get the students to use their own
14  conjoint survey to then think, "Well, what would I do?"
15  And that's the case in both classes.                           13:30:50
16          But, of course, in pricing there's more of an
17  emphasis on using the utility values that come out of a
18  conjoint to convert them to an actual price.  Whereas in
19  the general marketing course, we're taking more of a
20  perspective of:  What should the product look like for       13:31:12
21  that second?
22      Q.  BY MR. GRABER:  You go into -- is it fair to say
23  that in all three of these classes, you go into equal
24  amounts of depth regarding conjoint but maybe just cover
25  different aspects of conjoint?                                13:31:33

Page 84

1      MR. ACOTT:  Object to the form.
2      THE WITNESS:  Are you asking me to
3  self-criticize as a teacher here?  I -- you know, it's
4  because the MBAs -- because I designed the pricing module
5  for the MBAs, I think there's more of me talking, quite       13:31:56
6  honestly, in that class.
7      MR. GRABER:  Yeah --
8      THE WITNESS:  Whereas in the executive MBA
9  class, I actually encourage them more to share their
10  experiences of using conjoint and how it's being useful.     13:32:11
11  What are the flaws they see?  How can it go wrong?  And
12  so I'm more encouraging a conversation around the actual
13  practical use of conjoint at the firms.
14          Now, I'm not -- it's different.  I'm not sure
15  which one you would consider deeper.                          13:32:28
16      Q.  BY MR. GRABER:  Yeah, I think we're talking past
17  each other.  I'm not trying to criticize your teaching or
18  how you select -- how you decide to teach conjoint in one
19  class versus another.  What I'm really getting at here,
20  Dr. Tucker, is I'm trying to get a sense of whether --       13:32:44
21  let me back up.
22          You testified that you offer three different
23  classes in which you teach conjoint; is that right?
24      A.  Yes.
25      Q.  Okay.  What I'm trying to understand,               13:33:00

Page 85

1  Dr. Tucker, is whether you cover conjoint a lot in one
2  class and only a little bit in others or whether you
3  basically cover conjoint to the same extent in all three
4  of the classes.  Does that make sense?
5      A.  Yes, it does.                                          13:33:19
6      Q.  Okay.
7      A.  And I have a way of actually distinguishing, I
8  think, which is less about my teaching.
9      Q.  Okay.
10      A.  In the pricing class, I get the students to do       13:33:30
11  an explicit homework on conjoint, and I explicitly
12  encourage them to design conjoints as part of their end
13  project.
14          For the marketing management class, I say
15  there's no homework on conjoint, and I say if you want to   13:33:48
16  do a conjoint, they're really tricky to do, we're going
17  to have office hours together, and I'm going to have to
18  help you.
19          And so if you take an outcomes-orientated
20  approach, the marking management class is designed to        13:34:07
21  allow my senior management students to be expert
22  consumers of conjoint and to understand what the numbers
23  mean and to ask the right questions.  And of course I
24  will train them to do a conjoint.  But, honestly, they're
25  making -- sorry, I shouldn't say this.  They're very        13:34:25

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1 highly compensated individuals who are unlikely to be
2 running their own conjoint.
3        My pricing students on the other hand, my aim is
4 that they can run a conjoint at the end of the class, do
5 the analytics, work out how to use it. I think that's a        13:34:39
6 better way of sort of saying, you know, which one is
7 deeper.
8     Q. Okay. It sounds like you cover conjoint to the
9 same extent in all of these classes but maybe in
10 different ways?        13:35:00
11        MR. ACOTT: Object to the form.
12     Q. BY MR. GRABER: How about I ask it this way: Do
13 you spend more time in -- in pricing on conjoint than you
14 do in the other two classes?
15     A. So in the two pricing classes, I expect students        13:35:19
16 to spend more time on conjoint.
17        The reason I'm hesitating about the timing is
18 that in unpandemic years, I would probably spend longer
19 talking about conjoint in the pricing class. But this
20 year, because we were remote, I made a lot of -- I was        13:35:52
21 like, you know, trying to do it all online, engaging, all
22 of these things. So I think it shifted a bit. And I
23 think probably this time we spent more on class time in
24 the management class, but that's not typical.
25        So if you're looking for time, generally more        13:36:13

Page 87

1 time in pricing and certainly more time expected of the
2 students in non-pandemic times.
3     Q. How long have you taught this pricing class?
4     A. Since 2005.
5     Q. And you've always covered conjoint in these        13:36:32
6 classes?
7     A. So, yes, I've always covered conjoint. I think
8 it's fair to say in the last decade I've been able to
9 cover it in more depth. Because pre-2010, it was just a
10 very expensive tool which wasn't -- they weren't really        13:36:55
11 tools for doing an accessible way for a student.
12        But since then, there's been an advent of easily
13 accessible cloud-based tools which allow any student to
14 do a conjoint. And so that allows me to cover it in more
15 depth.        13:37:15
16        So I think previously, prior to those
17 cloud-based tools, you know, I was more covering it in a
18 theoretical level, like you employ an expensive firm to
19 do a conjoint for you. Now I can teach students how to
20 do it themselves.        13:37:31
21     Q. When did you start teaching how to do it?
22     A. So in all cases I've taught how to do it, sort
23 of in guiding people. But actually having a cloud-based
24 tool to allow the students to do it in real time and me
25 to set it up real time -- oh, I don't actually know.        13:37:49

Page 88

1 It's been many years. I know it's been many, many years
2 for many reasons.
3        I'm just conscious of the fact that there was
4 this brilliant switch as a teacher from me having to say,
5 "This is what a conjoint looks like, this is what the        13:38:09
6 data looks like," to being actually able to teach in real
7 time how to do a conjoint and how conjoint data is
8 produced.
9     Q. Do you remember when you started teaching it in
10 real time?        13:38:25
11     A. I'm really sorry, I don't.
12        I'm trying to think. So, look, it -- I know
13 it -- the reason -- I know it's at least ten years. And
14 the reason I know it's at least ten years is that I
15 remember I had -- you know, an example, and I remember        13:38:53
16 being a junior female professor, and then one of my
17 students said something completely inappropriate, and I
18 just remember that feeling. And that was in real time.
19 And I know I was untenured, and I knew I felt vulnerable,
20 and I didn't know what to do.        13:39:20
21        So it was certainly, I think, before 2012, when
22 I was tenured, but I can't pinpoint it. That's my
23 memory, if you see what I mean. I can't do it any better
24 than to say it was when I was untenured.
25        MR. ACOTT: Geoff, we've been going for a little        13:39:35

Page 89

1 over an hour. Whenever you get to a good stopping point,
2 maybe we can take a break.
3        MR. GRABER: Sure. Yeah, I think we're wrapped
4 up on this one. Yeah, let's go off the record.
5        THE VIDEOGRAPHER: We are now going off the        13:39:48
6 record. The time is 1:40 p.m. Eastern Daylight Time.
7        (Recess.)
8        THE VIDEOGRAPHER: We are now back on the
9 record. The time is 2:18 p.m. Eastern Daylight Time.
10     Q. BY MR. GRABER: Welcome back, Dr. Tucker.        14:18:19
11        So let me ask you a few more questions about the
12 conjoint issue and your history of teaching that. Let's
13 bring up the next document.
14        MR. GRABER: So, Shireen, this is Document 2. I
15 guess this will be Exhibit 345.        14:18:44
16        (Exhibit 345, Screenshots, MIT Course Number
17        15.818, marked for identification electronically
18        by counsel.)
19        MR. GRABER: One second. Okay. I think it's on
20 there now.        14:18:59
21     Q. Do you see the document that's been marked as
22 Exhibit 345?
23     A. I see it. I'm just trying to open it.
24     Q. Are you not able to pull it up?
25     A. So, yes, I can see the document. I'm having --        14:19:47

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1 I got a scary out of memory warning, so I'm just warning
2 you about that, but I can see it.
3    Q. Okay. This document should be three pages. Is
4 that what you're seeing?
5    A. Yes, I am.                              14:20:01
6    Q. Okay. Does the first page appear to be the
7 first homepage for your pricing class as taught in spring
8 2010?
9    A. Yes.
10    Q. And the second page is the calendar.        14:20:21
11       Do you see that?
12    A. That is correct.
13    Q. And the third page reflects lecture notes for
14 these -- for this class; right?
15    A. That's right.                            14:20:35
16    Q. Okay. Does this class generally remain the same
17 over the years that you've taught it?
18    A. Oh, no.
19       MR. ACOTT: Object to the form.
20    Q. BY MR. GRABER: Okay. How has it changed?    14:20:45
21    A. Oh, I would say -- so this is -- this class is
22 my -- I'm very passionate about this class. I update it
23 every year. This is a very early iteration of the class.
24    Q. Okay. And let's go to Document 3.
25       (Exhibit 346, Measuring Customer Reactions to    14:21:15

Page 91

1       Prices, lecture notes, marked for identification
2       electronically by counsel.)
3    Q. BY MR. GRABER: Have you been able to pull up
4 the next document? It should be marked as Exhibit 346.
5    A. Let me bring that up.                     14:21:52
6    Q. Okay.
7    A. I'm afraid I do not yet see it, but I'm keeping
8 on refreshing.
9       Sorry. It's just not refreshing yet.
10    Q. I think it's just come up for me.         14:22:17
11    A. Oh, there we are.
12    Q. All right. Are you able to see the document
13 that's been marked as Exhibit 346?
14    A. Yes.
15    Q. Do these appear to be lecture notes by you?   14:22:32
16    A. Yes.
17    Q. And these are lecture notes for one of the
18 classes that was taught in 2010; right?
19    A. So these are the lecture notes from 2010 of the
20 lecture entitled "Measuring Customer Reactions to    14:23:04
21 Prices."
22    Q. Just one second.
23       And if you could go -- I'm sorry. If you could
24 go back to Exhibit 345 for a moment, Dr. Tucker.
25    A. Yes.                                     14:23:39

Page 92

1    Q. And if you go to the second page.
2    A. Yes.
3    Q. Do you see the calendar?
4    A. Yes.
5    Q. And you see under session 5 it says, "Measuring    14:23:48
6 Customer Responses to Prices."
7       Do you see that?
8    A. That's right.
9    Q. So these lecture notes correspond to session 5
10 of your class; right?                          14:23:58
11       MR. ACOTT: Object to the form.
12       THE WITNESS: Well, let's be clear. They
13 correspond to a lecture I gave back in 2010, yes, so they
14 certainly don't correlate to any recent iterations of the
15 class, but they do correlate to the structure of the    14:24:17
16 class as it existed in 2010.
17    Q. BY MR. GRABER: Okay.
18       Okay. So let's go to exhibit -- back to
19 Exhibit 346.
20       Do you see the reference to conjoint on the    14:24:44
21 first page?
22    A. Yes.
23    Q. And this reflects what you taught the class
24 about conjoint; right?
25       MR. ACOTT: Object to the form.            14:25:03

Page 93

1       THE WITNESS: So these are just the lecture
2 notes from the class in 2010. They certainly don't
3 reflect what I teach the class now about conjoint, and
4 they -- you know, I think if you were to go to them,
5 they -- the lecture notes themselves contain some -- I    14:25:22
6 guess some cliff notes about some of the things to be
7 weary about in terms of doing a conjoint, but, you know,
8 as I say, these are quite outdated materials. Very
9 outdated materials.
10    Q. BY MR. GRABER: Sure. These lecture notes run    14:25:45
11 nine pages; correct?
12    A. Yeah. The lecture notes run nine pages, because
13 as you can see, the majority of the material is
14 devoted -- well, the majority of the lecture notes are
15 actually reminding my students how to calculate the price    14:26:05
16 elasticity. So the bulk of the lecture notes are a
17 prompt on that, so that's certainly true.
18       You know, but, again, I would just say this
19 doesn't represent anything like any current version of
20 the class or what I actually teach in the class. These    14:26:25
21 are just lecture notes, cliff notes for the students to
22 remember.
23    Q. If you go to page 4, do you see where it says,
24 "Improving surveys by using conjoint analysis"?
25    A. Yes.                                     14:26:38

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

1 Q. And the section on conjoint runs from the bottom
2 of page 4 to the top of page 5; right?
3 A. So the section of these lecture notes dating
4 from an outdated version of the class in 2010, the cliff
5 notes for conjoint are focused on some of the advantages     14:26:52
6 and disadvantages of conjoint, and the bulk of the
7 lecture notes are devoted to the question of how to
8 appropriately calculate the price elasticity.
9 Q. Most of this lecture doesn't deal with conjoint;
10 correct? Is that fair?     14:27:11
11     MR. ACOTT: Object to the form.
12     THE WITNESS: No, that's not correct, because
13 you're now talking about a lecture as opposed to lecture
14 notes. The majority of the lecture notes are devoted to
15 the question of how to calculate a price elasticity.     14:27:23
16 These lecture notes have some cliff notes about conjoint.
17     But, again, I want to be clear. This is not
18 representative of whatever the lecture was like in 2010,
19 because lecture notes are not intended to do that, and
20 they're also certainly not representative of any of the     14:27:47
21 more recent iterations of the class.
22 Q. BY MR. GRABER: Most of the lecture notes are
23 not devoted to conjoint; is that right?
24     MR. ACOTT: Object to the form.
25     THE WITNESS: So as I said before, in the early     14:28:04

Page 95

1 years of the pricing class, I taught a far more
2 traditional version of pricing where we had a lot of --
3 you see cases. You see a far more traditional MBA course
4 structure. These lecture notes you found on the internet
5 reflect that older structure. Since these lecture notes     14:28:26
6 were shared to the world by MIT, I have spent many years
7 updating these lectures to be contemporary and really
8 focused on training my students how to practically do
9 pricing analytics.
10     All I just want to say is that these lecture     14:28:47
11 notes -- you know, we can point to them. They're not
12 representative of the lecture, and they're certainly not
13 representative of what I teach or what I taught, you
14 know, over the course of many years.
15 Q. BY MR. GRABER: Are you saying that you cover     14:29:00
16 conjoint in far more depth now than you did in 2010 in
17 your pricing class?
18     MR. ACOTT: Object to the form.
19     THE WITNESS: Yes. I thought I'd already said
20 that, and if it's not clear, yes, definitively.     14:29:14
21 Q. BY MR. GRABER: Okay. And did that greater
22 focus on conjoint start shortly after 2010?
23 A. So -- now, looking at the -- if you look at the
24 structure of this class or the lecture as it was in 2010,
25 as I say, it's still got a lot of cases in the class.     14:29:45

Page 96

1 Obviously, we've moved to a world of analytics and away
2 from cases. I certainly know that before 2012, because
3 of my memory of this unfortunate incident with a male
4 student saying something very inappropriate in class,
5 that I was definitely demonstrating conjoint and conjoint     14:30:03
6 estimates in class prior to 2012.
7     I can't tell you, though, if I was making that
8 demonstration in 2010 on the basis of those lecture
9 notes. What I do know now is that if you were to sit in
10 on most -- on, oh, iterations of my class for now many     14:30:23
11 years, there is a lot of material devoted to the question
12 of how actually to conduct a conjoint, a demonstration of
13 conjoint, an analysis of conjoint data, all of which,
14 that I think looking at the lecture notes, you wouldn't
15 get.     14:30:45
16 Q. Well, how many years back has it been that
17 you've started going into more depth regarding conjoint
18 in your pricing class?
19     MR. ACOTT: Object to the form.
20     THE WITNESS: So as I say, I can't say that in     14:30:58
21 2010 -- I'm not sure how much depth I was going into on
22 the basis of these lecture notes, but what is clear is
23 that I was devoting one lecture towards analytical
24 methods. Now, that has changed, and, of course, I'm now
25 devoting much more time to analytic methods.     14:31:18

Page 97

1     Now, in terms of the shift to demonstrating and
2 analyzing conjoint data in class, I certainly know I was
3 doing it before tenure. Whether that was really the 2011
4 iteration or the 2012 iteration of the class, I'm not
5 sure. I just know that it was before tenure.     14:31:42
6 Q. BY MR. GRABER: Okay. I'm sorry, Dr. Tucker. I
7 just want to make sure I understand, so you're saying
8 sometime before you obtained tenure, you began teaching
9 conjoint in greater depth; is that right?
10     MR. ACOTT: Object to the form.     14:32:02
11     THE WITNESS: So sometime before -- so you
12 know, first of all, let's be clear, this is an iterative
13 process. Every year my class, I like to think, has
14 improved, become more analytical and all of these things.
15     Now, you've presented lecture notes from a     14:32:21
16 lecture I gave 11 years ago. I'm not sure what I
17 actually did in class in these -- 11 years ago in terms
18 of devoting of time. You know, certainly when I review
19 the lecture notes, it does not surprise me that I devote
20 a lot of space in them to the question of elasticities,     14:32:44
21 because that's obviously an important driver of how to do
22 pricing.
23     Now -- so every -- so if you think about the
24 incremental improvements and how I started to teach
25 pricing -- started to teach conjoint in pricing, you     14:33:03

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1 know, we started off using a tool -- one of the first
2 cloud-based tools, and that had some advantages and
3 disadvantages.
4       I would actually say on the whole it was
5 inferior to the tool that I'm using now.  I remember          14:33:20
6 demonstrating this tool and having students discuss it
7 prior to tenure, because as I say, this male student made
8 an inappropriate comment during the time I was presenting
9 the results, and I wish I could go back in time and have
10 handled that inappropriate comment differently.             14:33:40
11      Since then, tools have been introduced which
12 allow more of a cloud-based discussion, such as discovery
13 sawtooth, and I have been demonstrating that tool in
14 class, how to use it, how to interpret all the numbers
15 that come out of it, and, you know, that's been a          14:34:01
16 constant iteration improvement over the last 11 years.
17      Q.  BY MR. GRABER:  Did you ever come to a period of
18 time where you spent more than one session of your class
19 on conjoint?
20          MR. ACOTT:  Object to the form.              14:34:23
21          THE WITNESS:  So currently I use two sessions
22 for my class devoted to conjoint.  Or rather, to be
23 clear, there is one class where I discuss what a monadic
24 survey is and then how it could be -- then I go to
25 conjoint and explain what a conjoint can do, and then     14:34:45

Page 99

1 separately I then go on in a different class to talk
2 about how to use conjoint to do ideal forms of price
3 segmentation.
4       Q.  BY MR. GRABER:  When did you start devoting two
5 classes to conjoint?                                        14:35:08
6           MR. ACOTT:  Object to the form.
7           THE WITNESS:  Well, I should be clear that it
8 was around about -- I can't remember if it was 2013 or
9 2014.  No, it wasn't 2014.  I taught a 24-session version
10 of this class, and at that point, certainly the amount of  14:35:37
11 conjoint shifted.  I then started teaching a 12-unit --
12 sort of 12-session version of this class, and at that
13 point it would be when I started teaching the two
14 sessions devoted to conjoint.  So that would be at least
15 six years ago, by my rough math.                           14:36:07
16      Q.  BY MR. GRABER:  Okay.  Let's take a look at a
17 2014 version of your pricing class, if we could pull that
18 up.
19          (Exhibit 347, MIT Sloan School of Management
20          15:818 Pricing, marked for identification     14:36:36
21          electronically by counsel.)
22      Q.  BY MR. GRABER:  So we should be pulling up a new
23 document now.
24      Okay.  So I believe Exhibit 347 has been pulled
25 up.                                                         14:37:03

Page 100

1      A.  I'm just bringing it up.
2      And I -- here we are.  It's just coming up.
3      Yes.
4      Q.  Does this appear to be a syllabus for your
5 pricing class?                                              14:37:34
6      A.  Yes, it does.
7      Q.  And if you go to page 3, do you see "Class
8 Schedule"?
9      A.  That is correct.
10     Q.  And do you see session 6, "Pre-launch Pricing      14:37:52
11 Data"?
12     Do you see that?
13     A.  Yes.
14     Q.  And it says, "Monadic surveys; conjoint."
15     Do you see that?                                        14:38:05
16     A.  Yes.  I think I just described that session.
17     Q.  It doesn't refer to conjoint anywhere else in
18 this, does it?
19     A.  So it doesn't refer to conjoint, but you asked
20 me if I -- that's because it's taking place in what is      14:38:16
21 now session 9, the segmentation class, where I discuss
22 how to use conjoint for segmentation.  That was the other
23 class I referred to.
24     Q.  Great.  Okay.  Is this version of your class
25 similar to what you teach today?                            14:38:39

Page 101

1      A.  No.
2           MR. ACOTT:  Object to the form.
3      Q.  BY MR. GRABER:  No?
4      A.  So, no, this class is not similar.  Do you
5 remember I just said for one year I taught a 24-session    14:38:47
6 version of the class, and then I decided -- well, I don't
7 want to go into my decision making, but I've -- I teach
8 an awful lot relative to most MIT professors, and after a
9 discussion with the deans, it was decided that I would
10 teach -- they really wanted me to teach pricing, because   14:39:17
11 it's such a popular class, but we worked out a compromise
12 where I teach a 12-session version of this class.
13     And if you want to, sort of, think about what
14 the conceptual difference is, there's no Filepicker case
15 there's no current case, and, basically, a lot -- I mean,  14:39:35
16 I could tell you which ones still exist, but I think
17 probably which is what's more pertinent for your question
18 is it still has this -- within these 12 classes -- we've
19 got 12 classes.  One of them is still about monadics and
20 conjoints, and then the -- there is -- the segmentation    14:39:55
21 class, again, is devoted to the question of how to use
22 conjoint to do better product-based price segmentation.
23     Q.  BY MR. GRABER:  Thank you.  That's helpful,
24 Dr. Tucker.
25     Dr. Tucker, you don't have a computer science         14:40:22

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1  degree, do you?

2    A.  No, I don't have a computer science degree.

3    Q.  And are you proficient in writing computer code?

4    A.  Yes.

5    Q.  Okay.  What computer code are you proficient in?  14:40:40

6    A.  So as an economist -- well, you know, yeah, so I

7  am -- I'm very skilled at writing code, especially for

8  the kind of statistical econometric applications that

9  professors use, so that would be things like R, Stata,

10  that kind of coding.                    14:41:10

11    I can also read -- you know, I can read code,

12  because code is code.  I've certainly worked with another

13  coauthor with Java code.  I've worked with various

14  students who've been using Python, and I've read their

15  code, but would I ask -- is it efficient to ask me to  14:41:30

16  write Java code or Python code?  No.  I mean, I can look

17  at it, understand what it's trying to do, but I'm not --

18  you know, I wouldn't employ me to be a Python coder.  I

19  think better uses of my time is spent on the economics of

20  digitization.                        14:41:51

21    Q.  You haven't published anything on auction

22  theory; is that right?

23    MR. ACOTT:  Object to the form.

24    THE WITNESS:  I've certainly -- I have published

25  papers about outcomes related to the Facebook auction,  14:42:05

Page 103

1  but I have not written a purely theoretical paper on

2  auctions.  I am an empiricist, not a theorist.

3    Q.  BY MR. GRABER:  Have you ever had anything

4  published that dealt specifically with auctions of any

5  kind?                            14:42:32

6    A.  Yes.  That's what I just said.  I've had a paper

7  published looking at outcomes from the Facebook ad

8  auction.

9    Q.  Okay.  And what was the name of that

10  publication?                        14:42:45

11    A.  You can see it on my CV.  I'll just bring my CV

12  up.  I'm very sorry, but Exhibit Share is so slow for

13  some reason.

14    So if you have my CV up and you look at entry

15  number 37, "Algorithmic bias?  An Empirical Study into  14:43:13

16  Apparent Gender-Based Discrimination in the Display of

17  STEM Ads," that paper is devoted to understanding how the

18  cost of minimizing effects -- or the cost minimization

19  optimization teams of the Facebook auction lead to

20  certain outcomes.                    14:43:39

21    Q.  And that's Algorithmic Bias?

22    A.  Question mark, yes.

23    Q.  But you didn't study the actual calculations

24  that went into the Facebook auction in that report, did

25  you?                            14:44:26

Page 104

1    A.  Yes --

2    MR. ACOTT:  Object to the form.

3    THE WITNESS:  Well, yes.  We were studying a

4  particular aspect of -- we were studying what the ad

5  algorithm -- what the auction algorithm does when  14:44:37

6  advertisers don't specify a preference over gender, so we

7  were looking at that input into the Facebook ad auction

8  and the outcome, which resulted from a process of

9  crowding out from other bids in that auction.  So it was

10  really about how different bids interact during the  14:45:01

11  Facebook auction process.

12    Q.  BY MR. GRABER:  But you didn't actually analyze

13  the Facebook online auction system itself and how it

14  works; right?

15    MR. ACOTT:  Object to the form.        14:45:18

16    THE WITNESS:  That's precisely what the paper is

17  about.  It was about how some advertisers' bids into the

18  auction affects outcomes in a way which can lead to

19  situations where women see different types of ads from

20  men.                            14:45:43

21    Q.  BY MR. GRABER:  Did you have access to

22  Facebook's auction system and how the algorithm

23  calculates -- how the algorithm is executed within the

24  online auction system?

25    MR. ACOTT:  Object to the form.        14:45:58

Page 105

1    THE WITNESS:  So that's a good question.  So

2  what we did in that paper was we ran 190 different

3  campaigns on Facebook on behalf of a wonderful nonprofit

4  that was trying to promote careers in STEM, and then we

5  studied the outcomes of the auction.        14:46:16

6    Now, I just realized that if you're looking for

7  a paper which is even more about the auction system,

8  then -- I mean, that one's really about the auction

9  system, but you said which studies the mechanisms, and at

10  that point, I would point you to my paper on "Do Computer  14:46:37

11  Algorithms Prefer Headless Women," which is devoted to

12  the question of how the learning process within a

13  Facebook ad auction can lead strange pieces of content to

14  be prioritized, potentially.

15    Q.  BY MR. GRABER:  What's the name of that article?  14:47:04

16    A.  It is called "Do Computer Algorithms prefer

17  Headless Women?"

18    Q.  Well, let's stick with this article here.

19  You're referring to algorithmic bias; right?

20    A.  That's correct, yes.            14:47:23

21    Q.  Okay.  And just going back to my question:  You

22  didn't actually analyze the Facebook online auction

23  system itself and how it worked; right?

