LATHAM & WATKINS LLP
Melanie M. Blunschi (CA Bar No. 234264)
*melanie.blunschi@lw.com*
Nicole C. Valco (CA Bar No. 258506)
*nicole.valco@lw.com*
Francis J. Acott (CA Bar No. 331813)
*francis.acott@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6548
Telephone: +1.415.391.0600

Andrew B. Clubok (pro hac vice)
*andrew.clubok@lw.com*
Susan E. Engel (pro hac vice)
*susan.engel@lw.com*
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

*Counsel for Defendant Meta Platforms, Inc.*
*(formerly known as Facebook, Inc.)*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DZ Reserve and Cain Maxwell (d/b/a Max Martialis), individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendants. | Case No. 3:18-cv-04978-JD<br><br>**DEFENDANT META PLATFORMS, INC.'S TRIAL BRIEF**<br><br>Date:  September 18, 2025<br>Time:  1:30 p.m.<br>Court:  Courtroom 11, 19th Floor<br>Judge: Hon. James Donato |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................................. 1

II. FACTUAL AND PROCEDURAL BACKGROUND...................................................... 3

III. PLAINTIFFS WILL NOT PROVE THEIR FRAUD CLAIMS AT TRIAL ................... 4

    A. Facebook Did Not Fraudulently Substitute "People" For "Accounts" ................................................................................................................. 4

        *1. Facebook Did Not Falsely Substitute "People" For "Accounts"* ............................................................................................... 4

        *2. Facebook Did Not Harbor Fraudulent Intent* ............................................. 4

        *3. Plaintiffs Will Not Prove Actual Or Justifiable Reliance* ......................... 5

        *4. Plaintiffs Will Not Prove Resulting Injury Or Damages* .......................... 7

        *5. Plaintiffs Will Not Show Fraudulent Concealment Of A "Central Function"* ...................................................................................... 9

    B. Plaintiffs Are Not Entitled To Punitive Damages................................................... 9

IV. META WILL PREVAIL ON ITS AFFIRMATIVE DEFENSE ...................................... 9

V. THIS CASE SHOULD NOT PROCEED AS A CLASS ACTION ............................... 10

VI. CONCLUSION................................................................................................................ 10

# TABLE OF AUTHORITIES

**CASES**

*Cadlo v. Owens-Ill., Inc.*,
  125 Cal. App. 4th 513 (Ct. App. 2004) ............................................................................. 5

*Calif. v. Altus Fin. S.A.*,
  540 F.3d 992 (9th Cir. 2008) ............................................................................................ 9

*Collins v. eMachines, Inc.*,
  202 Cal. App. 4th 249 (Ct. App. 2011) ............................................................................. 5

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .......................................................................................................... 10

*DZ Rsrv. v. Meta Platforms, Inc.*,
  96 F.4th 1223 (9th Cir. 2024) .............................................................................. 2, 3, 4, 10

*Engalla v. Permanente Med. Grp., Inc.*,
  15 Cal. 4th 951 (1997), *as modified* (July 30, 1997) ............................................... passim

*Harnish v. Widener Univ. Sch. of Law*,
  833 F.3d 298 (3d Cir. 2016) ............................................................................................. 8

*Heeger v. Facebook, Inc.*,
  509 F. Supp. 3d 1182 (N.D. Cal. 2020) ........................................................................ 6, 7

*Hodsdon v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) ............................................................................................ 9

*Hoffman v. 162 N. Wolfe LLC*,
  228 Cal. App. 4th 1178 (2014) ..................................................................................... 5, 7

*In re First Alliance Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) ............................................................................................ 9

*In re Natera Prenatal Testing Litig.*,
  664 F. Supp. 3d 995 (N.D. Cal. 2023) .............................................................................. 9

*In re Paradigm Int'l, Inc.*,
  635 F. App'x 355 (9th Cir. 2015) ..................................................................................... 5

