# Exhibit A

Pages 1 - 42

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

```
DZ RESERVE, et al.,            )
                              )
          Plaintiffs,          )
                              )
   VS.                         )     NO. C 18-04978 JD
                              )
META PLATFORMS, INC.,          )
                              )
          Defendant.           )
_____)
```

San Francisco, California
Thursday, September 18, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

      COHEN MILSTEIN SELLERS & TOLL PLLC
      1100 New York Ave., NW, Fifth Floor
      Washington, D.C.  20005
  BY:  **GEOFFREY GRABER, ATTORNEY AT LAW**
      **KARINA PUTTIEVA, ATTORNEY AT LAW**

      COHEN MILSTEIN SELLERS & TOLL PLLC
      88 Pine Street - 14th Floor
      New York, New York  10005
  BY:  **ERIC KAFKA, ATTORNEY AT LAW**

      COHEN MILSTEIN SELLERS & TOLL PLLC
      11780 US Highway One - Suite 500
      Palm Beach Gardens, Florida  33408
  BY:  **THEODORE J. LEOPOLD, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
      U.S. District Court - Official Reporter

1 | **APPEARANCES:**  (continued)

2

3 | For Plaintiffs:

4 |                          LAW OFFICES OF CHARLES REICHMANN
                             16 Yale Circle
                             Kensington, California  94708

5 |                 BY:  **CHARLES REICHMANN, ATTORNEY AT LAW**

6 | For Defendant:

7 |                          LATHAM & WATKINS LLP
                             505 Montgomery Street - Suite 2000
                             San Francisco, California  94111

8 |                 BY:  **MELANIE BLUNSCHI, ATTORNEY AT LAW**
                      **NICOLE VALCO, ATTORNEY AT LAW**

9 |                      **FRANCIS J. ACOTT, ATTORNEY AT LAW**

10 |                         LATHAM & WATKINS LLP
                            555 Eleventh Street, N.W., Suite 1000

11 |                        Washington, D.C.  20004
                 BY:  **ANDREW B. CLUBOK, ATTORNEY AT LAW**

12 |                     **SUSAN E. ENGEL, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Thursday - September 18, 2025**                    **1:36 p.m.** |
| 2 | P R O C E E D I N G S |
| 3 | ---000--- |
| 4 | **THE CLERK:**  All rise.  Court is now in session.  The |
| 5 | Honorable James Donato presiding. |
| 6 | **THE COURT:**  Good afternoon. |
| 7 | **THE CLERK:**  Please be seated.  Calling civil 18-4978, |
| 8 | DZ Reserve, et al. versus Meta Platforms. |
| 9 | Counsel, go to the podium. |
| 10 | **MR. GRABER:**  Good afternoon, Your Honor, Geoffrey |
| 11 | Graber on behalf of Plaintiffs. |
| 12 | **MR. LEOPOLD:**  Good afternoon, Your Honor, Ted Leopold |
| 13 | on behalf of the class. |
| 14 | **MR. REICHMANN:**  Good afternoon, Charles Reichmann on |
| 15 | behalf of Plaintiff class. |
| 16 | **MR. KAFKA:**  Eric Kafka on behalf of the Plaintiff |
| 17 | class. |
| 18 | **MS. PUTTIEVA:**  Karina Puttieva on behalf of the |
| 19 | Plaintiff class. |
| 20 | **MR. CLUBOK:**  Good afternoon, Your Honor, Andrew Clubok |
| 21 | from Latham & Watkins LLP on behalf of Facebook, Meta. |
| 22 | **MS. BLUNSCHI:**  Good afternoon, Your Honor, Melanie |
| 23 | Blunschi on behalf of Facebook, now Meta. |
| 24 | **MS. ENGEL:**  Good afternoon, Your Honor, Susan Engel on |
| 25 | behalf of Defendant Meta. |

1          **MS. VALCO:**  Good afternoon, Your Honor, Nicole Valco

2     on behalf of Meta.

3          **MR. ACOTT:**  Good afternoon, Your Honor, Francis Acott

4     on behalf of Meta.

5          **MR. CLUBOK:**  And, Your Honor, we have our clients here

6     with us today, Nikki Sokol and Leslie Vigen from Facebook.

7          **THE COURT:**  Okay.  Set the table.  Got you-all set up

8     here for October 14th-ish with an I-S-H added.  It might be

9     like the 16th.  We have a little jury mash up, so it might be a

10    day or two, here or there.

11        I do know that I typically don't have dark days, but I'm

12    probably going to have one day on, I think it is October 22nd.

13    I have got to check my calendar, but I have got a thing I got

14    to do all day that day, so we won't do the 22nd.  I will

15    confirm that.

16        Okay.  Let me just tell you how the trial is going to run.

17    Then we will get through your motions in limine.

18        I'm going to give each side eight hours for presentation

19    of evidence.  You will have an additional 30 minutes each for

20    opening and 30 minutes for closings.  So, you will have a total

21    of nine hours but eight will be for the presentation of

22    evidence.  Ms. Clark, who you have met, my courtroom deputy, is

23    the exclusive keeper of the clock and the final word on time.

24    So, whatever she says goes so with respect to how much time you

25    have on the clock.

1        Now, for jury selection I'm going to seat 8 jurors most

2   likely -- about 90 percent certain -- 8 jurors to do that.  I'm

3   thinking about 7 but I might do 8, probably will do 8.  Now,

4   here is what we are going to do, we have this post-COVID

5   practice that we have now institutionalized for all cases.  It

6   is sending out a written questionnaire in advance.  People will

7   fill that out.  It has all the basic questions on demographics

8   and prior experience, and I usually put one or two, you know,

9   larger potential conflict screens in there.  In this case it's

10  not really -- not terribly controversial in terms of conflicts.

11  So, we will see what happens with that.

12       Then we will call in probably about 40 people, 40 to 45

13  people, to be in the venire pool.  The jury -- from which the

14  jurors will be selected.

15       Now, after I get the written questionnaires back, we will

16  send them to you.  You will work with Ms. Clark on designating

17  someone to get them, and we will have a conference, remote,

18  live video conference -- I try to avoid product names.  I think

19  you know what I'm saying -- and we will do some very, very high

20  level screening at that point, not for peremptory challenges,

21  not for cause challenges but only for conflicts.

22       So, if someone says, you know, I'm due in the hospital for

23  a major procedure on the second day of trial or I have

24  non-refundable tickets to go to some exotic destination, we

25  will screen through that.

1      And then we will have the jury in and I will do some

2   in-court questions.  And after that, you can exercise your

3   peremptory and challenges for cause.

4      Now, here is how I seat the jurors:  We will have 40

5   people come into the gallery.  Eight will be randomly called

6   into the jury box.  We are still doing a little post-COVID

7   separate seating, so they will be distributed in a zigzag

8   fashion through the 14 seats in the jury box.