24    MR. ACOTT:  Object to the form.

25    THE WITNESS:  Well, that was the point of the  14:47:42

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1 paper. What we said is we documented this pattern where
2 women saw a different selection of ads from men, and then
3 we went back to the Facebook ad auction to try and back
4 out why it happened.
5    Q. BY MR. GRABER: Yeah, but the actual          14:48:03
6 calculations of the auction were unknown to you; right?
7    MR. ACOTT: Object to the form.
8    THE WITNESS: So at that time -- I'm trying to
9 remember if Facebook -- so at that time, we had
10 information on estimated bids in the auction, and we had   14:48:28
11 data on outcomes, and so that's what we were studying.
12    Now, of course, Facebook treats as -- and
13 appropriately treats as highly confidential questions of
14 precisely how it does its ad quality scoring, so, no, of
15 course we didn't have access to that, but certainly we    14:48:52
16 were studying outcomes from the auction system.
17    Q. BY MR. GRABER: Well, the auction system itself
18 and how it was calculated is a black box to you; right?
19    MR. ACOTT: Object to the form.
20    THE WITNESS: So the -- some parts of the        14:49:07
21 algorithm are intentionally not made public. As an
22 advertiser, you're told, for example, that you need to
23 have highly relevant ads, that they shouldn't be spammy,
24 and all these things. Now, you're not told exactly how
25 the algorithm's going to analyze your ads and make that   14:49:34

Page 107

1 decision, because Facebook wants to prevent gamesmanship
2 so, no, we didn't have access to, say, the precise way
3 that ad quality scores were calculated, for example, but
4 what we did have was we did have our own bidding data and
5 bidding data based on typical advertising behavior in    14:49:53
6 that auction.
7    Q. BY MR. GRABER: But you didn't have the actual
8 calculation, for example, of the quality score and the
9 bids of other advertisers that the advertising auction
10 algorithm used; right?                           14:50:11
11    MR. ACOTT: Object to the form.
12    THE WITNESS: So I did not have access to
13 underlying Facebook code uploading the algorithm, and
14 what I was able to observe in that paper was the outcomes
15 of the code, and in doing so, of course, it involved a    14:50:29
16 lot of study of what actually was going in to what you
17 refer to as the black box.
18    Q. BY MR. GRABER: Have you ever designed a --
19 well, what kind of auction does -- does Facebook use?
20    MR. ACOTT: Object to the form.                14:50:56
21    THE WITNESS: So Facebook uses, you know, a
22 special -- you know, so it's improving over time, and I
23 want to say that it's highly specialized, but it's what
24 is commonly known as a generalized second price auction,
25 which allows the auctioneer to auction off multiple     14:51:23

Page 108

1 grids. It's named traditionally -- I hope I get it
2 right -- the VCG auction. It's certainly somewhere in
3 your expert reports, but think of it as a generalized
4 second price auction, which allows advertisers to bid in
5 different slots.                                 14:51:51
6    Q. BY MR. GRABER: Have you ever written code to
7 design an auction simulation?
8    MR. ACOTT: Object to the form.
9    THE WITNESS: Sorry. I'm just trying to -- I
10 can't recall doing so. I'm only hesitating because, you   14:52:37
11 know, I have at the top of my mind, of course, my
12 published papers. I don't -- you know, there's always a
13 potential that there's a -- you know, a long-neglected
14 project that I've forgotten about, but I think you can
15 say that in none of my published papers have I written an  14:53:02
16 auction simulation, because, you know, ultimately, I'm an
17 empiricist. I like to study exactly how things behave
18 and looked at observed outcomes.
19    Q. BY MR. GRABER: So you have never written code
20 to develop an auction simulation; right?         14:53:27
21    MR. ACOTT: Same objection.
22    THE WITNESS: So the answer would be: To the
23 best of my knowledge, I have never written that code,
24 because I'm an empiricist, and it sounds like you're
25 asking about a purely theoretical simulation exercise,   14:53:54

Page 109

1 and I certainly haven't done that. My only hesitation is
2 if back in the past there's some forgotten structural
3 modeling project which I've forgotten about, but I
4 certainly haven't published any -- any theoretical
5 simulation of auctions.                          14:54:13
6    Q. BY MR. GRABER: You don't teach any classes
7 specifically on auction theory; right?
8    A. So, no. I mean, obviously, like every
9 economist, it was a mainstay of my graduate Ph.D.
10 education, thinking about auction theory, and I was lucky  14:54:38
11 to have Susan Athey, who's one of the foremost auction
12 economists in the world as my advisor, but, no, I haven't
13 personally taught action theory in the classroom, to the
14 best of my recollection.
15    Q. Well, Dr. Tucker, you've testified several times   14:54:59
16 for Facebook; right?
17    MR. ACOTT: Objection to form.
18    THE WITNESS: So I have been asked by Facebook
19 to offer an expert opinion in several matters, yes.
20    Q. BY MR. GRABER: This is the fifth lawsuit in   14:55:17
21 which you've offered an opinion on behalf of Facebook; is
22 that right?
23    MR. ACOTT: Object to the form.
24    THE WITNESS: Yes, that sounds right.
25    Q. BY MR. GRABER: Now, you testified on behalf of   14:55:37

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1 Facebook in a case entitled Campbell versus Facebook; is
2 that right?
3         MR. ACOTT:  Object to the form.
4         THE WITNESS:  So, again, I was offered to -- I
5 was offered -- I was asked to offer an expert opinion in        14:55:53
6 the Campbell matter, yes, by Facebook.
7         Q.  BY MR. GRABER:  And you were asked to testify in
8 the Atkins versus Facebook case; right?
9         A.  Yes.  That's right --
10         MR. ACOTT:  Object to the form.        14:56:07
11         THE WITNESS:  -- by Facebook.
12         Q.  BY MR. GRABER:  And you were asked to testify on
13 behalf of Facebook in a case titled Fraley versus
14 Facebook; is that right?
15         MR. ACOTT:  Object to the form.        14:56:17
16         THE WITNESS:  Yes.  And I should just clarify,
17 I -- in each case, where you say testified on behalf of,
18 I was asked by Facebook to offer an opinion -- expert
19 opinion, and, yes, Facebook asked me to offer an expert
20 opinion in the Fraley case.        14:56:34
21         Q.  BY MR. GRABER:  And Facebook asked you to offer
22 an expert opinion in the Integrity Messages case; right?
23         MR. ACOTT:  Object to the form.
24         THE WITNESS:  So, yes, I was asked for an expert
25 opinion.  I think it was called Integrity Message Boards        14:56:49

Page 111

1 case.
2         Q.  BY MR. GRABER:  Thank you.
3         Let's walk through each of these.  Dr. Tucker,
4 how much money did you earn in total on the Campbell
5 matter?        14:57:11
6         MR. ACOTT:  Object to the form.
7         THE WITNESS:  Gosh, that's going back a bit.  I
8 would estimate -- and this is very much an estimate --
9 that I usually spend about 100 hours on a case, and given
10 my billing rate, it would probably be around $100,000,        14:57:34
11 but I couldn't say precisely.
12         Q.  BY MR. GRABER:  Did you do that work in
13 affiliation with the Analysis Group?
14         MR. ACOTT:  Object to the form.
15         THE WITNESS:  So for the Campbell matter, my        14:57:54
16 memory is that I had a support team at the Analysis Group
17 for that matter.
18         Q.  BY MR. GRABER:  And part of your compensation is
19 based on the hours billed by your support team; right?
20         MR. ACOTT:  Object to the form.        14:58:11
21         THE WITNESS:  So I receive a proportion of
22 Analysis Group's billings in a matter where they're my
23 support team.
24         Q.  BY MR. GRABER:  Did you have a support team in
25 Campbell?        14:58:34

Page 112

1         A.  So in Campbell --
2         MR. ACOTT:  Object to the form.
3         THE WITNESS:  -- I had a support team from AG.
4         In Fraley, I didn't have a support team, and I
5 think for the cases after Campbell, I would have had a        14:58:46
6 support team from Analysis Group.
7         Q.  BY MR. GRABER:  Staying with the Campbell case,
8 how much money did you earn from the hours
9 billed by your support team?
10         MR. ACOTT:  Object to the form.        14:59:02
11         THE WITNESS:  I'm really sorry.  I couldn't tell
12 you.
13         Q.  BY MR. GRABER:  Would you say it's over 50,000?
14         A.  I just don't know.  I mean, it would be in the
15 tens of thousands probably, but I don't know.  I really        14:59:17
16 just don't know.
17         Q.  Let's talk about the Fraley case.  How much
18 money did you earn in total on the Fraley case?
19         MR. ACOTT:  Object to the form.
20         THE WITNESS:  So in the Fraley case I, again,        14:59:44
21 would have billed around 100 hours, and given my billing
22 rate, that would be around $100,000.
23         Q.  BY MR. GRABER:  And you had no support team on
24 Fraley; right?
25         A.  No, I didn't.        15:00:00

Page 113

1         Q.  Okay.  How about the Atkins case?  How much
2 money did you earn in total on the Atkins case?
3         MR. ACOTT:  Object to the form.
4         THE WITNESS:  I'm really sorry.  My estimate's
5 going to be exactly the same.  You know, typically I        15:00:19
6 spend about 100 hours on a case.  That's obviously an
7 estimate.  Times it by my billing rate, and then I just
8 have no idea at this distance how much money I may have
9 got as a proportion of AG's billing, so I just wouldn't
10 know beyond saying I would have billed directly around        15:00:38
11 $100,000.
12         Q.  BY MR. GRABER:  You have no memory at all of how
13 much money you earned through your support staff on the
14 Atkins case?
15         MR. ACOTT:  Object to the form.        15:00:51
16         THE WITNESS:  I'm really sorry.  I couldn't tell
17 you, no.
18         Q.  BY MR. GRABER:  You worked on that case less
19 than two years ago; right?
20         MR. ACOTT:  Object to the form.        15:01:10
21         THE WITNESS:  Yes, that's right.
22         Q.  BY MR. GRABER:  Do you think you made something
23 in the tens of thousands through the efforts of your
24 support staff at Analysis Group?
25         MR. ACOTT:  Same objection.        15:01:25

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1        THE WITNESS:  Again, I can only say that I would
2   expect in a case like this for it to have been in --
3   somewhere in the tens of thousands, but I really have no
4   memory of that specific case.  I'm sorry.
5        Q.  BY MR. GRABER:  How about -- let's talk about      15:01:53
6   Integrity Message Boards.  That case is still going on;
7   right?
8        MR. ACOTT:  Object to the form.
9        THE WITNESS:  So I've submitted an expert
10   report, and I've given deposition testimony.  You          15:02:12
11   probably know better than me whether it's still going on.
12   I just know what I've done so far.
13        Q.  BY MR. GRABER:  Well, you testified earlier that
14   you just recently testified in that case; is that right?
15        A.  Yes, that's right.  And I haven't heard of any    15:02:26
16   outcome from that case, so I assume it's still going on.
17   I just don't want to speak to something I'm not quite
18   sure about.
19        Q.  Okay.  And how much money have you made in
20   connection with the Integrity Message Boards case?          15:02:39
21        MR. ACOTT:  Object to the form.
22        THE WITNESS:  So in the Integrity Message
23   case -- sorry -- Integrity Message Boards case, my answer
24   would be similar, in that typically I bill about 100
25   hours.  My billing rate for that case was 1250, and so     15:03:02

Page 115

1   that would, you know, be slightly over $100,000.
2        Q.  BY MR. GRABER:  And how much money did you earn
3   in Integrity Message Boards in connection with the work
4   done by your support staff at Analysis Group?
5        MR. ACOTT:  Object to the form.                        15:03:22
6        THE WITNESS:  So, again, I'm just -- I really
7   don't know, but it would be, I imagine, in the tens of
8   thousands of dollars again, but I really have no idea.
9        Q.  BY MR. GRABER:  How many hours have you billed
10   on this matter?                                             15:03:42
11        A.  I actually don't -- I really don't know, and so
12   it feels like it's probably going to work out to about
13   100 hours, or maybe a little more, and so the similar
14   answer would be somewhere -- a little over 100 hours
15   times my billing rate of $1250.                            15:04:06
16        Q.  And in this matter, you will obtain compensation
17   based also on the work of your support staff at Analysis
18   Group; right?
19        A.  That's right.
20        MR. ACOTT:  Objection.                                15:04:24
21        THE WITNESS:  I apologize, and, yes, that's
22   correct.
23        Q.  BY MR. GRABER:  And you -- do you know how much
24   the other folks at Analysis Group have billed, the
25   support staff at Analysis Group?                           15:04:42

Page 116

1        MR. ACOTT:  Object to the form.
2        THE WITNESS:  I absolutely -- I really don't
3   know.
4        Q.  BY MR. GRABER:  You've also testified for
5   Facebook before the Australian Competition and Consumer    15:04:54
6   Commission; right?
7        MR. ACOTT:  Object to the form.
8        THE WITNESS:  So I just should clarify:  I
9   didn't testify in the sense that we've been using testify
10   so far.  Instead, what Facebook asked me to do was to      15:05:10
11   update a paper I'd already written and had published
12   about -- is an update to a competitive advantage, and I
13   updated that paper and submitted it as part of the
14   platform's inquiry that the ACCC was doing, and I also
15   gave a short presentation on the topic of that paper to    15:05:33
16   economists at the Australia Competition Commission.
17        Q.  Were you compensated by Facebook with respect to
18   your submission and testimony before the ACCC?
19        MR. ACOTT:  Object to the form.
20        THE WITNESS:  So, yes, Facebook covered the cost      15:05:56
21   of my hours to prepare the report.  I do just want to
22   clarify it wasn't testimony in the sense that we would
23   use it in a legal context.
24        Q.  BY MR. GRABER:  Well, by testimony I mean a live
25   verbal presentation to the ACCC, so you did provide that   15:06:13

Page 117

1   type of a presentation; right?
2        MR. ACOTT:  Object to the form.
3        THE WITNESS:  So, no, it was a -- very much an
4   educational tutorial for their economists, so it wasn't,
5   you know, oriented toward a Court or lawyers or anything    15:06:27
6   like that.  It was trying to educate the economists about
7   something we call the programatic advertising ecosystem.
8        Q.  BY MR. GRABER:  So were you compensated in
9   connection with your submission and presentation to the
10   ACCC?                                                       15:06:47
11        MR. ACOTT:  Object to the form.
12        THE WITNESS:  Yes, I was.
13        Q.  BY MR. GRABER:  And how much did Facebook
14   compensate you in connection with your work related to
15   the ACCC?                                                   15:06:55
16        MR. ACOTT:  Same objection.
17        THE WITNESS:  So I don't know the precise number
18   of hours I worked.  That would be probably less than the
19   report, so my guess would be something under 70 hours,
20   but I just don't know.  It was less than the report, I     15:07:20
21   know that, in terms of number of hours I worked.
22        Q.  BY MR. GRABER:  Was it your same typical billing
23   rate of 1,000 to $1,200 an hour?
24        A.  So, yes, it would be a similar billing -- I use
25   the same billing rate for everything.  It just changes     15:07:35

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1 sometimes over the years.
2    Q. And according to the ACCC, Facebook engaged you
3 to prepare a submission on the extent to which large
4 amounts of data can pose a competitive advantage. Does
5 that sound right?                          15:07:54
6       MR. ACOTT: Object to the form.
7       THE WITNESS: Yes. As I said, I'd written an
8 academic paper on this topic, and Facebook asked me to
9 update it with more Australia examples in a way which was
10 relevant to people thinking about Australia.      15:08:06
11    Q. BY MR. GRABER: According to the ACCC, you
12 argued that the amount of data an entity has is not
13 inherently valuable. Does that sound right?
14       MR. ACOTT: Same objection.
15       THE WITNESS: So I don't know what you're    15:08:23
16 quoting from. What I said was that data is not a barrier
17 to entry, and, of course, is value produced by data, but
18 a lot of the value comes from expectation and encoding
19 and algorithms and all of these things, so that's what I
20 said. I certainly -- certainly it is my opinion that   15:08:46
21 data, at least in the specific context of online
22 advertising we're thinking about, was not their barrier
23 to entry.
24    Q. BY MR. GRABER: The ACCC rejected your argument;
25 right?                                    15:09:02

Page 119

1       MR. ACOTT: Object to the form.
2       THE WITNESS: So I don't know why you would say
3 that. I think -- yeah, so, no, I'm actually -- you know,
4 the ACCC, the economists, listened, and, you know, I
5 certainly think I provided some useful information about  15:09:29
6 how to think of it from an economics point of view. The
7 ACCC did decide to do -- you know, for example, made
8 decisions regarding payment for news, but I'm not sure
9 what that has to do with my opinions.
10    Q. BY MR. GRABER: They did disagree with your    15:09:54
11 argument; right?
12       MR. ACOTT: Object to the form.
13       THE WITNESS: So it looks like you're looking at
14 a document, which I can't see, and, you know, so my
15 memory of the conversation was of one which was robust   15:10:09
16 and constructive and useful, and so if you've got a
17 document you'd like to show me, I'd be really happy to
18 see it.
19    Q. BY MR. GRABER: Yeah. I was just asking
20 whether -- I was asking your recollection, whether you   15:10:24
21 thought they disagreed with you or not.
22    A. So I mean --
23    Q. Is it your recollection that they didn't
24 disagree with you?
25    A. So I mean --                          15:10:33

Page 120

1       MR. ACOTT: Same objection.
2       THE WITNESS: So if you remember, in there, you
3 know, I was saying because data is ubiquitous, because we
4 all have a broad digital footprint, data is not a barrier
5 to entry, and we have lots of examples of firms that were   15:10:52
6 growing without having core sources of data. Now, you
7 know, the only disagreement I can recall at this distance
8 was that one of the economists said, "Oh, but what
9 happens if I have an emergency -- plumbing emergency and
10 I have to use Google and find a plumber? Then only   15:11:13
11 Google knows, right? That's unique?" And I said, "Yes,
12 that's unique."
13       And I actually thought that was a useful
14 example, and I've used it since in my published academic
15 work, so that was the main disagreement I recall in that   15:11:26
16 conversation. Otherwise, I found it a very useful
17 discussion. I hope they did, too.
18    Q. BY MR. GRABER: Well, didn't they disagree with
19 your assertion that Facebook obtains little competitive
20 advantage as a result of the data that it holds?   15:11:42
21       MR. ACOTT: Object to form.
22       THE WITNESS: So I don't know what you're
23 actually looking at here. I think I've given you an
24 example of where they said that, "Oh, what about this
25 context where data could potentially be unique and,   15:12:03

Page 121

1 therefore, give rise to some degree of market power," and
2 we discussed that example.
3       And I was like, yes, it's in the framework,
4 because there the additional footprint is not ubiquitous,
5 and so I remember the conversation with them. It was   15:12:25
6 really -- it was constructive, and it looks to me like
7 you're looking at a document --
8    Q. BY MR. GRABER: Well, yeah --
9    A. -- and I'm happy to look at the document, too,
10 but I can just tell you that the conversation I had with   15:12:36
11 them I felt were remarkably constructive.
12    Q. Okay. Yeah. Let's go to the document.
13       MR. GRABER: Could we pull up Document 6?
14       (Exhibit 348, Digital Platforms Inquiry Report,
15       June 2019, marked for identification   15:12:49
16       electronically by counsel.)
17       MS. PUTTIEVA: It has been introduced.
18    Q. BY MR. GRABER: Okay. So do you see the
19 document that's been marked as Exhibit 348?
20       MR. ACOTT: Geoff, it doesn't appear to be   15:13:43
21 marked in the copy that I've opened.
22       MR. GRABER: Yeah, we'll make sure it gets
23 marked.
24    Q. But do you see at the top it should say
25 Exhibit 348 in the Exhibit Share?   15:13:56

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1    A. I just want to apology. In the -- it actually
2  is not loading properly for me, and it's giving me -- I
3  think it's a very long document and --
4    Q. It is.
5    A. -- it's giving an out of memory -- it's giving     15:14:06
6  me a, you know, sort of, big out of memory warning file.
7      MR. GRABER: Francis, are you able to see it?
8      MR. ACOTT: I can see it, and I do see that 348
9  in the file name at the top.
10     Dr. Tucker, if you're having issues -- I don't     15:14:30
11 know if it's with your web browser. We might want to go
12 off the record and restart your --
13     THE VIDEOGRAPHER: Would you like to go off,
14 Counsel?
15     THE WITNESS: I think it's loading up very     15:14:43
16 slowly, and so --
17     MR. GRABER: Why don't we give it just a second.
18 If it doesn't load up, we can go off the record, but
19 let's just, if we can, try to plow through.
20     THE WITNESS: Yeah, of course. It's doing that     15:14:57
21 thing where the PDF is just loading up with gray boxes.
22   Q. BY MR. GRABER: I see.
23   A. And it says, "There was an error processing a
24 page. An internal error occurred."
25   Q. Is it still loading?     15:15:19

Page 123

1    A. I'm just trying to reload it, and it's saying
2  out of memory. I am so sorry, but is there a chance we
3  could take a break and I restart my computer, because
4  that usually helps?
5    Q. If that helps, sure. Sure. Why don't we take a     15:15:38
6  break. We've been going for a little while anyway.
7      THE VIDEOGRAPHER: We are now going off the
8  record. The time is 3:16 p.m. Eastern Daylight Time.
9      (Recess.)
10     THE VIDEOGRAPHER: We are now back on the     15:25:21
11 record. The time is 3:25 p.m. Eastern Daylight Time.
12   Q. BY MR. GRABER: Okay. And, Dr. Tucker, you see
13 the document that's been labeled as -- or designated as
14 Exhibit 348?
15   A. Yes. I see it, yes.     15:25:42
16   Q. Okay. If you could go to page 91 of the
17 document. At the bottom of the page, it's exhibit (sic)
18 87 of the document itself, but it is page 91 of the PDF.
19   A. Could you just repeat the number, so page 87 in
20 the PDF?     15:26:07
21   Q. It's page 87 of the document itself, but if you
22 look --
23   A. Yes, I can see that.
24   Q. Yeah. Are you there?
25   A. Yes, I am.     15:26:16

Page 124

1    Q. Okay. And you see towards the bottom of the
2  page it says, "2.5.2 Google."
3      Do you see that?
4    A. Yes, I do.
5    Q. All right. And you see in the third full     15:26:30
6  paragraph where it says, "Facebook asserts"?
7    A. Yes.
8    Q. And you see where it states there: "Facebook
9  assets that the data it uses to personalize advertising
10 is not rare or unique, and that the data it uses to     15:26:45
11 personalize ads is not entirely replicable. Facebook
12 engaged Professor Catherine Tucker to prepare a
13 submission on the extent to which large amounts of data
14 confers a competitive advantage. Professor Tucker argues
15 that the amount of data an entity has is not inherently     15:27:02
16 valuable. For example, she cites her prior research
17 where the ability to predict gender was not correlated
18 with the amount of data a data broker has access to.
19 Professor Tucker concedes that what makes data valuable
20 is the ability to make the right inferences based on the     15:27:20
21 data that a firm has access to."
22     Did I read that right?
23   A. Yes.
24   Q. Okay. And then do you see where it says, "The
25 ACCC disagrees with Professor Tucker's assertion that     15:27:31

Page 125

1  Facebook obtains little competitive advantage as a result
2  of the data held."
3      Do you see that?
4    A. Yes, I see that sentence.
5    Q. Okay. Were you aware that the ACCC disagreed     15:27:43
6  with your assertion as is set forth here?
7      MR. ACOTT: Object to form.
8      THE WITNESS: You know, it's a long time since I
9  looked at this report. You know, I had a few feelings
10 about it. The first, I was actually just pleased that     15:27:59
11 they cited so much of my research for it, and they did
12 certainly mention -- you know, you can look through it
13 and see other mentions of me.
14     Now, what's interesting about this is that in
15 some sense they've adopted the framework that I was     15:28:15
16 encouraging them to adopt, so that is pleasing, and I
17 think our matter of disagreement is whether the types of
18 declared data that Facebook has access to, such as gender
19 and age, are particularly unique, and so you can see
20 there in the paragraph below, you know, they said what     15:28:32
21 they said, but I would encourage you to also look at the
22 rest of the document, because they certainly cite a lot
23 of my research there, too, and I think they found that
24 helpful.
25   Q. BY MR. GRABER: You conduct academic experiments     15:28:50

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1 using Facebook's platform; is that right?
2     MR. ACOTT: Object to the form.
3     THE WITNESS: So I can -- usually what happens
4 is I partner with a small nonprofit, and then I conduct
5 an experiment to an academic inquiry while trying to help      15:29:07
6 that nonprofit with their advertising.
7     Q. BY MR. GRABER: Did you obtain any type of
8 permission from Facebook to conduct that research on its
9 platform?
10     MR. ACOTT: Object to form.      15:29:24
11     THE WITNESS: So, no, I mean, usually what's
12 happening is I'm helping a small nonprofit with its
13 advertising, and, you know, I'm paying the money to
14 Facebook and acting as any advertiser would.  The only
15 distinction is that I, then, try and publish and peer      15:29:46
16 review the search, what I find out as a result of the
17 advertising I've conducted on behalf of the nonprofit.
18     Q. BY MR. GRABER: Have you ever obtained
19 permission from Facebook to utilize the platform for your
20 academic research?      15:30:05
21     MR. ACOTT: Object to the form.
22     THE WITNESS: So I've certainly had permission,
23 obviously, from the nonprofit, and I have my own Facebook
24 ads account, which gives me permission to run ad
25 campaigns.  You know, I couldn't, sitting here today,      15:30:35

Page 127

1 tell you -- you know, all I know is I have a Facebook ad
2 account, which gives me permission to run ad campaigns,
3 and any results I publish are metrics which are freely
4 given by Facebook -- from Facebook to me as an
5 advertiser.      15:30:54
6     Q. BY MR. GRABER: Now, in the past you've stated
7 that you worry about Facebook; right?
8     MR. ACOTT: Object to the form.
9     THE WITNESS: I just don't know the context of
10 that. I mean, if you give me -- I've certainly said --      15:31:15
11 and I don't know what you're referring to, quite
12 honestly. I have said in the past that I was worried --
13 and this is the distant past -- that at least initially
14 Facebook's advertising product -- and we're talking about
15 2010 -- wasn't great. And so I have maybe expressed a      15:31:41
16 worry then. Is that what you're thinking of?
17     But if you give me a context, I can explain it.
18 I certainly -- you know, I -- when Facebook started out
19 doing advertising, it hadn't done any of the wonderful
20 innovations it's done today, and I might have expressed      15:32:00
21 worry then, but you've probably got something specific in
22 mind.
23     Q. BY MR. GRABER: Haven't you expressed more
24 recently worry about Facebook's competitive position?
25     MR. ACOTT: Same objection.      15:32:14

Page 128

1     THE WITNESS: So I just -- I really don't know
2 what you're talking about. I'm really happy if you put
3 something in front of me so I can understand what you're
4 talking about, but I really just don't know.
5     Q. BY MR. GRABER: Well, it wouldn't surprise you      15:32:45
6 if you said that; right?
7     MR. ACOTT: Same objection.
8     THE WITNESS: Well, I mean, it would surprise me
9 to a certain extent, because, you know, as someone who
10 thinks about antitrust. I think about switching costs.      15:33:01
11 I think about network effects. I think about unique
12 sources of competitive advantage. These are not the
13 economic -- as economic forces, they would lead me to not
14 worry about Facebook, so that's why I'm surprised at what
15 you just said, but if you want to point me to something,      15:33:25
16 I'm really happy to look at it.
17     Q. BY MR. GRABER: Let's go to Document 7.
18     (Exhibit 349, The Technology Policy Institute
19     article, marked for identification
20     electronically by counsel.)      15:33:43
21     MS. PUTTIEVA: Exhibit 349 has been introduced.
22     Q. BY MR. GRABER: Do you see the document that's
23 been designated as Exhibit 349?
24     A. So, yes, I see that document.
25     Q. Okay. And the title of this document is "MIT      15:34:13

Page 129

1 Sloan Professor Catherine Tucker on Privacy, Antitrust,
2 and the Value of Data."
3     Do you see that?
4     A. Yes.
5     Q. Do you remember giving this -- or sitting down      15:34:25
6 for this talk or podcast?
7     A. I don't remember it specifically.  I give a lot
8 of talks, but, you know, I know The Technology Policy
9 Institute.
10     Q. Okay.      15:34:50
11     If you go to page 7. And do you see there's a
12 question from Tom Lenard. It says, "Well, but the people
13 who are most worried about competition problems in the
14 tech sector."
15     Do you see that?      15:35:12
16     A. Yes, I see that question.
17     Q. Okay. And then you see there's a response from
18 you?
19     A. I do see --
20     Q. Do you see that?      15:35:24
21     A. Yes. Oh, I see it, yes, but I think you're
22 reading the entire sentence wrong. I'm saying I'm
23 worried about Facebook's longevity in the face of TikTok.
24     Q. Uh-huh.
25     A. And so, yes, and that is true. I was really      15:35:43

33 (Pages 126 - 129)

Page 130

1 confused about what you were talking about, but now this
2 all makes sense.
3         I'm talking here about the fragility of network
4 effects, and I'm saying, gosh, Facebook and the entire
5 TikTok process shows exactly how inherently fragile        15:35:57
6 network effects are for a social media website, and I
7 worry about Facebook's future in this industry, so that's
8 what I'm saying there.
9     Q.   That's all I was asking.
10    A.   Yeah, I'm just -- phew.  I was just like -- I        15:36:18
11 was very surprised by your question, and I was worried
12 I'd been misquoted somewhere, but, no, in this passage
13 I'm talking about, you know, my work on the fragility of
14 network effects and the fact that it's easy for a new
15 social media platform, such as TikTok, to come along, and  15:36:36
16 that's why network effects aren't as strong as often
17 believed in social media websites, and that's all I'm
18 saying here.
19         MR. GRABER:  Okay.  Is anyone hearing a beeping
20 sound in the background?                                   15:36:54
21         MR. ACOTT:  Yeah, I'm getting that, too.
22         MR. GRABER:  Could we go off the record for just
23 a second?
24         THE VIDEOGRAPHER:  We are now going off the
25 record.  The time is 3:37 p.m. Eastern Daylight Time.      15:37:03

Page 131

1         (Discussion off the record.)
2         THE VIDEOGRAPHER:  We are now back on the
3 record.  The time is 3:39 p.m. Eastern Daylight Time.
4     Q.   BY MR. GRABER:  All right.  So we'll just
5 continue on, notwithstanding this beeping sound in the     15:39:00
6 background.  I apologize for that, Dr. Tucker.
7         Let me ask you some -- let me ask you some easy
8 questions now.  Can we agree that advertisers don't want
9 to be lied to?
10        MR. ACOTT:  Object to the form.                     15:39:14
11        THE WITNESS:  So, you know, in general, no one
12 wants to be lied to, you know, just as a general point.
13    Q.   BY MR. GRABER:  And in that same vein, can't we
14 agree that advertisers don't want to be lied to?
15        MR. ACOTT:  Same objection.                         15:39:41
16        THE WITNESS:  So in terms of -- I'm just
17 hesitating because evidently if -- you know, we're
18 talking about -- I'm just worried that we're going to
19 equate an estimate with a lie, but, you know, I think in
20 general, if you give people a choice, they prefer not to   15:40:10
21 be lied to.  There are, of course, occasions where people
22 receive more utility if they do choose to be -- if they
23 are lied to, but I think as a general principle, if you
24 ask most people, they say, "No, I prefer to not -- not be
25 lied to."                                                  15:40:31