*Larin v. Bank of Am., NA*,
  617 F. App'x 651 (9th Cir. 2015) ..................................................................................... 4

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx.
  Bond & Indem. Co.*, 553 U.S. 639 (2008) ........................................................................ 8

*Mezzadri v. Med. Depot, Inc.*,
  2016 WL 5107163 (S.D. Cal. May 12, 2016) ................................................................. 7

*Mier v. CVS Pharmacy, Inc.*,
  2021 WL 6102519 (C.D. Cal. Nov. 19, 2021) .............................................................. 10

*OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*,
  157 Cal. App. 4th 835 (2007) ..................................................................................... 6, 8

*Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*,
  946 F. Supp. 2d 957 (N.D. Cal. 2013) ............................................................................ 9

*Racies v. Quincy Bioscience, LLC*,
  2020 WL 2113852 (N.D. Cal. May 4, 2020) ............................................................... 10

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ........................................................................................ 10

*Terpin v. AT&T Mobility LLC*,
  118 F.4th 1102 (9th Cir. 2024) ....................................................................................... 9

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ...................................................................................................... 10

*Unico Am. Corp. v. Ins. Sys., Inc.*,
  2016 WL 11506626 (C.D. Cal. May 2, 2016) ................................................................ 7

*Vasquez v. Superior Ct.*,
  4 Cal. 3d 800 (1971) ....................................................................................................... 6

*Young v. Cree, Inc.*,
  2021 WL 4749384 (N.D. Cal. Oct. 12, 2021) ................................................................. 6

**STATUTES**

Cal. Civ. Code § 3294(a) ...................................................................................................... 9

Cal. Civ. Code § 3294(c)(3) .................................................................................................. 9

**RULES**

Fed. R. Civ. P. 23(c)(1)(C) ................................................................................................. 10

**TREATISES**

Restatement (Second) of Torts § 538 (1977) ....................................................................... 6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

DEFENDANT META PLATFORMS INC.'S
TRIAL BRIEF
CASE NO. 3:18-cv-04978-JD

## I. INTRODUCTION

Plaintiffs are attempting to extract billions of dollars in damages from Meta based on alleged misrepresentations related to Potential Reach, an estimate of audience size that Meta, then-Facebook, *never* used to bill any class member. Plaintiffs *did not rely on* Potential Reach at all to make spending decisions, and they will not be able to establish their fraud claims at trial. Facebook never intentionally misrepresented Potential Reach; on the contrary, it worked hard to provide the best estimates possible along with clear disclosures about what Potential Reach was (and what it wasn't) and what factors might affect its accuracy. The evidence will show that any inaccuracy was immaterial to advertisers' spending decisions, particularly in the context of the total mix of information Facebook provided to advertisers, and that advertisers were not buying ads because of supposed inflation in Potential Reach estimates—or because of Meta labeling it "people" rather than "accounts." Far from suffering damages, advertisers got great value for their Facebook ads.

Potential Reach was one of several estimates that Facebook provided to advertisers as they planned ad campaigns. It estimated the size of the audience that met the advertiser's chosen targeting criteria, before accounting for their budget. Alongside Potential Reach, Facebook provided advertisers a separate estimate—Estimated Daily Reach—that, as Facebook explained, estimated the number of people who actually *would see* an ad, taking into account an advertiser's budget. Plaintiffs do not challenge the accuracy of Estimated Daily Reach, or the real-time data about advertisers' actual results that Facebook offered the very same day their ads started running.

Plaintiffs' claims hinge on the notion that the class—which ranges from sole proprietors to Fortune 500 companies to the very law firm representing Plaintiffs in this case, and includes advertisers who placed ads via agencies and thus never directly saw any Potential Reach figure at all—relied on Potential Reach, instead of Estimated Daily Reach or actual results from their prior ad campaigns, to make ad spending decisions. But the evidence at trial will show that even the named Plaintiffs themselves did not rely on or suffer any injury from Potential Reach—much less the class as a whole. These flaws, amongst others, will be fatal to Plaintiffs' claims.