9      We will run through my questions.  You will hear people

10  speak.  But the selection process goes like this:  Once I have

11  the eight in the box completed with the in-court voir dire

12  questions, we will do our peremptories and challenges for

13  cause.

14      When I dismiss a juror -- or how many jurors get dismissed

15  depending on what you-all do with your challenges -- I will

16  call up -- you know, three people, say, get dismissed, we will

17  call up three people to replace them.  Every other juror is

18  seated, all right.  So, you cannot go back later.

19      So, for example, if jurors 1, 3, 4 and 5, make it through

20  the first round with no challenges, you can't go back later and

21  say "We don't like juror number 1."  So, it's one and done.

22  Once they are seated, that is the jury.  And you can't go back

23  and try to get them off.

24      The people in the gallery will be following along with the

25  questions.  They will have a notepad.  They will write down the

1    note, the number of the question.  Very elaborate explanation
2    to make sure everybody is on board and they understand this.
3    And then when they come back up, they will just raise their
4    hands and answer whatever -- I don't have to read all the voir
5    dire questions again.  They will answer whatever question they
6    have a notation for.

7         You should plan on about 90 minutes, 9-0 minutes, for jury
8    selection.  That has been my benchmark since 2014.  This means
9    that you will open on Monday or the 14th or whenever we
10   start -- whatever day we do jury selection, you will open that
11   day and you will put on your first witnesses, all right.  So,
12   make sure you are ready to do that.

13        Jury time, trial time is 9:00 a.m. time to about 2:30 each
14   day.  We do not do lunch but we take a fairly -- by the way,
15   this is all going to be in the pretrial order, so you don't
16   have to burn up your pens trying to write all this down.  It
17   will all be in the pretrial order.

18        We have about two substantial breaks about 15 minutes
19   each.  I do try to keep them 15 although sometimes that's not
20   possible but no lunch.  9:00 a.m., reality is the traffic in
21   the Bay Area, it is kind of hard to get here any earlier than
22   that.  I do have colleagues who start earlier, but I think
23   that's a little burdensome for people who have families and
24   other people they need to attend to in the morning; and getting
25   people out by 2:30 helps to avoid the crush of the commute.

1        Now, if we have to finish a witness, we will go a little

2    bit longer.  This is not carved in stone.  But 2:30 is a -- the

3    target for ending trial days.  That's Monday through Thursday

4    except for that one day I will put down in the minutes.

5    Fridays are dark days so I can get some other business done.

6        Now, once we get to the end of the case, though, if we are

7    ready to close or, you know, we have got one tiny little

8    witness and then we can close, we will do Friday.  All right.

9    So, all of these are flexible.

10        The touchstone for all of this is a preciousness of jury

11    time.  These individuals are fellow citizens in this community.

12    You may not live here but they are my fellow citizens.  Are

13    dropping everything, literally on a moment's notice, to come in

14    and adjudicate your dispute.  So, we treat that time like what

15    it is, the most precious commodity in this courtroom.  We will

16    not waste a minute of it.

17        So, that means if you are not ready to go with your next

18    witness in order and there is time on the trial clock, you will

19    deemed to have rested.  Your case will be over at that point.

20    I will not take any excuses of "Oh, we didn't think this was

21    going to happen.  We told the person tomorrow or they are in

22    Jackson Hole and they can't get here," none of that is going to

23    fly, all right.  You will be resting at that point.  The trial

24    time for -- the time of the jurors is too precious to squander.

25        Now, what that also means is if you have to have a witness

1  out in the hallway for a day, that's just the way it is going

2  to be; okay.  So, balancing the hardship, it is going to fall

3  on the party witnesses.  It is not going to fall on the jurors.

4  Okay, any questions so far, anyone?

5      **MR. GRABER:**  Your Honor, if we could very quickly

6  address one of the points that Your Honor raised about the

7  trial length.

8      **THE COURT:**  Yes.

9      **MR. REICHMANN:**  Good afternoon, Your Honor, Charles

10  Reichmann.  The amount -- we understand everything you have

11  said and we have seen you at trial before and certainly, you

12  know, we appreciate the Court's procedures.

13      We are concerned, however, with the amount of time you

14  have allotted to both sides.  In our view this is a pretty

15  complicated case; the product that's at offer, how the prices

16  are achieved, for example, just as two variables, damages, and

17  a whole lot of other things.  And the number of witnesses that

18  each side has put on the witness list that we have submitted, I

19  think it's approximately 20 on each side.  So, eight hours for

20  each case seems to us --

21      **THE COURT:**  It's not that complicated.  Your theory is

22  Google lied about how many people would see the ads that you

23  paid for and as a result of that, they got more money than they

24  should have gotten.

25      **MR. REICHMANN:**  Well, just explaining it --

1          **THE COURT:**  It's not that hard.

2          **MR. REICHMANN:**  Well --

3          **THE COURT:**  It's not.

4          **MR. REICHMANN:**  If we can make those through lines.

5    You know, as you saw, we are relying on experts to explain how

6    the auction system works, how pricing has set, the fact that

7    there is inflation, you know, which runs throughout every

8    presentation on ad manager during the class period, all of

9    these things we think do take a little bit of time with all due

10   respect and so --

11         **THE COURT:**  Of course they take time but not nearly as

12   much as you are thinking.

13         **MR. REICHMANN:**  Well, you know, we had initially

14   proposed to you 30 hours which --

15         **THE COURT:**  That's not going to happen.

16         **MR. REICHMANN:**  We understood --

17       (Simultaneous crosstalk.)

18         **THE COURT:**  And I will tell you it has never been

19   happened --

20         **MR. REICHMANN:**  Yeah.

21         **THE COURT:**  More importantly, it has never needed to

22   happen.

23         **MR. REICHMANN:**  So, we did --

24         **THE COURT:**  And I will also tell you that since 2014,

25   I have set trial time limits in every civil case and not

1  once -- not once has anyone actually used their entire time let

2  alone asked for more.  You will not be the first.

3         **MR. REICHMANN:**  Okay.

4         **THE COURT:**  Now, what do you want, another hour?

5         **MR. REICHMANN:**  Well --

6         **THE COURT:**  That's about all I'm going to do, hour --

7  90 minutes?  I mean --

8         **MR. REICHMANN:**  We had proposed 24 but --

9         **THE COURT:**  That's just not --

10        (Simultaneous crosstalk.)

11        **THE COURT:**  -- completely unrealistic for this case.

12        **MR. REICHMANN:**  Understood.

13        **THE COURT:**  You are overestimating and under crediting

14  the speed with which you can present this.  No one is going to

15  be going at a break neck pace.  No one is going to be slighted,

16  but you don't need anywhere close to 48 hours to try this case.

17  That's ludicrous.

18        **MR. REICHMANN:**  Understood, Your Honor.  Then I would

19  propose 12 hours for each side.

20        **THE COURT:**  That's also excessive.  That's more than I

21  did in the *Google Play Store Antitrust* case, which was a

22  massively more complicated case than this.  Trust me, I know.