Page 132

1     Q.   BY MR. GRABER:  Some people get more utility
2 from being lied to, that's your testimony?
3         MR. ACOTT:  Object to the form.
4         THE WITNESS:  No.  I just meant that
5 sometimes -- say when someone's given a bad speech and     15:40:44
6 they ask you how it went, they're just not looking for
7 you to tell the truth.  They're looking for you to say
8 something supportive, as supportive as you can, and
9 that's all I meant, just that common nicety, and that's
10 just, you know, part of human interaction, but I think if  15:41:04
11 you asked most people, they would say that they would
12 prefer not to be lied to in general.
13    Q.   BY MR. GRABER:  But do you think advertisers
14 ever want to be lied to?
15        MR. ACOTT:  Object to the form.                     15:41:32
16        THE WITNESS:  So with the same qualification, I
17 think if you ask people's -- advertisers' stated
18 preference about whether or not they wanted to be lied
19 to, like most of the population, they would say no, but
20 again, with the caution that we're not -- I'm not in any   15:41:58
21 way wanting to imply a lie and a potential reach
22 estimate.
23    Q.   BY MR. GRABER:  Can we agree it's always best
24 for Facebook to tell advertisers the truth?
25        MR. ACOTT:  Same objection.                         15:42:19

Page 133

1         THE WITNESS:  I think it is in Facebook's
2 self-interest to provide as much data and analytics it
3 can do and reliable as whereas possible to its
4 advertisers, yes, and that's part of digital advertising,
5 to try and provide useful data for advertisers.           15:42:48
6     Q.   BY MR. GRABER:  You do agree with me that it's
7 always best for Facebook to tell advertisers the truth;
8 right?
9         MR. ACOTT:  Same objection.
10        THE WITNESS:  Well, again, I'll have just one of    15:42:59
11 my qualifications, that given that Facebook is a
12 two-sided platform, I actually don't think it's best for
13 Facebook to, for example, make completely transparent the
14 way they identify spam ads, so annoying ads, so if you
15 take that -- you know, there are times when I actually     15:43:21
16 think in order to balance the two sides of the platform,
17 it's not in Facebook's -- the two-sided platform's
18 interest to be completely, radically transparent at all
19 times, but in general, I do believe that Facebook's
20 incentives as an advertising platform is to try to put     15:43:41
21 together the best and most useful and accurate data it
22 can to its advertisers.
23    Q.   BY MR. GRABER:  Okay.  Well, maybe we're talking
24 past each other, Dr. Tucker.  I mean, this seems to be a
25 simple "yes" or "no" question.  Let's set aside issues     15:43:59

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1 relating to the disclosure of, you know, the inner
2 workings of Facebook or the disclosure of trade secrets
3 or other proprietary data.
4        Can we just agree as a general matter it's
5 always best for Facebook to tell advertisers the truth?        15:44:21
6        MR. ACOTT: Object to the form.
7        THE WITNESS: Yes. I think it is in
8 Facebook's -- they have incentives to try and give
9 advertisers the data and tools they need to best measure
10 their advertising outcomes, and that's what they do.        15:44:43
11        Q. BY MR. GRABER: And you would agree that
12 advertisers deserve to be told the truth from Facebook;
13 right?
14        MR. ACOTT: Object to the form.
15        THE WITNESS: So I'm -- I am an economist, not a        15:44:56
16 philosopher, but I do believe that advertisers should
17 receive, to the best of Facebook's ability, data which
18 helps them make the right advertising decisions.
19        Q. BY MR. GRABER: Okay. I don't think I got a
20 "yes" or "no" answer to this straightforward question.        15:45:21
21 Let me ask it one more time.
22        You agree that advertisers deserve to be told
23 the truth from Facebook; right?
24        MR. ACOTT: Object to the form.
25        THE WITNESS: So, yes, I do believe advertisers        15:45:40

Page 135

1 deserve the -- to receive the truth in the form of, you
2 know, data which helps them make good advertising
3 decisions. Yes.
4        Q. BY MR. GRABER: Can we agree that Facebook
5 should always be honest with its advertisers?        15:45:58
6        MR. ACOTT: Object to the form --
7        THE WITNESS: So that goes -- I don't want to
8 annoy you by putting a caveat about why you wouldn't want
9 to be completely transparent, so what I'd say is that
10 Facebook, and any advertising platform that's competing        15:46:18
11 in this competitive industry, needs to be honest with its
12 advertisers to the extent that it's not leading to the
13 kind of disclosure which leads to gaming the system.
14        Q. BY MR. GRABER: How would disclosures lead to
15 gaming the system?        15:46:50
16        MR. ACOTT: Object to the form.
17        THE WITNESS: Oh, that just goes back to my
18 point about why you wouldn't want to be completely
19 transparent with advertisers how you identified ads which
20 were spammy or disruptive to user experience.        15:47:06
21        Q. BY MR. GRABER: Okay. So, Dr. Tucker, again,
22 let's set aside the situation of, you know, proprietary
23 information, trade secrets, information securities
24 protocols. Let's set that aside.
25        As a general matter, can we agree that Facebook        15:47:26

Page 136

1 should be honest with its advertisers?
2        MR. ACOTT: Object to the form.
3        THE WITNESS: Yes. As any company competing in
4 the digital advertising system, yes, they need to
5 communicate honestly with advertisers.        15:47:46
6        Q. BY MR. GRABER: And you agree that advertisers
7 deserve accurate metrics from Facebook; right?
8        MR. ACOTT: Object to the form.
9        THE WITNESS: So I think advertisers need to
10 have reliable data on which to make decisions, and they        15:48:07
11 need to be able to -- you know, to make those decisions.
12 Facebook, like other advertising platforms, needs to
13 provide reliable data as much as it can on, say, clicks,
14 conversions and so on.
15        Q. BY MR. GRABER: I asked something a little bit        15:48:36
16 different. I asked: Can't we agree that advertisers
17 deserve accurate metrics from Facebook?
18        MR. ACOTT: Same objection.
19        THE WITNESS: So I thought I answered that, and
20 I don't want to revisit an old discussion about what is a        15:49:00
21 metric and what isn't, and so, yes, I believe that
22 advertisers should receive, to the best of Facebook's
23 ability, data which helps inform them and evaluate the
24 performance of their ads, yes.
25        Q. BY MR. GRABER: So you've studiously avoided the        15:49:17

Page 137

1 term "accurate," Dr. Tucker, and I'm just -- I'm
2 wondering why you're having a difficult time answering
3 the question. So let me just ask it again.
4        Can we agree that advertisers deserve accurate
5 metrics from Facebook?        15:49:37
6        MR. ACOTT: Object to the form.
7        THE WITNESS: So what -- so advertisers deserve
8 to have -- so the reason -- I'm going to just be clear.
9 You know, you're, sort of, going on the word "accurate,"
10 why am I avoiding the word "accurate." It's that I know        15:49:58
11 in digital advertising, ultimately accuracy is a goal,
12 rather than zero-one standard. So, for example, if
13 someone sees an ad, goes to a website, buys the product,
14 yes -- and there was a click involved, then Facebook
15 would count that as a conversion.        15:50:27
16        Now, it could just be that for whatever reason,
17 that person randomly, upon chance, went to that website,
18 and then, you know, is it accurate to call it a
19 conversion due to the Facebook ad? That's not clear, so
20 that's why I'm saying accuracy -- you know, what you        15:50:46
21 count as a conversion, is something which is actually
22 just debated within the digital advertising community.
23        And so I think when you're using the word
24 "accurate," maybe the reason I'm not using the word
25 "accurate" is that I think you have in mind a zero-one        15:51:06

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1 definition of accuracy, rather than acknowledging that
2 any metric is going to have inputs of judgment about how
3 you -- how you calculate it.
4 Now, I do believe that Facebook advertisers and
5 Facebook itself has competitive reasons to try and use    15:51:28
6 the best judgment to come up with its metrics to try and
7 make them as close to the truth as possible.  But I do
8 want to emphasizes that this notion of zero-one accuracy
9 or being completely binary ignores all the debate about
10 what is an appropriate metric within online advertising.    15:51:53
11 Q. BY MR. GRABER: So my question to you as to
12 whether advertisers deserve accurate metrics from
13 Facebook, that's -- in your view, that's a little bit of
14 a complex nuanced question; is that fair?
15 MR. ACOTT: Object to the form.    15:52:14
16 THE WITNESS: No, that's not fair.  What I said
17 is that Facebook advertisers deserve Facebook to work
18 hard to obtain estimates, or metrics when it's relating
19 to conversions, that can best inform advertising
20 decisions.    15:52:37
21 Now, any advertiser knows that whether or not --
22 that it's not that there's ever going to be one
23 definition of exactly what that metric is, but that
24 Facebook needs to come up and use its best judgments,
25 best efforts to come up with a way of coming up with a    15:52:56

Page 139

1 metric that an advertiser might use, and that's simply
2 what I'm saying.
3 You were just asking me -- you're asking me a
4 question which is not that it's nuanced.  It's just that
5 it misunderstands whether or not metrics is, sort of,    15:53:15
6 zero-one in their accuracy, and I think that's what I'm
7 trying to clarify.
8 Q. BY MR. GRABER: Okay.  I don't want to go around
9 and around.  So let me just ask it this way: I mean, it
10 sounds to me like -- to me, Dr. Tucker, that my question    15:53:30
11 to you as to whether advertisers deserve accurate metrics
12 from Facebook is not a "yes" or "no" question for you; is
13 that fair?
14 MR. ACOTT: Object to the form.
15 THE WITNESS: So how about I answer it this way:    15:53:52
16 Given the -- given the ambiguity about how to define any
17 one metric, Facebook advertisers deserve the most
18 accurate rendering of that metric.
19 Q. BY MR. GRABER: Has any advertiser told you that
20 they do not care about being misled by Facebook?    15:54:32
21 MR. ACOTT: Object to the form.
22 THE WITNESS: So no, no advertiser's said that
23 directly, but, of course, in my report I quote one of the
24 named plaintiffs who was explaining why even despite the
25 revelation -- he was on a message board explaining why he    15:54:58

Page 140

1 continued to use Facebook despite his role in the case.
2 So I've certainly read that, but I haven't independently
3 gone to an advertiser and interviewed them as part of
4 this case.
5 Q. BY MR. GRABER: So it's your view that the    15:55:14
6 plaintiff you're talking about doesn't care about being
7 misled.  Is that your testimony?
8 MR. ACOTT: Object to the form.
9 THE WITNESS: I'm just pointing to what he said
10 in the -- in the message board, and we can go to that    15:55:26
11 precise paragraph in my report, if you'd like, and, you
12 know, that he continued to spend money with Facebook.
13 It's not clear to me that -- you know, we have,
14 obviously, a disagreement about whether or not he was
15 actually misled in any sense.    15:55:46
16 But, you know, even -- even having filed a
17 complaint saying he had been misled, he continued to use
18 Facebook, you know, and I'm just pointing to that,
19 because you asked me about any advertisers that appeared
20 to not have cared when they claim that they have been    15:56:05
21 misled.
22 Q. BY MR. GRABER: So let's set aside the named
23 plaintiffs in this action.  What I'm asking you is
24 whether any advertiser has ever told you personally that
25 they do not care about being misled by Facebook?    15:56:21

Page 141

1 MR. ACOTT: Object to form.
2 THE WITNESS: So, no, I've never been told that,
3 and it would be a highly unlikely conversation to have
4 with any official advertiser, so no.
5 Q. BY MR. GRABER: Has your research ever shown    15:56:41
6 that advertisers prefer to be lied to?
7 MR. ACOTT: Object to the form.
8 THE WITNESS: So, I mean, my research
9 consistently supports my viewpoints in the case about
10 what advertisers care about.  I have not conducted an    15:56:59
11 inquiry about whether or not advertisers have a
12 preference to be lied to.
13 Q. BY MR. GRABER: Do you think they have a
14 preference to be lied to?
15 MR. ACOTT: Same objection.    15:57:18
16 THE WITNESS: I think when -- you asked me that
17 question and I said no, I imagine -- but this is -- I've
18 never -- you asked me if I conducted a study, and I said,
19 no, I haven't.  You know, the great thing -- you know,
20 you spoke about -- the great thing about the digital    15:57:32
21 revolution is that in the past, because you couldn't
22 check whether or not your advertising was performing, it
23 was certainly possible to be lied to.  It was possible to
24 be lied to about a circulation or a viewership.  You just
25 wouldn't know.    15:57:55

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1  Now, because of this measurability, in some
2  sense the focus is on, well, how is my advertising
3  performing in real dollars that I can myself observe, and
4  so, no, I don't think that advertisers want to be lied
5  to, but what I am -- I'm happy about, as someone who          15:58:12
6  studies this area, is that now that's far less of a risk
7  for advertisers, because they are able to concretely
8  measure their metrics.
9  Q.  BY MR. GRABER:  Has your research ever shown
10 that advertisers want inflated metrics?                       15:58:39
11     MR. ACOTT:  Object to the form.
12     THE WITNESS:  Well, I'm just trying to think,
13 so -- I'm just trying to make sense of your question, but
14 no.  Typically, the digital revolution is about being
15 able to actually measure whether an ad leads to a sale       15:59:10
16 and gives you dollars, and I have not seen any -- you
17 know, I have not researched and have no reason to suppose
18 that advertisers would be -- would prefer to not receive
19 the accurate data there.
20 Q.  BY MR. GRABER:  And you don't have any research          15:59:36
21 showing that advertisers want inflated metrics; right?
22     MR. ACOTT:  Object to the form.
23     THE WITNESS:  That they want -- I'm sorry.  I
24 missed the word.
25 Q.  BY MR. GRABER:  Inflated metrics.                         15:59:46

Page 143

1      MR. ACOTT:  Same objection.
2      THE WITNESS:  Oh, so you said -- yeah.  So I'm
3  sorry I wasn't clear.  No, I have seen no evidence that
4  when -- I mean, I -- it is very difficult to think about
5  a way to inflate a cost for conversion, but I certainly      16:00:01
6  don't think that if there was a way to inflate a cost for
7  conversion that advertiser would like that, because it
8  would mean that they'd miss out on valuable advertising
9  opportunities, potentially.
10 Q.  BY MR. GRABER:  Can you think of any metrics            16:00:19
11 that an advertisers would want to be inflated?
12     MR. ACOTT:  Object to the form.
13     THE WITNESS:  Probably if I thought about it
14 long enough I could come up with a clever example, but
15 no.  You know, I think the main example of the key metric   16:00:45
16 here is the cost for conversion, and I really can't see
17 why any advertiser would want that inflated, because
18 they'd miss out on valuable advertising opportunities.
19 So I might think of a clever response in 24
20 hours, but the main metric, cost for conversion, return     16:01:02
21 on ads spent, typically advertisers don't want that to be
22 inflated, because otherwise -- so you wouldn't want costs
23 for conversion inflated, because otherwise you would miss
24 out on good opportunities to advertise.
25 Q.  BY MR. GRABER:  Dr. Tucker, if you were given           16:01:21

Page 144

1  sufficient time, you think you could come up with a
2  clever way of saying that advertisers do want some metric
3  inflated; is that right?
4      MR. ACOTT:  Object to the form.
5      THE WITNESS:  Well, you know, it might come to        16:01:40
6  me, but it would be of the kind where a single advertiser
7  would want some -- so if I'm an advertiser -- I'll give
8  you an example of the kind of thing I was thinking of
9  that's not very good.  So if I'm an advertiser, then --
10 and I'm in a competitive industry, then there's a reason    16:01:56
11 that I might want my rivals or competitors' metrics to be
12 distorted, because then they wouldn't make great
13 advertising decisions.
14 Now, let's be clear.  That example, and probably
15 any example I could come up with, would be where the        16:02:15
16 advertisers themselves had a source of truth, and instead
17 it was giving them some kind of a competitive advantage
18 within the industry.
19 Q.  BY MR. GRABER:  So maybe an advertiser would
20 want to inflict inflated metrics on one of their            16:02:37
21 competitors to harm them; right?
22     MR. ACOTT:  Object to the form.
23     THE WITNESS:  So what I was thinking about is
24 that, you know, if we have an example where, you know,
25 I'm using this obscure website to place ads.  My            16:02:59

Page 145

1  competitor does it, too.  For whatever reason, there's a
2  blip in the website and then that competitor measures the
3  wrong cost for conversion and receives an inflated cost
4  for conversion, well, then I indirectly benefit as an
5  advertiser, because then I don't have competition on that   16:03:21
6  website, but it's incredibly indirect, and, as I say,
7  it's sort of a -- very much an edge case of the kind you
8  asked me about.
9  Q.  BY MR. GRABER:  Dr. Tucker, when were you first
10 engaged in this matter?                                      16:03:40
11 A.  My impression is it was -- I believe it was
12 before the pandemic.
13 Q.  Did you sign -- do you remember signing a
14 protective order and making some disclosures in
15 connection with your engagement in this matter?             16:04:06
16     MR. ACOTT:  Object to the form.
17     THE WITNESS:  I'm so sorry.  I don't remember
18 any such document.
19 Q.  BY MR. GRABER:  Who was the first person to call
20 you about this matter?                                       16:04:26
21 A.  I apologize.  I can't remember.  I remember an
22 interview, but I don't remember how it was initiated.
23 Q.  Who interviewed you?
24     MR. ACOTT:  Object to the form.
25 And I would just caution the witness not to        16:05:00

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1 divulge the contents of any communications with counsel.

2      THE WITNESS: I remember it being -- I remember

3 it being outside counsel, and I believe I remember Hilary

4 being on that call, but I don't remember much else, and I

5 can't remember who else was on it.            16:05:46

6    Q.  BY MR. GRABER:  What was the first case you

7 worked on with Facebook?

8    A.  That would be the Fraley case.

9    Q.  Do you remember roughly when that was?

10    A.  That would be around 2011/12.            16:06:09

11    Q.  Prior to working on that lawsuit, did you know

12 anyone at Facebook?

13      MR. ACOTT:  Object to the form.

14      THE WITNESS:  Not that I can remember.

15    Q.  BY MR. GRABER:  You didn't know anybody who      16:06:38

16 works at Facebook?

17    A.  Prior to 2011, I didn't know of anyone who

18 worked at Facebook that I can recall, no.

19    Q.  Have you ever met any Facebook executives?

20    A.  So I have met Facebook data scientists at a      16:07:19

21 variety of conferences.  For example, they often come to

22 the conferences on digital experimentation, which is held

23 at MIT, and I remember meeting a data scientist at the

24 MBR conference on the economics of artificial

25 intelligence, so I've certainly met Facebook people      16:07:48

Page 147

1 there, but I don't -- they never -- they didn't strike me

2 as particularly executives, if that makes sense, though I

3 don't want to in any way denigrate how important the work

4 they do is.

5    Q.  Yeah, and I didn't mean to suggest that.  I      16:08:05

6 just -- I'm referring to, you know, senior business

7 people at Facebook.  Like, have you ever met any vice

8 presidents at Facebook?

9    A.  No.  I don't think so, no.

10    Q.  You're a professor at MIT; right?            16:08:26

11    A.  Yes, I am.

12    Q.  Does MIT place a limit on the amount of

13 litigation-related work you can do?

14    A.  Yes, they do.

15    Q.  What's that limit?                  16:08:37

16    A.  So that limit is we're -- we're allowed to do,

17 basically, a day's work a week.

18    Q.  Is that calculated as 8 hours per week, so 8

19 times 4, 24 hours a month?

20      MR. ACOTT:  Object to the form.            16:09:08

21      THE WITNESS:  So I'm not actually sure how it's

22 spelled out.  Certainly MIT professors don't work eight

23 hours a day.  I can tell you that, so I'm not sure how

24 it's spelled out, but it's told it's a day a week.

25    Q.  BY MR. GRABER:  And you've abided by that rule;      16:09:33

Page 148

1 right?

2    A.  I've tried my best --

3      MR. ACOTT:  Object to the form.

4      THE WITNESS:  Yes.  I have tried to abide by

5 that rule as best as I can, yes.                  16:09:40

6    Q.  BY MR. GRABER:  Do you think you've gone over it

7 a little bit over the last couple of years?

8    A.  So, you know, what -- it's certainly going to

9 balance out, but, you know -- actually, it's not a

10 problem, because MIT allows you to balance it out over a      16:10:02

11 year, so if in a month like this where due to the

12 pandemic a lot of things have just got bunched up, my job

13 is, then, to just balance it out over the rest of the

14 year, so, no, I don't think I have gone over it, though,

15 of course, there has been a little bit of bunching this      16:10:24

16 particular month due to things being done delayed to the

17 pandemic.

18    Q.  Understood.

19      And, Dr. Tucker, you spoke with several Facebook

20 employees in connection with the preparation of your      16:10:44

21 report in this matter; is that right?

22    A.  That is correct.

23    Q.  And did counsel select the persons you spoke to?

24      MR. ACOTT:  Object to the form.

25      THE WITNESS:  So, no.  What happened was there      16:11:01

Page 149

1 were three documents that I wanted to know more about,

2 and I asked counsel to set up interviews with Facebook

3 employees who could tell me about those documents.

4    Q.  BY MR. GRABER:  And who was on the call when you

5 spoke to those employees -- or I should -- strike that.      16:11:29

6      Who were on the calls when you spoke to Facebook

7 employees in connection with preparation of your report?

8      MR. ACOTT:  Object to the form.

9      THE WITNESS:  So I can't recall precisely.  I

10 remember me -- you know, it was a Zoom call, so it was me      16:11:52

11 and the employee mainly on my screen.  I think counsel

12 from Latham & Watkins was on the call, though I couldn't

13 tell you who for each call.

14    Q.  BY MR. GRABER:  Any Facebook inhouse counsel?

15    A.  I'm afraid I really don't know.            16:12:18

16      MR. GRABER:  Let's go off the record.

17      THE VIDEOGRAPHER:  We are now going off the

18 record.  The time is 4:12 p.m. Eastern Daylight Time.

19      (Recess.)

20      THE VIDEOGRAPHER:  We are now back on the      16:28:24

21 record.  The time is 4:28 p.m. Eastern Daylight Time.

22      MR. GRABER:  Okay.  Just to be clear, can

23 everybody hear me?

24      THE VIDEOGRAPHER:  Yes, sir.

25      MR. ACOTT:  I can hear you.            16:28:45

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

1     MR. GRABER:  Okay.  Sorry.  I had my volume
2  down.  All right.
3     Q.  Dr. Tucker, during the break just now, did you
4  have any conversations with your counsel about the
5  substance of your testimony?                16:28:57
6     A.  No, I didn't.
7     Q.  Okay.  During any of the breaks today, have you
8  had any discussions with your counsel regarding the
9  substance of your testimony?
10    A.  No, I haven't.                16:29:07
11    Q.  Okay.  Have you had any discussions with anyone
12  about the substance of your testimony today during the
13  breaks?
14    MR. ACOTT:  Sorry to interrupt you, Geoff.  I'm
15  having a hard time hearing you.                16:29:17
16    MR. GRABER:  Sorry.  What's that?
17    MR. ACOTT:  You're really choppy on my end.
18  Could you --
19    MR. GRABER:  Yeah.  Is that better?
20    MR. ACOTT:  I can hear you now.                16:29:25
21    MR. GRABER:  Yeah.  Sorry about that.
22    MR. ACOTT:  Thank you.
23    Q.  BY MR. GRABER:  Have you had any discussions
24  today with anyone about the substance of your testimony
25  during any of the breaks?                16:29:40

Page 151

1     A.  No, I haven't.
2     Q.  Thank you.  I have no further questions.  Your
3  counsel may have some redirect questions, but other than
4  that, thank you so much for your time today, Dr. Tucker.
5  We really appreciate it.                16:29:54
6     A.  My absolute pleasure.
7     MR. ACOTT:  Thanks, Geoff.  Do you mind if we
8  just go off the record and just take five to go over
9  notes?
10    MR. GRABER:  No problem.                16:30:04
11    THE VIDEOGRAPHER:  We are now going off the
12  record.  The time is 4:30 p.m. Eastern Daylight Time.
13    (Recess.)
14    THE VIDEOGRAPHER:  We are now back on the
15  record.  The time is 4:34 p.m. Eastern Daylight Time.                16:34:30
16    MR. ACOTT:  Thank you.
17
18                EXAMINATION
19  BY MR. ACOTT:
20    Q.  Dr. Tucker, I just have a few questions for you.                16:34:34
21    Can you please pull up Exhibit 344, which is
22  your report?
23    A.  Yes, I have that up.
24    Q.  And you reviewed your report since it was
25  submitted on March 3rd; is that right?                16:35:00

Page 152

1     A.  Yes, I have read through my report.
2     Q.  Are there any clarifications that you would like
3  to make to your report?
4     A.  Yes.  There's one -- well, there's two
5  clarifications.  The first is obviously to update the                16:35:11
6  list of testimony, which I think we've already done on
7  the record.
8        The other thing I would like to clarify is that
9  when I reread paragraph 123, I felt I could have
10  expressed it better.                16:35:32
11    Q.  How so?
12    A.  Well, what -- I was relating a conversation I
13  had with Mr. Geller, and Mr. Geller was saying that if
14  there was a formal study, it must have predated his
15  tenure by quite some time, because otherwise he would                16:35:52
16  have known of it.  Now, I'm not sure that's fully
17  captured in the first sentence of paragraph 123, and I
18  just wanted to clarify that for the record.
19    Q.  And does that clarification cause you to change
20  any of your opinions in case?                16:36:08
21    A.  No, it doesn't.
22    Q.  Now, I'm going to try and introduce the document
23  as Exhibit 348 -- I'm sorry -- 350.  Do you see it on
24  your end?
25    (Exhibit 350, Expert Reply Report of Armando                16:36:44

Page 153

1        Levy, Ph.D., marked for identification
2        electronically by counsel.)
3        THE WITNESS:  Yes, I do.  Dr. Levy's report.
4     Q.  BY MR. ACOTT:  And that's Dr. Levy's March 23rd,
5  2021, report?
6     A.  Yes.  Sorry.  I should be clear.  It's his reply
7  report.
8     Q.  Did you review that report prior to today?
9     A.  Yes, I did.
10    Q.  Did anything in that report cause you to change
11  any of your opinions in this case?
12    A.  No, it didn't.
13    Q.  I'm going to direct you to paragraph 5 of that
14  report, which is on page 2.
15    Mr. Levy states, quote:  "Professor Tucker                16:37:19
16  points out that advertisers received value from their
17  advertisements on Facebook's platforms.  She states that
18  I ignore this value, which is incorrect."
19        Do you agree with Mr. Levy?
20    A.  No, I don't.                16:37:35
21    Q.  Why not?
22    A.  Well, Dr. Levy does ignore the value that
23  Facebook advertisers received for their impressions, and
24  he assumes that they benefit universally when they have
25  fewer impressions, and that's just ignoring the value                16:37:50

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 154

1  that's created by Facebook ads.
2      Q.  And in the next paragraph, paragraph 6, Mr. Levy
3  states that you provided no empirical evidence that
4  advertisers with different objectives differ in their
5  preferences for potential reach.                    16:38:08
6          Do you agree with Mr. Levy's critique?
7      A.  No, I don't.  I have an entire section in my
8  report devoted to the differences in objectives, the
9  underlying literature and industry studies which support
10 this point of view.                                16:38:32
11     Q.  And in the next paragraph, paragraph 7, Mr. Levy
12 states, quote:  "Professor Tucker's examples or case
13 studies are irrelevant for the calculation of damages and
14 do not represent the economic value of advertisements but
15 a post-purchase benefit."                          16:38:49
16         Do you agree with Mr. Levy?
17     A.  No.
18     Q.  Why not?
19     A.  Well, he seems to completely misunderstand what
20 digital advertising is.  Digital advertising is all about  16:39:02
21 orientation towards being able to measure outcomes, and
22 the idea that there's a separation that seems to be in
23 Dr. Levy's mind just ignores how digital advertising
24 works.
25     Q.  Now, I want to direct you to the next paragraph,  16:39:26

Page 155

1  paragraph number 8, of Mr. Levy's March 23rd report.  He
2  states, in the last sentence:  "Professor Roughgarden's
3  simulation demonstrates that given the distribution of
4  budget changes estimated from Professor Allenby's
5  conjoint -- analysis, truthful disclosure of Potential  16:39:45
6  Reach would result in lower CPM for all of Facebook's
7  advertisers."
8          Do you agree?
9      A.  No.
10     Q.  Why not?                                   16:39:57
11     A.  Well, you know, first of all, I evidently
12 disagree with the inputs that the Roughgarden simulations
13 are using to find any blurring of budgets, but even
14 disregarding that, it ignores completely the huge
15 heterogeneity in ads, auctions, the fact that not all  16:40:21
16 advertisers are competing with similar advertisers, but
17 instead we have lots of individualized auctions with
18 highly selected numbers of advertisers bidding against
19 each other in a manner which means you can't make this
20 universal statement that other advertisers would be  16:40:43
21 effected, even supposing the -- the Allenby and other
22 inputs he used in his analysis were correct.
23     Q.  And in the next paragraph, paragraph 9, Mr. Levy
24 states that:  "Professor Tucker's analysis" -- this is
25 the last sentence.  "Professor Tucker's analysis is  16:41:01