Plaintiffs also have another fundamental problem—stemming from the Ninth Circuit's decision affirming this Court's class certification decision. Plaintiffs alleged that Facebook

fraudulently misrepresented Potential Reach in two ways: (1) the numerical estimates were inflated because Facebook failed to sufficiently remove duplicate and fake accounts and (2) the description of Potential Reach as an estimate of "people" was wrong because Potential Reach actually tracked accounts. Dkt. 332 at ¶¶ 143-44, 153. The Ninth Circuit affirmed class certification only as to the second alleged misrepresentation (which this Court also identified as the misrepresentation to which "all class members were exposed," Dkt. 388 at 10)—namely, "the fact that [Facebook] substituted people for accounts" in describing Potential Reach, *not* "the numerical discrepancy between people and accounts," which undisputedly varied across advertisers. *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1230, 1234-35 (9th Cir. 2024); *see* Dkt. 388 at 10 (acknowledging variation). Plaintiffs thus cannot proceed on their theory that the specific *numbers* that class members saw were "inflated." Instead, Plaintiffs are limited to the theory that Facebook "substituted" the *word* "people" in describing a numerical figure that "really measures" the number of "accounts," *DZ Rsrv.* 96 F.4th at 1237—that is, that Facebook allegedly "actually measure[d]" the number of accounts and then re-labeled that number as "people," *id.* at 1231. But Plaintiffs cannot prevail on that theory, because the record reflects Facebook's extensive efforts to estimate *people*, not accounts, including by deduplicating accounts held by the same person and removing fake accounts from its estimates, so that the number presented was lower than the number of accounts in the target audience. Labeling that estimate "accounts" would have been inaccurate.

Moreover, Plaintiffs' only expert to test whether the label "people" or "accounts" mattered to advertisers' spending decisions found that the substitution of accounts for people had *no* statistically significant effect on those decisions. The "substitution" theory simply cannot sustain a fraud claim, as the use of the word "people" did not result in any harm. As a result, Plaintiffs will likely instead try to establish their claims via the independent inflation theory the Ninth Circuit disclaimed—*i.e.*, they will argue that the "numerical value" itself was too high. *Id.* at 1235. It would be legal error to permit them to do so because the "numerical value" of Potential Reach estimates is not a common representation.

Regardless, Plaintiffs' claims are deficient and will fail on any theory.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Potential Reach was one of several customized estimates displayed on Facebook's self-service ad creation interface, Ads Manager. Dkt. 375-1 at 12; Dkts. 375-17, 375-19. Potential Reach provided an initial "estimation of how many people are in an ad set's target audience" based on an advertiser's targeting and placement criteria. Dkt. 375-3 at 2-5; Dkt. 375-7. As Facebook explained, it was "not an estimate of how many people will actually see your ad." Dkt. 296-17 at 4. That information was provided by a different estimate, Estimated Daily Reach, which Plaintiffs do not challenge and which was presented directly below Potential Reach and accounted for the advertiser's budget and other factors. Dkt. 296-15 at 18-19; Dkt. 385-39 ¶ 85. Advertisers often made purchasing decisions based on Estimated Daily Reach or the real-time results of their ads, not Potential Reach. Dkt. 385-39 ¶¶ 8-9, 50-55, 69-72, 114-15. And advertisers were not charged based on Potential Reach. Dkt. 375-20; Dkt. 385-39 ¶¶ 50, 138; Dkt. 385-37 ¶¶ 30, 154-58.