23  So, that's not going to happen either.  You know, I might give

24  you nine or ten, that's going to be it.  Just plan on no more

25  than ten max.  I will make a decision when I get to the

1  pretrial order, but it's going to be ten max; okay?

2      **MR. REICHMANN:**  Okay.

3      **THE COURT:**  You do not need anything more than that.

4      **MR. REICHMANN:**  Understood, Your Honor, and we

5  certainly would never present duplicative testimony of any

6  kind.  Thank you.

7      **THE COURT:**  All right.  Now -- oh, yes?  No?

8      **MR. CLUBOK:**  If the Plaintiffs are done, Your Honor, I

9  had a couple --

10     **THE COURT:**  Yeah, go ahead.

11     **MR. CLUBOK:**  -- strays.  One, I just want to make sure

12  Your Honor is aware that the parties had jointly submitted on

13  the 4th of September a proposed questions for the jury

14  questionnaire that we had agreed upon and hopefully Your Honor

15  will agree that those are appropriate questions.

16     **THE COURT:**  I'm not giving more than two and I will

17  take care of them.  I don't -- there is no space for more than

18  about two.  There is only two or three.  I will take care of

19  that.  Don't worry about that.  I will certainly look at that,

20  but I will make the determination of what to put in there.

21     **MR. CLUBOK:**  Understood.  The particular one that we

22  want to ensure is clearly asked because of a number of issues,

23  which I can talk about at length, is the question of bias

24  against Meta, social media companies, Mark Zuckerberg.

25     **THE COURT:**  Bias?

```
 1          MR. CLUBOK:  Bias, yes.  In other words, animosity

 2    that -- the eighth question is:  Do you have any strong

 3    positive or negative opinions about Meta, Facebook, Instagram,

 4    Mark Zuckerberg or the people who run or have run Meta?  There

 5    is --

 6          THE COURT:  Why would I ever ask a question like that?

 7          MR. CLUBOK:  Well, the Ninth Circuit has said in Scott

 8    v. Lawrence and in Darbin v. Nourse that it is very

 9    important -- you know, they have emphasized the importance

10    of --

11          THE COURT:  That's not my question.  Are you concerned

12    that Meta is a widely hated and viled company?  I don't

13    understand.  Why would you ask that question.

14          MR. CLUBOK:  Frankly, Your Honor, yes.  We are

15    concerned -- and there has been lots of public reporting.  I

16    mean, a peer research survey earlier this year found that

17    67 percent of respondents had an unfavorable view of Mark

18    Zuckerberg.  That's really high.  And --

19          THE COURT:  He is not going --

20          (Simultaneous crosstalk.)

21          MR. CLUBOK:  Your Honor --

22          THE COURT:  He is not a witness in this case.

23          MR. CLUBOK:  I beg your pardon?

24          THE COURT:  Is he testifying in this case?

25          MR. CLUBOK:  Well, the Plaintiffs have made it clear
```

1  they want to tie a number of documents to him and talk about

2  him --

3          **MR. GRABER:**  No.

4          **MR. CLUBOK:**  He is perceived, I think, as

5  interchangeable with Meta.  So, they have indicated documents

6  on their exhibit list.  They have made it clear to us that they

7  are intending to do so.  So, certainly that would be an issue.

8      But there's also similar kind of research that's found

9  negative views generally of social media companies and

10  I believe Facebook in particular.

11      Look, Your Honor, there was just a verdict that was -- as

12  you know -- against Meta in this district.  There has been a

13  number of other cases -- high-profile cases against Meta.

14          **THE COURT:**  Are you talking about the verdict in the

15  *Flo* case?

16          **MR. CLUBOK:**  Yes, Your Honor.

17          **THE COURT:**  If you are under the impression,

18  Mr. Clubok, that verdict was just an expression of animosity to

19  Meta, you are wildly off the mark.  That verdict, which I just

20  sustained in the post-trial motions that you brought, was

21  solidly rooted in the evidence.  That had nothing to do with

22  your suggestion that anybody is irrationally crazed in their

23  hatred of Meta.

24      And I resent your implication of this jury, who I watched

25  and whose verdict I sustained on the evidence, made anything

other than a reasoned and reasonable decision based on the facts before it.  They did not act in any way, shape, or form out of animosity or your perception of animosity to your client.  That is a terrible thing to say and I reject it categorically.

MR. CLUBOK:  That is not at all what I said, Your Honor, and I apologize if I misstated it.  I'm saying --

THE COURT:  You stated it just the way you meant it and you were wrong.

MR. CLUBOK:  No, that is not the way I meant it, Your Honor.  I was saying that a verdict against any company in a district can have an effect on the next case.  I was not --

THE COURT:  You are suggesting that any verdict because it's adverse must necessarily be manifesting some kind of emotional state.  You are wrong.

MR. CLUBOK:  I'm not saying necessarily --

THE COURT:  Then why are you asking me these questions?  Why do you want to ask do you have a strong negative feeling about Meta?

MR. CLUBOK:  Because the Ninth Circuit --

THE COURT:  What do you think is going to happen?  You think I'm going to exclude every juror?  Absolutely not.  That is not a cause challenge for that.

MR. CLUBOK:  I think the Court, as the Ninth Circuit has said, does have a serious duty to explore that kind of

1    bias.  When it's that pronounced against --

2          **THE COURT:**  There is no evidence of bias.  You haven't

3    shown me any evidence of bias.

4          **MR. CLUBOK:**  I'm happy to --

5          **THE COURT:**  What are you going to do if someone says

6    "I love Facebook more than my own family," are you going to ask

7    me to throw that person off too?

8          **MR. CLUBOK:**  I'm certain the Plaintiffs will ask you

9    to throw that person out, and I presume Your Honor would.

10         **THE COURT:**  Well, why aren't you asking me that?  You

11   say you don't want to have any emotional extremes.  You should

12   be saying, you know what, this person has to go; they like me

13   too much.

14         **MR. CLUBOK:**  Well, we are asking that.  The question

15   says "strong positive or negative" -- the question that both

16   sides proposed to you on November 4th says:  Do you have strong

17   positive or negative --

18         **THE COURT:**  I think the premise of this is terrible

19   but I will consider it.

20         **MR. CLUBOK:**  All right.

21         **THE COURT:**  Do you have any views on that?

22         **MR. GRABER:**  Your Honor, we agree with the Court.  It

23   is not relevant.  It is just not relevant.

24         **MR. CLUBOK:**  Okay.  The parties submitted it jointly

25   on November 4th.  And, again, I can cite other cases that say

1    that is a critical issue at the voir dire stage for both sides,

2    whether people love Facebook --

3         **THE COURT:**  Okay.  Anything else?