Page 156

1  inconsistent with the proper application of the results
2  of Professor Allenby's conjoint survey on a proportional
3  basis."
4          Do you agree with Mr. Levy?
5      A.  No.  This makes no sense to me.  I showed in the  16:41:18
6  data that there's a complete lack of correlation in terms
7  of people's -- or advertisers' actual behavior, and
8  Dr. Levy says, well, that's at odds with Dr. Allenby's
9  conjoint survey, but as I detailed in my report, you
10 know, there are many flaws with Dr. Allenby's conjoint  16:41:44
11 survey, and it seems nature to actually look at what
12 advertisers do, rather than some hypothetical survey, and
13 I've looked at what advertisers appear to be doing in the
14 data.
15     Q.  Thank you.                                 16:41:59
16         I'm going to introduce another document that was
17 previously marked as Exhibit 286.  Bear with me for a
18 moment.
19         It should have appeared in your Exhibit Share.
20 Do you see it?                                      16:42:29
21     A.  I'm just refreshing in the hope that it is.
22     Q.  It will be at the top since it's previously
23 marked.
24     A.  Oh, it's at the top.
25         I have it now.                             16:42:42

Page 157

1      Q.  Great.  And this is the March 22nd, 2001 (sic),
2  report from Dr. Greg Allenby.  Did you review this report
3  prior to today?
4      A.  Yes, I did.
5      Q.  Did anything in this report change you -- cause  16:42:55
6  you to change any of your opinions in any way in this
7  case?
8      A.  No, it didn't.
9      Q.  So I'm going to direct you to page 5 of
10 Dr. Allenby's March 22nd report.                   16:43:09
11         And on this page, Dr. Allenby includes several
12 responses to critiques that you made in your March 3rd
13 report.  In the first paragraph, Dr. Allenby states,
14 quote:  "Conjoint analysis does not require the
15 replication of the purchase process nor inclusion of all  16:43:31
16 product features."
17         Do you agree with Dr. Allenby?
18     A.  So, no, I think he's -- we're talking past each
19 other.  Look, you can conduct a bad conjoint, which isn't
20 going to give reliable results, which doesn't replicate a  16:43:50
21 purchase process or include product features.  Of course
22 you can conduct a conjoint.
23         My point here, though, is if you conduct a
24 conjoint in that manner, it's not going to be reliable,
25 and Dr. Allenby doesn't seem to be addressing that in his  16:44:03

40 (Pages 154 - 157)

Page 158

1  response.
2     Q.  And in the next paragraph, which has in italics,
3  "The survey artificially forces all respondents to
4  consider features they may not naturally consider leading
5  to an inflation of estimated results," which is          16:44:21
6  Dr. Allenby's recitation of critique you make in your
7  March 3rd report.  At the end of the paragraph,
8  Mr. Levy -- or Dr. Allenby states, quote: "The presence
9  of fairly modest effects for many attributes indicates
10 that focalism bias is not present."                       16:44:44
11       Do you agree with Dr. Allenby?
12    A.  So, no, I disagree.  I mean, I did use the term
13 "focalism" and "bias," but what I was talking about in my
14 report is, look, I could run a conjoint about a hotel
15 room, and I could put in the conjoint the material for    16:45:01
16 the bathtub stopper, is it steel, or is it brass?  And if
17 I run that conjoint, I'm going to get some value.  It may
18 be modest, but I'll get some value input on the material
19 of the bathtub stopper, but that doesn't mean that people
20 are choosing hotel rooms based on what the bathtub        16:45:18
21 stopper looks like.
22       And Dr. Allenby doesn't seem to be addressing
23 that critique here.  The presence of modest effect sizes
24 is not a cure for including something in a conjoint which
25 just isn't relevant to the decision making.               16:45:34

Page 159

1     Q.  And in the last paragraph there, which states in
2  italics: "The survey unrealistically forces respondents
3  to make budget allocation," which is, again,
4  Dr. Allenby's recitation of the critique you make in your
5  March 3rd report, he states: "The conjoint analysis      16:45:59
6  includes an outside 'elsewhere' option and allows for
7  respondent heterogeneity in the estimated coefficient
8  estimates.  Respondents are not forced to allocate their
9  budget in any particular manner.  Respondents who do not
10 place importance on an attribute or utilize it in their   16:46:21
11 decision process will not alter their budgets in the
12 choice task based on that attribute."
13       Do you agree with Dr. Allenby?
14    A.  No.
15    Q.  Why not?                                           16:46:34
16    A.  Well, here he doesn't seem to be addressing my
17 point, and the point I was making in what he refers to as
18 page 86 is that number one, some advertisers perhaps as
19 allocating budgets up front based on their vast
20 experience of advertising formats, other advertisers may  16:46:55
21 allocate a small amount of budget at the beginning and
22 then test it and then allocate budget later on.
23       None of this procedure reflects the potential
24 for a dynamic nature of budget decisions in a digital
25 environment, and nor does it reflect the fact that some,  16:47:15

Page 160

1  but perhaps not all, advertisers are making those
2  decisions in that dynamic way.
3     Q.  Thank you, Dr. Tucker.  Those are all the
4  questions that I have.
5     A.  Thank you.                                         16:47:29
6       MR. GRABER:  I have nothing further.  Thank you.
7       THE VIDEOGRAPHER:  So we can conclude?
8       MR. ACOTT:  Yes.
9       MR. GRABER:  Yes.
10      THE VIDEOGRAPHER:  This concludes today's           16:47:41
11 testimony given by Dr. Catherine Tucker.  The number of
12 media units used was one.  It will be retained by
13 Veritext.  The time is 4:48 p.m. Eastern Daylight Time.
14 We are now off the record.
15      (Time noted:  4:48 p.m.)                             16:47:55
16          --oOo--
17
18
19
20
21
22
23
24
25

Page 161

1  STATE OF CALIFORNIA       ) ss:
2  COUNTY OF MARIN           )
3
4       I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5  hereby certify:
6       That the foregoing deposition testimony was
7  taken before me at the time and place therein set forth
8  and at which time the witness was administered the oath:
9       That testimony of the witness and all objections
10 made by counsel at the time of the examination were
11 recorded stenographically by me, and were thereafter
12 transcribed under my direction and supervision, and that
13 the foregoing pages contain a full, true and accurate
14 record of all proceedings and testimony to the best of my
15 skill and ability.
16       I further certify that I am neither counsel for
17 any party to said action, nor am I related to any party
18 to said action, nor am I in any way interested in the
19 outcome thereof.
20       IN WITNESS WHEREOF, I have subscribed my name
21 this 14th day of April, 2021.
22
23
24
25          LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

1  Francis Acott, Esquire
2  francis.acott@lw.com
3        April 15, 2021
4  RE:   DZ Reserve v. Facebook, Inc.
5    4/8/2021, Catherine Tucker , Ph.D. (#4502127)
6    The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-midatlantic@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19  If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 164

1  DZ Reserve v. Facebook, Inc.
2  Catherine Tucker , Ph.D. (#4502127)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Catherine Tucker , Ph.D., do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____   _____
12 Catherine Tucker , Ph.D.        Date
13 *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20___.
16
17
18      _____
19      NOTARY PUBLIC
20
21
22
23
24
25

Page 163

1  DZ Reserve v. Facebook, Inc.
2  Catherine Tucker , Ph.D. (#4502127)
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Catherine Tucker , Ph.D.        Date
25

42 (Pages 162 - 164)

**[& - 68]**                                                                                                   Page 1

**&**

**&**   3:4,14 4:3,11
   8:6,7 22:15,21
   23:4 149:12

**0**

**0.055**   72:16
**04978**   1:7 2:5 7:19

**1**

**1**   7:7,14 28:1
**1,000**   117:23
**1,200**   117:23
**100**   111:9 112:21
   113:6 114:24
   115:13,14
**100,000**   111:10
   112:22 113:11
   115:1
**11**   7:13 48:25
   97:16,17 98:16
**1100**   3:7
**12**   99:11,12 101:12
   101:18,19
**121**   6:12
**123**   152:9,17
**1250**   114:25
   115:15
**128**   6:14
**12:12**   51:7
**12:29**   51:10
**12:31**   52:5
**12:36**   52:8
**140**   4:5
**14th**   161:21
**15**   162:3
**15.818**   6:7 89:17
**151**   5:10
**152**   6:16
**156**   6:22
**15726**   81:2,8 82:12

**15732**   81:3,10 82:7
**15818**   81:1,5
**15:818**   6:11 99:20
**16**   40:9
**18**   57:20
**190**   105:2
**1:40**   89:6

**2**

**2**   31:23,23 35:18
   35:23 36:13 89:14
   153:14
**2.5.2**   124:2
**20**   164:15
**2000**   3:18
**20005**   3:8
**2001**   157:1
**2005**   87:4
**2010**   87:9 90:8
   91:18,19 92:13,16
   93:2 94:4,18
   95:16,22,24 96:8
   96:21 127:15
**2011**   97:3 146:17
**2011/12**   146:10
**2012**   88:21 96:2,6
   97:4
**2013**   99:8
**2014**   99:9,9,17
**2019**   6:13 121:15
**202**   3:9
**2021**   1:18 2:18 5:4
   7:1,7,14 153:5
   161:21 162:3
**22**   29:17
**22nd**   157:1,10
**23rd**   153:4 155:1
**24**   99:9 101:5
   143:19 147:19
**25**   51:3
**27**   6:4

**28**   31:12 32:8 35:8
   35:15,16 36:13
**286**   6:22 156:17
**2:18**   89:9

**3**

**3**   31:24 71:4 90:24
   100:7
**3.5**   71:16 72:5
**30**   162:17
**30th**   71:24 72:13
**328-4600**   4:7
**344**   6:4 27:10,15
   28:25 151:21
**345**   6:6 89:15,16
   89:22 91:24
**346**   6:8 90:25 91:4
   91:13 92:19
**3462**   1:24 2:19
   161:4,25
**347**   6:10 99:19,24
**348**   6:12 121:14,19
   121:25 122:8
   123:14 152:23
**349**   6:14 128:18,21
   128:23
**35**   28:1 62:22
**350**   6:16 152:23,25
**37**   103:15
**391-0600**   3:20
**3:16**   123:8
**3:18**   1:7 2:5 7:19
**3:25**   123:11
**3:37**   130:25
**3:39**   131:3
**3rd**   151:25 157:12
   158:7 159:5

**4**

**4**   31:24 71:4,17
   72:5 93:23 94:2
   147:19

**4.6**   71:13 72:2
**4/8/2021**   162:5
**40**   55:24
**408-4600**   3:9
**40th**   71:24
**415**   3:20
**43**   55:16
**44**   29:21
**45**   31:7,11
**4502127**   1:25
   162:5 163:2 164:2
**48**   37:8,9
**4:12**   149:18
**4:28**   149:21
**4:30**   151:12
**4:34**   151:15
**4:48**   2:18 160:13
   160:15

**5**

**5**   71:3 74:12 92:5
   92:9 94:2 153:13
   157:9
**50**   37:9
**50,000**   112:13
**505**   3:18
**50th**   71:24
**5411**   161:24
**55**   31:4,7,11
**56**   31:3,20 35:23
**57**   32:5,10 33:15
   34:10

**6**

**6**   100:10 121:13
   154:2
**62**   31:20 35:23
**63**   37:24 39:25
   51:22 59:13,21
**650**   4:7
**68**   37:24 39:25
   51:22 59:13,22

**[69 - ad]**                                                                                     Page 2

| | | | |
|---|---|---|---|
| **69**  63:5,10 | 107:14 122:7 | 13:1,18 14:4 15:3 | 111:6,14,20 112:2 |
| **7** | 136:11 142:7,15 | 15:7,21 16:1,9,25 | 112:10,19 113:3 |
| **7**  70:25 71:11,23 | 154:21 | 17:5,17,25 18:10 | 113:15,20,25 |
| 72:12 73:12 74:8 | **absolute**  151:6 | 18:21 19:5,14,21 | 114:8,21 115:5,20 |
| 76:9 128:17 | **absolutely**  62:12 | 20:6,19,24 21:3,15 | 116:1,7,19 117:2 |
| 129:11 154:11 | 116:2 | 21:22 22:3,8,18 | 117:11,16 118:6 |
| **70**  117:19 | **abstract**  13:8 | 23:6,15,22 24:2,15 | 118:14 119:1,12 |
| **72**  63:5,10 | 69:16 | 24:23 25:3,12 | 120:1,21 121:20 |
| **75**  71:14,25 72:1,1 | **academic**  33:18,21 | 26:4,11 27:24 | 122:8 125:7 126:2 |
| 74:12 | 34:2,5,8,9 118:8 | 28:6,13 29:3,10 | 126:10,21 127:8 |
| **75th**  71:1,1,12 | 120:14 125:25 | 31:8,21 33:8,16 | 127:25 128:7 |
| **8** | 126:5,20 | 34:16 35:1,25 | 130:21 131:10,15 |
| **8**  1:18 2:18 5:4,9 | **accc**  116:14,18,25 | 36:15 37:5,19 | 132:3,15,25 133:9 |
| 7:1 147:18,18 | 117:10,15 118:2 | 38:6,10,20 39:5,20 | 134:6,14,24 135:6 |
| 155:1 | 118:11,24 119:4,7 | 40:3,14 41:2,7,18 | 135:16 136:2,8,18 |
| **86**  159:18 | 124:25 125:5 | 42:20 43:3,19 | 137:6 138:15 |
| **87**  123:18,19,21 | **access**  27:17 69:10 | 44:17 45:12 46:10 | 139:14,21 140:8 |
| **89**  6:6 | 104:21 106:15 | 47:1,22 48:13,22 | 141:1,7,15 142:11 |
| **8th**  7:6,14 | 107:2,12 124:18 | 49:10,23 50:18 | 142:22 143:1,12 |
| **9** | 124:21 125:18 | 51:14,20 52:17,23 | 144:4,22 145:16 |
| **9**  48:25,25 100:21 | **accessible**  87:11 | 53:6,19 54:2 | 145:24 146:13 |
| 155:23 | 87:13 | 56:12 57:9,17 | 147:20 148:3,24 |
| **90**  6:8 | **account**  126:24 | 58:12,18 59:4,11 | 149:8,25 150:14 |
| **91**  123:16,18 | 127:2 | 61:5,11,22 62:13 | 150:17,20,22 |
| **94025**  4:6 | **accuracy**  17:10 | 63:6,13 65:3,15 | 151:7,16,19 153:4 |
| **94111**  3:19 | 137:11,20 138:1,8 | 66:18 67:11 68:6 | 160:8 162:1 |
| **99**  6:10 | 139:6 162:9 | 68:22 69:3 70:2 | **acting**  43:15 |
| **a** | **accurate**  21:12 | 70:19 71:9 72:21 | 126:14 |
| **a.m.**  2:18 7:2,13 | 133:21 136:7,17 | 74:2 75:19 77:12 | **action**  32:17 36:14 |
| **abide**  148:4 | 137:1,4,9,10,18,24 | 77:24 78:7,25 | 109:13 140:23 |
| **abided**  147:25 | 137:25 138:12 | 81:21 82:25 84:1 | 161:17,18 |
| **ability**  29:11 52:22 | 139:11,18 142:19 | 86:11 88:25 90:19 | **actions**  32:13 |
| 53:20 124:17,20 | 161:13 | 92:11,25 94:11,24 | **active**  37:20 |
| 134:17 136:23 | **acknowledgement** | 95:18 96:19 97:10 | **activities**  79:17,19 |
| 161:15 | 164:3 | 98:20 99:6 101:2 | **actual**  12:13 32:24 |
| **able**  27:17 36:25 | **acknowledging** | 102:23 104:2,15 | 64:2 67:20 68:17 |
| 37:11 45:16 73:19 | 138:1 | 104:25 105:24 | 75:25 83:18 84:12 |
| 75:2 87:8 88:6 | **acknowledgment** | 106:7,19 107:11 | 103:23 106:5 |
| 89:24 91:3,12 | 162:12 | 107:20 108:8,21 | 107:7 156:7 |
| | **acott**  3:15 5:10 8:5 | 109:17,23 110:3 | **ad**  30:17 32:23 |
| | 8:5 11:23 12:19 | 110:10,15,23 | 41:15 44:1 58:8 |

58:20 71:5,8,20
72:9 83:8 103:7
104:4,7 105:13
106:3,14 107:3
126:24 127:1,2
137:13,19 142:15
**add** 41:3
**added** 79:9
**additional** 121:4
**additions** 164:6
**addressing** 157:25
158:22 159:16
**adjective** 49:21
**adjustment** 55:22
**administered**
161:8
**adopt** 125:16
**adopted** 125:15
**ads** 32:14,16,18,22
37:1,11 39:12
52:2,16,22 53:3,21
65:12 68:10 70:4
70:11,12 103:17
104:19 106:2,23
106:25 124:11
126:24 133:14,14
135:19 136:24
143:21 144:25
154:1 155:15
**adstage** 59:18
60:24
**advantage** 116:12
118:4 120:20
124:14 125:1
128:12 144:17
**advantages** 94:5
98:2
**advent** 87:12
**advertise** 143:24
**advertisements**
153:17 154:14

**advertiser** 37:12
49:2,2,20 55:20
56:18,24 57:1,21
57:24 58:5,19
59:2,6 63:16 66:9
66:12,16 67:25
68:12 70:10,25
71:11 72:3 73:6
74:4,25 75:24
76:3,8 106:22
126:14 127:5
138:21 139:1,19
140:3,24 141:4
143:7,17 144:6,7,9
144:19 145:5
**advertiser's** 52:22
139:22
**advertisers** 20:1
29:25 30:11,17,19
31:13 32:12,15,21
33:6,10 34:14,18
34:19,23 35:4,9
36:22,25 37:10
38:3,23 39:8,15,18
39:23 40:17 41:12
41:15,21 42:1
48:9,20 49:8,12
50:16,21 51:13,17
51:19,23 52:2,16
53:1,3,4,5,14,18
53:24 54:4,15,19
54:20 55:3,23
56:7,14,14 57:6,12
58:10 59:8,10,15
59:17,19 60:1,3,6
60:8,13 61:1,4,7
61:10,16,21,24
62:5,8,12,20,24
64:13 65:2,5,7,10
65:14,17,20,25
66:10,20,23 67:4,5

67:8 68:4 69:2,10
69:22,23,24 70:16
70:22 72:23 73:17
73:25 74:9 75:4
75:11,14 76:11
77:5 104:6,17
107:9 108:4 131:8
131:14 132:13,17
132:24 133:4,5,7
133:22 134:5,9,12
134:16,22,25
135:5,12,19 136:1
136:5,6,9,16,22
137:4,7 138:4,12
138:17 139:11,17
140:19 141:6,10
141:11 142:4,7,10
142:18,21 143:11
143:21 144:2,16
153:16,23 154:4
155:7,16,16,18,20
156:7,12,13
159:18,20 160:1
**advertising** 17:13
19:25 20:11 31:11
31:14 32:13 33:20
34:12,20 35:9
36:7,22 37:1 42:1
42:13,22 49:18
56:25 63:25 66:2
66:22 67:6,25
69:21 72:6,24
73:1 74:11 75:4
76:4,17 107:5,9
117:7 118:22
124:9 126:6,13,17
127:14,19 133:4
133:20 134:10,18
135:2,10 136:4,12
137:11,22 138:10
138:19 141:22

142:2 143:8,18
144:13 154:20,20
154:23 159:20
**advisor** 109:12
**affiliation** 111:13
**affiliations** 7:25
**affirmative** 17:18
**afraid** 23:9 91:7
149:15
**ag** 112:3
**ag's** 113:9
**age** 30:16 32:12
49:13 55:24 57:20
125:19
**ago** 12:20 44:9
48:18 97:16,17
99:15 113:19
**agree** 52:21 53:4
131:8,14 132:23
133:6 134:4,11,22
135:4,25 136:6,16
137:4 153:19
154:6,16 155:8
156:4 157:17
158:11 159:13
**agreement** 12:13
12:23
**ahead** 17:8 23:7
27:5 41:10
**aim** 86:3
**alabama** 13:24
14:1
**algorithm** 104:5,5
104:22,23 106:21
107:10,13
**algorithm's**
106:25
**algorithmic**
103:15,21 105:19
**algorithms** 105:11
105:16 118:19

**alleged**  18:6 29:25
**allenby**  155:21
 157:2,11,13,17,25
 158:8,11,22
 159:13
**allenby's**  26:20
 155:4 156:2,8,10
 157:10 158:6
 159:4
**allocate**  65:5
 74:11 159:8,21,22
**allocating**  42:13
 64:23 159:19
**allocation**  42:2
 64:11 72:24 73:2
 159:3
**allotted**  162:20
**allow**  20:9 39:15
 41:20 54:9 58:6
 85:21 87:13,24
 98:12
**allowed**  17:19
 41:6 147:16
**allowing**  39:23
 43:22
**allows**  30:16 36:22
 54:19 87:14
 107:25 108:4
 148:10 159:6
**alter**  159:11
**amazing**  36:21
 69:9
**ambiguity**  139:16
**amended**  64:16
**amount**  99:10
 118:12 124:15,18
 147:12 159:21
**amounts**  82:23
 83:24 118:4
 124:13

**analysis**  14:25
 23:20 24:4,6 35:3
 35:22 36:13 72:14
 93:24 96:13
 111:13,16,22
 112:6 113:24
 115:4,17,24,25
 155:5,22,24,25
 157:14 159:5
**analytic**  96:25
**analytical**  96:23
 97:14
**analytics**  81:18
 86:5 95:9 96:1
 133:2
**analyze**  104:12
 105:22 106:25
**analyzing**  97:2
**anne**  3:17
**annoy**  135:8
**annoying**  133:14
**answer**  5:12 10:6
 15:8 16:1 18:24
 26:5,15 28:15
 38:14 40:21 41:8
 41:11 48:18
 108:22 114:23
 115:14 134:20
 139:15
**answered**  41:3
 57:11 136:19
**answering**  137:2
**answers**  65:8
**antitrust**  13:20
 128:10 129:1
**anybody**  146:15
**anyway**  123:6
**apart**  29:4
**apologies**  27:9
**apologize**  20:21
 23:10 26:24 82:6

115:21 131:6
 145:21
**apology**  122:1
**apparent**  103:16
**appear**  27:19 90:6
 91:15 100:4
 121:20 156:13
**appearances**  3:1
 4:1 7:24
**appeared**  140:19
 156:19
**appended**  164:7
**applicable**  162:8
**application**  156:1
**applications**  102:8
**apply**  77:16
**appreciate**  151:5
**approach**  18:20
 19:3,6 85:20
**appropriate**  59:7
 79:7,10 138:10
**appropriately**
 94:8 106:13
**approximately**
 26:23
**april**  1:18 2:18 5:4
 7:1,6,14 161:21
 162:3
**area**  78:9 142:6
**argued**  118:12
**argues**  124:14
**argument**  118:24
 119:11
**armando**  6:17
 152:25
**article**  6:15 59:19
 60:25 77:7,10
 105:15,18 128:19
**articles**  34:4,11
**artificial**  146:24

**artificially**  158:3
**aside**  42:17 47:7,8
 47:10,11,16 78:4
 133:25 135:22,24
 140:22
**asked**  12:3 14:5
 17:1 21:9 40:25
 44:8 45:21 48:17
 52:15 75:23 78:1
 78:4,5,17 100:19
 109:18 110:5,7,12
 110:18,19,21,24
 116:10 118:8
 132:11 136:15,16
 140:19 141:16,18
 145:8 149:2
**asking**  15:19
 22:23 40:11 41:22
 42:18 47:17 64:19
 84:2 108:25
 119:19,20 130:9
 139:3,3 140:23
**aspect**  104:4
**aspects**  83:25
**assertion**  79:12
 120:19 124:25
 125:6
**asserts**  124:6
**assess**  54:19,20
**assets**  124:9
**associated**  58:21
**assume**  114:16
**assumes**  153:24
**athey**  109:11
**atkins**  110:8 113:1
 113:2,14
**attached**  28:1
 162:11
**attempt**  80:10
**attempted**  18:5

**attend**  78:15
**attending**  7:21
**attorney**  26:16
  162:13
**attorneys**  22:15,21
**attribute**  159:10
  159:12
**attributes**  158:9
**auction**  102:21,25
  103:8,19,24 104:5
  104:7,9,11,13,18
  104:22,24 105:5,7
  105:8,13,22 106:3
  106:6,10,16,17
  107:6,9,19,24,25
  108:2,4,7,16,20
  109:7,10,11
**auctioneer**  107:25
**auctions**  103:2,4
  109:5 155:15,17
**audience**  32:19
  39:9 40:19,19
  49:1 51:24 52:19
  53:8,21,21 55:24
  56:15 57:3,25
  58:7 67:10 70:1
  70:18 72:15 73:12
  75:18 76:14
**audiences**  20:10
**australia**  116:16
  118:9,10
**australian**  116:5
**automatically**
  76:20
**av**  9:11
**available**  72:8
  162:6
**avenue**  3:7
**avoid**  10:14,14
**avoided**  136:25

**avoiding**  137:10
**aware**  26:19 76:24
  125:5
**awful**  101:8

**b**

**b**  1:5 2:4 24:10
**back**  45:8 48:17
  51:3,9,11,22 52:7
  59:12 69:7 77:17
  84:21 89:8,10
  91:24 92:13,18
  96:16 98:9 105:21
  106:3,3 109:2
  111:7 123:10
  131:2 135:17
  149:20 151:14
**background**
  130:20 131:6
**bad**  132:5 157:19
**balance**  133:16
  148:9,10,13
**balls**  62:1,6
**bargaining**  12:2,9
  12:21 13:9
**barrier**  118:16,22
  120:4
**based**  18:16 19:3,7
  44:13 87:13,17,23
  98:2,12 101:22
  103:16 107:5
  111:19 115:17
  124:20 158:20
  159:12,19
**basically**  11:13
  85:3 101:15
  147:17
**basis**  15:22 26:15
  31:6,9,19 33:13,17
  34:5 63:4,8 64:1
  72:25 78:23 79:12
  96:8,22 156:3

**bathtub**  158:16,19
  158:20
**bear**  156:17
**bearings**  29:15
**beeping**  130:19
  131:5
**began**  97:8
**beginning**  2:17
  159:21
**behalf**  1:6 2:4,16
  8:6,8,9 11:14
  13:21 16:23 105:3
  109:21,25 110:13
  110:17 126:17
**behave**  108:17
**behavior**  36:5,14
  64:3 66:7,9,16
  75:12 76:18 77:1
  77:4 107:5 156:7
**behaviors**  68:25
**believe**  34:24 40:1
  41:24 48:20 49:8
  50:8,24 65:1,4,6
  66:5,6,13 99:24
  133:19 134:16,25
  136:21 138:4
  145:11 146:3
**believed**  130:17
**belmont**  1:17 2:17
  7:1
**benefit**  145:4
  153:24 154:15
**best**  9:6 21:2,4,5,8
  21:9 29:11 61:18
  73:7 108:23
  109:14 132:23
  133:7,12,21 134:5
  134:9,17 136:22
  138:6,19,24,25
  148:2,5 161:14

**beth**  23:11,12
**better**  20:10,13
  56:24 57:6,13,16
  57:25 58:5,6,11,14
  61:14 66:10,20
  86:6 88:23 101:22
  102:19 114:11
  150:19 152:10
**beyond**  26:14
  113:10
**bias**  70:6,10
  103:15,21 105:19
  158:10,13
**bid**  108:4
**bidding**  107:4,5
  155:18
**bids**  104:9,10,17
  106:10 107:9
**big**  40:19 122:6
**bill**  114:24
**billed**  111:19
  112:9,21 113:10
  115:9,24
**billing**  111:10
  112:21 113:7,9
  114:25 115:15
  117:22,24,25
**billings**  111:22
**binary**  138:9
**bit**  10:13 12:20
  32:4 49:4 56:2,3
  74:4 85:2 86:22
  111:7 136:15
  138:13 148:7,15
**black**  106:18
  107:17
**blip**  145:2
**blue**  13:19,20 14:6
  14:7
**blurring**  155:13

**board** 139:25 140:10
**boards** 16:21 110:25 114:6,20 114:23 115:3
**borek** 24:7,10
**boston** 55:18
**bottom** 94:1 123:17 124:1
**box** 106:18 107:17
**boxes** 122:21
**brass** 158:16
**break** 48:15 51:1 89:2 123:3,6 150:3
**breaks** 150:7,13 150:25
**brief** 12:6
**brilliant** 88:4
**bring** 89:13 91:5 103:11
**bringing** 100:1
**broad** 39:9 43:16 44:6 51:25 52:20 54:21 56:21 57:19 61:2 66:4,12 120:4
**broader** 56:2 65:24
**broker** 124:18
**browning** 24:7
**browser** 122:11
**buckets** 61:2
**budget** 31:15 42:2 42:14 49:2 51:16 51:16 64:11,18,23 71:11,15 75:17 76:4 155:4 159:3 159:9,21,22,24
**budgeting** 30:11 32:21 33:3,5