Throughout the Class Period (August 15, 2015 to October 27, 2021), Facebook undertook various initiatives to improve its ability to approximate an ad's target audience size through Potential Reach, including deduplicating Instagram accounts matched to Facebook accounts, Dkt. 293-11; Dkt. 296-15 at 17, and removing billions of bot and spam accounts each year, Dkt. 385-37 ¶¶ 61-63. Through disclosures on Ads Manager and its Advertiser (Business) Help Center, Facebook explained that Potential Reach was "not designed to match population or census estimates," "depend[ed] on factors such as how many accounts are used by each person," and "may" be "impact[ed]" by "the presence of fake accounts." Dkt. 296-17 at 2-5; Dkt. 375-3 at 4-7.

In 2018, Plaintiffs sued Facebook, alleging that Potential Reach estimates were inflated and inaccurately described as a number of "people." Dkt. 1 ¶ 70; *see id.* ¶¶ 81-90. In 2021, Plaintiffs moved to certify a damages class based on fraud. Dkt. 282. This Court certified a Rule 23(b)(3) class, but made clear that its ruling in no way spoke to "[w]hether plaintiffs can ultimately prove [their claims] up at trial." *See* Dkt. 388 at 9. At the same time, the Court excluded the opinions of Plaintiffs' expert Bruce McFarlane, who purported to "calculate damages stemming from Potential Reach's 'inaccurate' reference to 'people.'" Dkt. 317 at 12.

The Ninth Circuit affirmed certification of the damages class on the premise that the

alleged "substitution of people for accounts" was a common misrepresentation. *DZ Rsrv.*, 96 F.4th at 1230, 1234-35. Plaintiffs issued class notice for advertisers who purchased ads from Facebook on certain platforms from August 15, 2015 to October 27, 2021. Dkt. 470 at 2; Dkt. 471.

### III. PLAINTIFFS WILL NOT PROVE THEIR FRAUD CLAIMS AT TRIAL

#### A. Facebook Did Not Fraudulently Substitute "People" For "Accounts"

To prove fraudulent misrepresentation and concealment, Plaintiffs must show "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, *i.e.* to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997), *as modified* (July 30, 1997) (citation omitted).

##### 1. Facebook Did Not Falsely Substitute "People" For "Accounts"

Plaintiffs will be unable to show that Facebook "substituted" the word "people" for "accounts," or that Potential Reach "actually measure[d] … accounts." *DZ Rsrv.*, 96 F.4th at 1231. Facebook did not simply calculate the number of accounts and then replace the label with the word "people." To the contrary, Facebook employees, including Chief Marketing Officer and VP of Analytics Alex Schultz, will testify that Facebook made extensive efforts to deduplicate accounts and remove fake accounts from Potential Reach. *See supra* at 3. In light of these steps, characterizing Potential Reach as the number of "accounts" would have been inaccurate. And "stating that Potential Reach was an estimate of people," rather than "an estimate of accounts," was not false. *DZ Rsrv.*, 96 F.4th at 1230, 1247. Potential Reach was what Facebook said it was: "a rough or approximate calculation" of the number of people in an ad set's target audience. *Estimate*, Merriam-Webster. That the estimate started from a sample of accounts does not change this. Facebook's disclosures explained that estimates "depend[ed]" on "how many accounts are used by each person" and that "fake accounts may have some impact" on "potential reach estimates." Dkt. 296-17 at 4-5; *see, e.g.*, *Larin v. Bank of Am., NA*, 617 F. App'x 651, 652 (9th Cir. 2015) ("no affirmative misrepresentation" given disclosures). There was no false statement or concealment.

##### 2. Facebook Did Not Harbor Fraudulent Intent

Plaintiffs will not be able to show that Facebook had any intent to defraud advertisers—

1  *i.e.*, to induce them to rely on the description of Potential Reach as an estimate of "people" in
2  deciding how much to spend on ads from Facebook. *Engalla*, 15 Cal. 4th at 977. Although
3  Plaintiffs will try to suggest otherwise based on internal documents discussing how to improve
4  Facebook's estimates, those cherry-picked soundbites cannot overcome the broader context—
5  including the other information Facebook provided to advertisers. Indeed, it would make no sense
6  to attempt to defraud advertisers by providing an inaccurate preliminary estimate, while at the
7  same time providing *accurate* tailored information—like Estimated Daily Reach and actual
8  reach—that an advertiser is much more likely to rely on in deciding whether to purchase an ad.