4         **MR. CLUBOK:**  Yes.  Oh, no, I think that's sufficient,

5    Your Honor.  Thank you.  Appreciate you letting me say that.

6         **THE COURT:**  Okay.  Let's see, okay, no sidebars during

7    trial.  Don't ask.  All right.  You can talk to me before or

8    after but do not ask me during trials.

9         Now, jurors will be taking notes.  What you are going to

10   do is prepare a binder -- well, this is about an inch -- maybe

11   an inch and a half, not bigger than that.  Put in some

12   dividers, you know, little dividers like this.  Put in three or

13   four.  And put in 50 sheets, 5-0 sheets, of pre-ruled college

14   lined note paper so they can take their notes.  They will also

15   keep in there a copy of the preliminary instructions and then

16   when time comes, a copy of the final jury instructions.

17        Now, for each witness that gets presented in court, you

18   will begin the examine -- or if it's a video before they play

19   the video -- by handing to Ms. Clark an 8-and-a-half by 11

20   three-hole punched headshot in color of what that witness looks

21   like that day; okay.  So, don't -- you know, no vacation photos

22   if they are going to be wearing a suit or vice versa.  It must

23   be identical eyewear, whatever it is, to what they look like

24   while they are being presented to the jury, either on video or

25   live.  And you will have at the bottom of it -- nothing else --

just that witness' name; nothing else, no company affiliation,
no titles, nothing, just their name in about 16 point font, big
font -- 14, 16 -- 16 probably.  This is a mnemonic device that
I have found to be very useful for the jury so they can keep
people straight.  They have a little headshot.  They can take
their notes and remember who they are.

Now, you two work on these together; okay.  Just have nine
copies.  We will have a spare if we need one; maybe two spares
for the jurors.  Have that on Monday morning when the jury will
be selected.

I do let people ask questions.  I screen them.  They will
be written questions.  I will take a look at them.  I will have
a chance to do it.  To be honest, I'm not always that great
about remembering to ask.  I always try to ask at the end of
each witness.  I sometimes don't.  You know, the juries run hot
and cold.  In the *Google* case, it was a very active jury.  In
the last trial I did, it was not so active on questions.  That
doesn't mean anything about their attention spans or anything
else; but, you know, each jury has its spirit and some are
moved to ask questions.  Others are less moved but we will see
what happens.  They will have the chance to ask.

This is a cardinal rule, no motions of any sort may be
filed during trial unless I have approved them.  If you file
something without my prior consent, it will be summarily
stricken from the docket.  Don't make that mistake.  Ask first.

1    This is not a situation where you should file and explain.  You

2    ask first or they will be taken off the docket in prompt

3    fashion.

4         Do you want to exclude witnesses before they testify,

5    either one of you?

6              **MR. GRABER:**  Yes.

7              **MR. CLUBOK:**  Yes, Your Honor.

8              **THE COURT:**  You do?

9              **MR. GRABER:**  Yeah.

10             **THE COURT:**  Okay, all right.  Witnesses will be

11   excluded until they are ready to testify.  Let's see.

12                         (Pause in proceedings.)

13             **THE COURT:**  Oh, witnesses, one and done.  Don't get

14   hung up on cases in chief.  Get one person on.  Do all of your

15   questions and then that person is discharged.  We do not have

16   one person come in on Wednesday and then a week later that

17   person comes back, all right.  Just get them done -- call them

18   once and get them all done.

19        Now, for witness disclosures, I think you should have a

20   good lead time.  Disclosure schedule is typically a day and a

21   half before the witness will be called.  So --

22             **MR. CLUBOK:**  Your Honor, could we make that, like,

23   48 hours?

24             **THE COURT:**  You want to do 48 hours?

25             **MR. CLUBOK:**  Sure.

1     **THE COURT:**  You want to do 48 hours?

2      **MR. GRABER:**  Your Honor, I think the Court's standing

3  order addresses this.  I think it is sufficient.

4      **THE COURT:**  Your colleague has suggested 48.  Do you

5  want 48?

6      **MR. GRABER:**  48 is fine, Your Honor.

7      **THE COURT:**  All right.  So, that means Monday

8  witnesses will be disclosed on a Thursday, okay.  And, you

9  know, not Thursday at midnight, Thursday at, like,

10  5:00 o'clock; okay.  So, Monday -- so, for Wednesday witnesses,

11  you will share that with each other on Monday by 5:00 p.m.

12  Okay.  Then for Monday witnesses you will do that by Thursday

13  at 5:00 p.m.  Okay.  Any other questions so far?  No?

14      **MR. CLUBOK:**  Sorry, Your Honor.  Would it be for a

15  Wednesday witness for the 48 hours by Monday morning like at

16  9:00 a.m.?

17      **THE COURT:**  10:00 a.m.?

18      **MR. CLUBOK:**  Well, sometime in the morning on Monday

19  so that it is 48 hours so the witness has time to come on

20  Wednesday.  You had said 5:00 p.m. on Monday.  I think that

21  would not --

22      **THE COURT:**  9:00 a.m.  Want to do 9:00 a.m.?

23      **MR. GRABER:**  Your Honor, I would request 5:00 p.m.

24  consistent with the Court's standing order.

25      **THE COURT:**  I will do noon.  I will split it.  Let's

1    do noon.

2              **MR. CLUBOK:**  Thank you, Your Honor.

3              **THE COURT:**  Solomonic.  Okay.  All right.  I think

4    that's it for the mechanics.  Oh, please, demonstratives, just

5    share them with each other first.  All right.  Work all that

6    out.  There shouldn't be any surprises at this point.  You-all

7    know everything inside and out.  I mean, this case has been

8    around here now since 2021.  I can't imagine there is anything

9    you haven't seen a dozen times.  Just run it by each other so

10   we don't have people popping up at the last minute.

11        Also, I really don't -- you know, I don't police this.  I

12   let you do what you want to do, but I really do not like

13   objections during openings and closings.  Okay.  This is your

14   time to talk to the jury.  This is your time; okay.  So, give

15   each other the courtesy of not, you know, popping up and

16   disrupting your colleague's presentations.  Okay.  I think

17   that's very important.

18        And if you feel like you need to do something, that's

19   fine.  If it comes to the point where I think you are being

20   disruptive, you will stop.  I will have you stop.  But I just

21   think it's important that all of you have the space to be able

22   to talk.

23        And, look, it doesn't matter -- I'm sure you both know

24   this -- all of you know this.  It doesn't matter if someone

25   overstates, okay.  That's how you kill them.  If they overstate

 1   and under deliver, that's what you want.  You want someone to

 2   get up and say in their opening "I'm going to show you X, Y and

 3   Z" and then at the end of the trial you say "They didn't show

 4   you anything."  So, don't -- you understand what I'm saying.

 5   Just give each other the rope to hang yourselves.  That's not

 6   an objection.  Just take advantage of it later.  That's good

 7   trial practice.

 8        Okay, let's go through the motions in limine.

 9                      (Pause in proceedings.)