42:22 50:3,17,21 63:1,25 65:11 69:21
**budgets** 65:5 73:18 75:4,11,14 155:13 159:11,19
**bulk** 93:16 94:6
**bunched** 148:12
**bunching** 148:15
**bundling** 35:11
**business** 147:6
**buys** 137:13

**c**

**c** 9:1
**cain** 1:5 2:3
**calculate** 93:15 94:8,15 138:3
**calculated** 106:18 107:3 147:18
**calculates** 104:23
**calculation** 107:8 154:13
**calculations** 103:23 106:6
**calendar** 90:10 92:3
**california** 1:2 2:2 3:19 4:6 7:18 161:1
**call** 31:23 67:4 117:7 137:18 145:19 146:4 149:4,10,12,13
**called** 105:16 110:25
**calls** 149:6
**campaign** 57:19 61:8 67:15,18,20 67:25 68:2 71:5,8 74:6

**campaigns** 66:22 67:9 69:8,11,25 70:17 73:3,5,10 74:9 76:12 105:3 126:25 127:2
**campbell** 110:1,6 111:4,15,25 112:1 112:5,7
**candidly** 77:25
**captured** 152:17
**card** 54:6,9,11 55:17,25
**care** 139:20 140:6 140:25 141:10
**cared** 140:20
**careers** 105:4
**careful** 46:23 47:20 63:7
**carefully** 60:10 61:16
**case** 7:19 10:23,24 11:9,12,22,24 12:1 12:4,7,11 13:13,19 13:20,22,23 14:3 14:14,15,22 15:2 16:20 17:1,4,9,16 18:4 27:20 29:6 42:24 44:2 50:5 56:25 73:3 83:15 101:14,15 110:1,8 110:13,17,20,22 111:1,9 112:7,17 112:18,20 113:1,2 113:6,14,18 114:2 114:4,6,14,16,20 114:23,23,25 140:1,4 141:9 145:7 146:6,8 152:20 153:11 154:12 157:7

**cases** 13:12 45:16 55:20 71:14 83:1 87:22 95:3,25 96:2 112:5
**casual** 45:17
**casually** 44:20
**cat.rizzoni** 3:23
**categories** 18:18 19:9
**catherine** 1:15 2:15 3:17 5:7 6:2 6:5 7:8,15 8:25 15:7 27:11 124:12 129:1 160:11 162:5 163:2,24 164:2,4,12
**cause** 152:19 153:10 157:5
**caution** 17:6 18:1 18:23 21:23 25:13 26:13 132:20 145:25
**caveat** 79:9 135:8
**certain** 44:1 45:22 47:24,25 66:22,23 73:15 74:16 103:20 128:9
**certainly** 34:1,3 34:10 36:2 46:17 48:3 50:4,20 52:25 56:8 63:8 64:16 69:18,18 77:18 78:18 87:1 88:21 92:14 93:2 93:17 94:20 95:12 96:2 97:2,18 99:10 102:12,24 106:15 108:2 109:1,4 118:20,20 119:5 125:12,22 126:22 127:10,18

**[certainly - comparing]**                                                                 Page 7

140:2 141:23
143:5 146:25
147:22 148:8
**certify**  161:5,16
**chance**  123:2
137:17
**change**  62:7
152:19 153:10
157:5,6 163:4,7,10
163:13,16,19
**changed**  90:20
96:24
**changes**  117:25
155:4 162:10
164:6
**channel**  11:15
**check**  15:4 141:22
**checking**  28:1
65:23
**checks**  16:13
**chiagouris**  40:6
41:24 42:12,17
45:7,21 47:3,7,13
47:16,18
**choice**  131:20
159:12
**choices**  47:24,25
**choose**  131:22
**chooses**  57:25
**choosing**  58:6
158:20
**choppy**  150:17
**chosen**  33:10
**christopher**  24:7
**christopher's**  24:8
**circulation**  37:13
38:1 39:1 141:24
**circumstances**
50:2 58:15 66:11
66:22 74:16

**cite**  33:23,25
125:22
**cited**  34:8,9
125:11
**cites**  124:16
**citings**  34:9
**claim**  69:12
140:20
**claimed**  69:5
**claiming**  64:10
**clarification**  70:4
70:15 152:19
**clarifications**
152:2,5
**clarify**  15:10
43:22 46:19 55:8
65:17 110:16
116:8,22 139:7
152:8,18
**class**  16:11,12 76:9
80:10,21 81:1,1,2
81:5,8,10 82:3,4,7
82:12,13,18 83:8
84:6,9,19 85:2,10
85:14,20 86:4,19
86:23,24 87:3
90:7,14,16,21,22
90:23 92:10,15,16
92:23 93:2,3,20,20
94:4,21 95:1,17,24
95:25 96:4,6,10,18
97:2,4,13,17 98:14
98:18,22,23 99:1
99:10,12,17 100:5
100:7,21,23,24
101:4,6,11,12,21
**classes**  81:12,20
82:20,22,24 83:15
83:23 84:23 85:4
86:9,14,15 87:6
91:18 99:5 101:18

101:19 109:6
**classifications**
14:12
**classifies**  42:25
43:1
**classify**  16:8
**classroom**  109:13
**clean**  9:13,18
**clear**  22:23 34:7
42:16 48:18 55:15
60:18,24 63:24
77:3 80:25 92:12
94:17 95:20 96:22
97:12 98:23 99:7
137:8,19 140:13
143:3 144:14
149:22 153:6
**clearest**  21:11
**clearly**  55:2 59:16
61:2 74:13
**clears**  49:4
**clever**  143:14,19
144:2
**click**  137:14
**clicks**  32:14
136:13
**client**  26:16
**cliff**  93:6,21 94:4
94:16
**close**  71:15 73:18
75:1 76:10 138:7
**closer**  27:1
**cloud**  87:13,17,23
98:2,12
**coauthor**  102:13
**code**  102:3,5,7,11
102:12,12,13,15
102:16,16 107:13
107:15 108:6,19
108:23

**coder**  102:18
**coding**  102:10
**coefficient**  159:7
**cohen**  3:4 4:11 8:2
8:3
**cohenmilstein.c...**
3:10,11
**combination**
61:25 62:6
**come**  13:8 51:3
58:5 61:12 83:17
91:10 98:15,17
130:15 138:6,24
138:25 143:14
144:1,5,15 146:21
**comes**  53:8 60:16
61:24 118:18
**comfortable**  79:5
**coming**  45:8 46:3
100:2 138:25
**comment**  45:16
98:8,10
**commission**  116:6
116:16
**common**  45:3
132:9
**commonly**  107:24
**communicate**
136:5
**communications**
15:24 17:7 18:2
18:24 19:23 21:24
22:24 25:17 146:1
**community**
137:22
**companies**  79:22
80:13
**company**  54:9
136:3
**comparing**  73:2,5
73:9

compensate 117:14
compensated 86:1 116:17 117:8
compensation 111:18 115:16
competing 135:10 136:3 155:16
competition 116:5 116:16 129:13 145:5
competitive 116:12 118:4 120:19 124:14 125:1 127:24 128:12 135:11 138:5 144:10,17
competitor 145:1 145:2
competitors 144:11,21
compilation 28:4
complaint 64:16 140:17
complete 21:12 28:4,7,9,9,11 29:1 29:5 63:11 156:6 164:8
completed 162:17
completely 68:8 71:17 88:17 133:13,18 135:9 135:18 138:9 154:19 155:14
complex 138:14
compressed 82:14
compromise 101:11
computer 101:25 102:2,3,5 105:10 105:16 123:3

concedes 124:19
conceptual 13:6 101:14
conclude 160:7
concludes 160:10
conclusion 33:14 33:17
concretely 142:7
conduct 77:23 78:6 96:12 125:25 126:4,8 157:19,22 157:23
conducted 34:22 48:19 49:6 126:17 141:10,18
conference 7:21 22:7 26:1,2 78:20 146:24
conferences 78:12 78:15 146:21,22
confers 124:14
confidential 1:13 2:13 106:13
conflate 37:25
conflict 78:2
confused 26:25 130:1
confusing 79:25
conjoint 77:8,10 77:11,14,20,23 78:6,9,13,16,19,21 78:24 79:2,8,11,13 79:13,15,21,23 80:16,21 81:13,16 81:25 82:10,19,21 83:2,4,7,7,14,18 83:24,25 84:10,13 84:18,23 85:1,3,11 85:15,16,22,24 86:2,4,8,13,16,19 87:5,7,14,19 88:5

88:7,7 89:12 92:20,24 93:3,7,24 94:1,5,6,9,16,23 95:16,22 96:5,5,12 96:13,13,17 97:2,9 97:25 98:19,22,25 98:25 99:2,5,11,14 100:14,17,19,22 101:22 155:5 156:2,9,10 157:14 157:19,22,24 158:14,15,17,24 159:5
conjoints 77:16 79:16 80:10,12 85:12 101:20
connection 34:14 34:17 114:20 115:3 117:9,14 145:15 148:20 149:7
conscious 88:3
consider 30:10 84:15 158:4,4
considered 29:8 35:5
consistent 32:11
consistently 141:9
constant 98:16
construct 14:21,23
constructive 119:16 121:6,11
consumer 116:5
consumers 85:22
contain 93:5 161:13
contained 35:23
contains 28:3
contemporary 95:7

contend 78:23
content 105:13
contention 64:8
contentions 63:20 64:5,8,13
contents 15:23 18:2,23 19:22 21:24 25:17 146:1
context 45:14 50:14 52:12 59:15 60:19 75:23 116:23 118:21 120:25 127:9,17
continue 131:5
continued 4:1 140:1,12,17
continues 39:14
contradict 64:3
contrast 32:10
convenient 68:18
conversation 84:12 119:15 120:16 121:5,10 141:3 152:12
conversations 150:4
conversion 71:19 73:7 74:14 137:15 137:19,21 143:5,7 143:16,20,23 145:3,4
conversions 32:14 72:11 136:14 138:19
convert 83:18
copies 9:20 162:14
copy 9:12,13,15,18 27:19 121:21
copying 68:13
core 120:6

**correct** 10:22 14:22 19:13 22:2 27:16 29:22 35:18 48:3 55:4 70:14 80:4 81:8,9,11 90:12 93:11 94:10 94:12 100:9 105:20 115:22 148:22 155:22 164:8
**corrections** 164:6
**correctly** 73:24
**correlate** 18:6 92:14,15
**correlated** 124:17
**correlation** 49:1 156:6
**correlations** 48:24
**correspond** 92:9 92:13
**cost** 67:21 71:19 72:11 73:7 74:14 103:18,18 116:20 143:5,6,16,20 145:3,3
**costs** 128:10 143:22
**counsel** 7:16,24 8:19 15:24 17:7 18:3,24 21:19,21 21:24 22:24 23:1 25:17 27:12 41:5 41:5 89:18 91:2 99:21 121:16 122:14 128:20 146:1,3 148:23 149:2,11,14 150:4 150:8 151:3 153:2 161:10,16 162:14
**count** 26:18 137:15,21

**county** 161:2
**couple** 13:11 44:8 148:7
**course** 6:6 8:25 15:20 21:11 28:15 30:7 34:19,20 44:23 47:24 55:7 74:8 77:10 83:16 83:19 85:23 89:16 95:3,14 96:24 106:12,15 107:15 108:11 118:17 122:20 131:21 139:23 148:15 157:21
**court** 1:1 2:1 7:18 7:22 117:5
**cover** 75:2,18 80:18 81:12 82:19 82:21 83:24 85:1 85:3 86:8 87:9,14 95:15
**coverage** 73:20
**covered** 87:5,7 116:20
**covering** 87:17
**cpm** 155:6
**created** 56:5 58:4 61:14 154:1
**creating** 58:20 67:15
**credit** 54:6,9,11 55:17,25
**criteria** 19:9 38:3 38:24 39:16,24 40:18 41:13,21 56:7,17,20 57:23 58:6,22,24
**criticize** 84:3,17
**criticized** 18:7

**criticizing** 15:17 17:15,24 18:9
**critique** 154:6 158:6,23 159:4
**critiques** 157:12
**cross** 13:20 14:6 68:16
**crowding** 104:9
**cs** 162:15
**csr** 1:24 2:19 161:4,25
**cure** 158:24
**current** 93:19 101:15
**currently** 11:6 98:21
**custom** 56:15
**customer** 6:8 90:25 91:20 92:6
**cv** 1:7 2:5 7:19 11:6,20 13:14 34:10 103:11,11 103:14

**d**

**d** 1:5 2:4 5:1
**daily** 62:25
**damages** 17:21,23 154:13
**dan** 69:14,14
**dashboard** 57:4 68:19 76:21
**data** 17:10 20:9,9 21:17 42:8 53:8 53:20,24 54:4,5,6 54:8,13,15 55:7 57:1 59:7 61:14 88:6,7 96:13 97:2 100:11 106:11 107:4,5 118:4,12 118:16,17,21 120:3,4,6,20,25

124:9,10,13,15,18 124:18,19,21 125:2,18 129:2 133:2,5,21 134:3,9 134:17 135:2 136:10,13,23 142:19 146:20,23 156:6,14
**date** 163:24 164:12
**dating** 94:3
**day** 17:12 80:6,15 80:19 147:23,24 161:21 164:15
**day's** 147:17
**daylight** 7:6,13 51:7,10 52:5,8 89:6,9 123:8,11 130:25 131:3 149:18,21 151:12 151:15 160:13
**days** 162:17
**dc** 3:8
**deal** 94:9
**dealt** 103:4
**deans** 101:9
**debate** 138:9
**debated** 137:22
**decade** 87:8
**decide** 19:9 38:16 84:18 119:7
**decided** 101:6,9
**deciding** 18:17
**decision** 50:4 56:25 57:2 58:5 72:6,25 73:2 101:7 107:1 158:25 159:11
**decisions** 30:12 31:16 32:21 33:3 33:5,12 35:11

42:2,14,23 50:17
50:22 51:16 57:6
57:22,24 60:10
63:25 64:11,18
65:12 66:11,21
69:21 119:8
134:18 135:3
136:10,11 138:20
144:13 159:24
160:2
**declare** 164:4
**declared** 125:18
**deeley** 23:12 42:6
54:17 74:21
**deemed** 164:6
**deeper** 84:15 86:7
**defendant** 1:11
2:10 3:13 8:8
11:11,12
**defense** 12:15,16
**define** 41:23
139:16
**defined** 61:2
**definitely** 50:8
96:5
**definition** 43:12
47:6 138:1,23
**definitively** 95:20
**degree** 79:1 102:1
102:2 121:1
**delay** 10:13
**delayed** 148:16
**delivered** 32:16,18
**delivering** 37:2
62:16 73:7
**delivers** 44:1
**demonstrate** 83:7
**demonstrates**
155:3
**demonstrating**
96:5 97:1 98:6,13

**demonstration**
96:8,12
**denigrate** 147:3
**deploy** 79:22
**deponent** 162:13
164:3
**deposed** 9:23
10:21,24 11:3,7
13:15 16:16
**deposing** 162:13
**deposition** 1:15
2:15 6:1 7:8,15,20
9:10 21:14,21
22:2 23:1,5 25:24
69:19 114:10
161:6
**depositions** 10:9
13:16
**depth** 80:18 82:24
83:24 87:9,15
95:16 96:17,21
97:9
**describe** 36:18
39:10,24 51:21
59:14 64:17
**described** 14:9
19:24 39:15 40:7
40:9 59:16 100:16
**describes** 30:24
40:9 59:19
**description** 6:3
**deserve** 134:12,22
135:1 136:7,17
137:4,7 138:12,17
139:11,17
**design** 85:12 108:7
**designated** 123:13
128:23
**designed** 13:5 84:4
85:20 107:18

**designing** 79:6
**desired** 32:17,19
32:23
**despite** 139:24
140:1
**detail** 30:17,25
32:4 34:4 69:17
**detailed** 156:9
**details** 15:12,13
**determine** 67:10
70:1,18 76:13
**develop** 108:20
**developed** 18:16
19:7
**devote** 97:19
**devoted** 93:14
94:7,14,23 96:11
98:22 99:14
101:21 103:17
105:11 154:8
**devoting** 96:23,25
97:18 99:4
**dial** 56:20 58:21
61:15
**differ** 154:4
**difference** 74:12
101:14
**differences** 154:8
**different** 16:7
18:13,16 40:11
42:9 49:5 81:23
82:11 83:25 84:14
84:22 86:10 99:1
104:10,19 105:2
106:2 108:5
136:16 154:4
**differently** 98:10
**difficult** 38:15
67:13 137:2 143:4
**digital** 6:12 17:13
19:25 20:8 30:16

32:12 33:18 34:12
34:20 36:21 39:2
49:13,18 50:11
52:24 53:12 76:17
120:4 121:14
133:4 136:4
137:11,22 141:20
142:14 146:22
154:20,20,23
159:24
**digitization**
102:20
**direct** 75:8 153:13
154:25 157:9
**direction** 161:12
**directly** 113:10
139:23
**disadvantages**
94:6 98:3
**disagree** 63:23
119:10,24 120:18
155:12 158:12
**disagreed** 119:21
125:5
**disagreement**
120:7,15 125:17
140:14
**disagrees** 124:25
**disclose** 25:16
**disclosure** 134:1,2
135:13 155:5
**disclosures** 135:14
145:14
**disconnect** 46:8
**discovery** 98:12
**discrimination**
103:16
**discuss** 34:4 59:18
98:6,23 100:21
**discussed** 60:20
121:2

**[discusses - emergency]**                                        Page 11

discusses   60:21
  64:2
discussion   7:11
  52:6 78:17 98:12
  101:9 120:17
  131:1 136:20
discussions   150:8
  150:11,23
display   103:16
disregarding
  155:14
disruptive   135:20
distance   113:8
  120:7
distant   127:13
distinction   61:13
  62:9 126:15
distinctive   55:6
distinguishing
  85:7
distorted   144:12
distribution   11:15
  155:3
district   1:1,2 2:1,2
  7:18,18
division   1:3 19:10
  19:18
divulge   15:23
  146:1
document   19:7
  45:15 89:13,14,21
  89:25 90:3,24
  91:4,12 99:23
  119:14,17 121:7,9
  121:12,13,19
  122:3 123:13,17
  123:18,21 125:22
  128:17,22,24,25
  145:18 152:22
  156:16

documented   106:1
documents   9:21
  25:1,5,6,14 26:8
  26:13 45:23 149:1
  149:3
doing   72:4 74:25
  76:6 87:11 93:7
  97:3 107:15
  108:10 116:14
  122:20 127:19
  156:13
dollars   20:11
  74:11 80:12 115:8
  142:3,16
double   15:4 65:23
dr   7:15 8:11 15:23
  20:22 21:13 22:22
  26:13,20,20 27:5
  29:13 37:17 38:4
  38:18 40:1,12,20
  41:3,10 42:16,18
  44:7 46:5 47:9,16
  48:19 49:3,19
  51:11,12 52:9
  53:17 58:10 59:24
  62:11 63:19 66:15
  66:25 67:8 71:22
  77:7 82:6 84:20
  85:1 89:10 91:24
  97:6 101:24,25
  109:15 111:3
  122:10 123:12
  131:6 133:24
  135:21 137:1
  139:10 143:25
  145:9 148:19
  150:3 151:4,20
  153:3,4,22 154:23
  156:8,8,10 157:2
  157:10,11,13,17
  157:25 158:6,8,11

158:22 159:4,13
  160:3,11
draw   62:9
drive   4:5 66:14,16
driven   32:21
driver   56:8 97:21
drives   66:8
driving   32:13 66:6
due   137:19 148:11
  148:16
dynamic   159:24
  160:2
dz   1:5 2:3 3:3 7:16
  162:4 163:1 164:1

**e**

e   5:1 9:1 24:10
  163:3,3,3
earlier   35:24 36:1
  65:8 70:4 114:13
early   90:23 94:25
earn   111:4 112:8
  112:18 113:2
  115:2
earned   113:13
easily   87:12
eastern   7:6,13
  51:7,10 52:5,8
  89:6,9 123:8,11
  130:25 131:3
  149:18,21 151:12
  151:15 160:13
easy   55:1 79:23
  130:14 131:7
econometric   12:25
  14:14,17,21,24
  15:1,13,16,18
  18:20 19:12 102:8
econometrics
  14:16
economic   31:10
  33:20 36:17,19

128:13,13 154:14
economics   14:11
  102:19 119:6
  146:24
economist   102:6
  109:9 134:15
economists   14:8
  109:12 116:16
  117:4,6 119:4
  120:8
ecosystem   65:24
  117:7
edge   145:7
educate   117:6
education   109:10
educational   66:19
  66:25 67:1 117:4
effect   158:23
effected   155:21
effective   67:22
effects   14:18
  103:18 128:11
  130:4,6,14,16
  158:9
efficient   102:15
efforts   113:23
  138:25
eight   147:22
either   19:13
elasticities   97:20
elasticity   93:16
  94:8,15
electronically
  27:12 89:17 91:2
  99:21 121:16
  128:20 153:2
elizabeth   8:25
emergence   33:19
emergency   120:9
  120:9

emphasis 83:17
emphasizes 138:8
empirical 103:15
  154:3
empiricist 103:2
  108:17,24
employ 87:18
  102:18
employee 18:17
  19:8 149:11
employees 44:14
  45:9,14,25 46:7,13
  46:18 148:20
  149:3,5,7
enabled 30:16
encoding 118:18
encourage 59:6
  61:18 84:9 85:12
  125:21
encourages 44:5
  60:9 66:10,20
encouraging 38:2
  84:12 125:16
endeavor 21:11
ended 11:13
engaged 118:2
  124:12 145:10
engagement
  145:15
engaging 86:21
enhance 20:13
enhanced 32:11
ensure 20:1 43:25
entire 35:2 75:18
  129:22 130:4
  154:7
entirely 124:11
entitled 91:20
  110:1
entity 118:12
  124:15

entry 103:14
  118:17,23 120:5
environment
  52:24 159:25
equal 82:23 83:23
equate 131:19
era 39:2 53:13
errata 162:11,13
  162:17
error 122:23,24
especially 102:7
esq 3:5,6,15,16,17
  4:4
esquire 162:1
establish 76:15
estimate 37:22,25
  38:22 39:22,23
  40:7,10,16 41:12
  41:20 43:5 49:14
  54:19 67:14 111:8
  111:8 113:7
  131:19 132:22
estimate's 113:4
estimated 49:1
  62:25 106:10
  155:4 158:5 159:7
estimates 30:1,10
  30:18 96:6 138:18
  159:8
evaluate 14:5
  41:15 43:10,13
  45:3 47:4 48:10
  50:9 67:24 69:11
  74:10 82:10
  136:23
evaluated 49:16
evaluates 48:10
evaluating 14:24
  15:2,14,17 69:8
  73:9

events 68:24
everybody 149:23
evidence 8:14
  10:25 20:16 35:5
  50:4,16,24 76:25
  77:2 143:3 154:3
evidently 20:8
  50:23 53:12
  131:17 155:11
evolved 48:4
exact 28:20
exactly 16:13
  106:24 108:17
  113:5 130:5
  138:23
examination 5:6
  8:21 151:18
  161:10
example 28:19
  37:8,12 43:25
  45:18 48:1 59:18
  60:24 69:4 71:24
  88:15 106:22
  107:3,8 119:7
  120:14,24 121:2
  124:16 133:13
  137:12 143:14,15
  144:8,14,15,24
  146:21
examples 118:9
  120:5 154:12
excel 68:15
exception 29:5
excited 79:21
execute 81:18
executed 104:23
executive 80:3,8
  81:1,7 82:13 84:8
executives 44:14
  79:20 80:2,9,19
  146:19 147:2

exercise 108:25
exhibit 6:4,6,8,10
  6:12,14,16,21,22
  27:10,13,14,15
  28:25 70:25 71:11
  71:23 72:12 73:12
  73:22 74:8 76:9
  89:15,16,22 90:25
  91:4,13,24 92:18
  92:19 99:19,24
  103:12 121:14,19
  121:25,25 123:14
  123:17 128:18,21
  128:23 151:21
  152:23,25 156:17
  156:19
exhibits 6:1,19
  27:22 28:1 31:23
  31:25 48:25
exist 101:16
existed 92:16
existing 28:24
  48:2
expect 86:15 114:2
expectation
  118:18
expected 87:1
expensive 87:10
  87:18
experience 135:20
  159:20
experienced 10:5
experiences 84:10
experiment 126:5
experimentation
  146:22
experiments
  125:25
expert 6:4,16 9:16
  12:4 14:25 16:15
  17:2,4,21 18:5

[expert - footprint]                                                            Page 13

21:18 27:10,19
28:21 78:24 79:6
85:21 108:3
109:19 110:5,18
110:19,22,24
114:9 152:25
**expertise**  33:18,21
34:2 77:18,19
79:2,13
**experts**  14:17
28:16 29:24 30:9
**explain**  31:2,6,6,9
33:11 37:24 50:25
98:25 127:17
**explained**  14:18
**explaining**  139:24
139:25
**explanation**  63:9
63:12
**explicit**  85:11
**explicitly**  49:16
85:11
**exploring**  11:25
**expressed**  17:18
127:15,20,23
152:10
**expressing**  33:21
**extant**  48:2
**extensively**  33:22
49:12
**extent**  15:7 16:1
36:6 46:10 48:4
85:3 86:9 118:3
124:13 128:9
135:12
**eye**  62:1,6

**f**

**face**  129:23
**facebook**  1:10 2:9
3:13 4:13 7:17 8:6
8:8,9 16:22,23

17:2,10 18:15,17
19:4,7,8,9 23:14
29:24 30:19 31:13
32:12 34:13,18,19
34:23 35:4,8 40:9
42:4,8,8 44:10,14
45:9,14,24 46:6,13
46:14,18 48:20
49:7,20 58:20
61:19,21,24 62:4
62:12,15,24 64:24
65:10,19,20,20,22
66:2 67:3,6 68:18
69:23,24 73:17
102:25 103:7,19
103:24 104:7,11
104:13 105:3,13
105:22 106:3,9,12
107:1,13,19,21
109:16,18,21
110:1,1,6,8,11,13
110:14,18,19,21
116:5,10,17,20
117:13 118:2,8
120:19 124:6,8,11
125:1,18 126:8,14
126:19,23 127:1,4
127:4,7,18 128:14
130:4 132:24
133:7,11,13 134:2
134:5,12,23 135:4
135:10,25 136:7
136:12,17 137:5
137:14,19 138:4,5
138:13,17,17,24
139:12,17,20
140:1,12,18,25
146:7,12,16,18,19
146:20,25 147:7,8
148:19 149:2,6,14
153:23 154:1

162:4 163:1 164:1
**facebook's**  39:3,12
51:12 65:9 104:22
126:1 127:14,24
129:23 130:7
133:1,17,19 134:8
134:17 136:22
153:17 155:6
**fact**  55:16 57:1
79:13 88:3 130:14
155:15 159:25
**facts**  12:11,13
**fail**  29:24 30:9
**fails**  162:19
**fair**  24:12 29:1
55:9 83:22 87:8
94:10 138:14,16
139:13
**fairly**  158:9
**far**  29:6 68:1,9
95:1,3,16 114:12
116:10 142:6
**fashion**  81:13
**faster**  82:15
**feature**  81:25 82:2
**features**  82:11
157:16,21 158:4
**feel**  28:17 57:10
**feeling**  88:18
**feelings**  125:9
**feels**  115:12
**felt**  88:19 121:11
152:9
**female**  55:16
88:16
**fewer**  153:25
**fifth**  3:7 109:20
**figure**  71:17
**file**  122:6,9
**filed**  7:17 140:16

**filepicker**  101:14
**finally**  36:22
**find**  70:23 73:21
120:10 126:16
155:13
**fine**  9:14 15:5
38:15
**finish**  10:16
**firm**  11:12 45:2
47:4 48:10 74:23
74:23 83:4 87:18
124:21
**firms**  11:14 79:18
84:13 120:5
**first**  13:19 18:12
21:20 22:1 43:4,7
75:21 76:16,16
90:6,7 92:21
97:12 98:1 125:10
145:9,19 146:6
152:5,17 155:11
157:13
**fit**  47:5 82:10
**five**  26:24,25 27:1
31:4 151:8
**flaws**  77:14 84:11
156:10
**floor**  3:7
**focalism**  158:10
158:13
**focus**  25:8,18 36:6
36:25 95:22 142:2
**focused**  12:8 16:15
32:15 64:16,17
65:19 94:5 95:8
**focusing**  34:23
48:20 49:7
**folks**  7:9 115:24
**follow**  47:9
**footprint**  120:4
121:4