9  The evidence will prove that, after public reports criticizing Potential Reach, Facebook
10 promptly began studying how to refine its methodology. *See* Dkt. 385-10; Dkt. 376-8 at 157:6-
11 159:9. Within 15 days of the first report, Facebook made the first of several additional disclosures
12 about Potential Reach, all the while balancing the need to maintain a user-friendly, uncluttered
13 interface. *See supra* at 3; *In re Paradigm Int'l, Inc.*, 635 F. App'x 355, 357 (9th Cir. 2015) (no
14 intent to defraud where alleged misstatement was "at odds" with "express language" from
15 defendant). That is a far cry from cases where fraudulent intent has been found. *Cf. Collins v.*
16 *eMachines, Inc.*, 202 Cal. App. 4th 249, 259 (Ct. App. 2011) (finding intent to defraud based on
17 "directive to keep selling . . . amidst a customer service campaign to keep consumers ignorant of
18 the corporate-known [] Defect").

19              3.      *Plaintiffs Will Not Prove Actual Or Justifiable Reliance*

20 Plaintiffs also will fail to prove actual or justifiable (*i.e.*, reasonable) reliance.

21 First, testimony and documentary evidence of both the named Plaintiffs and Plaintiffs' own
22 expert will establish that Plaintiffs cannot show actual reliance—*i.e.*, that the representation of
23 Potential Reach as "people" instead of accounts was "an immediate cause of" their purchases and
24 that they would not "in all reasonable probability" have made those purchases otherwise. *Hoffman*
25 *v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1193 (2014). As to the named Plaintiffs, neither
26 actually "was reassured by and relied on" the representation of Potential Reach as an estimate of
27 "people" and not "accounts." *Cadlo v. Owens-Ill., Inc.*, 125 Cal. App. 4th 513, 520 (Ct. App.
28 2004). Cain Maxwell admitted that he relied on a third-party tutorial that did not mention Potential

Reach, consistently buying $20, one-day ad campaigns in accordance with that tutorial and regardless of Potential Reach estimates. *See* Dkt. 376-4 at 124:23-125:8, 130:2-131:6, 138:24-139:7, 167:22-168:11, 203:13-23; Dkt. 385-6 ¶¶ 64-77; Dkts. 377-9, 385-26; Dkt. 385-39 ¶¶ 100-04. As for DZ Reserve, Dan Ziernicki said he cared only about performance of his ads, testifying that advertisers "pour[ed] more money" into successful ad campaigns—in other words, they relied on actual results, not Potential Reach. *See* Dkt. 376-5 at 59:11-22, 60:21-61:11. And, after joining this lawsuit, Ziernicki continued buying ads using new company names, his girlfriend's account, and a college acquaintance's account—even saying on Facebook that this lawsuit should "not deter anyone from doing [Facebook] ads for ecom[merce]." Dkt. 376-17 at 3; *see* Dkt. 376-6 at 28:9-29:8, 62:11-25, 201:9-203:24, 207:15-213:22, 217:22-219:10; Dkt. 375 ¶¶ 55-63; *cf. Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1194 (N.D. Cal. 2020) ("continued use of Facebook even after discovery of" challenged conduct undercut "any alleged reliance").