10        THE COURT:  Motion in limine number 1, Plaintiffs --

11   sorry, Meta's motion number 1, docket number 487, to exclude

12   Dr. Roughgarden's report, that is denied in principle.  You are

13   going to have to lay a foundation at trial --

14        MR. GRABER:  Yes, Your Honor.

15        THE COURT:  -- but I'm not going to exclude on the

16   basis that Meta proposes.  Also, arguably in violation of my

17   order of not bringing 702 challenges, but make sure you have a

18   foundation, Defendants -- Plaintiffs.

19        Meta's motion number 2, docket number 488, with respect to

20   the LWI document, that's also denied pending foundation at

21   trial.  Meta's motion number 3 --

22        MS. BLUNSCHI:  Your Honor, may I ask a clarification?

23        THE COURT:  Oh, yes.

24        MS. BLUNSCHI:  So, given --

25        THE COURT:  Go ahead.  You've got to speak up a little

 1  bit.

 2          **MS. BLUNSCHI:**  Melanie Blunschi for Facebook.  Sorry

 3  about that.

 4          **THE COURT:**  Don't worry about it.  Do it now and not

 5  on show day.

 6          **MS. BLUNSCHI:**  I just wanted to clarify that given the

 7  Plaintiffs have not shown foundation and will need to show

 8  foundation at trial, that that document shouldn't be used --

 9          **THE COURT:**  They have to lay a foundation at trial,

10  yes.

11          **MS. BLUNSCHI:**  And so, it shouldn't be used in their

12  opening or characterizations of it in their opening.

13          **THE COURT:**  It is up to them.  I mean, if it doesn't

14  work, I will end up giving an instruction and it will highlight

15  a problem.  It can be taken care of in a million different

16  ways.  It is up to them but they do have to lay a foundation

17  before you can introduce it into evidence.

18          **MR. GRABER:**  Understood.

19          **MS. BLUNSCHI:**  Thank you, Your Honor.

20          **THE COURT:**  Number 3 -- Meta's motion number 3 in

21  limine, docket number 489, something about numerical

22  discrepancy evidence, that's denied.  And, you know, obviously,

23  subject to the same foundation issues.

24       Meta's motion number 4, to exclude Armando -- Dr. Armando

25  Levy's damages opinion, also denied, you know, pending proof at

1  trial.  But also, again, in violation of my instruction not to

2  bring 702 issues in in limine motions.

3          **MS. BLUNSCHI:**  Your Honor, if --

4          **THE COURT:**  Yes.

5          **MS. BLUNSCHI:**  We didn't move under Rule 702 for this

6  late disclosed opinion.

7          **THE COURT:**  I'm having just a little trouble --

8          **MS. BLUNSCHI:**  Yes, sorry.

9          **THE COURT:**  Just pull it towards you.  Can you pull it

10  a little bit towards you?  Yeah, good, go ahead.

11          **MS. BLUNSCHI:**  I just wanted to clarify the basis of

12  that motion in limine which is not at all under Rule 702.  It

13  is because this was a late disclosed opinion that was not part

14  of any aspect of expert discovery.  It was not until actually

15  the day that we were exchanging motions in limine that we were

16  surprised by a supplemental expert report sponsoring --

17          **THE COURT:**  I thought you all agreed on this?  No?

18          **MS. BLUNSCHI:**  Absolutely not.

19          **THE COURT:**  You didn't agree on this?  I may have

20  misunderstood.  I thought you all agreed that Dr. Levy could do

21  this?  No?

22          **MR. KAFKA:**  So, they agreed to get the five of the six

23  paragraphs of the six paragraph supplement --

24          **THE CLERK:**  Counsel, you are?

25          **MR. KAFKA:**  This is Eric Kafka for the Plaintiffs.

1          **THE COURT:**  Pull the microphone towards you.

2          **MR. GRABER:**  Eric Kafka for the Plaintiffs.

3          **THE COURT:**  Just pull it towards you.

4          **MR. KAFKA:**  Thank you, Your Honor.  So, they agreed

5     that we could have five of six paragraphs of the --

6          **THE COURT:**  That's what I thought.

7          **MR. KAFKA:**  Right, but they don't want the paragraph

8     in which he multiplies two numbers together.

9          **THE COURT:**  Is that it?

10         **MS. BLUNSCHI:**  Well --

11         **THE COURT:**  I thought you agreed to all of this.

12         **MS. BLUNSCHI:**  We absolutely did not agree that he

13    could multiply two brand new numbers to sponsor a new opinion

14    that actually was previously excluded when offered by

15    Mr. McFarland.  So, Dr. Levy previously --

16         **THE COURT:**  It is just the multiplication process,

17    that's all you're --

18         **MS. BLUNSCHI:**  So, but it actually is -- so, he is

19    sponsoring a damages number.  It is ultimately the result of

20    multiplication that the jury can do themselves if they want to.

21    But the important thing is, as Plaintiffs state in their

22    opposition, they have two wholly independent damages theories.

23    Dr. Levy's original report and all of expert discovery

24    sponsored only one of their damages theory.

25        A different expert, Mr. McFarland addressed the other one.

1    He was excluded.  Now, at the eleventh or eleventh-and-a-half

2    hour, we get a supplemental report from Mr. -- from Dr. Levy.

3    The part that we agreed to was that he could update his

4    original theory; so, on one of two independent theories, that

5    he could bring that current based on current revenue.  We did

6    not agree that he could now sponsor the separate damages theory

7    previously offered by Mr. McFarland.

8         **THE COURT:**  Well, it is not a separate damages theory.

9    He is just making a bigger number.

10         **MS. BLUNSCHI:**  I'm actually quoting their motion in

11   limine opposition that it is an independent damages theory.

12   They have two.  They have one that is based on the inflation of

13   the potential reach number, the alleged inflation that the

14   numbers are too high, and they have a different one based on

15   the use of people versus accounts.  That results --

16         (Simultaneous crosstalk.)

17         **THE COURT:**  What's the multiplication?

18         **MS. BLUNSCHI:**  So, the multiplication is that

19   Dr. Roughgarden, a different expert, comes up with two wholly

20   different price premiums.  One price premium is purportedly the

21   result of inflation in the potential reach numbers.  That's the

22   3.4 percent price premium.

23         **THE COURT:**  Yes, I remember that.

24         **MS. BLUNSCHI:**  A different price premium, the

25   8.9 percent price premium, is purportedly the result of

1   offering potential reach as people at all.  So, Dr. Levy never

2   engaged with the 8.9 percent --

3         THE COURT:  Where is the math?  Is he multiplying 3.4

4   and 8.9?

5         MS. BLUNSCHI:  Yeah, I query whether you need Dr. Levy

6   at all since all he does is multiply 3.4 and 8.9 and then

7   sponsor is with the imprimatur of an expert.  But, first --

8         THE COURT:  Can do a little math on the fly.  What's

9   wrong with that?