**force** 33:20
**forced** 159:8
**forces** 128:13
158:3 159:2
**foregoing** 161:6
161:13 164:5
**foremost** 109:11
**forgotten** 108:14
109:2,3
**form** 11:23 12:19
13:1,18 14:4 15:3
15:21 16:25 17:5
17:17,25 18:21
19:5,14,21 20:6,19
20:24 21:3,15,22
23:6,15 24:2,15,23
25:3,12 26:4,11
27:24 28:6,13
29:3,10 31:8,21
33:8,16 34:16
35:1,25 36:15
37:5 38:6 39:5,20
40:3,14 41:2,18
42:6,20 43:3,19
44:4,17 45:12
46:10 47:1,22
48:22 49:10,23
50:18 51:14,20
52:17,23 53:6,19
54:2,17 56:12
57:9,17 58:12,18
59:4,11 61:5,11,22
62:13 63:6,13
65:3,15 66:18
67:11 68:6,22
69:3 70:2,19 71:9
72:21 74:2,21
75:19 77:12,24
78:25 81:21 82:25
84:1 86:11 90:19
92:11,25 94:11,24

95:18 96:19 97:10
98:20 99:6 101:2
102:23 104:2,15
104:25 105:24
106:7,19 107:11
107:20 108:8
109:17,23 110:3
110:10,15,23
111:6,14,20 112:2
112:10,19 113:3
113:15,20 114:8
114:21 115:5
116:1,7,19 117:2
117:11 118:6
119:1,12 120:21
125:7 126:2,10,21
127:8 131:10
132:3,15 134:6,14
134:24 135:1,6,16
136:2,8 137:6
138:15 139:14,21
140:8 141:1,7
142:11,22 143:12
144:4,22 145:16
145:24 146:13
147:20 148:3,24
149:8
**formal** 45:1
152:14
**format** 10:7
**formats** 159:20
**forming** 35:5
**forms** 99:2
**forth** 31:19 33:14
50:24 63:4,9
125:6 161:7
**forty** 31:4
**forward** 74:11
**found** 95:4 120:16
125:23

**four** 27:1,3
**fragile** 130:5
**fragility** 130:3,13
**fraley** 110:13,20
112:4,17,18,20,24
146:8
**framework** 121:3
125:15
**francis** 3:15 8:5
15:5 23:8 122:7
162:1
**francis.acott** 3:21
162:2
**francisco** 1:3 3:19
7:19
**freely** 127:3
**frequency** 70:6,10
**front** 38:9 40:23
40:24 45:24 50:7
128:3 159:19
**full** 8:23 82:17
124:5 161:13
**fully** 152:16
**function** 61:18
**further** 30:8 56:22
57:1,2,22 58:6
151:2 160:6
161:16
**future** 130:7

**g**

**g** 3:6
**gained** 77:19
**gamesmanship**
107:1
**gaming** 135:13,15
**geared** 63:16
**geller** 152:13,13
**gender** 103:16
104:6 124:17
125:18

**general** 10:1 16:11
50:10 64:12,19
65:14,18,24 69:22
69:23 79:16 81:2
81:10 82:4 83:19
131:11,12,20,23
132:12 133:19
134:4 135:25
**generalized**
107:24 108:3
**generalizing** 74:3
**generally** 64:21
86:25 90:16
**generated** 32:24
**generating** 32:22
**generic** 12:13,23
**geoff** 48:13 88:25
121:20 150:14
151:7
**geoffrey** 3:5 8:1
**getting** 9:15 20:5
26:25 54:25 82:5
84:19 130:21
**ggraber** 3:10
**give** 8:15 9:6 12:6
14:2 18:22 21:1
21:11 26:12 45:18
121:1 122:17
127:10,17 129:7
131:20 134:8
144:7 157:20
**given** 10:25 12:10
24:17 44:4 57:3
58:1 60:16,18,25
69:9 72:8 78:11
78:17 111:9
112:21 114:10
120:23 127:4
132:5 133:11
139:16,16 143:25
155:3 160:11

**[given - half]** Page 15

164:9
**gives** 58:13,17
66:1 126:24 127:2
142:16
**giving** 122:2,5,5
129:5 144:17
**glad** 70:3 79:9
**glm** 16:12
**glumetza** 10:24
11:9,14,24 13:12
**go** 10:4 15:8 17:8
23:7 27:5,9 29:12
29:14 30:8,25
31:12 32:3 37:7
41:10 48:17 49:24
51:5 52:3 55:13
56:20 64:15 68:12
69:15 70:24 82:23
83:22,23 84:11
89:4 90:24 91:23
91:24 92:1,18
93:4,23 98:9,24
99:1 100:7 101:7
121:12 122:11,13
122:18 123:16
128:17 129:11
130:22 139:8
140:10 149:16
151:8,8
**goal** 137:11
**god** 8:16
**goes** 31:1 69:17
135:7,17 137:13
**going** 7:9 19:16
22:24 23:17 31:23
38:12 40:5 41:8
44:5,6 48:13 51:6
52:4 54:21 55:19
55:20 56:16,19,21
57:22 65:18 71:2
71:12 73:1 74:7,8

74:11,23 75:5,5
85:16,17 88:25
89:5 96:17,21
105:21 106:25
107:16 111:7
113:5 114:6,11,16
115:12 123:6,7
130:24 131:18
137:8,9 138:2,22
148:8 149:17
151:11 152:22
153:13 156:16
157:9,20,24
158:17
**good** 8:1,5,23,25
28:17 48:15 80:14
89:1 105:1 135:2
143:24 144:9
**google** 120:10,11
124:2
**gosh** 56:1 111:7
130:4
**graber** 3:5 5:9 8:1
8:1,22 12:3,24
13:10,23 14:13
15:10 16:5,16
17:3,8,23 18:8,19
19:2,12,19 20:4,15
20:22 21:1,6,20
22:1,6,13,22 23:7
23:20,25 24:5,22
25:1,9,15,20 26:8
26:22 27:7,13
28:3,11,23 29:7,12
31:12,25 33:13,23
34:22 35:7 36:12
36:19 37:15 38:4
38:8,12 39:3,11,21
40:11,20 41:5,8
42:3,15 43:1,17
44:7 45:8 46:2,21

47:7 48:12,16
49:3,19 50:15
51:1,5,11,18 52:1
52:3,9,21 53:2,16
53:23 54:3,24
57:5,15 58:9,16
59:1,8,23 61:9,20
62:10,22 63:11,18
65:6,21 66:24
68:4,20 69:1,13
70:7 71:6,21
73:11 74:19 75:16
76:11 77:22 78:3
78:11 79:5 81:23
83:22 84:7,16
86:12 89:3,10,14
89:19 90:20 91:3
92:17 93:10 94:22
95:15,21 97:6
98:17 99:4,16,22
101:3,23 103:3
104:12,21 105:15
106:5,17 107:7,18
108:6,19 109:6,20
109:25 110:7,12
110:21 111:2,12
111:18,24 112:7
112:13,23 113:12
113:18,22 114:5
114:13 115:2,9,23
116:4,24 117:8,13
117:22 118:11,24
119:10,19 120:18
121:8,13,18,22
122:7,17,22
123:12 125:25
126:7,18 127:6,23
128:5,17,22
130:19,22 131:4
131:13 132:1,13
132:23 133:6,23

134:11,19 135:4
135:14,21 136:6
136:15,25 138:11
139:8,19 140:5,22
141:5,13 142:9,20
142:25 143:10,25
144:19 145:9,19
146:6,15 147:25
148:6 149:4,14,16
149:22 150:1,16
150:19,21,23
151:10 160:6,9
**graduate** 109:9
**graph** 72:1
**gray** 122:21
**great** 10:20 27:18
100:24 127:15
141:19,20 144:12
157:1
**greater** 95:21 97:9
**greg** 157:2
**grids** 108:1
**ground** 10:1
**group** 23:21 24:4
24:6 111:13,16
112:6 113:24
115:4,18,24,25
**group's** 111:22
**growing** 120:6
**guess** 48:14 89:15
93:6 117:19
**guideline** 40:16
41:20 43:15 44:5
51:23 53:10,13
54:12
**guidelines** 60:25
**guiding** 87:23

**h**

**h** 4:4 163:3
**half** 27:4

**halfway** 53:9
**hamdan** 4:11 8:3
**hand** 8:12 62:18
  86:3
**handled** 98:10
**happen** 44:24 75:5
**happened** 12:12
  50:5,8,8 106:4
  148:25
**happening** 126:12
**happens** 68:25
  120:9 126:3
**happy** 9:12 45:23
  46:1 50:9 64:15
  119:17 121:9
  128:2,16 142:5
**hard** 40:22 49:25
  60:15,17 76:1
  77:14 138:18
  150:15
**harm** 144:21
**header** 35:17,18
  35:21
**heading** 35:8
**headless** 105:11
  105:17
**health** 14:6,11
**hear** 149:23,25
  150:20
**heard** 114:15
**hearing** 130:19
  150:15
**held** 7:20 125:2
  146:22
**help** 8:16 38:24
  57:12,15,16 58:10
  60:4 62:5,8 67:5
  79:22,24 85:18
  126:5
**helped** 79:16 83:4

**helpful** 20:15 44:7
  51:23 58:16
  101:23 125:24
**helping** 126:12
**helps** 52:1,16,18
  53:2,13,24 54:4
  57:5 59:1 123:4,5
  134:18 135:2
  136:23
**hereto** 164:7
**hesitating** 28:14
  86:17 108:10
  131:17
**hesitation** 43:7
  109:1
**heterogeneity**
  155:15 159:7
**high** 12:7,8 14:2
  15:15 29:14 30:5
  80:19
**higher** 82:22
**highest** 12:21 16:3
  16:6 17:9,11
**highly** 1:13 2:13
  12:9 13:4 50:12
  50:13 67:12 68:20
  86:1 106:13,23
  107:23 141:3
  155:18
**hilary** 4:4 8:7 23:8
  146:3
**hilary.mattis** 4:8
**history** 89:12
**hit** 44:3 71:2,4
  73:19
**hitting** 71:13,15
  74:12
**hoc** 83:8
**hold** 79:2
**holds** 120:20

**homepage** 90:7
**homework** 85:11
  85:15
**hone** 20:10 38:3
  38:24 39:15,24
  40:17 41:13,21
  56:2,7,16,22 57:2
  57:22
**honest** 135:5,11
  136:1
**honestly** 79:24
  84:6 85:24 127:12
  136:5
**hope** 17:19 24:10
  46:13 108:1
  120:17 156:21
**hotel** 158:14,20
**hour** 48:14 51:4
  89:1 117:23
**hours** 24:24 26:24
  26:25 27:1,2
  85:17 111:9,19
  112:8,21 113:6
  114:25 115:9,13
  115:14 116:21
  117:18,19,21
  143:20 147:18,19
  147:23
**huge** 52:25 53:12
  53:18,22 55:3
  155:14
**huh** 35:15 129:24
**human** 132:10
**hundreds** 80:12
**hypothetical** 13:6
  76:2 156:12

**i**

**idea** 73:9 76:18
  113:8 115:8
  154:22

**ideal** 99:2
**identification**
  27:12 89:17 91:1
  99:20 121:15
  128:19 153:1
**identified** 6:3
  135:19
**identify** 32:16
  54:9 82:1 133:14
**ignore** 12:11 68:1
  153:18,22
**ignores** 138:9
  154:23 155:14
**ignoring** 68:17
  153:25
**iii** 29:20,23 35:2
  55:14
**illuminate** 13:5
**illustration** 36:17
**image** 61:15
**imagine** 40:22
  50:1 57:19 115:7
  141:17
**imperative** 36:17
  36:19
**implausible** 68:3
  68:19,21 76:18,22
  76:24
**implement** 79:16
**implied** 14:18
**imply** 132:21
**implying** 55:7
**importance** 64:18
  64:22 159:10
**important** 10:13
  20:5 34:24 42:10
  48:21 49:8,22
  52:22 55:3,11,12
  60:1 63:21 64:9
  64:12,20,21 65:1,7
  65:11,13 66:4,6

97:21 147:3
**impression**   145:11
**impressions**   53:9
   55:19 72:15 73:12
   153:23,25
**improved**   97:14
**improvement**
   98:16
**improvements**
   97:24
**improving**   93:24
   107:22
**inaccuracies**   30:1
**inaccuracy**   18:6
**inappropriate**
   78:10 88:17 96:4
   98:8,10
**incentives**   133:20
   134:8
**incident**   96:3
**include**   49:14
   157:21
**included**   29:7
**includes**   157:11
   159:6
**including**   158:24
**inclusion**   157:15
**inconsistent**   156:1
**incorporated**   7:17
**incorrect**   153:18
**increased**   30:15
**incredibly**   13:7
   55:18 68:24 73:21
   76:18 145:6
**incremental**   97:24
**independent**   47:17
**independently**
   140:2
**indicates**   158:9
**indirect**   145:6

**indirectly**   145:4
**individualized**
   50:14 155:17
**individually**   1:6
   2:4
**individuals**   86:1
**industry**   130:7
   135:11 144:10,18
   154:9
**inferences**   124:20
**inferior**   98:5
**inflate**   143:5,6
**inflated**   142:10,21
   142:25 143:11,17
   143:22,23 144:3
   144:20 145:3
**inflation**   158:5
**inflict**   144:20
**influenced**   50:3
   64:11
**influencing**   64:22
**inform**   136:23
   138:19
**information**   36:24
   69:10 73:15,16
   106:10 119:5
   135:23,23
**informative**   71:5,7
   73:21 74:13,17,18
   74:19
**inherently**   118:13
   124:15 130:5
**inhouse**   149:14
**initial**   66:13
**initially**   127:13
**initiated**   145:22
**inner**   134:1
**innovation**   52:25
**innovations**   62:2
   127:20

**input**   17:14 20:1
   20:12 104:7
   158:18
**inputs**   138:2
   155:12,22
**inquiry**   6:12
   116:14 121:14
   126:5 141:11
**instances**   36:3
   72:1
**institute**   6:15
   128:18 129:9
**instruct**   15:22
   26:15
**instructed**   5:12
**instruction**   16:2,9
   18:11,22 19:22
   22:4 26:12
**instructions**   22:9
   22:19
**insurance**   14:6,11
**integrity**   16:21
   110:22,25 114:6
   114:20,22,23
   115:3
**intelligence**
   146:25
**intended**   94:19
**intentionally**
   106:21
**interact**   104:10
**interaction**   132:10
**interest**   78:2 133:2
   133:18
**interested**   31:14
   32:12 34:3 35:9
   36:8,25 55:25
   75:1 76:5 161:18
**interesting**   125:14
**interface**   68:10
   70:11,13

**interjected**   20:21
**internal**   122:24
**internet**   95:4
**interpret**   98:14
**interrupt**   150:14
**interview**   145:22
**interviewed**   140:3
   145:23
**interviews**   149:2
**introduce**   27:7
   152:22 156:16
**introduced**   76:25
   98:11 121:17
   128:21
**investment**   20:3,5
   20:14 36:23 41:15
**involve**   69:20
**involved**   19:17
   107:15 137:14
**irrelevant**   30:19
   51:13,16 75:10
   154:13
**issue**   7:10 89:12
**issues**   122:10
   133:25
**italics**   158:2 159:2
**iteration**   90:23
   97:4,4 98:16
**iterations**   92:14
   94:21 96:10
**iterative**   97:12

**j**

**java**   102:13,16
**jd**   1:7 2:5 7:19
**job**   1:25 28:17
   57:13 148:12
**john**   24:7
**johnson**   3:16
**judgment**   138:2,6
**judgments**   138:24

**june**  6:13 121:15
**junior**  88:16
**jury**  20:23 38:9,16
  40:23,24

**k**

**k**  9:1 24:10
**karina**  3:6 8:3
**kat**  23:9
**kate**  23:24
**keep**  40:4
**keeping**  91:7
**key**  33:20 45:20
  143:15
**kind**  43:10 50:3
  75:12 81:19 102:8
  102:10 103:5
  107:19 135:13
  144:6,8,17 145:7
**knew**  88:19
**know**  10:14,16
  11:5,17,18 13:5
  15:6,15 16:6
  21:10 23:9 24:17
  26:17 28:9,19
  34:1 36:3 37:8,21
  38:15 41:6,11,22
  43:4,9 44:18,19,23
  44:24 45:1,4,13,15
  46:1,9,12 47:12,13
  48:1,7 49:16,17,24
  49:25 50:6,7,10
  54:22 56:14 57:21
  59:20 60:4,11,12
  60:15 63:8 64:1
  66:3,4,5 67:23,23
  68:7,14 69:4,11,18
  71:25 73:21 74:15
  75:7 76:1,9,11,15
  76:16,23 77:17,18
  78:17 79:2,23
  80:11,17 84:3

86:6,21 87:17,25
88:1,12,13,14,15
88:19,20 93:4,7,18
95:11,14 96:2,9
97:2,5,12,18 98:1
98:15 102:6,11,18
107:21,22 108:11
108:12,13,16
112:14,15,16
113:5,10 114:11
114:12 115:1,7,11
115:23 116:3
117:5,17,20,21
118:15 119:2,3,4,7
119:14 120:3,7,22
122:6,11 125:8,9
125:12,20 126:13
126:25 127:1,1,9
127:11,18 128:1,4
128:9 129:8,8
130:13 131:11,12
131:17,19 132:10
133:15 134:1
135:2,22 136:11
137:9,10,18,20
140:12,13,16,18
141:19,19,25
142:17 143:15
144:5,24,24
146:11,15,17
147:6 148:8,9
149:1,10,15
155:11 156:10
**knowing**  23:10
71:4,16 76:20
**knowledge**  108:23
**known**  107:24
152:16
**knows**  120:11
138:21

**kputtieva**  3:11

**l**

**labeled**  123:13
**lack**  48:25 156:6
**lady**  23:8,11
**laid**  35:4
**language**  46:20
  47:24,25 48:7
**large**  32:19 76:4
  79:1 118:3 124:13
**lasted**  26:23
**latham**  3:14 4:3
  8:6,7 22:15,21
  23:4 24:17 149:12
**launch**  66:21
  100:10
**launched**  32:23
  67:18
**launching**  74:6
**lawsuit**  34:14,18
  49:6,11 64:5,8
  109:20 146:11
**lawyers**  117:5
**lazo**  4:14 7:23
**lead**  64:18 103:19
  104:18 105:13
  128:13 135:14
**leading**  135:12
  158:4
**leads**  135:13
  142:15
**learn**  42:3
**learned**  69:2
**learning**  73:3
  105:12
**lecture**  6:9 90:13
  91:1,15,17,19,20
  92:9,13 93:1,5,10
  93:12,14,16,21
  94:3,7,9,13,13,14
  94:16,18,19,22

95:4,5,10,12,24
96:8,14,22,23
97:15,16,19
**lectures**  95:7
**legal**  63:8 116:23
  162:23
**lenard**  129:12
**leslie**  1:24 2:19
  7:22 161:4,25
**level**  12:7,8,21
  14:2 15:15 16:4,6
  17:9,11 29:14
  30:5 80:19 82:22
  87:18
**levy**  6:17 153:1,15
  153:19,22 154:2
  154:11,16 155:23
  156:4,8 158:8
**levy's**  26:20 153:3
  153:4 154:6,23
  155:1
**lie**  131:19 132:21
**lied**  131:9,12,14
  131:21,23,25
  132:2,12,14,18
  141:6,12,14,23,24
  142:4
**lies**  61:17 62:3
**lighting**  9:11
**limit**  147:12,15,16
**line**  24:13 163:4,7
  163:10,13,16,19
**list**  152:6
**listed**  11:6,19,20
  13:14
**listened**  119:4
**literature**  14:11
  60:20,21 154:9
**litigation**  13:22
  147:13

**little** 7:10 10:12
12:20 30:8 32:4
48:13 49:4 53:11
53:15 85:2 88:25
115:13,14 120:19
123:6 125:1
136:15 138:13
148:7,15
**live** 54:7 116:24
**lives** 55:17
**living** 22:14
**llp** 3:14 4:3
**load** 122:18
**loading** 122:2,15
122:21,25
**long** 24:22 26:22
87:3 108:13 122:3
125:8 143:14
**longer** 86:18
**longevity** 129:23
**look** 26:19 32:4
34:10 37:9,12
45:23 50:9 56:1
62:22 64:15 67:19
69:7 72:23 74:5
74:24 75:3,17,21
75:24 76:9 83:20
88:12 95:23 99:16
102:16 103:14
121:9 123:22
125:12,21 128:16
156:11 157:19
158:14
**looked** 108:18
125:9 156:13
**looking** 14:24
35:20 36:23 43:23
43:24 54:11 71:22
86:25 95:23 96:14
103:7 104:7 105:6
119:13 120:23

121:7 132:6,7
**looks** 88:5,6
119:13 121:6
158:21
**loose** 46:20
**lot** 12:11 67:3
80:18 85:1 86:20
95:2,25 96:11
97:20 101:8,15
107:16 118:18
125:22 129:7
148:12
**lots** 120:5 155:17
**low** 71:23 73:25
**lower** 155:6
**lucky** 109:10
**lw.com** 3:21,22,23
4:8 162:2

**m**

**main** 60:12 120:15
143:15,20
**mainstay** 109:9
**major** 63:15
**majority** 60:13
75:4 77:4 93:13
93:14 94:14
**making** 51:16
56:24 58:4 72:6
75:13 85:25 96:7
101:7 145:14
158:25 159:17
160:1
**male** 96:3 98:7
**management** 6:11
81:2,10 82:4
85:14,20,21 86:24
99:19
**manager** 39:12
68:10 70:5,11
**manager's** 70:12

**manner** 68:18
155:19 157:24
159:9
**manually** 68:13
**mapping** 28:20,24
**march** 151:25
153:4 155:1 157:1
157:10,12 158:7
159:5
**marin** 161:2
**mark** 103:22
**marked** 6:19
27:11 28:24 89:17
89:21 91:1,4,13
99:20 121:15,19
121:21,23 128:19
153:1 156:17,23
**market** 55:21
56:15 66:13 75:2
121:1
**marketing** 83:19
85:14
**marking** 85:20
**martialis** 1:5 2:4
**massachusetts**
1:17 2:17 7:1
55:25 57:21
**match** 57:25
**material** 80:19
82:14,17 93:13
96:11 158:15,18
**materials** 29:8
93:8,9
**math** 99:15
**matter** 7:16 8:15
18:12 20:17 24:1
24:6 28:4 29:2,9
38:18 64:18 75:21
79:7,10 110:6
111:5,15,17,22
115:10,16 125:17

134:4 135:25
145:10,15,20
148:21
**matters** 109:19
**mattis** 4:4 8:7,7
**max** 1:5 2:4
**maxwell** 1:5 2:3
**mba** 80:8 82:17
84:8 95:3
**mbas** 84:4,5
**mbr** 146:24
**mean** 15:17 21:4
21:10 23:16 24:17
25:5 39:6 41:14
42:8 44:18,20,22
47:4 48:2 50:6
54:22,24 55:13
57:10 59:24 61:23
67:1,3 68:7 69:15
69:16 73:5,16,24
78:15 80:13,17
81:16 83:11 85:23
88:23 101:15
102:16 105:8
109:8 112:14
116:24 119:22,25
126:11 127:10
128:8 133:24
139:9 141:8 143:4
143:8 147:5
158:12,19
**meaning** 48:5 63:8
**meaningful** 72:6
**means** 36:23 50:11
55:18 68:12 71:11
155:19
**meant** 36:7 132:4
132:9
**measurability**
30:16 32:11 142:1

**measure** 30:17
36:22 37:11 48:9
134:9 142:8,15
154:21
**measurement**
49:18 61:25 62:6
**measures** 68:2
145:2
**measuring** 6:8
90:25 91:20 92:5
**mechanisms** 105:9
**media** 7:7,14
130:6,15,17
160:12
**meet** 14:12 21:20
22:6
**meeting** 22:1 23:4
23:19 24:13,21,22
25:2,6,20,23 26:3
26:9,22,23 146:23
**meetings** 22:11
23:1
**meets** 45:4
**memory** 13:25
16:12 21:25 23:23
25:18 88:23 90:1
96:3 111:16
113:12 114:4
119:15 122:5,6
123:2
**men** 104:20 106:2
**menlo** 4:6
**mention** 11:3
125:12
**mentioned** 11:9
77:6
**mentions** 125:13
**mentorship** 79:17
79:18
**message** 16:21
110:25 114:6,20

114:22,23 115:3
139:25 140:10
**messages** 110:22
**met** 21:19 22:11
22:15,21 146:19
146:20,25 147:7
**methodologies**
18:5,7,8,13
**methodology** 12:1
12:10,17 17:22,23
18:14,15,25 19:10
79:4
**methods** 96:24,25
**metric** 37:4,7,14
37:18,21 38:19,22
39:2,12,18,22 40:2
40:13 41:1,14,17
41:23,24 42:1,5,11
42:13,19,22,23,25
43:2,9,12,14,24
44:11,15,20,25
45:4,5,6,10,11,14
45:19,22,25 46:6,7
46:15,19,24 47:3
47:21 48:8,11
60:7 74:13,17
76:19 136:21
138:2,10,23 139:1
139:17,18 143:15
143:20 144:2
**metrics** 43:6 72:8
76:21 127:3 136:7
136:17 137:5
138:6,12,18 139:5
139:11 142:8,10
142:21,25 143:10
144:11,20
**midatlantic**
162:15
**milstein** 3:4 4:11
8:2,4

**mind** 55:21 108:11
127:22 137:25
151:7 154:23
**minimization**
103:18
**minimizing**
103:18
**minutes** 44:9
**misleading** 79:24
**misled** 139:20
140:7,15,17,21,25
**misquoted** 130:12
**missed** 35:13
142:24
**misstated** 17:12
**misunderstand**
154:19
**misunderstands**
139:5
**misunderstood**
80:7
**mit** 6:6,10 79:14
79:15,20 80:3
89:16 95:6 99:19
101:8 128:25
146:23 147:10,12
147:22 148:10
**mixed** 82:5
**model** 12:9,21,25
13:4,5,8 14:14,17
14:21 15:1,13,16
15:18 16:4,6
18:20 19:13
**modeling** 109:3
**models** 16:7,11
**modern** 17:12
**modest** 158:9,18
158:23
**module** 84:4
**moment** 91:24
156:18

**monadic** 98:23
100:14
**monadics** 101:19
**monday** 21:25
23:5 24:14 26:7
**money** 37:2 54:10
64:24 73:8 111:4
112:8,18 113:2,8
113:13 114:19
115:2 126:13
140:12
**monitor** 72:4
**montgomery** 3:18
**month** 147:19
148:11,16
**monthly** 37:20
**morning** 8:1,5,23
8:25
**motivation** 76:3
**moved** 96:1
**multiple** 107:25
**multiplication**
19:1,11,18

| n |
| --- |

**n** 5:1
**name** 8:24,24 9:1
11:17,18 15:18
16:20 23:9,10
24:8 40:6 103:9
105:15 122:9
161:20
**named** 16:21
23:11 36:5,14
69:5,14 77:3
108:1 139:24
140:22
**narrow** 39:9 43:16
44:6 48:5 51:25
52:19 54:21 61:2
66:12

narrower  20:10
  20:10
naturally  158:4
nature  11:21 14:3
  17:3 156:11
  159:24
necessary  164:6
need  10:15 57:13
  106:22 134:9
  136:4,9,11
needs  135:11
  136:12 138:24
neglected  108:13
neither  161:16
network  14:18
  128:11 130:3,6,14
  130:16
never  21:9 78:19
  108:19,23 141:2
  141:18 147:1
new  3:7 81:25
  99:22 130:14
news  119:8
newspaper  37:12
  38:1 39:1
nicety  132:9
nikki  4:13 8:9
nine  93:11,12
non  87:2
nonprofit  105:3
  126:4,6,12,17,23
northern  1:2 2:2
  7:18
notary  164:13,19
note  69:6 162:10
noted  160:15
  164:7
notes  6:9 90:13
  91:1,15,17,19 92:9
  93:2,5,6,10,12,14
  93:16,21,21 94:3,5

94:7,14,14,16,16
94:19,22 95:4,5,11
96:9,14,22 97:15
97:19 151:9
notion  138:8
notwithstanding
  131:5
nuanced  138:14
  139:4
nudge  57:3 58:2,3
  58:14,17,21,24,25
  59:6,9,17 60:4,9
  60:14 61:7,13,16
  61:17 66:1,5
number  6:3,7,21
  7:19 37:20 43:6
  43:12,18 44:4,20
  45:4,19 47:4
  60:16 68:13 69:6
  72:19 73:19 89:16
  103:15 117:17,21
  123:19 155:1
  159:18 160:11
numbers  13:9
  73:13,25 74:20
  75:7,9,16,21 82:5
  83:11 85:22 98:14
  155:18
nw  3:7