Nor will Plaintiffs be able to show that the class actually relied on the representation of Potential Reach as an estimate of "people" and not "accounts" in their purchasing decisions. *Young v. Cree, Inc.*, 2021 WL 4749384, at *6-7 (N.D. Cal. Oct. 12, 2021) (dismissing fraud claim given lack of reliance). Plaintiffs cannot rely on an "inference" of reliance, which arises where "there is a showing that a misrepresentation was material," because the alleged "substitution of people for accounts" was not material. *See infra*. Regardless, the evidence will "rebut[]" any classwide inference. *Engalla*, 15 Cal. 4th at 977; *see Vasquez v. Superior Ct.*, 4 Cal. 3d 800, 814 (1971). Plaintiffs' ***own*** expert Greg Allenby found that advertisers did not make different purchasing decisions when the description of Potential Reach was changed from "people" to "accounts." *See* Dkt. 393-2 at 159:2-12, 200:23-201:18; Dkt. 385-31 at 21, tbl. 4; Dkt. 385-36 ¶ 119.

Second, Plaintiffs cannot show reasonable reliance either. Reasonable reliance requires a showing of materiality, which must be assessed in the context of "the transaction in question." *Engalla*, 15 Cal. 4th at 977 (quoting Restatement (Second) of Torts § 538 (1977)); *see OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 157 Cal. App. 4th 835, 862 n.17 (2007). Plaintiffs will not convince the jury that a reasonable advertiser would have "attach[ed] importance," *Engalla*, 15 Cal. 4th at 977, to the substitution of "people" for "accounts" in

DEFENDANT META PLATFORMS INC.'S
TRIAL BRIEF
CASE NO. 3:18-cv-04978-JD

determining how much to spend on ads. Potential Reach was a preliminary planning tool that was displayed alongside Estimated Daily Reach, an estimate of the number of people who would *actually* see an ad per day, accounting for budget. And Facebook provided advertisers with actual results promptly after their ad campaigns launched, allowing them to adjust their budgets based on actual results. Plaintiff DZ Reserve's owner Dan Ziernicki and other advertisers testified that they did just that. Plus, Facebook disclosed that Potential Reach estimates "depend[ed]" on "how many accounts are used by each person" and that "fake accounts may have some impact" on "potential reach estimates." Dkt. 296-17 at 4-5; Dkt. 385-39 ¶¶ 8-9, 69-72; *e.g.*, *Unico Am. Corp. v. Ins. Sys., Inc.*, 2016 WL 11506626, at *4 (C.D. Cal. May 2, 2016) (reliance unjustified given disclosures).

Numerous other factors also rendered Potential Reach immaterial to advertisers' respective "transaction[s]." *Engalla*, 15 Cal. 4th at 977. As Meta's experts will explain, wide swaths of the class—which ranges from sole proprietors to government entities to multinational Fortune 500 companies—relied on real-time results of their ads, a host of internal metrics, and/or professional consultants in deciding how much to spend on ads, rendering any alleged misrepresentation in the description of Potential Reach immaterial. *See* Dkt. 385-39 ¶¶ 8-9, 50-55, 69-72, 110-17. These same factors render any reliance unreasonable. *Hoffman*, 228 Cal. App. 4th at 1194 (reasonableness turns on plaintiff's "particular knowledge and experience"). This expert testimony will be confirmed by advertisers' testimony that they did not attach importance to Potential Reach in deciding how much to spend on ads. *See Mezzadri v. Med. Depot, Inc.*, 2016 WL 5107163, at *5-8 (S.D. Cal. May 12, 2016) (considering testimony about class member purchasing methods in finding "materiality varie[d] markedly"). Moreover, class members who purchased ads after public reports about Potential Reach in September 2017 and the announcement of this lawsuit in August 2018 could not have justifiably relied on any alleged misrepresentation of Potential Reach. *See Heeger*, 509 F. Supp. 3d at 1194 (plaintiffs "failed to explain how their continued use of Facebook even after discovery of [the challenged conduct] does not defeat any alleged reliance"). These deficiencies will doom Plaintiffs' case, or at minimum, require decertification. *See infra* at 10.