10        MS. BLUNSCHI:  I mean --

11        (Simultaneous crosstalk.)

12        THE COURT:  He is not changing anything.  He is just

13  putting another number up there.

14        MS. BLUNSCHI:  Well, I think it's not proper for --

15  number one, for him to be offering a different theory; right.

16  He previously only engaged with the inflation theory, not the

17  people theory.  So, this is a whole different theory.  And if

18  all they wanted him to do is multiply, then there is no reason

19  to have that sponsored by an expert saying that this is damages

20  as opposed to allowing the jury to multiply revenue by 8.9.

21        THE COURT:  We don't ask the jury to do math.

22        MR. KAFKA:  Your Honor, you asked a question and I

23  wanted to answer it, which is what is being multiplied and that

24  is the 8.9 percent by the amount of revenue at issue.  There is

25  no dispute that the 8.9 percent -- that you have allowed the

1   8.9 percent to come in.  The revenue at issue is a number that

2   was not locked in place until after these reports came out.

3   So, we supplemented and have the revenue at issue.  They don't

4   dispute that the revenue at --

5          **THE COURT:**  The algorithm is there but the data in the

6   algorithm wasn't?  In other words, this expert had always said,

7   I'm going to multiply some number for revenue by 8.9 percent?

8          **MR. KAFKA:**  He did not say -- he did not say

9   previously specifically 8.9 percent.  However, he can

10  multiply -- these are now two numbers that are in the record

11  that he can multiply by each other.  It is a simple

12  multiplication.  And as we -- as, you know, you said, juries

13  shouldn't have to do that.  There is no dispute --

14         **THE COURT:**  We don't call on jurors to do research in

15  the jury room.  That's not going to happen.

16         **MR. KAFKA:**  Right.  So, there is no dispute that two

17  numbers can come in, at least not pursuant to this motion.  The

18  question is only can he multiply 8.9 percent by the number that

19  we didn't have at the time he submitted his report.  And we

20  say --

21         **THE COURT:**  That's what I asked.  So, he said

22  somewhere, "Here is my formula.  It is going to be 8.9 percent

23  times X.  I just don't have X yet."

24         **MR. KAFKA:**  Yes, I think their dispute is he didn't

25  specifically put that formula in the report they submitted in

1  20 --

2      **THE COURT:**  I can't do this without him.  So, as

3  reluctant as I am to do this, we will just have to talk with

4  him for a half an hour outside of the jury and I will just have

5  to see.  You can do a little voir dire of the expert.  That's

6  the only way I can do it.  It's not possible for me to do it on

7  the record without hearing from the witness.

8      So, before this fellow goes on, just make sure you

9  remember that.  I'm not going to remember that.  You need to

10  remember that.  Okay.

11      **MS. BLUNSCHI:**  Thank you, Your Honor.

12      **THE COURT:**  Remind me, not minutes before he goes on

13  but like a day or two before so we have some time to do it.

14  Okay?

15      **MS. BLUNSCHI:**  Thank you, Your Honor.

16      **THE COURT:**  Okay.  So, that's taken under submission

17  pending further proceedings.  What was that, number 4?

18      **MS. BLUNSCHI:**  Uh-huh.

19      **THE COURT:**  That's it for Meta.  Plaintiffs, oh.

20                  (Pause in proceedings.)

21      **THE COURT:**  Yes, okay.  Plaintiffs' motion in limine

22  number 1, docket number 483, unresolved disputes about

23  something.  I didn't understand this.  What are you worried

24  about?

25      **MR. GRABER:**  Well, Your Honor, we were worried about

1    the -- basically what would be the result of one of the MILs

2    that the Court has resolved, so I think this issue is largely

3    resolved.

4            **THE COURT:**  We are good?  Okay.

5            **MR. GRABER:**  We are good.

6            **THE COURT:**  Okay.  That's terminated as moot.

7        Plaintiffs' motion in limine number 2 docket 484 with

8    respect to unavailable witnesses.  They are either live or they

9    are not.  It is not a combo, okay.

10           **MR. GRABER:**  Understood, Your Honor.

11           **THE COURT:**  Yeah.  So, they are either live or they

12   are not.  You don't get to stick people with games.  If they

13   are going to testify live for one side, they are going to

14   testify for both sides.

15           **MR. GRABER:**  Okay.

16           **THE COURT:**  If they are going to be by video for one

17   side, they are going to be by video for both sides.

18           **MR. CLUBOK:**  Your Honor, if I may briefly, the issue

19   on that is that there are three -- there are several Meta

20   witnesses -- some who are current employees, some who are

21   former employees -- that Plaintiffs want to call in their case

22   in chief.

23        And what we said at the outset was -- and some of them

24   live outside the jurisdiction.  One lives in England.  One

25   lives in Spain.  One lives in Utah.  One lives here, works at a

1    different company, has told us he is going to be out of the

2    jurisdiction for much of the trial due to work that we don't

3    control.

4    So, with all of these initially what we said to

5    Plaintiffs -- as we did in the last trial -- hey, we will work

6    with you.  Give us a general sense of when you want them,

7    whether you really want them the first week, the second week.

8    We will make every effort to get them here the day you want

9    them.  If we can't -- and particularly we don't control it --

10   and they have some issue whereas maybe they can come the second

11   week, not the first week, we will let you -- it doesn't matter

12   if you've had to rest your -- we won't make you rest your case.

13   We will let you keep your case open.  We might have to switch

14   it up to accommodate their schedules.  We will do the same for

15   all of your experts or all of your witnesses.

16   And that is what we had understood was going to happen

17   based on conversations we had.  It's since then -- since we

18   said, okay, we will work with you on this, we have literally

19   had total refusal to tell us any of that; to give us any sense

20   of roughly when they would like the witnesses to accommodate

21   specific very serious scheduling difficulties where we say,

22   hey, gee, this witness is just not available these three days

23   but he or she will be available the other five.  Just tell us

24   if that's okay.

25   **THE COURT:**  Just work it out.  We are not going to

1    have -- no one is going to get an unfair advantage by having a

2    witness be available when they want it and not available when

3    the other side wants it.

4        **MR. CLUBOK:**  And that's the unfair advantage the

5    Plaintiffs are trying to get with this motion because if we

6    can't make someone to come here -- because they live out of the

7    jurisdiction -- until the following week, they want to say,

8    haha, if you don't give them to us the exact minute we want --

9    and we won't tell you in advance until two days before -- then

10   you are out of luck and now it will be deposition.  I think all

11   of this should be worked out.  I agree.

12       **THE COURT:**  You do it.  That's the rule.  I'm not

13   having mixed talking heads.  If they are going to testify in

14   your case live, Meta, they are going to testify live in the

15   Plaintiffs' case and vice versa.  That is the rule.  You do the

16   rest.  That is the rule.  If you can't make it happen, the rule

17   will be applied.  That's just the way it's going to be.