**o**

o  24:10
o'clock  7:13
oath  9:3 161:8
object  11:23 12:19
  13:1,18 14:4 15:3
  15:22 17:5,5,17,25
  18:21 19:5,14,21
  20:6,19,24 21:3,15
  21:22 23:6,15
  24:2,15,23 25:3,12
  26:4 27:24 28:6

28:13 29:3,10
31:8,21 33:8 35:1
36:15 37:5 38:6
39:5,20 40:3,14
41:2,18 42:20
43:3,19 44:17
46:10 47:1,22
48:22 49:10,23
50:18 51:14,20
52:17,23 53:6,19
54:2,17 56:12
57:17 58:12,18
59:4,11 61:5,11,22
62:13 63:13 65:3
65:15 66:18 67:11
68:6 69:3 70:2,19
71:9 75:19 77:24
78:25 81:21 82:25
84:1 86:11 90:19
92:11,25 94:11,24
95:18 96:19 97:10
98:20 99:6 101:2
102:23 104:2,15
104:25 105:24
106:7,19 107:11
107:20 108:8
109:23 110:3,10
110:15,23 111:6
111:14,20 112:2
112:10,19 113:3
113:15,20 114:8
114:21 115:5
116:1,7,19 117:2
117:11 118:6
119:1,12 120:21
125:7 126:2,10,21
127:8 131:10
132:3,15 134:6,14
134:24 135:6,16
136:2,8 137:6
138:15 139:14,21

140:8 141:1,7
142:11,22 143:12
144:4,22 145:16
145:24 146:13
147:20 148:3,24
149:8
objection  15:21
  16:25 18:10 23:22
  26:11 33:16 34:16
  35:25 37:19 38:10
  38:20 42:6 45:12
  57:9 63:6 68:22
  72:21 74:2,21
  77:12 78:7 108:21
  109:17 113:25
  115:20 117:16
  118:14 120:1
  127:25 128:7
  131:15 132:25
  133:9 136:18
  141:15 143:1
objections  16:9
  22:3,8,18 41:6
  161:9
objective  32:20
  43:6,10,18,24 47:4
  48:9
objectively  45:2
objectives  33:7,7
  33:10 154:4,8
obscure  144:25
observation  44:19
observe  107:14
  142:3
observed  108:18
obtain  115:16
  126:7 138:18
obtained  97:8
  126:18
obtains  120:19
  125:1

**obviously**  11:6
  13:15 36:9 62:1,4
  78:15 96:1 97:21
  109:8 113:6
  126:23 140:14
  152:5
**occasions**  11:4
  131:21
**occur**  50:12,13,13
**occurred**  122:24
**odds**  156:8
**offer**  14:13 55:17
  84:22 109:19
  110:5,18,19,21
**offered**  109:21
  110:4,5
**offering**  17:20
  79:6
**offers**  54:7 55:25
  78:9
**office**  85:17
**official**  141:4
**oh**  44:5 60:23 73:6
  80:7 87:25 90:18
  90:21 91:11 96:10
  120:8,24 129:21
  135:17 143:2
  156:24
**okay**  9:18 10:4,12
  10:20,23 11:8
  12:6 13:10,17
  14:2,20 21:6
  28:23 33:23 34:7
  37:15 38:12 48:12
  52:15 55:9 58:9
  65:6,23 69:22
  70:9 72:14 78:23
  79:18 81:12,15,19
  81:23 82:3,16
  84:25 85:6,9 86:8
  89:19 90:3,6,16,20

90:24 91:6 92:17
  92:18 95:21 97:6
  99:16,24 100:24
  102:5 103:9
  105:21 113:1
  114:19 121:12,18
  123:12,16 124:1
  124:24 125:5
  128:25 129:10,17
  130:19 133:23
  134:19 135:21
  139:8 149:22
  150:1,7,11
**old**  55:16 136:20
**older**  95:5
**once**  83:4
**one's**  105:8
**ones**  101:16
**online**  7:20 86:21
  104:13,24 105:22
  118:21 138:10
**ooo**  160:16
**open**  89:23
**opened**  121:21
**opined**  19:19
**opining**  12:18
  15:16
**opinion**  12:4,7
  14:3 15:13 17:2,4
  17:11,19,20 20:4,7
  30:25 31:2,19,24
  35:6 37:3,17
  38:17,21,22 40:15
  41:4,16 50:10
  60:12 109:19,21
  110:5,18,19,20,22
  110:25 118:20
**opinions**  17:15
  28:4,8 29:2,5,8,14
  30:22,24 31:10
  119:9 152:20

153:11 157:6
**opportunities**
  143:9,18,24
**opposed**  33:7
  94:13
**opposing**  14:16
  16:14 17:20
**optimization**
  103:19
**optimize**  20:2 42:1
**option**  159:6
**order**  69:6 133:16
  145:14
**orient**  29:13
**orientated**  85:19
**orientation**  36:6
  154:21
**oriented**  117:5
**original**  48:5
**outcome**  12:2,23
  13:9 43:11,13
  47:5 67:24 104:8
  114:16 161:19
**outcomes**  42:13
  45:3 67:20 68:16
  68:17 85:19
  102:25 103:7,20
  104:18 105:5
  106:11,16 107:14
  108:18 134:10
  154:21
**outdated**  36:24
  37:4,6,14,18 38:19
  39:2,4,7,10 93:8,9
  94:4
**output**  17:14
**outside**  49:6,11
  146:3 159:6
**overcharge**  11:16
**overview**  12:6

                **p**

**p.m.**  2:18 51:7,10
  52:5,8 89:6,9
  123:8,11 130:25
  131:3 149:18,21
  151:12,15 160:13
  160:15
**page**  6:21 29:17
  31:12 32:8 35:9
  35:13,15,16 36:13
  62:22 90:6,10,13
  92:1,21 93:23
  94:2,2 100:7
  122:24 123:16,17
  123:18,19,21
  124:2 129:11
  153:14 157:9,11
  159:18 163:4,7,10
  163:13,16,19
**pages**  90:3 93:11
  93:12 161:13
**paid**  77:22 78:5,8
**pandemic**  87:2
  145:12 148:12,17
**panels**  78:18
**paper**  103:1,6,17
  104:16 105:2,7,10
  106:1 107:14
  116:11,13,15
  118:8
**papers**  102:25
  108:12,15
**paragraph**  28:20
  29:21 32:5,10
  33:15 34:10 37:24
  40:9 51:22 124:6
  125:20 140:11
  152:9,17 153:13
  154:2,2,11,11,25
  155:1,23,23
  157:13 158:2,7

[paragraph - pointing]                                                    Page 23

159:1
paragraphs  31:7
  31:11,20 32:1
  35:7,23 36:2,9,10
  37:8 39:25 59:13
  59:21 63:5,10
paralegal  4:11
park  4:6
part  13:21 24:3
  36:12 54:12 62:16
  79:16 80:9 85:12
  111:18 116:13
  132:10 133:4
  140:3
particular  14:6
  33:25 44:3 63:16
  81:25 104:4
  148:16 159:9
particularly
  125:19 147:2
parties  7:21
partner  126:4
partners  18:15
parts  106:20
party  161:17,17
passage  130:12
passionate  90:22
pasting  68:13
patrick  3:16
patrick.johnson
  3:22
pattern  106:1
pause  10:15
pausing  65:17
paying  74:15
  126:13
payment  119:8
pdf  28:1 122:21
  123:18,20
peer  126:15

pending  13:23
  14:1 52:10
people  24:18,20
  26:6,6 32:18
  44:19,21 54:9,10
  67:21 72:9,10
  74:5,15 76:6
  87:23 118:10
  129:12 131:20,21
  131:24 132:1,11
  146:25 147:7
  158:19
people's  132:17
  156:7
percent  71:3,4,13
  71:14,17 72:1,2,16
percentage  44:1
  67:10 70:1,18
  72:24 74:5,24
  75:25 76:13
percentages  71:7
  71:23
percentile  71:2,12
  72:14
percentiles  71:24
perfectly  9:14
performance
  30:17 31:14 32:13
  32:22 33:6,10,19
  34:12 35:9 36:7
  48:10 49:21 67:20
  68:2,17 71:7
  136:24
performed  37:11
performing
  141:22 142:3
period  98:17
permission  126:8
  126:19,22,24
  127:2

persistently  40:6
person  22:11
  137:17 145:19
personalize  124:9
  124:11
personalized
  63:16
personally  109:13
  140:24
persons  148:23
perspective  83:20
persuasive  50:20
  50:25
pertinent  101:17
ph.d.  1:15 2:16 5:7
  6:2,5,17 27:11
  109:9 153:1 162:5
  163:2,24 164:2,4
  164:12
phew  130:10
philosopher
  134:16
photographs  31:3
phrases  45:18
physical  22:10
pick  43:21
piece  14:24
pieces  36:24
  105:13
pinpoint  88:22
place  48:7,8 50:2
  100:20 144:25
  147:12 159:10
  161:7
placed  79:3
plaintiff  2:16 3:3
  7:16 8:2 11:10,17
  11:19 69:14 140:6
plaintiff's  18:4
plaintiffs  1:8 2:6
  11:14 12:1,18

13:21 17:12 28:16
  29:1,24 30:9 36:5
  36:14 50:23 63:20
  63:24 64:4,7,10,13
  64:20,21 69:5
  76:25 77:3 139:24
  140:23
platform  14:7,9,10
  67:6 126:1,9,19
  130:15 133:12,16
  133:20 135:10
platform's  116:14
  133:17
platforms  6:12
  14:8 121:14
  136:12 153:17
plausible  75:23
plausibly  73:19
play  40:23 59:9
played  38:9
please  7:24 8:12
  8:23 151:21
pleased  125:10
pleasing  125:16
pleasure  151:6
pllc  3:4 4:12
plow  122:19
plumber  120:10
plumbing  120:9
podcast  129:6
point  20:12 34:3
  36:11 47:11 59:12
  64:22 75:13 76:8
  81:16 89:1 95:11
  99:10,13 105:10
  105:10,25 119:6
  128:15 131:12
  135:18 154:10
  157:23 159:17,17
pointing  13:3 40:8
  140:9,18

**points** 63:15
153:16
**policy** 6:14 128:18
129:8
**poorly** 40:6
**popular** 101:11
**populated** 27:14
**population** 82:11
132:19
**portion** 28:21
**pose** 118:4
**position** 127:24
**positive** 72:10
**possibility** 49:20
**possible** 32:18
67:8 74:4 133:3
138:7 141:23,23
**possibly** 74:25
**post** 154:15
**potential** 15:8
30:1,10,18 31:15
33:2,11 34:24
35:3,10 37:3,17,23
37:25 38:18,21,23
39:3,6,7,7,11 40:1
40:7,12,15 41:1
42:4,11,18,25
43:11,14,17 44:2,3
44:10,15 45:10
46:5,7,14,18,22
47:5,20 48:11,21
49:8,14,16,17,21
50:3,16,21 51:13
51:18,22 52:1,12
52:15 53:2,4,10,13
53:23 54:3,12,15
54:18 55:3,10,11
55:21 56:5,10,16
57:3,5,18 58:1,10
58:20 59:1,6,9,14
59:25 60:6,21

61:3,6,20 62:11,16
62:18 63:1,20
64:1,9,10,12 65:1
65:4,7,9,13,19,25
66:8,16,24 67:6,9
67:13,24 68:9
69:25 70:17 71:3
71:13,16,17 73:19
74:6 75:15,18,25
76:12 77:14
108:13 132:21
154:5 155:5
159:23
**potentially** 56:18
59:17 62:20 66:21
75:24 82:1 105:14
120:25 143:9
**power** 31:1 121:1
**practical** 84:13
**practically** 81:17
95:8
**pre** 87:9 100:10
**precise** 13:8 56:23
68:8 107:2 117:17
140:11
**precisely** 52:18
104:16 106:14
111:11 149:9
**predated** 152:14
**predict** 124:17
**predicted** 32:22
**prefer** 9:13 105:11
105:16 131:20,24
132:12 141:6
142:18
**preference** 104:6
132:18 141:12,14
**preferences** 154:5
**preparation**
148:20 149:7

**prepare** 21:13,21
22:2 23:1,5 25:23
116:21 118:3
124:12
**prepared** 21:1
**preparing** 29:8
**presence** 158:8,23
**present** 4:10 48:24
78:15 158:10
**presentation**
116:15,25 117:1,9
**presentations**
78:12
**presented** 38:2
59:14 60:19 62:25
67:14 68:10,18
78:19 97:15
**presenting** 98:8
**presidents** 147:8
**presume** 47:23
48:3,6
**pretty** 38:13 54:25
56:4
**prevent** 107:1
**previously** 6:19
87:16 156:17,22
**price** 81:25 82:2
82:13 83:18 93:15
94:8,15 99:2
101:22 107:24
108:4
**prices** 6:9 91:1,21
92:6
**pricing** 6:11 80:21
81:1,1,5,7,24 82:3
82:13 83:16 84:4
85:10 86:3,13,15
86:19 87:1,3 90:7
95:1,2,9,17 96:18
97:22,25,25 99:17
99:20 100:5,10

101:10
**principle** 131:23
**prior** 87:16 96:6
98:7 124:16
146:11,17 153:8
157:3
**prioritized** 105:14
**privacy** 129:1
**privilege** 15:9,22
25:13 26:16
**privileged** 15:23
18:2 19:23
**probably** 27:3
86:18,23 101:17
111:10 112:15
114:11 115:12
117:18 127:21
143:13 144:14
**problem** 148:10
151:10
**problems** 129:13
**procedure** 159:23
**proceed** 8:19
**proceeding** 1:16
2:17 16:17
**proceedings** 7:4
11:1 161:14
**process** 54:13 55:4
55:6,11 56:5,9
57:14 68:14 69:20
97:13 104:8,11
105:12 130:5
157:15,21 159:11
**processing** 122:23
**produce** 18:13
79:25
**produced** 83:12
88:8 118:17
**product** 26:16
58:1 82:1,10
83:20 101:22

127:14 137:13
157:16,21
**professor** 47:25
67:2 88:16 124:12
124:14,19,25
129:1 147:10
153:15 154:12
155:2,4,24,25
156:2
**professors** 101:8
102:9 147:22
**proficient** 102:3,5
**program** 80:3,6,16
80:20
**programatic**
117:7
**programs** 37:13
**project** 80:10
85:13 108:14
109:3
**promote** 105:4
**prompt** 93:17
**pronounce** 40:5
**proper** 156:1
**properly** 122:2
**proportion** 111:21
113:9
**proportional**
156:2
**proposed** 11:25
14:25
**proposition** 64:20
**proprietary** 134:3
135:22
**prospects** 54:10
**protective** 145:14
**protocols** 135:24
**provide** 17:2 54:3
61:4,21 116:25
133:2,5 136:13

**provided** 38:23
41:4 61:24 76:20
76:21 119:5 154:3
**provides** 41:20
53:23 54:15,18
55:2 61:7,9 62:4
62:11 65:10 73:15
73:16
**providing** 20:16
59:8 60:13,18
**provision** 62:1
**public** 106:21
164:19
**publication**
103:10
**publish** 126:15
127:3
**published** 77:7,9
102:21,24 103:4,7
108:12,15 109:4
116:11 120:14
**pull** 89:24 91:3
99:17 121:13
151:21
**pulled** 99:24
**pulling** 99:22
**purchase** 154:15
157:15,21
**purely** 103:1
108:25
**purported** 14:17
**purpose** 18:17
**purposes** 20:5
24:6 63:1 82:2
**put** 45:24 50:7,23
73:7 128:2 133:20
158:15
**puttieva** 3:6 8:3
121:17 128:21
**putting** 68:14
135:8

**python** 102:14,16
102:18

**q**

**qualification**
132:16
**qualifications**
133:11
**quality** 106:14
107:3,8
**question** 10:6,16
15:11 21:7 28:15
37:15 38:13 40:21
40:22,25 41:4,9
44:11 45:9 46:11
47:15 48:17 49:4
52:9 55:1 64:25
70:5 94:7,15
96:11 97:20
101:17,21 103:22
105:1,12,21
129:12,16 130:11
133:25 134:20
137:3 138:11,14
139:4,10,12
141:17 142:13
**questions** 5:12
22:25 30:5 48:15
48:16 85:23 89:11
106:13 131:8
151:2,3,20 160:4
**quickly** 10:4 11:8
82:19
**quite** 21:16 59:16
59:21 84:5 93:8
114:17 127:11
152:15
**quote** 139:23
153:15 154:12
157:14 158:8
**quoting** 118:16

**r**

**r** 9:1 24:10 102:9
163:3,3
**radically** 133:18
**raise** 8:11
**ran** 105:2
**randomly** 137:17
**rare** 124:10
**rate** 111:10 112:22
113:7 114:25
115:15 117:23,25
**rates** 18:6
**ratio** 72:15 73:12
**reach** 30:1,10,18
31:15 32:15 33:2
33:7,11 34:24
35:3,10 37:3,18,23
37:25 38:18,21,23
39:3,6,7,8,12 40:2
40:7,12,16 41:1
42:4,11,18,25
43:14,17 44:2,4,10
44:15 45:10 46:5
46:7,15,22 47:5,20
48:11,21 49:8,14
49:17,21 50:3,16
50:21 51:13,18,23
52:1,12,15 53:2,5
53:10,13,23 54:3
54:12,15,18 55:4
55:10,12,21 56:5
56:10,16 57:3,5,18
58:1,10,20 59:1,6
59:9,14,25 60:6,21
61:3,7,20 62:11,16
62:19,25 63:1,20
64:1,9,11,12 65:1
65:5,7,9,13,19
66:1,8,16,24 67:6
67:9,10,14,24 68:9
69:25 70:1,6,17,18

**reach** 71:3,13,16,17
73:19 74:6,15,24
75:15,18,25,25
76:12,13 132:21
154:5 155:6
**reached** 67:21
74:5 76:5
**reaching** 70:9
**reacting** 40:5
47:12
**reactions** 6:8
90:25 91:20
**read** 21:16,18
33:14 69:18
102:11,11,14
124:22 140:2
152:1 162:9 164:5
**reading** 129:22
**real** 30:18 87:24
87:25 88:6,10,18
142:3
**realize** 48:4 50:23
**realized** 105:6
**really** 9:15 11:8,25
13:5 20:2 24:18
36:25 37:7 44:15
45:10 46:6 58:3
60:18 61:13 73:4
80:13 84:19 85:16
87:10 88:11 95:7
97:3 101:10
104:10 105:8
112:11,15 113:4
113:16 114:3
115:6,8,11 116:2
119:17 121:6
128:1,2,4,16
129:25 143:16
149:15 150:17
151:5

**reask** 52:10
**reason** 9:6 28:14
67:17 70:24 72:4
72:22 73:24 86:17
88:13,14 103:13
137:8,16,24
142:17 144:10
145:1 162:11
163:6,9,12,15,18
163:21
**reasonably** 68:14
**reasons** 30:10
55:14 88:2 138:5
**rebut** 28:21 45:21
**rebuttal** 6:4 26:20
26:20 27:10 28:16
28:18,21
**rebutting** 28:18
**recall** 16:13 23:16
23:18,19 24:20
25:4,9 35:3 44:8
44:11 52:11,13
78:14,16 108:10
120:7,15 146:18
149:9
**receipt** 162:18
**receive** 111:21
131:22 134:17
135:1 136:22
142:18
**received** 78:9
153:16,23
**receives** 145:3
**recess** 51:8 89:7
123:9 149:19
151:13
**recitation** 158:6
159:4
**recognize** 29:24
**recollection** 16:10
19:15,17 22:20

25:2,11,15 26:10
26:14,18 109:14
119:20,23
**record** 7:5,11,12
7:25 8:24 15:8
27:6 43:21 51:5,6
51:10 52:3,5,6,8
69:6 89:4,6,9
122:12,18 123:8
123:11 130:22,25
131:1,3 149:16,18
149:21 151:8,12
151:15 152:7,18
160:14 161:14
**recorded** 1:15
2:15 7:7,15 67:15
161:11
**redirect** 151:3
**redundant** 18:18
19:10
**refer** 42:9 46:7
48:23 100:17,19
107:17
**reference** 35:13
71:10 92:20
**referenced** 6:19
32:1 162:6
**referencing** 68:16
**referred** 14:15
19:3,6 44:10
46:14,14 100:23
**referring** 29:20
33:6 37:14 44:15
45:10,13 46:19
60:24 105:19
127:11 147:6
**refers** 42:4 51:22
159:17
**refinements** 19:17
**reflect** 34:2 93:3
95:5 159:25

**reflected** 75:18
**reflects** 90:13
92:23 159:23
**refresh** 26:14
**refreshed** 25:2,10
25:14 26:9
**refreshing** 26:18
91:8,9 156:21
**refused** 78:1
**regarding** 18:23
19:22 34:11 77:8
78:12 83:24 96:17
119:8 150:8
**regression** 16:4,5
16:7
**rehash** 65:8
**reinforce** 36:11
**rejected** 118:24
**relate** 31:24 36:2,4
**related** 18:14 45:1
102:25 117:14
147:13 161:17
**relates** 69:19
**relating** 134:1
138:18 152:12
**relationship** 75:8
**relative** 56:4 71:18
74:5,13 75:14
101:8
**relevant** 49:18
51:19 58:7 60:1
63:1 68:2 71:18
72:8 75:6,22
106:23 118:10
158:25
**reliable** 80:1 133:3
136:10,13 157:20
157:24
**reload** 123:1
**remain** 90:16

**remains** 39:11,12
**remarkably**
    121:11
**remember** 23:17
    24:16 25:5,7
    67:13 88:9,15,15
    88:18 93:22 98:5
    99:8 101:5 106:9
    120:2 121:5 129:5
    129:7 145:13,17
    145:21,21,22
    146:2,2,3,4,5,9,14
    146:23 149:10
**reminding** 93:15
**remote** 1:16 2:16
    86:20
**remotely** 7:21
**remove** 9:12
**render** 12:3 65:11
**rendering** 139:18
**renders** 30:18
**repeat** 123:19
**repeatedly** 41:23
**replicable** 124:11
**replicate** 157:20
**replication** 157:15
**reply** 6:16 28:25
    152:25 153:6
**report** 6:4,13,16
    9:12,16 11:4,7,19
    11:20 13:13,16,21
    20:17 21:16,18
    25:7,10,19 26:20
    26:21 27:6,10,20
    27:23,25 28:3,8,17
    28:20,21,24 29:12
    29:21 30:22 34:1
    36:4,10 37:24
    39:25 40:6 41:25
    42:12,17 45:7,22
    47:3,8,12,13,14,17

47:18 50:25 51:21
55:14 59:14 62:22
64:2 69:17 103:24
114:10 116:21
117:19,20 121:14
125:9 139:23
140:11 148:21
149:7 151:22,24
152:1,3,25 153:3,5
153:7,8,10,14
154:8 155:1 156:9
157:2,2,5,10,13
158:7,14 159:5
**reported** 1:23
**reporter** 7:22 8:10
    8:18
**reports** 21:18
    28:16,25 108:3
**represent** 93:19
    154:14
**representative**
    94:18,20 95:12,13
**require** 67:25
    157:14
**required** 164:13
**reread** 152:9
**research** 124:16
    125:11,23 126:8
    126:20 141:5,8
    142:9,20
**researched** 142:17
**reserve** 1:5 2:3 3:3
    7:16 162:4 163:1
    164:1
**resource** 67:4
**resources** 67:3,7
**respect** 116:17
**responded** 72:10
**respondent** 159:7
**respondents** 158:3
    159:2,8,9

**response** 129:17
    143:19 158:1
**responses** 92:6
    157:12
**rest** 125:22 148:13
**restart** 122:12
    123:3
**restate** 66:14
**result** 120:20
    125:1 126:16
    155:6
**resulted** 104:8
**results** 18:13
    32:23,24 80:1,14
    98:9 127:3 156:1
    157:20 158:5
**retained** 160:12
**return** 20:2,5,13
    36:23 37:2 41:15
    44:1 71:20 143:20
    162:13,17
**reveal** 17:7 18:2
    18:23 21:23
**revelation** 139:25
**revenue** 18:14,19
    49:1
**review** 97:18
    126:16 153:8
    157:2 162:7
**reviewed** 21:17
    151:24
**revisit** 136:20
**revolution** 141:21
    142:14
**right** 8:12 9:16,20
    9:24 10:2,7,21
    12:5,15 13:13,14
    14:14 16:18,19
    19:4,20 21:2 22:5
    22:16 25:21,22
    27:23 28:5 29:9

30:23 31:7,20,22
31:25 32:1,2,9
33:3,7,15,24 34:8
34:15,25 35:24,24
37:22 38:5,9
39:13,17 43:18
44:16,16 45:11
46:24 47:21 48:21
49:9,22 51:3 52:2
52:14,16 53:18,25
54:16 57:7,24
58:17 61:4,10,21
63:5,12,21,23 64:4
64:9,14 65:2
66:17 68:5 69:2
72:18,20 73:15
74:1,20 77:11
78:21,22,24 80:3,5
80:6,22,24 81:4,6
81:13 82:4 84:23
85:23 90:14,15
91:12,18 92:8,10
92:24 94:2,23
97:9 102:22
104:14 105:19,23
106:6,18 107:10
108:2,20 109:7,16
109:22,24 110:2,8
110:9,14,22
111:19 112:24
113:19,21 114:7
114:14,15 115:18
115:19 116:6
117:1 118:5,13,25
119:11 120:11
124:5,20,22 126:1
127:7 128:6 131:4
133:8 134:13,18
134:23 136:7
142:21 144:3,21
147:10 148:1,21

150:2 151:25
**rights**  11:13
**rise**  121:1
**risk**  142:6
**rivals**  144:11
**rizzoni**  3:17
**robust**  119:15
**robustness**  16:13
**rockwood**  1:24
2:19 161:4,25
**roi**  62:16
**role**  17:12 19:20
23:25 54:23 59:9
140:1
**ron**  4:14 7:23
**room**  9:10,13
158:15
**rooms**  158:20
**rosas**  1:24 2:19
7:22 161:4,25
**rough**  99:15
**roughgarden**
155:12
**roughgarden's**
155:2
**roughly**  146:9
**rpr**  1:24 2:19
161:4,25
**rule**  49:19 147:25
148:5
**rules**  10:1 15:6
**run**  86:4 93:10,12
126:24 127:2
158:14,17
**running**  67:9
69:25 70:17 76:12
77:19 86:2
**runs**  94:1

**s**

**s**  163:3
**sale**  142:15
**san**  1:3 3:19 7:18
**sat**  78:18
**saw**  11:15 106:2
**sawtooth**  83:9
98:13
**saying**  41:23 44:24
45:17 56:10,13
60:8 65:16 68:11
69:9 71:21,25
72:7,13,19 73:6
75:3 76:1,17,23
86:6 95:15 96:4
97:7 113:10 120:3
123:1 129:22
130:4,8,18 137:20
139:2 140:17
144:2 152:13
**says**  30:9 31:13
49:16 92:5 93:23
100:14 122:23
124:2,6,24 129:12
156:8
**scary**  90:1
**schedule**  100:8
**schofield**  23:24
24:3
**schofield's**  23:25
**school**  6:10 99:19
**science**  101:25
102:2
**scientist**  146:23
**scientists**  42:9
146:20
**score**  107:8
**scores**  107:3
**scoring**  106:14
**scott**  4:5

**screen**  25:6 60:17
149:11
**screenshots**  6:6
89:16
**search**  126:16
**searched**  55:17
**searching**  54:6
**second**  19:3,6
25:20,23 27:8
83:21 89:19 90:10
91:22 92:1 107:24
108:4 122:17
130:23
**secrets**  134:2
135:23
**section**  29:20,23
35:2,17,18,21
55:14 59:18 64:2
94:1,3 154:7
**sector**  129:14
**securities**  135:23
**see**  14:20 24:18
27:13 30:2,8,13,20
31:13,17 32:6,25
34:11 35:12,19,20
35:20 56:20 59:15
63:2 71:1,2 72:17
73:13 74:7,7 76:5
81:4 84:11 88:23
89:21,23,25 90:2
90:11 91:7,12
92:3,5,7,20 93:13
93:23 95:3,3
100:7,10,12,15
103:11 104:19
119:14,18 121:18
121:24 122:7,8,8
122:22 123:12,15
123:23 124:1,3,5,8
124:24 125:3,4,13
125:19 128:22,24