### 4. Plaintiffs Will Not Prove Resulting Injury Or Damages

Plaintiffs will fall far short of proving injury or damages with a "causal connection" to

class members' "reliance on the [challenged] representation[]," *OCM*, 157 Cal. App. 4th at 870. Plaintiffs' expert Allenby expressly found *no* statistically significant impact on advertisers' budgets when Potential Reach was described as an estimate of "accounts" rather than "people." Dkt. 385-31 at 20-21; *see* Dkt. 385-36 ¶ 119. And although Plaintiffs will attempt to rely on two price premium opinions from Dr. Timothy Roughgarden, both should be rejected. Roughgarden's 3.4% price premium opinion concerns alleged inflation in Potential Reach numbers—that is, the **numerical discrepancy** between "people" and "accounts," which was not certified for class treatment. Dkt. 281-15 ¶¶ 19, 55; *see also* Dkt. 391 at 20 (distinguishing between opinions on damages from inflation and from "the 'inaccurate' reference to 'people'"). And Roughgarden's 8.9% price premium opinion should be excluded because it hinges on an input from McFarlane, whose opinion this Court already excluded. Dkt. 388 at 14; *see also* Meta MIL 1.[1]

Moreover, Plaintiffs will not be able to support their theory that Facebook's ad auction efficiently assimilated alleged misrepresentations about Potential Reach, such that changes to only some advertiser budgets necessarily raised prices across the board—an essential aspect of their damages models. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 224 (2d Cir. 2008) (unlike securities market, "the market for consumer goods . . . is anything but efficient"), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008). Rather, the evidence will show that such an assumption cannot apply to Facebook's highly individualized auction system, which turns on factors like ad quality and other advertisers' bids, not simply the amount of the winning advertiser's bid. *See* Dkt. 296-14 ¶¶ 16-18; Dkt. 385-37 ¶¶ 142-76; *Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 312 (3d Cir. 2016) (efficient market more plausible in "fixed-price market" than in "auction style market with individually matched asks and bids").

Accordingly, Plaintiffs cannot prove that reliance on the only alleged misrepresentation accepted for class treatment caused "resulting damage." *Engalla*, 15 Cal. 4th at 974.[2]

---

[1] Plaintiffs' eleventh-hour attempt to revive that exact same damages theory through their "inflation" damages expert Dr. Armando Levy should be excluded. *See* Meta MIL 4.

[2] Even as to Plaintiffs' numerical discrepancy (*i.e.*, inflation) theory, Plaintiffs have no viable damages evidence, because their proffered "inflation" damages model is flawed, as detailed in Meta's *Daubert* motion to exclude Allenby's "inflation" damages opinion, *see* Dkt. 385-4 at 10-

5. *Plaintiffs Will Not Show Fraudulent Concealment Of A "Central Function"*

Plaintiffs' fraudulent concealment claim fails for the additional reason that they will be unable to prove any concealment of defects that made their ads "incapable of use." *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 864-65 (9th Cir. 2018); *see In re Natera Prenatal Testing Litig.*, 664 F. Supp. 3d 995, 1008 (N.D. Cal. 2023). It is undisputed that Potential Reach estimates had no impact on the value or performance of ads, and the evidence will show that named Plaintiffs purchased thousands of ads, including, in the case of Ziernicki, after filing this lawsuit.

### B. Plaintiffs Are Not Entitled To Punitive Damages

Plaintiffs will not be able to prove their entitlement to compensatory damages, much less punitive damages (which must be bifurcated). *See Calif. v. Altus Fin. S.A.*, 540 F.3d 992, 1000 (9th Cir. 2008) ("actual damages" required for punitive damages). Plaintiffs cannot show, by clear and convincing evidence, any "intention . . . of [] depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3); *see In re First Alliance Mortg. Co.*, 471 F.3d 977, 999 (9th Cir. 2006). To the contrary, Meta will show that it did its best to provide accurate estimates in the first instance, then promptly acted to clarify the nature of Potential Reach estimates and refine the estimation methodology, reflecting an intent to **prevent** any injury. No officer or director "intended to harm" the class or "consciously disregarded a known risk." *Terpin v. AT&T Mobility LLC*, 118 F.4th 1102, 1112 (9th Cir. 2024); *see also* Cal. Civ. Code § 3294(a).