18       **MR. CLUBOK:**  Even if it is an out-of-state witness

19   that we are helping facilitate to come in?

20       **THE COURT:**  Even if they are coming from the new

21   colony on Mars, it doesn't matter to me.  You get it worked

22   out, okay.  Now, let's move on.  Plaintiffs' motion in limine

23   number 3, docket number 485, exclude witnesses, late disclosed

24   witnesses.  You know, it is just a general rule.  If you didn't

25   produce it on time, it's out.  But you got to just do it during

 1   the -- I can't tell in advance.  I mean --

 2           **MR. GRABER:**  Well --

 3           **THE COURT:**  -- it's proved in principle.  You have got

 4   to show me when you get there.  All right.  We didn't get this

 5   during discovery or whatever, whatever you want to say.

 6           **MR. GRABER:**  Okay.  Yeah, they purport to have, you

 7   know, ten absent class members who they -- one of whom they

 8   improperly contacted because they are now represented by class

 9   counsel -- they are purporting to put them on their witness

10   list and say they are planning on calling these people.

11           **THE COURT:**  You know, people end up calling 10 percent

12   of the things they put on documents and witness lists.  We will

13   just see how it goes and you can object.  But, I mean, as a

14   matter of principle, yes, if you didn't produce it on time, you

15   can't use it; but I can't tell in advance.

16      Plaintiffs' -- oh, okay, Plaintiffs' motion in limine

17   number 4, docket number 486, post October 2021 events.  What is

18   it you are worried about?

19           **MR. GRABER:**  Well, Your Honor, if they are going to

20   march in here and start offering all kinds of new testimony

21   about things that occurred after the class period that were not

22   subject to discovery or offering up financial analysis or --

23           **THE COURT:**  Just object.  I can't -- I don't -- look,

24   I mean, I guess that's the date the class period ends,

25   October 27th, 2020?

```
 1              MR. GRABER:  Correct, Your Honor.

 2              THE COURT:  Well, I mean, typically you wouldn't go

 3     past that but maybe -- who knows.

 4              MR. GRABER:  Okay.  Thank you, Your Honor.

 5              THE COURT:  Yeah, let's see.  That's it; right?

 6              MR. GRABER:  Yes, I think so, Your Honor.

 7              THE COURT:  Okay.  Anything else I can help you with?

 8              MR. GRABER:  Nothing further, Your Honor.

 9              THE COURT:  Defendant?

10          MR. CLUBOK:  Well, Your Honor --

11              THE COURT:  Oh, I have a question, sorry.  Let me just

12     interrupt.  April, April is the last mediation date?  That's a

13     long time ago.

14              MR. GRABER:  We had a mediation two days ago,

15     Your Honor.

16              THE COURT:  Oh, okay, so this is then -- events have

17     overtaken the filings; is that right?

18          MR. CLUBOK:  Yes, we had a mediation just a couple of

19     days ago.

20              THE COURT:  Okay.  I take it, it didn't go well.

21          MR. CLUBOK:  We are not really permitted to say

22     anything about it.  It is still open and ongoing, but we are

23     not permitted to --

24              THE COURT:  Of course you are not permitted to say

25     anything about it, okay.  You are all set, Plaintiffs?
```

```
 1              MR. GRABER:  Yes.

 2              THE COURT:  Also, tech, make sure you come in and

 3    visit with Ms. Clark.  Set a tech date.  Get everything set up.

 4    I'm assuming there won't be any exotic need for translators or

 5    anything else like that?

 6              MR. CLUBOK:  I don't think so, not in this case.

 7    Your Honor --

 8              THE COURT:  Yes.

 9              MR. CLUBOK:  Dr. Allenby, there is still an

10    outstanding Daubert motion.

11              THE COURT:  Oh, yes -- wait, sorry.  I'm saying yes to

12    something else.  Go ahead, yes.  Sheryl Sandberg I wanted to

13    cover that too but go ahead.

14              MR. CLUBOK:  With Dr. Allenby, there is still an

15    outstanding Daubert motion.  We had proposed various ways to

16    address it.  This was invited, I believe, to be renewed at the

17    summary judgment stage -- I'm sorry at the prior -- post class

18    cert just on the merits.

19         And Dr. Allenby, his opinion, first of all, he concludes

20    that there was no difference between advertisers' purchasing

21    decision based on people versus --

22              THE COURT:  What are you saying?  Are you saying there

23    is a 702 motion that I need to decide?

24              MR. CLUBOK:  It is still pending, yes, Your Honor.

25              THE COURT:  Okay.  While you are all here, what is
```

1  this thing with Sheryl Sandberg?

2       **MR. GRABER:**  Your Honor, we subpoenaed Ms. Sandberg.

3  We have been in touch with her counsel, and we have worked out

4  a briefing schedule for a motion to quash.  They have moved to

5  quash it and we will be briefing it.

6       **THE COURT:**  It's not on here right now?

7       **MR. GRABER:**  No.  The parties have proposed a hearing

8  date of October 2nd.

9       **THE COURT:**  She has her own lawyer and is not being

10 represented by Meta?

11      **MR. GRABER:**  Correct.  She has her own lawyer.

12      **THE COURT:**  What is it that you want to do with her?

13      **MR. GRABER:**  What's that?

14      **THE COURT:**  What do you want to do with her?

15      **MR. GRABER:**  Well, we would like to question her.  She

16 participated in key meetings, and she was on key documents.

17 And the witnesses when they were deposed, they couldn't recall

18 what they had talked about with her.

19      **THE COURT:**  Is this her business area, advertising?

20      **MR. GRABER:**  It was her business area.  She was the --

21 she was in the center of it.

22      **THE COURT:**  Is this her business area?

23      **MR. CLUBOK:**  Your Honor, so, first of all, she has her

24 own counsel.  She is a former employee.  I will say I believe,

25 Your Honor addressed this during discovery, and Your Honor

1    denied their request to depose her.

2              **THE COURT:** I did that?

3              **MR. CLUBOK:** That's my understanding. Ms. Blunschi is

4    nodding. And so, my understanding is that there was some --

5    you know, the normal apex doctrine proceedings, and Your Honor

6    rejected an effort to have a deposition at the time. She

7    certainly wasn't deposed. She is now a former employee. And,

8    you know, I know her counsel filed the motion and are -- I

9    trust want to be heard on it or have Your Honor apply the same

10   rulings, the spirit of them at least.

11             **THE COURT:** Did I deny your request to depose her?

12             **MR. GRABER:** Yes, many, many years ago earlier in the

13   case; but we are now at a different stage.

14             **THE COURT:** Why would that change now?

15             **MR. GRABER:** Well, two reasons primarily, Your Honor.

16   Number one is that we have taken the depositions of the fact

17   witnesses, and we asked them what occurred during those

18   meetings; and they said they couldn't recall.

19        And, number two, at that time she was a current employee

20   and clearly subject to an apex doctrine; and now she is a

21   former employee and she doesn't have those same

22   responsibilities.