129:3,11,15,16,17
129:19,20,21
143:16 152:23
156:20
**seeing**  25:4 90:4
**seeking**  20:2
**seen**  50:4,16,20
72:9 142:16 143:3
**sees**  137:13
**segmentation**  82:2
82:2 99:3 100:21
100:22 101:20,22
**segments**  82:11
**select**  33:6 53:8,21
58:7 84:18 148:23
**selected**  51:24
52:19 155:18
**selection**  66:13
106:2
**selects**  49:20
**self**  84:3 133:2
**sellers**  3:4 4:11
**senior**  79:20 85:21
147:6
**sense**  10:18 23:2
23:18 28:18,22
29:15 30:6 39:1
42:23,25 43:2,14
44:25 45:1,22
47:3,8,11 48:5
55:13 64:5 66:6
67:2 72:7 73:10
75:1,13 77:4
84:20 85:4 116:9
116:22 125:15
130:2 140:15
142:2,13 147:2
156:5
**sent**  162:14
**sentence**  125:4
129:22 152:17

**[sentence - spending]**                                    Page 29

155:2,25
**separate**  68:15
**separately**  67:16
   67:17,19 69:7
   99:1
**separation**  154:22
**series**  48:24
**session**  92:5,9
   98:18 99:9,12
   100:10,16,21
   101:5,12
**sessions**  98:21
   99:14
**set**  9:11 28:7 31:19
   33:14 42:17 47:7
   47:8,10 48:15
   50:1 56:15 63:4,9
   68:24 78:4 79:24
   82:10 83:4,7,9
   87:25 125:6
   133:25 135:22,24
   140:22 149:2
   161:7
**setting**  12:10
   47:16 73:17
**share**  25:6 27:14
   84:9 103:12
   121:25 156:19
**shared**  95:6
**sharing**  18:14,20
**sheet**  162:11
**shield**  13:20 14:7
**shift**  97:1
**shifted**  86:22
   99:11
**shireen**  4:11 8:3
   89:14
**short**  116:15
**shortly**  95:22
**show**  48:25 53:21
   83:8 119:17

**showed**  156:5
**showing**  142:21
**shown**  25:1,9,14
   26:8 45:15 141:5
   142:9
**shows**  50:24 72:14
   72:15 130:5
**sic**  123:17 157:1
**side**  15:14
**sided**  14:7,8,9,10
   133:12,17
**sides**  133:16
**sign**  145:13 162:12
**signature**  161:24
**signed**  162:20
**signing**  145:13
**similar**  100:25
   101:4 114:24
   115:13 117:24
   155:16
**similarly**  1:6 2:5
   45:19
**simple**  40:25 41:9
   133:25
**simplified**  12:10
**simplifying**  74:22
**simply**  32:17
   139:1
**simulation**  108:7
   108:16,20,25
   109:5 155:3
**simulations**
   155:12
**single**  19:8 144:6
**sir**  149:24
**sit**  96:9
**sitting**  9:10 29:6
   126:25 129:5
**situated**  1:7 2:5
**situation**  135:22

**situations**  104:19
**six**  99:15
**size**  32:19 49:1
   72:15 73:12
**sizes**  158:23
**skill**  161:15
**skilled**  102:7
**slightly**  115:1
**sloan**  6:10 99:19
   129:1
**slots**  108:5
**slow**  103:12
**slowly**  122:16
**small**  40:18 72:20
   74:20 75:9,11
   126:4,12 159:21
**social**  130:6,15,17
**sokol**  4:13 8:9,9
**solemnly**  8:14
**solutions**  162:23
**someone's**  46:22
   132:5
**sorry**  7:9 11:18,20
   24:9 27:3 31:3
   35:13 43:20 46:20
   48:25 60:23 80:7
   85:25 88:11 91:9
   91:23 97:6 103:12
   108:9 112:11
   113:4,16 114:4,23
   123:2 142:23
   143:3 145:17
   150:1,14,16,21
   152:23 153:6
**sort**  12:2 13:7 44:3
   64:19 76:7 82:21
   86:6 87:22 99:12
   101:13 122:6
   137:9 139:5 145:7
**sound**  118:5,13
   130:20 131:5

**sounds**  44:13
   76:15 86:8 108:24
   109:24 139:10
**source**  56:8
   144:16
**sources**  120:6
   128:12
**space**  97:20
**spam**  133:14
**spammy**  106:23
   135:20
**speak**  82:15
   114:17
**speaking**  24:20
   41:6
**special**  107:22
**specialist**  77:11,15
**specialized**  76:8
   107:23
**specific**  12:24
   32:13,16 34:23
   45:16 48:19 49:7
   114:4 118:21
   127:21
**specifically**  60:22
   78:12 103:4 109:7
   129:7
**specifications**
   16:14
**specified**  55:23
**specify**  104:6
**speech**  132:5
**spell**  8:24 11:10
   24:8
**spelled**  9:1 24:10
   147:22,24
**spend**  41:16 71:20
   86:13,16,18 111:9
   113:6 140:12
**spending**  37:2
   44:1 64:23

**spent** 86:23 95:6 98:18 102:19 143:21
**spoke** 35:14 141:20 148:19,23 149:5,6
**spoken** 34:13
**spreadsheet** 68:15
**spring** 90:7
**ss** 161:1
**staff** 113:13,24 115:4,17,25
**standard** 137:12
**start** 18:19 29:17 29:17 56:18 57:19 83:4 87:21 95:22 99:4
**started** 88:9 96:17 97:24,25 98:1 99:11,13 127:18
**starting** 29:21
**stata** 102:9
**state** 7:24 8:14,23 29:23 30:15 32:10 33:2 62:24 161:1
**stated** 55:2 63:24 127:6 132:17
**statement** 63:4,9 155:20
**statements** 64:17
**states** 1:1 2:1 7:17 124:8 153:15,17 154:3,12 155:2,24 157:13 158:8 159:1,5
**stating** 11:2
**statistical** 102:8
**stay** 72:12 73:11
**staying** 112:7
**steel** 158:16

**stem** 103:17 105:4
**stenographically** 161:11
**steps** 68:11
**stick** 35:7 105:18
**stop** 7:9
**stopper** 158:16,19 158:21
**stopping** 89:1
**straightforward** 38:14 55:1 134:20
**strange** 22:13 105:13
**straying** 47:11
**street** 3:18
**strike** 82:20 147:1 149:5
**strong** 130:16
**structural** 109:2
**structure** 92:15 95:4,5,24
**student** 87:11,13 96:4 98:7
**students** 77:20,25 78:3,5 83:6,10,11 83:13 85:10,21 86:3,15 87:2,19,24 88:17 93:15,21 95:8 98:6 102:14
**studied** 105:5
**studies** 34:23 48:1 48:20 49:7 50:1 76:17 78:16 105:9 142:6 154:9,13
**studiously** 136:25
**study** 33:18 103:15,23 107:16 108:17 141:18 152:14
**studying** 34:20 104:3,4 106:11,16

**style** 57:3
**stylized** 13:4
**subheading** 36:3
**subheadings** 30:4 36:4
**subject** 79:7,10 80:18
**submission** 13:13 20:17 116:18 117:9 118:3 124:13
**submit** 28:25
**submitted** 11:4,7 13:16,21 17:21 27:23 28:8,10,16 114:9 116:13 151:25
**subscribed** 161:20 164:14
**subsection** 30:9 35:23 36:13,18
**substance** 22:23 81:17 150:5,9,12 150:24
**substantive** 81:13
**substitute** 45:4
**suburb** 55:17
**successful** 66:21
**sufficient** 75:17 144:1
**suggest** 14:18 70:5 76:25 147:5
**suggested** 18:5 46:15,17
**suggesting** 41:25 43:10 68:25 72:3 72:23 75:8,12
**suggests** 31:14 35:10 42:12 73:2
**suite** 3:18

**summarizes** 63:14
**summation** 29:2,5
**superficial** 82:22
**supervision** 161:12
**support** 24:4,5 35:22 36:12 111:16,19,23,24 112:3,4,6,9,23 113:13,24 115:4 115:17,25 154:9
**supportive** 36:10 132:8,8
**supports** 141:9
**suppose** 142:17
**supposing** 155:21
**sure** 19:16 24:19 42:15 43:13 46:3 48:18 53:10,16 59:24 62:20 71:4 73:23 84:14 89:3 93:10 96:21 97:5 97:7,16 114:18 119:8 121:22 123:5,5 147:21,23 152:16
**surprise** 42:3 44:9 46:16 69:1,24 70:21,22,24 97:19 128:5,8
**surprised** 70:16 128:14 130:11
**surprising** 69:12
**surrounding** 12:14 60:20 62:2
**survey** 76:25 77:10,23 78:6,9,19 79:6 83:14 98:24 156:2,9,11,12 158:3 159:2

**surveys** 77:6,8,20 78:13 93:24 100:14
**susan** 109:11
**swear** 8:11
**switch** 88:4
**switching** 128:10
**sworn** 164:14
**syllabus** 100:4
**system** 104:13,22 104:24 105:7,9,23 106:16,17 135:13 135:15 136:4

**t**

**t** 9:1 163:3,3
**take** 9:18 16:23 27:8 32:4,17 43:11 48:15 50:2 51:1 72:13 83:6 83:10 85:19 89:2 99:16 123:3,5 133:15 151:8
**taken** 2:16 7:15 10:9 64:3 161:7
**talk** 10:16 15:5 32:3 37:6,23 46:23 47:21 49:13 49:25 69:16,22 77:6 83:1 99:1 112:17 114:5 129:6
**talked** 34:18 36:5
**talking** 10:14,15 24:21 33:9 35:16 36:20 37:7 38:25 46:22 47:20 52:11 60:25 64:4 65:21 68:9,9 69:13,15 70:4,5,7,9,10,12 79:19 80:2 84:5 84:16 86:19 94:13

127:14 128:2,4 130:1,3,13 131:18 133:23 140:6 157:18 158:13
**talks** 129:8
**tangential** 32:19 33:11
**target** 20:10 43:24 51:24 52:2,16,19 52:22 53:3,11,11 53:14,14,24 54:4 55:16,21 56:15 57:16 58:11,14 60:4 66:13
**targeting** 17:10,12 17:13 18:7,18 19:20,25 20:4,12 38:3,24 39:16,24 40:17 41:13,21 52:12,25 53:3,8,12 53:17 54:5,13,14 55:2,4,5,7,11,15 56:5,7,9,16,20,22 57:2,6,13,20,23 58:5,6,22,23 59:7 60:10 61:8,14,17 61:18,25 62:6 66:11
**task** 159:12
**taught** 87:3,22 90:7,17 91:18 92:23 95:1,13 99:9 101:5 109:13
**teach** 77:10 78:21 79:13,15,20 80:3 80:16,17,21,24,25 81:5,7,19 84:18,23 87:19 88:6 93:3 93:20 95:13 97:24 97:25 100:25 101:7,10,10,12

109:6
**teacher** 84:3 88:4
**teaches** 77:13
**teaching** 43:9 77:20 81:16 82:9 84:17 85:8 87:21 88:9 89:12 97:8 99:11,13
**team** 24:4,5 111:16,19,23,24 112:3,4,6,9,23
**teams** 103:19
**tech** 129:14
**technical** 7:10
**technique** 18:16
**technology** 6:14 128:18 129:8
**tedious** 68:14
**tell** 47:23 48:6 67:21 70:21 73:4 96:7 101:16 112:11 113:16 121:10 127:1 132:7,24 133:7 134:5 147:23 149:3,13
**temporary** 60:16 60:17
**ten** 88:13,14
**tens** 112:15 113:23 114:3 115:7
**tenure** 97:3,5,8 98:7 152:15
**tenured** 88:22
**term** 21:7 37:21 41:25 42:12 43:9 45:14 48:2 66:4 137:1 158:12
**terms** 14:7 25:6 26:6 32:22 39:23 42:13 45:24,25

58:4 62:15 64:22 73:19 77:15 93:7 97:1,17 117:21 131:16 156:6
**test** 159:22
**testified** 13:12 16:23 46:13,17 60:3 84:22 109:15 109:25 110:17 114:13,14 116:4
**testify** 25:15 26:13 110:7,12 116:9,9
**testifying** 12:15,16
**testimony** 9:7 11:21 16:17 20:16 20:23 21:2,10,12 38:5,8 40:2 42:16 44:13 46:21 47:2 47:19 50:15,19 59:2,5,24 61:3,6 66:9,15 69:19 114:10 116:18,22 116:24 132:2 140:7 150:5,9,12 150:24 152:6 160:11 161:6,9,14 162:9,18 164:8
**thank** 8:10,13,18 9:2 13:10 20:15 24:12 31:5 43:21 49:3 51:2 101:23 111:2 150:22 151:2,4,16 156:15 160:3,5,6
**thanks** 151:7
**theoretical** 87:18 103:1 108:25 109:4
**theorist** 103:2
**theory** 13:4,5,8 102:22 109:7,10

[theory - transparent]                                                                                                   Page 32

109:13

**thereof**  161:19

**thing**  45:20 67:19
70:23 122:21
141:19,20 144:8
152:8

**things**  13:3 42:9
45:21 48:1 86:22
93:6 97:14 102:9
106:24 108:17
118:19 148:12,16

**think**  11:19 12:2
14:8 16:11 17:19
21:9 31:23 32:7
36:1 37:21,22
40:20,22,25 41:17
42:10,24 43:1,5,8
43:23 44:5,18,25
45:3,5,20 48:8
49:24 50:25 54:25
56:22 57:13 59:13
59:16,21 60:9,15
60:17 61:1,15,16
63:14 65:9,13,24
65:25 66:8,10
68:4 71:6 74:3,22
75:8,20 76:2,3
77:3 78:14 79:3
81:24 83:1,12,14
84:5,16 85:8 86:5
86:22,23 87:7,16
88:12,21 89:3,19
91:10 93:4 96:14
97:13,23 100:16
101:13,16 102:19
108:3,14 110:25
112:5 113:22
119:3,5,6 120:23
122:3,15 125:17
125:23 128:10,11
128:11 129:21

131:19,23 132:10
132:13,17 133:1
133:12,16 134:7
134:19 136:9
137:23,25 139:6
141:13,16 142:4
142:12 143:4,6,10
143:15,19 144:1
147:9 148:6,14
149:11 152:6
157:18

**thinking**  42:22
56:2,19 62:15
71:5 77:16 80:9
109:10 118:10,22
127:16 144:8,23

**thinks**  77:14
128:10

**third**  90:13 124:5

**thought**  14:10
64:23 95:19
119:21 120:13
136:19 143:13

**thoughtful**  58:22

**thoughtfulness**
58:23

**thousands**  80:12
112:15 113:23
114:3 115:8

**three**  24:24 83:23
84:22 85:3 90:3
149:1

**threshold**  71:15
75:2

**thursday**  1:18
2:18 5:4 7:1

**tiktok**  129:23
130:5,15

**time**  7:6,6,13,13
10:13 11:7 12:20
24:25 28:8 30:18

46:6 48:15 51:7,7
51:10,10 52:5,5,8
52:8 77:21 82:17
86:13,16,23,23,25
87:1,1,24,25 88:7
88:10,18 89:6,6,9
89:9 96:25 97:18
98:8,9,18 102:19
106:8,9 107:22
123:8,8,11,11
125:8 130:25,25
131:3,3 134:21
137:2 144:1
149:18,18,21,21
150:15 151:4,12
151:12,15,15
152:15 160:13,13
160:15 161:7,8,10
162:19

**timeframe**  162:8

**times**  21:17 26:25
41:4 87:2 109:15
113:7 115:15
133:15,19 147:19

**timing**  86:17

**title**  128:25

**titled**  110:13

**today**  8:2 9:4,7,9
9:21 20:23 21:2
21:14,21 23:2
28:12 29:6 39:13
44:13 46:21 47:19
100:25 126:25
127:20 150:7,12
150:24 151:4
153:8 157:3

**today's**  160:10

**told**  106:22,24
134:12,22 139:19
140:24 141:2
147:24

**toll**  3:4 4:12

**tom**  129:12

**tool**  56:6 66:20,25
67:1 71:5 77:21
79:21 83:9 87:10
87:24 98:1,5,6,13

**tools**  62:4,8,19
65:10 67:7 87:11
87:13,17 98:2,11
134:9

**top**  29:23 31:13
35:8,15,16 36:13
94:2 108:11
121:24 122:9
156:22,24

**topic**  116:15 118:8

**total**  67:10 70:1,18
76:13 111:4 112:8
112:18 113:2

**totally**  18:16

**tracking**  76:19

**trade**  134:2
135:23

**traditional**  31:11
95:2,3

**traditionally**
108:1

**train**  85:24

**training**  95:8

**transcribed**
161:12

**transcript**  162:6
162:20 164:5,8

**transformation**
31:10 33:19 34:12
36:21

**transformative**
33:20

**transparent**
133:13,18 135:9
135:19

**treats** 106:12,13
**trial** 20:23 38:5
**tricky** 85:16
**tried** 148:2,4
**trouble** 21:7
**troves** 20:9
**true** 55:14 93:17
  129:25 161:13
  164:8
**truth** 8:15,16,16
  132:7,24 133:7
  134:5,12,23 135:1
  138:7 144:16
**truthful** 155:5
**try** 12:22 13:8
  20:1 56:21 57:11
  58:14 62:5 67:5
  80:16 106:3
  122:19 126:15
  133:5,20 134:8
  138:5,6 152:22
**trying** 32:15 40:17
  41:12 43:15 44:3
  46:8 55:8 56:7
  59:23,25 60:4
  62:9 74:10 78:14
  78:16 84:17,20,25
  86:21 88:12 89:23
  102:17 105:4
  106:8 108:9 117:6
  123:1 126:5 139:7
  142:12,13
**tucker** 1:15 2:15
  5:7 6:2,5 7:8,15
  8:11 9:1,3,9,23
  15:23 20:22 21:13
  22:22 26:13 27:5
  27:11 29:13 37:17
  38:4,18 40:1,12,20
  41:3,10 42:16,18
  44:7 46:5 47:9,16

48:19 49:3,19
  51:11,12 52:9
  53:17 58:10 59:24
  62:11 63:19 66:15
  66:25 67:8 71:22
  77:7 82:6 84:20
  85:1 89:10 91:24
  97:6 101:24,25
  109:15 111:3
  122:10 123:12
  124:12,14,19
  129:1 131:6
  133:24 135:21
  137:1 139:10
  143:25 145:9
  148:19 150:3
  151:4,20 153:15
  160:3,11 162:5
  163:2,24 164:2,4
  164:12
**tucker's** 124:25
  154:12 155:24,25
**tutorial** 117:4
**tv** 37:13
**twice** 11:3 21:19
**two** 13:16 14:7,8,9
  14:10 18:5,8 80:6
  80:15,19 86:14,15
  98:21 99:4,13
  113:19 133:12,16
  133:17 152:4
**type** 16:5 74:24
  76:8 77:3 117:1
  126:7
**types** 16:7 18:8
  71:6 104:19
  125:17
**typical** 70:11
  71:11 86:24 107:5
  117:22

**typically** 32:15
  83:3 113:5 114:24
  142:14 143:21

**u**

**u** 9:1
**ubiquitous** 120:3
  121:4
**uh** 35:15 129:24
**ultimately** 108:16
  137:11
**unaffected** 29:25
**underlying** 31:10
  36:17 107:13
  154:9
**understand** 9:3
  10:1,6,12 12:22
  20:22 27:22 38:4
  38:8 41:7 46:3,8
  47:15 53:16 59:24
  64:7 73:23 84:25
  85:22 97:7 102:17
  128:3
**understanding**
  59:25 60:5 63:19
  103:17
**understood**
  148:18
**undesirable** 32:20
**unfortunate** 96:3
**unimportant**
  30:11 31:15 33:3
  34:24 35:4,10
  48:21 49:9
**uninformative**
  71:18
**unique** 76:7
  120:11,12,25
  124:10 125:19
  128:11
**unit** 7:7,14 99:11

**united** 1:1 2:1 7:17
**units** 160:12
**universal** 155:20
**universally** 153:24
**unknown** 106:6
**unlock** 59:2,7 61:7
  62:5,8 66:1 67:5
**unlocked** 57:1
  62:15
**unlocking** 58:24
  62:21
**unmeaningful**
  74:13
**unpandemic** 86:18
**unrealistic** 12:10
**unrealistically**
  159:2
**unsatisfactory**
  36:24
**untenured** 88:19
  88:24
**unusual** 50:2
  67:12 68:24 69:12
**update** 90:22
  116:11,12 118:9
  152:5
**updated** 116:13
**updating** 95:7
**uploading** 107:13
**use** 12:9,9,24
  14:12 21:7 38:3
  39:8 41:14,15
  43:9,11,12 44:20
  44:21,22 45:3,17
  45:18 48:4,7
  50:16,21 51:23
  53:8,20 56:19
  59:7,19 60:3
  61:14,18 67:9,23
  69:20 70:16 76:12
  77:15,21 81:24

82:9 83:2,9,13
84:13 86:5 98:14
98:21 99:2 100:22
101:21 102:9
107:19 116:23
117:24 120:10
138:5,24 139:1
140:1,17 158:12
**useful** 39:18,22
40:16 41:12 42:22
55:10,22 56:10
58:2,14 59:9,17
61:15,15 62:20
63:17 66:1,5
70:23 72:19,22
73:24 75:17,21
82:1 84:10 119:5
119:16 120:13,16
133:5,21
**user** 135:20
**users** 32:16 37:20
**uses** 47:4 48:2
102:19 107:21
124:9,10
**usually** 14:12 43:5
43:8 111:9 123:4
126:3,11
**utility** 37:23 39:15
83:17 131:22
132:1
**utilize** 18:20 44:21
45:18 126:19
159:10
**utilized** 12:17
17:24

**v**

**v** 162:4 163:1
164:1
**valuable** 52:25
53:3,5 54:5,8
55:18 56:11

118:13 124:16,19
143:8,18
**value** 18:6 49:12
49:13 53:7,12,18
53:22 55:3,15
56:8,25 58:4,24
59:2,7 60:6,8,12
60:12,17 61:4,7,9
61:13,17,21,23
62:3,5,8,12,15,17
62:21 66:1 67:5
118:17,18 129:2
153:16,18,22,25
154:14 158:17,18
**value's** 56:4
**values** 83:17
**variety** 16:12
146:21
**various** 102:13
**vary** 74:8
**vast** 20:9 60:13
73:16 75:3 159:19
**vcg** 108:2
**vein** 131:13
**verbal** 116:25
**verify** 162:9
**veritext** 7:23,23
160:13 162:14,23
**veritext.com**
162:15
**version** 93:19 94:4
95:2 99:9,12,17
100:24 101:6,12
**versus** 7:17 16:21
74:12 82:23 84:19
110:1,8,13
**vice** 147:7
**video** 1:15 2:15
7:7,15 22:6 24:20
26:1,2

**video's** 24:18
**videographer** 4:14
7:5,12,23 51:6,9
52:4,7 89:5,8
122:13 123:7,10
130:24 131:2
149:17,20,24
151:11,14 160:7
160:10
**videos** 23:17
**view** 40:12 42:18
42:21 44:14 45:9
47:17 51:12,15
62:11,14,18 119:6
138:13 140:5
154:10
**viewed** 17:13
19:25
**viewership** 37:13
141:24
**viewpoints** 141:9
**views** 49:21
**volume** 62:7 150:1
**vs** 1:9 2:8
**vulnerable** 88:19

**w**

**walk** 11:8 13:17
30:4 111:3
**want** 15:12,15
22:22 24:24 29:14
42:15 45:24 46:1
46:3 47:15 50:7
53:16 68:8 69:16
73:23 77:17 78:1
79:22 85:15 94:17
95:10 97:7 101:7
101:13 107:23
114:17 116:21
122:1,11 128:15
131:8,14 132:14
135:7,8,18 136:20

138:8 139:8 142:4
142:10,21,23
143:11,17,21,22
144:2,7,11,20
147:3 154:25
**wanted** 101:10
132:18 149:1
152:18
**wanting** 43:25
65:8 132:21
**wants** 107:1
131:12
**warning** 90:1,1
122:6
**washington** 3:8
**waste** 54:10
**wasted** 20:11
**wasting** 55:19
**watkins** 3:14 4:3
8:6,7 22:16,21
23:4 149:12
**way** 14:8 37:22
38:2 39:24 41:11
41:24 42:11 44:21
45:5,5 49:5 56:20
62:10 64:25 72:10
76:2 81:19 85:7
86:6,12 87:11
104:18 107:2
118:9 132:21
133:14 138:25
139:9,15 143:5,6
144:2 147:3 157:6
160:2 161:18
**ways** 42:10 75:22
86:10
**we've** 48:13 68:8
76:5 88:25 96:1
101:18 116:9
123:6 152:6

**wealth** 69:9
**weary** 93:7
**web** 122:11
**website** 130:6
  137:13,17 144:25
  145:2,6
**websites** 130:17
**week** 147:17,18,24
**welcome** 51:11
  89:10
**went** 103:24 106:3
  132:6 137:17
**whereof** 161:20
**who've** 78:4
  102:14
**widespread** 77:1
**wish** 98:9
**witness** 3:13 5:6
  5:12 8:6,8,17
  11:24 12:20 13:2
  13:19 14:5 15:4
  15:25 16:3,10
  17:1,6,18 18:1,4
  18:12,25 19:6,15
  19:24 20:7,20,25
  21:4,16,23,25 22:5
  22:10,20 23:16,23
  24:3,16,24 25:4,18
  26:5,17 27:25
  28:7,14 29:4,11
  31:9,22 33:9,17
  34:17 35:2 36:1
  36:16 37:6,20
  38:7,11,21 39:6
  40:4,15 41:19
  42:7,21 43:4,20
  44:18 45:13 46:12
  47:2,23 48:23
  49:11,24 50:19
  51:2,15,21 52:18
  52:24 53:7,20

54:18 56:13 57:10
57:18 58:13,19
59:5,12 61:6,12,23
62:14 63:7,14
65:4,16 66:19
67:12 68:7,23
69:4 70:3,20
71:10 72:22 74:3
74:22 75:20 77:13
77:25 78:8 79:1,7
81:22 83:1 84:2,8
92:12 93:1 94:12
94:25 95:19 96:20
97:11 98:21 99:7
102:24 104:3,16
105:1,25 106:8,20
107:12,21 108:9
108:22 109:18,24
110:4,11,16,24
111:7,15,21 112:3
112:11,20 113:4
113:16,21 114:1,9
114:22 115:6,21
116:2,8,20 117:3
117:12,17 118:7
118:15 119:2,13
120:2,22 122:15
122:20 125:8
126:3,11,22 127:9
128:1,8 131:11,16
132:4,16 133:1,10
134:7,15,25 135:7
135:17 136:3,9,19
137:7 138:16
139:15,22 140:9
141:2,8,16 142:12
142:23 143:2,13
144:5,23 145:17
145:25 146:2,14
147:21 148:4,25
149:9 153:3 161:8

161:9,20 162:8,10
162:12,19
**women** 55:24
  104:19 105:11,17
  106:2
**wonderful** 13:25
  20:8 105:3 127:19
**wondering** 137:2
**word** 39:21 44:20
  44:21 45:6,25
  66:3 137:9,10,23
  137:24 142:24
**work** 26:16 39:8
  40:18 43:16 51:24
  52:18 53:14 86:5
  111:12 115:3,12
  115:17 117:14
  120:15 130:13
  138:17 147:3,13
  147:17,22
**worked** 34:19 83:3
  101:11 102:12,13
  105:23 113:18
  117:18,21 146:7
  146:18
**working** 146:11
**workings** 134:2
**works** 104:14
  146:16 154:24
**world** 11:25 19:25
  20:8 22:13 50:11
  65:18 95:6 96:1
  109:12
**worried** 127:12
  129:13,23 130:11
  131:18
**worry** 127:7,16,21
  127:24 128:14
  130:7
**worth** 11:2

**wrapped** 89:3
**write** 67:16,17
  68:1 102:16
**writing** 102:3,7
**writings** 33:24
  34:1,2,6,8
**written** 33:22 34:2
  34:11 49:12,15
  59:21 103:1 108:6
  108:15,19,23
  116:11 118:7
**wrong** 45:11 79:23
  84:11 129:22
  145:3
**wrongly** 43:21
**wrote** 67:19

|       x       |
|---------------|

**x** 5:1

|       y       |
|---------------|

**yeah** 15:7 22:13
  45:8 51:5 54:24
  84:7,16 89:3,4
  93:12 102:6 106:5
  119:3,19 121:8,12
  121:22 122:20
  123:24 130:10,21
  143:2 147:5
  150:19,21
**year** 22:11 55:16
  86:20 90:23 97:13
  101:5 148:11,14
**years** 34:21 86:18
  88:1,1,13,14 90:17
  95:1,6,14 96:11,16
  97:16,17 98:16
  99:15 113:19
  118:1 148:7
**yesterday** 25:25
  26:9

**[york - zoom]**                                                                    Page 36

| |
|---|
| **york**   3:7 |
| **young**   83:3 |
| **z** |
| **zero**   137:12,25<br> 138:8 139:6<br>**ziernicki**   69:14,14<br>**zoom**   1:16 2:16<br> 10:10,21,24 11:1,5<br> 22:12 24:17<br> 149:10 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.