## IV. META WILL PREVAIL ON ITS AFFIRMATIVE DEFENSE

As Meta will prove, Ziernicki brought claims on behalf of DZ Reserve despite violating Facebook's Terms of Service by purchasing ads through other people's accounts and attempting to do so through covert means *after* joining this lawsuit and asserting fraud claims based on Potential Reach. *Supra* at 6. This is precisely the kind of "bad faith[] or inequitable conduct . . . in connection with the matter in controversy" that precludes relief. *E.g.*, *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 974 (N.D. Cal. 2013) (citations omitted).

---

15. Those flaws infect Levy and Roughgarden's related opinions. And Plaintiffs could not prove their claims based on the "inflation" theory for many of the other reasons discussed above.

## V. THIS CASE SHOULD NOT PROCEED AS A CLASS ACTION

"A district court may decertify a class at any time," including after the trial. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *see* Fed. R. Civ. P. 23(c)(1)(C). The evidence will show that decertification is necessary on multiple grounds. For example, Plaintiffs will not prove named Plaintiffs' reliance on Potential Reach. *See Racies v. Quincy Bioscience, LLC*, 2020 WL 2113852, at *4-5 (N.D. Cal. May 4, 2020) (decertifying class where named plaintiff's trial testimony was "equivocal" as to reliance). The evidence will also show wide variation in advertiser sophistication, spending power, and marketing strategies, confirming the need for individualized inquiries as to reliance and injury.[3] *Supra* at 7. Furthermore, to the extent Plaintiffs rely on Allenby's inflation damages opinion, they will run afoul of the Supreme Court's admonition that Plaintiffs are "entitled only to damages resulting from . . . the only theory . . . accepted for class-action treatment." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *see Mier v. CVS Pharmacy, Inc.*, 2021 WL 6102519, at *2 (C.D. Cal. Nov. 19, 2021) (decertifying fraud class where damages model did not match liability theory). Even if that model were properly considered in theory, "evidence . . . at trial" will "substantially impeach[]" Allenby's opinions, requiring decertification—a possibility this Court already noted. Dkt. 388 at 14.

In the event that the Court declines to decertify the class, Meta retains its due process and Seventh Amendment rights to litigate individualized issues, including but not limited to reliance and equitable defenses like unclean hands. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458 (2016) (noting right to litigate defenses to individual claims); *DZ Rsrv.*, 96 F.4th at 1237 (acknowledging potential for "individualized questions of reliance" (citation omitted)). Only common issues can be resolved through this trial, and no finding of classwide liability or damages can be made. Individual issues, including reliance, must instead be resolved in later proceedings.

## VI. CONCLUSION

Plaintiffs will not prevail on their causes of action and claims against Meta at trial.

---

[3] Furthermore, Meta has moved to compel arbitration of all class members (other than named Plaintiffs) who purchased ads as of May 25, 2018 and therefore agreed to arbitrate their claims. Dkt. 472. Those individuals cannot be included in the class.

Dated: September 4, 2025

LATHAM & WATKINS LLP

By: /s/ Melanie M. Blunschi
Melanie M. Blunschi (CA Bar No. 234264)
melanie.blunschi@lw.com
Nicole C. Valco (CA Bar No. 258506)
nicole.valco@lw.com
Francis J. Acott (CA Bar No. 331813)
francis.acott@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6548
Telephone: +1.415.391.0600

Andrew B. Clubok (pro hac vice)
andrew.clubok@lw.com
Susan E. Engel (pro hac vice)
susan.engel@lw.com
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

*Counsel for Defendant Meta Platforms, Inc. (formerly known as Facebook, Inc.)*