23             **THE COURT:** Well, you should have told me that earlier

24   and asked to take her deposition at that point.

25             **MR. GRABER:** Well, that was -- Your Honor, that was

 1   like seven years ago when we were --

 2         THE COURT:  I know but after you heard from the other

 3   employees, you should have come back and said, you know, we

 4   would like to have you take another look at this because here

 5   is our situation.  I mean, you are going to put her on the

 6   stand not knowing what she is going to say?  Are you going to

 7   do a full cross of a witness?

 8         MR. GRABER:  Well, it's -- I understand where the

 9   Court is coming from, but we -- we are willing to take that

10   risk.

11         THE COURT:  Well, I mean, who is her lawyer; do you

12   know?

13         MR. GRABER:  I believe it is Akin Gump, Parvin Moyne

14   represents --

15         THE COURT:  Why don't you come in on Monday, this

16   coming Monday.

17         MR. GRABER:  Sorry?

18         THE COURT:  Just come in on this coming Monday,

19   whatever this Monday is.  What is this Monday, Lisa?

20         THE CLERK:  Twenty-second.

21         THE COURT:  The 22nd, yeah, come in on the 22nd.  How

22   about that?  Just tell your colleague at -- who is representing

23   her, Ms. Sandberg, to just be here on Monday at 10:30.

24         MR. GRABER:  Okay.

25         THE COURT:  I'm skeptical.  I will just tell you that

1    now.

2            **MR. GRABER:**  Sorry?

3            **THE COURT:**  I'm skeptical about this.

4            **MR. GRABER:**  I understand, Your Honor.

5            **THE COURT:**  If you don't want to do it, just reach a

6    decision and tell me.  I have got a long criminal calendar

7    Monday but I will fit you in.

8            **MR. GRABER:**  If we -- certainly if we reach a decision

9    or reach some agreement that moots out the motion, we will

10   immediately notify the Court.

11           **THE COURT:**  Okay.

12           **MR. GRABER:**  Your Honor, there is a briefing schedule

13   that has been agreed to, though.

14           **THE COURT:**  Let's just do this.  This is not something

15   that requires to be papered.

16           **MR. CLUBOK:**  Your Honor?

17           **THE COURT:**  Yes.

18           **MR. CLUBOK:**  So, perhaps because of the resistance by

19   Ms. Sandberg and her counsel but the Plaintiffs are now also

20   trying to pursue adding Facebook's current chief operating

21   officer, Mr. Javier Olivan.  My understanding is they purported

22   to or tried to serve him yesterday.  We don't think that

23   service was effective.

24       But setting aside the service issue, he is the current

25   CEO.  He was never deposed.  He is now the COO, and all of the

```
 1    apex doctrine principles would apply.  I don't think he is

 2    on -- there is any individual document that he --

 3         THE COURT:  Let me just jump in.  I was going not to

 4    say anything, but I really do not like this apex doctrine,

 5    quote-unquote.  It gives people the misimpression that somehow

 6    executives are treated in a way that is different from other

 7    people, which is not true.

 8         The touchstone is the same, whether it is the CEO or

 9    someone who just got hired last week as an intern.  If they

10    have relevant knowledge that would be useful for the jury to

11    hear and also fair as a matter of due process to call them in,

12    that's the only thing.  Okay.

13         So, I'm not going to -- I don't know anything about this

14    one.  You two talk about it.  If you can't work out this other

15    person, you can let me know.  I can't do it on the fly.

16         MR. CLUBOK:  Thank you, Your Honor.  I hate to bring

17    this up again but for the other witnesses -- particularly the

18    ones who don't work for us that have scheduling issues where

19    they have said, We will come in the next week but not this week

20    or whatever, we will go back to them.  We will tell them.  They

21    may still want us to move to modify the trial subpoena just so

22    they can show up just once -- and the Plaintiffs can still call

23    them first -- but just around their legitimate personal

24    professional issues.  That's -- it's something that I agree we

25    should be able to work out.  I'm actually shocked we haven't
```

1   been able to work out.

2       **THE COURT:**  Let me just jump in.  What are you asking

3   me?  You are giving me a big speech.  What do you want me to

4   do?  Just tell me, I would like you to do this.  I don't

5   understand what you are talking about.

6       **MR. CLUBOK:**  We may have to, after talking to them,

7   have to at least have to ask for relief to see if Your Honor --

8       **THE COURT:**  Just wait.  You know what, a million

9   things can happen between now and trial.  I can't -- there is

10  no need to talk about it.  If something comes up, you can ask.

11  I'm expecting you two to make this thing work.  All right.  I

12  mean, they are the witnesses.  They are out of town.  They live

13  wherever.  Just make it happen.  Now, don't make it happen in

14  such a way that we lose trial days.  That's the most important

15  thing.  Don't let that happen.

16      If it turns out -- I'm not even going to say it.  I'm

17  going to say it, and I'm not going to let you say it back to

18  me.  If it turns out that everybody can't be available until

19  the week of the 21st, okay, let me know.  All right.  Then we

20  will just start a week later.  Okay.  But you can't say that to

21  me.  You can just tell me.  I will decide that.  But that's the

22  thing, then make it happen.  But just, we have got to get this

23  thing done.  This case is too old.  It has been around too

24  long.  It's 2021.  Judgment day is coming, one way or the

25  other.  So, we just got to get this done.  I'm looking at --

```
 1   you two need to get this done.  Okay?

 2          MR. CLUBOK:  We wholeheartedly agree.

 3          THE COURT:  All right.  Thank you.  I will see you in

 4   a bit.

 5          MR. CLUBOK:  I don't want to push my luck, Your Honor,

 6   just to remind -- there are two other outstanding motions.  I

 7   know there is a hearing set for the arbitration -- motion to

 8   compel arbitration, I believe, for next week.  And then --

 9          THE COURT:  Oh, I might do that on the papers.  There

10   won't be a hearing on that.  Thank you for reminding me.  That

11   will be done under Civil Local Rule 701b submitted on the

12   papers.

13          MR. CLUBOK:  Okay, thank you, Your Honor.  And then as

14   an order of operations, I guess, also after that, Your Honor,

15   there's a summary judgment motion.

16          THE COURT:  Yes.

17          MR. CLUBOK:  We would like the --

18          THE COURT:  Focus on trial prep.

19          MR. CLUBOK:  We will.

20          THE COURT:  I will get those out.

21          MR. CLUBOK:  That's what we will do.  Thank you very

22   much.

23          THE COURT:  All right.  Thanks a lot.

24              (Proceedings adjourned at 2:25 p.m.)

25
```

1
2
3                    **CERTIFICATE OF REPORTER**
4           I certify that the foregoing is a correct transcript
5     from the record of proceedings in the above-entitled matter.
6
7     DATE:    September 21, 2025
8
9
10
11     _____
12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
             United States District Court - Official Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25